IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
-------------------------------------------------:
Beth M. Norden, Ph.D.,                           :
112 Greenhill Road                               :
Greenbelt, MD  20770                             :
          Plaintiff,                             :       Civil Action No:
                                                 :
v.                                               :       Complaint for Disability
                                                 :       Discrimination under Section
                                                 :       501 of the Rehabilitation Act
Lawrence M. Small,                               :       29 U.S.C. 791 et.seq.
Secretary of the Smithsonian Institution,        :
P.O. Box 37012                                   :
Washington, DC 20001                             :
          Defendant,                             :
                                                 :
-------------------------------------------------:
```

## COMPLAINT AND DEMAND FOR JURY TRIAL

### I.  JURISDICTION

1.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. sec. 1331 for claims arising under federal law, i.e., Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. 791. et. seq.

2.  There is an actual controversy between Plaintiff and Defendant.

3.  The EEOC issued a "right to sue" letter to Plaintiff on March 22, 2005.  A copy of this "right to sue" letter is attached to this complaint.

4.  Plaintiff filed this complaint within 90 days after Plaintiff received her "right to sue" letter from the EEOC.

5.  Plaintiff has two other formal complaints currently before either the Smithsonian EEO or the Equal Employment Opportunity Commission.

6.  The Court does not have jurisdiction of these two additional formal complaints, and the allegations and damages flowing there from are not a part of the instant complaint.

7.  Depending upon the resolution of the two formal complaints identified above, this complaint may be amended to include additional allegations, causes of action, and damages.

## II.  FACTS

**(Introduction to Dr. Beth Norden, Ph.D, and
her contact with dengue hemorrhagic fever. "DHF")**

8.  Plaintiff hereby re-alleges and incorporates by reference all paragraphs above, par.'s 1-7 herein.

9.  Complainant, Dr. Norden, is a dedicated scientist who first began working at the Smithsonian in 1984 on a pre-doctoral fellowship.

10.  She received her doctorate in entomology from the University of Maryland in 1985 and continued working as an entomologist at the Smithsonian's Museum of Natural History.

11.  With the exception of one three-year sabbatical, Dr. Norden spent her entire professional career performing research support for the entomology department at the Smithsonian Museum of Natural History and has always taken pride in both her work and her association with the internationally prestigious museum.

12.  The majority of Dr. Norden's work was conducted in the field of aculeate Hymenoptera - stinging insects such as bees, ants, and wasps.

13.  Although she was never promoted beyond the level of GS11 research support staff, the work Dr. Norden performed is consistent with a higher government position.  A GS12 scientist, for example, is described as one who carries out "difficult and extensive

research in the development of improved methods and techniques, and sometimes they publish technical papers and articles resulting from these studies (though such publication is not a requirement for evaluation of the position at this grade level)."

14.  Dr. Norden carried out difficult and extensive research in the development of improved methods and techniques and in other, substantive areas of Hymenoptera.

15.  Dr. Norden published over 50 professional papers in her field, was awarded the highly competitive Fulbright Fellowship to perform research in Sri Lanka, and regularly traveled internationally with her colleagues on research expeditions.

16.  Although she was kept in a research support staff position, Dr. Norden's work at the Smithsonian was appreciated.  She routinely received outstanding performance evaluations and cash awards for exemplary work.

17.  The vast majority of her work required little supervision, and she worked very long hours, often alone, on weekends and in the evenings at the Smithsonian.

18.  In August of 2000, Dr. Norden went with a multidisciplinary team comprised of Smithsonian scientists and others to Brazil, primarily to study fungus-growing ants.  The team was led by Dr. Norden's supervisor, Dr. Ted Schultz, and Dr. Norden's participation in the trip was a regular part of her employment with the Smithsonian.

19.  On her return, Dr. Norden became extremely ill and was taken to Georgetown University Hospital where she was diagnosed with a hemorrhagic fever, later described as dengue hemorrhagic fever.

20.  During September and October of 2000, Dr. Norden spent approximately 20 days in the hospital, much of the time literally hovering between life and death, with massive internal bleeding from leaking capillaries that affected all of her organ systems.

Dr. Norden's dengue hemorrhagic fever was determined to have been acquired on her research trip in Brazil through a mosquito bite that carried the virus.

