IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
-------------------------------------------------:
Beth M. Norden, Ph.D.,                           :
112 Greenhill Road                               :
Greenbelt, MD  20770                             :
        Plaintiff,                               :     Civil Action No: 1:05-cv-1232
                         v.                      :
                                                 :     FIRST AMENDED COMPLAINT for
                                                 :     Disability Discrimination and Retaliation
                                                 :     under Section 501 of the Rehabilitation Act
Lawrence M. Small,                               :     29 U.S.C. 791 et.seq.
Secretary of the Smithsonian Institution,        :
P.O. Box 37012                                   :
Washington, DC 20001                             :
        Defendant                                :
                                                 :
-------------------------------------------------:
```

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

### I.    JURISDICTION

1.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. sec. 1331 for claims arising under federal law, i.e., Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. 791. et. seq.

2. There is an actual controversy between Plaintiff and Defendant.

3.   The EEOC issued a "right to sue" letter to Plaintiff on March 22, 2005.  A copy of this "right to sue" letter is attached to this amended complaint.

4. Plaintiff filed the original complaint within 90 days after Plaintiff received her "right to sue" letter from the EEOC.

5. Plaintiff has filed this amended complaint within 30 days of receiving the final agency decision regarding all of Dr. Norden's outstanding claims including her termination.

6. A copy of the final agency decision on all of Dr. Norden's outstanding claims including her termination is attached to this amended complaint.

7. This Court now has jurisdiction of all of Dr. Norden's claims.

## II.  FACTS

**(Introduction to Dr. Beth Norden, Ph.D, and
her contact with dengue hemorrhagic fever. "DHF")**

8.  Plaintiff hereby re-alleges and incorporates by reference all paragraphs above, par.'s 1-7 herein.

9.  Complainant, Dr. Norden, is a dedicated scientist who first began working at the Smithsonian in 1984 on a pre-doctoral fellowship.

10.  She received her doctorate in entomology from the University of Maryland in 1985, and she continued working as an entomologist at the Smithsonian's Museum of Natural History.

11.  With the exception of one three-year sabbatical, Dr. Norden spent her entire professional career performing research support for the entomology department at the Smithsonian Museum of Natural History and has always taken pride in both her work and her association with the internationally prestigious museum.

12.  The majority of Dr. Norden's work was conducted in the field of aculeate Hymenoptera - stinging insects such as bees, ants, and wasps.

13.  Although she was never promoted beyond the level of GS 11 research support staff, the work Dr. Norden performed is consistent with a higher government position.  A GS 12 scientist, for example, is described as one who carries out "difficult and extensive research in

the development of improved methods and techniques, and sometimes they publish technical papers and articles resulting from these studies (though such publication is not a requirement for evaluation of the position at this grade level)."

14.  Dr. Norden carried out difficult and extensive research in the development of improved methods and techniques and in other, substantive areas of Hymenoptera.

15**.** Dr. Norden published over 50 professional papers in her field, was awarded the highly competitive Fulbright Fellowship to perform research in Sri Lanka, and regularly traveled internationally with her colleagues on research expeditions.

16.  Although she was kept in a research support staff position, Dr. Norden's work at the Smithsonian was appreciated.  She routinely received outstanding performance evaluations and cash awards for exemplary work.

17.  The vast majority of her work required little supervision, and she worked very long hours, often alone, on weekends and in the evenings at the Smithsonian.

18.  In August of 2000, Dr. Norden went with a multidisciplinary team comprised of Smithsonian scientists and others to Brazil, primarily to study fungus-growing ants.  The team was led by Dr. Norden's supervisor, Dr. Ted Schultz, and Dr. Norden's participation in the trip was a regular part of her employment with the Smithsonian.

19.  On her return, Dr. Norden became extremely ill and was taken to Georgetown University Hospital where she was diagnosed with a hemorrhagic fever, later described as dengue hemorrhagic fever.

20.  During September and October of 2000, Dr. Norden spent approximately 20 days in the hospital, much of the time literally hovering between life and death, with massive internal bleeding from leaking capillaries that affected all of her organ systems.  Dr. Norden's

dengue hemorrhagic fever was determined to have been acquired on her research trip in Brazil through a mosquito bite that carried the virus.

21. Many people who suffer from the hemorrhagic form of dengue fever do not survive, particularly if they acquire the disease as adults. Those who do are often, like Dr. Norden, globally affected by the disease and suffer from neurological damage, including brain trauma, a weakened immune system, a lost ability to thermo regulate, a bleeding disorder, and a heightened sensitivity to various chemicals. The internal bleeding is so extensive that one of the doctors involved with Dr. Norden's care characterized her disease as **"a cousin to Ebola."**

22. After her stay in the hospital, Dr. Norden went home in an extremely weakened condition, with body-wide under skin hemorrhages, to recuperate.

23. She spent months in intense pain and encephalitic confusion, unable even to read a newspaper competently. Her progress was monitored by a team of medical experts as she slowly recovered her intellectual capability while she continued to suffer from frequent, prolonged migraine headaches, an inability to withstand heat and other physical effects from her bleeding disorder.

24. Dr. Norden will carry two different serotypes of the dengue antibodies for the rest of her life. These antibodies make her capillaries vulnerable to leaking, and it is the leaking capillaries that can cause migraine headaches, cognitive impairment severe enough to render her unable to care for herself in any of her daily life functions, a severe loss of energy, hallucinations, and other impairments and life threatening conditions. Exposure to heat, excessive stress, and certain chemicals are among the triggers for capillary bleeds.

25. The Smithsonian's Office of General Counsel has determined that there is sufficient evidence to find that Dr. Norden is a person with a disability within the meaning of

the OHR Rehabilitation Act.

26.  As long as Dr. Norden succeeds at the vital task of limiting her capillary bleeds, she is now able to function competently and to perform the tasks her former position required.

27.  Recovery was gradual and painstaking, however.  Tests performed in April and May of 2001 revealed, among other things, that Dr. Norden suffered from impaired performance on measures of complex attention and information processing speed, that her cognitive function was negatively impacted by time pressures, and that she suffered from a mild encoding deficit.

