To: Marilyn Slomba, Labor Relations                December 23, 2003

From: Thomas C. Lawford, MD -- Occupational Medicine for SI

This memorandum is the review of medical documents submitted to me by Beth Norden, as requested by SI management. I am in possession of two medical reports recently received. I have checked with Dr. Norden by telephone, and she says that these two reports best represent the summation of her present medical status, and that there are no more documents to follow.

One is originated by Donald L Oberg, PhD who is her mental health provider. The other is originated by Dr. David Granite, her longstanding personal physician. He has referred her out to a GTU Neurologist, as well as a Hematologist, a Dermatologist and an Infectious Disease specialist for ongoing consultations. Since Dr. Granite gets a constant flow of medical information back from these consultants, his report incorporates information from them. I have spoken with both of the providers mentioned and gone over their reports with them for clarifications and to ask additional questions.

Her illness and outage are an accepted OWCP case, caused by her contracting a near fatal mosquito-borne disease while on the job in Brazil in August of 2000. This was/is a multisystem disease which affected her physically, mentally and neurologically. Her last return to work in her department, Entomology, was from April to November in 2002 at 20 hours per week. Her department felt that they could not continue with this accommodation.

<u>Overall Recovery</u>: Both providers advise me that she has, albeit slowly, made great progress in recovery from her cluster of symptoms. While her disease is still present in vastly diminished form, it is considerably improved from the period she attempted work at 20 hours per week. They both feel that she is now capable of performing her full duties for 40 hours per week. Dr. Oberg has told me that her mental acuity has now returned to "what one would expect of a Fulbright PhD scholar" and should allow her to be fully functional in all of the duties she had before this disease occurred.

Dr. Oberg has (successfully) been treating her for a mental state of dysfunctionality caused by "a state of devaluation" and her perception of punishment by the combination of her disease and her management's unacceptance. He advises that for her to remain mentally healthy and fully functional, she should be given work that is as mentally demanding as the "work she performed prior to contracting" her disease. He says that "this is particularly important in that doing less intellectually demanding work in all likelihood will ...deprive her of the intellectual stimulation essential to neurological recovery" and possibly resurrect her former mentally dysfunctional status.

Dr. Oberg goes on to add that a successful return to work will require absence of agency/supervisor retaliation and hostility. To that end he proposes that "Rehabilitative reentry would consist primarily of a complete job description and names of line supervisors. With this in hand, ....interventions could (if necessary – my interpretation) be conducted to ensure Dr. Norden's successful return to the workplace."

<u>Migraines – naphthalene</u> Beth has a history of migraine headaches. They occurred sporadically before her disease process began in August of 2000. After her disease

*Exhibit A*

began in August of 2000 the migraines were almost nonstop, requiring narcotics. Their frequency and intensity gradually lessened over the next several years. Beth discovered upon her attempts at return to work that naphthalene, even at levels below the ACGIH maximum recommended levels (such as is found in all floors of her department) would trigger a migraine. She also discovered that sudden barometric pressure drops heralding an oncoming storm would trigger one. The recent hurricane Isabel triggered an extremely intense migraine. Before her disease began in August of 2000 naphthalene did not trigger a migraine. Both of her providers are certain, as am I, that the naphthalene trigger is a feature generated by her August 2000 disease.

Dr. Oberg writes that for her return to be successful she "would require protection from exposure to naphthalene – this would include both atmospheric exposure and direct contact due to specimen handling. Dr. Norden's sensitivity to naphthalene is a direct consequence of the (diagnosis August 2000)."

Dr. Granite writes that "I believe that she is a strong candidate for …. Control procedures to limit her exposure to naphthalene." He earlier said in his letter that her August 2000 disease causes her to have capillary fragility and easy bleeding which is triggered by naphthalene. This easy bleeding in turn triggers migraines. I concur with this.

Both providers advise that management should be prepared for her need for "flex time". I questioned each of them by telephone. Are they suggesting that she should be allowed to work on Saturday or perhaps early AM Sunday. No. They are strictly speaking of any time lost due to leaving work from a migraine, which she might want to make up another day. Of even more consequence, however, is the fact that Beth has numerous medical appointments each month. Some she can schedule outside of work hours, some she cannot. Her near fatal illness is so rare and undocumented in the Northern Hemisphere, that all of the aforementioned University specialists want to chart her recovery in great detail.

Migraine Frequency Beth is, at this stage in her recovery down to having typically two, sometimes three migraines in a month's time. Her providers agree with this figure. The question I know management wants to ask me is "What will be the frequency once she re-enters the naphthalene ambient atmosphere is her department?" I have asked both providers, and even asked Beth. No one knows. Her overall disease process and its symptoms have lessened since she last worked 20 hours per week, so I would hold that she should experience less migraine frequency in the workplace than she had one year ago.

Every return to work from a serious illness (even physical ones such as back surgery or total knee replacement) is a judgment call by health care providers based on their professional judgment and experience, that the time is appropriate. I believe that such is the case here.