**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **Beth M. Norden,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1232 (RMC) |
| | ) | |
| **Lawrence M. Small,** | ) | |
| **Secretary of the Smithsonian** | ) | |
| **Institution** | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

## PLAINTIFF'S STATEMENT OF THE CASE & CAUSES OF ACTION

### Plaintiff's Disability

1. Plaintiff, a dedicated research scientist with a doctorate in entomology, a Fulbright scholar, the author of over 50 scientific papers, and a 20 year employee of the Smithsonian who has been named as one its "unsung heroes," was stricken with hemorrhagic dengue fever as a result of field work she performed for the Smithsonian in the summer of 2000.

2. The hemorrhagic form of dengue is often fatal, particularly for adults. Dr. Norden will carry two different serotypes of the dengue antibodies for the rest of her life. These antibodies make her capillaries vulnerable to leaking. The leaking capillaries can cause migraine headaches, cognitive impairment severe enough for her to be unable to care for herself in any of her daily functions, a severe loss of energy, hallucinations, and other impairments. Exposure to heat, excessive stress, and certain chemicals are among the triggers for capillary bleeds. <u>Preventing capillary bleeds is crucial for Dr. Norden to maintain her overall health and cognitive functioning.</u>

3. The Smithsonian's Office of General Counsel has found that Dr. Norden is a person with a disability within the meaning of OHR Rehabilitation Act.

4. Since her infection, Dr. Norden has recovered her intellectual capabilities and has attempted to return to work at the Smithsonian.

### Dr. Norden's Return to Work

5. Dr. Norden's return to work[1] began on April 3, 2002. Both Dr. Norden's neurologist and the Smithsonian's own physician Dr. Lawford advised that Dr. Norden be given "flex time" as an accommodation so Dr. Norden could meet her many doctors' appointments and take time off when she suffered from a migraine or when the heat might cause her to bleed.

6. Although Dr. Norden was given "light duty" of 20 hours per week, her return to work excluded even the normal scheduling flexibility that Dr. Norden had always enjoyed prior to contracting dengue.

7. Soon after she returned to work, Dr. Norden and her doctors identified the chemical naphthalene as a trigger for Dr. Norden's capillary bleeds. In April of 2002, Dr. Norden spoke to her supervisor, Dr. Schultz, several times about her sensitivity to naphthalene and her resulting need for accommodations.[2]

8. Dr. Norden provided Dr. Schultz with a respirator request form and was fitted and tested for a respirator to protect her from the naphthalene fumes. Smithsonian physician Dr. Lawford expedited her request for a respirator as a result of Dr. Norden's increasing sensitivity to naphthalene. Dr. Norden began suffering from frequent nose bleeds and intense

---

[1] Dr. Norden returned to work prior to this time, but was not ready and the return only lasted a short time.

[2] Napthalene is a chemical widely used in the insect collection to prevent live insects from eating the insect specimens. Because napththalene is believed to cause bleeding and other blood vessel problems, it has not been used by museums in England for approximately 20 years. Its use is not considered good practice at the Smithsonian either, and its continued use is contrary to Smithsonian policy.

migraines, indicating that she was experiencing regular capillary bleeds.  Dr. Norden, Dr. Lawford, and the Smithsonian hygienist made numerous requests for accommodations such as a respirator or an air filter.

9. Throughout the entire period of Dr. Norden's second return to work, which lasted from April 3, 2002 to November 30, 2002, Dr. Norden was never given a respirator or an air filter, never moved to another office farther from the fumes or allowed to work from home,[3] never given a change of duty that would decrease her exposure to naphthalene, and never given any other accommodation except her temporary light duty hours.

10. Dr. Norden also sought, on her own, accommodations by requesting a transfer to either the insect zoo or to the USDA, both of which are naphthalene free environments.  The insect zoo transfer was denied.  When Dr. Norden requested the USDA transfer, one of her superiors told her that she was "probably going through menopause" which was making her more "emotional" on the subject of naphthalene.

