Alex T. Sliheet, D.C. Bar No. 438977
Vickie Inge Fang, *pro hac vice*
Attorneys for Plaintiff Beth Norden
8792 Nightingale Drive
Lanham, MD  20706
alexsliheet@yahoo.com
fvickie@comcast.net
(301) 552-4908

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Beth M. Norden,** ) | |
| ) | **Case No. 051232 (RMC)** |
| **Plaintiff** ) | |
| ) | **PLAINTIFF'S NOTICE OF MOTION &** |
| **v.** ) | **MOTION FOR SUMMARY** |
| **Lawrence M. Small,** ) | **JUDGMENT, OR IN THE ALTERNATIVE** |
| ) | **SUMMARY ADJUDICATION** |
| **Defendant** ) | |
| _____) | |

**TO: ALL PARTIES HEREIN AND TO THEIR RESPECTIVE ATTORNEYS OF
RECORD**

PLEASE TAKE NOTICE that in the above entitled Court Plaintiff Beth Norden will move

for summary judgment or in the alternative for summary adjudication.  The motion is made

on the grounds that there are no material facts in dispute.   This motion is based on this

notice, the accompanying memorandum of points and authorities, the statement of material

facts not in dispute, the declaration of Beth Norden and attached exhibits, pleadings and

records on file in this action, and upon such further oral and documentary evidence as may

be presented at or before the hearing on the motion.

Dated: _____          _____

`                Alex T. Sliheet, Vickie Inge Fang, *pro hac vice*
                Attorneys for Plaintiff Beth Norden

## MEMORANDUM OF POINTS AND AUTHORITIES

**Table of Contents**                                               **Page**

I.     STANDARD OF REVIEW……………………………………………5

II.    OVERVIEW OF THE REHABILITATION ACT ………………….…….6

III.   PLAINTIFF IS A PERSON WITH A DISABILITY UNDER THE
       REHABILITATION ACT…………………………………………………….7

IV.    PLAINTIFF IS A QUALIFIED INDIVIDUAL WHO COULD
       PERFORM THE ESSENTIAL REQUIREMENTS OF HER JOB
       WITH REASONABLE   ACCOMMODATIONS……………………...…..13

V.     PLAINTIFF REQUESTED REASONABLE ACCOMMODATIONS BUT
       WAS DENIED RESONABLE ACCOMMODATIONS FOR HER
       DISABILITY……………………………………………………………...…14

VI.    PLAINTIFF EXHAUSTED HER ADMINISTRATIVE REMEDIES……..…16

VII.   RETALIATION AGAINST DR. NORDEN BASED UPON THE APRIL
       2004 RETURN TO WORK PLAN AND HER OCTOBER 2003
       TERMINATION……………………………………………………………….23

VIII.    CONCLUSION…………………………………………………………..30

**Table of Authorities**                                                          **Page**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)……………………………..5

Anthony v. Bowen, 674 F. Sup. 876, 879 (D.D.C. 1986)……………………………..…18

Armstrong v. Reno 172 F. Supp 2d 11, 23 (D.D.C. 2001)…………………………..6,19

Bonura v. Chase Manhattan Bank, N.A. 795 F.2d 276, 277 (2nd Cir. 1986)…………..30

Burlington Northern v. White, 126 S.Ct. 2405 (June 22, 2006)…………………….…..23

Carney v. American University, 151 F.3d 1090, 331 U.S.App.D.C. 416 (1998)……….27

Carr v. Reno, 306 U.S. App. D.C. 217, 23 F.3d 525, 529 (D.C. Cir. 1994)……………..6

Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986)……………………………………..…5

D'Angelo v. Congra Foods, Inc., 422 F.3d 1220 (11th Cir., 2005)………………………11

Dorchy v. Washington Transit, 45 F. Supp. 2d 5, 13 (D.D.C. 1999)……………………29

Felter v. Norton, 412 F. Supp. 2d 118, 126 (D.D.C. 2006)……………………….......21

Forkkio v. Powell, 353 U.S. App. D.C. 301, 306 F.3d 1127, 1131 (D.C. Cir. 2002).….23

Katz v. City Metal Co., 87 F.3d 26, 33 (1st Cir. 1996)…………………………………..12

Pace v. Paris Maintenance Co., 107 F. Supp. 2nd 251 (S.D.N.Y. 2000)…………………10

Pantazes v. Jackson, 366 F. Supp. 2d 57 (D.D.C. 2005)…………………………………7

Richards v. CH@M Hill, Inc., 26 Cal. 4th 798, 823; 29 P.3d 175;
111 Cal. Rptr. 2d 87 (2001)………………………………………………………………..20

School Board of Nassau County v. Arline, 480 U.S. 273, 107 S.Ct. 1123,
94 Led.2d 307 (1987),…………………………………………………………………………11

Scott v. Garcia, 370 F. Supp. 2d 1056, 1065 (D.C. Cal. 2005)…………………………19

<u>Singletary v. District of Columbia</u>, 359 U.S. App. D.C. 1 351 F.3d 519, 524
(DC Cir. 2003)…………………………………………………………………..…..26

<u>Shager v. UpjohnCo</u>. 913 F. 2d 398, 405 (7th Cir. 1990)………………………….…..30

<u>Southeastern Community College v. Davis</u>, 442 U.S. 397, 410-411,
60 L. Ed. 2d 980, 99 S. Ct. 2361 (1979)…………………………………………………..6

<u>Stemmons v. Missouri Department of Corrections,</u> 82F.3d 817 (8th Cir. 1996) ………..30

<u>Tsai v. Helfer & FDIC</u>, 940 F. Supp. 597, 599 (S.D.N.Y. 1996)………………..…….18

<u>Weigert v. Georgetown Univ.</u>, 120 F. Supp. 2d 1, 16 (D.D.C. 2000)……………....…23

<u>Weldon v. Kraft, Inc.,</u> 896 F.2d 793, 799 (3d Cir. 1990)……………………………..30

<u>Williams v. Philadelphia Housing Authority</u>, 380 F.3d 751 (3rd Cir. 2004)…………….11

**Statutes/Codes**

Fed. R. Civ. P. 56(c)

29 U.S.C. § 791, et.al

29 C.F.R. Section 1630.2, et. al.

42 USC section 12102, et. al.

## Brief Introduction

The Smithsonian is a federal agency mandated by law to provide affirmative action in terms of accommodating its employees with disabilities. The Smithsonian has already acknowledged that Dr. Norden has a disability that she incurred in the service of the Smithsonian. Instead of rising to its responsibility and providing the modest accommodations that Dr. Norden requested to solve the problem, the Smithsonian allowed her to work without accommodations, knowing that she suffered increasing pain and injury when she did so. Even more egregious, the Smithsonian actually refused to provide the accommodations unless draconian new conditions in the terms of employment were also accepted. These conditions were not linked to the disability, and they were designed to ensure failure by Dr. Norden. Finally, the Smithsonian terminated Dr. Norden, effectively destroying the career of a scientist in a highly specialized field of study.

