Alex T. Sliheet, D.C. Bar No. 438977
Vickie Inge Fang, *pro hac vice*
Attorneys for Plaintiff Beth Norden
8792 Nightingale Drive
Lanham, MD  20706
alexsliheet@yahoo.com
fvickie@comcast.net
(301) 552-4908

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **Beth M. Norden,** ) | **Case No. 051232 (RMC)** |
| ) | |
| ) | **PLAINTIFF'S STATEMENT OF** |
| **Plaintiff** ) | **MATERIAL FACTS NOT AT ISSUE** |
| ) | |
| **v.** ) | |
| ) | |
| **Lawrence M. Small,** ) | |
| ) | |
| **Defendant** ) | |

## STATEMENT OF MATERIAL FACTS NOT AT ISSUE

1. Plaintiff (Dr. Norden) is a former Smithsonian employee who holds a Ph.D. in entomology.  She worked at the Smithsonian for approximately 15 years, and consistently received the highest possible performance evaluation – "outstanding." (Norden affidavit, par. 4)

2. Dr. Norden has published over 50 professional papers in her field, was awarded the highly competitive Fulbright Fellowship to perform research in Sri Lanka, and has regularly traveled internationally with her colleagues on research expeditions.  (Complaint ¶15, admitted by defendant in answer)

3. The vast majority of Dr. Norden's work at the Smithsonian required little supervision, and she worked very long hours, often alone, on weekends and in the evenings at the Smithsonian. (Complaint ¶17, admitted by defendant in answer)

4. In the summer of 2000, Dr. Norden acquired Dengue Hemorrhagic Fever (DHF) while in Brazil on Smithsonian business. (Complaint ¶18-19, admitted by defendant in answer and Norden affidavit, par. 5)

5. The DHF caused a near fatal level of hemorrhage that required approximately three weeks of hospitalization at Georgetown University Hospital. Dr. Norden was globally affected by her illness, suffering neurological damage, including brain trauma, an impaired immune system, and a damaged hematological system in the form of an increased tendency towards capillary bleeds. (Norden affidavit, par.6)

6. After Dr. Norden left the hospital, she spent months in intense pain and encephalitic confusion, unable even to read a newspaper competently. Although she continued to improve, during the next two years, her neuropsychologist documented cognitive impairment, including areas of attention and information processing speed, learning and memory, and performance on timed measures of mental flexibility. In April and May of 2001, Dr. Norden took a battery of tests at Georgetown University. She tested at the 16th percentile for auditory attention span, at the 5th percentile for a test that measured auditory, working memory, and processing speed, and at the 14th percentile for verbal learning. Her personality testing revealed that she had

some concerns about physical functioning and health in general that were entirely consistent with her medical history. There was no evidence of clinical psychopathology, and her interpersonal style was characterized as "cheerful, friendly, and extraverted." (Norden affidavit, par. 7, and Exhibit 1)

7. In January of 2003, Dr. Norden's intellectual functioning was documented as having returned to the "oftentimes superior level" by the same neuropsychologist. (Norden Aff. Par. 8, Exhibit 2)

8. Although she was eager to return to her career, Dr. Norden spent almost all of the period from September, 2000 to April, 2002 on complete disability. She attempted a 12 hour per week return to work in 2001, but after four months, her doctors determined that even this limited schedule was too physically stressful for her to continue at that time. (Norden affidavit, par.9)

9. Records of Dr. Norden's illness and impaired functioning were sent to the Smithsonian physician, Dr. Lawford. (Complaint¶30, admitted by defendant in answer)

10. The Smithsonian Office of General Counsel advised that there was sufficient evidence to determine that Dr. Norden was disabled. (Exhibit 3, p.3)

11. Dr. Norden's supervisor, Ted Schultz, also testified that, "Dr. Norden presented satisfactory evidence of disability, and this disability was never in question." (Exhibit 4, p.3)

12. In early 2002, Dr. Norden again began communicating with the Smithsonian about her desire to return to work on a part time basis. (Norden affidavit, par. 10)

