Alex T. Sliheet, D.C. Bar No. 438977
Vickie Inge Fang, *pro hac vice*
Attorneys for Plaintiff Beth Norden
8792 Nightingale Drive
Lanham, MD 20706
alexsliheet@yahoo.com
fvickie@comcast.net
(301) 552-4908

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **Beth M. Norden,** | ) | Case No. 051232 (RMC) |
| | ) | |
| | ) | **PLAINTIFF'S AFFIDAVIT IN** |
| **Plaintiff** | ) | **SUPPORT OF MOTION FOR** |
| | ) | **SUMMARY JUDGMENT OR** |
| **v.** | ) | **IN THE ALTERNATIVE** |
| | ) | **SUMMARY ADJUDICATION** |
| **Lawrence M. Small,** | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

### AFFIDAVIT OF BETH NORDEN

I, Beth M. Norden, declare:

1.  My name is Beth Norden.

2.  I am over the age of eighteen and competent to testify.

3.  My address is 112 Greenhill Road, Greenbelt, Maryland.

4.  I am a former Smithsonian employee who holds a Ph.D. in entomology. I worked

    at the Smithsonian for approximately 15 years, and consistently received the

    highest possible performance evaluation – "outstanding."

1

5.  In the summer of 2000, I acquired Dengue Hemorrhagic Fever (DHF) while in
    Brazil on Smithsonian business.

6.  The DHF caused a near fatal level of hemorrhage that required approximately
    three weeks of hospitalization at Georgetown University Hospital. I was globally
    affected by my illness, suffering neurological damage, including brain trauma, an
    impaired immune system, and a damaged hematological system in the form of an
    increased tendency towards capillary bleeds.

7.  After I left the hospital, I spent months in intense pain and encephalitic confusion,
    unable even to read a newspaper competently. Although I continued to improve,
    during the next two years, my neuropsychologist documented cognitive
    impairment, including areas of attention and information processing speed,
    learning and memory, and performance on timed measures of mental flexibility.
    In April and May of 2001, I took a battery of tests at Georgetown University. I
    tested at the 16th percentile for auditory attention span, at the 5th percentile for a
    test that measured auditory, working memory, and processing speed, and at the
    14th percentile for verbal learning. My personality testing revealed that I had
    some concerns about physical functioning and health in general that were entirely
    consistent with my medical history. There was no evidence of clinical
    psychopathology, and my interpersonal style was characterized as "cheerful,
    friendly, and extraverted."

8.  In January of 2003, my intellectual functioning was documented as having
    returned to the "oftentimes superior level" by the same neuropsychologist.

2

9. Although I was eager to return to my career, I spent almost all of the period from September, 2000 to April, 2002 on complete disability. I attempted a 12 hour per week return to work in 2001, but after four months, my doctors determined that even this limited schedule was too physically stressful for me to continue at that time.

10. In early 2002, I again began communicating with the Smithsonian about my desire to return to work on a part time basis.

11. On Feb. 14, 2002, I executed another medical release so that Smithsonian physician Dr. Lawford could have access to my team of physicians and other medical specialists and to my complete medical record.

12. My physicians and neuropsychologist supported my return to work with accommodations.

13. At this time, I had demonstrated substantial, though not full, cognitive improvement, and no longer suffered from the acute dengue infection.

14. I still, however, suffered from fatigue so intense that my doctors would initially only approve a 20 hour per week schedule. Both the Defendant and I understood that the light duty hours were temporary. My doctor said that he would revisit the need for light duty at the end of 2002, and I hoped to return to full time employment at the beginning of 2003.

15. I still carried the dengue antibodies that weakened my capillary system. The presence of these antibodies is permanent, and their effect on my capillary system is also ongoing. These antibodies make my capillaries vulnerable to leaking, and it is the leaking capillaries that can cause migraine headaches, severe loss of

3

energy, bruising, and cognitive impairment severe enough to render me unable to work, learn, or care for herself in many of my daily functions. On my doctor's advice, I removed my consent to donate organs from my driver's license because my hematological system is so seriously and permanently affected by the dengue antibodies that my organs would no longer be acceptable for donation. I am unable to thermo regulate, and the bruising is so consistent that I have ended my previous habit of wearing skirts so that I will no longer expose my bruised legs. I also continue to suffer from intense and frequent migraine headaches. These headaches can be triggered by heat, stress, changes in barometric pressure, illness, medication, and naphthalene.

