# **<u>EXHIBIT 4</u>**

**AFFIDAVIT**

| City of: | **Washington** | ) |
| | | ) |
| | | ) |
| | | ) |
| **District of:** | **Columbia** | ) |

I, Theodore Robert Schultz, am being first duly sworn on oath make the following statement freely and voluntarily to James S. Gee who has identified himself to me as an investigator assigned by the Smithsonian Institution to perform this investigation, knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to any party who has an official interest.

This affidavit is given in relation to the complaint of discrimination filed by Beth Norden on January 25, 2005, SI Case NO.: 05-06-012505.

Q.    What is the name of the agency for which you worked the organizational unit to which you were assigned and the address of your duty station at the time of the alleged discrimination (April 8, 2004, through October 15, 2004)?

A.    Smithsonian Institution, National Museum of Natural History, Department of Entomology.

Q.    What were your position title, series and grade at the time of the alleged discrimination?  How long did you hold this position?

A.    Research Entomologist and Department Chair, GS-14.

Q.    Please provide the names and titles of your immediate and second-level supervisors at the time of the alleged discrimination.

A.    Dr. Hans-Dieter Sues, Associate Director of Research and Collections, and Dr. Cristian Samper, Director.

Q    Please give a brief history of your employment with the National Museum of Natural History. Have any of your positions been supervisory?

A.    Since July 1995 I have been employed as a Research Entomologist in the Department of Entomology.  Prior to becoming Department Chair on 01 April 2004, I intermittently supervised one person, Beth Norden, a Museum Support Specialist.  During some of the years 1995 to 2004 I served as Beth's supervisor, whereas in other years Beth Norden was variously supervised by Karl Krombein (Research Entomologist), Nancy Adams (Museum Specialist), and Marc Epstein (Museum Specialist).  I also currently supervise Molecular Systematics Technician Nor Faridah Dahlan (past four years), Research Entomologist Sean

Initials TRS

Brady (past 1.5 years). Since becoming Department Chair on 01 April 2004, I have supervised all the Research Entomologists, the Entomology Collection Manager, the Entomology Funds Manager, and the Head of Entomology's Information Technology Unit.

Q.   Do you have a mental or physical disability that substantially impacts a major life activity, if so, what is your disability claim?

A.   No, I do not have a mental or physical disability that substantially impacts a major life activity.

Q.   Please indicate whether you have ever been involved in any prior EEO activity and describe the nature of your involvement (e.g., sought counseling, filed formal complaint, participated as witness, identified as responsible official).

A.   I have been interviewed by EEO staff members on two prior occasions in connection with actions filed by Beth Norden. My recollection is that one of these interviews was conducted by Shadella Davis and took place in late 2002. My records indicate that the second interview was conducted by Karen Margensey and took place on 14 May 2004.

Q   Have you had EEO for Supervisors training and if so, when?

A.   No. I have not had EEO for Supervisors training.

Q.   Did you know Beth Norden, the Complainant? If so, for how long and in what capacity did you know her?

A.   Yes. I have known Beth Norden since arriving in the Museum in 1995. I became her supervisor either in late 1995 or early 1996. As indicated above, in some of the years between 1995 and 2004 I served as Beth Norden's supervisor, whereas in other of those years Dr. Norden was supervised by Museum Specialist Nancy Adams, Museum Specialist Marc Epstein, or Research Entomologist Karl Krombein.

Q.   To your knowledge, did Ms. Norden engage in any formal or informal EEO activity? If so please explain what you understood about her EEO activity, and when and how you became aware of it.

A.   As mentioned above, I was interviewed on two separate occasions by EEO representatives in connection with Beth Norden. I believe I was told by the interviewers that these interviews were connected with formal or informal complaints filed by Beth. My recollection is that one of these interviews was conducted by Shadella Davis and took place in late 2002. My records indicate that the second interview was conducted by Karen Margensey and took place on 14 May 2004.

1.    **Complainant alleges that she was discriminated against on the bases of disability (physical, perceived mental) and/or reprisal for prior EEO activity, when during the period from April 8, 2004, through October 15, 2004, she was denied a requested reasonable accommodation.**

Q.    What was your role in the decision to deny the Complainant's requested for reasonable accommodation?

A.    There was no such decision made. Quite the opposite, we sought and followed guidance from the Smithsonian Office of Safety and Environmental Management, from the Smithsonian Occupational Health Services Center, and from the Smithsonian Office of Human Resources. Based on this guidance, we designed a return to work that accommodated all of the needs communicated to us by Beth Norden, by Beth Norden's lawyer, Vicki Fang, and by Beth Norden's physicians, who communicated directly to Smithsonian physician Dr. Thomas Lawford, an Occupational Medicine Specialist in the Occupational Health Services Center.

Q.    What is your response to the Complainant's allegation that she was subjected to discrimination when she was denied a requested reasonable accommodation? Did the Complainant present satisfactory evidence that she was disabled? If so, what was the evidence and what was the official response? Was the official response based on Smithsonian's rules and policies? If so, what rules and/or policies were applied?

