# EXHIBIT 14

Schultz

1    Chandra's attempts to move Beth over to the insect

2    zoo vacancy, is that correct?

3              MR. HENAULT:  Objection.  Go ahead, sir.

4              THE WITNESS:  Well, of Chandra trying to

5    move Beth to the insect zoo?

6              BY MS. FANG:

7        Q     Yes.  Of her having proposed it.

8        A     No.

9        Q     Of anyone having proposed it.

10       A     I may recall Beth mentioning that she

11   would like to work in the insect zoo at some point.

12   That's it.

13       Q     Would there be any reason for her not to

14   work at the insect zoo?

15       A     No.

16       Q     Okay.  Another possibility that Beth had

17   proposed was that she be loaned to the USDA.  Do

18   you know of other Smithsonian employees who have

19   been on some sort of loan program to the USDA or

20   USDA employees who have been loaned in some way to

21   the Smithsonian?

22              MR. HENAULT:  Objection.  Go ahead and

# EXHIBIT 15

301345169?

OCT 02, 2006 17:36

# Smithsonian Institution                                    Memo

~~3 meetings~~

Office of Safety and Environmental Management
Environmental Management Division

**Date**   October 17, 2002

**To**    Scott Miller, Chair
       Department of Systematic Biology, NMNH

**cc**    Ross Simons
       Wayne Mathis
       Ted Schultz
       Rudy Anderson
       ~~Beth Norden~~

**Through**  Rachel L. Gregory, Assistant Director *Rachel L. Gregory*   *Walter G. Bailey*
        Walter G. Bailey, Assistant Director for Occupational Health Services

**From**   Thomas Lawford, M.D. *TL by kam*
       Kathryn Makos, Industrial Hygienist *Kathryn Makos*

**Subject**  **Naphthalene Exposure Control Options for Beth Norden**

       **ACTION REQUIRED: Respond, as soon as feasible, with plan of action based on
       recommendations.**

           This memorandum outlines recommendations for managing potential
       occupational exposure to naphthalene for Dr. Beth Norden, of your staff. With the
       concurrence of Dr. Norden's personal physician, Dr. David Granite, we recommend that
       she be relocated to a work area free of naphthalene supplies and, to the greatest extent
       feasible, be allowed to work with collections without residual naphthalene vapor
       associated with past storage and treatment practices.

       **Background**

           Dr. Norden appears to have developed an acute sensitization to naphthalene as a
       side effect of hemorrhagic fever contracted in the course of fieldwork for the Smithsonian
       Institution in August 2000. Since returning to work in the Court East, 5th floor, she has
       progressively exhibited symptoms, including nosebleeds, intense headaches, and nausea.
       Both hemorrhagic fever, and naphthalene, can cause these symptoms, as well as
       hematological dysfunction. In addition, naphthalene exposure can inflame nasal passages
       and vessels. In Dr. Norden's case, the two conditions appear to be acting in concert to
       aggravate her symptoms considerably.

           Ambient air monitoring conducted on Dr. Norden's floor revealed naphthalene
       concentrations of 0.039-0.100 parts per million (ppm) in the adjacent office and in the
       hallway outside her office. These concentrations are significantly less than the Permissible
       Exposure Limit of 10.0 ppm for naphthalene, established by the Occupational Safety and
       Health Administration (OSHA). However, the exposure standards established by OSHA

PO Box 37012
Victor Building , Suite 9100, MRC-932
Washington DC 20013-7012
202.275.1167 Telephone
202.275.0746 Fax

3013451697

OCT 02,2006 17:36

are based on a relatively healthy worker population, not a community with wide variance in age and health histories, and are not meant to accommodate highly susceptible individuals.

Over the past six months, this office has consulted with her immediate supervisor, Dr. Ted Schultz, her personal physician, and had conducted inspections of her work areas with Mr. Rudy Anderson, NMNH Safety Manager. Exposure control options were discussed with Drs. Schultz and Norden, but it is unclear as to how fully these have been attempted. It would be of value, at this point, to systematically re-evaluate the feasibility of these options, in the new context of relocation to a naphthalene-free environment.

