Alex T. Sliheet, D.C. Bar No. 438977
Vickie Inge Fang, *pro hac vice*
Attorneys for Plaintiff Beth Norden
8702 Nightingale Drive
Lanham, MD  20706
alexsliheet@yahoo.com
fvickie@comcast.net
(301) 552-4908

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Beth M. Norden,**          ) | |
| ) | Case No. 051232 (RMC) |
| **Plaintiff**     ) | |
| ) | **PLAINTIFF'S OPPOSITION TO** |
| ) | **DEFENDANT'S MOTION TO AMEND** |
| **v.**          ) | **THE SCHEDULING ORDER FOR AN** |
| ) | **EXTENSION OF TIME TO OPPOSE** |
| ) | **PLAINTIFF'S SUMMARY JUDGMENT,** |
| ) | **OR IN THE ALTERNATIVE, SUMMARY** |
| ) | **ADJUDICATION MOTION** |
| **Lawrence M. Small,**          ) | |
| ) | |
| **Defendant**          ) | |

COMES NOW Plaintiff, Beth Norden, Ph.D., by and through counsel, and opposes Defendant's motion to amend the Scheduling Order for an extension of time to oppose Plaintiff's Summary Judgment, or in the alternative, Summary Adjudication Motion and states as follows:

**Table of Contents**                                          **Page**

I.     The Scheduling Order can only be modified with "Good Cause"………..…..4

II.     Good cause requires the Defendant to show that the deadlines cannot reasonably be met despite its diligence, and Defendant's moving papers do not even discuss its diligence……………………………………………………4

III.     Defendant has not been diligent in raising its objection to the dispositive motion timeline in the Scheduling Order…………………………………………..5

IV.     Defendant has not been diligent in conducting discovery………………..….6

      A) Defendant has made little formal discovery to date………………....…7

      B) Defendant has performed so little formal discovery because it already felt confident that it had all of the information……..………………..…8

V.     Specifically the following information and arguments are examples of what was made available to the Defense team prior to the start of formal discovery in this court case……………………………………………………………...9

      A)     Dr. Norden's Disability………………………………………………..9

      B)     Dr. Norden's reliance on the continuing violation doctrine………….10

      C)     Dr. Norden's requests for accommodations/Defendant's failure to accommodate……………………………………………………………11

      D)     Dr. Norden's specific objections to:
            1) the April 2004, Retaliatory Return to Work Plan, and
            2) the October 2004, Termination……………………..12

VI.     Granting this Motion Would Unfairly Prejudice Dr. Norden…………………13

VII.     Conclusion……………………………………………………………...……14

**Table of Authorities**                                                                 **Page**

**Cases:**

Celotex Corp. v. Catrett,
  477 U.S. 317, 326, 91 L. Ed. 2d. 265, 106 S. Ct. 2548 (1986)……………….….4

Dickens v. Whole Foods Market Group, Inc.,
  2003 U.S. Dist. LEXIS 11791 (D.D.C. Mar. 18, 2003)…………………………..4

Hussain v. Nicholson,
  369 U.S. App. D.C. 247; 435 F.3d 359,368 (D.C. Cir. 2006)……………………5

Johnson v. Mammoth,
  975 F.2d 604, 609 (9th Cir. 1992)………………………………..……………….5

Olgyay v. Society for Environmental Graphic Design,
  169 F.R.D. 219, 220 (D.D.C. 1996)…………………………………………..4,6


**Statutes:**

Fed. R. Civ. P. 16(b),
  Fed. R. Civ. P. advisory committee notes (1983 amendment) on Rule 16(b).…4,5,6


**Other:**

Wright, Miller, & Kane, Federal Practice and Procedure
  Section 1522.1 at 231 (2nd ed. 1990)………………………………………………4

## Memorandum in Opposition

*Giving the Defendant any more time to oppose Plaintiff's Summary Judgment Motion effectively turns the Motion into nothing more than an opportunity for Defendant to preview Plaintiff's case before preparing for trial and to prepare its own motions. The Court should see through this tactic and prohibit it.[1]*

**I.     The Scheduling Order can only be modified with "Good Cause."**

Orders entered before the final pretrial conference may only be modified upon a showing of "Good Cause." Fed. R. Civ. P. 16(b). The Scheduling Order itself states in par.7 that: "A motion for extension of time to file a motion, opposition, or reply will be denied except upon a showing of good cause."  See also Olgyay v. Society for Environmental Graphic Design, 169 F.R.D. 219, 220 (D.D.C. 1996):

> "Once the schedule is set at the scheduling conference, the presumption should be firmly against the granting of continuances. If good cause is shown, a reasonable extension of time for a particular purpose may be granted by the Court…"

**II.    Good cause requires the Defendant to show that the deadlines cannot reasonably be met despite its diligence, and Defendant's moving papers do not even discuss its diligence.**

- Good cause require(s) the party seeking relief to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension."

