COPY

1

COPY

```
 1              UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF COLUMBIA

 3

 4   - - - - - - - - - - - - - - x

 5   BETH M. NORDEN,                :

 6          Plaintiff,             :

 7   v.                            :    Case No: 05-1232(RMC)

 8   LAWRENCE M. SMALL, SECRETARY, :

 9   SMITHSONIAN INSTITUTION,       :

10          Defendant              :

11   - - - - - - - - - - - - - - x

12                              Washington, D.C.

13                              November 7, 2006

14

15

16

17   Whereupon,

18                       BETH M. NORDEN

19   the Witness, called for examination by Counsel for the

20   Defendant, pursuant to notice and agreement of counsel as to

21   time and place, at 501 3rd Street, NW, 4th Floor, Washington

22   D.C., where were present on behalf of the parties:

23

24

25
```

```
 1  APPEARANCES:

 2              On Behalf of the Plaintiff:

 3              VICKIE FANG, Esquire

 4              8702 Nightingale Drive

 5              Lanham, Maryland  20706

 6              301-552-4908

 7

 8              On Behalf of the United States:

 9              JOHN F. HENAULT, Esquire

10              U.S. Department of Justice

11              555 4th Street, NW

12              Washington, DC  20530

13

14              On Behalf of the Smithsonian Institution:

15              FARLEIGH EARHART, Esquire

16              Office of General Counsel

17              1000 Jefferson Drive, SW

18              Washington, DC  20230

19              202-633-5095

20

21

22

23

24

25
```

5

```
 1              P R O C E E D I N G S
 2                                          (9:53 a.m.)
 3   Whereupon,
 4                   BETH M. NORDEN
 5   was called as a witness and after having been first duly
 6   sworn, was examined and testified as follows:)
 7                 DIRECT EXAMINATION
 8        BY MR. HENAULT:
 9        Q    Good morning, ma'am.  Could you please state your
10   name for the record and spell it.
11        A    Beth Mary Norden, B-e-t-h, M-a-r-y, N-o-r-d-e-n.
12        Q    Thank you, Ms. Norden.  As you know, my name is John
13   Henault and I'm with the United States Attorney's Office here
14   in DC and I represent the Smithsonian in the case you filed in
15   Federal court.  You've just been given an oath that you will
16   provide truthful testimony.  You are aware of what that means,
17   correct?
18        A    Yes.
19        Q    Is there any reason today why you cannot give honest
20   and truthful testimony?
21        A    No.
22        Q    Okay.  Before we get into the questioning I just
23   want to give a couple preliminary instructions.  I know you've
24   sat through some depositions.  You're, you're aware of most of
25   these but I would ask that all your responses be verbal.  If
```

58

```
 1              MS. FANG:  Objection as to form.

 2         BY MR. HENAULT:

 3     Q    Is that accurate?

 4     A    My Fulbright research was conducted in Sri Lanka.

 5     Q    Thank you.  Did you remain an employee of the

 6  Smithsonian during your Fulbright scholarship period?

 7     A.   Yes, I did.

 8     Q    Did you continue to receive your salary from the

 9  Smithsonian during your Fulbright scholarship period?

10     A    Yes, I did.

11     Q    Okay.

12     A    I was told it was akin to a sabbatical leave.

13     Q    Now, in September of 2000, you went to Brazil in

14  support of --

15     A    I thought you said prison.

16          (Laughter.)

17          BY MR. HENAULT:

18     Q    I started to say Prazil but you went to Brazil in

19  support of one of Dr. Schultz's research projects, correct?

20     A    Yes.

21     Q    And while there you contracted Dengy Hemorrhagic

22  fever, correct?

23     A    While in Brazil I was bitten by a mosquito that

24  conveyed the virus which resulted in Dengy hemorrhagic fever.

25     Q    Okay.  And when you came back to the United States
```

```
 1  is that when you got sick, actual -- the manifestation or did
 2  that -- I'm just trying to get timing down.
 3       A    I know, and I'm a scientist so when you say when you
 4  got sick, to me the moment of getting sick was the moment that
 5  I was injected with the virus.
 6       Q    Was when you came back to --
 7       A    But I incubated --
 8       Q    -- the United States.  Is that --
 9       A    -- about 14 days --
10       Q    Okay.
11       A    -- so I was back in the United States when I --
12       Q    So the symptoms manifested.
13       A    The symptoms --
14       Q    Okay.
15       A    -- began, yes.
16       Q    I apologize for speaking over you.
17       A    I've done it to you so it's okay.
18       Q    You know, it does happen.  So upon your return back
19  to the United States, shortly thereafter you were
20  hospitalized, correct?
21       A    Yes.
22       Q    How long were you hospitalized for?
23       A    There was a period of about three weeks.  I was in
24  the hospital.  I was released and like a day later I had to be
25  readmitted and again so it was -- I think I totaled about 25
```

1    days in Georgetown University Hospital.

2        Q    Now, in March of 2001, you had been out of the

3    hospital and attempted a return, a first return to work,

4    correct?

5        A    Yes.

6        Q    And for that first return to work your doctors

7    requested that you be allowed to work limited and light duty

8    hours, correct?

9             MS. FANG:  Objection to form.

10            BY MR. HENAULT:

11       Q    Let me, let me rephrase the question.  For the first

12   return to work you requested, on the advice of your doctors,

13   that you be allowed to work a limited schedule, correct?

14       A    My doctors in consultation with Dr. Lawford

15   (phonetic), the Smithsonian doctor, determined that a reduced

16   work schedule was best, yes.

17       Q    And in fact, the Smithsonian agreed and you came

18   back originally only set for working 12 hours a week, correct?

19       A    That is correct.

20       Q    In July 2001, at your request, that first return to

21   work ended because you were unable to do it because of the

22   illness, correct?

23       A    My doctors advised Dr. Lawford that the extreme heat

24   of summer -- we were having unusually hot weather -- seemed to

25   be exacerbating the bleeding condition and they advised that I

1   go out for an additional three months.

2        Q    Okay.  And you did?

3        A    And I did follow their advice, yes.

4        Q    Now, shortly after you became ill -- I'm not going

5   to nail down a specific date, but when you were not able to

6   work because of the work related illness that you contracted,

7   you started receiving Workers Compensation payments, correct.

8             MS. FANG:  Objection, form.

9             THE WITNESS:  No, that's --

10            MR. HENAULT:  May I ask what your objection is?

11            THE WITNESS:  -- not correct.

12            MR. HENAULT:  What is wrong with the question?

13            MS. FANG:  The shortly.

14            MR. HENAULT:  Okay.

15            BY MR. HENAULT:

16       Q    After, after, after you became ill and, and when you

17   were unable to work, you began to receive Workers Compensation

18   payments, correct?

19       A    No.

20       Q    No?  When did you -- what --

21       A    That was actually a very serious concern.  Unless

22   you've been involved in a Workers Comp situation you can't

23   comprehend that it isn't an automatic and in my case I had a

24   really weird thing that nobody else was suffering from, so no,

25   unfortunately it didn't begin so I was out and I wasn't being

1  compensated through Workers Comp.  It actually took Dr.

2  Lawford and Audrey Fowler who was with OHI.  I don't think

3  she's there anymore -- made an appointment and went to

4  Department of Labor on my behalf and were able then to at

5  least get the initial paperwork processed.  That still did not

6  rectify the situation.

7      Q.    There did come a time when you started to receive

8  Workers Compensation payments?

9      A     There was a point, after I had an interview with the

10  deputy secretary through a contact at Georgetown Hospital

11  where Workers Comp finally was --

12      Q    Okay.

13      A    -- covering me.

14      Q    And how did that work?  When you were working the,

15  the light duty, the 12 hours a week, how did that work?  Were

16  your Workers Comp payment reduced --

17      A    Yes.

18      Q    -- by how much salary you actually received?

19      A    Yes.

20      Q    Or was it a proportion, do you know?

21      A    All I know is that the amount of time I worked went

22  on my Smithsonian time sheets and then the hours that I was

23  not able to work due to the illness were submitted.  I believe

24  Michael Johnson handled that at the time.  He's not longer

25  with the Smithsonian.  And I was supposed to get Workers Comp

73

1  but that was during the period of time it never happened.

2      Q    Okay.  So back to, again, your -- at the request of

3  your doctors because of your illness, your first return to

4  work ended in July of 2002, correct?  Or excuse me, July of

5  2001.  I made a mistake.

6      A    July of 2001, yes.

7      Q    The beginning of 2002, now, you began to explore

8  with the Smithsonian the possibility of a second return to

9  work.  Isn't that right?

