## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BETH M. NORDEN,                                )
                                              )
      Plaintiff,                        )
                                              )
v.                                            )        No. 05-1232 (RMC)
                                              )
LAWRENCE  M. SMALL, SECRETARY                 )
  SMITHSONIAN INSTITUTION,                    )
                                              )
      Defendant.                        )
_____)

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, defendant Lawrence M. Small, in his official capacity as Secretary of the Smithsonian Institution, hereby opposes plaintiff's motion for summary judgment and cross-moves for summary judgment in his favor.

Defendant respectfully refers the Court to the accompanying memorandum in opposition to plaintiff's motion and in support of defendant's cross-motion, and to the enclosed response to plaintiff's statement of material not at issue and defendant's statement of material facts not at issue.  A proposed order is also included herewith.

November 24, 2006                    Respectfully submitted,


                                     _____/s/_____
                                     JEFFREY A. TAYLOR, D.C. Bar # 498610
                                     United States Attorney


                                     _____/s/_____
                                     RUDOLPH CONTRERAS, DC BAR #434122
                                     Assistant United States Attorney


                                     _____/s/_____
                                     JOHN F. HENAULT, D.C. Bar # 472590
                                     Assistant United States Attorney
                                     555 4th Street, N.W.
                                     Washington, DC 20530
                                     (202) 307-1249
                                     (202) 514-8780 (facsimile)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BETH M. NORDEN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 05-1232 (RMC) |
| ) | |
| LAWRENCE  M. SMALL, SECRETARY ) | |
| SMITHSONIAN INSTITUTION, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S**
**STATEMENT OF MATERIAL FACTS NOT AT ISSUE**

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h), defendant

hereby files this response to plaintiff's statement of material facts not at issue:

1.  Defendant disputes ths statement in paragraph 1.  Plaintiff initially received a fully

successful rating in 2002, which was withdrawn at her request and replaced with a narrative

rating that did not use the standard rating categories. See Exhibit 26 (Plaintiff's Performance

Appraisals).

2.  The statement contained in paragraph 2 is not in dispute.

3.  The statement contained in paragraph 3 is not in dispute.

4.  The statement contained in paragraph 4 is not in dispute.

5.  The statement contained in paragraph 5 is not in dispute.

6.  The statements contained in paragraph 6  are not proper for consideration on summary

judgment, as Ms. Norden is not a medical doctor and has no foundation to discuss the specific

medical diagnoses of her condition and the medical effect of that condition.  In fact, when asked

in deposition whether she still had dengue fever, plaintiff testified, "I'm not a medical person so

I can't really answer the medical terms."  Pltf's Depo. 139:23-140:1.  To the extent a response to paragraph 6 is required, the statements contained in paragraph 6 are not in dispute, with the caveat that the effects of the Dengue Hemorrhagic Fever ("DHF") on plaintiff were not permanent.  See Pltf's Stmt. of Facts ¶ 15 (stating that plaintiff no longer suffered from acute dengue infection in early 2002).

7.  The statements contained in paragraph 17 are not proper for consideration on summary judgment, as Ms. Norden is not a medical doctor and has no foundation to discuss the specific medical diagnoses of her condition and the medical effect of that condition.

8.  The statement contained in paragraph 8 is not in dispute.

9.  The statement contained in paragraph 9 is not in dispute.

10.  The statement contained in paragraph 10 is disputed.  The Smithsonian General Counsel's office did not make a determination that plaintiff was disabled.  Moreover, the alleged record evidence that plaintiff offers to support this proposition is *double* hearsay.  In fact, there is no competent record evidence regarding any legal advice from the Smithsonian Office of General Counsel.

11.  The statement contained in paragraph 11 is not in dispute as a factual matter for the September 2000 to November 2002 time frame, see Declaration of Ted Shultz ¶¶ 1 & 5, but is not relevant on the legal issue of plaintiff's alleged disability under the Rehabilitation Act.

12.  The statement contained in paragraph 12 is not in dispute.

13.  The statement contained in paragraph 13 is not in dispute.

14.  The statement contained in paragraph 14 is hearsay and, therefore, not proper for consideration in summary judgment.  To the extent a response is necessary, defendant admits

that plaintiff and her doctors conveyed to the Smithsonian that she could return to work with a limited, light duty schedule.  See Pltf's Stmt. of Fact ¶ 16 (asserting that plaintiff was approved for a 20 hour return to work schedule in early 2002).

15.  The statement contained in paragraph 15 is not in dispute.

16.  The statement contained in paragraph 16 is not in dispute, except for the statement regarding Ms. Norden's doctor's statements, which are hearsay and, therefore, not proper for consideration on summary judgment.

17.  The statements contained in paragraph 17 are not proper for consideration on summary judgment, as Ms. Norden is not a medical doctor and has no foundation to discuss the specific medical diagnoses of her condition and the medical effect of that condition.  In fact, when asked in deposition whether she still had dengue fever, plaintiff testified, "I'm not a medical person so I can't really answer the medical terms."  Pltf's Depo. 139:23-140:1.  To the extent that the Court considers plaintiff's statements on summary judgment, the statements are disputed by plaintiff's own deposition testimony.  In deposition, plaintiff admitted that she is able to care for herself when not debilitated by a migraine, and that she is only "debilitated" by a migraine for approximately three days a month, as she can control and alleviate the migraines with medication.  Pltf's Depo. 143:13-144:1.  Accordingly, plaintiff's condition is not "substantially limiting."  Moreover, the statement regarding Ms. Norden removing her consent to be an organ donor is not material to this case.

18.  The statement contained in the first sentence of paragraph 18 is not proper for consideration on summary judgment, as Ms. Norden is not a medical doctor and has no foundation to discuss the specific medical diagnoses of her condition and the medical effect of

that condition.  In fact, when asked in deposition whether she still had dengue fever, plaintiff

testified, "I'm not a medical person so I can't really answer the medical terms."  Pltf's Depo.

139:23-140:1.  The remainder of paragraph, which discusses a cat bite in July 2006 and its

effects on Ms. Norden are not material to this case, as the case involves Ms. Norden's work with

the Smithsonian, which ended in October 2004.

19.  The statement in paragraph 19 is not in dispute.

20.  The statement contained in paragraph 20 is not material to this case because it

involves a claim that was not properly exhausted and, therefore, not properly before this Court.

To the extent the statement is deemed material, defendant denies the statement contained in

paragraph 20, as the return to work plan in April 2002 provided plaintiff with a flexible schedule

that she helped put in place.  Pltf's Depo. 75:19-76:10.

21.  Defendant denies the statement contained in paragraph 21.  Notwithstanding

plaintiff's statement that she learned of her naphthalene sensitivities in April, plaintiff informed

Dr. Lawford at least as early as February 2002 that naphthalene was an issue for her.  Exhibit 27

(Feb. 12, 2002 Email from B. Norden to T. Lawford) ("I do think naphthalene is important

because most of the work Marc wants me doing involves the pinned collection . . .").

22.  The statement contained in paragraph 22 is not in dispute.

23.  The statement contained in paragraph 23 is not in dispute.

24.  The statement contained in paragraph 24 is disputed and not supported by the

evidence plaintiff cites.  The email to which plaintiff cites states that "[the Entomology

Department is] no longer adding naphthalene to the collections."  This is not "Smithsonian" or

"museum" policy.  Furth Declaration ¶¶ 2-3.

25.  The statement contained in paragraph 25 is not proper for consideration on summary judgment, as Ms. Norden is not a medical doctor and has no foundation to discuss the specific medical diagnoses of her condition and the medical effect of that condition, nor is she qualified to discuss the effect that naphthalene has on her from a medical standpoint.  In fact, when asked in deposition whether she still had dengue fever, plaintiff testified, "I'm not a medical person so I can't really answer the medical terms."  Pltf's Depo. 139:23-140:1.  Further, when asked about naphthalene in deposition, plaintiff responded that she was not qualified to discuss the chemical because she was "not a biochemist."  Pltf's Depo. 88:15-88:18.

26.  Defendant admits that plaintiff made certain requests between May 2002 and November 2002, but disputes the remainder of paragraph 26.  However, plaintiff did not receive a respirator because plaintiff herself informed Ms. Carol Youmans that Ms. Youmans should not order a respirator because her doctors were concerned it may cause her to faint.  See Declaration of Carol Youmans ¶ 11 ("Youmans Decl.").  Plaintiff also confirmed by email with Ms. Youmans on July 5, 2002 that Ms. Youmans was waiting to hear back from plaintiff *prior* to ordering a respirator because plaintiff has received varying medical opinions.  Youmans Decl. ¶ 12.  Following this email, plaintiff never requested from Ms. Youmans that she order the respirator.  Youmans Decl. ¶ 13.  Moreover, although plaintiff may have requested a portable air filter, the Smithsonian determined that such an air filter would not be effective for plaintiff.  See Exhibit 28 (October 17, 2002 Memo from K. Makos & Dr. Lawford).  Defendant further disputes that there was a vacancy in the insect zoo into which it could transfer plaintiff.  Declaration of Nathan Erwin ¶¶ 4-5 ("Erwin Decl.").  Defendant further dispute that the USDA

is a "sister research facility," as the USDA is an Executive Agency that is separate and distinct from the Smithsonian.

27.   The statements contained in paragraph 27 is not material to this case because it involves a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent a response is deemed necessary, the statement contained in the first sentence of paragraph 27 is denied; the respirator was not purchased because plaintiff herself advised Carol Youmans, not to purchase the respirator.  Youmans Decl.  ¶ 11.  Moreover, plaintiff confirmed to Ms. Youmans that Ms. Youmans should not purchase the respirator until Ms. Youmans heard back from plaintiff and plaintiff never subsequently requested that Ms. Youmans order the respirator.  Youmans Decl. ¶¶ 12-13.  Dr. Shultz was not responsible for purchasing a respirator, so he would not have purchased one were it purchased.  Youmans Decl. ¶ 9.  The statement contained in the second paragraph is denied, Ms. Norden received several accommodations from the Smithsonian, including testing 5th floor areas for naphthalene, Pltf's Depo. 78:1-78:8, transferring trays of specimens stored in her office into new drawers that were naphthalene-free, Pltf's Depo. 78:10-79:11; authorization to order a respirator, Youmans Decl., and suggesting plaintiff work in a ventilated room on the 4th floor, Pltf's Depo. 80:7-80:12.  Moreover, regarding the 4th floor ventilated room, Dr. Shultz advised plaintiff in writing on September 30, 2002 that, "[i]f you have problems with naththlene, I strongly encourage you to work with specimens in the ventilated room on the fourth floor.  This advise is based on conversations with Safety people."  Exhibit 29 (Sept. 30, 2002 Email from T. Shultz to B. Norden).

28.   The statements contained in paragraph 28 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court.

Moreover, the statements regarding her medical condition and her doctor's "beliefs" are not supported by competent, admissible evidence and, therefore, not proper for consideration on summary judgment. To the extent a response is necessary, the statements contained in paragraph 28 are disputed. Plaintiff herself testified at deposition that her migraines have decreased due to her medical treatments and her ability to control them through medication. Pltf's Depo. 141:25-143:8. Furthermore, defendant disputes that plaintiff was financially damaged by the return to full disability. The worker's compensation payments received by plaintiff were 75% of her before-injury income and were tax free, and expert testimony in this action evidences the fact that plaintiff actually suffered no economic damages by being returned to full disability or being terminated; plaintiff will received worker's compensation for life provided she does not return to employment, whereas she would not have received her salary for life.

29. The statements contained in paragraph 29 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent a response is deemed necessary, the statements regarding the medical advice of Ms. Norden's doctors are hearsay and, therefore, not proper for consideration on summary judgment.

30. The statements contained in paragraph 30 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent a response is necessary, defendant notes that, like plaintiff, Dr. Shultz is not a medical doctor and, therefore, not competent to testify as to the effects naphthalene had on plaintiff's medical condition.

31.  The statements contained in paragraph 31 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent that a response is necessary, the statements contained in the exhibit supporting paragraph 31 are hearsay and, therefore, not proper for consideration on summary judgment. Moreover, the statements contained in the exhibit do not support paragraph 31, Dr. Miller is referenced as saying plaintiff told the Smithsonian not to purchase the respirator, not that she refused to wear it.  See Exhibit 8 to Pltf's Stmt. of Fact.  See also Youmans Decl. ¶¶ 9-13.

32.  The statements contained in paragraph 32 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent a response is necessary, the statements contained in paragraph 32, defendant admits that the quoted portion of the paragraph reference its discovery response, and further admits that the response is supported by the Youmans Declaration.  See Youmans Decl. ¶¶ 9-13.

33.  The statements contained in paragraph 33 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent a response is necessary, the statements contained in paragraph 33 are admitted in part and denied in part.  Although plaintiff did send the email she references, plaintiff also declined the respirator by instructing Ms. Youmans not to purchase the respirator because wearing it made her faint.  Plaintiff then confirmed by email that Ms. Youmans was awaiting further instructions from plaintiff before purchasing a respirator.  Youmans Decl. ¶¶ 9-13.

34.  The statements contained in paragraph 34 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent a response is necessary, the statements contained in paragraph 34 are admitted;

8

plaintiff found that she could not wear a respirator and, therefore, advised Ms. Youmans not to purchase it on her behalf.  Youmans Decl. ¶¶ 9-13.

35.  The statements contained in paragraph 35 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent a response is necessary, the statements contained in paragraph 35 are denied. Plaintiff mischaracterizes the plain language of the document supporting her statement.  The document does not state that "the department was still attempting to purchase a respirator," it does says that the problem could be cured by *using* the respirator.  Pltf's Exhibit 12.  Moreover, as evidenced by plaintiff's own words, on July 5, 2002, plaintiff knew that Ms. Youmans was waiting for further instructions from plaintiff prior to ordering the respirator for plaintiff, yet plaintiff never provided those further instructions.  Youmans Decl. ¶¶ 12-13 & Exhibit 3 to the Youmans Decl.

36.  The statements contained in paragraph 36 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent a response is necessary, defendant admits that certain assistive devices would help plaintiff perform her work, including a respirator and a ventilation system whereby the naphthalene fumes are drawn away from the specimens on which she was working.  To the extent that plaintiff asserts that she required a portable air filter, the Smithsonian's Environmental Safety Office had determined that such an air filter would be ineffective for plaintiff and that the superior accommodation would be for plaintiff to use the 4th floor ventilated room.  Exhibit 28 (October 17, 2002 Memo from K. Makos & T. Lawford).