21.   Many people who suffer from the hemorrhagic form of dengue fever do not survive, particularly if they acquire the disease as adults.  Those who do are often, like Dr. Norden, globally affected by the disease and suffer from neurological damage, including brain trauma, a weakened immune system, a lost ability to thermo regulate, a bleeding disorder, and a heightened sensitivity to various chemicals.  The internal bleeding is so extensive that one of the doctors involved with Dr. Norden's care characterized her disease as "a cousin to Ebola."

22.   After her stay in the hospital, Dr. Norden went home in an extremely weakened condition, with body-wide under skin hemorrhages, to recuperate.

23.   She spent months in intense pain and encephalitic confusion, unable even to read a newspaper competently.  Her progress was monitored by a team of medical experts as she slowly recovered her intellectual capability while she continued to suffer from frequent, prolonged migraine headaches, an inability to withstand heat and other physical effects from her bleeding disorder.

24.   Dr. Norden will carry two different serotypes of the dengue antibodies for the rest of her life.  These antibodies make her capillaries vulnerable to leaking, and it is the leaking capillaries that can cause migraine headaches, cognitive impairment severe enough to render her unable to care for herself in any of her daily life functions, a severe loss of energy, hallucinations, and other impairments and life threatening conditions.  Exposure to heat, excessive stress, and certain chemicals are among the triggers for capillary bleeds.

25.   The Smithsonian's Office of General Counsel has determined that there is

sufficient evidence to find that Dr. Norden is a person with a disability within the meaning of the OHR Rehabilitation Act.

26.  As long as Dr. Norden succeeds at the vital task of limiting her capillary bleeds, she is now able to function competently and to perform the tasks her former position required.

27.  Recovery was gradual and painstaking, however.  Tests performed in April and May of 2001 revealed, among other things, that Dr. Norden suffered from impaired performance on measures of complex attention and information processing speed, that her cognitive function was negatively impacted by time pressures, and that she suffered from a mild encoding deficit.

28.  At this time, Dr. Norden estimated that she had recovered 60% of her premorbid level of cognitive function and 50% of her premorbid level of general energy. The neuropsychologist found that test results were consistent with Dr. Norden's self-report. When tested again in September of 2001, Dr. Norden's cognitive levels appeared somewhat improved, and it was noted that there was no evidence of clinical psychopathology.

29.  In January of 2002, Dr. Norden's tests showed significant improved performance, though her performance on measures of information processing speed remained below expectation.

30.  The reports documenting her cognitive impairment were sent to the Smithsonian as part of the regular medical reporting made to Smithsonian physician Dr. Lawford, as were more recent reports documenting a greater recovery and the ability to return to her position at the Smithsonian.

31.  Fluctuating vascular factors significantly affected her cognitive abilities and her overall health, and it was anticipated that her continued recovery from dengue hemorrhagic fever would result in continued cognitive improvement.

32.  Her migraine headaches appeared to be caused by capillary leaks in her brain, and her inability to thermo regulate resulted in leaking capillaries that caused large bruises.

33.  Dr. Norden's cognitive abilities and overall energy level and physical health were, and remain, closely tied to her success in limiting capillary bleeds.

34.  However, despite the fact that dengue hemorrhagic fever is known to cause depression, at no point in any of her testing was there any finding of depression or any other sort of mood disorder other than appropriate anxiety related to the condition of her health.

35.  Throughout her recovery, Dr. Norden was eager to begin working again.

36.  In December of 2000, Dr. Norden asked Dr. Schultz if she could do some comparatively simple work from home.

37.  Dr. Schultz denied her request.

38.  The Hymenoptera Unit Collection Manager, however, did send her some collections tasks at home which she began performing successfully in January of 2001.

39.  In March of 2001, she returned to work at the Smithsonian on light duty hours of 12 hours per week.

40.  While working at the Smithsonian, however, she suffered from serious problems with fatigue, migraine headaches, and capillary bleeds.

41.  Dr. Norden's doctors and Smithsonian officials both agreed that she should continue on disability, and her first return to work ended.

42.  In retrospect, Dr. Norden believes that her exposure to naphthalene at the Smithsonian exacerbated her health problems, but naphthalene was not identified as a health problem at the time, and no naphthalene exposure accommodations were requested.

43.  When Dr. Norden left on disability, she again asked Dr. Schultz if she could do some work from home.

44.  Dr. Schultz again denied her request, although he had hired contractor T. Surran to work at home pinning ants.

### (Dr. Norden's 2nd return to work)

45.  Although Dr. Norden began requesting a second return to work, with her doctors' approval, on February 6, 2002, Dr. Norden did not return to work for the second time until April 3, 2002.