28.  At this time, Dr. Norden estimated that she had recovered 60% of her pre-morbid level of cognitive function and 50% of her pre-morbid level of general energy.  The neuropsychologist found that test results were consistent with Dr. Norden's self-report.   When tested again in September of 2001, Dr. Norden's cognitive levels appeared somewhat improved, and it was noted that there was no evidence of clinical psychopathology.

29.  In January of 2002, Dr. Norden's tests showed significant improved performance, though her performance on measures of information processing speed remained below expectation.

30.  The reports documenting her cognitive impairment were sent to the Smithsonian as part of the regular medical reporting made to Smithsonian physician Dr. Lawford, as were more the later reports documenting a greater recovery and the ability to return to her position at the Smithsonian.

31.  Fluctuating vascular factors significantly affected her cognitive abilities and her overall health, and it was anticipated that her continued recovery from dengue hemorrhagic fever would result in continued cognitive improvement.

32.  Her migraine headaches appeared to be caused by capillary leaks in her brain, and her inability to thermo regulate resulted in leaking capillaries that caused large bruises.

33. Dr. Norden's cognitive abilities and overall energy level and physical health were, and remain, closely tied to her success in limiting capillary bleeds.

34. However, despite the fact that dengue hemorrhagic fever is known to cause depression, at no point in any of her testing was there any finding of depression or any other sort of mood disorder other than appropriate anxiety related to the condition of her health.

35. Throughout her recovery, Dr. Norden was eager to begin working again.

36.  In December of 2000, Dr. Norden asked Dr. Schultz if she could do some comparatively simple work from home.

37. Dr. Schultz denied her request.

38.  The Hymenoptera Unit Collection Manager, however, did send her some collections tasks at home which she began performing successfully in January of 2001.

39.  In March of 2001, she returned to work at the Smithsonian on light duty hours of 12 hours per week.

40.  While working at the Smithsonian, however, she suffered from serious problems with fatigue, migraine headaches, and capillary bleeds.

41.  Dr. Norden's doctors and Smithsonian officials both agreed that she should continue on disability, and her first return to work ended.

42.  In retrospect, Dr. Norden believes that her exposure to naphthalene at the Smithsonian exacerbated her health problems, but naphthalene was not identified as a health problem at the time, and no naphthalene exposure accommodations were requested at that time.

43.  When Dr. Norden left on disability, she again asked Dr. Schultz if she could do some work from home.

44.  Dr. Schultz again denied her request, although he had hired contractor T. Surran to work at home pinning ants.

### (Dr. Norden's 2nd return to work)

45.  Although Dr. Norden began, with her doctors' approval,  requesting a second return to work on February 6, 2002, Dr. Norden did not return to work for the second  time until April 3, 2002.

46.  Both her neurologist and Smithsonian physician Dr. Lawford had advised the Smithsonian that Dr. Norden be given "flex time" as an accommodation so that Dr. Norden could go to her many doctor's and laboratory blood work appointments, and take time off when she suffered from a migraine or when the heat might cause her to begin bleeding.

47.  Because Dr. Norden suffered from a serious condition that is rare in this part of the world, she was not able to change doctors easily and she was dependent upon her specialists' schedules at Georgetown University Hospital.

48.  Dr. Norden was given the accommodation of "light duty hours" of 20 hours per week to begin with, with the understanding that she would work towards full time employment again.

49.  Although her return to work document had been devised over a period of four months and had included numerous departmental meetings and phone calls with Dr. Norden's doctors, the document did not include any provision for flex time to accommodate Dr. Norden's handicapping condition.

50.  The return to work document was drafted primarily by Smithsonian attorney,

Marylin Slomba, rather than by a Smithsonian doctor or supervisor, and it largely consisted of a schedule that excluded even the normal flexibility in work hours that Dr. Norden had enjoyed prior to contracting dengue.

51.  Dr. Norden was required to work a tightly defined schedule of days and hours because Dr. Schultz and attorney Slomba regarded her as no longer capable of working in the unsupervised manner in which she had worked prior to her illness.

52.  In dramatic contrast to her many previous years at the Smithsonian, Dr. Norden was not allowed to work from home or during the weekends or evenings, and she had little opportunity to make up time lost to illness or her frequent doctor's appointments.

53.  The prohibition against her working on evenings or weekends was enforced despite the fact that the Smithsonian's own physician, Dr. Lawford, had been emphatic in advising that there was no medical basis for it.

54.  Dr. Norden soon found out the extent of her new schedule's inflexibility when she decided to move a work day from Monday, April 22 to Tuesday, April 23 because a large protest in Washington had been planned for Monday, April 22.

55.  The police were advising people to avoid coming into Washington if possible during the demonstration, and Dr. Norden was very fearful that she would be jostled by the crowd or hit on the head.  Since Dr. Norden has a bleeding disorder, and her work would be unaffected by a change from Monday to Tuesday, she believed that coming to work on a day when she would not be subjected to any physical roughness or injury would be a reasonable accommodation for her disability.

56.  She tried to call Dr. Schultz on Sunday, April 21, but he did not answer his phone, and his answering machine was full.  Dr. Norden then emailed Dr. Schultz and another

supervisor on April 21 that she was moving her work day.

57. On her return, Dr. Norden received several emails from Dr. Schultz berating her for having changed her schedule, stating that doing so "violates the rather clear terms we all agreed to under the guidance of OHR's Marilyn Slomba."

58. The hostility of these emails was consistent with the overall change in Dr. Schultz's demeanor towards Dr. Norden. Although the two scientists had worked together for a number of years and had previously enjoyed a friendly relationship, Dr. Schultz was noticeably cold and dismissive towards Dr. Norden throughout the entire tenor of her second return to work.

59. Early in her April 2002 return to work, three of Dr. Norden's doctors advised her that she was being harmed by her workplace exposure to naphthalene. In this same month, Dr. Norden spoke to Dr. Schultz several times about her sensitivity to naphthalene and her resulting need for accommodations.

60. Naphthalene is a chemical widely used in the insect collection that is in the nonpublic section of the museum. It is the active ingredient in moth balls, and it is used to protect the insect specimens from being eaten by live insects.

61. Because naphthalene is believed to be a carcinogen which may cause bleeding and other blood vessel problems, it has not been used by museums in England for approximately twenty years.