11. The Smithsonian physician and hygienist increased their pressure on Dr. Schultz to provide accommodations.  Dr. Schultz responded by asking a personnel officer if he was required to keep Dr. Norden on light duty hours.  The personnel officer stated that Dr. Schultz was not required to do so.

### Dr. Norden Forced To Go On Disability Status

12. On November 18, 2002, Dr. Norden was given a memo terminating her from light duty as of November 30, 2002, and putting her on disability status.  Dr. Norden <u>remained on the Smithsonian rolls as an employee</u> and was told that the goal was for her to return to work full time.  Dr. Norden was not given any information, however, as to her request for accommodations.

---

[3] Other employees in Dr. Norden's department were previously allowed this accommodation.

13. Dr. Norden's treating physicians believe that Dr. Norden's prolonged and heavy exposure to naphthalene may have irreversibly exacerbated her sensitivity to the chemical and her tendency to suffer from intense migraines even without its presence.

14. In August of 2003, Dr. Norden filed a formal complaint of disability discrimination against the Smithsonian.

15.  Subsequently, Dr. Norden has made attempts to be removed from disability status and to regain employment with the Smithsonian who claimed that it was waiting for clearance from Dr. Norden's doctors.  In April of 2004, after such clearance was given, the Smithsonian provided a return to work plan conditioned on Dr. Norden relinquishing her present and future rights to file suit for any adverse actions by the Smithsonian, specifically including her August 26, 2003 discrimination complaint.  This explicit condition in the Smithsonian's return to work plan is direct evidence of retaliation.  Unlike the case of indirect evidence of retaliation, direct evidence of retaliation does not require a McDonald Douglas analysis with: 1) an inference of retaliation raised by plaintiff's prima facie case, 2) defendant's non-discriminatory reasons, and 3) plaintiff's evidence of pretext.

16.  The return to work plan also would have required Dr. Norden to do work that was very different from what she had done previously in her career at the Smithsonian with a review cycle of every 8 weeks rather than every year, a rigid set of deadlines and the provision that she would be terminated if she missed any of them for any reason, and a greater exposure to naphthalene because under the Smithsonian's return to work plan, Dr. Norden would now be working primarily on insect collection[4] instead of research.

---

[4] With heavy naphthalene exposure.

17.     Dr. Norden declined the Smithsonian's return to work plan, and filed a new complaint for retaliation against the Smithsonian.  In the interim, there were positions available for Dr. Norden that made use of her entomology specialty.  Dr. Norden was not offered these positions.  Instead, in September of 2004, the Smithsonian invited Dr. Norden to apply for a position as a "zoo registration specialist" at the National Zoo.  This position made no use of Dr. Norden's expertise as an entomologist; instead it required legal knowledge of  "[zoo] compliance with federal, state, and local wildlife regulations. . . legal, ethical and care standards. . .domestic and/or international shipments of live animals. . .Interior, Agriculture, Treasury and other government requirements relating to collection activities."  Dr. Norden did not apply for the "zoo registration specialist" job.

### Smithsonian's Termination of Dr. Norden

18.     On October 8, 2004, the Smithsonian terminated Dr. Norden from its' rolls, bootstrapping its' reasons that Dr. Norden would not accept the Smithsonian's previous retaliatory return to work plan or the Smithsonian's "zoo registration specialist" job.

### CAUSES OF ACTION

Disability Discrimination, Failure to Accommodate, Retaliation including Direct Evidence of Retaliation: All under Section 501 of the Rehabilitation Act, 29 U.S.C. Section 791.[5]

_____
Alex T. Sliheet
D.C. Bar No. 438977
Vickie Inge Fang, *Pro Hac Vice*
Attorneys for Plaintiff Beth Norden
8792 Nightingale Dr.
Lanham, MD 20706
 (301) 552 -4908

---

[5] Section 501 of the Rehabilitation Act places the Federal Government on a higher standard than other employers.  The Rehabilitation Act specifically mandates non-discrimination by the Federal Government and requires affirmative action by the Federal Government in the hiring, placement and advancement of people with disabilities.