## I.  STANDARD OF REVIEW

Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits or declarations, if any, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  When considering a motion for summary judgment, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in their favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  However, summary judgment is not a "disfavored legal shortcut." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986), and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of

summary judgment. . . If evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 248.

### III.     OVERVIEW OF THE REHABILITATION ACT

To prevail on a claim under the Rehabilitation Act, a plaintiff must prove that (1) he is disabled within the meaning of the act…, (2) he is otherwise qualified; (3) his employer was aware of his disability; and (4) he was denied a reasonable accommodation for the disability." Armstrong v. Reno 172 F. Supp 2d 11, 23 (D.D.C. 2001).   "The Rehabilitation Act was amended to adopt the standards of Title I of the Americans with Disabilities Act (ADA) of 1990. 29 U.S.C. section 794(d)." Id.

"Section 501 of the Act applies specifically to federal employers; it requires them to take *affirmative action* on behalf of the disabled, an obligation that goes beyond the non-discrimination requirement in § 504. 29 U.S.C. § 791 (b)." Carr v. Reno, 306 U.S. App. D.C. 217, 23 F.3d 525, 529 (D.C. Cir. 1994).  See also Southeastern Community College v. Davis, 442 U.S. 397, 410-411, 60 L. Ed. 2d 980, 99 S. Ct. 2361 (1979)

Reasonable accommodation means modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed or modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.  Reasonable accommodation may include but is not limited to job restructuring; part-time or modified work schedules; reassignment to a vacant position; acquisition or modifications of equipment or devices.  To determine the appropriate reasonable accommodation it may be

necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.  See: 29 CFR 1630.2

The interactive process begins when an employee requests an accommodation. Once this process has begun, both the employer and the employee have a duty to act in good faith, and the absence of good faith, **including unreasonable delays caused by an employer,** can serve as evidence of a Rehabilitation Act violation.  See:  Pantazes v. Jackson, 366 F. Supp. 2d 57 (D.D.C. 2005).

### III.    PLAINTIFF IS A PERSON WITH A DISABILITY UNDER THE REHABILITATION ACT

A person is "disabled" if that person has (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual, (B) a record of such impairment, or (C) is regarded as having such an impairment.  42 U.S.C. Section 12102(2).  Dr. Norden meets each of these three categories.

#### (A)  Physical or mental impairment

Dr. Norden has both physical and mental impairments that substantially limit one or more of her major life activities.  As shown in the Statement of Material Facts, Dr. Norden's neurological, hematological, and immune systems have been severely compromised as a result of the DHF.  After spending nearly three weeks in the hospital in the fall of 2000, she spent more than two years recovering from brain trauma, too fatigued to be able to work full time, and plagued by migraine headaches, spontaneous bruising, and nose bleeds caused by capillary bleeds.  Her abilities to learn, concentrate , think, care for

herself, and engage in normal sexual relations were all seriously impaired.  She eventually

recovered intellectual functioning and much of the physical stamina she enjoyed prior to

her illness, but she continues to suffer from frequent migraines, frequent bleeding, an

inability to thermo regulate, and an inability to enjoy normal sexual relations.  She has also

permanently retained the dengue antibodies which weaken the walls of her capillaries.  She

must remain constantly watchful that she does not trigger additional severe capillary bleeds

which could cause renewed brain trauma.  Her migraine headaches may be triggered by

heat, stress, illness, medication, a change in barometric pressure, storms and by certain

chemicals, including naphthalene.  Her migraine headaches are so severe that they prevent

her from being able to concentrate, learn, socialize, or even care for herself in many routine

activities.  Dr. Norden's major life functions of learning, concentrating, self care, and

sexual activity have been substantially limited for two years.  The major life function of

sexual activity remains severely limited, and she still suffers from frequent migraines that

substantially limit her in the several other major life functions.  She also still suffers from

the sequlea of the illness and the threat of additional brain trauma if her special needs are

not accommodated.  *See paragraphs 5 – 7, 16 – 18, 29 – 30, and 42 of the Material Facts*.

At the Smithsonian, Dr. Norden's work station was near the storage cabinets of

the specimens that contained naphthalene.  Every time Dr. Norden was forced to open a

cabinet or when someone else opened a cabinet, Dr. Norden would get a DHF capillary

nose bleed <u>instantaneously</u> from the naphthalene fumes.  This happened on a daily basis

and often more than once a day.  Dr. Norden would then have to leave her station and go

down the hall into the ladies room to be free from the naphthalene fumes and to try and

control the nose bleed.  This escape to the ladies room would last for a prolonged period of

time, sometimes hours, depending on how much naphthalene Dr. Norden was exposed to and how quickly she was able to escape her office.  She would also have to wait for the naphthalene fumes to clear her department.  On many occasions, the return to her work station only triggered another nose bleed again.  The nose bleeds would also be accompanied by subsequent headaches.  On some occasions, the headaches were so severe as to force Dr. Norden to leave work and go home.  During the nose bleeding, Dr. Norden would many times be forced to lie down in the ladies room while trying to control the bleeding using Kleenex.  During this daily bleeding episode, not only was Dr. Norden's long-term health being damaged, but also Dr. Norden would have substantial difficulty in performing tasks, being at her work station, thinking, concentrating and communicating with other individuals.  The migraine headaches also affected Dr. Norden's ability to think, concentrate and communicate with other individuals, and even to stand or to take care of herself.  *See paragraph 22 of Material Facts.*