13. On Feb. 14, 2002, Dr. Norden executed another medical release so that Smithsonian physician Dr. Lawford could have access to her team of physicians and other medical specialists and to Dr. Norden's complete medical record. (Norden affidavit, par.11)

14. Dr. Norden's physicians and neuropsychologist supported her return to work with accommodations. (Norden affidavit, par. 12)

15. At this time, Dr. Norden had demonstrated substantial, though not full, cognitive improvement, and no longer suffered from the acute dengue infection. (Norden affidavit, par. 13)

16. She still, however, suffered from fatigue so intense that her doctors would initially only approve a 20 hour per week schedule. Both Dr. Norden and the Defendant understood that the light duty hours were temporary. Dr. Norden's doctor said that he would revisit the need for light duty at the end of 2002, and Dr. Norden hoped to return to full time employment at the beginning of 2003. (Norden affidavit, par. 14)

17. Dr. Norden still carried the dengue antibodies that weakened her capillary system. The presence of these antibodies is permanent, and their effect on her capillary system is also ongoing. These antibodies make her capillaries vulnerable to leaking, and it is the leaking capillaries that can cause migraine headaches, severe loss of energy, bruising, and cognitive impairment severe enough to render her unable to work, learn, or care for herself in many of her daily functions. On her doctor's advice, Dr. Norden removed her consent to donate organs from her driver's license because her hematological system is so

seriously and permanently affected by the dengue antibodies that her organs would no longer be acceptable for donation.  She is unable to thermo regulate, and the bruising is so consistent that she has ended her previous habit of wearing skirts so that she will no longer expose her bruised legs. She also continues to suffer from intense and frequent migraine headaches.  These headaches can be triggered by heat, stress, changes in barometric pressure, illness, medication, and naphthalene.  (Norden affidavit, par. 15)

18.  The permanent presence of the dengue antibodies also causes her immune system to be compromised so that any infection can cause severe and alarming results.  Approximately ten weeks ago, in July of 2006, Dr. Norden was bitten on the hand by her daughter's cat.  The cat bites resulted in an eight day hospitalization, surgery, the near loss of her hand, currently ongoing pain intense enough to require narcotic pain killers, physical therapy, continued dramatic swelling, and the potential for additional surgery.  While she was in the hospital, a central line had to be cut into her chest to insert an i.v. tube because her blood vessels are too fragile to hold an i.v. line.  Because of her increased susceptibility to infection, Dr. Norden feels limited in her contact with the public and her ability to travel or take physical risks.  She consequently feels limited in her ability to work in positions that would require such contact or physical risks.  Sexual intercourse is not possible for Dr. Norden because the physical pressure involved causes her to bleed heavily.  Heat, stress, and exposure to certain chemicals can trigger the capillary bleeds.  (Norden affidavit, par.16)

5

19. Both her neurologist and Smithsonian physician Dr. Lawford advised the
Smithsonian that Dr. Norden be given "flex time" as an accommodation so that
Dr. Norden could go to her many doctors' appointments and take time off when
she suffered from a migraine or when the heat might cause her to begin bleeding.
(Complaint ¶46, admitted by defendant in answer)

20. Dr. Norden's return to work plan for April, 2002 did not incorporate "flex
time." Despite the fact that Dr. Norden had previously worked evenings and
weekends, the return to work plan limited her to specific days and hours, so that
her work schedule had far less flexibility than she had previously enjoyed.
(Exhibit 5)

21. Shortly after Dr. Norden returned to work in April, she realized that she was
affected by the presence of naphthalene in the museum, and her doctors advised
her that she was being harmed by exposure to this chemical. (Norden affidavit,
par. 17)

22. In this same month, Dr. Norden spoke to Dr. Schultz several times about her
sensitivity to naphthalene and her resulting need for accommodations.
(Complaint¶59, admitted by defendant in answer)