16. The permanent presence of the dengue antibodies also causes my immune system to be compromised so that any infection can cause severe and alarming results. Approximately ten weeks ago, in July of 2006, I was bitten on the hand by my daughter's cat. The cat bites resulted in an eight day hospitalization, surgery, the near loss of my hand, currently ongoing pain intense enough to require narcotic pain killers, physical therapy, continued dramatic swelling, and the potential for additional surgery. While I was in the hospital, a central line had to be cut into my chest to insert an i.v. tube because my blood vessels are too fragile to hold an i.v. line. Because of my increased susceptibility to infection, I feel limited in my contact with the public and her ability to travel or take physical risks. I consequently feel limited in my ability to work in positions that would require such contact or physical risks. Sexual intercourse is not possible for me because

4

the physical pressure involved causes me to bleed heavily. Heat, stress, and exposure to certain chemicals can trigger the capillary bleeds.

17. Shortly after I returned to work in April, I realized that I was affected by the presence of naphthalene in the museum, and my doctors advised me that I was being harmed by exposure to this chemical.

18. Since naphthalene appeared to increase capillary leaks for me, it was a significant hazard to my overall cognitive functioning and health.

19. In the period of May, 2002 through November 2002, I made more than a dozen additional requests for accommodations for naphthalene, including requests for air filter, respirator, transfer to a vacant position in the Smithsonian's "Insect Zoo" which did not use naphthalene, and a "loan" to a sister research facility at the USDA which also did not use naphthalene.

20. Although I was tested for a respirator, funding was approved for it, and the Smithsonian physician and industrial hygienist urged management to adopt numerous accommodations for me, Dr. Schultz never purchased the respirator. I never received the respirator or any other accommodation for my naphthalene sensitivity.

21. I experienced severe physical pain and emotional distress as a result of not receiving accommodations for my naphthalene sensitivity. My existing migraine problem greatly increased during the 2002 return to work, and I continue to suffer far more migraines than I ever had before, even after contracting DHF. My doctors believe that I might have become permanently more prone to migraine headaches as a result of the naphthalene exposure. I was also financially damaged

in the form of lost income and job benefits when I was returned to 100%

disability status.

22. At the Smithsonian, my work station was near the storage cabinets of

the specimens that contained naphthalene. Every time I was forced to

open a cabinet or when someone else opened a cabinet, I would get a

DHF capillary nose bleed <u>instantaneously</u> from the naphthalene fumes. This

happened on a daily basis when I was at work and often more than once a day. I

would then have to leave my room and go down the hall into the ladies room to be

free from the

naphthalene fumes to try and control the nose bleed. I would remain in

the ladies room for varying amounts of time, generally ranging from 10 to 30

minutes, depending on how much naphthalene I was exposed to and how quickly I

was able to escape my office. On many occasions, the return to my work area only

triggered another nose bleed again. The nose bleeds would sometimes be

accompanied by subsequent headaches. On occasion, the headaches were so severe

as to force me to leave work and go home. During the nose bleeding, I would many

times be forced to lie down in the ladies room while trying to control the bleeding

with paper towels. During these bleeding episodes, not only was my long-term

health being damaged, but also I would have substantial difficulty in performing tasks,

being at my work station, thinking, concentrating and communicating with other

individuals. The migraine headaches would also affect my ability to think,

concentrate and communicate with other individuals, and even to stand or to take care

of myself.

6

23. I never refused a respirator. I did send an email that advised Dr. Schultz, as well as Dr. Lawford, and the industrial hygienist (both of whom are with the Office of Safety and Environmental Management, OSEM) that I was unable to use a microscope while using the full face mask required by the respirator and asked if I could have a portable air filter instead.

24. As of late July, three weeks after the putative refusal, I was still being advised that I would receive one. Dr. Schultz signed a performance evaluation in late July stating that a respirator and an air filter would be provided for me.

25. Dr. Schultz continued to assure me that I would receive both accommodations almost until the day that the Smithsonian forced me to go back onto 100% disability. I welcomed the possibility of receiving both accommodations. I could benefit from the portable air filter while using a microscope, and I could use the respirator when I had to open a specimen cabinet or do other tasks that would cause me to have particularly strong exposure to naphthalene.

26. The "ventilated room" on the fourth floor was kept locked. I requested a key for it, and this request was denied.

27. Even after the October 17, 2002 memo by Dr. Lawford and the industrial hygienist from OSEM, I still not accommodated in any way for naphthalene.

28. My doctor had advised that he would reconsider my ability to work without the light duty accommodation at the end of 2002. I continued to believe that I would eventually receive naphthalene accommodations and that once I had them, I would be able to work full time. I advised Dr. Schultz of this in November of 2002, and he again promised that I would receive accommodations.