A.    As mentioned above, we carefully designed a return to work for Dr. Norden based on guidance from the Smithsonian Office of Safety and Environmental Management (OSEM), from the Smithsonian Occupational Health Services Center (OHSC), and from the Smithsonian Office of Human Resources (OHR). This return to work included all of the accommodations communicated to us by Dr. Norden, by Dr. Norden's lawyer, Vicki Fang, and by Dr. Norden's physicians, communicating directly with Smithsonian physician Dr. Thomas Lawford. These requested accommodations centered on Beth Norden's sensitivity to napthalene. Dr. Norden presented satisfactory evidence of disability, and this disability was never in question. The evidence consisted of medical evaluations that were communicated directly to Dr. Lawford, which he interpreted for us. Our official response was to make every effort, under the guidance of the OSEM, OHSC, and OHR, to accommodate Dr. Norden's needs in order to return her to work successfully. Many weeks were devoted to implementing these accommodations in expectation of Dr. Norden's return to work, and included the following actions: (1) We relocated Dr. Norden's office (i.e., moved all of her furniture, cabinetry, equipment, files, books, etc., installed a new phone and assigned a VOIP number to Dr. Norden and listed it in the Departmental directory) to the fourth floor East Court, where there are no collections and thus where ambient napthalene levels are lower than anywhere else in our Department. (2) We located Dr. Norden's new office adjacent to the Sorting Center, a specially ventilated facility. In a dedicated

Initials _____

on-site study of the Norden situation, OSEM Industrial Hygienist Kathy Makos recommended that Dr. Norden "attempt to do the majority of her work" in that room. (3) We planned to fit Dr. Norden with a mask respirator, which we would then purchase, as soon as she returned.

2. **Complainant alleges that she was discriminated against based on disability and/or reprisal, when on October 15, 2004, she was separated from her Museum Specialist, GS-1016-11, position and the rolls of the Smithsonian..**

Q.    In what way were you officially involved in the decision to separate the Complainant from her Museum Specialist, GS-1016-11, position and the rolls of the Smithsonian?

A.    On advice of Marilyn Slomba at the Office of Human Resources, and acting as Dr. Norden's immediate supervisor, I wrote the first proposal to separate letter on 05 November 2003. Subsequent to receiving this letter, Dr. Norden, communicating through her lawyer, Vicki Fang, and Dr. Norden's physicians, communicating through SI physician Dr. Thomas Lawford, indicated that Dr. Norden was in fact fully capable of performing her full range of duties full-time, subject to accommodation of her sensitivity to napthalene. As a result, a third attempt was made to return Dr. Norden to work (two prior attempts were made during 08 March through 25 July 2001 and during 03 April to 04 November 2002). Dr. Norden responded to our plan to return her to work through her lawyer, Vicki Fang, in an e-mail message dated 07 July 2004, stating "Dr. Norden can not accept an offer which is at such variance with her doctors' recommendations, the Smithsonian doctor's recommendations, and her lawyers' recommendations." Subsequently, OHR attmpted to find Dr. Norden a different, suitable position within the Smithsonian. Then, on advice of OHR, a second proposal to separate letter was issued on 08 October 2004, which was signed by Wayne Mathis, who was serving as Acting Chair of Entomology during my absence.

Q.    If you were involved in the decision-making process, how was it determined that the Complainant should be separated from her position and the rolls of the Smithsonian? What criteria were used in making the determination?

A.    As stated in my letter of 05 November 2003: "I must emphasize that your proposed separation is based solely upon the fact that you cannot perform the essential duties of your position of record." As stated in Wayne Mathis' letter of 08 October 2004, "Since we are unable to plan for your return to duty, I believe that your separation from the Smithsonian rolls is warranted, based on your inability to perform the essential duties of your position."

Q.    Was the Complainant's disability status and involvement in prior EEO activities among the evaluation criteria? If so, what criterion was applied?

Initials _*GPS*_

A.    No, the Complainant's disability status and involvement in prior EEO activities were not among the evaluation criteria.

Q.    What knowledge do you have that bears directly on the failure of the Complainant to remain in the position in question? Please elaborate.

A.    Dr. Norden became ill on 21 September 2000. She was entirely absent until 08 March 2001, during which time she received benefits from the Office of Workers' Compensation Program (OWCP). The first attempt to return Dr. Norden to work took place between 08 March 2001 to 25 July 2001. This return included a light-duty accommodation, specified by Dr. Norden's physicians, consisting of a 12-hour work week. This attempt failed and Dr. Norden returned to OWCP benefits. The second attempt to return Dr. Norden to work took place between 03 April 2002 and 04 November 2002, and included a light-duty accommodation, specified by Dr. Norden's physicians, of 20 hours per week. This attempt also failed (Dr. Norden missed approximately 20% of her scheduled time), and Dr. Norden again returned to OWCP benefits. Because this situation had not changed, in November 2003, on advice of OHR, I wrote the first proposal to separate letter, based "solely upon the fact that you cannot perform the essential duties of your position of record." Dr. Norden's response to this letter, communicated through her lawyer, Vicki Fang, and the response of Dr. Norden's physicians, communicated to us through SI physician Dr. Thomas Lawford, indicated that Dr. Norden was in fact fully capable of performing her full range of duties full-time, subject to accommodation of her sensitivity to napthalene. As a result, a third attempt was made to return Dr. Norden to work. However, this return-to-work plan was rejected by Dr. Norden, as described above. Subsequent to this rejection, and following an unsuccessful attempt to find Dr. Norden a different job within the Smithsonian, a second proposal to remove letter was sent to Dr. Norden by Wayne Mathis, Acting Chair of Entomology. Dr. Norden's inability to fulfill the requirements of her position was the sole criterion for both proposals to separate.