**Discussion of Control Options**

Based on Dr. Norden's description of her typical tasks, an acute exposure to naphthalene might be initiated upon opening treated cases to retrieve specimen drawers. Dr. Norden has been medically certified, trained, and fit-tested to wear a full-face air-purifying respirator for this task. However, Dr. Norton reported that a respirator, loaned to her from this office to assess its effectiveness, was unwieldy and impractical. Dr. Schultz, and Dr. David Furth, collections manager, agreed that technicians, in most cases, could accomplish the "pulling" task. Although naphthalene may have been added to the perimeter of a specimen drawer, the boxes of specimens within each drawer are typically not treated. Dr. Furth suggested that these boxes could be removed to a new, untreated drawer, by technicians, prior to any examinations by Dr. Norden. If Dr. Norden is required to open treated collection cases for any reason, or work with drawers containing naphthalene, she must wear the appropriate respirator, which the department is responsible for providing.

Another option discussed would be to purchase a table-top ductless fume hood for Dr. Norden's office, under which treated specimens and/or drawers could be left while she works. These cost in the range of $2500-3500 for a unit with appropriate alarms and breakthrough monitoring ports. We have researched four major vendors, several of which have units of the dimensions which could fit into her office. However, given the fact that this unit would still not vent the ambient office and collections area, it seems best for her to attempt to do the majority of her work in a relatively naphthalene-free environment.

The selection of suitable alternative work sites is within your purview, as we are not aware of all the possibilities. However, consideration might be given to the laboratories at the Museum Support Center, or a Court East office on a floor not associated with a naphthalene storage collection. A lesser option would be to move Dr. Norden's microscope and examining station, and data entry equipment, to the Court East, 4th floor processing room. This room does not contain treated cabinets, according to Dr. Furth, and contains table-height wall return slot grilles which were designed specifically for the purpose of venting residual vapors from treated collections while they are being examined or catalogued.

We ask that you notify us as soon as possible as to the course of actions to be taken to minimize naphthalene exposure to Dr. Norden in the course of her work. We are continuing to provide medical and industrial hygiene oversight in the management of this case, and remain available to consult with you as to these recommendations. Should you wish to discuss this case further, please contact us at either 202-275-9286 (Dr. Lawford) or 202-275-0705 (Ms. Makos).

**EXHIBIT 16**

OCT 02, 2006 17:36
~ From: Thomas Lawford ~

Page 1 of 2





> Member Services

MESSAGE
CENTER          Read Message                                        Logged in as: abnorden

Mailbox: **abnorden on AT&T Worldnet**          Message: **4 of 4**
Current Folder: **INBOX**

   

**From:** Thomas Lawford <tlawford@erols.com>  [ **Save address** ]
**To:** Beth Norden <abnorden@worldnet.att.net>
**Subject:** Re: Norden/dengue
**Date:** Sat, 23 Nov 2002 16:12:00 -0500

We (Ted, Marilyn Slomba, myself, maybe Kathy Makos I cant remember) had a
conference maybe 6 weeks ago about the naphthalene problem. Those conversations
were prompted by my memo to them which said "her doctors will revisit this on
December 31". I'm sorry that I cant be more precise of the date of this
conference. The main topic of discussion was options of what to do about the
naphthalene. We discussed the room with vents in it, a personal air purifier,
pros and cons of a mask or even a respirator. I didnt make any record of it.
There was no speculation at that time about what would happen after Dec 31, but
Ted did say, "Well if her doctors can revisit it on Dec 31, we can revisit it
too." I took the unspoken thought there to be that they might cease to offer
limited duty. Ted asked Marilyn Slomba if "we have to offer light duty."
Marilyn told him "not if it is  insufficiently productive toward the
departments goals." Ted seemed surprised to learn this.


But no one questioned me at the time on "Just when do you think she will go to
full duty." I would have had to tell them that up to that point, you and I had
not ventured into that territory.

==============================================nuther topic which is, not good news
I just heard this week from Julie in Workmens Comp when she gave a general talk
to our gang on OWCP that there appeared a new regulation about 6 months ago. It
goes thusly; If an employee is off for 12  continuous (not 12 total, but 12
running consecutive months) the agency can then, at its discretion, remove that
individual from its rolls. The person at home continues to get paid, but they
no longer have an automatic return to their agency. They would have to reapply
to said agency for any job openings that get posted. Meanwhile, that frees up
the position in the department to have an open slot to hire someone elsed into.

Dont mean to be giving you bad news  to celebrate Thanksgiving with, but its

important that you know when I learn of anything that is applicable to your
situation.

Before this new rule appeared, it was typical to leave people who were out for
years on the roles of their agency for 4,5 years, and in the case of the USPS
12,13 years.