    Wright, Miller, & Kane, Federal Practice and Procedure Section 1522.1 at 231

---

[1] The Court should dismiss Defendant's threat to file a 56(f) affidavit in response to Plaintiff's Motion. "The purpose of Rule 56(f) is to prevent 'railroading' the non-moving party through a premature motion for summary judgment before the non-moving party has had the opportunity to make full discovery." *Dickens v. Whole Foods Market Group, Inc.*, 2003 U.S. Dist. LEXIS 11791, 2003 WL 21486821, at *2 n.5 (D.D.C. Mar. 18, 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)).  As will be shown infra, any argument by the Defendant that it is being "railroaded" is ludicrous.

(2nd ed. 1990); <u>Hussain v. Nicholson</u>, 369 U.S. App. D.C. 247; 435 F.3d 359,368 (Concurring Opinion) (D.C. Cir. 2006).[2]

- "If that party was not diligent, the ["good cause"] inquiry should end." <u>Johnson v. Mammoth</u>, 975 F.2d 604, 609 (9th Cir. 1992).

- In its moving papers, Defendant has not even attempted to show why the existing deadline cannot reasonably be met with diligence, nor has Defendant attempted to suggest why a <u>three month</u> extension would be required.[3] Thus, the "good cause" inquiry should end, and Defendant's motion should be denied. <u>Johnson</u>, <u>supra.</u>

Nevertheless, Plaintiff, herself, will demonstrate that Defendant has not been diligent.

### III. **Defendant has not been diligent in raising its objection to the dispositive motion timeline in the Scheduling Order.**

First, the Court issued its timeline for dispositive motions [4] in accordance with and perfectly consistent to the joint report language submitted by the parties: "**within 45 days**

---

[2] "<u>Federal Rule of Civil Procedure 16(b)</u> provides that a scheduling order 'shall not be modified except upon a showing of good cause . . . .' The advisory committee notes on the Rule explain that there is good cause 'if [the schedule] cannot reasonably be met despite the diligence of the party seeking the extension.' <u>FED. R. CIV. P. 16(b)</u> advisory committee's notes (1983 amendments)."

[3] Defendant gives 3 reasons for its Motion for an extension of time: 1) the Scheduling Order set dispositive motions as due prior to the close of discovery; 2) defendant will be forced to respond with a Rule 56(f) declaration explaining why it is unable to oppose the Plaintiff's motion until after discovery closes and defendant has had sufficient time to wade through the record in this case; 3) counsel's busy schedule.

[4] **Defendant is wrong** that its opposition was due on October 13, 2006, and that it got an extension from Plaintiff until November 1, 2006. The Scheduling Order, and no other rule, governs the date when Defendant's opposition is due.
<u>The Court's Scheduling Order</u>, par. 7, states:
> "Dispositive motions shall be filed no later than October 2, 2006. Oppositions shall be filed no later than November 1, 2006. Replies shall be filed no later than November 21, 2006. A motion for extension of time to file a motion, opposition, or reply will be denied except upon a showing of good cause."

of the close of discovery [Discovery closes on November 15, 2006.]" (emphasis added) (See moving papers, p.1, par.2) Defendant now says that the language that it wants is "45 days **after** the close of discovery."  (emphasis added)

This Scheduling Order was issued on May 19, 2006, almost five months prior to the Plaintiff's motion at issue.  Since the only reason given for the extension is that the Court did not choose Defendant's preferred dispositive motion deadline date, Defendant has been on notice for nearly five months of what it sees as a need to "change" the Order.  As the Fed. R. Civ. P. advisory committee notes (1983 amendment) state: "Rule 16(b)'s good cause standard primarily considers the diligence of the party seeking the amendment.  The district court may modify the pretrial schedule if it cannot reasonably be met despite the diligence of the party seeking the extension."