10      A    Correct.

11      Q    And through several -- it was a process but --

12      A    It was.

13      Q    -- eventually you did return to work in April of

14  2002, correct?

15      A    It was a very lengthy process.  I don't understand

16  why it was as involved as it was, but I know the doctors were

17  involved.

18      Q    Okay.  Let me --

19      A    And yes, I did return --

20      Q    Thank you.

21      A    -- in April of --

22      Q    Okay.

23      A    -- that year.

24      Q    And when you returned you were given a light duty

25  schedule, correct?

1    A    Correct.

2    Q    You were only required to work 20 hours a week?

3    A    Correct.

4    Q    Okay.  And that was -- that 20 hours a week was one

5 of the things that was requested by your, your physicians,

6 right?

7    A    My doctors requested the half time work schedule but

8 my doctors also requested flexibility which that schedule

9 unfortunately did not provide.

10    Q    Okay.  Now, you're aware that Dr. Lawford was

11 involved in -- on the Smithsonian's end as a conduit between

12 you and your physicians and Smithsonian, correct?

13    A    Absolutely.

14    Q    And he made suggestions to the Smithsonian as to

15 what would comply with the recommendations or requests of your

16 doctors, right?

17    A    I kept him updated as best I could and had signed

18 release forms so that he could directly contact and have

19 discussions with my doctors, so much of the medical

20 information that he was given actually came directly from my

21 doctors.

22    Q    Dr. Lawford would also run his suggestions and

23 recommendations by you to make sure that, that you agreed with

24 him, right?

25    A    There were times that he would discuss with me his

75

1  insights, his thoughts. I don't think I would -- saw, you

2  know, what the doctors were saying, what they were discussing

3  but before anything was finalized, he did ask my opinion and

4  did tell me what he was thinking and why.

5      Q     Okay.

6      A     He was very careful about that.

7      Q     Now, on -- just to set the parameters, this, what

8  I'm going to refer to as the second return to work, began in

9  April of 2002, and ended November 30, 2002, correct?

10     A     And ended the end of November. That's when I was

11 forced out.

12     Q     Okay. That's what -- I'm just trying to set the

13 parameters so that --

14     A     Yes.

15     Q     -- when we're discussing what I'm going to call the

16 second return to work that we have in the record the

17 parameters, the beginning and end of that period.

18     A     Yes.

19     Q     Okay. During your second return to work you were

20 allowed to work the light duty, 20 hours per week, correct?

21     A     Correct.

22     Q     Okay. And your schedule was modified from a

23 proposed, original proposal of five days a week, four hours a

24 day, to three days a week, correct?

25     A     Correct. Longer three days, no commute on two of

     1  the days.

     2        Q    And that was at your request?

     3        A    That was at the suggestion of my neurologist, I --

     4        Q    Okay.

     5        A    -- believe, Dr. Blake (phonetic.)

     6        Q    At the suggestions of your physicians though as

     7  something that would be better for you?

     8        A    Yes.

     9        Q    And that's something the Smithsonian agreed to?

    10        A    Yes.

    11        Q    Okay.  Now, you took off approximately a month in

    12  August of 2002, correct?

    13             MS. FANG:  Objection as to form.

    14             THE WITNESS:  I don't know what you're talking

    15  about.

    16             BY MR. HENAULT:

    17        Q    In 2002, did there come a time when you took almost

    18  a full month off?

    19             MS. FANG:  Objection as to form.

    20             MR. HENAULT:  What's -- may I ask what's wrong with

    21  the question?

    22             MS. FANG:  The took off.

    23             MR. HENAULT:  Okay.

    24             BY MR. HENAULT:

    25        Q    When -- during 2002, was there a period of -- in --

78

1      Q    Fair enough, ma'am.  During your second return to

2  work, you're aware that the 5th floor was routinely tested for

3  naphthalene exposures, correct?

4           MS. FANG:  Objection as to form.

5           THE WITNESS:  I remember Kathy Makos, the industrial

6  hygienist, had set up some monitoring.  I only was aware that

7  that was going on during a period of about a week, the only

8  time I was aware that that was occurring.

9           BY MR. HENAULT:

10     Q    Okay.  During your second return to work were

11  specimens stored in naphthalene transferred to naphthalene

12  free drawers for you to be able to use?

13     A    During --

14          MS. FANG:  Objection as to form.

15          BY MR. HENAULT:

16     Q    Go ahead, ma'am.

17     A    That second return to work I was using material from

18  many different places.  Some of the drawers, for example, in

19  the type collection were loaded with naphthalene -- the old

20  drawers that had actual naphthalene sitting in the edges of

21  the, the drawers.  Some of the specimens in Dr. Krombein's

22  office that I was cleaning up because he no longer was able to

23  come in, these loads had to be sent back, had been placed in

24  new drawers so were naphthalene free.

25          I am aware that David Furth provided me with new

1    drawers to put a batch of collection of Dr. Krombein's in so

2    that I didn't have to use old drawers that were loaded with

3    the, the naphthalene vapors, but there were a variety of

4    drawers that I was using during that period of time.

5         There were also drawers in the ant lab during that

6    period of time that had open trays of naphthalene sitting in

7    them because Ted Suman (phonetic), our contractor, was pinning

8    ants at home for Ted as per his contract, was bringing them in

9    and there was the fear that they could have domestic beatles

10   that could contaminate the collection so Ted had advised

11   naphthalene to be used in -- drawers.

12        Q    During the second return to work you were encouraged

13   to work in the ventilated fourth floor room.  Isn't that

14   correct?

15        MS. FANG:  Objection as to form.

16        THE WITNESS:  During my second return to work,

17   towards the end of that period of time when I repeatedly asked

18   for help to avoid naphthalene because I was having daily nose

19   bleeds and the respirator had not been provided, an air filter

20   for my desk had not been provided, the fourth floor was

21   proposed as a possibility.  I did go down to the fourth floor

22   and check out that room, but this was, this was late in that

23   return to work period of time.

24        The door was always kept locked.  I did not have a

25   key.  The day David Furth let me in, it became very clear to

1    me that delicate specimens could not be worked on because the

2    air draft is so great.  I mean it's, it's powerful air

3    current.

4            BY MR. HENAULT:

5        Q    Let me just -- I think, again --

6        A    So --

7        Q.   -- we're off track from my question.  My only

8    question is during the second return to work were you

9    encouraged to use the ventilated room on the fourth floor?

10       A    If you say encouraged I have to say no.

11       Q    Okay.

12       A    Suggested I might check it out, yes.

13       Q    Okay, fair enough.  Now, you say the fourth floor

14   was, was a locked room?

15       A    Yes.

16       Q    That the -- and when I say the room, I'm referring

17   to on the fourth floor there is a ventilated room, correct?

18       A    Correct.

19       Q    And it is ventilated so that it draws the

20   naphthalene away from the person working on the specimen,

21   correct?

22       A    Or whatever fume.

23       Q    Okay.  Did you ever ask anyone for a key to that

24   room?

25       A    Yes, I did.

1    Q   Yes, ma'am.

2    A   I believe it was said that Dr. Schultz never

3 purchased a respirator.

4    Q   Purchasing a respirator was not Dr. Schultz's

5 responsibility, was it?

6    A   Dr. Schultz was my direct supervisor.  It was his

7 responsibility to see that it was purchased.

8    Q   Okay.

9    A   And I had asked earlier in an e-mail, did I need to

10 do anything further to have this happen.

11    Q   Ma'am, what is naphthalene?

12    MR. HENAULT:  And just let me say for the court

13 reporter, that's n-a-p-h-t-h-a-l-e-n-e.

14    BY MR. HENAULT:

15    Q   Okay.  What is naphthalene?

16    MS. FANG:  Objection as to form.  You can answer.

17    THE WITNESS:  I'm not a biochemist but I can tell

18 you that it's a chemical.  It smells like mothballs that we

19 use in our insect collection, or did in the past.  We are no

20 longer supposed to use it -- to serve not as a fumigant but as

21 a repellant to keep the domestics and other live bugs that

22 might eat our dead bugs out of the collection.