37.  The statements contained in paragraph 37 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent a response is necessary, the statements contained in paragraph 37 are disputed; Dr. Shultz testified that a computer would have been placed in the room plaintiff was directed to use upon her request.  Shultz Depo. Aug. 23, 2006 114:17-117:8.  In fact, in preparation for plaintiff's return to work in early 2004, the Smithsonian moved plaintiff's entire office to the 4th floor, thereby permitting her to do all work on the 4th floor.  Furth Decl. ¶ 15.

38.  The statements contained in paragraph 38 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent a response is necessary, the statements contained in paragraph 38 are denied, plaintiff was not denied a key.  Furth Decl. ¶ 4.  To the contrary, as set forth in Dr. Furth's declaration, had plaintiff asked, he would have assisted her in obtaining a key for the 4th floor. Furth Decl. ¶ 4.  Furthermore, plaintiff could have requested a computer be placed in the ventilated room and then, could have brought the specimens on which she was working to the ventilated room to work with.  Shultz Depo. Aug. 23, 2006 114:17-117:8.

39.  The statements contained in paragraph 39 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent a response is necessary, the statements contained in paragraph 39 are denied; the October 17, 2002 memo advising that a portable air filter would be ineffective and that plaintiff should use the fourth floor was addressed to plaintiff.  Exhibit 28 (Oct. 17, 2002 Memo from K. Makos and T. Lawford).

40.  The statements contained in paragraph 40 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent a response is necessary, the statements contained in paragraph 40 are denied.  A September 30 memo to plaintiff stated, "if you have problems with naphthalene, I strongly urge you to work with specimens in the ventilated room on the fourth floor.  This is advice is based on conversations with the Safety people."  Exhibit 29(Sept. 30, 2002 Email from T. Shultz to B. Norden).  Also the October 17, 2002 Memo from Kathy Makos and Dr. Lawford suggested that her office be re-located.  Exhibit 28 (Oct. 17, 2002 Memo from K. Makos and T. Lawford).

41.  The statements contained in paragraph 40 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent a response is necessary, the statements contained in paragraph 41 are denied, as there was no vacancy at the Insect Zoo for plaintiff to receive in 2002.  Erwin Decl. ¶ 3-5.

42.  The statements contained in paragraph 42 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent a response is necessary, the statements contained in paragraph 42 are admitted in part and denied in part.  The statements are admitted to the extent that they quote from the October 17 memorandum, although defendant respectfully directs the Court to the memorandum itself for the best evidence of its content.  To statements are denied to the extent that they claim plaintiff did not receive any accommodations for her naphthalene sensitivities; as explained in defendant's response to plaintiff's paragraph 27, defendant did make efforts to limit plaintiff's exposure to naphthalene and plaintiff in fact received accommodations for her naphthalene sensitivity.

11

43. The statements contained in paragraph 43 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent a response is necessary, the statements contained in paragraph 43 that are attributed to plaintiff's physician are hearsay and, therefore, not appropriate for consideration on summary judgment. Further, plaintiff's "belief" is not sufficient for summary judgment.

44. The statements contained in paragraph 44 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent a response is necessary, defendant admits that plaintiff received a memorandum on November 18, 2002 informing her that her light duty status would be terminated at the end of the month and that she would be returned to leave without pay status and, accordingly, could collect full workers compensation payments. See Exhibit 3 (Nov. 18, 2002 Memorandum from S. Miller to B. Norden).

45. The statements contained in paragraph 45 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent a response is necessary, defendant directs the Court to Exhibits 26, which are plaintiff's performance appraisals for the relevant time period.

46. The statements contained in paragraph 46 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent a response is necessary, the memorandum itself explained the rationale for the decision to return plaintiff to full disability status. See Exhibit 3 (November 18, 2002 Memorandum from S. Miller to B. Norden). Furthermore, the statement contained in paragraph 46 is disputed; after Dr. Miller provided the November 2002 memo to plaintiff, plaintiff asked

12

him questions about the memo and Dr. Miller responded to those questions.  Miller Depo. 86:9-86:21.

47.  The statements contained in paragraph 47 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent a response is necessary, the statements attributed to Dr. Lawford and his email are hearsay and double hearsay respectively and, therefore, not appropriate for consideration on summary judgment.

48.  The statements contained in paragraph 48 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent a response is necessary, defendant admits that plaintiff sent an email to Kathy Makos, Rudy Anderson, Ted Shultz and Carol Gover.  Plaintiff's email is contained at exhibit 18 to her Statement of Material facts.  Accordingly, defendant respectfully refers to the Court to the email for the best evidence of its content.

49.  The statements contained in paragraph 49 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent a response is necessary, the statements attributed to Dr. Lawford are hearsay and, therefore, not appropriate for consideration on summary judgment.  Moreover, the statements attributed to Dr. Lawford by plaintiff are incomplete and misleading.  In response to her question "After today, I am removed from light duty in my dept.  how do I know when it might be safe to return if it is the naphthalene which is activating my current blood problems?" Dr. Lawford wrote, "Re when might it be safe to return to (some) naphthalene. That is an issue where I am in standby waiting for your docs to take a lead in advising . . ..  However, when and if your docs

13

issue future advisories on this, I would then be most interest in conferring with them to establish a meeting of the minds. Once that occurs, I would forward their new advisory to management." Exhibit 19 to Pltf's Stmt of Fact.

50. The statements contained in paragraph 50 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent a response is necessary, the statements attributed to Ms. Gover's email are hearsay and, therefore, not appropriate for consideration on summary judgment. Also, plaintiff's selective quotations of Ms. Gover's email is incomplete and, accordingly, defendant respectfully refers the Court to Exhibit 20 to Plaintiff's Statement of Material Facts, which provides the best evidence of Ms. Gover's statements.

51. The statements contained in paragraph 51 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent a response is necessary, the statements contained in paragraph 51 attributed to a co-worker's email are **hearsay and double hearsay**, therefore, not appropriate for consideration on summary judgment.

52. The statements contained in paragraph 52 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent a response is necessary, the statements contained in paragraph 52 are admitted; plaintiff was informed by Smithsonian employees that she should advise the Smithsonian when she was cleared by her doctors to return to work full time. In deposition, however, plaintiff admitted that prior to her November 13, 2003 letter to Dr. Shultz, her doctors did not clear her to return to work full time and she never advised the Smithsonian that she was capable of returning

14

to work full time.  Pltf's Depo. 128:20-129:1 (confirming that although she told Dr. Lawford that her goal was to come back to work, plaintiff's doctors needed to make the determination that plaintiff was able to return to work); 110:17-111:6 (confirming that between November 2002 and November 2003, plaintiff never asked her doctors about returning to work full time).

53.  The statements contained in paragraph 53 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent a response is necessary, defendant responds that it anticipated restoring plaintiff to her position if she had recovered within one year, consistent with FECA requirements.  To the extent that plaintiff's statement characterizes comments made by Smithsonian employees by stating what they "seemed" to be saying, defendant respectfully refers the Court to the statements by Smithsonian employees, which are discussed in paragraphs 50 through 51 above.

54.  The statements contained in paragraph 54 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent a response is necessary, defendant disputes the statements contained in paragraph 54.  Plaintiff was advised by Smithsonian personnel that she should advise the Smithsonian when she was cleared by her doctors to return to work.  Additionally, defendant anticipated restoring plaintiff to her position if she had recovered within one year, consistent with FECA requirements.  To the extent that plaintiff professes a "reasonable" belief about her future, such a belief is not proper to support summary judgment.

55.  The statements contained in paragraph 55 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent a response is necessary, defendant anticipated restoring plaintiff to her position if

she had recovered within one year, consistent with FECA requirements. Additionally, plaintiff's statement regarding the reason for the Smithsonian's action is not supported by evidence and, therefore, not appropriate for summary judgment.

56. The statements contained in paragraph 56 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent a response is necessary, the statements attributed to a news letter are hearsay and, therefore, not appropriate for consideration on summary judgment.

57. The statements contained in paragraph 57 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent a response is necessary, plaintiff's "belief" is not sufficient for summary judgment, particularly in light of the regulations setting forth that restoration rights for employees receiving Workers Compensation are established by law and are not indefinite. See 5 CFR § 353.301.

58. The statements contained in paragraph 58 are not material to this case because they involve a claim that was not properly exhausted and, therefore, not properly before this Court. To the extent a response is necessary, defendant does not dispute that plaintiff "became increasingly depressed," but disputes that this increasing depression was attributable to any unlawful conduct on the part of defendant. To the contrary, defendant was following appropriate regulations.

59. Defendant admits that plaintiff first filed her informal complaint of discrimination in April 2003 alleging that the Smithsonian failed to accommodate her disability. Defendant denies, however, that the April 7, 2003 informal complaint alleged reprisal or retaliation. See Exhibit 5 (April 7, 2003 Informal Complaint of Discrimination). The fact that plaintiff began to

16

see Dr. Oberg in April 2003 is not relevant to this case.  Moreover, the statements attributed to

Dr. Lawford's memo to Dr. Oberg are hearsay and, therefore, not appropriate for consideration

on summary judgment.

60.  Defendant does not dispute that plaintiff has the mental health issues set forth in

paragraph 60, but disputes the legal conclusion that those conditions are attributable to any

unlawful conduct on the part of defendant.

61.  The statements contained in sentence of paragraph 61 are not proper for

consideration on summary judgment, as Ms. Norden is not a medical doctor and has no

foundation to discuss the specific medical diagnoses of her condition and the medical effect of

that condition.  In fact, when asked in deposition whether she still had dengue fever, plaintiff

testified, "I'm not a medical person so I can't really answer the medical terms."  Pltf's Depo.

139:23-140:1.  Accordingly, the statements contained in paragraph 61 are not proper for

consideration on summary judgment.  Furthermore, the statement that plaintiff became upset at a

deposition and counsel for defendant suggested that the parties take a break are not material to

this case; the fact that counsel for defendant showed compassion to plaintiff is not something

that can be held against defendant and, certainly, is not related to her treatment while employed

at the Smithsonian.

62.  Defendant admits that plaintiff's April 2003 complaint was denied as untimely, as

plaintiff's light duty status had been terminated more than 45 days prior to plaintiff's informal

complaint.

63.  Defendant admits that on November 5, 2003, a proposed removal notice was set to

plaintiff consistent with relevant regulations.  This proposed removal notice informed plaintiff

that she would be separated from the Smithsonian not earlier than 30 days from her receipt of the notice. See Exhibit 6 (Nov. 5, 2003 Letter from T. Shultz to B. Norden).

64. Plaintiff responded to the November 5, 2003 letter on November 13, 2003. See Exhibit 7 (Nov. 13, 2003 Letter from B. Norden to W. Mathis & T. Shultz).

65. The statements contained in paragraph 65 are not material to this case and are hearsay. To the extent a response is necessary, defendant admits that Dr. Shultz requested that he no longer be plaintiff's supervisor if she returned to full employment, and respectfully refers the Court to Exhibit 30 to Plaintiff's Statement of Material Facts.

66. Defendant admits that it requested plaintiff provide the Smithsonian with statements from her physicians regarding whether or not she was capable of returning to work at the Smithsonian.

67. Defendant admits that plaintiff submitted letters from her physicians in November 2003, after defendant proposed plaintiff's removal, advising that she was capable of returning to work with certain accommodations. See Exhibit 8 (Nov. 24, 2003 Letter from Dr. Oberg to Dr. Lawford); Exhibit 9 (Nov. 26, 2003 Letter from Dr. Granite to V. Fang). Contrary to plaintiff's assertions, neither of these letters state that plaintiff is capable of returning to work full time. In a December 23, 2003, memo Dr. Lawford reported to Marilyn Sloma, of Smithsonian Labor and Employee Relations, that he had spoken to both doctors and both doctors had assured him that plaintiff could return to work 40 hours. Exhibit 10 (Dec. 23, 2003 Memo from T. Lawford to M. Slomba). In this memo, Dr. Lawford expressed his medical opinion based upon conversations with plaintiff's treating physicians that plaintiff's "mental acuity has not returned to what one would expect of a Fulbright PhD scholar and should allow her to be fully functional in all of the

18

duties she had before this disease occurred." Exhibit 10 (Dec. 23, 2003 Memo from T. Lawford to M. Slomba).

68. The statements regarding "rumors" that plaintiff may have heard from unnamed co-workers are hearsay and, therefore, not appropriate for consideration on summary judgment.

69. Defendant admits that it sent plaintiff a proposed settlement agreement, which proposed that, in exchange for her agreeing to dismiss her EEO claims, the Smithsonian would agree to withdraw the notice of proposed termination. Exhibit 11 (Proposed Settlement Agreement). Slomba Decl. ¶¶ 3-6. The provisions of the proposed settlement agreement are standard settlement provisions. Slomba Decl. ¶ 7.

70. Defendant disputes that it was required to provide a work plan that would give plaintiff the duties she "desired." The proposed work plan provided plaintiff with duties that were consistent with her job title, grade level, and position description. See Exhibits 12 (work plan); 2 (position description) & 26 (Plaintiff's Performance Appraisals & Work Plans). To the extent that plaintiff asserts that the work plan did not involve research support, this claim is disputed. Furth Decl. ¶¶ 16-17. Further, plaintiff would have been permitted to use departmental resources for further her own independent research and writing. Shultz Decl. ¶ 6.

71. Defendant admits that the proposed work plan provided plaintiff with accommodations for her naphthalene sensitivities, but denies that the work plan and proposed return to work plan provided a portable air filter, which the Smithsonian Office of Environmental Safety had determined would be ineffective. See Exhibit 12 (work plan) & Exhibit 17 (proposed return to work plan). In fact. Dr. Lawford determined that the agreement provided plaintiff with "reasonable and appropriate" accommodations. Lawford Depo. 74:3-74:8; Exhibit 16 (Mar. 24,

19

2004 Email from T. Lawford to M. Slomba) ("Thank you for the opportunity to review the most recent agreement with Beth Norden. I have read it carefully, and all the medically related items appear to be reasonable and appropriate.").

72. Defendant denies that the proposed work plan would have increased plaintiff's exposure to naphthalene, as it provided accommodations for her chemical sensitivities. <u>See</u> Exhibit 12 (work plan). Moreover, Dr. Lawford concurred with the accommodations provisions contained in the proposed settlement agreement and later incorporated into the return to work proposal. Lawford Depo. 74:3-74:8; Slomba Decl. ¶ 5; Exhibit 16 (Mar. 24, 2004 Email from T. Lawford to M. Slomba) ("Thank you for the opportunity to review the most recent agreement with Beth Norden. I have read it carefully, and all the medically related items appear to be reasonable and appropriate.").