46.  Both her neurologist and Smithsonian physician Dr. Lawford had advised the Smithsonian that Dr. Norden be given "flex time" as an accommodation so that Dr. Norden could go to her many doctor's and laboratory blood work appointments, and take time off when she suffered from a migraine or when the heat might cause her to begin bleeding.

47.  Because Dr. Norden suffered from a serious condition that is rare in this part of the world, she was not able to change doctors easily and she was dependent upon her specialists' schedules at Georgetown University Hospital.

48.  Dr. Norden was given the accommodation of "light duty hours" of 20 hours per week to begin with, with the understanding that she would work towards full time employment again.

49.  Although her return to work document had been devised over a period of four months and had included numerous departmental meetings and phone calls with Dr.

Norden's doctors, the document did not include any provision for flex time to accommodate Dr. Norden's handicapping condition.

50.  The return to work document was drafted primarily by Smithsonian attorney, Marylin Slomba, rather than by a Smithsonian doctor or supervisor, and it largely consisted of a schedule that excluded even the normal flexibility in work hours that Dr. Norden had previously enjoyed prior to contracting dengue.

51.  Dr. Norden was required to work a tightly defined schedule of days and hours because Dr. Schultz and attorney Slomba regarded her as no longer capable of working in the unsupervised manner in which she had worked prior to her illness.

52.  In dramatic contrast to her many previous years at the Smithsonian, Dr. Norden was not allowed to work from home or during the weekends or evenings, and she had little opportunity to make up time lost to illness or her frequent doctor's appointments.

53.  The prohibition against her working on evenings or weekends was enforced despite the fact that the Smithsonian's own physician, Dr. Lawford, had been emphatic in advising that there was no medical basis for it.

54.  Dr. Norden soon found out the extent of her new schedule's inflexibility when she decided to move a work day from Monday, April 22 to Tuesday, April 23 because a large protest in Washington had been planned for Monday, April 22.

55.  The police were advising people to avoid coming into Washington if possible during the demonstration, and Dr. Norden was very fearful that she would be jostled by the crowd or hit on the head.  Since Dr. Norden has a bleeding disorder, and her work would be unaffected by a change from Monday to Tuesday, she believed that coming to work on a day when she would not be subjected to any physical roughness or injury would be a

reasonable accommodation for her disability.

56.  She tried to call Dr. Schultz on Sunday, April 21, but he did not answer his phone, and his answering machine was full.  Dr. Norden then emailed Dr. Schultz and another supervisor on April 21 that she was moving her work day.

57.  On her return, Dr. Norden received several emails from Dr. Schultz berating her for having changed her schedule, stating that doing so "violates the rather clear terms we all agreed to under the guidance of OHR's Marilyn Slomba."

58.  The hostility of these emails was consistent with the overall change in Dr. Schultz's demeanor towards Dr. Norden.  Although the two scientists had worked together for a number of years and had previously enjoyed a friendly relationship, Dr. Schultz was noticeably cold and dismissive towards Dr. Norden throughout the entire tenor of her second return to work.

59.  Early in her April 2002 return to work, Dr. Norden had been advised by three of her doctors that she was being harmed by her workplace exposure to naphthalene, and she had spoken to Dr. Schultz several times about her sensitivity to naphthalene and her resulting need for accommodations.

60.  Naphthalene is a chemical widely used in the insect collection the nonpublic section of the museum.  It is the active ingredient in moth balls, and it is used to protect the insect specimens from being eaten by live insects.

61.  Because naphthalene is believed to be a carcinogen which may cause bleeding and other blood vessel problems, it has not been used by museums in England for approximately twenty years.

62.  Naphthalene use is not considered good practice at the Smithsonian either, and

its continued use is a violation of the Smithsonian's own policy.

63.  Since naphthalene appeared to increase capillary leaks for Dr. Norden, it was, of course, a significant hazard to her overall cognitive functioning and general physical health.

64.  Dr. Norden provided Dr. Schultz with a respirator request form, and on April 26, 2002, Dr. Schultz signed the request form.

65.  On May 14, Doctor Lawford sent an email stating that he had speeded the request process because of Dr. Norden's increasing sensitivity.

66.  On May 15, Dr. Norden was fitted and trained for a respirator.

67.  Having worked for nearly six weeks at this point without a respirator or any other accommodation for her naphthalene sensitivity, Dr. Norden was suffering from frequent nose bleeds and intense migraine headaches.  She knew that the capillary bleeds indicated by both these conditions were highly detrimental to her cognitive and physical well being.