62. Naphthalene use is not considered good practice at the Smithsonian either, and its continued use is a violation of the Smithsonian's own policy.

63. Since naphthalene appeared to increase capillary leaks for Dr. Norden, it was, of course, a significant hazard to her overall cognitive functioning and general physical health.

64. Dr. Norden provided Dr. Schultz with a respirator request form, and on April 26,

2002, Dr. Schultz signed the request form.

65.  On May 14, Doctor Lawford sent an email stating that he had speeded the request process because of Dr. Norden's increasing sensitivity.

66. On May 15, Dr. Norden was fitted and trained for a respirator.

67.  Having worked for nearly six weeks at this point without a respirator or any other accommodation for her naphthalene sensitivity, Dr. Norden was suffering from frequent nose bleeds and intense migraine headaches.  She knew that the capillary bleeds indicated by both these conditions were highly detrimental to her cognitive and physical well being.

68. However, Dr. Norden did not stop working during any of these bleeding spells because she was afraid to modify her working hours again without prior approval.  She continued to work hard and seek accommodations in the hopes that she would be able to increase her hours and end her temporary light duty accommodation.

69. Dr. Norden understood that a large agency such as the Smithsonian might move at a slow pace in making accommodations, but she believed that the promised accommodations to her naphthalene sensitivity would be made, in part because she had seen several of her coworkers receive accommodations for naphthalene.  These coworkers included Curator Robert Robbins whose office was moved to another department so that he wouldn't be exposed to ambient naphthalene fumes;  Technician Elizabeth Klafter who worked from home during her pregnancy because her doctor feared that the naphthalene might cause her a second miscarriage;  Technician John Nay who was provided a respirator for use while removing naphthalene from some collections;  and USDA Technician Lucrecia Rodriguez stationed at the Smithsonian who was provided a respirator to prevent migraine headaches that might be triggered by naphthalene.

70.  Dr. Norden believed that she too would eventually receive the promised

naphthalene accommodations, and this belief was reinforced by the fact that Dr.
Schultz wrote in Dr. Norden's July 23 performance evaluation that a respirator
and air filter were "in progress**."**

71.  This was a very timely reassurance since just the day before, on July 22, Dr.
Norden had met with Dr. Schultz's supervisor, Dr. Mathis, to discuss naphthalene
accommodations.  Although Dr. Mathis advised that Dr. Norden continue to seek Dr. Lawford's
opinion, Dr. Mathis further advised that at Dr. Norden's age she was probably going through
menopause and that, as a result, she was probably more emotional on the subject of naphthalene
than she otherwise would be.  Dr. Mathis also told her that she could do many things and asked
why she needed to work in the Smithsonian.  Dr. Mathis then discussed his wife's menopause
and told Dr. Norden that his wife had gone through a prolonged period of extreme emotional
sensitivity as a result of her changing hormones.  Dr. Norden was not going through menopause,
but saw no reason to discuss her continued menstruation with Dr. Mathis when she had a well
documented need to reduce her exposure to naphthalene.

72.  Dr. Norden met with collections manager David Furth on July 31 and reported to
him that the naphthalene smell was unusually strong.  Dr. Furth responded that an employee had
recharged the collection cabinet with naphthalene, contrary to Smithsonian policy.
Unfortunately, Dr. Furth also commented that he had "only known three people with
naphthalene sensitivity" and that Dr. Norden "didn't look like one of them."  The employee who
had recharged the cabinets apologized to Dr. Norden for having done so, and explained that she
had acted in accordance with Dr. Schultz's wishes.

73. Dr. Norden also remained in close contact with Smithsonian physician Dr.
Lawford and Smithsonian Industrial Hygienist Kathy Makos who both appeared to be working

diligently to help Dr. Norden get the needed accommodations.  On September 2, 2002, Dr.

Lawford emailed Dr. Schultz with Dr. Norden's medical updates and suggested that the issue of

whether Dr. Norden could work full time be revisited in December.  This memo further

supported Dr. Norden's belief that she was working towards full time employment again at the

Smithsonian.

74.    At the end of September, however, Dr. Schultz left the country to work in

Guyana until October 24.  He left Dr. Norden a memo instructing her to bar code, label, and

database the ant specimens from South America and curate the ant holotype collection.  His

memo stated, "If you have problems with naphthalene, I strongly encourage you to work with

specimens in the ventilated room on the fourth floor."

75.    This assignment was discouraging for a number of reasons.  Like the rest of the

work Dr. Norden had received since her April 3, 2002  return, much of it was significantly

beneath her intellectual capacities and different from the research support which had been her

primary job function for nearly two decades.  It seemed that she was regarded as too cognitively

impaired by her illness to be capable of doing the research and writing which she had performed

for so long.

76. In addition, Dr. Norden was dismayed because the ant collection cabinets,

especially the holotype collection, had very high concentrations of naphthalene, so that she

would be required to breathe heavy fumes every time she worked with a tray.  By altering her job

from one which was almost entirely research support to one which involved increased direct

contact with specimens, Dr. Schultz had substantially increased Dr. Norden's exposure to

naphthalene.  Although she had been advised to work on the fourth floor, she could not do so

because the necessary specialized equipment could not be moved from the fifth floor.

77. Finally, Dr. Norden was concerned because the nature of the assignment as well as the words "If you have problems with naphthalene. . ." suggested that her naphthalene sensitivity was not being acknowledged as a serious ongoing concern.  Dr. Norden continued to communicate closely with Makos and Lawford, and she began to seek other forms of accommodation.

78. Dr. Norden sought permission to work in the Smithsonian Insect Zoo where there would be no naphthalene fumes, but this request was denied despite the fact that a position was open at the time.

79. Dr. Norden also sought to be the subject of a "reimbursable loan" to the USDA where she could conduct insect research in an atmosphere free of naphthalene until suitable accommodations at the Smithsonian could be arranged.  On October 15, 2002, this "loan" was approved by the Smithsonian, and Dr. Norden awaited approval by the USDA.