In addition, by April of 2003, she suffered from a major depressive disorder and posttraumatic stress disorder as a result of the DHF and of the Smithsonian's refusal to accommodate her.  Although she has made some improvement, she still suffers from both disorders.  Episodically, these mental impairments substantially limit her ability to learn, socialize, and care for herself, as well as to take pleasure in any daily activity. Dr. Norden therefore has both physical and mental impairments which are ongoing and substantially limit her in a major life activity, i.e., qualify as a disability.  *See paragraphs 60 – 61 of the Material Facts.*

**(B) Record of a disability**

Dr. Norden meets the "record of" prong of the law because records of her impairment were continuously made available to the Smithsonian.  While there remains some debate as to whether "record of impairment" means a history of impairment or actual documents known to the employer, see <u>Pace v. Paris Maintenance Co.</u>, 107 F. Supp. 2nd 251 (S.D.N.Y. 2000), Dr. Norden meets both tests.  Not only did she have a history of serious impairment, but she provided these records of her physical and mental impairments to the Defendant.  Defendant had the added advantage of having a doctor on staff, Dr. Lawford, who was able to interpret the records and consult with both Dr. Norden and her doctors.  *See paragraph 9 of the Material Facts.*

**(C) Regarded as Impaired**

Dr. Norden meets the third prong of the law, "regarded as impaired" because she is regarded as having an impairment by her former employer, the Defendant.  Both the Defendant's Office of General Counsel and Dr. Norden's immediate supervisor regarded her as "disabled."  Dr. Schultz testified that "this disability was never in question."  *See paragraphs 10 – 11 of the Material Facts.*

While it is universally understood that reasonable accommodations that do not cause an undue hardship must be given for the disabled who meet the requirements of prong (A) a physical or mental impairment that substantially limits one or more major life activity, the federal courts have been divided as to whether employees who only have a record of impairment or are only regarded as impaired have a right to accommodation. Several circuits have ruled that such employees are only protected from discrimination or that either the "regarded as" or "record of" employees are excluded from the full protection

of the law.[1]  These cases do not state that the language of the law excludes employees whose disabilities spring from prong (B) or (C) of the definition of disability.  Instead, they hold that an unfortunate social consequence would result if such employees were entitled to reasonable accommodations.  Kaplan, for example, concedes that the literal language of the statutes require reasonable accommodations for all disabled employees, but goes on to reason as follows:

> "If we were to conclude that "regarded as" plaintiffs are entitled to reasonable accommodations, impaired employees would be better off under the statute if their employers treated them as disabled even if they were not. . .Were we to entitle "regarded as" employees to reasonable accommodations, it would do nothing to encourage these employees to educate employers of their capabilities. Supra at 1223."

Some more recent cases, however, have held that employees who meet prong (B) or (C) of the statute **are also entitled to accommodation**.  D'Angelo v. Congra Foods, Inc., 422 F.3d 1220 (11th Cir., 2005) and Williams v. Philadelphia Housing Authority, 380 F.3d 751 (3rd Cir. 2004) have both relied on the plain language of the statute to find that the law protects all disabled employees.  The Congra court held as follows:

> "In interpreting a statute, it is by now axiomatic that our first step "is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." Robinson v. Shell Oil Co., 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed. sd 808 (1997);  see also, e.g. Country Best v. Christopher Ranch, LLC, 361 F.3d 629, 632 (11th Cir. 2004).  We therefore turn to the text…
>
> The text of the statute simply offers no basis for differentiating among the three types of disabilities in determining which are entitled to a reasonable accommodation and which are not." Congra at 1236

---

[1] See Kaplan v. N. Las Vagas, 323 F.3d 1226, 1233 (9th Cir. 2003), Weber v. Strippit, Inc., 186 F.3d 907, 916 (8th Cir. 1999), Workman v. Frito Lay, Inc., 165 F.3d 460, 467 (6th Cir. 1998), and Newberry v. E. Tex. State Univ., 161 F.3d 276, 280 (5th Cir. 1998)

Other decisions, including <u>Katz v. City Metal Co.</u>, 87 F.3d 26, 33 (1st Cir. 1996) have also appeared to follow the plain language of the law regarding employees without current disabilities, although the courts did not hold directly on the issue. The Supreme Court in <u>School Board of Nassau County v. Arline</u>, 480 U.S. 273, 107 S.Ct. 1123, 94 Led.2d 307 (1987), ruling on the Rehabilitation Act itself, held in favor of a teacher who had a record of tuberculosis and was still regarded as having tuberculosis. The Court did not simply remand for a finding of whether she was actively discriminated against, but for "whether the school board could have reasonably accommodated her." <u>Arline</u> at 480 U.S. at 288. For the lower courts to find that the Rehabilitation Act does not give employees who are "regarded as disabled" or who have "a record of disability" the right to reasonable accommodations, they must first conclude that neither the Congress nor the Supreme Court intended the plain meaning of their own language.

Like Ms. Arline, Dr. Norden was regarded as disabled by her employer. Like Ms. Arline, Dr. Norden's employer treated her differently as a result of the fact that it regarded her as disabled. In Dr. Norden's case, this different treatment meant that her working hours were changed. The change was originally suggested by Dr. Norden's doctors as an accommodation for the effects of the DHF she had suffered. The changed hours, however, became a double edged sword, as they came with restrictions as to exactly when she was allowed to work. While she had previously spent more than a decade working "very long hours, often alone, on weekends and in the evenings at the Smithsonian," her 2002 return to work schedule required her to perform her light duty hours within a very limited time frame so that she had less ability to make up time lost to illness and medical appointments. *See paragraphs 3 and 20 of the Material Facts.* Her "regarded as disabled" status caused her to

be treated differently and put her in need of the "reasonable accommodation" protection of the law.

Also like Ms. Arline, Dr. Norden had a record of impairment. Also like Ms. Arline, Dr. Norden must live in fear that she will again suffer the devastating consequences of her underlying condition. A victim of tuberculosis remains vulnerable to the possibility of recurrence. Dr. Norden remains vulnerable to further neurological and hematological trauma if her damaged capillaries begin to leak uncontrollably. The catastrophic impairment Dr. Norden suffered when she spent nearly two years struggling with brain trauma and with fatigue so severe that she was unable to work even twelve hours per week may recur. In order to prevent this recurrence and to again become a productive person, she must receive **the reasonable accommodations that she, her doctors, and even the Defendant's own safety office requested.**

Dr. Norden suffers from the sequlea and ongoing impairment of DHF. She also has an active diagnosis of a major depressive disorder and posttraumatic stress. These are serious and disabling impairments which entitle her to protection under the law. In addition, she has a record of impairment and is regarded as impaired by the Defendant. She is therefore disabled under all three definitions in the Rehabilitation Act.