23. Naphthalene is a chemical widely used in the insect collection that is in the
nonpublic part of the museum. It is the active ingredient in moth balls, and it is
used to protect the insect specimens from being eaten by live insects.
(Complaint¶60, admitted by defendant in answer)

24. Smithsonian policy is not to use Naphthalene anymore. (Exhibit 6)

25. Since naphthalene appeared to increase capillary leaks for Dr. Norden, it was a significant hazard to her overall cognitive functioning and health. (Norden affidavit, par. 18)

26. In the period of May, 2002 through November 2002, Dr. Norden made more than a dozen additional requests for accommodations for naphthalene, including requests for air filter, respirator, transfer to a vacant position in the Smithsonian's "Insect Zoo" which did not use naphthalene, and a "loan" to a sister research facility at the USDA which also did not use naphthalene. (Norden affidavit, par.19)

27. Although Dr. Norden was tested for a respirator, funding was approved for it, and the Smithsonian physician and industrial hygienist urged management to adopt numerous accommodations for Dr. Norden, Dr. Schultz never purchased the respirator. Dr. Norden never received the respirator or any other accommodation for her naphthalene sensitivity. (Norden affidavit, par. 20)

28. Dr. Norden experienced severe physical pain and emotional distress as a result of not receiving accommodations for her naphthalene sensitivity. Her existing migraine problem greatly increased during the 2002 return to work, and she continues to suffer far more migraines than she ever had before, even after contracting DHF. Her doctors believe that she might have become permanently more prone to migraine headaches as a result of the naphthalene exposure. Dr. Norden was also financially damaged in the form of lost income and job benefits when she was returned to 100% disability status.

29. Dr. Norden continued to work while exposed to naphthalene and suffered increasing migraines, bruising, nose bleeds, and fatigue.  One of her doctors advised her that she had increased levels of blood in her urine during this period of exposure.  (Norden affidavit, par.21)

30. During this period, Dr. Norden's supervisor, Dr. Schultz, understood that the exposure to naphthalene was exacerbating her illness.  (Exhibit 7, p.143)

31. After Dr. Norden filed a complaint, Smithsonian management reported to the EEO counselor that Dr. Norden did not receive accommodations because she refused to wear a respirator and because she refused to have her office relocated. (Exhibit 8)

32. In Interrogatory Answers, Defendant claimed that "Dr. Norden failed to participate in good faith in the interactive process.  While on light duty, Plaintiff was fitted for a respirator, but informed the funds manager in her department not to buy one.  Plaintiff did not inform the Office of Safety and Environmental Management that she had rejected the respirator, leading them to believe the department was not following its advice."  (Exhibit 9)

33. Dr. Norden had not refused a respirator.  She had sent an email that advised Dr. Schultz, as well as Dr. Lawford, and the industrial hygienist (both of whom are with the Office of Safety and Environmental Management, OSEM) that she was unable to use a microscope while using the full face mask required by the respirator and asked if she could have a portable air filter instead.  (Exhibit 10)

34. Dr. Norden's supervisor, Dr. Schultz, was selected to be the person most qualified to testify about attempts to accommodate Dr. Norden.  Dr. Schultz

testified that a more accurate statement would be that the Smithsonian "made department resources available for a respirator, had Beth fitted by safety for a respirator, and in the end had it turn out that Beth didn't find it possible to work with wearing a respirator."  (Exhibit 11, Schultz testimony, p. 262)

35. As of late July, three weeks after the putative refusal, the department was still attempting to purchase a respirator, and Dr. Norden was still being advised that she would receive one.  Dr. Schultz signed a performance evaluation in late July stating that a respirator and an air filter would be provided for Dr. Norden. (Norden affidavit, par. 24,Exhibit 12, Performance evaluation )

36. Dr. Schultz continued to assure Dr. Norden that she would receive both accommodations almost until the day that the Smithsonian forced Dr. Norden to go back onto 100% disability.  Dr. Norden welcomed the possibility of receiving both accommodations.  She could benefit from the portable air filter while using a microscope, and she could use the respirator when she had to open a specimen cabinet or do other tasks that would cause her to have particularly strong exposure to naphthalene.  (Norden affidavit, par.25)