7

29. My performance evaluations for both my first and second return to work had been positive and suggested no area for improvement other than increased hours.

30. None of my supervisors would explain the substance of the memo to me.

31. As in the past, the Smithsonian seemed to be saying that I could return to work when I had recovered enough to be able to do so.

32. I did believe that the Smithsonian would eventually accommodate my disability, in part because I was reassured by several government officials that my return depended on my recovery, in part because I had been put on disability twice before to return when my health improved, and in part because I had seen the Smithsonian accommodate other employees who were sensitive to naphthalene.

33. When I could not get clarification as to how and when I would be accommodated, however, I became increasingly depressed.

34. In April of 2003, I filed an informal complaint for failure to accommodate and retaliation, and I began receiving therapy from Dr. Oberg. The Smithsonian physician, Dr. Lawford, sent Dr. Oberg the attached thorough summary of both my medical condition and my experience with the Smithsonian since acquiring DHF.

35. My depressive and posttraumatic stress disorders episodically impair my ability to socialize, to learn, and to care for myself in the vital functions of eating and sleeping. They also cause me to experience a deep sense of wrongdoing for having become sick in the first place and for having been fired; they severely diminish my self confidence, my ability to take risks, and my ability to enjoy life. I believe that I will always suffer from terrifying flashbacks when I am exposed to

8

stimulation that reminds me of my physical illness and the manner in which I was treated by the Defendant. I suffered from an intense PTSD flashback that included chest pains while attending Dr. Schultz's deposition. My reaction was so dramatic that defense counsel noted my agitation and interrupted the deposition, which led to the decision to take a break so that I could compose myself.

36. The Smithsonian denied my April, 2003 complaint as being untimely.

37. I responded that I was ready to return to work full time with accommodations for naphthalene sensitivity, "flex time" to accommodate my many doctor appointments and migraine headaches, and an absence of retaliation and hostility from the Smithsonian.

38. The Smithsonian responded by requesting that I provide letters from my doctors.

39. I timely submitted the requested letters, which did state that I was able to work full time with the accommodations I had requested in her letter of November 13, 2003.

40. In the spring of 2004, I began hearing rumors from other professional biologists that the Smithsonian was in the process of preparing my office and that I would soon return to my job at the Smithsonian. I hoped that my career would resume.

41. The proposal included a work plan that did not involve research support and would not lead to my writing or publishing papers.

42. Unfortunately, since it also provided for me to perform collections work almost exclusively, it also would have required me to have greater exposure to naphthalene. This is because the primary source of naphthalene is in the specimens themselves.

43. I had never before been given such tightly defined deadlines, and I believed that the scientific work required in the plan was not amendable to such specific time requirements. I further believe that the person who developed the plan, Ms. Adams, was unaware of the scientific difficulties the plan would have posed and that these assignments could not have been completed within the time frame given. In fact, I believe that at least one of the assignments could not have been completed at all.

44. Ms. Adams, did, however, leave a message on my answering machine stating that she hoped I was not being "set up" and that she hoped she (Nancy Adams) was not being "set up" in regard to the work plan.

45. I had always had been evaluated on the normal yearly cycle for all of my nearly fifteen years working for Defendant

46. When I received this proposal, I believed that I was indeed being "set up" for failure by Defendant. The plan was based on twenty days of work per month, so that if I missed a deadline because I was absent due to illness, the use of normal vacation leave, or federal holidays, I could be fired without recourse. Additionally, if any of the tasks were more difficult than originally envisioned, so that I was required to spend a day and a half, for example, on what had been designated as a one day task, I could also be fired without recourse. While I had previously performed mundane tasks, I had always had the freedom to define some of my own tasks and, at least some of the time, to use my scientific judgment in performing them.

47. The 2003 year had ten federal holidays. Based on my tenure, I was in the highest category of earned sick and vacation leave, meaning that I earned eight hours of combined leave time every two weeks. My earned leave would give me 26 days of leave per year in addition to the 10 federal holidays.

48. I was also very distressed by the fact that for the first time in my career, I was being assigned a work load that would preclude my researching and writing papers. As a Fulbright Scholar with more than fifty scientific papers to my credit, I knew that work without research and publishing would rob me of the key emotional and intellectual satisfactions of my profession.

49. Defendant retracted the requirement that I relinquish my past and future claims, but did not retract the other provisions of the proposal.

50. During this time period at least two positions for which I was qualified did become vacant, but I was not offered reassignment to either of these positions.