Q.    What employees, similarly situated to the Complainant, have been separated from their positions and the rolls of the Smithsonian? What was their disability status?

A.    I am not aware of any other employees who have been separated since I began working here. One employee, Maureen Mello, recently resigned.

Q.    Do you believe that the Complainant was discriminated against on the basis of disability status and/or involvement in EEO activities when she was separated from her Museum Specialist, GS-1016-11, position and the rolls of the Smithsonian? Please explain?

A.    No, I do not believe this to be the case. In fact, based upon my close involvement with this case, I believe that every effort was made to accommodate Dr. Norden's disability and that no bias exists due to Dr. Norden's EEO activities. I firmly believe that Dr. Norden's separation is entirely due to her inability, since

Initials _TRS_

September 2000, to perform the essential duties of her position. Multiple efforts involving numerous accommodations were made to return Dr. Norden to work, and all were made in good faith and in the genuine hope that those returns would be successful. Sadly, they were not. In response to the third and final attempt, Dr. Norden, through her lawyer, ultimately declined to return. I remain baffled by that response.

Q    Is there anything more you wish to add to your statement? If so, please explain.

A.    I am attaching two documents: (1) A copy of the first proposal to separate letter to Beth Norden, dated 05 November 2003 and signed by Ted Schultz; (2) an unsigned copy of the second proposal to separate letter to Beth Norden, dated 08 October 2004 and written by Wayne Mathis. These two letters summarize the history of this case.


I have read this statement consisting of 6 pages and I have made all necessary corrections and additions, and have initialed every page.

I hereby declare under penalty of perjury that the forgoing statement is true, correct, and complete to the best of my knowledge and belief.


Signature of Affiant: _____

Date: ____19 APR 2005____


Subscribed and sworn to before me this 19th day of April, 2005:


_____
Signature of EEO Investigator or Notary Public


Initials _____

Page 6of 6 Pages

# **EXHIBIT 5**

 **Smithsonian Institution**                    **Fax**

Office of Human Resources

To  Vickie Fang, Esq.

Fax  301 - 552 - 4435

Telephone  301 - 552 - 4908

Date  4 - 8 - 04

From  Marilyn Slomba, LER
Phone 275-1043/Fax 275-0144

Subject  Beth Norden

Total pages  18

Message

Forwarding the Performance Plan and
the Work Plan, cited in items 12 and 13 in the
agreement you received earlier today, as
you requested. As we discussed the work
assignments + standards are not subject to
negotiation. I've also included Dr. Norden's
position description.

You also asked me to send Dr. Lawford's
December 23, 2003 advisory. I will search
my file further on Monday for that, but wanted
to send this material for consideration before
leaving today for the weekend.

Victor Building, MRC 912
750 9th St. NW  Suite 6100
Washington  DC 20560-0912
Telephone    202.275.1102
Fax          202175.1115

## *Agreement*

This Settlement Agreement and General Release (hereinafter this Agreement) is hereby entered into by and between Beth Norden and the Smithsonian Institution (hereinafter the Smithsonian).

WHEREAS, Dr. Norden, who is employed at the National Museum of Natural History, as a Museum Specialist (Zoology), GS-1016-11, was issued a proposal to separate her from employment with the Smithsonian dated November 5, 2003, due to her inability to perform the duties of her position; and

WHEREAS, Dr. Norden has been and continues to be receiving pay compensation from the Smithsonian through the periodic rolls of the Department of Labor's Office of Workers' Compensation; and

WHEREAS, Dr. Norden submitted a reply to the proposal dated November 13, 2003, in which she designated Vickie Fang, Esq. as her representative; and

WHEREAS, the Smithsonian on December 5, 2003, provided her representative with a copy of the material on which the proposal was based; and

WHEREAS, Dr. Norden's physicians subsequently provided Smithsonian's Occupational Health physician with updated medical information, indicating that she is now capable of performing her full duties for 40 hours per week, and made some specific recommendations; and

WHEREAS, Dr. Norden stated in her reply that she desires to return to work at the Smithsonian; and

WHEREAS, the Smithsonian's Occupational Health physician issued an advisory on December 23, 2003, based on his review of that information Dr. Norden's physicians, and recommended that specified restrictions be followed by Dr. Norden and by the Smithsonian to maximize potential for her successful return to duty; and

WHEREAS, the Smithsonian wishes to return Dr. Norden to work in her Museum Specialist GS-11 position and to provide reasonable accommodation for her condition, and Dr. Norden wishes to return to work in that position and to avail herself of the accommodation offered;

NOW THEREFORE, in consideration of the mutual covenants and promises contained herein, and for other good and valuable consideration, it is hereby agreed by and between Dr. Norden and the Smithsonian as follows:

1. The Smithsonian agrees to return Dr. Norden to full duty status, effective April 18, 2004, in her position of record PD# 39725 (attached), as a Museum Specialist, GS-1016-11.

2. Dr. Norden will notify the Department of Labor that she has returned to work at the Smithsonian at her full salary, and provide a copy of that notification to Smithsonian's Office of Human Resources.