Tom

# **<u>EXHIBIT  18</u>**

GroupWise WebAccess Message Item                                               Page 1 of 1

Mail Message

Close  Previous Next    Delete From    Delete From All    Forward Reply to Sender Reply All  Move Delete  Read Later Properties
                        This Mailbox      Mailboxes

**From:**   Beth Norden
**To:**     Kathryn Makos, Rudy Anderson, Ted Schultz, Carol Gover, Thomas Lawford
**CC:**     Debbie Burney, Chandra Heilman
**BC:**     "jcole@mail.his.com".I.SIWP01
**Date:**   Friday - November 29, 2002 1:40 PM
**Subject:** Norden/Naphthalene

In order to keep my records updated, as well as to best work towards the future, I ask for the following
information:
1. What meetings (dates), people present, decisions, etc. resulted from the 17 Oct. 2002 memo
pertaining to my sensitivity to naphthalene?
2. After today, I am removed from light duty in my dept. How do I know when it might be safe to return if
it is the naphthalene which is activating the current blood problems?
3. Will anything dealing with my exposure be different upon return, or is my return based upon no longer
being sensitive to naphthalene?
Please excuse my confusion, but major changes have occurred in a short two weeks and I am unclear
what I need to do and why I am not part of the decision process. Thank you for your help in providing me
with these facts. Beth

# EXHIBIT  19



| | |
|---|---|
| **From:** | Thomas Lawford |
| **To:** | Anderson, Rudy; Gover, Carol; Makos, Kathryn; Norden, Beth; Schultz, Ted |
| **Date:** | 12/3/02 8:22AM |
| **Subject:** | Re: Norden/Naphthalene |

Good Morning Beth, I trust that you can read this from home. I have just conferred with **Kathy Makos** by phone, so my answers are from both Kathy and myself:

1. Kathy and I jointly constructed the memo of Oct 17 recommending possible maneuvers to reduce naphthalene exposure to you. Insofar as she and I know, there were no resulting replies to us or meetings that followed that memo.

2. Re when might it be safe to return to (some) naphthalene. That is an issue where I am in standby waiting for your docs to take a lead in advising. You have some pretty high powered experts taking care of you at GTU who have my respect. I wouldn't presume to step out in front of them with an advisory cooked up solely by me. However, when and if your docs issue future advisories on this, I would then be most interested in concurring with them to establish a meeting of the minds. Once that occurs, I would forward their new advisory on to your management.

3. Will anything re exposure be different upon return. This is 100% a management question as to what they can offer you, so sorry, I can't speculate on this one.

Dr Lawford

>>> Beth Norden 11/29/02 01:40PM >>>
In order to keep my records updated, as well as to best work towards the future, I ask for the following information:
1. What meetings (dates), people present, decisions, etc. resulted from the 17 Oct. 2002 memo pertaining to my sensitivity to naphthalene?
2. After today, I am removed from light duty in my dept. How do I know when it might be safe to return if it is the naphthalene which is activating the current blood problems?
3. Will anything dealing with my exposure be different upon return, or is my return based upon no longer being sensitive to naphthalene?
Please excuse my confusion, but major changes have occurred in a short two weeks and I am unclear what I need to do and why I am not part of the decision process. Thank you for your help in providing me with these facts. Beth

| | |
|---|---|
| **CC:** | Bailey, Walter C.; Burney, Debbie; Gregory, Rachel L.; Heilman, Chandra |

# EXHIBIT  20

so webacce message from

I said it was my belief that the museum's reason for returning you to full-time workers comp at this time was a staffing issue. I am not certain what role the napthalene plays in your doctors' decisions to limit your schedule to 20 hours each week. I did not participate in NMNH's decision to return you to workers comp on a full-time basis after Nov. 30.

I'm glad you followed-up with EAP. They are there to support Smtihsonian employees during stressful situations. Please take advantage of them if they can help you.

Finally, I have not heard anyone mention discharging you from the Smithsonian. You have been returned to full-time workers compensation (the same status that you were on before your part-time schedule in April). The goal if for you to successfully return to your job full-time.
Carol

Carol Gover
AA/Diversity/Disability Program Manager
Office of Equal Employment & Minority Affairs
Smithsonian Institution
(202) 275-0150

>>> Beth Norden 12/03/02 12:53PM >>>
Carol,
  Thanks for speaking with me this morning. I appreciate your concern for my furstration and wish that it was not. My attempts to understand my current situation and work towards returning to a "normal" life are my way of not letting things become defeating. I appreciated your offer to look into the money concerns for Dec. (please let me know when you learn something). I also appreciated your letting me know that Ted did not indicate that my work was inferior in any way. You also seemed to feel with some certainty that naphthalene was not part of the decision to have me go out of the museum again. You also had the impression that it was my doctors which indicated that 40 hrs/wk was not possible yet. I assume that this has been a recent decision. Please correct me if I misunderstood anything that you told me. I know that it is too late to undue the memo to go out, but I am trying to understand what needs to occur now to pick up. I did contact the EAP office and will follow-up with them. When I started at the S.I. in 1984 as a pre-doc. I never envisioned going out in this fashion. I do appreciate your help and honesty during these difficult times for us all. Beth