Again, Defendant has not even attempted to show that it exercised diligence in raising an objection to the very clearly written language of an Order issued nearly five months ago or why defendant cannot file its Opposition in the 30 days the Defendant will have had under the current scheduling order on November 1, 2006.

**IV.     Defendant has not been diligent in conducting discovery.**

In Olgyay, supra , 169 F.R.D. 219, 220 (D.D.C. 1996), Judge Friedman cited the Final Report of the Civil Justice Reform Act Advisory Group of the United States District Court for the District of Columbia as follows:

> "…failure on the part of counsel to proceed promptly with the normal processes of discovery and trial preparation should not be considered good cause." (emphasis added)

**A) Defendant has made little formal discovery to date.**

Not only did the <u>four attorneys</u> who were listed in the initial answer to the complaint wait nearly five months before objecting to the Scheduling Order, but they made little effort to perform formal discovery throughout the course of this litigation.

*Until October 18, 2006, Defendant's entire attempt to seek formal discovery consisted of:*

- *14 interrogatories,*
- *9 document requests, and*
- *6 requests for admissions.* (See Fang, Aff., par.3)

Moreover, despite the fact that Plaintiff executed a release for all her medical records, Defense counsel has not requested Plaintiff's psychologist's files, and it appears that Defense counsel may not have requested any medical records at all. On September 11, 2006, Plaintiff's counsel sent Defense Counsel an email noting that doctors' records had not been requested and asking whether he needed anything in addition to Dr. Norden's release in order to get them. Neither Defense Counsel nor anyone else on the defense team ever responded to this email. (See Fang, Aff., par.4)

Indeed, between July 18, 2006, when Defendants propounded its somewhat limited discovery requests above, and October 18, 2006, when Defendant began requesting deposition dates,[5] there has been no indication that Defendant has made any attempt to learn anything further about the facts of this case.

---

[5] On the afternoon of October 18, 2006, Defense counsel began for the first time to request dates to depose Dr. Norden and her expert economist. Within 24 hours of Defendant's request, Plaintiff's counsel agreed upon two dates Defendant had suggested, but as of the time of this filing, Defendant has not yet confirmed those dates, much less filed a notice of deposition, or actually deposed anyone in this case. (See Fang, Aff., par.5)

### B) Defendant has performed so little formal discovery because it already felt confident that it had all of the information.

It may be that the Defendant has performed so little discovery because it felt confident that it already knew everything.

First, Dr. Norden filed four informal and four formal complaints against the Defendant and cooperated fully in whatever investigation Defendant chose to conduct. (See Fang, Aff., par.6)

Second, in response to orders from the EEOC, Defendant EEO conducted a substantial internal investigation of whether it informed its employees of their requirement to report a violation within 45 days.

Third, the EEO hired an outside investigator, Mr. Gee, to investigate and report on Dr. Norden's charges of discrimination and retaliation. The results of both reports were available to all parties long before the instant litigation began. (See Fang, Aff., par.7)

Fourth, the Smithsonian attorneys had access to all the relevant facts in this case before litigation began and often approved the adverse employment actions in advance. Despite **EEOC Management Directive 715** which requires that federal agencies "ensure that the investigation and adjudication function of the agency's complaint resolution process are kept separate from the legal defense arm of the agency" the same lawyers who defended the Smithsonian before the EEOC, Mr. John Lapinia and Ms. Farliegh Earhart, were consulted by the Smithsonian as it took adverse employment actions against Dr. Norden for requesting accommodations. Email chains between Smithsonian OHR, EEO, and the Smithsonian defending lawyers show active attorney and EEO

involvement in approving the April 2004, retaliatory return to work plan,[6] and they also show Ms. Earhart's involvement in approving the October 2004, letter that fired Dr. Norden. (See Fang, Aff., par.8) A handwritten note on material sent to Dr. Norden's counsel in 2004 states that a copy was sent to Ms. Earhart, apparently because it was "her case now." (See Fang, Aff., par.9) Ms. Earhart was listed as "of counsel" on the answer to Dr. Norden's complaint, and Ms. Earhart attended depositions conducted by Dr. Norden's counsel. (See Fang, Aff., par.10) Certainly, if Ms. Earhart and the rest of the Defense team had been diligent in examining the facts and the legal arguments already made available to them, they would have been <u>aware of almost the entire factual and legal basis of Dr. Norden's Motion for Summary Judgment before the discovery period even began.</u> They would have been very knowledgeable as to: 1) Dr. Norden's disability itself, 2) the legal argument made for continuing violations, 3) Dr. Norden's many attempts to receive accommodations for her naphthalene sensitivity, 4) the fact that no accommodations for this sensitivity were given, 5) the objections to the April 2004, retaliatory return to work plan, and 6) the legal argument that firing Dr. Norden in October of 2004, was another instance of retaliation and was bootstrapping.