23    BY MR. HENAULT:

24    Q   Okay.  How did naphthalene affect you?

25    A   Pre-dengy or post-dengy?

```
 1      A     I'm sorry.

 2            MS. FANG:  No, that's fine.

 3            BY MR. HENAULT:

 4      Q     Okay.

 5      A     Yes.  Monday, Wednesday, Friday were my scheduled

 6 days.

 7      Q     During the second return to work did there come a

 8 time when you went with your son to bring him to college?

 9      A     My son wasn't in college at that time.

10      Q     No?  Okay.

11      A     No.  In fact, my son just started last year.

12      Q     Okay.  How about during the second return to work

13 was, was there a time when you brought your daughter to

14 college?

15      A     During the second return to work my daughter was in

16 college in Massachusetts and she had her own car and drove

17 herself.

18      Q     Okay.  So --

19      A     There was a period of time during the second return

20 to work though, as I already told you, I went up to U Mass,

21 which is not where my daughter was but it's nearby, still the

22 same state, and donated blood to --

23      Q     Okay.

24      A     -- do a program that is studying dengy antibodies.

25      Q     Now, during -- at the beginning of the second return
```

1  to work, you understood that you would be working back, trying

2  to get back full time, correct?

3      A    Absolutely.

4      Q    And that was the goal of the second return to work

5  was to end up bringing you back full time?

6      A    Absolutely.

7      Q    By November 2002, you weren't able to work full

8  time, were you?

9      A    We had agreed, my doctors, Dr. Lawford, my

10  department, that it would be revisited in December of 2002.  I

11  repeatedly told Ted that if my doctors approved, I would be

12  able to return to 40 hours a week by the end of December 2002.

13  That was my goal.  My doctors agreed although they did have

14  the stipulation they wanted some form of protection from

15  naphthalene.  Dr. Granite is my primary care doctor and he was

16  very concerned when I still had no respirator, I still had no

17  air filter.

18      Q    Okay.  I think we've gotten off -- my question was

19  --

20      A    Well, again, I'm trying to say that --

21      Q    Okay.

22      A    -- I was shocked --

23      Q    Ma'am --

24      A    -- when I got the --

25      Q    -- my question is, November of 2002, you were not

1          BY MR. HENAULT:

2     Q     Go ahead.

3     A     My belief in November of 2002, was that by December

4 of 2002, I would be working 40 hours.

5     Q     Okay.

6          MR. HENAULT:  Let's mark this the next exhibit.

7 This is 13, correct, sir?

8          COURT REPORTER:  All right.

9          (Norden Deposition Exhibit Number 13 was marked for

10 the record.)

11         BY MR. HENAULT:

12    Q     Ma'am, what has been marked as Exhibit 13 is a

13 letter or memorandum dated November 18, 2002, to you from

14 Scott Miller, correct?

15    A     Correct.

16    Q     And this letter informs you that effective November

17 30, 2002, your part time schedule will not be continued,

18 correct?

19    A     Correct.

20    Q     And that you will be returned to full time

21 disability leave, correct?

22    A     Correct.

23    Q     Okay.  This letter tells you the reason that you

24 were being returned to full time disability leave, correct?

25    A     This letter does not explain to me why it was being

110

```
 1                A F T E R N O O N   S E S S I O N

 2                                              (2:11 p.m.)

 3          MR. HENAULT:  Back on?

 4          COURT REPORTER:  Back on.

 5          BY MR. HENAULT:

 6      Q    All right.  Ms. Norden, before we move on I want to

 7  follow up on a couple questions.  You said that you

 8  anticipated returning back to work full time in December of

 9  2002.  Did your doctors clear you to work full time in

10  December 2002?

11      A    I never had that meeting.

12      Q    With your doctors?

13      A    With my doctors.

14      Q    Okay.

15      A    It was scheduled for before Christmas, December

16  2002, and it never occurred.

17      Q    Okay.  Did your doctors clear you to go back to work

18  any time, full time any time before November of 2003?

19      A    November of 2003, I don't know if I asked

20  specifically may I work 40 hours a week with any of my doctors

21  during that period of time.  My doctors were all aware that I

22  wanted to return to work.  I don't think a number of hours was

23  ever discussed.  The goal had always been to return to full

24  time work.

25      Q    Okay.  Prior to December 2003, though -- excuse me
```

1   -- November 2003, you did not receive information from your

2   doctors telling you that you could go back to work full time,

3   did you?

4          MS. FANG:  Objection as to form.  You can answer.

5          THE WITNESS:  Receive information.  That would be an

6   answer to a question that I never asked.

7          BY MR. HENAULT:

8     Q     Okay.  When I talked with you about driving your

9   daughter to school --

10    A     Yeah.

11    Q     -- you said something about your daughter has a car;

12  she can driver herself, but did you ever drive -- during the

13  time of your second return to work, did you ever drive your

14  daughter back to school in Massachusetts?

15    A     During my second return to work, I don't remember

16  ever driving Heather.  I know she had her own car during that

17  time and I know that when I donate the blood at U Mass I flew.

18  It was on Southwest Airlines.  I flew.  I did have dinner in

19  Boston with Heather the night I donated the blood and I know

20  she drove me, you know, back to her dorm where I spent the

21  night and then I went back the next day, and actually I, I e-

22  mailed Dr. Lawford from my daughter's computer in the dorm

23  because he wanted me to update him on, you know, the whole

24  blood business.  But driving her back to school, I, I honestly

25  don't remember.  I could check my calendar.

112

1    Q    Okay.

2         MR. HENAULT:  Let's mark the next exhibit please.

3    This is 13, correct?

4         COURT REPORTER:  14.

5         MR. HENAULT:  14.  What was 13 here?

6         THE WITNESS:  The memo.

7         MR. HENAULT:  Oh, okay, okay.  Where did I put that?

8         (Norden Deposition Exhibit Number 14 marked for

9    identification.)

10        BY MR. HENAULT:

11   Q    Ma'am, what has been marked as Exhibit 14 is a

12   Smithsonian Institution Office of Equal Employment and

13   Minority Affairs form that applicants, employees or applicants

14   for employment seeking counseling must fill out to get that

15   counseling, correct?

16   A    I don't know.  I never filled out this form.

17   Q    Okay.  This --

18   A    Obviously --

19   Q    At the time this form was filled out and submitted

20   on April 7, 2003, Mr. Goodman was your lawyer, correct?

21   A    Yes.

22   Q    So this was submitted on your behalf in an effort to

23   seek informal counseling related to the 2002 return to work,

24   correct?

25   A    I assume that's correct.

1      Q    Correct, which is when this form is signed.  You

2  didn't fill out one of these forms?

3      A    Not that I remember.

4      Q    And prior to April 7, 2003, you're not aware of

5  anyone else submitting one on your behalf?

6      A    I'm not aware of that.

7      Q    Okay.  And this is the first time that you sought

8  counseling alleging discrimination.  Isn't that right?

9            MS. FANG:  Objection as to form.

10          THE WITNESS:  When you say sought counseling, does

11  it count if I talk to the ombudsman or the Employee Assistance

12  Program, or does it have to be this EEO --

13            BY MR. HENAULT:

14      Q    Let me --

15      A    -- stuff?

16      Q    Let me ask this.  At any point prior to this, did

17  you go to the Office of Equal Employment and Minority Affairs

18  and tell them that you believed you had been or were being

19  discriminated against.

20          MS. FANG:  Objection as to form.

21          THE WITNESS:  The only time that I talked to anybody

22  in the EEO office --

23            BY MR. HENAULT:

24      Q    Uh-huh.

25      A    -- which is not ombudsman, not employee assistance,

1  and I think we have produced that.

2      Q    Was that after Exhibit 14 had been filed?  It's

3  dated April 7, 2003.

4      A    It may have been around this time and that --

5      Q    Okay.

6      A    -- may have stimulated the call.  I, I would have to

7  look at the calendar.

8      Q    Okay.  When did you retain counsel relating to

9  potential discrimination?

10     A    Official or unofficial?

11     Q    Let's start with unofficial.

12     A    Okay.  I officially, I got --

13     Q    And, and let me, let me say what I do not want you

14 to tell is specifics of conversations you had with any of your

15 lawyers, all right?

16     A    I wouldn't do that.

17     Q    Okay.  I just want to be clear and that you not

18 disclose that stuff.