73. Defendant admits that the work plan provided deadlines for tasks assigned to plaintiff.

74. Plaintiff's "beliefs" are not sufficient for summary judgment, particularly in light of the sworn testimony establishing that the assigned tasks could and have been completed within the set deadlines. Shultz Depo. 268:10-293:6 (discussing the specific tasks associated with the work plan and the reason they could be completed in the listed time frames).

75. The statements attributed to Ms. Adams and a voicemail she allegedly left for plaintiff are hearsay and, therefore, not appropriate for consideration on summary judgment. In her affidavit, Ms. Adams states the reasons she prepared the work plan and included the provisions that she had included. <u>See</u> Declaration of Nancy Adams.

76. Defendant admits that the proposed settlement agreement contained certain benchmarks for plaintiff's performance and evaluations. See Exhibit 11 (proposed settlement agreement). Additionally, the proposed return to work plan and the work plan that were provided to plaintiff following the withdrawal of the settlement agreement also contained benchmarks for plaintiff's performance. Exhibit 12 (work plan) & Exhibit 15 (proposed return to work plan).

77. Plaintiff's "subjective belief" regarding the return to work proposal is not appropriate for consideration on summary judgment. Moreover, in deposition plaintiff examined the return to work proposal that she was provided after she rejected the proposed settlement agreement and admitted that there is no provision whereby she could be terminated for missing a deadline. Pltf's Depo. 173:20-174:1. The return to work plan and work plan itself were appropriate for plaintiff's position, title and job description, and contained the necessary accommodations for plaintiff's chemical sensitivities. See Exhibit 12 (work plan); Exhibit 15 (return to work plan)); Exhibit 2 (plaintiff's GS-11 job description); Exhibit 16 (Mar. 23, 2004 email from T. Lawford to M. Slomba advising that the "medically related items appear to be reasonable and appropriate.").

78. Plaintiff's category of leave accrual and the number of federal holidays in a calendar year are not material to this case.

79. Plaintiff's "distress" and "emotional and intellectual satisfactions" are not material to summary judgment. The proposed return to work agreement was appropriate for plaintiff's position and grade level, and consistent with her assigned duties. See Exhibit 17 (return to work proposal); Exhibit 2 (plaintiff's GS-11 job description). Moreover, defendant denies that

plaintiff would have been unable to research and write under the work plan.  Shultz Decl. ¶ 6; Furth Decl. ¶¶ 16-17.

80.  Defendant does not dispute that plaintiff may have suffered "severe emotional and psychical pain," but disputes that those conditions were caused by any unlawful conduct by defendant.  Moreover, reports by her doctor to the Department of Labor are hearsay and, therefore, not appropriate for summary judgment.

81.  Defendant admits that plaintiff filed an informal complaint of retaliation based solely upon the terms contained in the proposed settlement agreement on April 19, 2004.  Defendant denies, however, that there was anything retaliatory about the proposed settlement agreement.

82.  Defendant admits that it retracted the proposed settlement agreement when plaintiff would not accept it.  Defendant also admits that it issued plaintiff a new return to work agreement that did not involve her relinquishing any rights.  See Exhibit 17 (return to work agreement).

83.  Defendant admits that there were open positions at the Smithsonian in the April/May 2004 time frame, but denies that plaintiff ever asked to be considered for those positions.  Further, defendant disputes that plaintiff was qualified for these positions.

84.  Defendant admits that, upon the request to defendant by counsel for plaintiff in July 2004 that defendant search for any appropriate openings for which plaintiff may be qualified, defendant conducted a 30 day search and located one vacant position.  Defendant further admits that it provided plaintiff the opportunity to submit a statement of qualifications for that position so that she may be considered as a candidate.  Pltf's Depo. 188:13-189:5.

85.  Defendant admits that it did not "offer" the job to plaintiff and that it invited plaintiff to submit a  statement of qualifications for that position so that the Smithsonian could determine if she was qualified.  Had plaintiff submitted the statement of qualifications and the Smithsonian determined that plaintiff was qualified, plaintiff would have received the position without competition.  Pltf's Depo. 188:13-189:5.

86.  Defendant admits that plaintiff refused to submit a statement of qualifications for the single opening identified in the search conducted by defendant.

87.  Defendant admits that plaintiff refused to return to her position.  Defendant further admits that plaintiff was removed as an employee of the Smithsonian based upon her inability to perform the essential duties of her position.  Exhibit 25 (Oct. 8, 2004 Letter from W. Mathis to B. Norden).

88.  Defendant denies that the Smithsonian has the capability of offering plaintiff disability retirement.  Disability retirement something that is applied for through the Office of Personnel Management, not the Smithsonian.  At deposition in this case, however, plaintiff acknowledged that Michael Johnson, an employee with the Smithsonian Human Resources Department, informed plaintiff "I recommend you apply for disability retirement and with confidence, I believe OPM will rule/approve in your favor."  Pltf's Depo. 201:23-202:2. Plaintiff then claimed that she refused to follow Mr. Johnson's advice after she allegedly had a discussion with an unnamed employee of the Department of Labor.  Pltf's Depo. 202:3-202:25.

89.  The statement contained in paragraph 89 is not material to plaintiff's treatment while an employee of defendant .  To the extent a response is necessary, defendant admits that it responded to plaintiff's interrogatories by asserting a privilege for communications relating to

33

the proposed settlement agreement, but later withdrew that objection upon consultation between counsel and produced responsive information to plaintiff.

90.   The statements contained in paragraph 90 is not material to plaintiff's treatment as an employee of defendant.  To the extent a response is necessary, defendant admits that it responded to plaintiff's interrogatories by asserting a privilege for communications relating to the proposed settlement agreement, but later withdrew that objection upon consultation between counsel and produced responsive information to plaintiff.

November 24, 2006                          Respectfully submitted,


                                           _____/s/_____
                                           JEFFREY A. TAYLOR, D.C. Bar # 498610
                                           United States Attorney


                                           _____/s/_____
                                           RUDOLPH CONTRERAS, DC BAR #434122
                                           Assistant United States Attorney


                                           _____/s/_____
                                           JOHN F. HENAULT, D.C. Bar # 472590
                                           Assistant United States Attorney
                                           555 4th Street, N.W.
                                           Washington, DC 20530
                                           (202) 307-1249
                                           (202) 514-8780 (facsimile)

25

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BETH M. NORDEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05-1232 (RMC) |
| | ) | |
| LAWRENCE  M. SMALL, SECRETARY | ) | |
| SMITHSONIAN INSTITUTION, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————————— | ) | |

## DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT AT ISSUE

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h), defendant hereby files this statement of material facts not at issue:

1.  At all times relevant to this action, up to her termination in October 2004, plaintiff was a GS-11 Museum Specialist with the Department of Entomology of the Smithsonian Institution's National Museum of Natural History.  See Exhibit 1 (SF-50 effective 10/12/1997). As a GS-11 Museum Specialist, plaintiff's position was set forth in position description 39725. Declaration of David Furth ¶ 9; Exhibit 2 (position description 39725).

2.  In approximately September 2000, plaintiff contracted Dengue Hemorrhagic Fever ("DHF") on a work-related trip to Brazil.  Deposition of Beth Norden 68:13-69:24 ("Pltf's Depo.").

3.  Due to plaintiff's DHF, plaintiff was forced to take a leave of absence from work, and received worker's compensation payments funded by the Smithsonian.  Pltf's Depo. 72:9-72:13.

4.  In early 2001, plaintiff inquired of the Smithsonian about a return to work.  Pltf's Depo. 70:2-70:5.  For this 2001 return to work, plaintiff's physicians, in consultation with Dr.

Lawford, the Smithsonian's Occupational Medicine Doctor, determined that a limited duty, 12 hour per week schedule was best.  Pltf's Depo. 70:11-70:16.

5.  In March 2001, plaintiff in fact returned to work with a limited duty, 12 hour per week schedule.  Pltf's Depo. 70:17-70:19.   During her limited duty status, plaintiff received worker's compensation payments that were reduced by her salary.  Pltf's Depo. 72:14-72:19.

6.  Afer several months, plaintiff found that she was unable to continue with her work and returned to a complete leave without pay status in July 2001.  Pltf's Depo. 70:20-71:3; Pltf's Stmt. of Facts ¶ 8.

7.  In early 2002, plaintiff again began to explore with the Smithsonian the possibility of a second return to work.   Pltf's Depo. 73:7-73:10.

8.  In April 2002, plaintiff in fact returned to work ("2002 Second Return to Work").  Pltf's Depo. 73:13-73:22.  Upon her return, plaintiff was scheduled to work 20 hours per week.  Pltf's Depo. 74:2-74:3.

9.  At all times, both plaintiff and the Smithsonian believed that plaintiff's light duty status would be temporary and that she would return to work full time.  See Pltf's Depo. 103:25-104:3; Pltf's Stmt. of Facts ¶ 16 ("Both Dr. Norden and the Defendant understood that the light duty hours were temporary.")

10.  On November 18, 2002, because plaintiff's supervisors determined that the expectation that plaintiff would return to full time employment was not been met, Dr. Miller informed plaintiff that her light duty status would be terminated effective November 30, 2002.  Pltf's Depo. 106:12-106:23.  Exhibit 3 (November 18, 2002 Memorandum from Scott Miller to Beth Norden).

2

11.  On November 30, 2002, plaintiff's light duty status was in fact terminated and she returned to a full time leave without pay status, during which she would receive worker's compensation payments.  Exhibit 4 (SF-50 effective 11/30/02).

12.  Days after receiving the memorandum from Dr. Miller advising her that her light duty status would be terminated, plaintiff consulted with an attorney to discuss her situation.  Pltf's Depo. 118:8-119:1.  Following that consultation, plaintiff was referred to another attorney and formally retained that counsel in January or February 2003.  Pltf's Depo. 120:8-120:17.

13.  During the time period before, during and after plaintiff's return to work in 2002, and the termination of her light duty status in November 2002, there were Equal Employment Opportunity posters located in several locations in the Smithsonian's Natural History Museum, the museum in which plaintiff worked.  Declaration of Carol Youmans ¶¶ 4-7; Declaration of Tracey L. Cones ¶¶ 5-7.  Furthermore, the Smithsonian's Intranet contained a notice regarding employees' Equal Opportunity rights and responsibilities, and time frames for filing complaints.  Declaration of Karen Margensey ¶ 2.

14.  On April 7, 2002, more than four months after the termination of her light duty status, and her consultation with a lawyer, plaintiff, through an attorney, sought informal counseling with the Smithsonian's EEO office.  See Pltf's Depo. 112:19-112:25; Exhibit 5 (April 7, 2003 Application for Informal Counseling).  Prior to April 7, 2003, plaintiff had not filled out the form requesting informal counseling for alleged discrimination.  Pltf's Depo. 114:1-114:6.

15.  In her application for informal counseling, plaintiff identified November 30, 2002 as the date of the alleged discriminatory act.  Exhibit 5 (April 7, 2003 Application for Informal Counseling).

16.  On November 5, 2003, Dr. Shultz signed and sent to plaintiff a letter proposing that, not earlier than 30 days after plaintiff received the letter, she would be separated from the Smithsonian.  Pltf's Depo. 125:7-126:15; Exhibit 6 (November 5, 2003 Letter from Ted Shultz to Beth Norden).  Accordingly, as of the date upon which plaintiff would be removed from the Smithsonian as an employee, plaintiff would have been on leave without pay and receiving full worker's compensation payments for more than one year.  Pltf's Depo. 126:16-126:24.

17.  On November 13, 2003, plaintiff wrote a letter to Drs. Mathis and Shultz informing the Smithsonian that she wanted to come back to work and believed that she could return full time.  Pltf's Depo. 130:22-130:25; Exhibit 7 (November 13, 2003 Letter from Beth Norden to Wayne Mathis and Ted Shultz).

18.  From November 2003 to December 2005, plaintiff suffered from incapacitating migraine headaches for approximately three days per month.  Pltf's Depo. 143:13-143:22.  Other than these approximately three days per month, plaintiff was able to control her migraines with medicine.  Pltf's Depo. 143:23-144:1.  Additionally, for the remainder of any given month, other than the three days of migraines, plaintiff was capable of working.  Pltf's Depo. 144:2-144:8.  Plaintiff also testified that in December 2005, she received a treatment for her migraines that has improved them.  Pltf's Depo. 142:13-142:21.  Plaintiff further acknowledged that, other than the three days per month when she may be incapacitated due to migraines, she is fully capable of working full time.  Pltf's Depo. 144:2-144:8.  And, in fact, she has volunteered at a lab run by the USDA.  Pltf's Depo. 208:19-208:21.

19.  In November and December 2003, following plaintiff's request to return to work, Dr. Lawford, the Smithsonian's Occupational Medicine Doctor, received information from

4

plaintiff's doctors, including a November 24, 2003 letter from Dr. Oberg. Exhibit 8 (Nov. 24, 2003 Letter from D. Oberg to T. Lawford). The November 24 letter from Dr. Oberg, who is a licensed psychologist, recommended five things for plaintiff's return to work: (1) protection from exposure to naphthalene; (2) flexible scheduling to permit plaintiff to make up time lost due to migraines; (3) flexible scheduling to permit plaintiff to make up time for doctor appointments; (4) protection from retaliation and hostility; and (5) a "rehabilitative entry" to work consisting of a complete job description and names of line supervisors. Exhibit 8 (Nov. 24, 2003 Letter from D. Oberg to T. Lawford).

20. Dr. Lawford also received a November 26, 2003 letter from Dr. Granite. Exhibit 9 (Nov. 26, 2003 Letter from D. Granite to V. Fang). This letter advised that plaintiff "is a strong candidate for both flex time and control procedures to limit her exposure to naphthalene." Exhibit 9 (Nov. 26, 2003 Letter from D. Granite to V. Fang).