68.  However, Dr. Norden did not stop working during any of these bleeding spells because she was afraid to modify her working hours again without prior approval.  She continued to work hard and seek accommodations in the hopes that she would be able to increase her hours and end her temporary light duty accommodation.

69.  Dr. Norden understood that a large agency such as the Smithsonian might move at a slow pace in making accommodations, but she believed that the promised accommodations to her naphthalene sensitivity would be made, in part because she had seen several of her coworkers receive accommodations for naphthalene.  These coworkers included Curator Robert Robbins whose office was moved to another department so that he

wouldn't be exposed to ambient naphthalene fumes;  Technician Elizabeth Klafter who worked from home during her pregnancy because her doctor feared that the naphthalene might cause her a second miscarriage;  Technician John Nay who was provided a respirator for use while removing naphthalene from some collections;  and USDA Technician Lucrecia Rodriguez stationed at the Smithsonian who was provided a respirator to prevent migraine headaches that might be triggered by naphthalene.

70.  Dr. Norden believed that she too would eventually receive the promised naphthalene accommodations, and this belief was reinforced by the fact that Dr. Schultz wrote in Dr. Norden's July 23 performance evaluation that a respirator and air filter were "in progress."

71.  This was a very timely reassurance since just the day before, on July 22, Dr. Norden had met with Dr. Schultz's supervisor, Dr. Mathis, to discuss naphthalene accommodations.  Although Dr. Mathis advised that Dr. Norden continue to seek Dr. Lawford's opinion, Dr. Mathis further advised that at Dr. Norden's age she was probably going through menopause and that, as a result, she was probably more emotional on the subject of naphthalene than she otherwise would be.  Dr. Mathis also told her that she could do many things and asked why she needed to work in the Smithsonian.  Dr. Mathis then discussed his wife's menopause and told Dr. Norden that his wife had gone through a prolonged period of extreme emotional sensitivity as a result of her changing hormones. Dr. Norden was not going through menopause, but saw no reason to discuss her continued menstruation with Dr. Mathis when she had a well documented need to reduce her exposure to naphthalene.

72.  Dr. Norden met with collections manager David Furth on July 31 and reported

to him that the naphthalene smell was unusually strong.  Dr. Furth responded that an employee had recharged the collection cabinet with naphthalene, contrary to Smithsonian policy.  Unfortunately, Dr. Furth also commented that he had "only known three people with naphthalene sensitivity" and that Dr. Norden "didn't look like one of them."  The employee who had recharged the cabinets apologized to Dr. Norden for having done so, and explained that she had acted in accordance with Dr. Schultz's wishes.

73.  Dr. Norden also remained in close contact with Smithsonian physician Dr. Lawford and Smithsonian Industrial Hygienist Kathy Makos who both appeared to be working diligently to help Dr. Norden get the needed accommodations.  On September 2, 2002, Dr. Lawford emailed Dr. Schultz with Dr. Norden's medical updates and suggested that the issue of whether Dr. Norden could work full time be revisited in December.  This memo further supported Dr. Norden's belief that she was working towards full time employment again at the Smithsonian.

74.  At the end of September, however, Dr. Schultz left the country to work in Guyana until October 24.  He left Dr. Norden a memo instructing her to bar code, label, and database the ant specimens from South America and curate the ant holotype collection.  His memo stated, "If you have problems with naphthalene, I strongly encourage you to work with specimens in the ventilated room on the fourth floor."

75.  This assignment was discouraging for a number of reasons.  Like the rest of the work Dr. Norden had received since her April 3 return, much of it was significantly beneath her intellectual capacities and different from the research support which had been her primary job function for nearly two decades.  It seemed that she was regarded as too cognitively impaired by her illness to be capable of doing the research and writing which

she had performed for so long.

76.  In addition, Dr. Norden was dismayed because the ant collection cabinets, especially the holotype collection, had very high concentrations of naphthalene, so that she would be required to breathe heavy fumes every time she worked with a tray.  By altering her job from one which was almost entirely research support to one which involved increased direct contact with specimens, Dr. Schultz had substantially increased Dr. Norden's exposure to naphthalene.  Although she had been advised to work on the fourth floor, she could not do so because the necessary specialized equipment could not be moved from the fifth floor.