80. Dr. Norden was greatly encouraged by the "loan" approval in addition to the fact that she knew that Kathy Makos and Dr. Lawford were advocating vigorously on her behalf for immediate accommodations.  On October 17, Dr. Lawford and Kathy Makos sent another memo regarding Dr. Norden's sensitivity to naphthalene and again urging accommodations for her.

81. What Dr. Norden did not know at the time was that Dr. Schultz and Smithsonian attorney Slomba responded to this memo in late October 2002 by holding a meeting with others at the Smithsonian to discuss accommodations for Dr. Norden.  Accommodations such as an office with air vents in it, a personal air purifier, a mask, and a respirator were initially discussed.  Then, in an apparent reference to the earlier agreement that the doctors would "revisit" Dr. Norden's need for light duty in early December, Dr. Schultz stated, "Well, if her

doctors can revisit it on December 31, we can revisit it too." Dr. Schultz then asked Ms. Slomba if he was required to continue to offer light duty, and Ms. Slomba replied "not if it is insufficiently productive toward the department goals." Although there were medical personnel in the room, only the attorney was consulted on the issue of continuing Dr. Norden's light duty hours.

82.  On November 13, 2002, Dr. Schultz informed Dr. Norden that he would approve an air filter for her in addition to a respirator. During this discussion, Dr. Norden told Dr. Schultz that once she had the air filter and respirator, she would be able to work forty hours per week.

### (Dr. Norden's being placed on forced disability status)

83.  However, on November 18, 2002, two other Smithsonian supervisors, Dr. Miller and Dr. Mathis, handed Dr. Norden a memo stating that she would be terminated from light duty on November 30, 2002.

84.  Dr. Norden was not fired, and she remained on the Smithsonian rolls. Dr. Norden was never told that she could not receive other accommodations, but no mention was made as to what Dr. Norden would be required to do to prove her ability to return full time. Neither Dr. Miller, Dr. Mathis, nor Dr. Schultz was willing to discuss the memo with her.

85.  The memo, however, stated that Dr. Norden was being put back on disability because she had not been capable of performing the required twenty hours per week of work. The memo was misleading as to the number of hours Dr. Norden had actually worked, and, of course, it made no mention of the fact that Dr. Norden missed the hours because she was unable to make up the time taken by her numerous doctors' appointments.

86.  Dr. Norden remained on the Smithsonian employee rolls and was given no reason

for being returned to disability status other than the fact that she was currently unable to work enough hours.

87.  Dr. Norden met with counselors at the Smithsonian Employee Assistance Program, but the counselors were unable to give her any clarity as to what she needed to do to return to work.

88.  Dr. Norden also sent email memos to numerous people within the Smithsonian asking, among other things, "How do I know when it might be safe to return if it is the naphthalene which is activating my current blood problems?"  and "Will anything dealing with my exposure be different on return, or is my return based upon no longer being sensitive to naphthalene?"

89.  On December 3, 2002, Dr. Lawford responded that he expected her doctors to take the lead in advising as to the extent of her naphthalene sensitivity.

90.  Also on December 3, 2002, Smithsonian Program Manager of Cultural Diversity/Affirmative Action Carol Gover sent Dr. Norden an email informing her that "The goal is for you to successfully return to your job full time."

91.  On January 7, 2003, the Office of Human Resources responded that Dr. Norden's return would depend on Dr. Norden's doctors.  As in the past, the Smithsonian seemed to be saying that Dr. Norden could return to work when she had recovered enough to be able to do so.

92.  Dr. Norden continued to remain on the Smithsonian rolls, continued not to receive accommodations, and continued to hope that she could recover enough for her doctors to be able to advise the Smithsonian that she did not require light duty hours.

93. Her status at the Smithsonian was so poorly defined that the request to "loan" Dr. Norden to the USDA was never cancelled, and in December of 2002, the USDA approved the

loan.  Dr. Norden was not able to work at the USDA, however, because she had been put on

disability status by the Smithsonian.

94.  Of the many people Dr. Norden contacted (a list that includes Smithsonian attorney

Slomba, the Office of Human Resources, Employee Assistance, medical personnel, supervisors

in her department, Smithsonian Program Manager Carol Gover who was with the Office of

Equal Employment and Minority Affairs (OEEMA), and the Smithsonian ombudsman) no one

suggested that Dr. Norden seek help from the Smithsonian OEEMA or that Dr. Norden file a

complaint within 45 days of having her light duty terminated.

95. Dr. Norden was unaware of any requirement that she get counseling from OEEMA

within 45 days of being discriminated against.

96. Dr. Norden saw no written signs or posters advising her of a 45 deadline to contact

an EEO officer, nor had she ever been given any training or information on the subject during her

employment with the Smithsonian.

97.  Had Dr. Norden been aware of such a requirement, she still would not have made a

complaint because she was still being told that she could return when her doctors advised that

she was ready to do so and because a program manager from the Smithsonian OEEMA office

had told her that the goal was for her to return to her job full time.

98. As time progressed, however, Dr. Norden grew increasingly worried by her

inability to get a clear statement as to what accommodations would be provided and what she

needed to do in order to return to work.

99.  Dr. Norden contacted an attorney early in 2003 who in turn contacted the

Smithsonian OEEMA.  This attorney contacted the Smithsonian OEEMA during the period in

which Dr. Norden was still an employee, had still not received reasonable accommodations, and

had still not been given any guidance other than that her doctors would be expected to take the lead in deciding when she could return to work.

100.  During this period of legal and professional uncertainty, Dr. Norden experienced serious depression for the first time.

101.  In April of 2003, Dr. Norden began seeing a therapist, Dr. Oberg, who diagnosed her as suffering from post traumatic stress disorder and major depressive disorder, recurrent and severe but without psychotic features.

102.  Dr. Norden remains in treatment with Dr. Oberg, receiving one 90 minute session with him every week.  She has made considerable progress in the past two years, but still suffers from both the anxiety and depressive disorders.

103.  Dr. Oberg has determined that the Smithsonian's failure to accommodate Dr. Norden effectively is a direct cause of her severe depression and is a significant contributing factor to her post traumatic stress disorder.