**IV.    PLAINTIFF IS A QUALIFIED INDIVIDUAL WHO COULD PERFORM THE ESSENTIAL REQUIREMENTS OF HER JOB WITH REASONABLE ACCOMMODATIONS**

Dr. Norden had worked as a museum specialist at the Smithsonian for nearly fifteen years and had consistently received the highest possible evaluation – "Outstanding." *See paragraph 1 of the Material Facts*. A battery of intelligence tests performed in early 2003 showed that, when not exposed to naphthalene or other factors that triggered her

13

Dengue Hemorrhagic Fever sequlea, she had regained her "superior" intellect. *See paragraph 7 of the Material Facts.* Her performance evaluations for both her first and second return to work stated that she performed her work well, *and this work was performed even when she did not have accommodations for her naphthalene sensitivity. See paragraph 45 of the Material Facts.*

In November of 2003, <u>Dr. Norden's doctors cleared her to work full time with accommodations for her sensitivity to naphthalene and with protection from employer hostility and retaliation.</u> *See paragraph 67 of the Material Facts.* The discharge letter dated October 8, 2004, which was signed by Dr. Mathis, stated that she was being discharged only because the Smithsonian could not accommodate her. *See paragraph 87 of the Material Facts.* Dr. Norden was a qualified individual who only needed the reasonable accommodations recommended by Defendant's own staff to return to a productive and useful life.

**V.     PLAINTIFF REQUESTED REASONABLE ACCOMMODATIONS BUT WAS DENIED RESONABLE ACCOMMODATIONS FOR HER DISABILITY.**

As described in the Statement of Material Facts Not at Issue, Dr. Norden made more than a dozen requests for accommodations. *See paragraph 26 of the Material Facts.* In addition, her doctors, Smithsonian medical and industrial hygiene personnel, and, later, Dr. Norden's attorneys made the same requests for accommodations. These requests centered on her need for flexible hours to accommodate her many doctors' visits and her migraine headaches, as well as her need to reduce her exposure to naphthalene. Since these requests were summarized and advanced by Defendant's own safety experts (Dr. Lawford and the industrial hygienist), and promised by Defendant, it is impossible for Defendant to

argue that it was not aware or even that it did not understand the needed accommodations or that the accommodations were not reasonable. Dr. Norden received no reasonable accommodations at all for her naphthalene sensitivity. *See paragraph 42 of the Material Facts.* Although accommodations were offered in the April 2004, return to work plan, they were not good faith and offered only on the condition that Dr. Norden acquiesce to draconian and punitive new terms of employment which will be discussed in section VII (A)(1), <u>infra</u>. [Also to be discussed in section VII(B)(2) <u>infra</u>, is the defendant's lack of good faith "accommodation" instructing Dr. Norden to apply for the D.C. Zoo position]

The Defendant's sole pretest for not providing accommodations has been the claim that, after begging for the accommodations, Dr. Norden refused to wear a respirator and refused to use the ventilated fourth floor office. At deposition, however, the Person Most Qualified to discuss the accommodations **admitted that Dr. Norden had not refused a respirator.** She had merely sent a memo suggesting that she could perform her job better with a portable air filter. Her performance evaluation, dated nearly three weeks after Dr. Norden's memo, <u>states that a respirator and portable air filter are being procured for her.</u> As of July 22, 2002, a respirator and air filter were still considered reasonable accommodations by the Defendant, and Dr. Norden's preference for an air filter over a respirator had not been viewed as a "refusal to wear a respirator." <u>She was still being promised both accommodations,</u> and she still hoped to receive both accommodations. *See paragraphs 34 – 36 of the Material Facts.*

As to moving Dr. Norden to the fourth floor, Dr. Norden has never refused to work on the fourth floor. Dr. Schultz, the PMQ, also admitted that Dr. Norden had never been instructed to move her office to the fourth floor and that she could not perform a

significant part of her work on the fourth floor.  Dr. Schultz  testified that Dr. Norden was

unable to do a substantial part of her work in the area to which she should have relocated

on the fourth floor as an accommodation because the necessary computer was not in that

room.  Not only did the "ventilated room" on the fourth floor lack both the computer and

the specimens Dr. Norden needed, it was also kept locked, and Dr. Norden was denied a

key.  *See paragraphs 37 – 40 of the Material Facts*.

   Wishing that an employee would change offices without instructing the employee to do

so and without making it possible for the employee to do a significant amount of her work

in the new office is hardly a legal defense to the employer's obligation to provide

reasonable accommodations. The sole defense for not providing reasonable

accommodations is a pretext that has been effectively withdrawn through deposition

testimony of PMQ, Dr. Schultz.

       Dr. Norden has shown as a matter of law that she was a disabled, qualified

employee who requested reasonable accommodations.  She has shown that these

reasonable accommodations were promised to her, but then refused for pretextual reasons.

She has also shown that she suffered damages as a result of the failure to accommodate her

in the form of severe physical pain, emotional distress, and loss of income and job benefits.

She has established that Defendant failed to accommodate her in violation of the

Rehabilitation Act, and that this failure to accommodate was material.

## VI.    <u>PLAINTIFF EXHAUSTED HER ADMINISTRATIVE REMEDIES</u>

       Dr. Norden filed separate informal and formal complaints for each of the

following adverse employment actions: 1) the initial failure to accommodate her disability

beginning with the 2002 return to work and continuing throughout the period that Dr.

Norden remained on the employment rolls, 2) the 2003 letter from Dr. Schultz threatening to remove Dr. Norden from the employment roll, 3) the April, 2004 retaliatory return to work proposal that caused migraines, nightmares, a temporary setback in her therapy and other emotional harm, and 4) the 2004 termination letter which ended her career.