37. Dr. Schultz also testified that Dr. Norden was unable to do a substantial part of her work in the area to which she should have relocated on the fourth floor as an accommodation because the necessary computer was not in that room.  (Exhibit 7, Schultz depo, p. 141)

38. Not only did the "ventilated room" on the fourth floor lack both the computer and the specimens Dr. Norden needed, it was also kept locked, and Dr. Norden

was denied a key.  Dr. Norden never refused to move to the fourth floor.

(Norden affidavit, par. 26)

39. Dr. Schultz also testified that Dr. Norden was never told that she would not

    receive other accommodations because the fourth floor room was the superior

    accommodation.  (Exhibit 13, Schultz depo., p. 8)

40. Dr. Norden was never instructed orally or in writing to move her office to the

    fourth floor.  (Exhibit 13, Schultz  depo., p. 8)

41. Dr. Norden was denied the vacant Insect Zoo position that she requested

    although Dr. Schultz testified that there was "no reason for her not to work at

    the insect zoo."  (Exhibit 14, Schultz depo., p. 229)

42. On October 17, 2002, Dr. Lawford and the industrial hygienist from OSEM sent

    a lengthy memo to upper management pointing out that since Dr. Norden had

    returned to work "she has progressively exhibited symptoms, including

    nosebleeds, intense headaches, and nausea.  Both hemorrhagic fever, and

    naphthalene, can cause these symptoms, as well as hematological

    dysfunction. . .In Dr. Norden's case, the two conditions appear to be acting in

    concert to aggravate her symptoms considerably."  The memo discussed a

    variety of accommodations and concluded with "We ask that you notify us as

    soon as possible to the course of actions to be taken to minimize naphthalene

    exposure to Dr. Norden in the course of her work."  Dr. Norden was still not

    accommodated in any way for naphthalene. (Norden affidavit, par.27, Exhibit

    15)

43. Dr. Norden's doctor had advised that he would reconsider her ability to work without the light duty accommodation at the end of 2002.  Dr. Norden continued to believe that she would eventually receive naphthalene accommodations and that once she had them, she would be able to work full time.  She advised Dr. Schultz of this in November of 2002, and he again promised that she would receive accommodations.  (Norden affidavit, par. 28)

44. On November 18, 2002, Dr. Norden was given a memo instructing her that her light duty accommodation was terminated as of the end of the month.  (memo)

45. Dr. Norden's performance evaluations for both her first and second return to work had been positive and suggested no area for improvement other than increased hours.  (Norden affidavit, par.29 , and Exhibit 12)

46. None of Dr. Norden's supervisors would explain the substance of the memo with her.  (Norden affidavit, par.30)

47. Dr. Norden then sent a memo to Dr. Lawford asking him what he knew about the decision to terminate her light duty.  On November 23, 2002, Dr. Lawford replied that he, Dr. Schultz, Marilyn Slomba, and possibly the industrial hygienist held a meeting prompted by his memo explaining that Dr. Norden's doctors would revisit her need for light duty at the end of 2002.  According to Dr. Lawford, Dr. Schultz said, "Well if her doctors can revisit it on Dec. 31, we can revisit it too."  Dr. Schultz then asked Ms. Slomba if "we have to offer light duty" and was told "not if it is insufficiently productive toward the departments goals."  (Exhibit 16)

48. Dr. Norden sent an email to numerous people asking, "How do I know when it might be safe to return if it is the naphthalene which is activating my current blood problems?" and "Will anything dealing with my exposure be different on return, or is my return based upon no longer being sensitive to naphthalene?" (Exhibit 18)

49. On December 3, 2002 Dr. Lawford responded that he expected her doctors to take the lead in advising as to the extent of her naphthalene sensitivity.  (Exhibit 19)