51. Nearly two years after terminating my light duty accommodation and forcing me back onto 100% disability, the Smithsonian offered me the possibility of a single alternative reassignment – a nonscientific job registering live animals at the zoo. This was not the Smithsonian Insect Zoo, which could have allowed me to continue in the field of entomology. This was the Washington Zoo, and the position bore almost no relationship at all to my educational and professional background.

52. I did not have the required qualifications, and the position did not make use of my special training and skills. I declined to apply for the position.

53. I was not offered a disability retirement, and I do not have a disability retirement. I remain unemployed and dependant on workers' compensation which I find depressing and degrading.

54. During litigation, I propounded the attached interrogatory asking why the punitive provisions were added to my April 2004 return to work proposal, and I received the attached answer claiming that the proposal was a privileged communication.

55. Through my attorney, I responded by sending the attached letter dated August 16, 2006 citing Carney v. American for the proposition that settlement offers are not privileged for all purposes. I believe that I have received no amendment or addition to the Defendant's interrogatory answers.

56. Exhibit 1 is a true and correct copy of the report of GNA neuropsychological evaluation.

57. Exhibit 2 is a true and correct copy of GNA follow-up memo 1/30/03

58. Exhibit 3 is a true and correct copy of Affidavit of Marilyn Slomba.

59. Exhibit 4 is a true and correct copy of Affidavit of Dr. Ted Schultz.

60. Exhibit 5 is a true and correct copy of 4-8-04 return to work plan.

61. Exhibit 6 is a true and correct copy of 4/19/01 email on naphthalene policy.

62. Exhibit 7 is a true and correct copy of Dr. Schultz depo excerpt.

63. Exhibit 8 is a true and correct copy of Sept. 15, 2003, memo.

64. Exhibit 9 is a true and correct copy of interrogatory answers of Smithsonian

65. Exhibit 10 is a true and correct copy of my email for further assistance on respirator.

66. Exhibit 11 is a true and correct copy of excerpt of Dr. Schultz depo.

67. Exhibit 12 is a true and correct copy of my performance evaluations

68. Exhibit 13 is a true and correct copy of excerpt of Dr. Schultz depo.

69. Exhibit 14 is a true and correct copy of excerpt of Dr. Schultz depo.

70. Exhibit 15 is a true and correct copy of October 17, 2002, memo.

71. Exhibit 16 is a true and correct copy of email of Nov. 23, 2002

72. Exhibit 18 is a true and correct copy of email of Nov. 29, 2002

73. Exhibit 19 is a true and correct copy of 12/3/02 email from Dr. Lawford.

74. Exhibit 20 is a true and correct copy of email 12/03/02 from Carol Gover.

75. Exhibit 21 is a true and correct copy of 12/18/02 email from me to Dave & Debbie Feher.

76. Exhibit 22 is a true and correct copy of 1/7/03 email to Carolyn Lohr

77. Exhibit 23 is a true and correct copy of excerpt of Dr. Schultz depo.

78. Exhibit 24 is a true and correct copy of excerpt of Dr. Schultz depo.

79. Exhibit 25 is a true and correct copy of entomology news 2/03 issue.

80. Exhibit 26 is a true and correct copy of report to Dr. Don Oberg

81. Exhibit 27 is a true and correct copy of Affidavit of Dr. Oberg

82. Exhibit 28 is a true and correct copy of 11/5/2003 letter to me.

83. Exhibit 29 is a true and correct copy of 11/13/03 letter I sent as reply to Dr. Schultz.

84. Exhibit 30 is a true and correct copy of 12/17/03 letter from Dr. Schultz.

85. Exhibit 31 is a true and correct copy of my informal complaint on 4/19/2004

86. Exhibit 32 is a true and correct copy of 9/8/2004 email from Marilyn Slomba

87. Exhibit 33 is a true and correct copy of 10/8/2004 letter to me terminating my job.

OCT 03,2006 12:24

88. Exhibit 34 is a true and correct copy of Smithsonian's interrogatory responses.

89. Exhibit 35 is a true and correct copy of my attorney's correspondence with
defense counsel.

90. Exhibit 36 is a true and correct copy of my first informal complaint in April of
2003.

OCT 03,2006 12:24

All attached exhibits are true and accurate copies of documents in my possession.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _2 Oct. 2006_                Respectfully submitted,

_Beth M. Norden, Ph.D._
Dr. Beth M. Norden

# **EXHIBIT 1**

OCT 02,2006 17:33                                                Page 3

P.02/16

# GNA
## GEORGETOWN NEUROPSYCHOLOGY ASSOCIATES

## REPORT OF NEUROPSYCHOLOGICAL EVALUATION

**NAME:**        NORDEN, ~~Elizabeth~~
**AGE:**         49
**TEST DATE(S):**  4/5/01, 5/2/01

## REFERRAL INFORMATION:

Beth Norden is a 49 year old, married, right-handed, Caucasian female with 20 years of formal education referred by Dr. Pamela Blake for neuropsychological evaluation. The primary goal of this neuropsychological evaluation is to obtain an objective baseline of neurocognitive function.