3. Nancy Adams will serve as Dr. Norden's supervisor.

4. Dr. Norden's performance will be measured against a work plan specifying requirements consistent with her performance plan, which will be provided to her upon her return to work.

5. To comply with Dr. Norden's physicians' recommendation that she be protected from exposure to the low ambient levels of naphthalene present in the Natural History Building, and based on the recommendations of the Smithsonian Office of Safety and Environmental Management, the Smithsonian

agrees *to:* (i) provide Dr. Norden with a fitted respirator similar to one she **has** worn previously and Dr. Norden agrees to **use** this respirator when **accessing** the collection cabinets; (ii) provide Dr. Norden with **work space** in the negative-pressure, ventilated Sorting Center, Room CE436; and (iii) **relocate Dr.** Norden's office to Room CE420, directly across from **the** Sorting Center on a **floor** that contains no permanent collections,

6.  Dr. Norden will have an **Alternative Work** Schedule (AWS) to facilitate the scheduling of her medical appointments and to assist her in making up unscheduled leave. Her schedule will be **as follows:** **Monday-Friday,** 8:00 a.m. to 5:30 p.m., **with** the second Friday of the pay period off **and** the first **Friday** as her 8-hour work day (8:00 a.m. to 4:30 p.m.). Dr. Norden may work on the AWS day (second **Friday**) between 8:00 a.m. and 5:30 p.m. to **make up any missed hours** during the pay **period. Dr.** Norden will **not** perform **work** outside of these hours.

7.  Dr. Norden understands that her current annual leave balance is 25 hours **and her** sick leave balance **is -4** hours, and agrees **during** *the* duration of this Agreement to **make** any leave **requests that** *exceed* her accrued leave balances as requests for leave without pay (LWOP).

8.  Dr. Norden agrees to comply during the **duration of this** agreement with **her physicians'** treatment recommendations regarding her work at the Smithsonian.

9.  Dr. Norden agrees to have her physicians provide medical updates to the Smithsonian's Occupational Health physician on a quarterly and as-needed basis, so that he can review that information and keep Smithsonian management staff apprised of information relevant to her work.

10. Dr. Norden's supervisors will also keep the Smithsonian **physician informed of any** relevant observations and concerns.

11. Dr. Norden agrees to **provide** copies of this agreement to her treating physicians within two **weeks** of the signing of this agreement.

12. Dr. Norden agrees to **meet** her performance standards **by accomplishing the tasks outlined in her work** plan in an accurate and timely manner, and to demonstrate satisfactory and punctual attendance, complying with all Smithsonian, NMNH and Department policies, including leave policy and procedures.

13. Dr. Norden's **supervisors** will review her **performance and her** attendance every 320 **hours (8** weeks) **and** on an as-needed **basis, to assess and** provide **feedback** on her **success in meeting the standards established in** the performance **plan as specified in** her work plan.

14. The Smithsonian agrees to release information concerning the terms of this agreement only as she authorizes, other than the itemized disclosures mated in this agreement.

15. The Smithsonian agrees to hold Dr. Norden's separation in abeyance while she demonstrates **satisfactory** performance and **attendance as shown** by compliance with this agreement, as judged **at the end of each** 320-**hour (8-week)** review cycle. Absences will not be acceptable reasons for not meeting the work plan and performance requirements.

16. The purpose of this agreement is to provide Dr. Norden with an opportunity to return to the Smithsonian to perform the full range of the duties of her position. The parties understand that it is critical that Dr. Norden adhere to each of the provisions of this agreement and that any failure to adhere to those provisions, as evaluated at the end of each **8-week** review cycle, will result in her separation from the

rolls of the Smithsonian as **proposed in** the November 5, 2003 letter, during *the* duration of *this* agreement.

17. Dr. Norden understands that her separation is being held in abeyance for **a** period not **to exceed one** (1) **calendar year**, commencing with **the signing** of this agreement. The Smithsonian **agrees** that the proposal *to* separate **will be** withdrawn one(1) *year* from the date of of s agreement, if Dr. Norden *is* successful in complying **with the** terms of this agreement.

18. It is understood that the record of the proposal to separate and this agreement will not be placed in **Dr.** Norden's Official Personnel Folder, if she successfully completes her obligations under this agreement However, the Smithsonian **may** consider and rely on **the** file related to **this separation action**, including this agreement, in **the event of a future lapse in attendance or performance after the** successful conclusion of this agreement.

19. **Dr.** Norden waives her right to grievance/arbitration procedures, *to* appeal *to the* Merit Systems Protection Board and **any right to** file suit in Federal **or state court** for any adverse **actions** based on performance or **conduct taken** *against* her **during** the life of this agreement or on any separation effected **as a** result of her failing to meet *the* terms of this **agreement**. While this agreement **waives her right to** appeal an adverse action triggering the terms of this agreement, Dr. Norden may petition the Merit Systems Protection Board following any subsequent separation based on this agreement **by making a** non-frivolous allegation that the Smithsonian violated a material term or acted in bad faith or that she did not breach the agreement.