>>> Carol Gover 12/02/02 17:14 PM >>>
Beth,
I'm not familiar with the Oct. 17 memo. Let's discuss your questions on Tuesday.
Carol

Carol Gover
AA/Diversity/Disability Program Manager
Office of Equal Employment & Minority Affairs
Smithsonian Institution
(202) 275-0150

>>> Beth Norden 11/29/02 01:40PM >>>
In order to keep my records updated, as well as to best work towards the future, I ask for the following information:
1. What meetings (dates), people present, decisions, etc. resulted from the 17 Oct. 2002 memo pertaining to my sensitivity to naphthalene?
2. After today, I am removed from light duty in my dept. How do I know when it might be safe to return if it is the naphthalene which is activating the current blood problems?
3. Will anything dealing with my exposure be different upon return, or is my return based upon no longer being sensitive to naphthalene?
Please excuse my confusion, but major changes have occurred in a short two weeks and I am unclear what I need to do and why I am not part of the decision process. Thank you for your help in providing me with these facts. Beth

# EXHIBIT  21

OCT 02,2006 20:24
GroupWise WebAccess Message Item

Page 1 of 2

## Mail Message

Novell.

Close   Next   Forward   Reply to Sender   Reply All   Move   Delete   Read Later   Properties

**From:** Beth Norden
**To:** Debbie Feher, Beth Norden
**CC:** "furth.david@nmnh.si.edu".i.SIWP01
**Date:** Wednesday - December 18, 2002 1:22 PM
**Subject:** Re: Accession Paperwork

Debbie & Dave, I appreciate your concern. Yet, I am worried about this return because they are holotypes. Please let me know if I can assist in any fashion with the return. Also, please know that none of my doctors or myself were consulted prior to my departure memo. I had not known before how compassionate our dept. could be. Happy holidays to you both, hold the fort! :) Beth

— co-worker
>>> Debbie Feher 12/17/02 16:12 PM >>>
Beth—          Collections Manager

I just talked to Dave Furth— asked if he knew what was going on with you.
He said as of November 30th you have been given a year off to try and recuperate fully. I don't know what sort of conditions you have been given, but if you have any sort of remuneration, just count yourself lucky. Of course, contracting this disease is probably one of the most unfortunate occurrences in your life... but please take this opportunity to regain your health.

DO NOT think or concern yourself about any aspect the job, least of all transactions. Above all dispense with any obsessing about modus operandi or relationships obtaining/pertaining here. Relax, read good books, listen to fine music, watch heartening films, enjoy your food, get fresh air, let your family do for you whatever they can. Now might be a good time to develop meditation techniques...join a group.

I'll remove your name from the TM Users group, so that you won't get any e-mails. However, if you'd like, I'll e-mail from time-to-time to see how you're doing.

I've had my knee surgery, and I seem to be gradually regaining flexibility... it's been four weeks now. I've dispensed with the cane, and can drive my clutch. Tomorrow I have my first session of physical therapy... I'm getting there.   I hope you do too.

Take care,
Debbie

>>> Beth Norden 12/17/02 02:21PM >>>
Hey Debbie. Hope you are doing well! I had a borrow return in process (awaiting Dave's signatures) when I was abruptly told to vacate. Don't know what has happened to it, but suppose someone can complete the job. Sorry for the problem...but it really was none of my doing. Have a good holiday, Beth

>>> Debbie Feher 12/16/02 18:44 PM >>>
Hello, TM Users—

I've only just found out from O.R. that for the past two years, they have not needed the second 'Registrar's copy', and have been tossing them for re-cycling.

So, if you are not already aware of this, please take note:

It is only necessary to print 'one' accession memo document, which includes the Accession Memorandum (please remember to use archival paper), and one 'Registrar's copy'. If you would like a copy for your own records, have the cursor on the first page, and print 'Current page only'— or make a photocopy.