**V.    Specifically the following information and arguments are examples of what was made available to the Defense team prior to the start of formal discovery in this court case.**

**A)    Dr. Norden's Disability**

Dr. Norden's medical files have been made available to Defendant since the fall of 2000, and the Defendant's own doctor, Dr. Lawford, was in consultation with five of Dr. Norden's physicians for the two years that followed. (See Fang, Aff., par.11)

---

[6] The head of Defendant's EEO insisted that she approve the language of the retaliatory April 2004, return to work plan before it was sent to Dr. Norden.

Defendant's own legal counsel determined that there was sufficient evidence of Dr. Norden's disability long before Dr. Norden filed this lawsuit, and Dr. Schultz, who was designated as the person most qualified to speak on the issue of accommodations, testified that there had never been a question as to whether Dr. Norden suffered from a disability. (See Fang, Aff., par.12) In November of 2003, Dr. Norden's psychologist wrote to the Smithsonian's Doctor Lawford, giving Dr. Norden's active diagnoses of Major Depressive and Post Traumatic Shock Disorders, stating that both disorders were caused in large part by Defendant's failure to accommodate. (See Fang, Aff., par.13) The two doctors communicated with each other about Dr. Norden both before and after this period. (See Fang, Aff., par.13)

**B)     Dr. Norden's reliance on the continuing violation doctrine**

Dr. Norden filed her first complaint for failure to accommodate in April of 2003. The Defendant EEO ruled that her complaint was untimely, and the issue of "continuing violation" made in Dr. Norden's present Motion for Summary Judgment was also briefed twice to the EEOC which refused to consider it whatsoever.[7]  Although there are additional case cites in her present Summary Judgment Motion, Dr. Norden's counsel have made the same legal arguments in the present Motion for Summary Judgment that they made before the EEOC.

---

[7] <u>The EEOC refused to address the continuing violation doctrine initially and in a motion for reconsideration by Dr. Norden.</u>  The EEOC never addressed the continuing violation doctrine whatsoever. However, this does not change the fact that the Defendant was well aware of this legal theory and that Dr. Norden was going to rely upon it in this Court.

**C)   Dr. Norden's requests for accommodations/Defendant's failure to accommodate.**

In the fall of 2003, after deciding that Dr. Norden's complaint was barred by the 45 day rule, the Defendant EEO demanded that Dr. Norden supply an accounting of her attempts to request accommodations and the responses that were made.  <u>Dr. Norden responded with a 7 page list of requests and responses, giving specific dates, the names of involved employees, and references to numerous documents within the Defendant's possession.</u>   (See Fang, Aff., par.14)  The list was more comprehensive than the factual allegations made on the same issues in the present Motion for Summary Judgment, and Dr. Norden was certainly willing and available to answer any questions Defendant might have had regarding her 7 page list concerning accommodations.  Other than a single interrogatory question propounded in the summer of 2006, <u>Defendant chose not to ask</u>.  Plaintiff answered Defendant's single interrogatory with 23 examples of requests made by Dr. Norden and others for accommodations for Dr. Norden's sensitivity to naphthalene.  A specific date was given for nearly every example. (See Fang, Aff., par.14)

Defendant knew that Dr. Norden repeatedly requested accommodations for her disabling condition, that these requests were strongly advocated by Defendant's own physician and industrial hygienist, and that Dr. Norden never received accommodations.  Defendant accepted management's unverified explanation that in the course of her requests, Dr. Norden secretly cancelled an order for a respirator and refused to move to an office with better ventilation while continuing to grow sicker from her exposure to naphthalene.  Defendant repeated this canard in its interrogatory answers despite the fact that it simultaneously provided documents that directly contradicted its own claim.  (See

Fang, Aff., par.15)  At deposition in August of 2006, Dr. Schultz testified that Dr. Norden did not refuse a respirator and that she could not have done the majority of her work in the ventilated room.  (See Fang, Aff., par.15)

A one hour review of documents and conversation with Dr. Schultz would have revealed the truth, had any of the Defendant's lawyers taken the trouble to do the most rudimentary investigation.  Had Smithsonian Legal Counsel Ms. Earhart chosen to do such an investigation prior to approving the October 2004, letter firing Dr. Norden, she might have directed the Smithsonian to provide appropriate accommodations, thus preventing this lawsuit altogether.  Instead, the Defendant and its defense "team" have chosen to channel their energies into retaliation and technical roadblocks.