19     A    Right.

20     Q    Right now I'm just interested in, in timing.

21     A    Right.

22     Q    Okay?  Okay, so start with unofficial.

23     A    I got this memo in November of 2002.

24     Q    Uh-huh.

25     A    That weekend I spoke with an attorney that's a

```
 1  member of my church.  He has an office in Greenbelt.
 2              MS. FANG:  And, Beth, I think those conversations
 3  are --
 4              MR. HENAULT:  Yeah.
 5              MS. FANG:  -- covered.
 6              MR. HENAULT:  Yeah, don't --
 7              MS. FANG:  That's it.
 8              THE WITNESS:  Yeah.  Just you spoke.  Don't tell me
 9  what you discussed, whether you retained him or not.
10              (Simultaneous conversation.)
11              THE WITNESS:  -- saying where he was located.
12              BY MR. HENAULT:
13      Q    Okay.
14      A    Kind of like I did, you know, go to Arizona and --
15      Q    No, I think we just, we just want to be sure that
16  you're not disclosing protective material.  Okay, so --
17      A    Well, good.
18      Q    So the weekend after receiving --
19      A    So almost immediately after getting this information
20  --
21      Q    Uh-huh.
22      A    -- I contacted my friend who is an attorney, asked
23  him how serious this was and --
24              MS. FANG:  No.
25              MR. HENAULT:  Don't, don't, don't --
```

120

```
 1              THE WITNESS:  Oh, I'm sorry.  Sorry, sorry, I'm
 2    sorry.  Asked him his -- can I say that?
 3              MS. FANG:  No.
 4              (Simultaneous conversation.)
 5              THE WITNESS:  -- spoke with him at that time.
 6              BY MR. HENAULT:
 7         Q    Okay.
 8         A    There were follow up conversations.  There were
 9    follow up e-mails.  He is the person that connected me with
10    Bruce Goodman.
11         Q    Okay.  When did you get connected with Mr. Goodman?
12         A    It was February I believe.  It may have been as
13    early as January.
14         Q    Of 2003, correct?
15         A    Of 2003.
16         Q    Okay.
17         A    Yes.  It was very early 2003.
18         Q    Okay.  Have you ever been to the entomology
19    chairman's office on the sixth floor?
20         A    Yes.
21         Q    Are you aware of there being EEO posters on the wall
22    outside --
23              MS. FANG:  Objection as to form.
24              BY MR. HENAULT:
25         Q    -- outside the --
```

```
 1              BY MR. HENAULT:
 2       Q    Take a read through what has been marked as Exhibit
 3  15 and let me know when you're ready, please, ma'am.
 4              (Pause.)
 5              THE WITNESS:  Yes.
 6              BY MR. HENAULT:
 7       Q.   Okay.  What has been marked as Exhibit 15 is a
 8  November 5, 2003 letter to you from Dr. Schultz, correct?
 9       A    Correct.
10       Q    When did you receive this letter?  Do you recall?
11  Ultimately the date doesn't matter.  It was shortly thereafter
12  November 5th, correct?
13       A    Sometime in --
14       Q    Okay.
15       A    -- November 2003.
16       Q    And this letter informed you that as of December,
17  was it December 2, you were -- he was proposing your
18  separation from the Smithsonian as an employee effective
19  December 2, correct?
20       A    If that's what it says, yes.
21       Q    Okay.
22       A    I don't see the exact date in front of me but he was
23  proposing to separate me, yes.
24              (Pause.)
25              THE WITNESS:  Do you see that date?
```

```
 1          BY MR. HENAULT:

 2     Q     I actually do not.

 3     A     I don't --

 4          MS. FANG:  First paragraph.  He doesn't say the date

 5     but it says 30 days.

 6          MR. HENAULT:  Okay.

 7          BY MR. HENAULT:

 8     Q     Okay.  So actually -- so this letter -- let me thank

 9     you for that.  Let me change the question.  This letter

10     informs you that effective not less than 30 days from your

11     receipt of this November 5, 2003 letter that you will be

12     removed from the Smithsonian as an employee, correct?

13     A     He said he's proposing --

14     Q     Correct.

15     A     -- that I be separated.

16     Q     Effective 30 days after your receipt of this you had

17     been on full disability.  You would have been on full

18     disability for over one year, correct?

19     A     I was forced to go out on disability the 30th of

20     November 2002.  This is November 2003, so it's close.

21     Q     Effective --

22     A     So if --

23     Q     Effective the 30 days.

24     A     It would be, yes.

25     Q     Okay.  During that period of time from November 30,
```

1    2003, who did you tell that you were prepared to come back to

2    work?

3        A    When I was forced out I asked how I knew when I

4    could come back and how I was to do that.  I was told, in an

5    e-mail, that I -- it was up to my doctors.  It was a medical

6    decision.  So I assumed at that point that what I needed to do

7    was to keep Dr. Lawford informed and it was Dr. Lawford that I

8    gave updated medical records to.  It was Dr. Lawford that knew

9    I was wanting to return to work.

10        Q    Okay.  Between November 30, 2002, and November 5,

11    2003, did you -- what information did you provide to Dr.

12    Lawford stating that you were ready and able to come back to

13    work?

14            MS. FANG:  Objection as to form.  You can answer.

15            THE WITNESS:  During that period of time there were

16    numerous e-mails with Dr. Lawford.  There were numerous phone

17    conversations with Dr. Lawford.  If you need specific dates I

18    would have to look at my calendar.

19            BY MR. HENAULT:

20        Q    Okay.  And it's your testimony that you specifically

21    told him that you were ready to come back to work, ready and

22    able to come back to work?  Is that right or wrong?

23        A    I specifically told him that my goal was to return

24    to work.  I was trying to return to work.  I can't make a

25    medical decision so my doctors needed to coordinate with Dr.

1  Lawford.

2      Q    Between November 30, 2005 (sic) and November 5,

3  2003, are you aware of any information provided to Dr. Lawford

4  by your doctors that said you were ready and able to come back

5  to work at the Smithsonian?

6      A    I'm not aware of a specific document.

7      Q    Okay.  Other than your interaction with Dr. Lawford,

8  between November 30, 2002, and November 5, 2003, did you tell

9  anyone else at the Smithsonian that you were ready and able to

10 come back to work?

11     A    I never used the words ready and able but I had been

12 in conversation with Debbie Burney in the Employee Assistance

13 program.  Basically asked me why I wanted -- would want to

14 return to work where I wasn't wanted.  I had been in

15 conversations with Chandra Heilman.  I had sent e-mails that

16 were requesting information on how to return to work but none

17 of that came.

18     Q    Okay.

19     A    I was also told I was supposed to take a year.

20     Q    Okay.  My question is any of these people you just

21 named, did you tell them in sum or substance, words to the

22 effect, anything implying this, that you were medically able

23 and willing to return to work between November 30, 2002, and

24 November 5, 2003?

25     A    Dr. Lawford is the only person that I said I think

150

```
 1  medically I am able and that needs to be discussed with my

 2  doctors.

 3      Q    So it's your testimony that you said to Dr. Lawford

 4  that you think you're medically able to come back to work?

 5      A    You're sort of putting a word in my mouth.  I didn't

 6  say I think I'm medically able.  I told him that I wanted to

 7  return to work and he needed to have a conversation with my

 8  medical providers.  He knew who all of them were.

 9      Q    When did this conversation take place?

10      A    Again, I don't know the exact date.  I was under the

11  impression at that point that I was supposed to wait a year

12  and this is within that period of time.  When the letter came

13  proposing to sever me, I realized it was time to put something

14  in writing and that's why the letter followed shortly after

15  getting this letter.

16      Q    Okay.  And let's, let's talk about this letter.

17           MR. HENAULT:  Can we mark this the next exhibit

18  please, sir.

19           (Norden Deposition Exhibit Number 16 marked for

20  identification.)

21           BY MR. HENAULT:

22      Q    Ma'am, what has been marked as Exhibit 16 is a

23  letter that you sent to Dr. Mathis and Dr. Schultz on November

24  13, 2003, correct?

25      A    Yes.
```

139

```
 1  concerns that, that you want to be able to provide information
 2  to your doctors about and that's how will the Smithsonian
 3  accommodate your naphthalene sensitivities, whether you will
 4  receive flexible hours so that you can go to doctors
 5  appointments and deal with migraines, and finally, what would
 6  be put in place to protect you from alleged retaliation or
 7  hostility, correct?
 8       A    Right.
 9       Q    And those are the three concerns that you needed
10  addressed, that you felt you needed addressed so that you
11  could return to work?
12            MS. FANG:  Objection as to form.
13            BY MR. HENAULT:
14       Q    Correct?
15       A    Those three listed concerns were my primary
16  concerns, yes.
17       Q    Okay.  Now, in November of 2003, was the dengy fever
18  -- you still have dengy fever?
19       A    I'm -- what date were you saying?
20       Q    In November of 2003, ma'am.  I'm talking right about
21  this, this time.
22       A    November 2003, correct?
23       Q    Yes.  Did you still have dengy fever?
24            MS. FANG:  Objection as to form.
25            THE WITNESS:  I'm not a medical person so I can't
```

1   really answer the medical terms.

2            BY MR. HENAULT:

3     Q    Uh-huh.

4     A    I certainly no longer have an acute infection of

5   dengy hemorrhagic fever.  I will always have antibodies I am

6   told.