21. Dr. Lawford also spoke with plaintiff's doctors about her ability to return to work full time. Deposition of Thomas Lawford 43:21-44:6. Based upon his review of documentation from plaintiff's physicians and his conversations with plaintiff's doctors, Dr. Lawford wrote a memorandum to Marilyn Slomba of the Smithsonian's Labor and Employee Relations Department. Exhibit 10 (Dec. 23, 2003 Memo from T. Lawford to M. Slomba). In this memo, Dr. Lawford informed Ms. Slomba that plaintiff's "mental acuity has returned to 'what one would expect of a Fulbright PhD scholar' and should allow her to be fully functioning in all of the duties she had before the disease." Exhibit 10 (Dec. 23, 2003 Memo from T. Lawford to M. Slomba). Dr. Lawford also advised Ms. Slomba that plaintiff should receive protection from naphthalene and a schedule that permits her to make up time lost due to appointments with her

5

doctors and her migraine headaches.  Exhibit 10 (Dec. 23, 2003 Memo from T. Lawford to M. Slomba).

22.  From the beginning of plaintiff's illness, Dr. Shultz believed that plaintiff was suffering from some impairment or disability.  Shultz Decl. ¶ 1.  After receiving plaintiff's November 13, 2003 letter, however, and learning from Dr. Lawford that plaintiff was 100% able to return to her full range of duties, Dr. Shultz no longer believed that plaintiff was suffering from any impairment or disability.  Shultz Decl. ¶ 5.

23.  After negotiations between plaintiff and her counsel, and Smithsonian representatives about plaintiff's return to work full time, the Smithsonian proposed to plaintiff a Settlement Agreement.   Pltf's Depo. 153:23-154:14; Exhibit 11 (Proposed Settlement Agreement and General Release).  Pursuant to the terms of proposed settlement agreement, the Smithsonian would agree to withdraw the notice of proposed termination and permit plaintiff to return to work under specified conditions provided the plaintiff withdrew her EEO complaint. Exhibit 11 (Proposed Settlement Agreement and General Release).

24.  On the same day the Smithsonian transmitted the Proposed Settlement Agreement to plaintiff's counsel, it sent a Work Plan that outlined her duties and responsibilities upon her proposed return to work.  Pltf's Depo. 163:1-163:9; Exhibit 12 (Work Plan).  This work plan was developed and drafted by Nancy Adams, a GS-12 Museum Specialist.  Pltf's Depo. 164:16-164:21.

25.  Plaintiff objected to the terms of the proposed settlement agreement and informed defendant on April 19, 2004 that she would not sign it.  Exhibit 13 (April 19, 2004 Letter from V. Fang to M. Slomba).  Based upon the terms of the proposed settlement agreement, plaintiff

also filed a claim of retaliation. Pltf's Depo. 159:20-160:13; Exhibit 14 (April 19, 2004 Letter to E. Marshall from V. Fang).

26. On April 22, 2004, the Smithsonian withdrew the proposed settlement agreement and sent to plaintiff's counsel a return to work plan that did not contain terms relating to the waiver of plaintiff's EEO claim or the withdrawal of the November 2003 notice of proposed removal. Slomba Decl. ¶ 12; Exhibit 15 (April 22, 2004 Letter to V. Fang from M. Slomba). Although this April 22, 2004 return to work plan did not contain any of the waiver and settlement language from the proposed settlement agreement, it did contain all of the medically-related provisions that Dr. Lawford had advised were "reasonable and appropriate." Exhibit 16 (Mar. 24, 2004 Email from T. Lawford to M. Slomba). Compare Exhibit 15 (April 22, 2004 Letter to V. Fang from M. Slomba) with Exhibit 11 (Proposed Settlement Agreement and General Release).

27. Specifically, this proposed return to work plan set forth that, upon her return to work, plaintiff would be supervised by Nancy Adams, a GS-12 Supervisory Museum Specialist against whom plaintiff had never alleged retaliation or discrimination and for whom plaintiff had respect as a person and a scientist. Pltf's Depo. 166:17-167:18; Exhibit 17 (April 22, 2004 Proposed Return to Work Agreement). This April 22, 2004 return to work agreement and the April 8, 2004 work plan combined provided plaintiff with the names of her line supervisors and a complete job description, consistent with plaintiff's doctor's recommendation that "[r]ehabilitative re-entry would consist primarily of a complete job description and names of line supervisors." Exhibit 8 (Nov. 24, 2003 Letter from D. Oberg to T. Lawford); Lawford Depo. 74:3-75:7.

28. To comply with the recommendations of plaintiff's physicians, the April 22, 2004 return to work plan also offered to

> (i) provide Dr. Norden with a fitted respirator, similar to the one she had worn previously, that she agreed to use when accessing the collection cabinets; (ii) provide Dr. Norden with work space in the negative-pressure, ventilated Sorting Center, Room CE436; and (iii) relocate Dr. Norden's office to Room CE420, directly across from the Sorting Center on a floor that contains no permanent collection.

Exhibit 17 (April 22, 2004 proposed return to work plan).

29. The Smithsonian April 22, 2004 proposal also offered plaintiff a schedule whereby she could make up time missed due to doctor appointments and other unscheduled leave:

> Dr. Norden will have an Alternative Work Schedule (AWS) to facilitate the scheduling of her medical appointments and to assist her in making up unscheduled leave. Her schedule will be as follows: Monday-Friday, 8:00 a.m. to 5:30 p.m., with the second Friday of the pay period of and the first Friday as her 8-hour work day (8:00 a.m to 4:30 p.m.). Dr. Norden may work on the AWS day (second Friday) between 8:00 a.m. and 5:30 p.m. to make up any missed hours during the pay period. Dr. Norden will not perform work outside of these hours.

Exhibit 17 (April 22, 2004 proposed return to work plan).

30. The terms set forth by the Smithsonian in the Proposed Return to Work Agreement were entirely consistent with plaintiff's duties as a GS-11 Museum Specialist. Exhibit 2 (Plaintiff's Position Description).

31. On April 20, 2004, plaintiff's counsel informed the Smithsonian that plaintiff would not accept the terms of the proposed return to work agreement because she was unable to determine why the proposed return to work agreement was consistent with any doctor's recommendations. Exhibit 18 (April 30, 2004 Letter from V. Fang to M. Slomba). Specifically, plaintiff claimed that the agreement did not limit her exposure to naphthalene, did not offer the sort of work that plaintiff was performing prior to contracting dengue, did not

8

provide that plaintiff would be returned to an environment free of retaliation, and did not provide

plaintiff with a flexible schedule to accommodate medical appointments and migraines.  Exhibit

18 (April 30, 2004 Letter from V. Fang to M. Slomba).  Plaintiff also objected to the proposed

return to work plan because she allegedly would be "forced to report to a supervisor with far less

education and knowledge of Dr. Norden's field of expertise," see Exhibit 18 (April 30, 2004

Letter from V. Fang to M. Slomba).  Plaintiff's counsel also offered that "[m]uch of the

necessary limiting of Dr. Norden's naphthalene exposure could be accomplished by simply

returning her to her former research support position."  Exhibit 18 (April 30, 2004 Letter from V.

Fang to M. Slomba).

32.  Despite the unsupported claim in her April 30, 2004 letter that the agreement did not

comply with the recommendations of the doctors, undisputed and uncontradicted evidence in this

action is to the contrary – after his receipt of information from plaintiff's doctors, his

conversations with those doctors, and examining the medically-related accommodations being

proposed to plaintiff, Dr. Lawford informed the Smithsonian that those recommendations were

"reasonable and appropriate."  Exhibit 16 (Mar. 24, 2004 Email from T. Lawford to M. Slomba).

33.  Additionally, despite plaintiff's claim that the proposed return to work agreement did

not provide a flexible schedule, plaintiff admitted that at the time she reviewed the agreement,

specifically the terms providing a flexible, AWS schedule, she "was not aware that [she]

understood it."  Pltf's Depo. 172:19-173:9.  Moreover, after reviewing the agreement in

deposition, plaintiff agreed that the proposal would allow her to make up time missed during the

pay period.  Pltf's Depo. 173:4-173:19.  Regarding the flexibility of the AWS schedule, Dr.

Lawford testified that a plan with a "floating Friday that is make up time," in fact "complies with my recommendation for flex time with an adjustable schedule."   Lawford Depo. 57:3-57:18.

34.  Regarding her claim that the agreement did not return her to an environment free of alleged retaliation, plaintiff admitted that, under the proposal, plaintiff would be under the supervision of a GS-12 Supervisory Museum Specialist who was senior to plaintiff in grade, with whom plaintiff had a good relationship and respect for, and against who she had never alleged any sort of retaliation or discrimination.  Pltf's Depo. 166:17-167:18.

35.  Regarding her claim that she should be "given work similar to the work she performed prior to contracting dengue," and the claim that "[m]uch of the necessary limiting of Dr. Norden's naphthalene exposure could be accomplished by simply returning her to her former research support position," plaintiff acknowledge that the work she performed prior to contracting dengue in support of Dr. Krombein did in fact involve exposure to naphthalene. Pltf's Depo. 216:15-216:18.  Moreover, plaintiff admitted that she could no longer do the type of work she performed for Dr. Krombein because he was no longer at the Smithsonian.  Pltf's Depo. 216:19-218:15.

36.  In addition to providing the accommodations requested by her doctors, the proposed return to work plan would have still allowed plaintiff to use department resources to pursue research and writing of interest to her, particularly in light of the fact that the proposed return to work plan included working on bees, which were of particular interest to plaintiff.  Shultz Decl. ¶ 6.  Permitting plaintiff to perform independent research using departmental resources is something that plaintiff had done before, Pltf's Depo. 179:14-179:21, and was something that was afforded to all Museum Specialists, Shultz Decl. ¶ 6.

10

37. On June 9, 2004, the Smithsonian responded to plaintiff's rejection of the proposed return to work plan. Pltf's Depo. 180:14-180:23; Slomba Decl. ¶ 14;  Exhibit 19 (June 9, 2004 Letter from M. Slomba to V. Fang).  Prior to sending the June 9, 2004 letter, Ms. Slomba investigated the specific terms of the proposed return to work plan, including the claim that the proposed plan was a career change and was inconsistent with recommendations by plaintiff's doctors. Slomb Decl. ¶ 14.  Following her investigation of these matters, Ms. Slomba informed plaintiff that the agreement was in fact consistent with her position as a GS-11 Museum Specialist, that the flexible AWS schedule was in fact to facilitate plaintiff making up time missed for appointments and medical issues, and that the performance review schedule was designed to provide plaintiff with feedback on her progress towards meeting the performance goals. Exhibit 19 (June 9, 2004 Letter from M. Slomba to V. Fang).  The June 9, 2004 letter provided plaintiff with another copy of the proposed return to work plan.  Exhibit 19 (June 9, 2004 Letter from M. Slomba to V. Fang).

38. Ms. Slomba's June 9, 2004 letter also informed plaintiff that, if she intended to return to work at the Smithsonian, she should inform her proposed supervisor by July 7, 2004 and should plan to return to work by July 12, 2004.  Exhibit 19 (June 9, 2004 Letter from M. Sloma to V. Fang).

39. On July 7, 2004, plaintiff's counsel sent Ms. Slomba an email informing her that plaintiff did not intend to return to work by July 12, 2004.  Pltf's Depo. 183:9-183:23; Slomba Decl. ¶ 15; Exhibit 20 (July 7, 2004 Email from V. Fang to M. Slomba).  The July 7 email also asked Ms. Slomba whether there were any open positions at the Smithsonian that plaintiff could

11

qualify for.  Pltf's Depo. 183:16-183:23; Slomba Decl. ¶ 15; Exhibit 20 (July 7, 2004 Email from V. Fang to M. Slomba).

40.  Following the request by plaintiff's counsel that the Smithsonian check for vacant positions for which plaintiff may qualify, the Smithsonian informed plaintiff's counsel that it would review current Smithsonian federal vacancies for positions for which plaintiff may qualify prior to taking action on the proposal to remove plaintiff from her position.  Exhibit 21 (July 7, 2004 Email from M. Slomba to V. Fang).

41.  Following the receipt of plaintiff's resume, the Smithsonian conducted a vacancy search.  Slomba Decl. ¶¶ 16-18.  As part of this process, the Smithsonian identified only one vacant  position, a GS-9/11 Zoological Registration Specialist position at the National Zoo, for which it believed plaintiff may be qualified.  Pltf's Depo. 186:17-187:4; Exhibit 22 (September 8, 2004 Email from A. Davis to B. Norden).  Plaintiff admitted in deposition that she is not aware of any other vacant positions at the Smithsonian during the 30 days of the vacancy search. Pltf's Depo. 195:24-196:8.

42.  The Smithsonian sent to plaintiff and her counsel a copy of the vacancy announcement for the vacant position, and requested that plaintiff submit a statement responsive to the selective factors contained in the announcement.  Exhibit 22 (Sept. 8, 2004 Email from A. Davis to B. Norden); Exhibit 23 (Sept. 8, 2004 Email from M. Slomba to V. Fang).  The Smithsonian also informed plaintiff and her counsel that, if plaintiff submits the statement, and is deemed qualified for the position, she would not need to compete for the position.  Pltf's Depo. 188:3-189:9; Exhibit 23 (Sept. 8, 2004 Email from M. Slomba to V. Fang).

12

43.   On September 23, 2004, plaintiff's counsel informed the Smithsonian that plaintiff would not apply for the vacant position identified in the vacancy search.  Pltf's Depo. 189:22-190:15; Exhibit 24 (Sept. 23, 2004 Email from V. Fang to M. Slomba).

44.   On October 8, 2004, Wayne Mathis informed plaintiff by letter that he had considered the November 5, 2003 proposal to separate her from the Smithsonian, her response to that proposal, and her subsequent refusal to return to work in her Museum Specialist position or apply for the only vacant position located during the vacancy search.  Exhibit 25 (October 8, 2004 Letter from W. Mathis to B. Norden).  Based upon the factors set forth in Mr. Mathis' letter, plaintiff was terminated from the Smithsonian for her inability to perform the essential duties of her position.  Exhibit 25 (October 8, 2004 Letter from W. Mathis to B. Norden).

November 24, 2006                    Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, DC BAR #434122
Assistant United States Attorney


_____/s/_____
JOHN F. HENAULT, D.C. Bar # 472590
Assistant United States Attorney
555 4th Street, N.W.
Washington, DC 20530
(202) 307-1249
(202) 514-8780 (facsimile)

14

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BETH M. NORDEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05-1232 (RMC) |
| | ) | |
| LAWRENCE M. SMALL, SECRETARY | ) | |
| SMITHSONIAN INSTITUTION, | ) | |
| | ) | |
| Defendant. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF
DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT**

Plaintiff's first amended complaint alleges two counts: (1) failure to accommodate under section 501 of the Rehabilitation Act, 29 U.S.C. § 791, and (2) retaliation for participation in protected activity. See Am. Compl. ¶¶ 142-163. In general, plaintiff's amended complaint and motion for summary judgment complain about four issues. First, plaintiff complains that she was not accommodated when she returned to work in early 2002. Second, plaintiff complains that she was discriminated against when her Second Return to Work was terminated on November 30, 2002 and she was returned to full time leave without pay status. Third, plaintiff's motion complains that the terms of her April 2004 proposed return to work were retaliation for her participation in protected activity. Finally, plaintiff's motion alleges that her termination from the Smithsonian in October 2002 was retaliation for her participation in protected activity. As explained below, each and every claim fails and defendant is entitled to summary judgment. Conversely, plaintiff's motion for summary judgment must be denied.