77.  Finally, Dr. Norden was concerned because the nature of the assignment as well as the words "If you have problems with naphthalene. . ." suggested that her naphthalene sensitivity was not being acknowledged as a serious ongoing concern.  Dr. Norden continued to communicate closely with Makos and Lawford, and she began to seek other forms of accommodation.

78.  Dr. Norden sought permission to work in the Smithsonian Insect Zoo where there would be no naphthalene fumes, but this request was denied despite the fact that a position was open at the time.

79. Dr. Norden also sought to be the subject of a "reimbursable loan" to the USDA where she could conduct insect research in an atmosphere free of naphthalene until suitable accommodations at the Smithsonian could be arranged.  On October 15, 2002, this "loan" was approved by the Smithsonian, and Dr. Norden awaited approval by the USDA.

80. Dr. Norden was greatly encouraged by the "loan" approval in addition to the fact that she knew that Kathy Makos and Dr. Lawford were advocating vigorously on her

behalf for immediate accommodations.  On October 17, Dr. Lawford and Kathy Makos

sent another memo regarding Dr. Norden's sensitivity to naphthalene and again urging

accommodations for her.

81. What Dr. Norden did not know at the time was that Dr. Schultz and

Smithsonian attorney Slomba responded to this memo in late October 2002 by holding a

meeting with others at the Smithsonian to discuss accommodations for Dr. Norden.

Accommodations such as an office with air vents in it, a personal air purifier, a mask, and a

respirator were initially discussed.  Then, in an apparent reference to the earlier agreement

that the doctors would "revisit" Dr. Norden's need for light duty in early December, Dr.

Schultz stated, "Well, if her doctors can revisit it on December 31, we can revisit it too."

Dr. Schultz then asked Ms. Slomba if he was required to continue to offer light duty, and

Ms. Slomba replied "not if it is insufficiently productive toward the department goals."

Although there were medical personnel in the room, only the attorney was consulted on the

issue of continuing Dr. Norden's light duty hours.

82. On November 13, 2002, Dr. Schultz informed Dr. Norden that he would approve an air

filter for her in addition to a respirator.  During this discussion, Dr. Norden told Dr. Schultz

that once she had the air filter and respirator, she would be able to work forty hours per

week.

83.

### (Dr. Norden's being placed on forced disability status)

83.  On November 18, 2002, two other Smithsonian supervisors, Dr. Miller and Dr.

Mathis, handed Dr. Norden a memo stating that she would be terminated from light duty on

November 30, 2002.

84.  Dr. Norden was not fired, and she remained on the Smithsonian rolls. Dr. Norden  was not told that she could not receive other accommodations, but no mention was made as to what Dr. Norden would be required to do to prove her ability to return full time. Neither Dr. Miller, Dr. Mathis, nor Dr. Schultz was willing to discuss the memo with her.

85.  The memo, however, stated that Dr. Norden was being put back on disability because she had not been capable of performing the required twenty hours per week of work.  The memo was misleading as to the number of hours Dr. Norden had actually worked, and, of course, it made no mention of the fact that Dr. Norden missed the hours because she was unable to make up the time taken by her numerous doctors' appointments.

86.  Dr. Norden remained on the Smithsonian employee rolls and was given no reason for being returned to disability status other than the fact that she was currently unable to work enough hours.

87.  Dr. Norden met with counselors at the Smithsonian Employee Assistance Program, but the counselors were unable to give her any clarity as to what she needed to do to return to work.

88.  Dr. Norden also sent email memos to numerous people within the Smithsonian asking, among other things, "How do I know when it might be safe to return if it is the naphthalene which is activating my current blood problems?"  and "Will anything dealing with my exposure be different on return, or is my return based upon no longer being sensitive to naphthalene?"

89.  On December 3, 2002, Dr. Lawford responded that he expected her doctors to take the lead in advising as to the extent of her naphthalene sensitivity.

90.  Also on December 3, 2002, Smithsonian Program Manager of Cultural

Diversity/Affirmative Action Carol Gover sent Dr. Norden an email informing her that

"The goal is for you to successfully return to your job full time."

91.  On January 7, 2003, the Office of Human Resources responded that Dr.

Norden's return would depend on Dr. Norden's doctors.  As in the past, the Smithsonian

seemed to be saying that Dr. Norden could return to work when she had recovered enough

to be able to do so.