104. In addition, Dr. Norden's treating physicians believe that Dr. Norden's prolonged and heavy exposure to naphthalene while at the Smithsonian may have irreversibly exacerbated her vulnerability to naphthalene and her tendency to suffer from intense migraines even without the presence of naphthalene.

105.  Dr. Norden endured substantial and prolonged physical suffering during her April 2002 - November 2002 period at the Smithsonian.

106.  Dr. Norden's resulting capillary bleeds caused blood to appear in her urine in substantially greater quantities during her second return to work than it ever had before or after this period.

107.  While on forced disability, Dr. Norden receives federal worker's compensation

benefits that partially, but not entirely, compensate her for her lost income.  She does not, however, receive any accrual to her pension, cash bonuses, or promotion potential, nor does she receive the much needed intellectual and emotional stimulus of continuing to engage in her career on a regular basis.

108.  She has been able to do some volunteer entomology work for the Department of Agriculture and through this work she has been able to make some ongoing contribution to her field by continuing her research and publishing the results.

109.  Since November of 2002, Dr. Norden has published five (5) substantial articles and one short note in respected scientific publications, and she is currently working on two more articles.  She has also three times performed research at her own expense at Archbold Biological Station in Florida where she was recently made a Research Affiliate.  Her volunteer experiences have consistently resulted in an increased sense of physical and psychological well being, and, with proper accommodations, she has long been capable of performing her old job full time.

110.  Although Dr. Norden has attempted to find employment in her highly specialized field, she has not been successful.

111.   She applied to teach biology at the Prince George's Community College, but there were no full time positions available and a part time position would preclude her from being able to accept any position elsewhere.

112.  She applied to work at the USDA as a support entomologist, but initially could not be considered by the USDA because she was still on the employment rolls at the Smithsonian.  Later, the USDA would not consider Dr. Norden because there was a hiring freeze.  Dr. Norden's resume remains on file with the USDA, however, and she continues to do volunteer work there.

113.  Dr. Norden also applied to work as a biologist/entomologist with the State of Maryland Department of Natural Resources, but could not be considered for that position because of a hiring freeze.  Her resume remains on file there as well.

114.  Dr. Norden is not able to find even volunteer work on a sufficient basis, nor does she have the economic security of knowing that she will always receive disability support. Though she is unable to find employment in her field, she may one day be required to do some other form of work in order to support herself.

115.  Moreover, her treating therapist, Dr. Oberg, believes that her professional abilities and accomplishments are an intrinsic part of her identity and self esteem and that her psychological health would be enormously improved if she could regain a position in her field with the accommodations necessary for her physical health.

116.  Dr. Norden currently struggles with severe depression, post traumatic stress disorder, frequent and severe migraines, flashbacks, loss of energy, diminished ability to concentrate and make decisions, and other crippling conditions.  Her distress and depression over her treatment by the Smithsonian invade even her sleep, causing her to have nightmares in which she is in the hospital trying to recover from dengue while her Smithsonian supervisors put poison in her IVs.  At other times, she dreams of vipers that attack her without warning.

117.  Dr. Norden's therapist considers such nightmares normal for someone with Dr. Norden's experiences who suffers from post traumatic distress disorder and a recurrent, severe major depressive disorder without psychotic features.

118.  On November 7, 2003, after the Smithsonian OEEMA ruled against Dr. Norden's initial complaint of discrimination, Dr. Norden's supervisor, Dr. Schultz, sent her a letter stating that he intended to separate her from the Smithsonian roles.

119.  On November 13, 2003,  Dr. Norden responded with a letter stating that she wanted to return to her position at the Smithsonian, and that she was capable of doing her old job with appropriate accommodations.

120. After close of business on November 19, 2003, Smithsonian attorney Marilyn Slomba faxed a letter requiring Dr. Norden to submit recommendations from her doctors as to what accommodations were necessary to perform her job.  These letters were to be written and delivered to the Smithsonian by December 2, 2003.

121. Dr. Norden complied, timely submitting recommended accommodations from Dr. Granite and Dr. Oberg.  Smithsonian physician, Dr. Lawford, reviewed these recommendations, questioned both doctors and Dr. Norden by phone, and then submitted a memo reviewing Dr. Norden's mental and physical health status, together with required accommodations, to Smithsonian attorney, Marilyn Slomba on December 23, 2003.  **(See Exhibit A)**

Dr. Lawford's memo included the following:

**(a)**  Both of Dr. Norden's doctors "feel that she is now capable of performing her full duties for 40 hours per week."

**(b)**  "Dr. Oberg has (successfully) been treating her for a mental state of dysfunctionality caused by 'a state of devaluation' and her perception of punishment by the combination of her disease and management's unacceptance."

**(c)** Dr. Oberg "advises that for her to remain mentally healthy and fully functional, she should be given work that is as mentally demanding as the work she performed prior to contracting her disease.. . .Dr. Oberg goes on to add that a successful return to work will require absence of agency/supervisor hostility."

**(d)** Dr. Granite "said in his letter that her August 2000 disease causes her to have

capillary fragility and easy bleeding which is triggered by naphthalene.  This easy bleeding in turn triggers migraines.  I concur with this."

(e) "Both providers advise that management should be prepared for her need for 'flex time.'. . .Beth has numerous medical appointments each month.  Some she can schedule outside of work hours, some she cannot.  Her near fatal illness is so rare and undocumented in the Northern Hemisphere, that all the aforementioned University specialists want to chart her recovery in great detail."

122.  At some point in the months that followed the submission of Dr. Lawford's memo, Dr. Norden's supervisor, Dr. Schultz, and Collections Manager, Dr. Furth, approached an employee in the Collections Department, Ms. Nancy Adams.  The two men explained to Ms. Adams that "no research entomologist was willing to take on the supervision of Beth," and they asked Ms. Adams to supervise Dr. Norden doing collections work within the Collections Management Group.  Ms. Adam's formal education is limited to a bachelor's degree, and she has little or no background in research or in Dr. Norden's field of expertise, which is Hymenoptera.

123.  Although Dr. Norden had sometimes supported collections work in association with research projects, the majority of work had been in support of research, and her primary supervisor had been Dr. Schultz.