Dr. Norden filed her first informal complaint in April of 2003. The defendant EEO ruled that that this complaint time was time barred. In so ruling, it made the assumption that Dr. Norden was complaining about the termination of light duty hours on November 30, 2002. Dr. Norden, however, never complained about the termination of light duty; she complained about the failure to accommodate her sensitivity to naphthalene. *See paragraph 59 of the Material Facts.*

Dr. Norden, through her pervious attorney, alleged, "Dr. Norden believes that the department can accommodate her disability, but is failing and refusing to do so. The accommodation is a reasonable one." In answer to the question, "What happened (how were you discriminated against)?" Dr. Norden answered as follows [Exhibit 36]:

> "In August 2000, Dr. Norden contracted hem. Fever performing fieldwork for the Smithsonian Institution. As a direct result, Dr. Norden has developed an acute sensitation to naphthalene, a chemical used throughout the department of systemic biology in the national museum of history. In October 2002, the office of safety and environmental management requested that this department develop a plan to control Dr. Norden's exposure to naphthalene, to accommodate her disability. The department failed and refused to do so. Rather, the department terminated Dr. Norden's part-time work schedule effective November 30, 2002."

In answer to the question "What remedy are you seeking for the alleged discrimination?" Dr. Norden answered, "For the department to accommodate Dr. Norden's disability. To be made whole for all losses sustained as a result fo (sic) the department's failure and refusal to accommodate Dr. Norden's disability." *See paragraph 59 of the Material Facts.*

17

Dr. Norden had been on light duty status before her naphthalene sensitivity was even known. Light duty status was therefore not an accommodation to her sensitivity, but to the lingering loss of stamina she suffered as the result of her DHF. As she recovered, Dr. Norden was regaining her stamina and did not believe that she needed the continued light duty accommodation hours as long as she had accommodations for her naphthalene sensitivity. She did answer "November 30, 2002" in response to the question, "On what date(s) did the alleged discrimination take place?" This answer, however, is at worst not artful. It does not change the fact that Dr. Norden also used the present tense in alleging that the department "is failing and refusing" to accommodate her handicapping condition. Dr. Norden was complaining about the failure to accommodate her naphthalene sensitivity, just as she and the safety office had been complaining, orally and in writing, for months.

Moreover, this was only an informal complaint. As the Court held in Anthony v. Bowen, 674 F. Sup. 876, 879 (D.D.C. 1986), "It is apparent from the regulatory scheme, then, that the parameters of an employee's charge of discrimination must be found in the *formal* complaint itself. . ." (emphasis added) This holding is in accord with Tsai v. Helfer & FDIC, 940 F. Supp. 597, 599 (S.D.N.Y. 1996) which holds, "That plaintiff may have neglected to raise her claim at the informal complaint stage does not in any way affect or alter the express allegations of the formal complaint."

Dr. Norden's formal complaint, filed in August of 2003, listed "ongoing" in answer to the question, "Date on which most recent discrimination took place." The Defendant's EEO Counseling report also lists "ongoing" as the date of the alleged discrimination. This report mentions light duty, but primarily discusses naphthalene accommodation. *See paragraph 62 of the Material Facts*. The EEO understood that the

18

failure to accommodate the naphthalene sensitivity was the crux of Dr. Norden's

complaint.  The question then becomes whether Dr. Norden made a timely complaint of

failure to accommodate her naphthalene sensitivity when she filed her first informal

complaint in April of 2002.

### A.    Continuing Violations Doctrine

The Court in Scott v. Garcia, 370 F. Supp. 2d 1056, 1065 (D.C. Cal. 2005) held as follows:

> "The Supreme Court in Amtrack v. Morgan, 536 U.S. 101, 113 (2002) held that
> 'discrete discriminatory acts are not actionable if time barred, even when they are
> related to acts alleged in timely filed charges.'  Id. However, the Supreme Court
> did not directly overrule the second part of the continuing violations doctrine in
> which a plaintiff may establish a continuing violation if they show 'a systemic
> policy or practice of discrimination that operated, in part, within the limitations
> period.' Id. At 107."

The systemic policy at issue in this case is Defendant's unofficial practice or

course of conduct that denied Dr. Norden accommodations for her naphthalene sensitivity.

Courts applying the continuing violation doctrine have tended toward a broader view of

that doctrine when the cause of action involves ongoing failure to accommodate disability,

and there is particularly good reason to view the failure over time to accommodate a

disabled employee as a single course of conduct.  As the federal regulations implementing

the duty of reasonable accommodation make clear, "[t]o determine the appropriate

reasonable accommodation it may be necessary for the [employer] to initiate an informal

interactive process" with the disabled employee.  29 C.F.R. Section 1630.2(o)(3)(2000).

"The appropriate reasonable accommodation is best determined through a flexible,

interactive process that involves both the employer and the [employee] with a disability."

(29 C.F.R. Appen. to 1630, Interpretive Guidance on Title I of the Americans with

Disabilities Act, foll. Section 1630.9, Process of Determining the Appropriate Reasonable

Accommodation (2000).

Thus, reasonable accommodation is often an ongoing process rather than a single

action and may have many facets and may take a number of different forms.  In <u>Armstrong</u>

<u>v. Reno</u>, 172 F. Supp. 2d 11, 20 (D.D.C. 2001), Judge Sullivan held as follows:

> ". . .the continuing violation doctrine allows a complainant to reach back to
> incidents that occur prior to the 45 days before his first complaint. . . in this case
> [events] that occurred prior to January 1996, n2 and through the entirety of his
> employment with DEA, are part of a continuing violation that plaintiff has alleged
> amounts to . . . failure to reasonably accommodate his disability. . ."