50. Also on December 3, 2002, Smithsonian Program Manager of Cultural Diversity/Affirmative Action Carol Gover sent Dr. Norden an email informing her that "The goal is for you to successfully return to your job full time." (Exhibit 20)

51. A coworker responded by email on December 17, 2002, that Dr. Norden's cosupervisor, Dr. David Furth, had said that "as of November 30th you have been given a year off to try and recuperate fully."  Dr. Norden responded to this information by replying to both the coworker and Dr. Furth, stating, "I had not know before how compassionate our dept. could be.  Happy holidays to you both, hold the fort!"  Neither Dr. Furth nor anyone else attempted to amend the statement or deny that Dr. Norden had been given "a year off to try and recuperate fully."  (Exhibit 21 )

52. On January 7, 2003, the Office of Human Resources responded, "As for returning to work, that is up to your doctor."  (Exhibit 22, Lohr email)

53. As in the past, the Smithsonian seemed to be saying that Dr. Norden could return to work when she had recovered enough to be able to do so.  (Norden affidavit, par. 31)

54. When Dr. Norden received the November memo terminating her light duty, it was reasonable for her to expect that the Smithsonian was still working to accommodate her and that she would be brought back if she was capable of coming back.  (Exhibit, 23, Schultz deposition, p. 14)

55. Dr. Norden had been kept on the rolls of employment at the Smithsonian rather than being terminated because the Smithsonian still expected her to return to work there, and it was still assuming the responsibility to accommodate her if it could.  (Exhibit 24, Schultz deposition, p. 13)

56. The Smithsonian publishes an entomology newsletter which is read by entomologists across the country and abroad.  In February of 2003, the front page of the newsletter contained the following statement, "In the last issue of Ent. News, it was reported that Beth Norden has left the Entomology Section due to health reasons.  However, Beth remains as an employee (non-pay status), and may return at a later date."  (Exhibit  25)

57. Dr. Norden did believe that the Smithsonian would eventually accommodate her disability, in part because she was reassured by several government officials that her return depended on her recovery, in part because she had been put on disability twice before to return when her health improved, and in part because she had seen the Smithsonian accommodate other employees who were sensitive to naphthalene.  (Norden affidavit, par. 32)

58. When she could not get clarification as to how and when she would be accommodated, however, Dr. Norden became increasingly depressed.  (Norden affidavit, par. 33)

59. In April of 2003, Dr. Norden filed an informal complaint for failure to accommodate and retaliation, and she began receiving therapy from Dr. Oberg. The Smithsonian physician, Dr. Lawford, sent Dr. Oberg the attached thorough summary of both her medical condition and her experience with the Smithsonian since acquiring DHF.  (Norden aff par.34, and Exhibit 26)

60. Dr. Norden has an active diagnosis of Major Depressive Disorder, Recurrent Severe without psychotic features and Post Traumatic Stress Disorder.  Dr. Norden's inability to continue her career has caused her depression and contributed substantially to her posttraumatic stress disorders.  (Exhibit 27, Oberg affidavit)

61. Dr. Norden's depressive and posttraumatic stress disorders episodically impair her ability to socialize, to learn, and to care for herself in the vital functions of eating and sleeping.  They also cause her to experience a deep sense of wrongdoing for having become sick in the first place and for having been fired; they severely diminish her self confidence, her ability to take risks, and her ability to enjoy life.  She believes that she will always suffer from terrifying flashbacks when she is exposed to stimulation that reminds her of her physical illness and the manner in which she was treated by the Defendant.  She suffered from an intense PTSD flashback that included chest pains while attending Dr. Schultz's deposition.  Her reaction was so dramatic that defense counsel noted

her agitation and interrupted the deposition, which led to the decision to take a break so that Dr. Norden could compose herself.   (Norden affidavit, par. 35)

62. The Smithsonian denied her April, 2003 complaint as being untimely.  (Norden affidavit, par.36 )

63. In November of 2003, Dr. Schultz sent Dr. Norden a letter saying that he proposed to separate her from the rolls of the Smithsonian.  (Exhibit 28)