## RELEVANT HISTORY:

Dr. Norden is employed as an Entomologist at the Smithsonian Institution. Following a trip to Brazil, Dr. Norden was ultimately determined to have contracted Dengue Hemorrhagic Fever. Her complicated medical history is well-documented in her medical chart. Dr. Norden continues to suffer physical symptoms including fatigue, bruising, heightened sense of smell and headache. She reports several cognitive concerns as well.   She is experiencing short-term memory loss, reduced concentration abilities, loss of sense of elapsed time and an inability to multi-task. She notes that she often daydreams and/or "drifts off." This is a profound change for her since her illness. Dr. Norden additionally notes that her ability to effectively manage stress has also decreased. Dr. Norden feels that she has thus far recovered approximately 60% of her premorbid level of cognitive function and 50% of her premorbid level of general energy.

Dr. Norden received her Ph.D. in Entomology (Pollination Ecology). She was awarded a Fulbright Scholarship in 1997. She has published many scientific articles. There is no history of learning disability, special educational needs, head injury, alcohol or substance abuse. Dr. Norden does report developmental delay with reading skills (5th grade). She has never been treated by a mental health professional. Dr. Norden lives at home with her husband and two children, ages 16 and 20.

## TESTS ADMINISTERED:

Wechsler Adult Intelligence Scale - III
California Verbal Learning Test
Trail Making Test
Verbal Fluency Test
Boston Naming Test
Paced Auditory Serial Addition Test
Wisconsin Card Sorting Test
Heaton Story Learning
Heaton Figure Learning
Personality Assessment Inventory

TEL: 202-686-7590                                        FAX: 202-686-8802

GEORGETOWN NEUROPSYCHOLOGY ASSOCIATES, LLC • 4910 MASSACHUSETTS AVENUE, NW • SUITE 100 • WASHINGTON, DC 20016
GEORGETOWN UNIVERSITY MEDICAL CENTER • DEPT. OF NEUROLOGY • 3800 RESERVOIR ROAD, NW • WASHINGTON, DC 20007

NORDEN, Beth
Page 2

## BEHAVIORAL OBSERVATIONS/MENTAL STATUS EXAMINATION:

Dr. Norden arrived to both of her scheduled appointments on time. The first testing session was ended midway through as a result of an intense migraine which manifested during a test of mental arithmetic. She experienced a headache again during the second examination while completing this same test. She was otherwise alert, and oriented throughout both testing sessions. She easily maintained and established rapport with the examiners. There was no evidence dysnomia or dysarthria in her responses to test items or during conversational speech. She had no difficulty following test instructions. Her mood appeared mildly anxious. Her affect was well-regulated. Dr. Norden became visibly distressed during administration of challenging neuropsychological measures. Despite this she showed good frustration tolerance and appeared motivated to perform to the best of her abilities. The following results are considered an accurate reflection of her current level of mentation.

## TEST FINDINGS:

*General Intellectual Abilities:* Intelligence testing estimates Dr. Norden to be functioning in the Average range of Verbal intelligence and the High Average range of Performance intelligence. Qualitative review of her performance reveals that she tended to perform markedly better on untimed measures. Her performance was in the Superior range on a measure of the ability to discriminate essential from non-essential visual details. Her performance was in the High Average range on measures of verbal abstract concept formation and general fund of knowledge. Although within normal limits, she evidenced relative weakness on timed measures of mental arithmetic, graphomotor speed, visuo-spatial constructional praxis, and the ability to identify cause and effect in a social context. Her performance on a measure of auditory attention span is impaired.

*Attention and Information Processing Speed:* Dr. Norden's level of performance on multiple measures of simple and complex attention was in the impaired range. Performance on a measure requiring visual scanning and tracking was impaired for both numbers (Trailmaking Test - Part A, 47 seconds, 3rd percentile) and letters (Trailmaking Test - Part C, 45 seconds). Performance on a measure of auditory attention span was impaired for her age and education (Wechsler Adult Intelligence Scale - III Digit Span subtest: 6 digits forward, 3 digits backwards, 16th percentile). Overall performance on a particularly challenging measure requiring auditory attention, working memory and information processing speed (Paced Auditory Serial Addition Test) was severely impaired for her age, education and estimated premorbid level of intellectual function (Total Score=82, 5th percentile). Qualitative review of her performance reveals that she was negatively impacted by increased rates of stimulus presentation. Her performance on this repeatable cognitive measure should provide a valid and reliable index of her anticipated continued cognitive recovery.