20. **Dr.** Norden agrees **that this** constitutes the full and final settlement of any and **all** complaints, **appeals, grievances, or** other actions, either administrative or civil, against the Smithsonian **and** related to her employment with *the* Smithsonian **to the** date of **this** agreement. This **specifically includes** her August 26, 2003 discrimination **complaint, SI 03-20-082603, EEOC No. 01A41096.**

21. This agreement shall not limit Dr. Norden's right to file a **complaint** based upon alleged discriminatory acts of the Smithsonian arising subsequent to the date of **this** agreement, and unrelated **to this agreement.**

22. Dr. Norden and the Smithsonian **agree that the facts and terms** of this agreement shall be treated as confidential.

23. **Dr.** Norden fully understands the terms of this agreement and **voluntarily agrees to said** t e n s .

24. Nothing in **this agreement shall** constitute an admission of wrongdoing on behalf of the Smithsonian or **any of** its agents, **officers** or employees,

IN WITNESS WHEREOF, the parties hereto set **their hands on the date** indicated.

| | | | |
|---|---|---|---|
| **Dr.** Beth Norden | Date | Dr. Wayne Mathis | Date |
| Employee Representative | Date | Nancy Adams, supervisor | |
| | | Smithsonian Representative | Date |

## MONTH 3
Transfer 20 KVK Office Schmitts. (1 day)

Creak and affix all drawer labels needed in the Odonate envelope collection. (3 days)

Take data, create & affix labels to the Mallophaga collection drawers. (3 days)

Upgrade and inventory the Tiphiid collection. (13 days)

Exceed: .Creates labels for and affixes labels for 5 drawers of Departmental pinned backlog material assigned by Supervisor. Keeps material in trays and drawers that are sorted to order.

## MONTH 4
Transfer 20 KVK Office Schmitts.(1 day)

Take data, create & affix labels to the Neuropteroid slide collection drawers. (1 day)

Upgrade and inventory the Scoliid Collection. (18 days)

Exceed: Creates labels for and affixes labels for 5 drawers of Departmental pinned backlog material assigned by Supervisor. Keeps material in trays and drawers that are sorted to order.

## MONTH 5
Transfer 20 KVK Office Schmitts. (1 day)

Upgrade and inventory the Chrysidids Collection. (14 days]

Improves 2 drawers of Ant Types. (5 Rays)

Exceed: Creates labels for and affixes labels for 5 drawers of Departmental pinned backlog material assigned by Supervisor. Keeps material in trays and drawers that are sorted to order.

## MONTH 6
Transfer 16 KVK Office Schmitts.(1 day)
Distributes and/or incorporates into the collection all KVK schmitt box material that had been transferred this year. (3 days)

Completes Ant Type collection upgrade. (16 days)

Exceed: Creates labels for and affixes labels for 5 drawers of Departmental pinned backlog material assigned by Supervisor. Keeps material in trays and drawers that are sorted to order.

**MONTH 7**
Upgrades and inventories Oxaeidae (1 **drawer**), Stenptritidae (1 **drawer**), Melittidae *(5 Drawers)* and Colletidae (39 drawers)

Exceed: Creates labels for and affixes **labels for 5** drawers of Departmental pinned backlog material assigned by Supervisor. Keeps material in trays and drawers that are sorted to order.

**MONTH 8**
Upgrades and inventories **Andrenidae (103 drawers)**

Exceed: *Creates* labels for and affixes **labels for** *5* drawers of Departmental pinned backlog material assigned by Supervisor. **Keeps** material **in trays and** drawers that are sorted to order.

**MONTH** *9*
Upgrades and inventories Megachilidae (112 **drawers)**

Pins, points and labels **5** Dept. Backlog batches of specimens of under 100 specimens each that *Supervisor* assigns.

**MONTH 10**
Upgrades **and inventories** Halictidae.

Exceeds: Pins, **points** and labels **5 Dept. Backlog** batches of specimens of under 100 specimens **each that Supervisor assigns.**

**MONTH 11**
*Start* **Upgrade** and **inventory.** Apidae (160 **drawers** NHB & 55 drawers at **MSC)**
Arrange for MSC Bombus drawers to be returned to NHB and incorporated into line collection. Completes this month, the organizing and **data capturing of** 110 drawers.

Exceeds: Pins, **points** and labels **5** Dept. Backlog batches **of specimens** of under 100 specimens each **that Supervisor assigns.**

**MONTH 12**
Completes upgrade & inventory of Apidae. **This** should include the organizing and data **capture of** the other 105 **drawers, printing,** cutting and affixing the tray labels and creating and affixing all drawer labels.

Exceeds: Pins, points and labels **5** Dept. Backlog **batches** of specimens of under 100 specimens **each that Supervisor assigns.**

**NOTE:** Upgrading **and inventorying includes:**

**Upgrading** = organizing *the* collection alphabetically within the family, transferring all cork trayed material to **foam trays**, leaving expansion **space** in each drawer using empty trays, putting in **drawer dividers**, cleaning the **glass, creating & affixing the drawer labels.**

Inventorying = Taking the family, genus, species, author, countries of the **world,** states of North America, **total** number of specimens per species, putting that **data** into a FileMaker data base, printing tray labels from that program, cutting the tray labels a h putting **them in the trays.**

# EXHIBIT 6

OCT 02, 2006 17:33

*— Collection's Manager for Entomology*

| | |
|---|---|
| **From:** | David Furth |
| **To:** | G-SI ENT STAFF;  NH - ENT USDA Staff;  NH - ENT WRBU Staff |
| **Date:** | 4/19/01) 11:35AM |
| **Subject:** | Naphthalene Policy |

Because the collections will soon all be in new air-tight, pest-proof cabinets, we are no longer adding naphthalene to the collections. Also, because for several years we have been processing all incoming and problematic specimens through a freezing regime this has minimized the need for fumigants inside collections cabinets. If incoming specimens are frozen and individuals do not leave specimens exposed or in non-standard collections storage containers in their offices, then there is no need to worry about potential pest problems in the collections. Naphthalene is only a repellent and will not kill pests. Additionally, for about 4 years we have been monitoring and recording pests problems throughout the department which has been a big help in locating potential pest problem areas and has also been very helpful for the moving process. Naphthalene is absorbed into the raw wood of the specimen drawers and will off-gas for many years even after it is removed, thereby providing continued repellency for a very long time.