Thank you

# EXHIBIT  22

## Mail Message                                                                 Novell.

Close  Previous Next       Delete From      Delete From All       Forward Reply to Sender Reply All  Move Delete  Read  Later Properties
                           Mailbox            Mailboxes

From:     Beth Norden
To:       Carolyn Lohr — OHR
CC:       "hellmanc@ops.si.edu".i.SIWP01, "burneyd@hr.si.edu".i.SIWP01,
          "miller.scott@nmnh.si.edu".i.SIWP01
Date:     Tuesday - January 7, 2003 3:22 PM
Subject:  Re: Norden light duty termination

Thank you for your response. However, I am still very confused. Also, none of my doctors feel that I
should be out, and in fact say that it is unhealthy for my recovery. Dr. Lawford can confirm that this was
not a medical decision.

>>> Carolyn Lohr 01/07/03 12:27 PM >>>
Beth, Sorry I didn't get back to you sooner, I was on leave.
The decision regarding light duty comes from individual offices, therefore, you need to speak to Mr.
Miller.
As for returning to work, that is up to your doctor.

Carolyn

>>> Beth Norden 12/29/02 04:13PM >>>
Carolyn, I have been trying to reach you by phone & e-mail for several weeks. I realize that the holidays
are a difficult time, yet I hope you can appreciate my concern and need for answers. I am told by several
of those copied on this e-mail that you are the correct person to provide answers to my "management
questions". My two main questions are:
1. In the Nov. 18, 2002 memo from Scott Miller I was informed that my light duty would not be continued
after Nov. 30, 2002. Why?
2. What must happen in order for a return to work?
Thank you for you for your help in providing these answers/understanding. Best, Beth

# EXHIBIT  23

Schultz

14

1        Q      As far as you know.  Should she have --
2    I will strike that because you're right, that's not
3    a good question.  As far as the Smithsonian knows,
4    would it be reasonable for Beth to expect that when
5    she received this memo in 2002 she should expect
6    that the Smithsonian was still working to
7    accommodate her and that she would be brought back
8    if she were capable of coming back?
9        A      Yes.
10       Q      Okay, good.  All right.  Now I know that
11   this stretches out over a long period of time and
12   there were a lot of efforts made so in organizing
13   my questions I broke a lot of them down into
14   specific time periods or specific accommodation
15   efforts.  At any point if you don't understand the
16   question, you're not sure which accommodation or
17   which time period I'm referring to, please ask me.
18       A      Okay.
19       Q      But I'm also kind of giving you titles
20   to groups of questions so that we can be clear.
21              I'm going to ask some questions
22   referring to the February 2002 through November

## **EXHIBIT  24**

Schultz

13

1    Duty."  I'm gathering from your earlier statements

2    that even when this memo was issued, there was

3    still -- you, meaning the department, were still in

4    the process of continuing to make some adjustments

5    for her and hoping to help her come back to work.

6    Is that correct?

7         A    Yes.

8         Q    Okay, good.  So I've got that as

9    Plaintiff's 2.  Thank you.

10             So this is why she was kept on the rolls

11   and not terminated, because you were still

12   expecting that she might come back?

13        A    Yes.  Yes.

14        Q    And you still, you being the

15   Smithsonian, you were still assuming this

16   responsibility to accommodate her if you could.

17        A    Yes.

18        Q    Okay.  And it was reasonable for Beth to

19   assume likewise.

20             MR. HENAULT:  Object to the form of the

21   question.

22             BY MS. FANG:

# **<u>EXHIBIT  25</u>**

# ENT. NEWS

## SYSTEMATIC BIOLOGY – ENTOMOLOGY NEWSLETTER

 Smithsonian
National Museum of Natural History

VOL. 17 - NO. 2
FEBRUARY 2003

## ANNOUNCEMENTS:

The 1071st Regular Meeting of the **Entomological Society of Washington** will convene on February 06 at 7:00 pm at the Cathy Kerby Seminar Room in the National Museum of Natural History. Robert Raguso, University of South Carolina, will present the topic "Moths as Pollinators: the Good, the Bad and the Lazy."

## GENERAL NEWS:

**Nancy Adams** recently finished the following project: "I have finally gotten data taken and entered for the Anoplura Collection at the USNM. The data are in FileMaker Pro. I was hoping to have a searchable database on the web but we have no one in-house to get things web ready right now. In 1995 the collection was organized using Durden & Mussers 1994 Catalog, "The Sucking Lice of the World: A Taxonomic Checklist with Records of Mammalian Hosts and Geographical Distributions." In 1996 most of the data was gathered but then I got completely absorbed in preparing for and moving the Entomological Collections from one side of the building to the other, a 3-4 year process. Then I was involved with a couple of large collection improvement grants. But then finally last summer and this summer another staff member & I were able to complete the data entry of the Anoplura. This morning I checked a few more localities and added data from a few more slides that were discovered in the Diptera collections so it is finally complete and available. I will be happy to e-mail the inventory which includes: Family, Genus, species, subspecies, Author, Year, Country of the World, States of North America, total number of slides and Hosts verbatim from the slides to anyone interested and thinks they can get at the data. I can also export it into an Excel format. There are 377 records. Enjoy! Also, please let me know if you are interested in studying any of this material or are willing to help out with identifications of undetermined material."