**D)     Dr. Norden's specific objections to:**
**1) the April 2004, Retaliatory Return to Work Plan, and**
**2) the October 2004, Termination.**

These complaints were the subject of the independent investigation ordered by the EEOC and performed by Mr. Gee.  (See Fang, Aff., par.16)  Before the lawsuit was filed, Defendant knew that the stated reason for the April 2004, work plan altering of Dr. Norden's tasks into collections work was that no researcher was willing to work with her. Defendant knew the psychological devastation caused by its failure to accommodate, and it had a copy of Dr. Norden's full affidavit.  Finally, Defendant was also made well aware of Dr. Norden's position in regard to the Defendant's decision to fire her.  On November 15, 2004, counsel for Dr. Norden filed a nine page informal complaint outlining both the relevant facts and the substantive legal arguments.  (See Fang, Aff., par.17)  Included in this complaint was a list of four positions which would have been appropriate for Dr. Norden both in terms of using her special talents and education and in supplying the

necessary accommodations. (See Fang, Aff., par.17)  Defendant appears to have ignored the information and argument in this complaint as well.

Thus, the "good cause" inquiry should end, and Defendant's motion should be denied because it has not been diligent. Johnson, supra.

### VI.     Granting this Motion Would Unfairly Prejudice Dr. Norden

Dr. Norden filed her Motion in a timely manner under the Scheduling Order.  To allow Defendant any additional time, let alone four months of time, in which to oppose her Motion would give Defendant an obvious, unfair and unneeded advantage.  By waiting until after Dr. Norden had already filed her Motion for Summary Judgment, Defendant gained the benefits of Dr. Norden's compliance with the Schedule.

Dr. Norden did not have an additional three months in which to complete discovery, do more intensive research, and prepare a motion or an opposition.  At the date of filing, Dr. Norden has not even received all outstanding discovery which is due. Defendant now seeks to free itself from its corollary obligations by taking four months rather than one in which to oppose a Motion which Dr. Norden and her counsel were forced to write quickly during the midst of discovery with diligence to meet the Scheduling Order deadline for dispositive motions.  *Defendant can do the same.*[8]

Furthermore, there has been no suggestion that if Defendant should file a post discovery motion, Dr. Norden will have 4 months time to oppose it.  Even if Dr. Norden

---

[8] Defendant gives as one of its reason that it has a full docket schedule.  This is not good cause.  Plaintiff's counsel also has a full docket schedule.  For example, Plaintiff's counsel, Alex Sliheet, has 10 active cases, two of which are class actions (one federal and one state), and another case that involves more than 91 plaintiffs and 23 causes of actions for a Ponzi scheme securities/fraud complaint. In this particular Ponzi case, Mr. Sliheet drafted a 25 page Opposition to the "Defendant's Motion to Dismiss" concurrently with the drafting of Dr. Norden's Motion for Summary Judgment.

were to be granted a similar amount of time, Dr. Norden would still be prejudiced by the unreasonable delay in the resolution of a case which began over three years ago when she first filed an informal complaint.

The bottom line is that the Motion for Extension lacks "good cause," and is an unreasonable and unjustified attempt by Defendant to alter the Scheduling Order to Dr. Norden's prejudice and to Defendant's serious advantage.

### VII.    Conclusion

For all of the above reasons, the Court should deny the Defendant's motion.

Dated: 10/22/06                                             Respectfully submitted,

                                                                            /s/
                                                            Alex T. Sliheet, D.C. Bar No. 438977
                                                            Vickie Inge Fang, *pro hac vice*
                                                            Attorneys for Plaintiff Beth Norden
                                                            8792 Nightingale Drive
                                                            Lanham, MD  20706
                                                            alexsliheet@yahoo.com
                                                            fvickie@comcast.net
                                                            (301) 552-4908