7     Q    Okay.  In November of 2003, could you care for

8   yourself at home?

9            MS. FANG:  Objection as to form.

10           THE WITNESS:  In November of 2003, if I did not have

11  a migraine I could care for myself.

12           BY MR. HENAULT:

13    Q    Okay.  Could you bathe yourself in November of 2003?

14    A    If I did not have a migraine.

15    Q    Okay.  Could you feed yourself?

16    A    If I didn't have a migraine.

17    Q    If you did have a migraine would others bathe you?

18    A    If I had a migraine, nobody came near me.

19    Q    Okay.  So -- okay.  During this time could you cook

20  for yourself?

21           MS. FANG:  Objection as to form.  You can answer.

22           THE WITNESS:  I can't speak for other people with

23  migraines.  I know that mine are extremely severe.  During the

24  period of time that I am with migraine, I am completely

25  incapacitated, so no, I couldn't cook, couldn't bathe.  I

FREE STATE REPORTING, INC.
Court Reporting  Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1  couldn't do anything --

2           BY MR. HENAULT:

3      Q    And that was when you --

4      A    -- for myself.

5      Q    That was when you had a migraine?

6      A    But that is only during the time of a migraine and

7  that's part of the reason I was so concerned about naphthalene

8  because naphthalene is a primary trigger.

9      Q    Okay.  So but when you didn't have a migraine you

10  could do all these things for yourself?

11     A    Yes.

12     Q    Okay.  How long do your migraines typically last?

13     A    Again --

14     Q    Let's use a time frame.  Say November --

15     A    From my reference point, my migraines typically are

16  two to three days.

17     Q    Okay.  So from -- is that consistent from say

18  November 2003 to current time?

19     A    It's consistent from onset of dengy hemorrhagic

20  fever until present day.

21     Q    Okay.  And for those two to three days that you said

22  your migraines last, that's how long you're basically

23  incapacitated?

24     A    Yes.

25     Q    Okay.  From November 2003 through current times, how

1  often do you get migraines?

2      A    It varies.   It's based on triggers.   Right now if

3  you gave me a plate with naphthalene in it, I would probably

4  go into a migraine.   I avoid all the triggers that I can

5  avoid.   Unfortunately there are some life changes and

6  barometric pressure I can't avoid, and working with the

7  neurologist I had a series of nerve blocks starting last

8  December going through March that have been effective in

9  reducing the number so now approximately two to three a month.

10     Q    Okay.   From November -- and is that a reduction from

11  what you were getting in the November 2003 time frame?

12     A    Yes, it is.

13     Q    Okay.   Let's talk about from roughly November 2003

14  until the time you had this treatment, I think you said

15  December of last year.

16     A    It started December.   My neurologist, Dr. Blake, had

17  suggested it because she knew that obviously I would like to

18  be migraine free.

19     Q    Uh-huh.

20     A    And I felt that would be very beneficial for any

21  kind of functioning.

22     Q    So from November 2003 until this, this treatment

23  successfully reduced your migraines, how many would you get a

24  month, average, rough, roughly?

25     A    Prior to that I was getting maybe five or six.

143

1    Q    Okay.  And that would mean you were, with those five

2  or six migraines, if you do the math, that incapacitated you

3  for two to three days a piece, you were incapacitated for 15

4  to 20 days a month?

5    A    Possibly.  Again, if a migraine begins, and there is

6  a precursor, there is the visual distortion, I know when I'm

7  going into a migraine.  If I'm able to early on take

8  medication I am usually successful in blocking it.

9    Q    Okay.

10    A    If I don't stop it, then it's just like a snowball

11  rolling downhill.  Then it becomes full blown and then it's

12  out of control.

13    Q    Okay.  So from roughly the November 2003 time frame

14  until this treatment that helped you out with the problem, how

15  many migraines a month would you get that incapacitated you?

16    A    Again, it's hard to answer your question because I

17  would get migraines and I know what to do so in terms of days

18  that I was totally incapacitated, maybe three.

19    Q    Maybe three days or three migraine episodes?

20    A    Maybe three days.

21    Q    Okay.  The rest of --

22    A    We're talking totally incapacitated.

23    Q    Right, right.  The rest of the time you feel you are

24  successfully able through medication to, to control the

25  migraine such that you were not incapacitated?

```
 1      A    Yes.

 2      Q    Okay.  When you are able to control your migraines

 3 such that you're not totally incapacitated, are you of a

 4 condition that you believe you are capable of working?

 5      A    I would not have requested to return to work if I

 6 didn't believe that I would be able to handle it, so to answer

 7 your question, yes, I believe I could return to work.  Yes, I

 8 believe with appropriate precautions I can work full time.

 9      Q    Okay.  And the precautions that, that you believe

10 you needed were the three set forth in the November 13, 2003

11 letter?

12      A    Yes.

13      Q    Okay.

14      A    Yes.  Again, nobody knows for sure --

15      Q    Hang on a second.  Let him mark this.

16           MR. HENAULT:  This is 17, correct, sir?

17           COURT REPORTER:  17, right.

18           (Norden Deposition Exhibit Number 17 marked for

19 identification.)

20           BY MR. HENAULT:

21      Q    Ms. Norden, please take a look at what has been

22 marked as Exhibit 17.

23           (Pause.)

24           BY MR. HENAULT:

25      Q    What has been marked as Exhibit 17 is -- purports to
```

1  contact at least monthly with Dr. Lawford and there may have

2  been some updates of blood work or there may have been

3  documents.  I just do not remember that.

4        Q    Okay.

5        A    I'm sure the file would show, the medical file would

6  show it.

7        Q    Now, between the time when you came back, or you

8  requested -- when you -- excuse me.  Between the time of your

9  November 13, 2003 letter and March 2004, you had many

10 discussions with Smithsonian personnel about returning to

11 work, correct?

12       A    Many discussions.

13       Q    What about e-mail or by phone or --

14       A    There were contacts --

15       Q    Okay.

16       A    -- and there were pieces of information exchanged,

17 yes.

18            MR. HENAULT:  19, sir?

19            COURT REPORTER:  19.

20            (Norden Deposition Exhibit 19 marked for

21 identification.)

22            BY MR. HENAULT:

23       Q    You're familiar with the document that has been

24 marked as Exhibit 19, correct?

25       A    I'm getting to not be familiar with anything

154

```
 1   anymore.  I believe this is the document that was sent to me

 2   from the Smithsonian.

 3        Q    In fact, what is marked as Exhibit 19 is the -- it's

 4   captioned agreement and it's a proposed settlement, settlement

 5   agreement and general release that was proposed by the

 6   Smithsonian to be entered into between you and the

 7   Smithsonian, correct?

 8        A    I believe this was sent by --

 9        Q    Prior --

10        A    -- the Smithsonian.

11        Q    Okay.  And received by you?

12        A    Um, I don't know if it was sent directly to me.

13        Q    But you, but you got it?

14        A    But I received it.

15        Q    Okay.

16        A    Yes.

17        Q    I think if we look at the last page it will show

18   that it was actually faxed to your counsel.

19        A    That's -- yeah.  I don't --

20        Q    But regardless, I just want to make sure there's no

21   dispute that you got it.

22        A    No.

23        Q    Okay.

24        A    I try to keep track of everything I sign for.

25        Q    Okay.
```

1     A     There was an effect.

2           MR. HENAULT:  This is 20?

3           COURT REPORTER:  Yep.

4           (Norden Deposition Exhibit Number 20 marked for

5    identification.)

6           BY MR. HENAULT:

7     Q     Ma'am, what has been marked as Exhibit 20 is an

8    April 18 -- or 19, 2004 letter from your counsel to Marilyn

9    Slomba, correct?

10    A     Yes.

11    Q     And it says that you will not return to work under

12   the agreement marked as Exhibit 19, and that you will be

13   filing a claim of retaliation with OEEMA relating to that

14   agreement, correct?

15    A     Correct.

16          COURT REPORTER:  21.

17          (Norden Deposition Exhibit Number 21 marked for

18   identification.)

19          BY MR. HENAULT:

20    Q     Ma'am, what has been marked as Exhibit 21 is the

21   claim of retaliation that was filed on your behalf with OEEMA

22   regarding the proposed settlement agreement, correct?