First, plaintiff's claims relating to her 2002 return to work are time barred, as are her claims relating to the November 30, 2002 light duty termination. Pursuant to all applicable rules

and regulations, a federal employee is required to seek informal counseling and file an informal complaint of discrimination within 45 days of the discrete act giving rise to her claim.  Plaintiff herself acknowledges that she did not seek counseling and file an informal complaint of discrimination relating to the 2002 return to work and the termination thereof until April 7, 2003, well outside of the 45 day limitations period.  Thus, defendant is entitled to summary judgment on these claims and, therefore, plaintiff's motion for summary judgment relating to these claims must be denied.

Second, plaintiff's claims relating to the April 2004 proposed return to work are two-fold.[1]  First, plaintiff complains about a proposed settlement agreement that included settlement language requiring plaintiff to waive certain previously-filed EEO claims in return for the Smithsonian withdrawing her proposed termination.  Second, plaintiff asserts that the job duties set forth in the work plan were not consistent with her education and experience level.  These claims fail.  Once plaintiff objected to the terms of the settlement agreement, the Smithsonian withdrew that settlement agreement and provided plaintiff with terms that would govern her return to work; the Smithsonian did not impose the settlement agreement on plaintiff.  Moreover, once the settlement terms were withdrawn, and the Smithsonian issued the April 22, 2004 proposed return to work plan, plaintiff was provided with medically reasonable and appropriate accommodations and plaintiff's duties upon her return to work were entirely consistent with

---

[1]  As explained herein, the 2004 proposed return to work involved three separate and distinct documents.  On April 8, 2004, the Smithsonian sent plaintiff a proposed settlement agreement.  See Exhibit 11.  Also on April 8, 2004, the Smithsonian sent plaintiff a work plan. See Exhibit 12.  Finally, on April 22, 2004, after plaintiff rejected the proposed settlement agreement, the Smithsonian withdrew that proposal and sent plaintiff a proposed return to work plan that set forth the accommodations plaintiff would receive upon returning to work and contained no settlement or release terms.  Exhibit 17.

plaintiff's duties and job description as a GS-11 Museum Specialist at the Smithsonian Institution.  And, the Smithsonian had legitimate, non-discriminatory reasons for assigning plaintiff the tasks it did in the Proposed Return to Work Plan and Work Plan.  In fact, the true reasons plaintiff rejected the Proposed Return to Work Agreement are two-fold, neither of which has any relation to her chemical sensitivity: (1) plaintiff objected to the fact that the Smithsonian was "assigning Dr. Norden to work for a manager with far less formal education and knowledge of Dr. Norden's area of expertise that Dr. Norden has," Stmt of Mat. Facts ¶ 31, and (2) plaintiff was confused and did not understand the terms of the proposal, Def's Stmt. ¶ 33.

Finally, to the extent that plaintiff complains that her termination from the Smithsonian in October 2004 was retaliation for her protected activity, that claim also fails.  Plaintiff was terminated from the Smithsonian Institution after she *refused* to return to work in her existing position and *refused* to apply for the only position identified as open by the Smithsonian. Accordingly, plaintiff's employment was properly terminated and her claims relating to that termination fail.

In sum, as explained in detail below, defendant is entitled to summary judgment on each and every one of plaintiff's claims.  For the same reasons that summary judgment in defendant's favor is appropriate, plaintiff's motion for summary judgment must be denied.

## FACTS

Defendant hereby incorporates his Statement of Material Facts not at Issue ("Def's Stmt.") and his Response to Plaintiff's Statement of Material Facts not at Issue ("Resp. to Pltf's Stmt.").

## LEGAL STANDARDS

## I.     SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Tao v. Freeh, 27 F.3d 635, 638 (D.C. Cir. 1994).  Under the summary judgment standard, defendant, as the moving party, bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Plaintiff, in response to defendant's motion, must "go beyond the pleadings and by [their] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial."  Id. at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a

4

reasonable trier-of-fact could find for the nonmoving party.  Laningham v. U.S. Navy, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); Liberty Lobby, 477 U.S. at 251 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").  "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted."  Liberty Lobby, 477 U.S. at 249-50 (internal citations omitted).  "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment."  Williams v. Callaghan, 938 F. Supp. 46, 49 (D.D.C. 1996).  The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'"  Id. at 587 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

Importantly, "[w]hile summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial."  Morgan v. Fed. Home Loan Mortgage Corp., 172 F. Supp. 2d 98, 104 (D.D.C. 2001) (quoting Calhoun v. Johnson, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998) (internal citation omitted), aff'd, No. 99-5126, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 2000)); see also Marshall v. James, 276 F. Supp. 2d 41, 47 (D.D.C. 2003) (special caution "does not eliminate the use of summary judgment in discrimination cases") (citing cases).  "Summary judgment is not a

'disfavored procedural shortcut,' but is an integral procedural tool which promotes the speedy and inexpensive resolution of every case." Marshall, 276 F. Supp. 2d at 47 (quoting Celotex Corp., 477 U.S. at 327).

## II.    ESTABLISHING A PRIMA FACIE CLAIM OF DISCRIMINATION UNDER THE REHABILITATION ACT

To establish a prima facie case of discrimination under the Rehabilitation Act for failure to accommodate, a plaintiff must show (1) that she was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation she could perform the essential functions of the position; and (4) that the employer refused to make such accommodations. Edwards v. U.S. E.P.A., – F. Supp. 2d –, 2006 WL 2965507, *20 (D.D.C. Oct. 18, 2006); Thompson v. Rice, 422 F. Supp. 2d 158, 165-66 (D.D.C.2006). Thus, the two-fold threshold question under the Rehabilitation Act is (1) whether a plaintiff is an individual with a disability who (2) is "otherwise qualified" to perform his or her job. Mack v. Strauss, 134 F. Supp. 2d 103, 109 (D.D.C.), aff'd, 2001 WL 1286263 (D.C. Cir. 2001). See also 29 U.S.C. § 794(a).

In this case, plaintiff has presented *no record evidence* to establish that she was disabled under the Rehabilitation Act as of November 2003 or later.[2]  In fact, all evidence shows that plaintiff was *not* disabled under the Rehabilitation Act.  Moreover, even if plaintiff could establish that she is disabled under the Act, undisputed, material facts establish that she was not "otherwise qualified."  Therefore, she cannot establish a prima facie case and her claims under the Rehabilitation Act should be dismissed.  Finally, even of plaintiff could establish a prima

---

[2]  As explained herein, plaintiff's claims relating to actions in 2002 return to work are barred as not timely exhausted

facie case under the Rehabilitation Act, defendant had legitimate, non-discriminatory reasons for

its actions and plaintiff cannot establish pretext.

## III.    ESTABLISHING A <u>PRIMA</u> <u>FACIE</u> CASE OF RETALIATION

A plaintiff establishes a <u>prima</u> <u>facie</u> case of retaliation or reprisal by demonstrating that

(1) she engaged in protected behavior; (2) the employer took a materially adverse action against

plaintiff that a reasonable employee would believe was designed to dissuade a reasonable worker

from making or supporting a charge of discrimination; and (3) there is a causal link between the

adverse action and the protected activity.[3] <u>Rochon v. Gonzales</u>, 438 F.3d 1211, 1219-20 (D.C.

Cir. 2006). <u>See</u> <u>also</u> <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 126 S. Ct. 2405 (2006). The

D.C. Circuit recently clarified that Title VII's anti-retaliation provision pertains **only** to those

employer actions that are materially adverse to a reasonable employee or applicant. <u>Rochon</u>, 438

F.3d at 1219-20. Therefore, a plaintiff must demonstrate "materially adverse consequences . . .

such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively

tangible harm" which would have dissuaded a reasonable employee from making or supporting a

charge of discrimination. <u>Id.</u> at 1219 (citing <u>Brown</u>, 199 F.3d at 457).

## IV.    THE BURDEN SHIFTING ANALYSIS

For failure to accommodate cases under the Rehabilitation Act, the plaintiff "carries the

burden of proving by a preponderance of the evidence that she has a disability, but with a

reasonable accommodation (which she must describe), she can perform the essential functions of

[his] job." <u>Flemmings v. Howard Univ.</u>, 198 F.3d 857, 861 (D.C.Cir.1999); <u>Pantazes v. Jackson</u>,

---

[3] Prior to <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 126 S. Ct. 2405 (2006), and <u>Rochon</u>, a plaintiff was required to establish an adverse employment action to meet the second prong of the <u>prima</u> <u>facie</u> case test. <u>See</u> <u>Mitchell v. Baldrige</u>, 759 F.2d 80. 86 (D.C. Cir. 1985).

366 F. Supp. 2d 57, 66 (D.D.C. 2005).  If such evidence is produced, it is up to the employer to submit rebuttal evidence; the ultimate burden, however, remains with the Plaintiff.  Barth v. Gelb, 2 F.3d 1180, 1185-86 (D.C. Cir.1993) (explaining that the McDonnell Douglas framework is not proper for reasonable accommodation claims, and that such claims can be tested through the "application of traditional burdens of proof").  This approach, rather than the familiar McDonnell Douglas test, governs cases where the employer claims non-discriminatory reasons for its adverse employment action and (2) where the employer maintains that the employee is not an otherwise qualified individual with a disability, or that no reasonable accommodation is available, so that the plaintiff falls outside the scope of Act's.  Barth, 2 F.3d at 1186.

    The burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies, however, to claims of retaliation for protected EEO activity.  See Holbrook v Reno, 196 F.3d 255, 263 (D.C. Cir. 1999) (citing Carney v. The American Univ., 151 F.3d 1090, 1094 (D.C. Cir. 1998)).  Pursuant to McDonnell Douglas, once a plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate nondiscriminatory reason for the challenged action.  Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981) (defendant's burden articulated for Title VII cases).  The defendant's burden is one of production, not of proof.[4]  See Aka v. Washington Hosp. Ctr., 156 F.3d 1284 (D.C. Cir. 1998).  Thus, the defendant's burden is satisfied if he simply explains what he has

_____

    [4] Defendant's burden is a "relatively light burden," Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994), and it "need not persuade the Court that it was actually motivated by the proffered reasons."  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981).  See also St. Mary's, 509 U.S. at 509 ("[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment.").

8

done or produces evidence of legitimate, nondiscriminatory reasons for the action.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993).

Importantly, the ultimate burden of persuading the court that the defendant intentionally discriminated remains at all times with the plaintiff under both the Rehabilitation Act failure to accommodate test and the McDonnell Douglas test.  Barth, 2 F.3d at 1185-86; Hicks, 509 U.S. at 507; Aka, 156 F.3d at 1288.  Thus, even if a plaintiff establishes a prima facie case, the employer prevails unless the employee succeeds in discrediting the employer's explanation.  See Sami v. Billington, 195 F.3d 1, 3 (D.C. Cir. 1999).  To do so, the plaintiff must present objective evidence that undermines the defendant's proffered explanation for its actions and/or independent evidence of the employer's discriminatory intent.  See Aka, 156 F.3d at 1289.  Moreover, even if a plaintiff creates a genuine issue of material fact with respect to the employer's proffered reason, she will not always be deemed to have presented enough evidence to survive summary judgment.  Id. at 1290.  A "weak issue of material fact" regarding the employer's explanation will not prevail in the face of "abundant independent evidence" showing that no discrimination has occurred.  Id. at 1291.

Personal speculation of discriminatory intent or unsubstantiated allegations cannot create a factual issue of pretext.  Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999).  A denial of a defendant's articulated reason without substantiation for the denial also is insufficient.  Phillips v. Holladay Prop. Serv., Inc., 937 F. Supp. 32, 35, n.2 (D.D.C. 1996), aff'd, 1997 WL 411695 (D.C. Cir. 1997).

## ARGUMENT

I.    **PLAINTIFF'S CLAIMS RELATING TO THE 2002 RETURN TO WORK AND THE NOVEMBER 2002 TERMINATION OF LIGHT DUTY HOURS ARE TIME BARRED**

  A.    **Plaintiff Failed to Seek Counseling within the Required Time Frame Relating to the 2002 Second Return to Work and the November 30, 2002 Termination of Her Light Duty Status**

Federal employees may only file a civil action after exhausting their administrative

remedies before the concerned Federal agency.  42 U.S.C. § 2000e-16(c).  Under rulemaking

authority delegated by Title VII, see 42 U.S.C. § 2000e-16(b), the EEOC has "established

detailed procedures for the administrative resolution of discrimination complaints, including a

series of time limits for seeking informal adjustment of complaints, filing formal charges, and

appealing agency decisions to the Commission."  Bowden v. United States, 106 F.3d 433, 437

(D.C. Cir. 1997); 29 C.F.R. Part 1614 (Federal Sector Equal Employment Opportunity).  "In

addition to claims brought under Title VII, the administrative procedures established by the

EEOC apply to claims brought under the Rehabilitation Act."  Wilderson v. Snow, No. 04-0708

(RJL), 2006 WL 571930, *2 (D.D.C. March 7, 2006).  See also 29 U.S.C. § 794a(a)(1).

The EEOC's regulations provide that "aggrieved" employees or applicants for

employment who allege they have been discriminated against must first consult an agency EEO

counselor and file an informal complaint of discrimination before filing a formal complaint of

discrimination, and must do so within 45 days of the "matter alleged to be discriminatory or, in

the case of personnel action, within 45 days of the effective date of the action."  29 C.F.R. §

1614.105(a)(1).  As stated by the United States Supreme Court, a party must file a charge of

discrimination within the Title VII limitations period for each discrete act of discrimination

10

alleged or lose the ability to recover for it. <u>National R.R. Passenger Corp. v. Morgan</u>, 536 U.S.