92.  Dr. Norden continued to remain on the Smithsonian rolls, continued not to

receive accommodations, and continued to hope that she could recover enough for her

doctors to be able to advise the Smithsonian that she did not require light duty hours.

93.  Her status at the Smithsonian was so poorly defined that the request to "loan"

Dr. Norden to the USDA was never cancelled, and in December of 2002, the USDA

approved the loan.  Dr. Norden was not able to work at the USDA, however, because she

had been put on disability status by the Smithsonian.

94.  Of the many people Dr. Norden contacted (a list that includes Smithsonian

attorney Slomba, the Office of Human Resources, Employee Assistance, medical

personnel, supervisors in her department, Smithsonian Program Manager Carol Gover who

was with the Office of Equal Employment and Minority Affairs (OEEMA), and the

Smithsonian ombudsman) no one suggested that Dr. Norden seek help from the

Smithsonian OEEMA or that Dr. Norden file a complaint within 45 days of having her

light duty terminated.

95.  Dr. Norden was unaware of any requirement that she get counseling from

OEEMA within 45 days of being discriminated against.

96.  Dr. Norden saw no written signs or posters advising her of a 45 deadline to

contact an EEO officer, nor had she ever been given any training or information on the subject during her employment with the Smithsonian.

97.  Had Dr. Norden been aware of such a requirement, she still would not have made a complaint because she was still being told that she could return when her doctors advised that she was ready to do so and because a program manager from the Smithsonian OEEMA office had told her that the goal was for her to return to her job full time.

98.  As time progressed, however, Dr. Norden grew increasingly worried by her inability to get a clear statement as to what accommodations would be provided and what she needed to do in order to return to work.

99.  She contacted an attorney early in 2003 who contacted the Smithsonian OEEMA.  This attorney contacted the Smithsonian OEEMA during the period in which Dr. Norden was still an employee, had still not received accommodations, and had still not been given any guidance other than that her doctors would be expected to take the lead in deciding when she could return to work.

100.  During this period of legal and professional uncertainty, Dr. Norden experienced serious depression for the first time.

101.  In April, 2003, she began seeing a therapist, Dr. Oberg, who diagnosed her as suffering from post traumatic stress disorder and major depressive disorder, recurrent and severe but without psychotic features.

102.  Dr. Norden remains in treatment with Dr. Oberg, receiving one 90 minute session with him every week.  She has made considerable progress in the past two years, but still suffers from both the anxiety and depressive disorders.

103.  Dr. Oberg has determined that the Smithsonian's failure to accommodate Dr.

Norden are the direct cause of her severe depression and are significant contributing factors to her post traumatic stress disorder.

104.  In addition, Dr. Norden's treating physicians believe that Dr. Norden's prolonged and heavy exposure to naphthalene while at the Smithsonian may have irreversibly exacerbated her vulnerability to naphthalene and her tendency to suffer from intense migraines even without the presence of naphthalene.

105.  Dr. Norden endured substantial and prolonged physical suffering during her April 2002 - November 2002 period at the Smithsonian.

106.  Dr. Norden's resulting capillary bleeds caused blood to appear in her urine in substantially greater quantities during her second return to work than it ever had before or after this period.

107.  Dr. Norden currently receives federal worker's compensation benefits that partially, but not entirely, compensate her for her lost income.  She does not, however, receive any accrual to her pension, cash bonuses, or promotion potential, nor does she receive the much needed intellectual and emotional stimulus of continuing to engage in her career on a regular basis.

108.  She has been able to do some volunteer entomology work for the Department of Agriculture and through this work she has been able to make some ongoing contribution to her field by continuing her research and publishing the results.

109.  Since November of 2002, Dr. Norden has published five (5) substantial articles and one short note in respected scientific publications, and she is currently working on two more articles.  She has also three times performed research at her own expense at Archbold Biological Station in Florida where she was recently made a Research Affiliate.

Her volunteer experiences have consistently resulted in an increased sense of physical and psychological well being, and, with proper accommodations, she has long been capable of performing her old job full time.

110.  Although Dr. Norden has attempted to find employment in her highly specialized field, she has not been successful.

111.  She applied to teach biology at the Prince George's Community College, but there were no full time positions available and a part time position would preclude her from being able to accept any position elsewhere.

112.  She applied to work at the USDA as a support entomologist, but could not be considered by the USDA because initially she was still on the employment rolls at the Smithsonian.  Later, the USDA would not consider Dr. Norden because there was a hiring freeze.  Dr. Norden's resume remains on file with the USDA, however, and she continues to do volunteer work there.