124.  Smithsonian personnel are assigned Personnel Descriptions ("PD") that describe the overall scope of their work.  PDs are typically numbered, individualized and very detailed.  Even though an employee's work plans and assignments may change from year to year, the PDs generally change only when there is a significant change in the conditions of employment, such as a promotion or assignment to a new department.

125. Dr. Norden was given a research support PD when she first joined the

Smithsonian and a new research support PD when she was promoted to a GS 11.  Both PDs were discussed with her, and both PDs give extensive information as to her capabilities and requirements in performing research support.  The PD Dr. Norden received on her promotion is dated 1992 and numbered 32204.  Dr. Norden is unaware of any subsequent PD.  Not having been promoted further, and not having changed departments, Dr. Norden did not expect to receive any additional PDs.

126.  Shortly after Dr. Schultz and Dr. Furth announced that "no research entomologist was willing to supervise Beth," Smithsonian attorney, Marilyn Slomba faxed what she alleged to be a copy of Dr. Norden's PD to Dr. Norden's legal counsel. This new PD is dated 1997, and it is for a collections support position.   It included another person's name and described that person's work at the Smithsonian, rather than Dr. Norden's.  It is signed by a supervisor who was never Dr. Norden's supervisor.  It is numbered 39725, and includes a statement that it replaces a PD number that had never been assigned to Dr. Norden.  It also includes a statement that it replaces GS 5 and GS 7 positions although Dr. Norden has never held a GS 5 or GS 7 position.

127.  All of Dr. Norden's evaluations prior and subsequent to 1997 reflect work consistent with her research support PD, rather than a collections PD.  Dr. Norden's previous supervisors who signed her evaluations were well aware of Dr. Norden's PD and the nature of her work at the Smithsonian.

128.  The Collections Support PD with Dr. Norden's name added to it is a false document produced to Dr. Norden's counsel by Smithsonian attorney, Marilyn Slomba.

129.  In April of 2004, the Smithsonian only offered to hold Dr. Norden's "separation in abeyance" and required Dr. Norden to fill a new position that changed her job duties to primary collections (thereby increasing her contact with naphthalene) and that did not require a

research entomologist to supervise Dr. Norden.  The false PD was relied upon by the Smithsonian to maintain, incorrectly, that the new position it offered was consistent with Dr. Norden's prior work.

130.  Nancy Adams had designed the work plan for this new position, but had expressed concern to Ms. Slomba that the plan required Dr. Norden to do work "she wouldn't like."  Ms. Adams advised Ms. Slomba to give Dr. Norden a copy of the work plan before Dr. Norden returned to work.  Ms. Slomba replied that she would only provide a copy of the plan if Dr. Norden's attorney requested it.

131.  The purpose of the Smithsonian's April of 2004 proposal and work plan was not to bring Dr. Norden back to her old job and duties under the working conditions of a research entomologist at the Smithsonian.  The purpose of the Smithsonian proposal and plan was to hold Dr. Norden's "separation in abeyance" while the Smithsonian created so many obstacles to Dr. Norden's ability to do her work that the Smithsonian would eventually have a rationale for "separating" her.  This Smithsonian proposal was titled "The Settlement Agreement and General Release" and is attached together with the work plan as **(Exhibit B)**

132.  This Smithsonian proposal included the following provisions:

**(a)**  Dr. Norden would be provided with a respirator and with the use of a negative-pressure, ventilated sorting room on the fourth floor.  (The fourth floor does not house permanent collections, but it houses individual collections containing naphthalene, and it is where the naphthalene itself is stored.)

**(b)**  Nancy Adams would be Dr. Norden's supervisor.

**(c)**  Dr. Norden would be provided with an "alternative work schedule" which would require her to work nine-hour work days with alternate Fridays off.  She would be expected to

attend doctors' appointments and experience migraines only during her "off" Fridays, or to make up missed work time on these Fridays. She would not be allowed any other "flex" time, such as coming to work late and working late the same day or working on weekends, despite the fact that, prior to becoming disabled, Dr. Norden had routinely worked late in the evenings and on weekends.

(d) Although Dr. Norden had been evaluated on the normal yearly cycle for all of her nearly two decades with the Smithsonian, her new position required that "Norden's supervisors will review her performance and her attendance every 320 hours (8 weeks) and on an as-needed basis. . .The Smithsonian agrees to hold Dr. Norden's separation in abeyance while she demonstrates satisfactory performance and attendance as shown by compliance with this agreement, as judged at the end of each 320-hour (8 week) cycle. **Absences will not be acceptable reasons for not meeting the work plan and performance requirements. . . .The parties understand that it is critical that Dr. Norden adhere to each of the provisions of the agreement and that any failure to adhere to those provisions, as evaluated at the end of each 8-week review cycle, will result in her separation from the rolls of the Smithsonian."** (emphasis added)

(e) The first six months of the work plan give time deadlines that range from half a day to 18 days. The next six months are organized into month-long assignments. By the terms of the proposed agreement, failure to meet any of the deadlines would be grounds for Dr. Norden's dismissal.

(f) Dr. Norden has never before been given such tightly defined time deadlines, and she also believes that the scientific work required in this plan is not amenable to such specific time requirements. She further believes that Ms. Adams was unaware of the scientific difficulties that

some of the assignments would have posed and that these assignments could not have been completed within the time frame given. In fact, she believes that at least one of the assignments could not have been completed at all.

**(g)** No explanation, other than "to assess and provide feedback" is given for the highly unusual time deadlines and 8-week review cycles.

**(h)** The proposal also demands the following waiver of rights in exchange for the "accommodations":

> "Dr. Norden waives her right to grievance/arbitration procedures, to appeal to the Merit Systems Protection Board and any right to file suit in Federal or state court for any adverse actions based on performance or conduct taken during the life of this agreement. While this agreement waives her right to appeal an adverse action triggering the terms of the agreement, Dr. Norden may petition the Merit Systems Protection Board following any subsequent separation based on this agreement by making a non-frivolous allegation that the Smithsonian violated a material term or acted in bad faith or that she did not breech the agreement."

> "Dr. Norden agrees that this constitutes the full and final settlement of any and all complaints, appeals, grievances, or other actions, either administrative or civil, against the Smithsonian and related to her employment with the Smithsonian to the date of this agreement. This specifically includes her August 26, 2003 discrimination complaint SI 03-20-082603, EEOC No. 01A41096."