As with harassment, an instance of an employer's failure to accommodate might,

in isolation, seem trivial, but it can assume greater significance and constitute a serious

injury when viewed as one of a series of such failures.  As the Supreme Court in California

has held,

> "As in <u>Berry</u>, we hold that an employer's failure to reasonably accommodate a
> disability, or to eliminate a hostile work environment targeting a disabled
> employee, is a continuing violation if the employer's unlawful actions are (1)
> sufficiently similar in kind – recognizing, as this case illustrates, that similar kinds
> of unlawful employer conduct, such as acts of harassment or failures to
> reasonably accommodate a disability, may take a number of different forms, (2)
> have occurred with reasonable frequency; (3) and have not acquired a degree of
> permanence.  (<u>Berry</u>, supra 715 F.2d at p. 981)

> . . .we further hold that "permanence in the context of an ongoing process of
> accommodation of disability, or ongoing disability harassment, should properly
> be understood to mean the following: than an employers statements and actions
> make clear to a reasonable employee that any further efforts at informal
> conciliation to obtain reasonable accommodation or end harassment will be futile.
> <u>Richards v. CH@M Hill, Inc.</u>, 26 Cal. 4th 798, 823; 29 P.3d 175; 111 Cal. Rptr.
> 2d 87 (2001)

Dr. Norden had not been fired; she was Defendant's employee.  The Defendant

therefore still had a responsibility to accommodate her and to allow her to return if she was

physically able to do so.  On this point, Dr. Norden and the Defendant are in perfect

agreement.  *According to the Defendant*, it was reasonable for her to expect that the

Smithsonian was still working to accommodate her and that she would be brought back if

she was capable of coming back.  Furthermore, Dr. Norden had been kept on the rolls of

employment at the Smithsonian rather than being terminated because the Smithsonian still

expected her to return to work there, and it was still assuming the responsibility to

accommodate her if it could.  *See paragraphs 54 – 55 of the Material Facts*.

Since Defendant had retained a responsibility to accommodate her, Defendant

was failing in its responsibility every day that it did nothing to fulfill its responsibility.

Defendant failed to accommodate Dr. Norden from the summer of 2002 when she

repeatedly requested accommodations to October of 2004 when Defendant at last openly

demonstrated that it had been lying and that it would not accommodate her and instead

fired her.

### B.    **Equitable Tolling Doctrine**

Even if Defendant had not had been responsible for accommodating Dr. Norden,

and thus had not committed an ongoing violation, the 45 day rule would still be equitably

tolled by the repeated, false assurances of government officials that Dr. Norden would be

accommodated.  See <u>Felter v. Norton</u>, 412 F. Supp. 2d 118, 126 (D.D.C. 2006:

> "Extraordinary circumstances are circumstances beyond the control of the
> complainant which make it impossible to file a complaint within the statute of
> limitations, <u>United States v. Cicero</u>, 341 U.S. App. D.C. 349, 214 F.3d 199, 203
> (D.C. Cir. 2000) **including government conduct that "lulled a complainant**
> **into inaction.**  <u>Curtiss v. Mt. Pleasant Corr. Facility</u>, 338 F.3d 851, 855 (8th Cir.
> 2003), and falsities that mislead a petitioner.  <u>Delaney v. Matesanz</u>, 264 F.3d 7, 15
> (1st Cir. 2000)." (emphasis added)

Dr. Norden was lulled into inaction by government conduct.  Defendant's physician and its Office of Human Resources both told her that her return would be addressed by her doctors.  The manager of Cultural Diversity/Affirmative Action stated that "The goal is for you to successfully return to your job full time." The possibility of her return was published in an internationally circulated newsletter approximately three months after she received the memo terminating her light duty hours.  A coworker wrote that one of Dr. Norden's cosupervisors had said she was being given a year off to recover.  When Dr. Norden wrote both the coworker and the supervisor back praising her department's compassion, no one corrected her belief or the original statement.  Even during the deposition of Dr. Schultz, the PMQ, in 2006, Defendant maintained that it had been attempting to accommodate Dr. Norden's disabilities during the period in which she filed her first informal complaint in April of 2003.  *See paragraphs 49 – 56 of the Material Facts.*  What the Defendant cannot maintain is that Dr. Norden should have known that Defendant would not accommodate her sensitivity to naphthalene on November 30, 2002.  Dr. Norden's initial informal complaint for failure to accommodate was therefore timely filed.

**<u>Other informal complaints filed by Dr. Norden</u>**

The Smithsonian EEO also found procedural fault with Dr. Norden's second and third informal complaints which were based on the 2003 letter and the retaliatory return to work proposal described above.  The alleged procedural failure was Dr. Norden's failure to file a formal complaint within 15 days of a Final Agency Decisions (FAD) on the two informal complaints.  Dr. Norden appealed the EEO decision to the EEOC <u>which found in her favor,</u> ruling on May 3, 2005, that neither Dr. Norden nor Dr. Norden's attorney had

ever received the FADs.  Defendant filed a Motion for Reconsideration which the EEOC

denied on October 21, 2005.  There was no problem with the 4th informal complaint on the

termination.  Dr. Norden has therefore timely filed all of her complaints and has exhausted

her administrative remedies.

**VII.     RETALIATION AGAINST  DR. NORDEN BASED UPON THE APRIL 2004 RETURN TO WORK PLAN AND HER OCTOBER 2004 TERMINATION.**

     **A.     Prima Facia Case.**

To establish a prima facie case of retaliation, the plaintiff must present evidence

that (1) she engaged in activity protected by Title VII; (2) the employer took an adverse

employment action against her; and (3) the adverse action was causally related to the

exercise of her rights.  Forkkio v. Powell, 353 U.S. App. D.C. 301, 306 F.3d 1127, 1131

(D.C. Cir. 2002)

(1) By repeatedly asking for accommodations in 2002, and by repeated filing

informal and/or formal complaints of disability discrimination throughout the period of

2003 and 2004, Dr. Norden engaged in protected activity.  See: Weigert v. Georgetown

Univ., 120 F. Supp. 2d 1, 16 (D.D.C. 2000) "At the outset, the court holds that Ms.

Weigert satisfies the first requirement of a prima facie case of retaliation, because

complaining of disability discrimination and filing an administrative complaint are

protected activities."

(2) The Supreme Court has recently given guidance as to what constitutes an

adverse employment action in the context of retaliation.  In Burlington Northern v. White,

126 S.Ct. 2405 (June 22, 2006), the Court held as follows:

    "We agree with the formulation set forth by the Seventh and District of Columbia
    Circuits.  In our view, a plaintiff must show that a reasonable employee would have

found the challenged action materially adverse, "which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Rochon, 438 F.3d at 1219 (quoting Washington, 420 F.3d at 662)."

"We phrase the standard in general terms because the significance any given act of retaliation will often depend upon the particular circumstances.  Context matters. . . A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children."

### 1.   2004 Return to work plan is an adverse employment action

The 2004 return to work plan was an adverse employment action.