64. Dr. Norden responded that she was ready to return to work full time with accommodations for naphthalene sensitivity, "flex time" to accommodate her many doctor appointments and migraine headaches, and an absence of retaliation and hostility from the Smithsonian.  (Exhibit 29)

65. Dr. Schultz responded to this letter by sending a memo to his superiors with the subject line, "My resignation as Norden's supervisor."  In the memo he states that he refuses to continue as her supervisor and suggests that she be assigned another supervisor and another unit "ideally outside of Entomology."  He gives her request for protection from hostility and retaliation and "the events that have transpired during the three years since Beth contracted dengue fever" as his reasons.  (Exhibit 30)

66. The Smithsonian responded by requesting that Dr. Norden provide letters from her doctors.  (Norden affidavit, par. 38)

67. Dr. Norden timely submitted the requested letters, which did state that she was able to work full time with the accommodations she had requested in her letter of November 13, 2003.  These letters included a statement from Dr. Oberg

advising Defendant of Dr. Norden's depressive and posttraumatic stress disorders. (Norden par.39, and Oberg affidavits)

68. In the spring of 2004, Dr. Norden began hearing rumors from other professional biologists that the Smithsonian was in the process of preparing her office and that she would soon return to her job at the Smithsonian. She hoped that her career would resume. (Norden affidavit, par. 40)

69. In April, 2004, Dr. Norden received a return to work proposal labeled "Settlement Agreement" from the Defendant. The proposed "Agreement" required her to relinquish both past and future claims against the Defendant. (Exhibit 5, return to work plan)

70. The proposal included a work plan that did not involve research support and would not lead to Dr. Norden's writing or publishing papers. (Norden affidavit, par. 41)

71. It provided for some of the accommodations that Defendant's own physician and industrial hygienist had recommended during Dr. Norden's second return to work in 2002 -- office on the fourth floor, a respirator, and a portable air filter. (Exhibit 5, return to work plan)

72. Unfortunately, since it also provided for Dr. Norden to perform collections work almost exclusively, it also would have required her to have greater exposure to naphthalene. This is because the primary source of naphthalene is in the specimens themselves. (Norden affidavit, par. 42)

73. This work plan also included deadlines that ranged from half of a day to a month. (Exhibit 5)

74. Dr. Norden had never before been given such tightly defined deadlines, and she believed that the scientific work required in the plan was not amendable to such specific time requirements.  She further believes that the person who developed the plan, Ms. Adams, was unaware of the scientific difficulties the plan would have posed and that these assignments could not have been completed within the time frame given.  In fact, she believes that at least one of the assignments could not have been completed at all.  (Norden affidavit, par. 43)

75. Ms. Adams, did, however, leave a message on Dr. Norden's answering machine stating that she hoped Dr. Norden was not being "set up" and that she hoped she (Nancy Adams) was not being "set up" in regard to the work plan.  (Norden affidavit, par. 44)

76. Although Dr. Norden had been evaluated on the normal yearly cycle for all of her nearly fifteen years working for Defendant, the April 2004 plan required that "Norden's supervisors will review her performance and her attendance every 320 hours (8 weeks) and on an as-needed basis. . . The Smithsonian agrees to hold Dr. Norden's separation in abeyance while she demonstrates satisfactory performance and attendance as shown by compliance with this agreement, as judged at the end of each 320-hour (8 week) cycle.  Absences will not be acceptable reasons for not meeting the work plan and performance requirements…The parties understand that it is critical that Dr. Norden adhere to each of the provisions of the agreement and that any failure to adhere to those provisions, as evaluated at the end of each 8-week cycle, will result in her separation from the rolls of the Smithsonian."  ( Exhibit 5)