*Learning and Memory:* Dr. Norden's overall performance on a serial word list learning task was intact (77th percentile). On this word list learning test, she was able to recall 15 of the 16 word list items after the fifth presentation of the list. This places her level of verbal learning one standard

**NORDEN, Beth**
Page 3

deviation above the mean for her age and education. After a 5-minute delay, she retained 14 words, and after a 20 minute delay, she retained 13 of the 16 words. Recognition memory was intact. When required to encode information presented in paragraph-length story form, Dr. Norden required two presentation trials. Her verbal learning score was impaired for her age and education (14th percentile). After a four hour delay interval, however, she was able to recall 93% of those details that she initially encoded (55th percentile). This represents a normal rate of forgetting for newly acquired verbal information. On a measure of visual learning and memory, Dr. Norden again required two presentation trials to adequately encode four unique geometric designs. This places her level of visual learning in the mildly deficient range (16th percentile). Following a four-hour delay, however, she was able to recall 83% of the visual design elements that she had originally recalled (intact performance). This finding represents a normal rate of forgetting for newly acquired visual information. **Overall performance on measures of learning and memory reveal mildly deficient encoding skills in the context of entirely intact consolidation and retrieval abilities. There is no evidence of organic amnesia. This pattern of performance has been demonstrated in patients with encephalopathy, among other possibilities.**

*Language:* There is no evidence of acquired or developmental language dysfunction. Performance on a confrontation naming task was intact. There was no evidence of word finding difficulty, circumlocution or even mild paraphasia. On verbal associative fluency testing Dr. Norden performed in the Superior range for her age and education generating 50 words beginning with three specified letters in three minutes and 28 items to the category "Animals" in sixty seconds. Receptive language abilities are intact. She is able to accurately repeat both simple and complex phrases.

*Frontal Lobe/Executive Function:* **Dr. Norden performed well on untimed measures of frontal/executive function (i.e. conceptual reasoning, mental flexibility, deductive and inductive reasoning).** She performed within normal limits on a measure of verbal abstract concept formation (84th percentile). On a measure of the ability to formulate concepts, shift attention and maintain cognitive set (Wisconsin Card Sort Test), performance was entirely intact. She did not make an excessive number of perseverative or non-perseverative errors. She was readily able to incorporate feedback from the examiner into her task strategies. In contrast, performance on timed measures of mental flexibility was below expectation. For example, when the requirement to systematically apply a novel sequencing rule was added to a visual scanning and tracking task, her performance was impaired for her age and education (Trailmaking Test - Part B, 86 seconds, 7th percentile). This finding appeared to be due to reduced information processing speed and not difficulty with mental flexibility.

*Personality Testing:* Validity scales on the Personality Assessment Inventory suggest that Dr. Norden may have approached the test in a manner that may have tended to minimize negative information. Although valid interpretation of the test results is available, the clinical profile may underrepresent the extent and degree of potential psychological distress. Test findings reveal no evidence of clinical psychopathology. Dr. Norden did report some concerns about physical functioning and health matters in general. This finding is entirely consistent with her medical history.

**NORDEN, Beth**
Page 4

Dr. Norden reported a relatively low number of stressors in her life, and an above average social support system. Her interpersonal style seems best characterized as being cheerful, friendly and extraverted.

## SUMMARY AND RECOMMENDATIONS:

Neuropsychological assessment reveals impaired performance on measures of complex attention and information processing speed. Performance on measures of simple attention span and novel learning (encoding) is viewed as mildly below expectation. In contrast, Dr. Norden performed well on all measures of language function, delay memory and untimed measures of mental flexibility. Personality test results reveal no evidence of clinical psychopathology. Dr. Norden did report some health-related anxiety entirely consistent with her medical history. The overall pattern of neuropsychological test results suggests persistent subcortical dysfunction consistent with her medical history. Test results are consistent with Dr. Norden's self-report.

Overall performance on measures of learning and memory reveal mildly deficient encoding skills in the context of entirely intact consolidation and retrieval abilities. There is no evidence of organic amnesia. This pattern of performance has been demonstrated in patients with encephalopathy, among other possibilities.

Recommendations:
(1) Test results reveal that at this time, Dr. Norden's level of cognitive function is negatively impacted by time pressures. During her continued recovery, she will benefit from additional time (particularly while completing cognitively complex tasks).