There has been increasing evidence that naphthalene is not healthy and some of our staff as well as others in the NMNH have complained about it.

Actually, in preparing for the move of Lepidoptera and Hemiptera to the 5th floor of the East Wing, we have been actively removing naphthalene as much as feasible. We have also been removing it at the MSC. We have been able to give away hundreds of pounds of this "recylced" naphthalene to other institutions who still need and use it. If you find naphthalene trays in the collection, you can bring them to the Chemical Storage room (CE-414) for processing or else let me know. If you know of potential institutional collections who may want some naphthalene, please let me know.

# EXHIBIT 7

Schultz

141

Q    So for Beth to do that, you would have had to have changed your plan for your research, is that correct?

A    Yes.

Q    Okay.  Now leaving for a moment the issue of naphthalene ants and alcoholic ants, note number one here requires her to bar code and database the returned specimens.  Is that something that she could have done on the fourth floor?

A    With the exception of returning specimens to the collection, which is, you know, a significant portion of the task, yes.

Q    But if she bar coded and databased the returned specimens on the fourth floor, she needed to have the computer that ran the program on the fourth floor.

A    Right.

Q    And as far as you know, she did not have the computer on the fourth floor, did she.

A    No.  As far as I know -- well, I know for sure she did not have a computer with Filemaker Pro running on it on the fourth floor.

Schultz

142

Q       So she really couldn't bar code and database on the fourth floor, could she.

A       She couldn't database.

Q       Okay.  Going to part two of this set of instructions, is the ant type collection project something that involves the holotypes?

A       Yes.

Q       So very precious, fragile specimens that are very heavily impregnated with naphthalene?

A       Precious.  In some cases fragile.  I'm not sure that they are heavily impregnated with naphthalene.

Q       And she couldn't database them on the fourth floor, could she.

A       Well, under the circumstances that we talked about in your previous question.  Without Filemaker Pro.

Q       Right.  Yeah.  I'm sorry these questions are tedious, but your attorney will explain that's how depositions are.

A       I mean it would have been possible, but it would have required Filemaker Pro.



Schultz

143

Q    Right.  There is an initial clause in
the next sentence that says "if you have problems
with naphthalene."  Was there any question in your
mind at this point on September 30, 2002, as to
whether Beth had problems with naphthalene?

A    Well, I don't think I meant it in that
way.

Q    Yeah.  I'm just giving you the chance to
explain how you meant it.

A    Okay.  There was no doubt in my mind
that naphthalene was exacerbating her condition, so
that's not what I meant.

Q    Yeah.  Okay.  Going back for just a
moment to Smithsonian 1927, the July 5th e-mail.

MR. HENAULT:  For the record, that's
Plaintiff's Exhibit 11.

BY MS. FANG:

Q    This is just a minor point, I think.
There has been an interrogatory answer that says
when Beth refused the respirator, she told Carol
not to order it, she didn't tell the occupational
safety people.  Seeing that this e-mail is copied

# **EXHIBIT 8**

OCT 02,2006 17:35

**MEMORANDUM**

**DATE:**      September 15, 2003

**TO:**       Director, Office of Equal Employment and Minority Affairs

**FROM:**     EEO Counselor - Shadella Davis

**SUBJECT:**   EEO Counseling Report - Beth Norden

1. Name, Series, Grade, Job Title, and Office Number of Person Counseled:
Beth Norden, Museum Specialist, GS-1016-11

2. Organization Designation and Location:
National Museum of Natural History
10th and Constitution Avenue, SW
Washington, D.C. 20013

3. Date of First Contact: April 7, 2003

4. Date of Initial Interview: May 14, 2003

5. Bases of Alleged Discrimination: Disability (Hemorrhagic Fever)

6. Date of Alleged Discrimination: Ongoing

7. Claim:
Whether Ms. Norden was discriminated against on the bases of her disability when she was
denied a reasonable accommodation.

8. Corrective Action Requested by Person Counseled:
Ms. Norden requests (1) an accommodation for her disability and (2) to be made whole for all
losses sustained as a result of management's failure and refusal to accommodate her disability.

9. Name and Job Title of Officials Involved:
Scott Miller, Chair, Department of Systematic Biology

10. Summary of Interviews:
Ms. Norden stated that she contracted Hemorrhagic Fever while performing fieldwork, as a
result, she developed an acute sensitization to Naphthalene. She stated that, in October 2002, the
Office of Safety and Environmental Management requested that her department develop a plan to
control her exposure to Naphthalene to accommodate her disability. Ms. Norden stated that her
department failed to develop a plan, and terminated her part-time schedule.