In the last issue of **Ent. News,** it was reported that **Beth Norden** has left the Entomology Section due to health reasons. However, Beth remains as an employee (non-pay status), and may return at a later date.

A new temporary exhibit, **"Nature's Jewels,"** A Living Exhibit of Orchids and Butterflies, opened on January 18 at the Arts and Industries

# EXHIBIT  26

## Beth Norden – Dengue Hemorrhagic Fever – summary to date

**To: Dr. Don Oberg  email**                    **301-220-0707**

<u>Medical Aspects</u>: Beth acquired (read 'caught') Dengue Hemorrhagic Fever (DHF) in August 2000 on a Smithsonian sponsored entomologic trip deep into Brazilian jungle. It is a viral disease transmitted by mosquitoes, and is thought to have 4 serotypes. The old fashioned name for Dengue is Breakbone Fever due to the intense skeletal pain that is experienced. The Hemorrhagic variety is much much worse, and is thought to be set in motion by first catching one serotype, and later in life catching a different serotype. This sets up an autoimmune phenomenon directed against the intracellular seals of capillary wall cells, making the capillaries leaky. There is no platelet dysfunction.

Beth became extremely ill (had a very good chance of dying) upon return from Brazil in August of 2000. Her illness consisted of intense migraine-like headaches all day every day, total body wide purpura seen on patches of skin over her entire body which would form where ever she rested an arm or leg against anything for a few minutes. An encephalitic dementia was a prominent part of the picture, with a fugue state and confusion. In addition she had visual difficulties. She learned in the next summer that she could no longer sweat and her thermoregulation was poor.

For a brief time she was turned away by hospital ER's and the rest of the medical establishment because "If you say its workmens comp your insurance won't pay us, and until you get Dept of Labor (DOL) approval, they may never pay us either." I suspect the DOL had never been faced with a claim like this, and it didn't fit the cookie cutter pattern of strained backs and knees. I and my nurse visited the DOL on N. Capitol Street and made a plea for acceptance. The DOL accepted her and she was admitted to GTU.

After a period of hospitalization and stabilization, she was sent home. Home in a state of stultification and confusion with intense pain that was to last for months, with body wide under-skin hemorrhages. I have a dental report from months later where Beth had crushed a rear molar by grinding her teeth in a state of blinding headache and encephalitic confusion. Beth has related to me that in perhaps the first 6 months she had difficulty reading a computer screen or a newspaper. When she got to where she could read a newspaper, it left her confused and she couldn't grasp what she had just read. For someone who is a Fullbright Scholar, PhD in Entomology -- and who lives in a world of ideas, this is a truly frightening and depressing state to be in. To be trapped at home in pain and confusion and unable to read for distraction, or to manage the torrent of DOL paper work required is a real downer.

Eventually in 2001 Beth through her physicians wanted to attempt a part time return to work. Her department was rather casual and said sure, why not. I gather from the record that several stressors combined were too much for her and she had to retreat back to home. Summer heat worsened her considerably. Getting to and from work on bus -- subway also caused an increase in migraines. The ever present smell of naphthalene in her department cause and increase in nosebleeds and headaches. (They sprinkle naphthalene all through their collections to keep live bugs from moving in to eat the dead

bugs.)

In November of 2001 Beth decided she was ready to attempt to return to work at 20 hours per week. Psychometric testing was done before this RTW by GTU. This time her department swung to the opposite of a casual return to work. It took 4 months of emails, conferences and meetings with confirmatory phone calls to her docs. When we hammered out the details with her management that the days would not be contiguous, I recall another two weeks of emails to decide how to handle it if there was a Monday holiday and 4 work days. Beth's perception of this was one of dismay and rejection. As we had discussed, one would expect that when you recover from nearly dying doing your job, one would be greeted with hugs and flowers on the desk. Beth tells me that was far from the case. Even so, she was diligent in doing her 20 hours per week, although the omnipresent naphthalene increased her symptoms – headaches and nosebleeds.