23          MS. FANG:  Objection.  You can answer.

24          THE WITNESS:  This is a document prepared by my

25   attorney but I, I'm not sure, what was it for?  Were you

1  asking --

2          BY MR. HENAULT:

3      Q    Remember we just discussed that the response -- look

4  at Exhibit 20 -- was I reject this proposed settlement

5  agreement and we will be filing an informal complaint of

6  retaliation --

7      A    Yes.

8      Q    -- with OEEMA.

9      A    Yes.

10     Q    What is marked as Exhibit 21 is the informal

11 complaint or the complaint that was then filed --

12     A    Yes.

13     Q    -- with OEEMA?

14     A    Yes.

15     Q    Okay.

16     A    Gotcha.

17     Q    And what is listed under Exhibit 3 --

18     A    Number 3?

19     Q    Number 3, yes.  I'm sorry, thank you.  Is the

20 reasons that you refused the back to work portion of that

21 agreement, correct?

22     A    Yes.

23     Q    Okay.  After you rejected the settlement agreement

24 the Smithsonian provided you with a new -- with a proposed

25 work plan, correct, to bring you back to work?

```
 1        Q    Okay.  Now, are you aware of the fact that in
 2   addition to the draft settlement agreement being sent to your
 3   counsel on April 8, 2004, what is marked as Exhibit 23, the
 4   work plan was also sent to your counsel on April 8, 2004.  Are
 5   you aware of that?
 6        A    I'm aware that I saw a work plan at the same time I
 7   saw the list of what you're calling a settlement.
 8        Q    Okay.  At the same time you saw Exhibit 19?
 9        A    Yes.
10        Q    Okay, fair enough.  Okay.  Now, take a look at the,
11   at the work plan.  There is nothing contained in this work
12   plan that requires you to relinquish any EEO rights, is there?
13             MS. FANG:  Objection as to form.  I'll go ahead and
14   let you answer.
15             THE WITNESS:  EEO rights?
16             BY MR. HENAULT:
17        Q    Rights and claims of discrimination, ma'am, or
18   retaliation.
19        A    This work plan involves work that I would be doing
20   as an entomologist.  The EEO is separate activity.
21        Q    Right.
22        A    Right?
23        Q    Yes.  And there is no provision in this work plan
24   that requires you to give up any EEO claims, is there?
25             MS. FANG:  Objection as to form.
```

1          MR. HENAULT:  Go ahead and answer, ma'am.

2          MS. FANG:  You can answer it.

3          THE WITNESS:  This work plan contains duties that I

4    believe are hurtful and discriminatory and therefore would

5    have a connection to EEO, so there is that --

6          BY MR. HENAULT:

7      Q     Okay.

8      A     -- provision.  This work plan was rejected at the

9    same time that we were rejecting some of the other EEO

10   statements in the settlement agreement and the reason for the

11   rejection, you know, was in part because of the work and work

12   plan, in part because of some of the other statements --

13     Q     Okay.

14     A     -- that dealt with my, my rights and the EEO

15   process.

16     Q     You're aware that Nancy Adams helped develop this

17   work plan, correct?

18     A     Yes, I am.

19     Q     Who is Ms. Adams?  You know what, Ms. Adams was a

20   GS-12 supervisory museum specialist, correct?

21     A     Yes, she was.

22     Q     Okay.  She was your GS-11 at the time, museum

23   specialist, correct?

24     A     Yes.

25     Q     So she was senior to you in grade, correct?

 1  year or two in -- you know, registration or something, not

 2  entomology prior to that.

 3      Q    But you're aware of her starting -- your

 4  understanding, her starting as a museum specialist in

 5  entomology in 1985?

 6      A    I'm aware that that's when we met.

 7      Q    Okay.

 8      A    She may have been within the museum a year or two

 9  prior to that.

10      Q    Okay.  Do you know if her time as a museum

11  specialist was continuous from when you met until 2004?

12      A    I believe it was, and I also know that her focus had

13  always been on collections and collections work.  She got her

14  bachelors degree at a bible college that I visited with her,

15  so I know she's very serious about science and I know she was

16  very serious about her work at the museum.

17      Q    Okay.  You and Ms. Adams had a good relationship,

18  didn't you?

19      A    I have always been very fond of Nancy, great respect

20  for her as a person.  I believe she also had great respect for

21  me and she, you know, acknowledged in several phone

22  conversations that I had expertise in hymenoptera.  She had

23  expertise in collections care and she felt that potentially

24  working together could be very good.  So I guess --

25      Q    Now, you've said you had respect for her as a

1  person.  Did you have respect for her as a museum specialist?

2      A    Of course.

3      Q    Okay.

4      A    But I'm saying beyond just the job that she did, she

5  was a very kind person and I had great respect for that.

6      Q    You had never alleged, prior to April 2004, that Ms.

7  Adams had taken any discriminatory or retaliatory conduct

8  towards you, had you?

9      A    Discrimination and retaliation, no.

10     Q    Okay.

11     A    No.  Did we disagree sometimes about aspects of the

12 collection?  For example, on the voucher collection of the Sri

13 Lankan material from -- insect project, yes, we did and we

14 actually ended up working together, decided purple labels

15 would be put out.  We compromised so they would be in the main

16 line collection but they would still be segregated within the

17 collection.  I always found Nancy a person that was receptive

18 to new ideas and that I could work very well with.

19     Q    Okay.  Now let's take a look at Exhibit 22, please,

20 ma'am.

21     A    22.

22     Q    What has been marked as Exhibit 22 is an April 22,

23 2004 letter from Marilyn Slomba to your lawyer, correct?

24     A    Yes.

25     Q    Okay.  And it says -- and this letter, have you seen

171

```
 1      A     Yes.

 2      Q     When did --

 3      A     Yes.

 4      Q     -- you discuss that with them?

 5      A     Again, I don't know exact dates.  I know that I had

 6  a concern about returning to work and a respirator and asked

 7  Dr. Lawford did I have to be retested.  He said yes.  I asked

 8  him if there should be any problem or do you automatically,

 9  you know, pass the test that you passed before.  He said no,

10  it could be a problem.  We have to test you.

11      Q     I think my question had --

12      A     And then --

13      Q     -- to do with your treating doctors, not Dr.

14  Lawford.

15      A     I was going to continue.  After speaking with Dr.

16  Lawford, then I talked to Dr. Granite.

17      Q     Okay.

18      A     And told him that I had to be retested and told him

19  what was being, you know, discussed in terms of a respirator

20  accommodation, so the answer to your question is, yes, I spoke

21  with Dr. Granite.

22      Q     When did you talk to him about whether providing you

23  with a fitted respirator and provided you with a work space in

24  the negative pressure ventilated sorting room and relocating

25  your office to room CE420 would be adequate to accommodate
```

1  your naphthalene sensitivities?

2      A    I don't recall ever mentioning CE420 to Dr. Granite.

3  I do remember talking to him about a respirator.  I do

4  remember talking to him about ways to avoid naphthalene in the

5  collection and I see Dr. Granite every month and we talk about

6  naphthalene just about every visit, so you know, I can't give

7  you the specific date but I can tell you that, yes, I did

8  speak with Dr. Granite about the respirator and about my, my

9  concerns about the retesting.

10     Q    But nothing about the, the working in the negative

11  pressure ventilated sorting room?

12     A    I talked to Dr. Granite about relocating my office

13  to the fourth floor and he agreed that was a very good idea.

14     Q    Uh-huh.

15     A    I did not talk to him specifically about this room

16  because I still believed and do believe that the type of work

17  I was going to be doing could not be done well in that office

18  because of the severe pull.

19     Q    Did you ever discuss with any of your treating

20  doctors whether or not providing you with an alternative work

21  schedule, that, that gave you a day per week to make up missed

22  hours, or a day per two weeks met their recommendations that

23  you be given an alternative work schedule?

24     A    Yes, I remember that specifically because when I

25  talked to Dr. Blake about it, my neurologist at Georgetown,

1   she laughed and she said, "I only see patients on Mondays," so

2   she felt it would be hard to schedule appointments with her

3   and meet this requirement.

4         Q    Now, but, but this agreement purports to allow you

5   to use the second Friday to make up any missed hours due to

6   doctors appointments, correct?  Please read point 6.

7              (Pause.)

8              THE WITNESS:  It does say that.  I am not aware that

9   I understood it.

10             BY MR. HENAULT:

11        Q    Okay.  But under the terms here, you could have gone

12   to see that doctor on Monday and made up the time on a Friday,

13   correct?

14        A    The way I'm reading this now, yes, it appears --

15        Q    Okay.

16        A    -- to be the case.  I don't remember having that

17   information, and if I did, maybe it didn't --

18        Q    Okay.

19        A    It wasn't comprehended that way.

20        Q    Ma'am, can you tell me where, if anywhere in the

21   proposed terms for your return to work as set forth in Ms.

22   Slomba's April 22, 2004 letter it says that you will be

23   terminated for missing a deadline?

24             (Pause.)