101, 114-15 (2002). Although the 45 day requirement is not jurisdictional, and is more akin to a

statute of limitations subject to waiver and estoppel, courts in this jurisdiction since <u>Morgan</u> have

been steadfast in enforcing the exhaustion requirement. <u>See</u> <u>Wilderson</u>, 2006 WL 571930 at *2-

*4 (dismissing plaintiff's claims for failure to exhaust within the 45 day limitations period);

<u>Powell v. Castaneda</u>, 390 F. Supp. 2d 1 (D.D.C. 2005) (dismissing all unexhausted discrete acts

of discrimination for failure to meet the 45 day requirement); <u>Aceto v. England</u>, 328 F. Supp. 2d

1 (D.D.C. 2004) (same).

The fact that plaintiff's 2002 return to work did not work for the agency is not in dispute,

nor is the fact that on November 18, 2002, the Smithsonian informed plaintiff that effective

November 30, 2002, her light duty status would be terminated and she would be returned to full

time leave without pay status and continued to collect worker's compensation payments.

<u>See</u> Def's Stmt. ¶ 10; Response to Pltf's Stmt. ¶ 44 ("defendant admits that plaintiff received a

memorandum on November 18, 2002 informing her that her light duty accommodation would be

terminated at the end of the month and that she would be returned to full disability status"). The

parties also do not dispute that plaintiff , through counsel, did ***not*** file an informal complaint of

discrimination relating to the 2002 return to work and the termination of her light duty status

until ***April 7, 2003***. <u>See</u> Def's Stmt. ¶¶ 14 & 15; Resp. to Pltf's Stmt. ¶ 59 ("Defendant admits

that plaintiff filed her informal complaint of discrimination in April 2003 alleging that the

Smithsonian failed to accommodate her disability."). In fact, plaintiff's informal counseling

application even identified November 30, 2002 as the date of the discriminatory act giving rise to

the complaint. <u>See</u> Def's Stmt. ¶ 15. Given that plaintiff did not seek counseling until April 7,

2003, all claims for alleged discriminatory acts prior to February 21, 2003 are barred as untimely.    Plaintiff herself recognizes the fact that she failed to timely exhaust her claims relating to the 2002 return to work and the November 30, 2002 termination of her light duty hours.  In an attempt to save these claims, however, plaintiff asserts that her claims are valid under a "continuing violation theory," and that, if the continuing violation theory will not save them, her failure to timely exhaust them should be excused under the doctrine of equitable tolling.  Unfortunately for plaintiff, neither of these arguments carry the day.  Accordingly, summary judgment on plaintiff's claims relating to the 2002 Return to Work and the November 30, 2002 termination of plaintiff's light duty status are appropriate.[5]

### B.    The Continuing Violation Theory is Inapplicable in this Action

Under the continuing violation theory, a claim that alleges a wrongful act that occurred within the statute of limitations, but also alleges wrongful acts that occurred outside the limitations period, will not be time barred it the acts were committed in furtherance of a continuing wrongful act.  Felter v. Norton, 412 F. Supp. 2d 118, 125 (D.D.C. 2006).  Under this theory, however, the acts alleged must be actual acts committed, not effects of prior acts.  Id. See also Guerra v. Cuomo, 176 F.3d 547, 551 (D.C. Cir. 1999) ("Rather than continuing

---

[5] To the extent that the Court determines that plaintiff did timely exhaust her claims, and that they are properly included in this action, summary judgment in plaintiff's favor is not appropriate.  As explained in defendant's response to plaintiff's statement of material facts not in issue, defendant made reasonable attempts to accommodation plaintiff during the 2002 return to work.  See Resp. to Pltf's Stmt. ¶¶ 6-58.  In fact, undisputed facts show that the reason plaintiff did receive the respirator was because Ms. Youmans was waiting for further information from plaintiff prior to ordering the respirator and plaintiff never provided that further information. See Def's Stmt. ¶ 35.  Thus, if plaintiff's claims relating to the 2002 return to work are at issue, there are questions of fact relating to the reasonableness of the accommodations provided to plaintiff and plaintiff's failure to participate in the interactive process under the Rehabilitation Act, making summary judgment on those issues inappropriate.

violations . . . Guerra has suffered what amounts to 'continuing effects of past discriminatory acts.'") (quoting Dixon v. Anderson, 928 F.2d 212, 216 (6th Cir. 1991)); Dasgupta v. University of Wisconsin Board of Regents, 121 F.3d 1138, 1140 (7th Cir. 1997) ("A lingering effect of an unlawful act is not itself an unlawful act.").

In Morgan, the United States Supreme Court's most recent case addressing the continuing violation theory, the Court held that discrete acts of discrimination are **not** actionable if time barred, even if they are related to acts that are properly exhausted.[6] Morgan, 536 U.S. at 113. As explained by this Court in Coleman v. Potomac Elect. Power Co., 310 F. Supp. 2d 154, 159-60 (D.D.C. 2004) (Collyer, J.), "Morgan teaches that discrete claims of retaliation that are time-barred do not become timely by alleging one timely retaliatory act related to earlier, untimely, retaliatory acts." In fact, the D.C. Circuit "has clearly held that a plaintiff may not rely on the continuing violation theory where she was aware of the discriminatory conduct at the time it occurred." Schraeder v. Tomlinson, 311 F. Supp. 2d 21, 27 (D.D.C. 2004) (citing Taylor v. Fed. Deposit Ins. Corp., 132 F.3d 753, 765 (D.C. Cir. 1997) ("For statute of limitations purposes, a continuing violation is 'one that could not reasonably have been expected to be made the subject of a lawsuit when it fist occurred because the character of the violation did not become clear until it was repeated during the limitations period.")).

---

[6] The **only** case that plaintiff cites from this jurisdiction in support of her continuing violation theory is Armstrong v. Reno, 172 F. Supp. 2d 11, 20 (D.D.C. 2001). Armstrong is not relevant to this matter, as it was issued prior to Morgan, which unequivocally rejected the continuing violation theory set forth in Armstrong as to discrete acts, and stated that each discriminatory act starts a new clock for filing charges alleging that act. Morgan, 536 U.S. at 113.

There is no dispute that plaintiff's 2002 return to work was terminated on November 30, 2002.  There is also no dispute that as of November 30, 2002, plaintiff was returned to full leave without pay status because the Smithsonian determined, and informed plaintiff, that the light duty status was not working.  Whether the Smithsonian failed to accommodate plaintiff's naphthalene sensitivities during the second return to work, and whether the November 30, 2002 termination of that return to work was discriminatory, are issues of "discrete acts of discrimination" under Morgan and plaintiff was required to exhaust those claims within 45 days of their occurrence.  Quite simply, plaintiff may not allege a continuing violation theory for an alleged failure to accommodate her disability once she was placed on full time leave without pay status, as the failure, if any, took place before November 30, 2002 and plaintiff never requested to come back to work prior to April 7, 2002.  To the extent that there was anything discriminatory that occurred *after* the November 30, 2002 termination of light duty, it was merely the continuing effect of the November 30, 2002 termination, and not a separate act or series of separate acts of discrimination.

Because the continuing violation theory is inapplicable to plaintiff's claims relating to the 2002 Second Return to Work and the November 30, 2002 termination of her light duty status, plaintiff's motion for summary judgment on this issue should be denied and summary  judgment should be entered for defendant.

### C.     The Doctrine of Equitable Tolling in Inapplicable in this Action

"The running of the statute of limitations can be equitably tolled for a complaint filed after its expiration where a plaintiff demonstrates '(1) that [she] had been pursuing [her] rights diligently, and (2) that some extraordinary circumstance stood in [her] way.'" Felter, 412 F.

Supp. 2d at 126 (quoting <u>Pace v. DiGuglielmo</u>, 544 U.S. 408 (2005)).  The D.C. circuit has held that "extraordinary circumstances" require a showing that there were circumstanced "beyond the control" of the complainant that made it impossible to file a complaint.  <u>United States v. Cicero</u>, 214 F.3d 199, 203 (D.C. Cir. 2000).  "A plaintiff bears the burden of pleading and proving in the district court the equitable reasons for non-compliance with the [45] day requirement." <u>Williamson v. Shalala</u>, 992 F. Supp. 454, 458 (D.D.C. 1998) (quoting <u>Bayer v. United States</u> <u>Dept. of Treasury</u>, 956 F.2d 330, 333 (D.C. Cir. 1992)) (internal quotations omitted).

In this Circuit, equitable tolling for challenging acts of discrimination is reserved for "extraordinary and carefully circumscribed circumstances."  <u>Norman v. United States</u>, -- F.3d --, 2006 WL 3069125, *3 (D.C. Cir. Oct. 31, 2006) (denying equitable tolling in the FTCA context because plaintiff was not diligent in exercising his rights); <u>Mondy v. Sec'y of the Army</u>, 845 F.2d 1051, 1057 (D.C. Cir. 1988); <u>Washington v. Washington Metro Area Transit Auth.</u>, 160 F.3d 750, 753 (D.C. Cir. 1998); <u>Smith-Haynie v. District of Columbia</u>, 155 F.3d 575, 579-80 (D.C. Cir. 1998).  As explained by the Supreme Court, equitable tolling should be applied only "sparingly."  <u>Morgan</u>, 536 U.S. at 113; <u>Baldwin County Welcome Center v. Brown</u>, 466 U.S. 147, 152 (1984) (<u>per</u> <u>curiam</u>) ("Procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants.").

To avail herself of the doctrine of equitable tolling, plaintiff must prove that, "despite all due diligence [she was] unable to obtain vital information about her claim."  <u>Norman</u>, 2006 WL 3069125 at *3 .  Conversely, if a plaintiff "failed to exercise due diligence in preserving [her]

legal rights," equitable tolling should be denied.  Id. (quoting Irwin v. Dept. of Veterans Affairs, 498 U.S. 89, 96 (1990)).

Plaintiff asserts that she meets the "extraordinary and carefully circumscribed" circumstances required for equitable tolling because Smithsonian employees told her that she could return to work after she got better and her doctors told her she could return to work.  These comments have **_nothing_** to do with whether or not the termination of the light duty status was discriminatory, which is the analysis applicable to whether or not plaintiff diligently exercised her right to challenge the termination of the light duty status and can equitably toll the 45 day limitations period.

When the Smithsonian determined that the 2002 return to work was unsuccessful, and terminated plaintiff's light duty status on November 30, 2002, the reason for the termination was clearly explained in the letter to plaintiff; there were no misleading or inaccurate statements made.  In the November 18, 2002 letter, Dr. Miller explained to plaintiff that the termination of her light duty status was necessary because it had become obvious that she was unable to work full time, as all parties including plaintiff had anticipated.  Accordingly, Dr. Miller explained, "We regret that the Department cannot continue your limited duty status."  Def's Stmt. ¶ 10.

The plain language of Dr. Miller's November 18, 2002 memorandum clearly explained to plaintiff that her light duty status was being terminated because she was not meeting the Smithsonian's expectations.  There were no false or misleading statements, nor did the Smithsonian hide the reason for the decision.  To the extent that plaintiff viewed the termination of her light duty status as discriminatory, regardless of whether or not she believed that she

16

would return to work after she was fully capable, she was required to assert such a claim.[7]  In fact, plaintiff would potentially have had the availability of a discrimination claim relating to the discrete act of the termination of her light duty status regardless of whether or not she returned to work.

In deposition, plaintiff acknowledged that she sought counsel from an attorney just days after receiving the November 18, 2002 memo from Dr. Miller.  Def's Stmt. ¶ 12. Notwithstanding that plaintiff viewed the termination of her light duty as potentially discriminatory, and actually sought the advice of a lawyer relating to that action, plaintiff failed to request counseling and file an informal complaint of discrimination with the Office of Equal Employment and Minority Affairs until April 7, 2003, well outside of the 45 day requirement. Def's Stmt. ¶ 14.  In short, plaintiff chose not to exercise her right to assert a claim until **after** the limitations period had expired and there is no reason to equitably toll the 45 day limitations period.

Another indication that plaintiff simply failed to exercise her rights with diligence is the fact that nothing changed between the time plaintiff's light duty status was terminated in November 2002 and the time she actually sought informal counseling on April 7, 2003; plaintiff remained on full time leave without pay status, continued to collect worker's compensation payments, and did **not** inform the Smithsonian that she was medically capable of returning to work.

---

[7]  Plaintiff cannot allege that she was not knowledgeable about the procedures for challenging discrimination, as undisputed evidence in this action shows that there were informational posters regarding the EEO process in or around plaintiff's workplace and on the Smithsonian's intranet.  See Def's Stmt. ¶ 13.

Because there is no basis for applying the doctrine of equitable tolling to plaintiff's time-barred claims, summary judgment in defendant's favor is appropriate.[8]

## II.    PLAINTIFF WAS NOT "DISABLED" UNDER THE REHABILITATION ACT AS OF HER NOVEMBER 2003 REQUEST TO RETURN TO WORK

In her motion for summary judgment, plaintiff makes the broad statement that she was a person with a disability under the Rehabilitation Act.  In doing so, however, plaintiff fails to acknowledge that, notwithstanding that she may have suffered from an impairment or possibly a disability immediately following her contracting dengue fever, by the time she requested to return to work in November 2003, she was no longer suffering from a "disability" under the Rehabilitation Act.

Plaintiff's condition was not a "disability" requiring accommodation when she requested to return to work in November 2003.  Evidence of an impairment, such as a medical diagnosis, is insufficient by itself to establish a disability, as not all impairments are disabilities for purposes of the Rehabilitation Act or the ADA.  Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184 (2002); Sutton v. United Air Lines, Inc., 527 U.S. 471, 483 (1999); Albertson, Inc. v. Kirkingburg, 527 U.S. 555, 565 (1999).  Thus, those claiming protection under the Rehabilitation Act must do more than submit statements of a medical diagnosis; they must prove a disability by offering evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial.  Toyota, 534 U.S. at 198. The Supreme Court

---

[8]  Likewise, because plaintiff's claims relating to the 2002 return to work are time barred, plaintiff's motion for summary judgment on all issues relating to that period must be denied.  As explained at footnote 5, if the Court determines that the claims relating to the 2002 return to work are properly at issue, there are genuine disputes of fact relating to defendant's accommodations and plaintiff's failure to participate in the Rehabilitation Act interactive process.

explained that "to be substantially limited in performing manual tasks . . . an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." Id.  In addition, the impairment's impact must be "permanent or long-term."  Id. (citing 29 C.F.R. § 1630.2(j)(2)(ii)-(iii) (2001)).  The Supreme Court listed bathing, household chores and brushing one's teeth as examples of manual tasks central to daily life.  Id. at 201.