113.  Dr. Norden also applied to work as a biologist/entomologist with the State of Maryland Department of Natural Resources, but could not be considered for that position because of a hiring freeze.  Her resume remains on file there as well.

114.  Dr. Norden is not able to find even volunteer work on a sufficient basis, nor does she have the economic security of knowing that she will always receive disability support.  Though she is unable to find employment in her field, she may one day be required to do some other form of work in order to support herself.

115.  Moreover, her treating therapist, Dr. Oberg, believes that her professional abilities and accomplishments are an intrinsic part of her identity and self esteem and that her psychological health would be enormously improved if she could regain a position in

her field with the accommodations necessary for her physical health.

116.  Dr. Norden currently struggles with severe depression, post traumatic stress disorder, frequent and severe migraines, flashbacks, loss of energy, diminished ability to concentrate and make decisions, and other crippling conditions.  Her distress and depression over her treatment by the Smithsonian invade even her sleep, causing her to have nightmares in which she is in the hospital trying to recover from dengue while her Smithsonian supervisors put poison in her IVs.  At other times, she dreams of vipers that attack her without warning.

117.  Her therapist considers such nightmares normal for someone with Dr. Norden's experiences who suffers from post traumatic distress disorder and a recurrent, severe major depressive disorder without psychotic features.

### III.    CAUSE OF ACTION: FAILURE TO ACCOMMODATE UNDER SECTION 501 OF THE REHABILITATION ACT, 29 U.S.C. SECTION 791

118. Plaintiff hereby re-alleges and incorporates by reference all paragraphs above, par.'s 1-117 herein.

119. Plaintiff has brought her complaint through the appropriate administrative procedures prior to filing this complaint.

120.  Plaintiff suffers from the sequelea of Dengue Hemorrhagic Fever ("DHF"), including the DHF antibodies.  This is a lifelong condition which causes her capillaries to be vulnerable to leakage.  Severe leaks cause, among other things, loss of energy, intense migraines, serious cognitive impairment, and hallucinations.  Because of this vulnerability, she is unable to endure naphthalene exposure and severe heat, and she requires regular monitoring and treatment by specialists.

121.  Plaintiff's vulnerable condition, if not properly managed, limits her in major life activities, including, but not limited to, thinking, concentrating, learning, standing, reading, and taking care of herself.

122.  Plaintiff is an individual with a "disability" within the meaning of the Section 501 of the Rehabilitation Act, 29 U.S.C section 791 et., seq., and statutes incorporated therein.

123.   Plaintiff, with the reasonable accommodations including but not limited to, the use of flex-time, a respirator, working at home, at night, on weekends, working in a naphthalene free environment on a different floor, can perform the essential functions of her job as a research support staff member for the entomology department at the Smithsonian Museum of Natural History.

124.  Plaintiff asked for reasonable accommodations, and Defendant refused to provide reasonable accommodations.

125.  Plaintiff has been a "qualified individual with a disability" since at least April of  2002.

## IV.  PRAYER FOR RELIEF

126. Plaintiff hereby re-alleges and incorporates by reference all paragraphs above, par's 1-125 herein.

127.  Plaintiff demands judgment for $2,500,000.00 against the Defendant for:

a) Back pay and front pay, salary and benefits, and accrued interest thereon continuing until entry of judgment against the Defendant

b) Compensatory damage for Plaintiff's mental anguish, pain and suffering, damages to her health, and other non-pecuniary losses.

c) Reinstatement without retaliation to her former position with her former duties of research support staff member for the entomology department at the Smithsonian Museum of Natural History.

d) Reasonable accommodations to address her naphthalene sensitivity and to address her need for a flexible schedule, so that Plaintiff can perform her essential job functions or front pay to compensate plaintiff for anticipated future losses due to Defendant's discrimination against her.

e) Plaintiff's attorneys' fees and cost of this action.

f) Such other relief as allowed by law and that may be just and equitable.

## **V.    JURY TRIAL DEMANDED**

128.  Plaintiff hereby re-alleges and incorporates by reference all paragraphs above, par.'s 1-127 herein.

129.  Plaintiff requests a jury trial for this Complaint.

_____
Alex T. Sliheet, DC
Bar No. 438977
Attorney for Plaintiff
8702 Nightingale Dr.
Lanham, MD 20706
fvickie@comcast.net
(301) 552-4908