133. Dr. Norden declined this offer and filed a separate complaint for retaliation instead.

134. During this time frame, the following positions which would have accommodated Dr. Norden were available at the Smithsonian:

**(a)** Vacancy Announcement 04GK-1137, Entomologist, GS-0414-11, which would have required Dr. Norden to work in the Office of Facilities Engineering and Operations using her extensive knowledge of insect life cycles and the environment;

**(b)** Vacancy Announcement 04AD-1109, Biological Laboratory Technician

GS-0404-09 (Promotion Potential to GS-11) which would have required Dr. Norden to work at a laboratory in Suitland, using her training and knowledge of insect DNA analysis, which she had received at this lab.

**(c)** On information and belief, the USDA was still willing to accept Dr. Norden as a "loan." Working at the USDA would have also meant continuing her research in a naphthalene free environment.

**(d)** On information and belief, a GS 9 position, which could have been upgraded to a GS 11, was available in the Smithsonian's Insect Zoo. Dr. Norden could have assisted in research on live insects and continued her work in public science education. Dr. Norden has a significant background in public science education, and her picture still hangs on the walls of the Smithsonian Insect Zoo.

**(e)** On information and belief, a GS 11 position was available in the SEM Lab in the basement of the Museum of Natural History. This work would have made use of Dr. Norden's impressive background in electron microscopy.

**(f)** Dr. Norden could have been returned to her previous position with such accommodations as "flex time," a ventilator and respirator, and permission to work from home or from an office on a different floor as the requirements of her work allowed. As described in paragraph 69, other individuals in Dr. Norden's department have been allowed such accommodations.

135.  Dr. Norden was qualified for all of the available positions listed supra, and all of the positions would have provided Dr. Norden with the necessary accommodations.

136.  Dr. Norden's counsel requested that the Smithsonian find another position for Dr. Norden. The only other position the Smithsonian was willing to consider for Dr. Norden was the

opportunity to apply for a job at the National Zoo (which is owned by the Smithsonian).

137. The Zoo position offer was made by Marilyn Slomba in early September of 2004. The job position was "Zoological Registration Specialist," and suggested backgrounds included a law degree. Work as a zoological registration specialist would have required knowledge of zoo "compliance with federal, state and local wildlife regulations and implementation of bureau policies as they relate to registration functions and activities. . .legal, ethical and care standards. . .domestic and/or international shipments of live animals. . . Interior, Agriculture, Treasury and other government requirements relating to collection activities."

138. Dr. Norden has no training or experience in any of the above-described areas, and nothing within the position description incorporated the specialized knowledge, duties, responsibilities and working conditions of her career as an entomologist. Knowing that entomologist positions did exist, and believing that she was "being set up for failure" with the invitation to apply for the "zoo registration specialist" position, Dr. Norden declined this position.

139. No further suggestions were made by the Smithsonian, and on October 8, 2004, Dr. Mathis sent Dr. Norden a letter in which he separated her from the rolls of the Smithsonian. In this letter Dr. Mathis stated that no vacant entomologist positions had been identified, and that "it is clear to me that we are not able to accommodate your doctors' recommendations, in manner (sic) you find acceptable, that would allow you to do the work of your position of Museum Specialist."

140. Dr. Norden filed a complaint for this retaliatory termination, and was eventually issued a final agency decision for all of her outstanding claims.

141. To date, Dr. Norden remains unemployed.

### III.  FIRST CAUSE OF ACTION:
### FAILURE TO ACCOMMODATE UNDER SECTION 501 OF THE
### REHABILITATION ACT, 29 U.S.C. SECTION 791

142.  Plaintiff hereby re-alleges and incorporates by reference all paragraphs above, par.'s 1-141 herein.

143.  Plaintiff has brought her complaint through the appropriate administrative procedures prior to filing this complaint.

144.  Plaintiff suffers from the sequelea of Dengue Hemorrhagic Fever ("DHF"), including the DHF antibodies.  This is a lifelong condition which causes her capillaries to be vulnerable to leakage.  Severe leaks cause, among other things, loss of energy, intense migraines, serious cognitive impairment, and hallucinations.  Because of this vulnerability, she is unable to endure naphthalene exposure and severe heat, and she requires regular monitoring and treatment by specialists.

145.  Plaintiff's vulnerable condition, if not properly managed, limits her in major life activities, including, but not limited to, thinking, concentrating, learning, standing, reading, and taking care of herself.

146.  Plaintiff is an individual with a "disability" within the meaning of the Section 501 of the Rehabilitation Act, 29 U.S.C section 791 et., seq., and statutes incorporated therein and has been so determined by Defendant's own legal department.

147.  Plaintiff, with the reasonable accommodations including but not limited to, the use of flex-time, a respirator, working at home, at night, on weekends, working in a naphthalene free environment on a different floor, can perform the essential functions of her job as a research support staff member for the entomology department at the Smithsonian Museum of Natural History.

148. Plaintiff asked for reasonable accommodations, and Defendant refused to provide reasonable accommodations.

149. Plaintiff has been a "qualified individual with a disability" since at least April of 2002.

150. As a result of defendant's failure to accommodate, plaintiff has lost and is losing wages, salary and benefits, raises, pension, and accrued interest thereon; Plaintiff's has suffered and is suffering mental anguish, pain and suffering, damages to her health, and other non-pecuniary losses. Plaintiff has lost and is losing potential promotional opportunities, and the quality of her previous successful professional life as an entomologist.

## IV. SECOND CAUSE OF ACTION
## RETALIATION FOR PROTECTED ACTIVITIES

151. Plaintiff hereby re-alleges and incorporates by reference all paragraphs above, par.'s 1-150 herein.

152. Plaintiff has brought her complaint through the appropriate administrative procedures prior to filing this complaint.

153. Since at least 2002 to the present, Dr. Norden has engaged in a variety of protected activities with the Smithsonian including but not limited to requesting reasonable accommodations on multiple occasions as well as instituting various EEO/EEOC complaints.

154. The Smithsonian was aware of all of Dr. Norden's protected activities.

155. The Smithsonian took various adverse employment actions against Dr. Norden for her protected activities.

156.  The Smithsonian refused to provide Dr. Norden with reasonable accommodations which Dr. Norden requested while Dr. Norden worked at the Smithsonian in the year 2002.