First, it required Dr. Norden to waive both present claims and future rights in order to receive accommodations and return to work.  By being required to surrender both past and future rights in order to gain accommodations, Dr. Norden was being asked to forgo compensation for the migraines and other bleeding she experienced while working without accommodation in the 2002.  She was also being asked to put herself in the unique position of being a federal employee who was forced to work with dramatically reduced civil rights.

Second, it required her to work under a highly specific work plan that had rigidly defined deadlines and an eight week review cycle -- with the constant threat of being fired if she missed any deadline for any reason.  One day and half-day deadlines were a complete change in the level of intellectual freedom she had enjoyed in the past.  While she had previously performed a number of mundane tasks, she had also been granted the initiative to use her scientific judgment in setting some of her own goals and determining the individual task requirements.  Dr. Norden had also always been given annual performance reviews.  By changing her review cycle to 8 weeks and "as-needed," Defendant created an intolerable atmosphere of pressure and mistrust.  After spending almost exactly two years without being accommodated for a serious injury incurred in the course of her employment,

Dr. Norden was now being told that if she missed a one day deadline because she took personal leave, because she was suffering from a migraine, or because, in her professional judgment, the task required more work than had been previously anticipated, she would be fired. The managers who drew up this plan and the attorneys currently representing the Defendant might ask themselves whether they would consider having to follow such a schedule -- with the threat of losing their jobs if they missed a single deadline over the course of a year -- to be a materially adverse action.

Third, the plan was limited to work that would not lead to researching and writing scholarly papers. For a Fulbright Scholar who had published over 50 professional papers, this was a devastating loss. The overriding reason for her to work at the Smithsonian was to advance the understanding of entomology through her scientific work. While she would remain a "museum specialist," the proposed new job took away the emotional and intellectual rewards of her career. As in Burlington, Defendant may argue, "that a reassignment of duties cannot constitute retaliatory discrimination where, as here, both the former and present duties fall within the same job description." Such an argument, however, is unavailing. As the Court held in Burlington,

> "Almost every job category involves some responsibilities and duties that are less desirable than others. Common sense tells us that one good way to discourage an employee (such as White) from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable. Burlington at 2417."

Fourth, the work plan was based on twenty days of work every month, equaling 240 days per year. There are 364 days in a non-leap year, 102 days of which are weekends. Subtracting the scheduled days and the weekends leaves 20 days per year for holidays, sick

leave, and vacation leave. At Dr. Norden's level of seniority, the normal holiday and leave allowance is 36 days per year.

Fifth and finally, Dr. Norden's separation was only held in abeyance during the first year of the work plan, meaning that Dr. Norden would lose her tenure and return to a probationary status. *See paragraphs 69 – 79 of the Material Facts*.

Taken in its totality, this proposal was dramatic and materially adverse. When Dr. Norden declined it and filed a new discrimination complaint, Defendant withdrew the requirement that she relinquish her civil rights, but the punitive work schedule, the loss of her ability to research and write papers, the eight week review cycle, and the reduction in holiday and leave time remained. Any reasonable person would see such a draconian change in the circumstances of her work as "adverse" and "material." Instead of complying with its affirmative duty and providing the reasonable accommodations as required by law, the Defendant proceed to attach conditions to its duty that had nothing to do with implementing the reasonable accommodations.

(3) The third element Dr. Norden must show in a prima facia case of retaliation is that the adverse action is causally related to the exercise of her rights. This element is easily established. The Defendant itself directly tied the provision of the requested accommodations to the work plan described above. It is Defendant's response to Dr. Norden's request for accommodations. <u>Moreover, the causal connection for any of the adverse employment actions</u> taken against Dr. Norden can be established based upon a close temporal relationship alone. <u>See: Singletary v. District of Columbia</u>, 359 U.S. App. D.C. 1 351 F.3d 519, 524 (Dc Cir. 2003) "this circuit has held that a close temporal relationship may alone establish the required causal connection." <u>As Dr. Norden's</u>

protected activity was ongoing and continuous from 2002-2004, and as all the adverse

employment actions occurred during the protected activity, the close temporal relationship

is sufficient for causation.

**B.    Pretext as to the Defendant's "legitimate" reasons for the adverse employment actions of the 2004 return to work plan and the 2004 termination.**

**1.    Pretext as to return to work plan.**

At this point in the analysis it is normal to aver that Defendant's allegation of

legitimate, nondiscriminatory reasons for the adverse actions is mere pretext. Dr. Norden

can not do this because Defendant has never alleged any reason, legitimate or otherwise,

for the work plan and agreement.  The plan and agreement are simply Dr. Norden's

return to work offer in response to her renewed requests for accommodations.

Dr. Norden did propound the following interrogatory [Exhibit 34]:

"EXPLAIN and DESCRIBE any legitimate, nondiscriminatory reasons for the clauses in the April 2003 (sic) Return to Work offer, which differed from her previous conditions of employment, that: required Plaintiff to be reviewed every 8 weeks, required her to lose her position if she failed to meet any deadline for any reason, required her to work under much more tightly defined schedules than she had worked under during her career at the Smithsonian, required her to do collections work, required her to work for someone whose formal education ended with a bachelor's degree, and required her to relinquish all complaints and causes of action."

Dr. Norden received the following answer:

"Subject to and without waiver of defendant's general objections, defendant responds as follows: Defendant objects to any attempt by plaintiff to state a cause of action relating to the Return to Work offer.  Such offer was made during an effort to settle plaintiff's administrative claims of discrimination and, therefore, is a protected communication."   *See paragraph 89 of the Material Facts.*

On August 18, 2006, Dr. Norden, through her counsel, Vickie Fang, sent counsel

for Defendant a letter [Exhibit 35] which spent approximately three pages discussing

Interrogatory 18 and related items on the Defendant's Privilege Log.  The letter included

the following:

> "Carney v. American University, 151 F.3d 1090, 331 U.S.App.D.C. 416 (1998)
> holds as follows: "although settlement letters are inadmissible to prove liability or
> amounts, they are admissible 'when the evidence is offered for another purpose.'
> FED. R. EVID. 408.  In particular, such correspondence can be used to establish an
> independent violation (here, retaliation) unrelated to the underlying claim which
> was the subject of the correspondence."  *See paragraph 90 of the Material Facts.*

As of the date of this writing, there has been no amendment to the Interrogatory

Answer and no other explanation of the terms of the return to work offer.  As discussed in

the material facts, the Defendant knew that Dr. Norden suffered from a major depressive

disorder and posttraumatic disorder related to the loss of her career and her treatment by the

Defendant.  The cruelty of allowing her to believe that she might resume her career and

then offering such an adverse proposal had its predictable result of increased nightmares,

severe migraine headaches, a sense of punishment and devaluation, and a temporary set

back in her course of therapy.