77. When Dr. Norden received this proposal, she believed that she was indeed being "set up" for failure by Defendant. The plan was based on twenty days of work per month, so that if she missed a deadline because she was absent due to illness, the use of normal vacation leave, or federal holidays, she could be fired without recourse. Additionally, if any of the tasks were more difficult than originally envisioned, so that Dr. Norden was required to spend a day and a half, for example, on what had been designated as a one day task, she could also be fired without recourse. (Norden affidavit, par. 46)

78. The 2003 year had ten federal holidays. Based on Dr. Norden's tenure, she was in the highest category of earned sick and vacation leave, meaning that she earned eight hours of combined leave time every two weeks. Her earned leave would give her 26 days of leave per year in addition to the 10 federal holidays. (Norden affidavit, par. 47)

79. Dr. Norden was also very distressed by the fact that for the first time in her career, she was being assigned a work load that would preclude her researching and writing papers. As a Fulbright Scholar with more than fifty scientific papers to her credit, Dr. Norden knew that work without research and publishing would rob her of the key emotional and intellectual satisfactions of her profession. (Norden affidavit, par. 48)

80. This proposal caused Dr. Norden severe emotional and physical pain in the form of serious and increased nightmares, migraine headaches, and a painful sense of devaluation and punishment. Her treating psychologist documented the nightmares and migraine headaches Dr. Norden experienced as a result of the

proposal in his reports to the Department of Labor.  He believes that the

Defendant's proposal caused a temporary setback in her treatment.  (Oberg

affidavit with attachments)

81. Dr. Norden filed a new informal complaint for retaliation based on the proposal.

(Exhibit 31, Informal Complaint)

82. Defendant retracted the requirement that Dr. Norden relinquish her past and

future claims, but did not retract the other provisions of the proposal.  (Norden

affidavit, par. 49)

83. During this time period at least two positions for which Dr. Norden was

qualified did become vacant, but Dr. Norden was not offered reassignment to

either of these positions.  (Norden affidavit, par. 50)

84. Nearly two years after terminating Dr. Norden's light duty accommodation and

forcing her back onto 100% disability, the Smithsonian offered Dr. Norden the

possibility of a single alternative reassignment – a nonscientific job registering

live animals at the zoo.  This was not the Smithsonian Insect Zoo, which could

have allowed her to continue in the field of entomology.  This was the

Washington Zoo, and the position bore almost no relationship at all to her

educational and professional background.  (Norden affidavit, par. 51)

85. Dr. Norden was not offered the job, she was only invited to demonstrate that she

met the vacancy's selective factor in addition to its general requirements.  She

was directed that "it would be essential for Dr. Norden to provide a statement of

her knowledge of professional museum registration methods and collection

management standards used in a zoo or similar wildlife setting." (Exhibit  32)

86. Dr. Norden had no such knowledge, and the position did not make use of her special training and skills. She declined to apply for the position. (Norden affidavit, par. 52)

87. Dr. Norden was then terminated from the rolls of employment based upon her refusal to accept the April 2004 proposal and her refusal to apply for the zoo registration job. (Exhibit 33)

88. Dr. Norden was not offered a disability retirement, and she does not have a disability retirement. She remains unemployed and dependant on workers' compensation which she finds depressing and degrading (Norden affidavit, par. 53)

89. During lititation, Dr. Norden propounded the attached interrogatory asking why the punitive provisions were added to her April 2004 return to work proposal, and she received the attached answer claiming that the proposal was a protected communication. [Exhibit 34]

90. Dr.Norden responded with the attached letter dated August 16, 2006 citing Carney v. American U. for the proposition that not settlement proposals are not privileged for all purposes. She has received no amendment or explanation of Defendant's interrogatory answer. [Exhibit 35]

Dated: _____                    Respectfully submitted,


                                        _____
                                        Alex T. Sliheet, D.C. Bar No. 438977
                                        Vickie Inge Fang, *pro hac vice*
                                        Attorneys for Plaintiff Beth Norden
                                        8792 Nightingale Drive

Lanham, MD  20706
alexsliheet@yahoo.com
fvickie@comcast.net
(301) 552-4908