(2) Performance on multiple measures of attention is impaired. To compensate for this attentional deficit, Dr. Norden is recommended to complete tasks in as linear a manner as possible. She will likely benefit from very brief, frequent breaks throughout the day as well.

(3) There is evidence of a mild encoding deficit. Dr. Norden may benefit from multiple repetition of new information.

(4) There is no evidence of organic amnesia or memory disorder. Detailed neuropsychological feedback conference is recommended. During her day, Dr. Norden's reported "memory lapses" appear to be associated with her reduced attentional abilities, and not difficulty with memory function per se. She may benefit from use of written reminders and/or a computerized organizer.

(5) Dr. Norden reports health-related anxiety entirely consistent with her medical history. She further notes her ability to handle stress as somewhat reduced. Brief cognitive-behavioral therapy targeting increased anxiety and stress management skills may be beneficial. In this regard, supplementary BioFeedback training (2 sessions) may be considered.

OCT 02,2006 17:34

**NORDEN, Beth**
**Page 5**

(6) Dr. Norden may benefit from Cognitive Retraining specifically in the areas of attention and information processing speed.

(7) Abbreviated follow-up neuropsychological testing is recommended to track her anticipated continued cognitive recovery.

Thank you for referring Dr. Norden for neuropsychological assessment. If you have any further questions please do not hesitate to contact us.

Maria L. Dittrich, B.S.
Psychology Extern

Mary Elizabeth Quig, Ph.D.
Clinical Neuropsychologist
Licensed Psychologist (DC, VA)
Clinical Instructor, Department of Neurology

# **<u>EXHIBIT 2</u>**



# GNA
## GEORGETOWN NEUROPSYCHOLOGY ASSOCIATES

1/30/03

RE:    NORDEN, Dr. Beth

TO WHOM IT MAY CONCERN:

This is to confirm, in writing, Dr. Beth Norden's high level of cognitive function. She has undergone comprehensive neuropsychological testing with me, and objective test results clearly demonstrate intact, and oftentimes Superior levels of cognitive function. Neuropsychological test results would strongly support her ability to function in the workplace at an optimal level.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Mary Elizabeth Quig, Ph.D.
Clinical Neuropsychologist
Department of Neurology,
Georgetown University Medical Center

TEL: 202-686-7590                                                                                    FAX: 202-686-8802

GEORGETOWN NEUROPSYCHOLOGY ASSOCIATES, LLC • 4910 MASSACHUSETTS AVENUE, NW • SUITE 100 • WASHINGTON, DC 20016
GEORGETOWN UNIVERSITY MEDICAL CENTER • DEPT. OF NEUROLOGY • 3800 RESERVOIR ROAD, NW • WASHINGTON, DC 20007

# EXHIBIT 3

# AFFIDAVIT

**City of:**     **Washington**               )
                                             )
                                             )
                                             )
**District of:**   **Columbia**               )

I, Marilyn J. Slomba, am being first duly sworn on oath make the following statement freely and voluntarily to James S. Gee who has identified himself to me as an investigator assigned by the Smithsonian Institution to perform this investigation, knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to any party who has an official interest.

This affidavit is given in relation to the complaint of discrimination filed by, Beth Norden, on January 25, 2005, SI Case NO.: 05-06-012505.

Q.     What is the name of the agency for which you worked the organizational unit to which you were assigned and the address of your duty station at the time of the alleged discrimination (April 8, 2004, through October 15, 2004)?

A.     The Smithsonian Institution.

Q.     What were your position title, series and grade at the time of the alleged discrimination?  How long did you hold this position?

A.     Human Resources Specialist (Employee Relations) GS-201-13, for 11 years.

Q.     Please provide the names and titles of your immediate and second-level supervisors at the time of the alleged discrimination.

A.     Immediate – Dolph Sand, Chief, Labor & Employee Relations (LER); Second-level – Carolyn Jones, Director, Office of Human Resources (OHR).

Q      Please give a brief history of your employment with the Nation Museum of Natural History. Have any of your positions been supervisory?

A.     The main function of my position is advising Smithsonian supervisors, including those in NMNH.  I am not employed by NMNH.  I have not held a supervisory position.

Q.     Do you have a mental or physical disability that substantially impacts a major life activity, if so, what is your disability claim?

A.     I do not have a mental or physical disability that substantially impacts a major life activity.

Initials _Mjk_                                         Page 1 of 4 Pages

Q.    Please indicate whether you have ever been involved in any prior EEO activity and describe the nature of your involvement (e.g., sought counseling, filed formal complaint, participated as witness, identified as responsible official).