*Management* stated that, ~~~ ~ ~ ~
*of dengue fever) while working in Brazil.* According to Mr. Schultz, Dr. Norden was on
*extended leave during the period of September 2000 through March 2001*; she worked a reduced
*schedule of 12 hours per week during the period of March 8, 2002 through July 25, 2001.* He
stated that Dr. Norden was absent from work during the period of July 26, 2001 through April 2,
2002; she returned to work, on April 3, 2002, and was placed on a temporary schedule of 20
hours per week. Mr. Schultz stated that, during the period of April 3, 2002 through July 12,
2002, Dr. Norton worked 223 out of 294 hours expected from her part-time schedule (71 hours
were due to sick leave). Management concurred that it was expected that Dr. Norden would
gradually return to a full-time schedule and perform the essential duties of her position. Mr.
Schultz stated that a large portion of his duties, over the next few years, is defined by contractual
obligations with the National Science Foundation, and a minimum of 50% of Dr. Norden's duties
are performed in support of his research. Management stated that a number of efforts have been
made to enable Dr. Norden to continue working, i.e., limited duties, part-time schedule, approved
funds to purchase a respirator, and offered to relocate her office space. Mr. Miller stated that Dr.
Norden told them not to purchase the respirator, and she refused to relocate.

11. Management Response to Corrective Action Requested:
Management stated that, after Dr. Norden is medically clear to perform her duties, they are
willing to relocate her office space and purchase a respirator, etc.

12. Date of Notice of Right to File: May 13, 2003

13. Date of Final Interview: July 30, 2003

14. Date of Report: September 15, 2003

15. Documents Reviewed:
Sec #17

16. Persons Interviewed:
Scott Miller
Ted Schultz
Wayne Mathis

17. Listing of Attachments:
Notice of Final Interview, dated July 30, 2003
Letter from Dr. Norden, dated July 11, 2003
Notice of Right to File a Discrimination Complaint, dated May 13, 2003
Employees' EEO Rights and Responsibilities, dated April 8, 2003
Request for Counseling w/attachments, received April 8, 2003

Signature of EEO Counselor

# **EXHIBIT 9**

3. Plaintiff failed to participate in good faith in the interactive process. While on light duty, Plaintiff was fitted for a respirator, but informed the funds manager in her department not to buy one. Plaintiff did not inform the Office of Safety and Environmental Management that she had rejected the respirator, leading them to believe the department was not following its advice. Following November 30, 2002, when the Smithsonian terminated Plaintiff's light duty assignment, Plaintiff did not inform the Smithsonian that she was capable of working 40 hours a week until the Smithsonian issued the November, 2003 proposal to terminate. Plaintiff requested changes in the Smithsonian's proposed job plan that were unrelated to her impairment (i.e, the inclusion of independent research and the elimination of collections management activities, the educational level of her supervisors). Plaintiff did not identify any actual vacancy at the Smithsonian that she was qualified to fill. Following the termination of her light duty assignment, Plaintiff did not inform the Smithsonian that the USDA had informed her that a detail was possible.

4. The Smithsonian had legitimate non-retaliatory reasons for terminating Plaintiff. Over the course of almost four years, the Smithsonian attempted to return Plaintiff to work in an environment that would not endanger her health and would address the concerns raised by her physicians and her attorney. Ultimately, Plaintiff refused to return to work and thus was terminated for her inability to perform her job functions.

5. Failure to state claim

6. Failure to mitigate damages: Plaintiff has not sought jobs outside of her specific area of expertise.

# EXHIBIT 10

To: "Carol Youmans" <Youmans.Carol@NMNH.SI.EDU>,
 "Thomas Lawford" <LAWFOTH@OEMS.SI.EDU>,
 "Kathryn Makos" <makoska@OEMS.SI.EDU>, <schultz@onyx.si.e
Subject: naphthalene/respirator

I am sending this e-mail as an update, and to request
further assistance. Because of an additional medical
problem I have experienced, Carol was waiting to hear back
before ordering the respirator. It may or may not be a
problem for me wearing one (I have varying medical
opinions). However, I have since realized that often times
I do things around a collection containing naphthalene that
I cannot do with a respirator on. For example, on Mon. I
was looking at some type specimens with a visitor. There
was a problem with a type that required careful use of the
microscope and  detailed conversation. It was obvious to me
that a desk unit that purified the ambient air would be much
better than having to take a respirator off to use the
microscope and be able to talk effectively. Reducing rather
than eliminating naphthalene that I'm exposed to seems more
reasonable given the kinds of things that I need to be able
to do (and my inclination to do them even when it means
removing the respirator). It also seems better to be
putting money into something that others can use too. (A
size small respirator won't fit too many others in the
dept.). Therefore...can an appropriate air purifying unit
be suggested? And, can it be ordered reasonably soon?
Thank you all for your help, and I apologize for the extra
work this situation has caused.   Beth

Beth B. Norden. Ph. D.
Dept. of Systematic Biology
NHB, MRC-188
Smithsonian Institution
Washington, D.C. 20560

Phone: 202-357-1821
FAX: 202-786-2894

---

Date: Mon, 22 Jul 2002 11:01:39 -0400
From: "Beth Norden" <Norden.Beth@NMNH.SI.EDU>
To: "Thomas Lawford" <LAWFOTH@OEMS.SI.EDU>
Cc: "Wayne Mathis" <Mathis.Wayne@NMNH.SI.EDU>, <schultz@o
Subject: Norden work at USDA, Beltsville

Dr. Lawford,
  I just had a discussion with Wayne Mathis and Ted
Schultz about the potential of my temporarily working (6-12
months) at the lab in Beltsville. I know we have previously
discussed my concerns about the naphthalene here in SI and
the metro/heat commuting problems. Wayne suggested that a
memo from you in support of my "loan" to the USDA might be a
good idea. If you would be able to provide your input as
part of the paperwork we submit, it would be much
appreciated. Thanks, Beth

# EXHIBIT 11

Schultz

262

1          MR. HENAULT:  Object to the form.  Go

2     ahead and answer the question, sir.