In Dec of 2002 her department notified her that they could no longer accommodate her working 20 hours a week, and that she should return home on workmens comp. While for some I have met, this would be a lifelong dream come true, it was the opposite for Beth. She has an active mind, publishes papers and is a scholar. Sitting at home is a real punishment for her. Comes the realization that even when she regains full stamina and could do 40 hours a week, the naphthalene will always be present and she can probably never go back to her career there. This now casts a dark shadow over what her career will be, if it is to be at all. Its as major a life stressor as a divorce or a death in the family.

There is a certain real negative aspect of being rejected by The Smithsonian Institution and being pushed out in the street. I am currently dealing with another employee here who is feeling what Beth feels. Smithsonian professionals feel a real pride in being a part of this noble institution, and sharing academic camaraderie with their coworkers. When they go to professional meetings, they make themselves an extra large badge that says in all caps "Smithsonian". Being rejected and pushed away by those whom you had felt for years you were family with is – traumatic. I have told Beth that it is analogous to Kubler-Ross' "stages of death and dying". Disbelief, lets make a deal, anger, resignation, and finally acceptance. I feel that Beth is still in the anger stage, with a dollop of depression thrown in.

I have told her in jest "Beth, you have a serious character flaw. As a good little federal employee, you are supposed to swallow the bureaucratic BS without so much as even a whimper. But noooooo, you run around grabbing people by the lapels protesting loudly. (A Briggs Myers ESFP I would guess.) You're an especially difficult case – it'll take a lot to bring you 'round." I think she feels betrayed by people who she thought were academic peers and friends. And what is to come of her career. When the DOL decides it is time to send her to voc rehab, will she become a Delta Airlines gate agent for the rest of her life? Being an entomologist is a very rare occupation. If she were an HVAC tech the whole thing would be easier.

As of right now her thinking machinery is 100% back. Vision is fine. The headaches are much less and manageable. She can sweat and thermoregulate again, so we hope that 97F days this summer won't fatigue her as much as last summer. The skin purpura are much less frequent. Nosebleeds seem to have stopped (but recurred once when she smelled naphthalene several weeks ago.) I hear that GTU may repeat psychometric testing, to give them two data points. They can likely get a paper out of Beth's case.

OCT 02,2006 17:38
3eb13681.CMC

rage 5 of 5

The medical team that Beth sees at GTU as well as Dr. Granite are all top notch. I think that medically she is in excellent hands. Now the thing that needs work is the mental health aspect of having been put through this experience. I am glad that she has chosen to see you, and hope and expect that good things will come of this. You will find Beth to be articulate, engaging and voluble, which should be a real plus for a therapeutic relationship. Please feel free to call me if you have any questions.

Respectfully,

Tom Lawford MD

Occupational Medicine for SI Tue Wed Thurs

202-275-9286 (or 2222)  (fax 202-275-1270)  home ph 703-476-5155

# EXHIBIT  27

### Affidavit of Donald L. Oberg

1. My name is Donald L. Oberg, Ph.D.

2. I am over the age of eighteen years, and I am competent to testify.

3. My address is 6713 44th St., University Park, Maryland.

4. I am Dr. Norden's treating psychologist and have been treating her since April of 2003.

5. In November of 2003, I wrote a letter to Smithsonian physician, Dr. Lawford in response to a request to provide information regarding the return to work of Dr. Norden and her needs vis-à-vis reasonable accommodations.

6. In the letter I advised that Dr. Norden had an active diagnosis of Major Depressive Disorder, Recurrent Severe – without psychotic features and Post Traumatic Stress Disorder.

7. I further advised that returning to work would be highly therapeutic, but that this return would require accommodations.

8. Among other things, I advised that Dr. Norden required "protection against agency/supervisor retaliation and hostility."

9. I treated Dr. Norden in April of 2004 after she received the Smithsonian's proposal for her return to work. The two attached notes are accurate copies of the session notes I submitted to the Department of Labor in April, 2004.

10. The Smithsonian's April 2004 return to work proposal caused Dr. Norden severe emotional and physical pain in the form of serious and increased nightmares, migraine headaches, and a painful sense of devaluation and punishment. It caused a temporary setback in her treatment.

11. Dr. Norden continues to suffer from the major depressive and posttraumatic stress disorders.

12. Her inability to continue her career has caused her depression and contributed substantially to her posttraumatic stress.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on September 29, 2006..