25             THE WITNESS:  I don't see it on this page.  I know I

1   read it in the other document.

2           BY MR. HENAULT:

3       Q    You're talking about the proposed settlement

4   agreement --

5       A    Yes.

6       Q    -- marked as Exhibit 19?

7       A    Yes.

8       Q    Can you point out to me -- and you're talking about

9   the document that you rejected, right?

10      A    Yes.

11      Q    Okay.  Can you point out to me where in Exhibit 19

12  it says that you will be terminated for missing a deadline?

13          (Pause.)

14          THE WITNESS:  Yes.  Number 16.

15          BY MR. HENAULT:

16      Q    Okay.

17      A    The parties understand that it is critical that Dr.

18  Norden adhere to each of the provisions of this agreement and

19  that any failure to adhere to those provisions as evaluated at

20  the end of each eight week review cycle will result in her

21  separation from the rolls of the Smithsonian as proposed in

22  November 5, 2003 letter during the duration of this agreement.

23      Q    Okay.

24      A    I interpreted that to mean that I would be separated

25  --

```
 1       Q     Okay.

 2       A     -- if I missed deadlines.

 3       Q     That provision is not included in the terms set

 4  forth in Ms. Slomba's April 22, 2004 letter, is it, ma'am?

 5             MS. FANG:  Objection as to form.

 6             THE WITNESS:  Give me a number, 22, okay.

 7             BY MR. HENAULT:

 8       Q     The most current letter that we're talking about.

 9       A     Yeah, which is dated April 22nd, 2004, and the date

10  of this was about the 8th of April.  I have to tell you once

11  again, I saw all of these at the same time.

12       Q     Well --

13       A     I didn't understand that this no longer was in

14  effect.  I assumed that this was in place and this was a

15  follow up to this agreement.  It may have been my not

16  understanding it clearly.

17       Q     Okay.

18       A     But I saw them all tied together at the same period

19  of time and --

20       Q     Okay.

21       A     -- they are fairly close in time.

22       Q     Okay.

23       A     I also can tell you the reason I had concerns in

24  part would be because of the phone messages that Nancy Adams

25  left for me.
```

1     A     Yes.

2     Q     And that as a museum specialist, part of your duties

3  are to support the, the research entomologists, right?

4     A     Yes.

5     Q     Okay.

6     A     And I know you had me earlier look at one of these

7  evaluations and you can see that research support was

8  primarily was what I always did and there was a place where

9  the collections work was mentioned and Dr. Schultz actually

10  said that contractor Ted Suman and I believe there was

11  somebody else, had been hired to do collections work so that I

12  was available for research support.  It's one of these.  I'd

13  have to go back and --

14     Q     Okay.

15     A     -- and read through it.  Also in previous years I

16  was actually given time, company time, on the clock time to do

17  my own personal research.  It was a small amount of time but

18  there's a period of many years where part of my job was to do

19  personal research, so to answer your question, I was not hired

20  as a research scientist but I was expected to do research and

21  to support research.

22     Q     Okay.  What year was it that you were given time to

23  do your own personal research?

24     A     I would have to pull the performance evaluations but

25  it was many years.  It was starting back in the '80s.

1     Q    Okay.

2     A    And actually went until just, you know, say recent,

3  but 2000, and in fact, ironically, I actually was marked down

4  on one of the recent performance evaluations for not using my

5  research time for my personal research.  I opted to do some

6  things for, for Ted and for Carl --

7     Q.   Okay.

8     A    -- on my research time.

9         MR. HENAULT:  Let's, let's get this next exhibit

10  marked.  Hang on.

11         (Norden Deposition Exhibit Number 25 marked for

12  identification.)

13         BY MR. HENAULT:

14     Q    Ma'am, take a look at what has been marked as

15  Exhibit 25, please.

16     A    Do you not want me to try to find -- 25.

17         (Long pause.)

18         THE WITNESS:  Okay.

19         BY MR. HENAULT:

20     Q    Okay.  What has been marked as Exhibit 25 is a June

21  9, 2004 letter to your counsel, Ms. Fang, from Ms. Slomba,

22  correct?

23     A    Correct.

24     Q    And if you look at the third page of this letter,

25  this is providing basically your counsel again with the return

183

```
 1      A     That's what it says, yes.

 2      Q     And your response to this letter -- let me mark

 3  this.

 4            COURT REPORTER:  26.

 5            MR. HENAULT:  Thank you, sir.

 6            (Norden Deposition Exhibit Number 26 marked for

 7  identification.)

 8            BY MR. HENAULT:

 9      Q     Your response to that June 9th, 2004 letter came in

10  the form of a July 7, 2004 e-mail from your counsel, Ms. Fang,

11  to Ms. Slomba, correct?

12      A     Correct.

13      Q     And there you're informing Ms. Slomba that you

14  cannot accept the offer, correct?

15      A     Correct.

16      Q     And also your counsel is now requests that the

17  Smithsonian see if they have any other open positions for you,

18  correct?

19      A     She states that in this e-mail; however, I have to

20  tell you that I assumed all along that this part of the

21  process of helping me to return to full time duty within the

22  Smithsonian, whether it be insect zoo or SEM lab, whatever --

23  are you going to ask anymore questions about 25?

24      Q     No, you can set that down.

25      A     Can I just let you know that there are things stated
```

1    A    Yes.

2    Q    And this vacancy announcement is for a GS-9/11,

3    zoological registration specialist, right?

4    A    Correct.

5    Q    Now, what I'm going to do is mark several more

6    documents.  They're all communications regarding this so just

7    to let you know.

8         COURT REPORTER:  29.

9         (Norden Deposition Exhibit Number 29 marked for

10   identification.)

11        BY MR. HENAULT:

12   Q    Ma'am, what has been marked as 29 is an e-mail on

13   that same day, September 8, 2004, to your counsel from Ms.

14   Slomba, providing her with the zoological registration

15   specialist position announcement, correct?

16   A    Correct.

17   Q    Okay.  Did you ever see this e-mail?

18   A    I don't remember this e-mail but I may have seen it.

19   Q    Okay.

20   A    This is the only vacancy announcement I was ever

21   provided so I think -- do remember that but the e-mails I

22   don't.

23   Q    Okay.

24        COURT REPORTER:  30.

25        (Norden Deposition Exhibit Number 30 marked for

```
 1  identification.)
 2          BY MR. HENAULT:
 3      Q    What has been marked as Exhibit 30 is another
 4  September 8 e-mail from your -- from Ms. Slomba to your
 5  counsel, correct?
 6      A    Correct.
 7      Q    And it explains to you that, that if you're
 8  interested in this, this vacancy you can provide a statement
 9  of -- or general qualifications -- hold on, let me read this.
10  I don't want to get the question wrong.
11          (Pause.)
12          BY MR. HENAULT:
13      Q    Okay.  This e-mail says that if you're interested in
14  the position you should provide a statement of your knowledge
15  of professional museum registration methods and collection
16  management standards used in a zoo or similar wildlife
17  setting, correct?
18      A    Correct.
19      Q    And that if you were found qualified for this
20  position you wouldn't even have to compete for it.
21      A    Does it say that?
22      Q    Please look at the --
23          MS. FANG:  Next paragraph.
24          BY MR. HENAULT:
25      Q    -- next paragraph.  If Dr. Norden is found, do you
```

```
 1  see that?

 2      A    Yes.

 3      Q    Okay.

 4      A    She would not need to compete for it, yes, I do see

 5  that.

 6      Q    And did you ever receive this e-mail?

 7      A.   This e-mail?

 8      Q    Yes, ma'am.

 9      A    I believe I did.

10      Q    Okay.

11           (Pause.)

12           MR. HENAULT:  Let's mark this next exhibit please.

13           COURT REPORTER:  31.

14           (Norden Deposition Exhibit Number 31 marked for

15  identification.)

16           BY MR. HENAULT:

17      Q    Let me know when you're done looking through this,

18  please, ma'am.

19           (Long pause.)

20           THE WITNESS:  Done.

21           BY MR. HENAULT:

22      Q    What has been marked as Exhibit 31 is a series of e-

23  mails but the top one is a message from Ms. Slomba to your

24  counsel, correct?

25      A    Correct.
```

1    Q    And the one directly below that is an e-mail from

2 your counsel to Ms. Slomba, right?

3    A    Correct.

4    Q    And I want to focus on the e-mail from your counsel

5 to Ms. Slomba.  This was sent on your behalf rejecting the

6 zoological registrant -- registration specialist position,

7 correct?

8    A    Correct.

9    Q    And the reason you rejected that is because you

10 didn't want to do a position that didn't utilize your

11 specialized knowledge and experience, correct?