The United States Supreme Court refined the class of individuals covered by the ADA in recent years by deciding both Toyota, 534 U.S. 184 (2002) and Sutton, 527 U.S. 471 (1999).  Under Sutton, mitigating measures, such as medication, *must* be taken into consideration when determining whether a person's impairment substantially limits one or more daily life activities.  527 U.S. at 482-483.  Moreover, under Toyota, when determining coverage under the Act, courts cannot focus on how an impairment limits a major life activity, such as performing manual tasks, associated only with a particular job.  534 U.S. at 201-202.  The  inquiry, instead, must focus on whether a person's impairment limits activities that are "central to most people's daily lives," such as bathing, feeding oneself, etc.  Id

This means that the condition cannot be transient in nature.  Instead, Plaintiff must "prove a disability by offering evidence that the extent of the limitation [caused by the impairment] in terms of [her] own experience is substantial.'"  Id. at 201-02.  To qualify as "substantial," "the impairment's impact must also be permanent or long-term."  Id. at 201.  Here, Plaintiff cannot meet this definition.  Plaintiff does *not* have a physical impairment which substantially limits one or more of her major life activities.

In her motion for summary judgment, plaintiff asserts that she is "disabled" because she is "unable to work, learn or care for herself in many of her daily functions."  Pltf's Def's Stmt. Not at Issue ¶ 17.  Plaintiff's own deposition testimony, together with the undisputed statements to the Smithsonian physician from plaintiff's own treating physicians, however, contradict this assertion.  Regarding plaintiff's claim that she is unable to learn, plaintiff's own treating physician disagrees with her.  On December 23, 2003, Dr. Lawford, the Smithsonian's Occupations Medicine Doctor, advised the Smithsonian that, based upon his conversations with plaintiff's treating physicians, plaintiff was "now capable of performing her full duties for 40 hours per week."  Def's Stmt. ¶ 21; Exhibit 10 (Dec. 23, 2003 memo from T. Lawford, MD to M. Slomba).  Further, based upon this conversation, Dr. Lawford advised the Smithsonian that plaintiff's "mental acuity has now returned to what one would expect of a Fulbright PhD scholar and should allow her to be fully functional in all of the duties that she had before this disease occurred."  Def's Stmt. ¶ 21; Exhibit 10 (Dec. 23, 2003 memo from T. Lawford, MD to M. Slomba).  Accordingly, all record evidence on the subject of plaintiff's ability to learn and process things mentally evidences the fact that she was **not** disabled.

Regarding the effect of the migraines on plaintiff's ability to care for herself, i.e., bathe and cook, plaintiff conceded that, from November 2003 on, she was "incapacitated" due to the migraines for **only** three days per month.  Def's Stmt. ¶ 18.  Additionally, plaintiff acknowledged in deposition that during this period, she was, and is, able to control the effects of her migraine headaches with medicine.  Def's Stmt. ¶ 18.  Plaintiff also acknowledged that in December 2005, she received a treatment from her doctor for her migraines and that the treatment has improved them.  Def's Stmt. ¶ 18.  Finally, plaintiff acknowledged that, other than the three days per

month when she may be incapacitated due to migraines, she is fully capable of working full time. Def's Stmt. ¶ 18.

　　　To qualify as disabled under the Rehabilitation Act, a plaintiff must offer competent evidence that she is substantially limited in her major life activities.  Toyota, 534 U.S. at 196 ("'[S]ubstantially' in the phrase 'substantially limits' suggests 'considerabl[y]' or 'to a large degree.'").  In light of plaintiff's undisputed testimony regarding the effects of her migraines, it is clear that plaintiff's condition does ***not*** substantially limit her major life activities; her "incapacitating migraines" are relieved by medicine and, in fact, are only "incapacitating" for approximately three days per month.  See Swart v. Premier Parks Corp., No. 03-1048, 2004 WL 309335, *4 (10th Cir. 2004) (rejecting a claim of disability relating to migraines where plaintiff takes medication for the migraines and that medicine relieves her migraines all by two or three times a month); Dendinger v. State of Ohio, No. 05-4478, 2006 WL 3311284, *5 (6th Cir. Nov. 14, 2006) (rejecting the proposition that migraine headaches limit plaintiff's ability to engage in major life activities because "the need to lie down occasionally in a dark, quiet room is not akin to blindness or the inability to walk"); Rhoads v. F.D.I.C., 257 F.3d 373, 388 (4th Cir. 2001) (employee who suffers from migraines which are induced by smoke in her workplace is not "substantially limited" in her ability to work); Roeber v. Yakima, No. 00-36011, 2001 WL 1254984,*1 (9th Cir. Oct. 19, 2001) (evidence consisting of affidavit by plaintiff describing "essentially incapacitating" migraine attacks, which could be treated with medication insufficient to establish a disability under the ADA); Williams v. Stark County Bd. of County Com'rs., No. 99-4081, 2001 WL 302035. *5 (6th Cir. Mar. 23, 2001) (concluding that summary judgment was appropriate because, although migraine headaches were an "impairment," the migraines did not

21

"substantially limit major life activity," and, therefore, plaintiff was not disabled for purposes of ADA); Cash v. Smith, 231 F.3d 1301, 1306 (11th Cir. 2000) (affirming the grant of summary judgment against an ADA plaintiff because, even though "her diabetes, migraines, and depression . . . have had an adverse impact on Cash's life, there is no evidence that they have limited her in a major life activity" (footnote omitted)). Plaintiff's "evidence does not satisfy the 'demanding standard' of a disability under the Act." Olds v. Natsios, No. 04-1048 (JGP), 2006 WL 416157, *4 (D.D.C. Feb. 22, 2006).

Plaintiff also cannot show that she has a record of a permanent impairment. One has a record of a substantially-limiting impairment if he has a record of, or is misclassified as having such an impairment. 29 C.F.R. § 1630.2(k). Again, all of the plaintiff's medical documentation reveal that she suffered a condition which everyone believed would improve with time. Moreover, she was cleared to return to work by her own health care providers in November 2003. Def's Stmt. ¶¶ 19-21. Thus, there is no evidence that plaintiff had a "record of permanent impairment."

Furthermore, Plaintiff was not "regarded" as having such an impairment. A defendant "regards" an employee as disabled when the defendant deems the plaintiff as being unable to perform a class of jobs or a broad range of jobs. Sutton, 527 U.S. 471 (1999). One who is regarded as having a disability means having a physical or mental impairment that does not substantially limit major life activities but that is treated by an employer as constituting such a limitation; has a physical or mental impairment that substantially limits major life activities only as a result of the attitude of any employer toward such impairment; or does not have an impairment but is treated by an employer as having a substantially limiting impairment. 29

22

C.F.R. § 1630.2(1). There is simply no evidence that reveals that plaintiff was regarded as having an impairment following her request to return to work in November 2003. It is beyond dispute that plaintiff's supervisors believed plaintiff contracted a serious disease while in Brazil and that the disease rendered plaintiff unable to perform her job for several years. Def's Stmt. ¶ 22. However, all record evidence shows that plaintiff's supervisors believed plaintiff had recovered and, therefore, was 100% able to return to her duties following her request in November 2003. Def's Stmt. ¶ 22. At this time, plaintiff's supervisors no longer believed that she was suffering from an impairment or disability. Def's Stmt. ¶ 22. Accordingly, management expected plaintiff, based upon her own medical documentation, to be able to return to work and regarded her as having *recovered* from her impairment or disability. Therefore, plaintiff was not regarded as disabled in November 2003 and thereafter.

## III. EVEN IF PLAINTIFF CAN ESTABLISH THAT SHE WAS "DISABLED," SHE WAS NOT "OTHERWISE QUALIFIED" UNDER THE ACT

Even if plaintiff could establish that she was "disabled" under the Rehabilitation Act, she was not a "qualified individual with a disability," which means an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position and who can perform the essential functions of such position. Aka v. Washington Hospital Center, 156 F.3d 1284 (D.C. Cir. 1998) (en banc).

Here, the Smithsonian made a good faith proposal to plaintiff containing reasonable proposed accommodations that complied with her requests. Def's Stmt. ¶¶ 24 & 26. Undisputed evidence establishes that the proposed accommodations complied with the recommendations by plaintiff and her physicians. Def's Stmt. ¶¶ 26-29, 32 & 33. Specifically, plaintiff was offered a respirator to alleviate her sensitivities to naphthalene, the Smithsonian moved plaintiff's office to

23

the 4th floor, which contained no permanent collections with naphthalene, the Smithsonian

provided plaintiff with work space in the negative-pressure, ventilated room and also offered

plaintiff an AWS schedule whereby she could make up lost time.  Def's Stmt. ¶ 28-29.  These

accommodations were "reasonable and appropriate."  Def's Stmt. 26.  Plaintiff's rejection of

these accommodations means that she was ***not*** a qualified individual under the Rehabilitation

Act and her failure to accommodate claim fails.[9]  Schmidt v. Methodist Hosp. of Indiana, Inc,. 89

F.3d 342, 345 (7th Cir. 1996) (employee not "qualified" if she rejects reasonable

accommodations simply because they are not the accommodations of the plaintiff's choice);

Hankins v. The Gap, Inc., 84 F.3d 797, 801 (6th Cir. 1996) (plaintiff suffering from migraine

headaches who refused to take advantage of reasonable accommodations provided by employer

because they were not the accommodations of plaintiff's choice was not "qualified individual

with a disability ").

## II.    PLAINTIFF'S RETALIATION CLAIMS RELATING TO THE PROPOSED
       SETTLEMENT AGREEMENT AND THE PROPOSED RETURN TO WORK
       AGREEMENT MUST FAIL

In April 2004, after the Smithsonian had proposed plaintiff's removal in November 2003,

and then plaintiff requested to return to work, the Smithsonian presented plaintiff with a

proposed settlement agreement.  Def's Stmt. ¶ 23.  Under the terms of this proposed settlement

agreement, the Smithsonian agreed to withdraw the notice of proposed removal and permit

plaintiff to return to work in exchange for plaintiff dismissing her EEO claims against the

---

[9]  In deposition, plaintiff admitted that she did not even discuss all of these options with her treating doctors.  Pltf's Depo. 171:22-172:9.  Such an admission is a direct violation of Worker's Compensation Rules and Regulations.  See 20 C.F.R. § 10.503(d).

Smithsonian.  Def's Stmt. ¶ 23.  Further, the Smithsonian provided plaintiff with a separate work plan that set forth the parameters of plaintiff's duties upon her return to work.[10]  Def's Stmt. ¶ 24.

After her receipt of the proposed settlement agreement, plaintiff immediately objected to the settlement language, and filed a new claim of retaliation based upon that language.  Def's Stmt. ¶ 25.  Upon plaintiff's objection, however, the Smithsonian withdrew the proposed settlement agreement.  Def's Stmt. ¶ 26.

Plaintiff's claims relating to the proposed settlement agreement are separate and distinct from her claims relating to the proposed return to work plan and the work plan: (1) plaintiff claims that the terms of the proposed settlement agreement, which required her to dismiss her EEO claims in return for the withdrawal of the notice of proposed removal, are in and of themselves retaliatory and (2) plaintiff claims that the terms set forth in the proposed return to work plan are retaliatory because they are not the job duties that plaintiff had previously performed.  To avoid confusion, defendant will address these claims independently.

A.     **Plaintiff cannot Establish a <u>Prima</u> <u>Facie</u> Case of Retaliation Relating to the Terms Contained in the Proposed Settlement Agreement**

As set forth previously, plaintiff claims that the terms of the proposed settlement agreement, which required her to dismiss her EEO claims in return for the withdrawal of the notice of proposed removal, are in and of themselves retaliatory.  A plaintiff establishes a <u>prima facie</u> case of retaliation or reprisal by demonstrating that  (1) she engaged in protected behavior;

---

[10]  As stated previously, there are three separate and distinct documents at issue in the discussion of the April 2004 proposed return to work: (1) the proposed settlement agreement (Exhibit 11); (2) the work plan (Exhibit 12); and (3) the April 22, 2004 proposed return to work plan (Exhibit 17).  Although plaintiff's motion confuses the proposed settlement agreement and the return to work proposal they are separate and distinct and, accordingly, will be addressed separately.

(2) the employer took a materially adverse action against plaintiff that a reasonable employee would believe was designed to dissuade a reasonable worker from making or supporting a charge of discrimination; and (3) there is a causal link between the adverse action and the protected activity. Rochon, 438 F.3d at 1219-20.

It is undisputed that "[e]vidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount." Fed. R. Evid. 408. Moreover, "[e]vidence of conduct or statements made in compromise negotiations is likewise not admissible." Id. Plaintiff in this case seeks to establish a claim of retaliation premised **solely** upon the terms of a proposed settlement agreement. Thus, to establish that the Smithsonian is liable to her for retaliation, plaintiff offers the proposed settlement agreement itself.

There is no dispute of fact that the proposed settlement agreement was offered to plaintiff by the Smithsonian **in an attempt to resolve** her EEO claims against the Smithsonian. As part of the proposed agreement, the Smithsonian agreed to withdraw its proposal to remove plaintiff from her position, and plaintiff agreed to withdraw her EEO claim against the Smithsonian. The language used for the proposed settlement agreement is a standard provision intended to protect the Smithsonian from frivolous appeals if plaintiff had failed to meet the terms of the agreement. Slomba Decl. ¶ 7. In exchange for the Smithsonian receiving protection from frivolous claims, plaintiff would be returned to work with the proposal to remove held in abeyance. This is a perfectly appropriate settlement agreement. Independent Living Resources v. Oregon Arena Corp., 982 F. Supp. 698, 752 (D. Or. 1997) ("By definition, a settlement agreement is a

compromise under which both sides typically accept something less than they believe they were entitled to.").