157.  Instead of providing Dr. Norden with the reasonable accommodations, the Smithsonian chose to force Dr. Norden to go on disability in November of 2002, and the Smithsonian chose to not provide a method for Dr. Norden to return to work.

158.  In early 2003, Dr. Norden's former legal counsel contacted the Smithsonian EEO to complain that Dr. Norden was not being given reasonable accommodations.  Dr. Norden's present legal counsel subsequently filed an informal complaint with the Smithsonian EEO in April of 2003 complaining of a lack of reasonable accommodations and of retaliation.  The informal complaint requested a return to work.  A formal complaint was subsequently filed in October of 2003.  The final agency decision denying the complaint was appealed to the EEOC.

159.  Based on Dr. Norden's doctors' recommendations, Dr. Norden's legal counsel again in early 2004 asked the Smithsonian to return Dr. Norden to work.  However, the Smithsonian refused to provide a non-retaliatory return to work plan.  The Smithsonian's plan was to retaliate, and the plan consisted of the following retaliatory conditions:

    **(a)**  Retaliating against Dr. Norden and increasing her exposure to naphthalene by requiring Dr. Norden to spend almost all her time working directly with specimens containing naphthalene.  This "plan" actually increased Dr. Norden's exposure to naphthalene as compared to Dr. Norden's previous working conditions with the Smithsonian and was a dramatically negative change.

**(b)** retaliating against Dr. Norden by decreasing her normal flexibility in scheduling by requiring her to work within a very specified number of hours despite her well established history of evening and weekend work.

**(c)** retaliating against Dr. Norden by creating a false PD to justify changing the nature of Dr. Norden's job duties and responsibilities.   The Smithsonian's written return to work plan changed Dr. Norden's job structure and job duties from one of primarily researcher to one of collections work.  This change would not only have failed to make use of Dr. Norden's special expertise and experience, but it would have also dramatically increased her exposure to naphthalene.

**(d)**  Retaliating against Dr. Norden by changing the subject matter of her work from Hymenoptera to other insects with which she had far less experience and expertise despite the fact that there were still Hymenoptera positions available.

**(e)** Retaliating against Dr. Norden with a series of arbitrary and draconian time deadlines.

**(f)** Retaliating against Dr. Norden by imposing a highly unusual 8-week performance cycle under which she could be dismissed if she had missed any deadlines in the cycle for any reason.

**(g)** And directly retaliating against Dr. Norden by requiring that she dismiss a good faith complaint of discrimination in order for her to receive accommodations.  The Smithsonian linked Dr. Norden's return to work to the explicit written requirement that Dr. Norden drop her existing good faith legal claims with the EEO/EEOC and also that Dr. Norden waive her rights to take future legal action against the Smithsonian for past and future Smithsonian conduct.  The Smithsonian's explicit requirement is direct evidence of the Smithsonian's retaliatory state of

mind that permeated the entire return to work proposal as well as all of the Smithsonian's

subsequent course of conduct.

160. When asked by Dr. Norden's legal counsel to consider placing Dr. Norden in

a position more commensurate wither special skills and experience, the Smithsonian again

retaliated. The Smithsonian did not offer a job that Dr. Norden was qualified for and that would

make use of her specialized skills and knowledge. Instead, the Smithsonian chose a job that they

knew Dr. Norden would reject, i.e., the Smithsonian made a bad faith offer to Dr. Norden of a job

as a "Zoological Registration Specialist" that had a law degree as one of the suggested

background for the position. Dr. Norden had no training or experience for this job and nothing

within the position description incorporated Dr. Norden's specialized knowledge or the

specialized duties, responsibilities and working conditions that Dr. Norden had acquired over her

entire career as an entomologist.

161 Instead of providing Dr. Norden with a non-retaliatory return to work plan or

even considering the placement of Dr. Norden in a job that used Dr. Norden's skills and abilities

in her field, the Smithsonian terminated Dr. Norden and removed her from the Smithsonian Rolls.

The Smithsonian bootstrapped its justification for Dr. Norden's termination by relying on its

retaliatory "return to work plan" and its bad faith, retaliatory job offer.

162 The Smithsonian's retaliation for Dr. Norden's protected activities is of an

ongoing nature.

163 As a result of defendant's continuing and ongoing retaliation, plaintiff

has lost and is losing wages, salary and benefits, raises, pension, and accrued interest thereon;

plaintiff has suffered and is suffering damages for mental anguish, pain and suffering, damages

to her health, and other non-pecuniary losses. Plaintiff has lost and is losing potential

promotional opportunities, and the quality of her previous successful professional life as an entomologist.

## V.  PRAYER FOR RELIEF

164 Plaintiff hereby re-alleges and incorporates by reference all paragraphs above, par's 1-162 herein.

165  Plaintiff demands judgment for $2,500,000.00 against the Defendant for back pay and front pay, salary and benefits, and accrued interest thereon continuing until entry of judgment against the Defendant as well as for compensatory damage for Plaintiff's mental anguish, pain and suffering, damages to her health, and other non-pecuniary losses.

166  Plaintiff further demands:

**(a)** Reinstatement without retaliation to her former position with her former duties of research support staff member for the entomology department at the Smithsonian Museum of Natural History.

**(b)** Reasonable accommodations to address her naphthalene sensitivity and to address her need for a flexible schedule, so that Plaintiff can perform her essential job functions, or front pay to compensate plaintiff for anticipated future losses due to Defendant's discrimination against her.

**(c)** Plaintiff's attorneys' fees and cost of this action.

**(d)** Such other relief as allowed by law and that may be just and equitable.

## VI.   JURY TRIAL DEMANDED

167  Plaintiff hereby re-alleges and incorporates by reference all paragraphs above, par.'s 1-164 herein.

168  Plaintiff requests a jury trial for this Complaint.

_____
Alex T. Sliheet, DC
Bar No. 438977
Attorney for Plaintiff
8702 Nightingale Dr.
Lanham, MD 20706
fvickie@comcast.net
(301) 552-4908