### 2.    Pretext as to the October 2004 termination

Defendant's stated reason for firing Dr. Norden was its "inability" to accommodate

her.  As has been shown above, the "inability" was based on illegal pretext.  Defendant

attempted to bolster its initial pretextual failure to accommodate by relying upon the fact

that Dr. Norden rejected the retaliatory return to work proposal.  In so doing, Defendant

used its own act of retaliation to justify a further act of retaliation and discrimination.

Defendant's final rationalization for abandoning its responsibility to accommodate

Dr. Norden and destroying her career was her refusal to submit a statement of her

qualifications for a non scientific job registering animals at the D.C. Zoo.  As was

explained in the material facts, Dr. Norden could not show her qualifications for this job

because she had none.  Moreover, the D.C. Zoo position to which Dr. Norden was

requested to apply did not use any of Dr. Norden's skills or abilities as an entomologist.

*See paragraphs 84 – 86 of the Material Facts*. This is in stark contrast to the two other

positions which became available that did use Dr. Norden's skills and ability but which the

Smithsonian did not offer to Dr. Norden. *See paragraph 83 of the Material Facts*.

Furthermore, the Defendant is under an affirmative duty by federal law to

accommodate Dr. Norden, and that accommodation in the D.C. Circuit is under a hierarchy

to keep Dr. Norden in the Entomology department if at all possible with appropriate

accommodations to her naphthalene sensitivity.  See: Dorchy v. Washington Transit, 45 F.

Supp. 2d 5, 13 (D.D.C. 1999)

> "Based on Congress' directive that "efforts should be made . . . to accommodate an
> employee in the position that he or she was hired to fill before reassignment is
> considered," the Circuit Court of Appeals directed that reassignment is "an option to
> be considered only after other efforts at accommodation have failed." Aka v.
> Washington Hosp. Ctr., 332 U.S. App. D.C. 256, 156 F.3d 1284, 1301 (D.C. Cir.
> 1998)"

Defendant then used its own failure to accommodate Dr. Norden as a justification

for firing her.  Under these circumstances, no rational finder of fact could find in favor of

the Defendant.  Accordingly, Dr. Norden asks this Honorable Court to grant her summary

judgment on both her claim of Discrimination and her Claim of Retaliation.

The Smithsonian cannot claim that the termination of Dr. Norden in October of

2004 was not retaliatory by relying on previous retaliatory adverse employment actions as

justification for the termination.  The Smithsonian's written, stated reasons for the

termination: 1) failure to accept return to work plan, and 2) failure to apply for a position at

the D.C. Zoo were employment actions that Dr. Norden alleges are also retaliatory.  In

other words, Dr. Norden's claim is that her termination is based on employment actions

which are themselves retaliatory and were not made in good faith. This is bootstrapping on

the part of the Smithsonian, akin to when an employer deliberately retaliates and handicaps

an employee's ability to perform, only to then cite that lack of performance as the

legitimate grounds for the employer's adverse employment action.[2]

## VIII.    CONCLUSION

Courts routinely, and properly, grant Summary Judgments by finding as a matter

of law that a given act was not retaliatory or that no jury could reasonably find that a

plaintiff met all the elements of a discrimination case. As was stated above, such

judgments are not "a disfavored legal shortcut." Celotex, supra When there are sufficient

undisputed facts to allow the court to rule on a case as a matter of law, the court should do

so. There is nothing in the law, however, that suggests that Summary Judgments are

reserved for Defendants alone.

Dr. Norden has shown undisputed facts supporting her claim of disability. She has

shown proof that she was willing and able to perform her job even when suffering from

severe pain as the result of Defendant's failure to accommodate her. The Defendant's own

---

[2] See Stemmons v. Missouri Department of Corrections, 82F.3d 817 (8th Cir. 1996) (plaintiff was able to show pretext where she was criticized for the way she dressed for an interview, but was not allowed by the defendant to leave early to change clothes).
See, e.g., Shager v. UpjohnCo. 913 F. 2d 398, 405 (7th Cir. 1990) (reversing summary judgment in ADEA case, in part based on evidence that employer had deliberately assigned plaintiff, a sales representative, unpromising territory);
See: Weldon v. Kraft, Inc., 896 F.2d 793, 799 (3d Cir. 1990) (race discrimination action could survive summary judgment where plaintiff alleged that he was purposely assigned first to unusually tough supervisor, and then to supervisor who lacked experience as trainer, thereby raising inference that defendant never expected plaintiff to succeed);
See: Bonura v. Chase Manhattan Bank, N.A. 795 F.2d 276, 277 (2nd Cir. 1986) (affirming jury verdict for ADEA plaintiffs based in part on evidence that supervisor had established unrealistic performance goals in order to justify replacing plaintiffs with younger employees).

safety office recommended accommodations, and Dr. Norden's supervisor approved them, but did not purchase them.

After failing to accommodate her for two years, the Defendant offered a return to work proposal that was retaliatory on its face. Even if the Court did not find that Dr. Norden was a qualified, disabled person as a matter of law, filing a complaint and requesting accommodation are protected activities, and Dr. Norden has shown, as a matter of law, that Defendant retaliated against her for those activities in its April, 2004 proposal.

For all of the above reasons, summary judgment should be granted to Plaintiff Dr. Norden, or in the alternative summary adjudication should be given as to those issues where the material facts are not in dispute.


Dated: _____            Respectfully submitted,


                                 _____
                                 Alex T. Sliheet, D.C. Bar No. 438977
                                 Vickie Inge Fang, *pro hac vice*
                                 Attorneys for Plaintiff Beth Norden
                                 8792 Nightingale Drive
                                 Lanham, MD  20706
                                 alexsliheet@yahoo.com
                                 fvickie@comcast.net
                                 (301) 552-4908