A.    On occasion I have provided information from case files as requested by Smithsonian's OEEMA staff.

Q    Have you had EEO for Supervisors training and if so, when?

A.    Yes, I believe it was in the past couple of years.

Q.    Did you know Beth Norden, the Complainant?  If so, for how long and in what capacity did you know her?

A.    In my current position I have spoken and corresponded by e-mail with Dr. Norden at various times, directly and through her attorney, exchanging information regarding her work status and personnel procedures.

Q.    To your knowledge, did Ms. Norden engage in any formal or informal EEO activity?  If so please explain what you understood about her EEO activity, and when and how you became aware of it.

A.    Dr. Norden's attorney, Vickie Fang, Esq., informed me on April 19, 2004, that she was responding to Smithsonian's proposed Return to Work document by filing an informal complaint of retaliation with OEEMA.

1.    **Complainant alleges that she was discriminated against on the bases of disability (physical, perceived mental) and/or reprisal for prior EEO activity, when during the period from April 8, 2004, through October 15, 2004, she was denied a requested reasonable accommodation.**

Q.  .    What was your role in the decision to deny the Complainant's requested for reasonable accommodation?

A.    I provided the LER advice to Dr. Norden's supervisors in their consideration of her request for accommodation.  I communicated with her attorney as management's representative.

Q.    What is your response to the Complainant's allegation that she was subjected to discrimination when she was denied a requested reasonable accommodation? Did the Complainant present satisfactory evidence that she was disabled? If so, what was the evidence and what was the official response?  Was the official response based on Smithsonian's rules and policies? If so, what rules and/or policies were applied?

Initials _mfl_

A.     Based on my knowledge of the situation, Dr. Norden was not subject to discrimination when management determined that they were not able to provide accommodation. I was informed by OEEMA's Disability Program Manager that the Office of General Counsel (OGC) advised that there was sufficient evidence to determine that Dr. Norden was disabled. The October 8, 2004 decision letter provides the official response to the accommodation request. The procedures that were followed included the OHR Rehabilitation Act Procedures issued December 19, 2000. A copy of the October 8, 2004 decision letter is attached to this statement.

**2.     Complainant alleges that she was discriminated against based on disability and/or reprisal, when on October 15, 2004, she was separated from her Museum Specialist, GS-1016-11, position and the rolls of the Smithsonian.**

Q.     In what way were you officially involved in the decision to separate the Complainant from her Museum Specialist, GS-1016-11, position and the rolls of the Smithsonian?

A.     I advised management and assisted in drafting the decision. I also communicated with Dr. Norden's attorney during the notice period following the proposal and provided a copy of the decision to her office.

Q.     If you were involved in the decision-making process, how was it determined that the Complainant should be separated from her position and the rolls of the Smithsonian? What criteria were used in making the determination?

A.     The November 5, 2003 proposal and the October 8, 2004 decision cite the criteria used in making the determination that Dr. Norden should be separated from the Smithsonian.

Q.     Was the Complainant's disability status and involvement in prior EEO activities among the evaluation criteria? If so, what criterion was applied?

A.     Dr. Norden's involvement in EEO activities was not among the evaluation criteria. The decision was based on her inability to perform the duties required for her position and the Smithsonian's lack of success in identifying an accommodation for Dr. Norden's disability that was acceptable to her.

Q.     What knowledge do you have that bears directly on the failure of the Complainant to remain in the position in question? Please elaborate.

A.     My knowledge on this subject is reflected in the October 8, 2004 decision.

Q.     What employees, similarly situated to the Complainant, have been separated from their positions and the rolls of the Smithsonian? What was their disability status?

Initials

A.    LER does not have records that identify such employees.

Q.    Do you believe that the Complainant was discriminated against on the basis of disability status and/or involvement in EEO activities when she was separated from her Museum Specialist, GS-1016-11, position and the rolls of the Smithsonian?? Please explain?

A.    I do not, based on the information provided in the proposal and decision on her separation.

Q     Is there anything more you wish to add to your statement? If so, please explain.

A.    I have nothing further to add.


I have read this statement consisting of 4 pages and I have made all necessary corrections and additions, and have initialed every page.

I hereby declare under penalty of perjury that the forgoing statement is true, correct, and complete to the best of my knowledge and belief.

Signature of Affiant: _Marilyn J. Sloulbe_

Date: _4/29/05_

Subscribed and sworn to before me this _29th_ day of _April_, 2005:


_____
Signature of EEO Investigator or Notary Public

Initials _MJS_                                        Page 4 of 4 Pages