3          THE WITNESS:  No, I don't.

4          BY MS. FANG:

5          Q     Okay.  Let me skip down a few sentences.

6     We have the phrase "Offered Beth a special

7     respirator which fit her and she turned it down."

8     Is that an accurate statement?

9          A     Well, it's somewhat inaccurate.

10         Q     Can you explain to me, please, what a

11    more accurate statement on the subject would be?

12         A     Made departmental resources available

13    for a respirator, had Beth fitted by safety for a

14    respirator, and in the end had it turn out that

15    Beth didn't find it possible to work with wearing a

16    respirator.

17         Q     Okay.  Do you have any idea where Tracey

18    got the idea that Beth simply turned it down?

19         A     No.  It may be Tracey's way of

20    expressing what I just said.  I don't know.

21         Q     I had the impression reading the

22    interrogatory answers that the Smithsonian was

# **EXHIBIT 12**



Performance Evaluation, Page 1
Beth B. Norden, SSN: 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
June 1, 2001 - May 31, 2002

*B. Norden 26 Aug. 2002 (I have read this evaluation, and sincerely hope that the coming year will bring more health & productivity).*

**TO:**      Beth B. Norden Personnel File

**FROM:**   Ted R. Schultz, Supervisor    *Ted Schultz*

**SUBJECT:** Norden Performance Evaluation, June 1, 2001 to May 31, 2002

**DATE:**    23 July 2002

## GENERAL COMMENTS:

The unusual circumstances reported in last year's evaluation memo have continued throughout the current review year. For this reason I am once again undertaking an evaluation that does not include formal assessments of standards (i.e., "not met" / "met" / "exceeded").

In general, I think it would be most accurate to say that Norden has performed her job better than might be expected under exceedingly trying and restrictive circumstances, and given the drastically reduced number of hours worked.

As it did during the 2000 to 2001 year, Norden's illness (a hemorrhagic form of dengue fever, contracted while on the job in Manaus, Brazil, in August 2000) has continued to complicate her job performance during the 2001-2002 year. On advice of physicians, Norden worked a reduced schedule of 12 hours per week from 08 March to 25 July 2001 (evenly divided 6/6 between Schultz and Epstein). She was entirely absent from work from 26 July 2001 to 02 April 2002. She returned to work on a reduced schedule of 20 hours per week from 03 April 2002, and this schedule continued until last week (again, evenly divided 10/10 between Schultz and Epstein).

During the period since April 2002, Norden's health has not been optimal. For the period from 03 April to 12 July, Norden worked 223 out of 294 hours expected from her half-time schedule. Of the missed 71 hours, 51 were due to sick leave and 20 were due to annual leave. The illness is persistent: 5 of the 8 pay periods during this time span included sick leave. As documented by physicians (including SI physician Thomas Lawford), certain aspects of Norden's job have been shown to exacerbate her condition. These include: working around napthalene vapors, prolonged work at a computer screen, commuting, and exposure to hot summer weather. Steps are being taken to deal with the first problem, including the use of a breathing mask and a negative air-flow filter, but the latter three problems still present a challenge.

Norden's time has been evenly divided between support of my research and support of collections under the supervision of Marc Epstein. Thus, from 08 March to 25 July 2001, Norden worked 6 hours per week research support and 6 hours per week collections support, and from 03 April 2002 to present she has worked 10 hours per week for research support and 10 hours per week for collections support. Given the short total hours, this 50/50 division has proven to be, in my opinion, a very poor arrangement.

Since Norden's duties (as outlined in her Performance Plan) were formulated with a 40-hour week in mind, Norden's reduced hours have been inadequate to address the totality of her duties. She has nonetheless persevered.

All attached exhibits are true and accurate copies of documents in my possession.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _2 Oct. 2006_                    Respectfully submitted,

_Beth M. Norden, Ph.D._
Dr. Beth M. Norden

# EXHIBIT 13

Schultz

8

BY MS. FANG:

Q    Do you know of any written instructions
to Beth to the effect of you will not be getting a
respirator or portable air filter because we have
identified the fourth floor ventilated room as the
best accommodation for you?

A    No.

Q    Do you recall any oral instructions to
that effect?

A    No.

Q    Okay.  Do you know of any documentation
directing Beth to move her things to the fourth
floor?

A    ˙ No.

Q    Do you recall any oral instructions to
that effect?

A    No.

Q    ˙ Okay.  Did you continue to tell Beth in
October and November of 2002 that you would help
her to get a respirator or an air filter, that
either of these accommodations were still in
process?