Donald L. Oberg

# EXHIBIT  28



# Smithsonian
## National Museum of Natural History

Department of Systematic Biology
MRC 188
National Museum of Natural History
Smithsonian Institution
Washington, DC 20560-0188

5 November 2003

Dr. Beth Norden
112 Greenhill Road
Greenbelt, MD 20770

Dear Beth,

     This letter serves to notify you that I propose to separate you from your position of Museum Specialist (Zoology), GS-1016-11, and from the rolls of the Smithsonian Institution, not earlier than thirty (30) days from the date of your receipt of this notice. My reason for proposing this separation is that you are unable to perform the duties required for your position. I regret that administrative requirements mandate the formality of this action, but I want to be sure that the basis for my proposal is clear.

     Your claim for Office of Workers' Compensation Program (OWCP) benefits was initially accepted by the Department of Labor (DOL) on October 31, 2000, with leave elected, according to their records. Our records show your initial absence from work was from September 21, 2000 through March 7, 2001. You returned to work temporarily on a reduced schedule of 12 hours per week from March 8 through July 25, 2001, which concluded when you were no longer able to maintain that schedule. You were in a non-duty status, receiving full OWCP compensation payments, from July 26, 2001 through April 2, 2002.

     Your second return to duty on a temporary part time schedule of 20 hours per week began on April 3, 2002. While working that schedule, you missed approximately 20 percent of the scheduled time, due to your continuing illness. It was determined that the essential functions of your position were not being accomplished. On November 4, 2002, your claim was again accepted by DOL for full Periodic Roll payments. A recent review of DOL's report of your OWCP payments, which are charged back to the Smithsonian, shows that you have continued to receive Periodic payments from November 2002 through the present.

     During your return to work in 2002 on part-time status, you authorized your physicians to provide relevant medical information to Dr. Thomas Lawford of the Smithsonian's Occupational Health Services Center. He conveyed your physicians' recommendations regarding your work limitations. As of September 25, 2003, Dr. Lawford verified that he had not received any recent updates on your medical condition, and since that date he has not notified us otherwise.

     The primary work limitation recommended by your doctors in 2002 was the part time work schedule, which was in practice less than half of your full time schedule. Other limitations that affected your work included your need for flexible deadlines, your need for a flexible schedule due to frequent debilitating migraine headaches and sensitivity to hot summer weather temperatures, and your inability to work for long periods at a computer. Your Museum Specialist (Zoology) position requires that you work full time and that you work for long periods of time on complex tasks, many of which require the use of a computer and many of which involve deadlines.

SMITHSONIAN INSTITUTION
National Museum of Natural History
10th & Constitution Avenue NW
Washington DC 20560

Based on the information we have on your medical limitations, you cannot perform the essential functions of your position at this point in time or in the near future. We have received no information indicating that you are able to perform other functions for which there is an available vacant position. Therefore, I must propose your separation.

I must emphasize that your proposed separation is based solely upon the fact that you cannot perform the essential duties of your position of record. Your separation from the rolls of the Smithsonian Institution will not in any way interfere with decisions made by, or compensation being received from the Office of Workmen's Compensation. Please feel free to contact Michael Johnson, Employee Relations Specialist, 202-275-0939, or Carolyn Lohr, 202-275-0946, in the Smithsonian's Benefits Office if you desire information or assistance concerning your Worker's Compensation claim or concerning your eligibility to apply for disability retirement.

You have the right to reply to this proposal notice personally, in writing, or both. You may submit affidavits or other documentary evidence on your behalf that are relevant to this proposal and they will be considered before the final decision is made. If you choose to reply, you must present your reply to Wayne Mathis, Department of Systematic Biology, 202-357-1566, within ten (10) calendar days from receipt of this notice. Consideration will be given to extending the reply period if you submit a written request to Dr. Mathis describing the need for and length of the desired extension.

You may review the material relied on to support the reasons for this proposal, which are available in the office of the Department of Systematic Biology in the National Museum of Natural History. (The medical documents that you have submitted are available at the Occupational Health Services Center.)

If you wish to be represented or accompanied by a representative, you must identify that person in writing to Dr. Mathis as soon as possible. Any change in your choice of representation also requires written notification. An additional copy of this proposal is attached so that you may provide it to your representative, if you choose to have one.

If you find that you need assistance or advice regarding your rights or the proper procedure to follow, you may contact our Human Resources Specialist, Audrey Davis, 750 Ninth Street NW, Suite 6100, Washington, DC 20560, phone 202-275-1005.

Sincerely yours,

Ted R. Schultz
Research Entomologist
202-357-1311
schultz@lab.si.edu