12         MS. FANG:  Objection as to form.

13         THE WITNESS:  That's a part of the reason.  The

14 primary reason I rejected this was because I did not feel at

15 all qualified.

16         BY MR. HENAULT:

17    Q    Okay.

18    A    And when I saw it, I initially thought they had sent

19 me the wrong announcement, and then when I thought about it

20 more, I thought well maybe because the 1016 series zoology

21 somehow, you know, in somebody's mind said zoo, but the zoo is

22 primarily mammals and reptiles and amphibians, not insects, so

23 very different and reading through this announcement, the work

24 is very different from anything I had ever done and I did not

25 qualify for the position, I felt, and I would never apply for

1    Q    You can answer it.

2    A    Without specifics I, I can't answer you honestly.

3    Q    Okay.

4    A    It doesn't sound like entomology to me.

5    Q    Okay.  Now, if you look at Ms. Slomba's e-mail

6    contained at the top of Exhibit 31, where she says we have

7    looked for Smithsonian vacancies in that field, specifically

8    referring to entomological research, but the only vacancy

9    identified for which the personnel specialist thought she

10   might be qualified was this one at the National Zoo.  Are you

11   aware of any positions at the Smithsonian that were open since

12   July -- hang on one second please -- July 2nd, 2004?

13   A    Okay.  Well, let me point out that the summertime is

14   not the time where many positions are usually open because a

15   lot of people are on, you know, summer vacations.  It's not

16   the most active time.  I'm not aware during that period of

17   time what was available and what was not available.  I do know

18   there have been several positions that I would have been very

19   eager to take seriously but I wasn't aware of them until, you

20   know, after the fact.

21   Q    Okay.  I guess -- yeah, and my question was

22   specifically related to whether --

23   A    July --

24   Q    Let me, let me ask the question again because I'm

25   going to ask it a little differently.  Do you have any

1  evidence that there were any open positions in the 30 days

2  after July 7, 2004, that you were not offered?

3      A    Thirty days?

4      Q    Yes.

5      A    Is 30 days a special number?

6      Q    I'm just asking about 30 days, ma'am.

7      A    I know, and I'm trying to understand.  I, I'm not

8  aware what went on in those 30 days.

9      Q    Okay.  Fair, fair enough.  Fair enough.

10          MR. HENAULT:  Let's mark this next exhibit please,

11  32?

12          COURT REPORTER:  Right.

13          MR. HENAULT:  I think we may make it with your

14  current --

15          THE WITNESS:  Are we done with these?

16          MR. HENAULT:  Yes, ma'am.

17          (Norden Deposition Exhibit Number 32 marked for

18  identification.)

19          BY MR. HENAULT:

20      Q    Don't worry about putting them in order.  We'll take

21  care of that after the deposition.

22      A    I'm trying to be organized.

23      Q    Ma'am, what has been marked as Exhibit 32 is an

24  October 8, 2004 letter to you from Wayne Mathis, correct?

25      A    This is the separation letter?

1  be back in the work place in entomology --

2      Q    Okay.

3      A    -- full time again.

4           COURT REPORTER:  33.

5           (Norden Deposition Exhibit Number 33 marked for

6  identification.)

7           BY MR. HENAULT:

8      Q    Ma'am, take a look at what has been marked as

9  Exhibit 33, please.

10          (Long pause.)

11          THE WITNESS:  He does say disability retirement,

12  yes.

13          BY MR. HENAULT:

14     Q    Ma'am, let me ask a question.  What has been marked

15  as Exhibit 33, right, is an e-mail chain.  On top is an e-mail

16  from you to Mr. Johnson dated November 10, 2003, correct?

17     A    Yes.

18     Q    In this e-mail, below, directly below your response

19  to Mr. Johnson is an e-mail that Mr. Johnson sent to you.

20  Isn't that correct?

21     A    I don't remember this e-mail but I have no reason to

22  believe this is not accurate and correct.

23     Q    Okay.  And what is accurate and correct is that Mr.

24  Johnson said to you, I recommend you apply for disability

25  retirement and with confidence I believe OPM will rule/approve

1  in your favor.

2       A     Yes.

3       Q     Okay.

4       A     I see that and I believe that I had follow up

5  conversations with Department of Labor after I got this and

6  they, you know, advised me not to, to go this route.  I did

7  not remember that conversation with him.  I can tell you, this

8  was a very difficult situation for me, and as you can see, our

9  house had gone into foreclosure because of outstanding bills

10 that I wasn't able to pay, so I don't remember the disability

11 being discussed with him.  I know that it was something that I

12 was advised not to do.

13      Q     By whom?

14      A     I told you, there was a conversation with --

15      Q     Someone at the Department of Labor?

16      A     -- Audrey Fowler and then at Department of Labor,

17 yes.

18      Q     Okay.  Why, why would the Department of Labor tell

19 you you should not pursue disability retirement?

20      A     What I was told by Department of Labor was that

21 because of my age, being relatively young, and because of the

22 nature of my illness, they felt that I would be returnable to

23 the work place, if not entomology somewhere within the

24 Smithsonian and that if I took a disability retirement I would

25 end up losing, I would end up losing money.

1  home because I do keep --

2      Q     Now, you're aware, are you not, that if you get

3  employment your disability payments, Workers Comp payments

4  stop?

5      A     Absolutely.  I would love for the payments to stop

6  and a real paycheck to be coming in, yes, yes, and I'm under

7  obligation to notify them immediately, yes.

8      Q     Okay.

9          MR. HENAULT:  Let's take a 10 minute break.

10         THE WITNESS:  What time is it?

11         MR. HENAULT:  It is 5 minutes of 4.

12         (Whereupon, a brief recess was taken.)

13         MR. HENAULT:  Okay, back on the record.

14         BY MR. HENAULT:

15     Q     Ms. Norden, the work you did in support of Dr.

16  Krombein's research, that involved you being exposed to

17  naphthalene, correct?

18     A     Yes.

19     Q     Okay.  When did Dr. Krombein stop working in any

20  capacity at the Smithsonian to your knowledge?

21     A     I think I answered that earlier today but --

22     Q     Let me say, let me stop you there.  If, if this is a

23  repeat of questions I apologize but it's just something I

24  don't remember.

25     A     I did answer but there's been a lot of questions and

```
 1  a lot of answers.  He had been suffering from Alzheimers for a
 2  period of time.  We don't know how long but -- and reviews
 3  some of my concerns and some of the problems with Dr.
 4  Krombein.  When I went to Brazil on Ted's trip, he started
 5  having some very serious problems.
 6       Q    He being Dr. Krombein?
 7       A    Dr. Krombein, yes.  When we returned it was clear to
 8  me that he was not functioning or capable of functioning on
 9  his own in the museum anymore.  I actually had a meeting with
10  Scott Miller in his office the day before I had -- in
11  Georgetown Hospital and I remember it well because I was
12  sitting there and these huge hemorrhagic bruises were coming
13  out on my arms as I was just sitting there talking to Scott.
14       Q    And just one second.  So that would have been
15  September 2000, correct?
16       A    It, it was when we had just returned --
17       Q    Okay.
18       A    -- from the field in Brazil, so it was probably the
19  first week in September 2000, yes.
20       Q    Okay.
21       A    And the conversation with Dr. Miller was actually
22  about protecting Carl from getting hurt and also protecting
23  some of the specimens from being damaged if he, you know, fell
24  on them, and he kind of had an incident where he, he was
25  falling more and more and he could have a very serious
```

```
 1  accident.
 2        Q     Uh-huh.
 3        A     But then I ended up going to the hospital and I was
 4  out of action for a while and it was during that period of
 5  time -- I don't know specifically which day but at that point
 6  his daughter realized she could not drop him off at the museum
 7  in the morning anymore and pick him up at the end of the day.
 8  She needed to have him officially retire.  Well, he had
 9  already retired but leave, leave the office --
10        Q     And that was, that was sometime towards the latter
11  half of 2001?
12        A     So it was in --
13        Q     Or 2000, rather?
14        A     -- 2000 --
15        Q     Okay.
16        A     -- when he went out.  When things actually happened
17  because I was shocked.  I mean, I'm the one that was
18  responsible for his personal items getting -- daughter and it
19  was Saturday I met with the family to get all his personal
20  effects.  And his office had to be archived.  It wasn't just a
21  matter of cleaning up and sending specimens back.
22              Because of his stature and his years of service, the
23  National Archives had to have a lot of his important documents
24  and he had seven or eight file cabinets just filled with
25  letters and documents and things that had to go into archive,
```