There is also no dispute of fact that, upon plaintiff's objection to the release language contained in the proposed settlement agreement, the Smithsonian withdrew that proposed agreement. Thus the proposal was just that, ***a proposal only***. Accordingly, even if the Court were to permit plaintiff to base a retaliation claim on the language contained in the proposed settlement agreement, the Smithsonian took ***no*** materially adverse action against plaintiff – the proposed settlement agreement was withdrawn upon plaintiff's objection. Because the Smithsonian ***took no action*** against plaintiff relating to the proposed settlement agreement, plaintiff cannot establish the second prong required for a <u>prima</u> <u>facie</u> case of retaliation, i.e, that the Smithsonian took a materially adverse action against plaintiff that a reasonable employee would believe was designed to dissuade a reasonable worker from making or supporting a charge of discrimination**.**

To support her proposition that she can base an independent claim solely upon a proposed settlement agreement, plaintiff proffers that <u>Carney v. American University</u>, 151 F.3d 1090 (D.C. Cir. 1998), permits such a thing. In reality, however, <u>Carney</u> does no such thing and is entirely inapplicable to the instant case. In <u>Carney</u>, the D.C. Circuit held that materials disclosed during settlement discussions could be used as evidence of an independent violation revealed to plaintiff during the settlement negotiations. 151 F.3d at 1095. In contrast to <u>Carney</u>, plaintiff seeks to base her retaliation claim solely upon the terms of the proposed settlement agreement itself, specifically, the terms requiring plaintiff to forgo certain rights in exchange for the Smithsonian withdrawing its notice of proposed removal. Thus, plaintiff is not using

settlement letters as evidence of a different violation, plaintiff is seeking to use the language contained in the settlement agreement itself as the violation. This is improper. Ramey v. Potomac Elec. Power Co., No. 04-2088 (RJL), 2006 WL 1102836, *6 n.11 (D.D.C. Mar. 31, 2006) (Statements that plaintiff could return to work in exchange for dropping his action are not admissible evidence of retaliation because "offers of compromise or settlement are not probative of discriminatory or retaliatory intent."). Moreover, permitting a plaintiff to base an independent claim on an agency's desire to settle an administrative claim would deter settlement and eviscerate the purpose of the administrative phase of a claim of discrimination. Brown v. Marsh, 777 F.2d 8, 14 (D.C. Cir.1985) (exhaustion gives notice and affords the agency the opportunity to address claims).

### B.    The Smithsonian Had Legitimate, Non-Retaliatory Reasons for the Terms Contained in the Proposed Settlement Agreement

To the extent that the Court determines that plaintiff can state a claim of retaliation based upon the proposed settlement agreement, it is clear that the Smithsonian had legitimate, non-retaliatory reasons for the release language contained in the proposed settlement agreement. In November 2003, after plaintiff was on full disability for almost a full year, the Smithsonian proposed her removal as an employee. Almost immediately after receiving this proposal to remove, plaintiff requested to come back to work.

In an effort to provide plaintiff with part of the remedy she requested in her EEO complaint, i.e., return her to work, and to satisfy plaintiff's desire to not be removed as an employee of the Smithsonian, the Smithsonian proposed a settlement agreement. Under the terms of this proposed settlement agreement, plaintiff would withdraw her EEO complaint, while the Smithsonian would hold the proposed removal in abeyance. Plaintiff would also return to

work with her requested accommodations, and the Smithsonian would receive guarantees about plaintiff's performance. Quite simply, the Smithsonian had legitimate, non-retaliatory reasons for the proposed settlement agreement – it was giving up some of its rights, i.e, the right to terminate plaintiff after a two years of unsuccessful part time attendance and one year of full leave without pay, in exchange for plaintiff giving up some her rights, i.e., withdrawing her EEO complaint. This language is standard settlement and release language designed to protect the interests of the Smithsonian while simultaneously providing plaintiff with what she wanted. Slomba Decl. ¶ 7. This is a perfectly proper proposal. Independent Living Resources, 982 F. Supp. at 752 ("By definition, a settlement agreement is a compromise under which both sides typically accept something less than they believe they were entitled to."). Accordingly, defendant has legitimate, non-retaliatory reasons for the waiver provisions in the proposed settlement agreement and plaintiff cannot establish that they are pretext.

### C.    Plaintiff cannot Establish a Prima Facie Case of Retaliation Relating to the Terms of the April 22, 2004 Proposed Return to Work Plan and Work Plan

Plaintiff proffers that the terms of the proposed return to work plan and the work plan were retaliation for her participation in protected activity.[11] This claim cannot survive summary judgment, as plaintiff cannot establish a prima facie case of retaliation relating to the plan – the drafter of the work plan had no knowledge of plaintiff's EEO activity and, even if she did have such knowledge, plaintiff cannot show that the Smithsonian took a materially adverse action that would dissuade a reasonable employee from participating in protected activity.

---

[11] Again, the proposed return to work plan and the work plan (Exhibits 17 & 12 respectively) are separate and distinct from the proposed settlement agreement.

To establish a prima facie case of retaliation, plaintiff must show that the person taking the allegedly retaliatory actions had knowledge of her protected activity.  See Laboy v. O'Neill, No. 01-5322, 2002 WL 1050416, at * 1 (D.C. Cir. March 13, 2002) ("because the official responsible for ordering appellant's termination was unaware of appellant's prior EEO activity, appellant failed to establish a prima facie case of retaliation") (citing Breeden, 532 U.S. at 272-73) ("alleged discriminating official's knowledge of prior equal employment opportunity (EEO) activity must precede official's contemplating adverse action"); Chandamuri v. Georgetown Univ., 274 F. Supp. 2d 71, 85 (D.D.C. 2003) ("To prove that a causal connection existed between his activities and the alleged retaliatory action, [the plaintiff] must demonstrate that [the employer] knew of his protected activity and that the retaliation closely followed the protected activity."). It is undisputed that Nancy Adams, a GS-12 Supervisory Museum Specialist drafted the work plan setting forth plaintiff's duties upon her return to work.  Def's Stmt. ¶ 24. Moreover, the record is devoid of evidence that Ms. Adams had any knowledge of plaintiff's protected activity at the time she developed the plan.  To the contrary, all evidence is that Ms. Adams had *no* knowledge that plaintiff had participated in any formal or informal EEO activity. Adams Decl. p. 3.  In fact, Ms. Adams did not find out that there was any formal or informal EEO activity on plaintiff's part until after plaintiff was terminated from the Smithsonian in October 2004.  Adams Decl. pp. 3-4.  Because Ms. Adams did not have knowledge of plaintiff's EEO activity when she drafted the allegedly retaliatory work plan, plaintiff cannot establish causation and her claim of retaliation relating to the work plan fails.

Even if Ms. Adams had knowledge of plaintiff's EEO activity, however, plaintiff would still be unable to establish a prima facie case of retaliation – she cannot establish a materially

adverse action.  First, plaintiff asserts that the proposed return to work plan was retaliatory because it forced her to give up her EEO claim in exchange for the Smithsonian withdrawing her proposed removal.  Pltf's Mtn. p. 24.  The release language about which plaintiff complains was contained in the proposed settlement agreement and ***not*** included in the April 22, 2004 return to work plan sent to plaintiff after she objected to the proposed settlement agreement.   Def's Stmt. ¶ 26.  Accordingly, plaintiff cannot assert a retaliation claim on any release language relating to the April 22, 2004 return to work agreement.

Second, plaintiff complains that under the return to work plan, she could allegedly be fired for missing a deadline.  Pltf's Mtn. for Summary Judgment pp. 24-25.  In deposition, however, plaintiff admitted that the proposed return to work plan provided for ***no such thing***.  Pltf's Depo. 173:20-175:13 (acknowledging that the alleged termination for missing a deadline was not in the April 22 return to work plan, and acknowledging that she incorrectly "assumed" it was in the plan).[12]  Because plaintiff herself acknowledges that there was no language in the April 22, 2004 return to work plan providing for her to be fired for missing a deadline, she cannot assert a retaliation claim based upon such language.  To the extent that the return to work plan involved a review of plaintiff's performance and attendance every eight weeks, the plain language of the return to work plan itself states that the purpose of this review is to assess plaintiff's success in meeting the goals and provide feedback regarding the same.  Exhibit 17

---

[12]  The reason plaintiff incorrectly "assumed" that there was a provision in the April 22, 2004 return to work plan was because she had incorrectly interpreted the plain language of the proposed settlement agreement regarding the eight week evaluation cycle to mean she could be terminated for missing a deadline.  Although plaintiff may have interpreted the proposed settlement agreement in such a way, her interpretation was not reasonable and was contrary to the plain language of the proposed settlement agreement.  See Exhibit 11 (proposed settlement agreement).

(April 22, 2004 return to work plan). Thus, the eight week review provision is not a materially adverse action against plaintiff.

Third, plaintiff asserts that the April 22, 2004 return to work plan and the work plan itself limited plaintiff's work in such a way that she would no longer be able to research and write scholarly papers. Pltf's Motion for Summary Judgment p. 25. This argument is flawed for several reasons. First, plaintiff's own motion acknowledges that she is a "Museum Specialist" and would remain a "Museum Specialist" Pltf's Motion p.25. The duties set forth in the work plan are entirely consistent with the duties of a Museum Specialist. <u>Compare</u> Exhibit 2 (Job Description) <u>with</u> Exhibit 11 (Work Plan) <u>and</u> Exhibit 26 (plaintiff's work plans and performance appraisals). Second, as explained in the Shultz declaration, plaintiff would still be permitted to use departmental resources to pursue research and writing of her interest. Thus, to the extent that plaintiff can pursue a claim based upon her the alleged taking away of her "emotional and intellectual rewards," that claim is entirely without merit. Moreover, the work plan actually involved plaintiff working with bees, which were her specific area of interest. Adams Decl. p. 2. Thus, the terms of the work plan are not a materially adverse action.[13]

Finally, plaintiff alleges that under the return to work plan, plaintiff would allegedly lose her tenure and be returned to a probationary status.[14] Again, neither the return to work plan nor

---

[13]  In stark contrast to the facts of <u>Burlington Northern</u>,  case, which involved a transfer of a plaintiff to duties that the plaintiff had never performed, notwithstanding that the duties were technically contained in her position description, plaintiff in this action had performed the duties set forth in the return to work plan.

[14]  Plaintiff is once again confusing the language of the withdrawn proposed settlement agreement with the April 22, 2004 return to work plan. Although the proposed settlement agreement contained language about plaintiff's separation being held in abeyance, that language was not included in the April 22, 2004 proposed return to work plan.

the work plan say any such thing.  See Exhibits 17 (April 22, 2005 Return to Work Plan) &

Exhibit 12 (Work Plan).  Given that there is *no language* in either the proposed return to work

plan or the work plan to that effect, plaintiff cannot establish that she would lose tenure or be

returned to a probationary status.

> **D.    Smithsonian Had Legitimate, Non-Retaliatory Reasons for the Terms of the Return to Work Plan and Work Plan**

Even if plaintiff could establish a prima facie case of retaliation relating to duties set

forth in the work plan, defendant is still entitled to summary judgment on the claim; defendant

had legitimate, non-retaliatory reasons for the work plan.

Plaintiff asserts that the work plan provided for a change in duties from those that she

performed prior to her contracting dengue fever.  Compare Exhibit 2 (Job Description) with

Exhibit 11 (Work Plan) and Exhibit 26 (plaintiff's work plans and performance appraisals).

Prior to contracting dengue fever, plaintiff worked in her Museum Specialist position by

supporting the research of Dr. Karl Krombein.  As of late 2000, about the same time that plaintiff

contracted dengue fever, however, Dr. Krombein left the Smithsonian.  Pltf's Depo. 218:10-

218:14.  Accordingly, to the extent that plaintiff asserts that she should have been able to do the

same work she performed prior to contracting dengue fever, she could not do that work, as Dr.

Krombein was no longer there for her to support and plaintiff had to be assigned other duties.

Accordingly, to the extent that the Court determines that plaintiff's duties were changed by the

work plan, defendant had a legitimate, non-retaliatory reason for the change and plaintiff cannot

establish that the reason is pretext for discrimination.

### III. PLAINTIFF'S CLAIM RELATING TO THE OCTOBER 2004 TERMINATION FAILS

Regarding the October 2004 termination of plaintiff's employment with the Smithsonian, defendant does not contest plaintiff's ability to establish a prima facie case. However, defendant is still entitled to summary judgment because it had legitimate non-retaliatory reasons for the termination and plaintiff cannot establish that the reasons are pretext for discrimination.

In July 2004, plaintiff informed the Smithsonian that she would not return to her position under the return to work plan. Following plaintiff's refusal to return to work, the Smithsonian honored plaintiff's request to perform a vacancy search for other positions for which she may be qualified.[15] Def's Stmt. ¶¶ 40-42. There was only a single position identified during the vacancy search. Def's Stmt. ¶ 41. Plaintiff refused to submit a statement of qualifications for the position. Def's Stmt. ¶ 43. Accordingly, plaintiff had now refused to return to work in her Museum Specialist position with medically appropriate accommodations and refused to apply for the only vacant position identified following her request that the Smithsonian search for vacancies. Due to the fact that plaintiff refused to return and perform the duties of her Museum

---

[15] Although plaintiff's motion for summary judgment asserts that defendant had a duty under the Rehabilitation Act to find plaintiff another position, and requests summary judgment on that issue, that claim fails. First, as explained previously, plaintiff was not entitled to an accommodation under the Act because she was not "disabled" and was not "otherwise qualified"under the Act. Second, even if plaintiff was disabled and otherwise qualified, defendant had no duty to reassign plaintiff until "other efforts at accommodation have failed." Aka, 156 F.3d at 1301. All other efforts had *not* failed. Rather, plaintiff had *rejected* all medically reasonable and appropriate accommodations because she did not like them, not because they were not proper. An otherwise qualified disabled employee is only entitled to a reasonable accommodation, not the accommodation that employee most desires. Thus, there was no duty to reassign plaintiff. Because there was no duty to reassign plaintiff, her motion for summary judgment on that issue must fail.

Specialist position, defendant informed plaintiff on October 8, 2004 that she was being terminated as an employee of the Smithsonian. Def's Stmt. ¶ 44. Thus, effective October 15, 2004, plaintiff was removed as an employee from the Smithsonian. Because the Smithsonian had legitimate, non-discriminatory reasons for removing plaintiff from her position, and plaintiff cannot establish that the reasons are pretext for discrimination, summary judgment in defendant's favor on the termination claim is proper.

## <u>CONCLUSION</u>

For the foregoing reasons, defendant Lawrence Small respectfully requests that the Court enter summary judgment in his favor on each and every one of plaintiff's claims and deny plaintiff's motion for summary judgment on those same claims.

November 24, 2006                    Respectfully submitted,


                          /s/
                        JEFFREY A. TAYLOR, D.C. Bar # 498610
                        United States Attorney


                          /s/
                        RUDOLPH CONTRERAS, DC BAR #434122
                        Assistant United States Attorney


                          /s/
                        JOHN F. HENAULT, D.C. Bar # 472590
                        Assistant United States Attorney
                        555 4th Street, N.W.
                        Washington, DC 20530
                        (202) 307-1249
                        (202) 514-8780 (facsimile)