Alex T. Sliheet, D.C. Bar No. 438977
Vickie Inge Fang, *pro hac vice*
Attorneys for Plaintiff Beth Norden
8702 Nightingale Drive
Lanham, MD  20706
alexsliheet@yahoo.com
fvickie@comcast.net
(301) 552-4908

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Beth M. Norden, ) | Case No. 051232 (RMC) |
| ) | |
| ) | **PLAINTIFF'S OPPOSITION TO** |
| **Plaintiff** ) | **DEFENDANT'S MOTION FOR** |
| ) | **SUMMARY JUDGMENT /** |
| **v.** ) | **(PLAINTIFF'S REPLY BRIEF)** |
| ) | |
| Lawrence M. Small, ) | |
| ) | |
| **Defendant** ) | |
| ) | |

Dr. Beth Norden, by and through counsel, hereby submits this Points and

Authorities in Opposition to Defendant's Motion for Summary Judgment / Summary

Adjudication and as Reply Brief in support of Plaintiff's Motion for Summary Judgment.

Plaintiff states as follows:

<u>**Table of Contents**</u>                                              <u>**Page**</u>

I.      Dr. Norden's April 7, 2003, informal EEO complaint regarding defendant's
        failure to accommodate her naphthalene sensitivity was timely......................1

II.     Dr. Norden's impairments substantially limit her major life activities...............7

III.    Dr. Norden is an otherwise qualified individual who can do the essential
        functions of her job with reasonable accommodations.............................17

IV.     The Smithsonian's October 2004 termination was a discriminatory/retaliatory
        adverse employment action. ....................................................19

V.      The Smithsonian's informing Dr, Norden to apply for the Washington Zoo
        Job registering zoo and wildlife animals.........................................22

VI.     The Smithsonian's 2004 return to work plan ("RTWP").............................25

VII.    The Smithsonian: 1) failed to provide timely reasonable accommodations,
        and/or 2) failed to act in good faith in the interactive process from 2002
        through 2004...................................................................35

VIII.   Conclusion....................................................................45

**Table of Authorities**                                                    **Page**

Beck v. University of Wisconsin, 75 F. 3d 1130, 1135 (7th Cir. 1996)......................35

Bonura v. Chase Manhattan Bank, N.A. 795 F.2d 276, 277 (2nd Cir. 1986)..............24

Breen v. DOT, 350 U.S. App. D.C. 212, 282 F. 3d 839, 844 n.7 (D.C. Cir. 2002).......35

Briggs v . Henderson, 34 F. Supp. 2d 785 (D. Conn. 1999)....................................6

Bultmeyer v. Fort Wayne Cmty. Sch.,  100 F. 3d 1281, 1287, (7th Cir. 1996).........21,36

Burlington v. White, 126 S. Ct. 2405; 165 L.Ed. 2d 345 (2006)............................29

Carlson v. INACOM Corp., 885 F. Supp. 1314 (D.C. Neb. 1995)........................14

Carney v. American University , 151 F.3d 1090, 331 U.S.App.D.C. 416 (1998)..........29

Cash v. Smith, 231 F.3d 1301 (11th Cir. 2000) .................................................13

Cherosky v. Henderson, 330 F.3d 1243 (9th Cir. 2003)......................................1

Clayborne v. Potter, 2006 U.S. Dist. LEXIS 64448, *18 (D.D.C. 2006)....................4

Dendinger v. State of Ohio, 2006 WL 3311284, (6th Cir. 2006)............................11

Dutton v. Johnson County Board, 859 F. Supp. 498 (D.D. Kan. 1994)....................14

Elmenayer v. ABF Freight System, Inc., 318 F.3d 130 (2d Cir. 2003)....................1

Johnson v. Glickman, 155 F. Supp. 2d 1240 (D. Kan. 2001)................................6

Lloyd v. Chao, 240 F. Supp. 2d 1, 4 (D.D.C. 2002)..........................................6

(ii)

Mantolete v. Bolger, 767 F.2d 1416 (9th Cir 1985)...................................................15

Olds v. Natsios, 2006 WL 416157, *12-13 (D.D.C. 2006)...................................13

Otting v. J.C. Penney, 223 F.3d 704, (8th Cir. 2000)..........................................15

Pantazes v. Jackson, 366 F. Supp 2d 57 (D.D.C. 2005).........................3,4,18,34,35

Pritchard v. Southern Co. Servs., 92 F.3d 1130, 1134 (11th Cir. 1996).....................17

Rhoads v. FDIC, 257 F.3d 373, 388 (4th Cir. 2001)...........................................11

Roeber v. Yakima, 2001 WL 1254984 (9th Cir. 2001 )..............................................12

Shager v. Upjohn Co. 913 F. 2d 398, 405 (7th Cir. 1990) ...................................24

Stemmons v. Missouri Department of Corrections, 82F.3d 817 (8th Cir. 1996) ..........24

Stewart v. District of Columbia, 2006 U.S. Dist LEXIS 12991, *18  (D.D.C. 2006)......1

Sutton v. Potter, 2004 U.S. Dist. LEXIS 4656, *16-17 (N.D. Ill. 2004)....................4

Swart v. Premier Parks Corp., 2004 U.S. App. LEXIS 2964 (Cir. 10th 2004).............11

Taylor v. Phoenixville School District,
    184 F. 3d 296, 311 (3rd Cir. 1999)..............................10,18,20,22,23,34,35

Weldon v. Kraft, Inc., 896 F.2d 793, 799 (3d Cir. 1990)....................................21

Williams v. Stark County Bd. Of County Com'rs , 2001 WL 302035 (6th Cir, 2001).....12

### Plaintiff's Opposition Memorandum/Reply Memorandum

I.     **Dr. Norden's April 7, 2003, informal EEO complaint regarding defendant's failure to accommodate her naphthalene sensitivity was timely.**

    **A) The Smithsonian did not reject Dr. Norden's request for naphthalene sensitivity accommodations.**

For an employee's claim of a failure to provide a specific accommodation to accrue, the employer must reject the employee's request to provide that specific accommodation.  Stewart v. District of Columbia, 2006 U.S. Dist LEXIS 12991, *18 (D.D.C. 2006) (claim accrued on the first explicit rejection by defendant in January of 2002)  Elmenayer v. ABF Freight System, Inc., 318 F.3d 130 (2d Cir. 2003); Cherosky v. Henderson, 330 F.3d 1243 (9th Cir. 2003).   The Smithsonian has its own rules for denying an accommodation which are that "…the Responsible Smithsonian Official must fill out the **'Denial of Request'** form and give it to the individual…" (emphasis added) [Ex: 1, Smithsonian Procedures for Accommodations.] The "Responsible Smithsonian Official" assigned to address the reasonable accommodations and/or provide the "Denial of Request" form was Dr. Schultz, the "requesting employee's immediate supervisor." [Ex: 2, Smithsonian's Procedures for Accommodations] Dr. Norden never received such a "Denial of Request" form at anytime during the period 2002 through 2004 [Norden Aff., par. 17], and additionally, the Defendant did not otherwise **orally or in writing reject** Dr. Norden's requests for naphthalene sensitivity accommodations.  On the contrary, the Smithsonian actually emphatically and repeatedly indicated its approval of the request for naphthalene sensitivity

1

accommodations starting in April of 2002,[1] and the Smithsonian did not deviate from this

"approval" position, orally or in writing, until the Smithsonian issued a written termination letter

to Dr. Norden in October of 2004.[2] [Norden Aff., par 2]  Defendant's only action between Dr.

Norden's initial request for naphthalene sensitivity accommodation in April of 2002, and her April

2003, informal EEO complaint, was to remove Dr. Norden's light duty status accommodation on

November 29, 2002.  Under the case law cited above, the removal of the specific accommodation

of the light duty status on November 29, 2002, only accrues a claim for the removal of that

specific accommodation, i.e., light duty status.  **But Dr. Norden is not suing for the removal of**

**the light duty status accommodation.**  As defendant admits, both plaintiff and defendant knew

that the light duty status was a temporary accommodation and both expected the light duty status

to end at or near the end of the year of 2002. [Plaintiff's SMF No. 16 not in dispute]

Moreover, once the employee receives a rejection of a particular requested

accommodation, the employee cannot restart the accrual period for that particular

accommodation by asking again.  A contrary ruling would eliminate the concept of a limitations

period for failure to provide a particular accommodation.  See: Stewart, *18, Elmenayer,

---

[1]   This includes fitting Dr. Norden for a respirator in May of 2002, stating on Dr. Norden's evaluation that the naphthalene accommodations were forthcoming on July 22, 2002, and Dr. Schultz telling Dr. Norden in the same month that she was removed from her light duty status in November of 2002, that the respirator and the air filter were on the way. [Norden Aff., par.3]

[2]   Obviously, an employer's termination of an employee puts the employee on notice that the employer is not going to accommodate anything, is a rejection of all accommodations, and thus accrues any claim.

2

Cherosky, supra.  To avoid this law, defendant argues that removal of Dr. Norden's light duty

hours accrued her claim for naphthalene sensitivity accommodations because she was only

requesting naphthalene sensitivity accommodations for the year 2002.  However, it is undisputed

that Dr. Norden needs accommodations for naphthalene sensitivity whenever she works at her job

in the Entomology Department, and that her need for naphthalene sensitivity accommodations is

not limited to a particular period. *The naphthalene sensitivity accommodation is not a short term*

*accommodation which was limited to the 2002 year.*  [Norden aff. Par.3]  Under Stewart, *18,

Elmenayer, Cherosky, supra, had the Smithsonian **hypothetically** told Dr. Norden **no** to her April

2002 request for naphthalene accommodation, then Dr. Norden would be barred from asking for

the same accommodation again in 2003 and thereby accruing a new claim, on the argument that

her 2002 request for the naphthalene accommodations was limited to the 2002 year.  The

Smithsonian must also be barred from making this same argument for Dr. Norden and solely for

its own benefit.  The argument is barred no matter who brings it.  The case law does not allow Dr.

Norden to limit her request to a particular year, and the Smithsonian is also not allowed to limit

Dr. Norden's request to a particular year.  Dr. Norden's failure to accommodate claim is that the

Smithsonian took years, 2002-2004, and never provided her with accommodations for her

naphthalene sensitivity recommended by both her doctors and the Smithsonian's own consultants.

See e.g., Pantazes v. Jackson, 366 F. Supp 2d 57 (D.D.C. 2005) denying the employer's summary

judgment motion on Pantazes' failure to accommodate claim which was that ("the employer took

years to provide him with the accommodations recommended by both his doctors and the

3

employer's own consultants.")  See also <u>Sutton v. Potter,</u> 2004 U.S. Dist. LEXIS 4656, *16-17

(N.D. Ill. 2004):

> "…At a minimum, Sutton argues that her receipt of OWCP disability benefits until July
> 2000 should excuse her from the requirement to file an EEO complaint till that
> point….Sutton's argument has some merit. While USPS is correct that a job transfer
> constitutes a single act inappropriate for the continuing violations doctrine, what is at issue
> here is a *failure to transfer or otherwise reasonably accommodate.* Unlike a job transfer,
> which happens on a precise date, the discrimination allegedly suffered by Sutton took the
> form of a required event *not happening* over an extended, continuous length of time.
> There  was no definitive temporal marker distinguishing for Sutton at what moment
> USPS' failure  to accommodate ceased to constitute the normal and expected
> administrative delay or red-tape associated with the process of reasonably
> accommodating, and started characterizing disability discrimination instead. Therefore,
> the Court finds that the discrimination Sutton suffered did constitute a "continuing
> violation."

"The duty to accommodate is a continuing duty …" <u>Clayborne v. Potter,</u> 2006 U.S.

Dist. LEXIS 64448, *18 (D.D.C. 2006) as acknowledged by the Smithsonian PMQ testimony

that the Smithsonian was continually trying to accommodate Dr. Norden during the 2002-2004

time period. [Plaintiff's MSJ, Ex:23, Ex: 3, Schultz depo, p. 14:ln 3-9]  The duty to accommodate

also mandates a back and forth interactive process in good faith.  Bad faith in the interactive

process is an independent violation of the Rehabilitation Act.  See: <u>Pantazes v. Jackson</u>, 366 F.

Supp 2d 57, 70 (D.D.C. 2005)   As to her naphthalene sensitivity accommodations, Dr. Norden

tried to keep the interactive process alive after receiving notice of the removal of her light duty

hours, engaged in the following actions, and received no response on her questions as to the

naphthalene accommodations:

1) As soon as Dr. Norden received the memo on November 18, 2003, she asked three

4

supervisors, Dr. Miller, Dr Mathis and Dr. Schultz, why the light duty status was ending and what she needed to do to return to the Smithsonian.  Neither of the three supervisors responded to her questions. [Norden aff., par. 5]

2) On November 29, 2002, Dr. Norden sent an email to numerous people including Dr. Schultz, Dr. Miller, Dr. Mathis, **Carol Gover (of the Smithsonian Office of Equal Employment and Minority Affairs OEEMA),** Smithsonian consultant Dr. Lawford, asking among other things: "How do I know when it might be safe to return if it is the naphthalene which is activating my current blood problems?"  And "Will anything dealing with my exposure be different upon return, or is my return based upon no longer being sensitive to naphthalene?" [Ex: 5]  Although a few people did respond by email, no one answered either question.  [Plaintiff's MSJ, Ex: 19 and 20]  On  April 7, 2003, Dr. Norden filed an informal complaint with the EEO on a continuing failure to accommodate her naphthalene sensitivity accommodations.  Dr. Norden filed a formal complaint on August 20, 2004, and described the failure to accommodate her naphthalene sensitivity as ongoing.  [Ex: 3]

**B) Dr. Norden  "initiated  contact" within the 45 days.**

From her receipt of the November 18, 2002, letter through November 29, 2002, Dr. Norden engaged in the interactive process regarding her naphthalene accommodations as described above, and she initiated contact: 1) with three of her supervisors, 2) with the Smithsonian Ombudsman Chandra Heilman, 3) with Dr. Lawford of the Office of Safety and Environmental Management, 4) **with Carol Gover, Smithsonian Program Manager of the**

5

**Office of Equal Employment and Minority Affairs – OEEMA.**[3]  Under the Smithsonian's

own rules, OEEMA is supposed to consult with the "Responsible Supervisor" for

accommodations.  [Ex:4, Smithsonian Accommodation Procedures]   When Dr. Norden initiated

contact with all of these individuals as described above, she spoke of her uncertainty of her future,

her lack of receiving accommodations for her naphthalene sensitivity and her lack of knowledge of

the defendant's position as to whether such accommodations would be forth coming in the future.

[Norden Aff., par.5] This is sufficient conduct to "initiate contact" within the 45 day rule as was

held in Lloyd v. Chao, 240 F. Supp. 2d 1, 4 (D.D.C. 2002):

> "Here, Lloyd alleges that she brought the sexual harassment and hostile environment
> claims arising out of Scott's actions to the attention of two supervisors in May 1998.
> Accepting Plaintiff's allegations as true, as the Court must in a motion to dismiss, Plaintiff
> has therefore alleged that she put the Department of Labor on notice of her complaints
> and afforded the agency an opportunity to resolve them. In so doing, Plaintiff satisfied the
> purpose underlying the EEO counseling requirement."

See also Briggs v . Henderson, 34 F. Supp. 2d 785 (D. Conn. 1999) (denying motion to dismiss

because plaintiff reported the discrimination to two supervisors within 45 days of the

discriminatory event); See also Johnson v. Glickman, 155 F. Supp. 2d 1240 (D. Kan. 2001)

(contact with former EEO officer satisfied the EEO counselor requirement).

---

[3]    Also, prior to the November 18, 2002, removal letter, Dr. Norden on October 8, 2002, met
with Chandra Heilman, Smithsonian Ombudsman to discuss Dr. Norden's need for
accommodation for her naphthalene exposure.  Ms. Heilman called **Carol Gover,
Smithsonian Program Manager of the Office of Equal Employment and Minority Affairs**
from Ms. Heilman's office, and Dr. Norden also personally spoke with Ms. Gover about her
needs for naphthalene accommodations.  [Ex: 5, item q] [Norden Aff., par.6]

### C) Dr. Norden was not on constructive notice of the 45 days based upon the posters at the Smithsonian.

Dr. Norden has no actual notice of the EEO posters which she has never seen.

[Norden Aff., par.7]  Dr. Norden has never previously used the EEO complaint procedures prior

to April 7, 2003, and this includes when Dr. Norden complained solely to a supervisor of sexual

harassment and took no further action. [Norden Aff., par.8]  There were no posters at the public

entrances or exits and these were the entrances and exits that Dr. Norden used. Dr. Norden did

not use the staff entrances or exits.  Dr. Norden brought her lunch and did not use the cafeteria.

[Norden aff., par.9]  Therefore, Dr. Norden would not see any posters that are alleged to have

been put in the cafeteria or elsewhere.  [Norden aff., par.10]  The Smithsonian is a huge series of

buildings, with many sections, and Dr. Norden would remain in her section.  [Norden aff., par.10]

As far as Dr. Norden was aware, the in-house Smithsonian PRISM system was not on her

computer or accessible from her computer. [Norden aff., par. 77]

## II.  Dr. Norden's impairments substantially limit her major life activities.

### A) DHF capillary fragility and its related condition of internal bleeding causing atypical severe and incapacitating migraines.

**First,** defendant concedes that Dr. Norden's was disabled under the Rehabilitation Act for

the period of April of 2002 through October of 2003 because it does not present any argument in

opposition relying solely on its 45 day limitations argument.

**Second**, Dr. David Granite has been Dr. Norden's treating physician since 1987, both

before she contracted dengue in 2000, and through the present.  Dr. Granite has seen Dr. Norden

each month subsequent to her contracting dengue in 2000.  Each month Dr. Granite and Dr.

Norden talk about the effects of her dengue and her dengue induced migraines for the past month,

as well as other medical issues that may arise.  [Granite Aff., par. 2]

Dr. Granite describes Dr. Norden's **impairment** of Dengue Hemorrhagic Fever (DHF)

and its related conditions as follows:

"The DHF has globally affected Dr. Norden in terms of suffering neurological damage…
an impaired immune system…capillary fragility…These [DHF] antibodies make the
capillaries vulnerable to leaking, and it is the leaking capillaries that cause severe migraine
headaches, severe loss of energy, bruising, and cognitive impairment.  Dr. Norden also has
difficulty thermo regulating, due to the dengue antibodies, and the dengue antibodies
cause her immune system to be compromised and function in an abnormal manner so that
any infection can cause severe and alarming results…being chronically ill with DHF makes
Dr. Norden much more susceptible to depression…she requires close medical monitoring
whenever she is experience any other disease entity or injury." [Granite Aff., par.3,4,5,11]

Dr. Granite describes the impact of the capillary fragility induced migraines in terms of

their **severity and duration** on Dr. Norden's major life activities as follows:

"Dr. Norden's migraines since contracting DHF are atypical in their extreme severity. The
migraines she experiences are totally incapacitating.  She experiences severe vomiting,
loses vision, has excruciating pain, disorientation, and cannot stand or do any other task
over a period of one to several days" [Granite Aff., par.8]

Dr. Granite describes the **long term nature** of the impact of the DHF capillary fragility

impairment on Dr. Norden's major life activities as follows:

"Dr. Norden has the dengue antibodies that weaken her capillary system for the rest of her
life.  The presence of these antibodies is permanent, and their effect on her capillary
system has been ongoing since her exposure to dengue fever."  "The past and current
effects that the dengue antibodies have on Dr. Norden's health in terms of capillary
fragility are of a long-term nature and their effects on her health will in all probability be

8

permanent." [Granite Aff., par.4,6]

Dr. Granite also describes the **frequency** that these dengue- induced migraines occur and their triggers as follows:

> "The frequency…varies depending on the presence of triggers. These triggers include the aforementioned heat, stress, certain chemicals,[4] medical procedures and barometric pressure. Dr. Norden has never had a month free of dengue-induced migraines. Dr. Norden cannot control the frequency or duration of the triggers. The migraines follow accordingly. For the period from 2003 through 2005, she has had many episodes of total incapacitation from the migraines that lasted from 3 to 6 days in a particular month." [Granite Aff., par. 10]

Finally, Dr. Granite also describes the **mitigating measures** available to Dr. Norden and their limitations and their side effects as follows:

> "Finally, being chronically ill with DHF makes Dr. Norden much more susceptible to depression. The medications used to manage the effects of dengue, particularly migraines, cause severe disruption in her sleep pattern. DHF causes capillary fragility. Therefore, Dr. Norden cannot take antidepressant medications that also compromise capillary integrity. In addition, Dr. Norden cannot take triptan medications for her migraines and is limited to taking narcotics for that severe pain. Therefore, from December of 2005 through the spring of 2006, Dr. Norden agreed to try painful experimental steroid injections into her fifth cranial nerve in an attempt to control the migraines. The injections themselves caused severe migraines, incapacitating her for days at a time. The treatment ultimately reduced the intensity of the migraines but did not stop them. The beneficial effects of the treatment have not lasted. Dr. Norden will begin the treatments again in January of 2007." [Granite Aff., par.5]

**Third**, defendant states that Dr. Norden testified that she only has approximately three days of incapacitation per month. This is inaccurate. Defendant asked her to give him an

---

[4]    "Dr. Norden's easy bleeding is exacerbated by naphthalene exposure. During the period when Dr. Norden was exposed to naphthalene in 2002, Dr. Norden had increased blood in her urine, nosebleeds and easy bruising." [Granite Aff., par. 9]

9

**"average, rough, roughly"** as to the number of migraines per month over an entire two year

period from November 2003 through November 2005.  This is an extremely broad question over

a broad time period,[5] and Dr. Norden told the defendant that it was difficult to answer.  Dr.

Norden's answers were based on this fact, and she told the defendant that **"It varies.  Its's based**

**on triggers."**  Dr. Norden also told the defendant that **"again, it's hard to answer your**

**question…"** (emphasis added)  [Ex: 6. Norden, depo. 143-145]  Nevertheless, Dr. Norden gave

the defendant his **"rough"** answer which he now puts before the court with words such as

**"approximately"** and **"only."**  However, Dr. Granite, having seen Dr. Norden each month from

2000 forward, is also aware of the specifics regarding her migraines.  Dr. Granite states that: "Dr.

Norden has never had a month free of dengue-induced migraines.  Dr. Norden cannot control the

frequency or duration of the triggers.  The migraines follow accordingly.  For the period from

2003 through 2005, she has had many episodes of total incapacitation from the migraines that

lasted from 3 to 6 days in a particular month." [Granite Aff., par. 10]

    **Fourth**, nevertheless, defendant's cases do not stand for defendant's proposition which is

that "only" 3 days of incapacitation per month is controlling/determinative on the issue of

disability.  Defendant cites <u>Swart v. Premier Parks Corp.</u>, 2004 U.S. App. LEXIS 2964 (Cir. 10th

---

[5]     Not only over a broad time period, **but also over an irrelevant time period**.  Dr. Norden
was terminated in October of 2004, but the defendant's question covers late 2003 through late
2005.  See <u>Taylor v. Phoenixville School District</u>, 184 F. 3d 296, 309 (3rd Cir. 1999) ( "…Taylor
is not presently June 24, 1997, exhibiting the symptoms of her disorder.  That statement does
not resolve what Taylor's condition was like between the fall of 1993 and the fall of 1994
[when she was asking for accommodations]"

2004). <u>Swart</u> is an unpublished opinion and is inapposite. In <u>Swart</u>, the court did not hold that

plaintiff's migraines were too infrequent to be a disability, the court held that: ("She [Ms. Swart]

did not describe, however, any life activities affected by her migraines. She testified only that she

had to leave work at Elitch early on day because of a migraine headache…") In Dr. Norden's

case, "…the migraines she experiences are totally incapacitating. She experiences severe

vomiting, loses vision, has excruciating pain, disorientation, and cannot stand or do any other task

over a period of one to several days." [Granite Aff., par. 8] Defendant's cited case of <u>Dendinger</u>

<u>v. State of Ohio</u>, 2006 WL 3311284, (6th Cir. 2006) is no better. The court found that

("Dendinger has not shown that her headaches considerably limit her ability to engage in major

life activities; the need to lie down occasionally in a dark, quiet room is not akin to blindness or

the inability to walk.") Dr. Norden is totally incapacitated from these atypical, severe migraines

for days and can do no task.[6] The lack of severity of the incapacitation in <u>Dendinger</u> was nothing

like Dr. Norden's total incapacitation. Defendant's next case of <u>Rhoads v. FDIC</u>, 257 F.3d 373,

388 (4th Cir. 2001), is also inapposite. There the plaintiff was able to control her symptoms

outside of the workplace. The <u>Rhoads</u> court held:

> "We accordingly hold that, where an ADA plaintiff asserts that she is disabled based on a
> substantial limitation of a major life activity other than working, but her condition is
> aggravated solely by her workplace environment, her claim must be assessed under our
> foreclosure test for a limitation on working."

---

[6]    See also, <u>Bragdon v. Abbott</u>, 524 U.S. 624, 641, 118 S. Ct. 2196, 141 L. Ed. 2d 540
(1998) ("The ADA definition of disability is met even if the difficulties created by the impairment
are not insurmountable.")

On the contrary, Dr. Norden's triggers are not limited to work, and include heat, stress, medical procedures, chemicals, and barometric pressure, and Dr. Norden cannot control or stop the migraines through mitigation.  [Dr. Granite Aff., par. 7, 10]  Defendant's next case of Roeber v. Yakima, 2001 WL 1254984 (9th Cir. 2001) is also inapposite to our case.  The Roeber court held that:

> "The district court did not err in finding insufficient evidence of disability. Roeber's evidence consisted of his affidavit describing migraine attacks, which Roeber could treat with medication. The affidavit also described bouts of depression brought on by migraines... The record is devoid of clinical findings. Indeed, the medical records, while reflecting frequent visits to physicians, do not show any complaints about medical problems interfering with any life activity. They show occasional complaints about headaches with medication giving good relief, and occasional consultations with a nurse practitioner but no complaints about depression."

On the contrary, Dr. Norden has submitted affidavits from Dr. Granite who has seen her every month since 2000 for the migraines and other conditions, and Dr. Oberg who sees her weekly for the depression/PTSD.  [Granite aff, par. 2] [Oberg aff., par. 2]  Furthermore, Dr. Norden cannot stop or control the migraines through mitigation measures. [Granite Aff., par. 5] Defendant's next case of Williams v. Stark County Bd. Of County Com'rs , 2001 WL 302035 (6th Cir, 2001) is also inapposite.  Williams was claiming that work was one of her major life activity. Work has its own special test, and Dr. Norden is not claiming work as a major life activity. With respect to the other major life activities in Williams, the court said that: ("The medical opinions in the record do not regard Plaintiff's migraines as a permanent condition or one causing significant functional impairment.")  In Dr. Norden's case, Dr. Granite's affidavit states the long term nature

12

and the severe functional impairment of the impact of the DHF capillary fragility impairment of

atypical severe incapacitating migraines. [Granite aff., par.6,8] Defendant's next case of <u>Cash v.

Smith,</u> 231 F.3d 1301 (11th Cir. 2000) is also inapposite. In <u>Cash,</u> plaintiff failed to identify a

major life activity that was impacted. The Court stated that ("Cash's seizure disorder results in

her experiencing "focal" seizures, which can last anywhere from a few seconds to several minutes

and result in her feeling numb on the left side of her body. Cash is briefly incapacitated during the

short period when she is experiencing a seizure, but she can resume her normal activity after it

passes.") This is not true of Dr. Norden because: "Dr. Norden experiences severe vomiting, loses

vision, has excruciating pain, disorientation, and cannot stand or do any other task over a period

of one to several days" [Granite aff., par.8]   Defendant's next cited case of <u>Olds v. Natsios,</u> 2006

WL 416157, *12-13 (D.D.C. 2006) is also inapposite. The <u>Olds</u> Court held that the following

evidence was insufficient to demonstrate the substantial impact of a major life activity:

> "Plaintiff avers only that she has "difficulty . . . performing daily tasks…In addition to her
> affidavit, plaintiff has provided affidavits from her husband, her 13-year old daughter,  and
> a house guest, all attesting to the pain and anguish they have witnessed of plaintiff in
> performing manual tasks and the assistance they have provided her."

Contrary to <u>Olds,</u> Dr. Norden has submitted Dr. Granite's affidavit and her own affidavit[7] as to

how she is totally incapacitated when undergoing the DHF capillary fragility induced atypical

migraines. [Granite aff., par. 8] Thus, all of defendant's cited cases on the aspect of substantially

---

[7]    See: <u>Haynes v. Williams</u> 364 U.S. App. D.C. 108; 392 F. 3d 478 482 (D.C. Cir. 2004)
("Whatever the comparative credibility of medical versus personal testimony, a plaintiff's
personal testimony cannot be inadequate to raise a genuine issue regarding his 'own
experience.'")

13

limiting are inapposite.

 **Fifth**, contrary to defendant's cases, see <u>Carlson v. INACOM Corp.</u>, 885 F. Supp. 1314

(D.C. Neb. 1995) where Carlson suffered from at least one migraine headache every month or

two, and the defendant argued that the frequency of the headaches was not sufficient.  The court

noted that frequency is not controlling and pointed to the facts that the headaches when they

occurred: 1) were "severe and debilitating" as Carlson would be unable to care for her son, drive

a car or concentrate, 2) the headaches lasted in duration from 1-4 days, 3) Carlson had suffered

from headaches for the past 20 years, and 4) Carlson's mitigation attempts of Motrin did not

relieve the migraines.  Dr. Norden's impairment from the migraines is worse in terms of the

frequency and the severity, similar in terms of the duration and also has a permanent DHF

antibody source that makes them long-term and in all likelihood permanent.  Dr. Norden's

migraines have not subsided since the DHF exposure in 2000 despite Dr. Norden's attempts at

mitigation.  [Granite aff, par. 5]  See also, <u>Dutton v. Johnson County Board of County</u>

<u>Commissionrs</u>, 859 F. Supp. 498 (D.D. Kan. 1994). Dutton's migraines headaches did not last a

long period of time in terms of their duration, but the migraines were very severe and debilitating

when they occurred as Dutton was unable to drive a car or carry out most normal everyday tasks,

and the migraines were of a long-term nature since 1971.  Defendant argued that the migraines

were too infrequent to be a disability as Dutton only missed less than 10 days of work in a 3 year

period due to the migraines.  The court held that frequency of Dutton missing work based on the

migraines was not determinative and that defendant has not established the absence of genuine

issues of material fact to show that Dutton is not disabled. The court cited <u>Mantolete v. Bolger</u>, 767 F.2d 1416 (9th Cir 1985) (epileptic considered disabled even though she averaged only one daytime grand mal seizure per year and partial seizures lasting a few moments only once every 2-3 weeks)  In our case, Dr. Norden's migraines are atypical, severe and incapacitating, are also of a long term nature, if not permanent, and in addition, the duration of Dr. Norden's migraines of 1-3 days is substantial.  See also, <u>Otting v. J.C. Penney</u>, 223 F.3d 704, (8th Cir. 2000), the Court held that Otting was disabled due to the following effects of her epilepsy:

> "…approximately two or three times monthly, Otting suffered a seizure, she became unable to see, hear speak, walk or work.  The seizures lasted between 30 seconds and two minutes.  Following a seizure,  Otting would be lethargic, shaky, and have difficulty concentrating.  Depending upon the severity of the seizure, the after-effect lasted between ten minutes and thirty-six hours."

<u>Conclusion</u>, based upon all of the above, Dr. Norden has a disability under the Rehabilitation Act for DHF Capillary Fragility and its related condition of internal bleeding causing atypical severe and incapacitating migraines.

**B) Stress is also a trigger for Dr. Norden's atypical migraines.**

Naphthalene is only one trigger for Dr. Norden's migraines, and Dr. Granite identified stress as an additional trigger. [Granite, Aff., par. 7]  Dr. Norden's stress is exacerbated by her susceptibility to depression from the dengue as well as the effects of the medicines used to combat the migraines on her ability to sleep. [Norden Aff., par. 12]  Dr. Granite has been seeing Dr. Norden each month and has stated that her DHF capillary fragility causes her migraines, her susceptibility to depression, and limits the anti depression medication that is available to her.

15

[Granitfe Aff., par.5]  Psychologist, Dr. Oberg, has been seeing Dr. Norden each week for 90

minute sessions since April of 2003.  On intake, Dr. Oberg diagnosed Dr. Norden with Major

Depressive Disorder- Severe and with Post Traumatic Stress Disorder ("PTSD").  Dr. Oberg

diagnosed these conditions as chronic and not temporary.  [Oberg Aff., par. 3]  Due to these

conditions, Dr. Norden experiences nightmares on almost a nightly basis, and the medications that

other people can take to fight the depression/PTSD she cannot take because of her capillary

fragility.  These nightmares and disruption in her sleep pattern, also cause Dr. Norden to feel

stress the next day.  Dr. Norden has had to wear a night guard in her mouth each night to prevent

her from grinding her teeth when she sleeps, and Dr. Norden has actually bitten through one night

guard and broken another. [Norden Aff., par. 13]  Dr. Oberg stated that: "In my professional

opinion, the stress that Dr. Norden experiences, her mental conditions, and the migraines that Dr.

Norden experiences as all interrelated."  [Oberg Aff., par. 10]

### C) The Smithsonian had Dr. Norden's record of a disability and/or regarded Dr. Norden as having a disability.

See Pritchard v. Southern Co. Servs., 92 F.3d 1130, 1134 (11th Cir. 1996):

> "Pritchard was placed on paid disability leave through November of 1992, and then on
> unpaid disability leave. This constitutes evidence that Pritchard had a record of being
> impaired and that SCSI regarded her as being impaired. Again, this evidence creates
> genuine issues of material fact as to whether Pritchard was disabled under the ADA."

In our case, the Smithsonian had the relevant records of Dr. Norden which were given to

its own consultant, Dr. Lawford.  (Plaintiff's SMF No.9, not in dispute) Furthermore, on Feb. 14,

2002, Dr. Norden executed another medical release so that Dr. Lawford could have access to her

team of physicians and other medical specialists and to Dr. Norden's complete medical record.

(Plaintiff's SMF not in dispute, No. 13)   As was done in Pritchard, the Smithsonian also placed

Dr. Norden on disability leave after removing her light duty hours in November of 2002. [Norden

Aff., par 14]  The Smithsonian Office of General Counsel advised that there was sufficient

evidence to determine that Dr. Norden was disabled.  (Plaintiff's MSJ, Exhibit 3, top of p.3)  Dr.

Norden's supervisor, Ted Schultz, also testified that, "Dr. Norden presented satisfactory evidence

of disability, and this disability was never in question."  (Plaintiff's MSJ, Exhibit 4, last paragraph,

p.3).  The Smithsonian consultant, Dr. Lawford, wrote to management pleading for the

naphthalene accommodations because of Dr. Norden's disability in October 17,  2002. [Plaintiff's

MSJ, Ex.15]  All of these facts taken together should be sufficient on the issue of Dr. Norden

having a record of a disability and/or being regarded as having a disability by the defendant.

Finally, the analysis regarding the necessity of providing reasonable accommodations under the

"record of" and/or the "regarded as" prongs of the disability statute is incorporated herein by

reference from Plaintiff's Points and Authorities for Summary Judgment.

III.   **Dr. Norden is an otherwise qualified individual who can do the essential
       functions of her job with reasonable accommodations.**

   Dr. Norden is a qualified individual with reasonable accommodation.  The Smithsonian

does not dispute that because Dr. Norden held her position at the Smithsonian "…for many years,

receiving high praise, there is no serious dispute that she satisfies the prerequisites for the

position." Taylor v. Phoenixville School District, 184 F. 3d 296, 311 (3rd Cir. 1999)

As to the reasonable accommodations that Dr. Norden must present which would enable her to do her research assistant job, see <u>Pantzes v. Jackson,</u> 366 F. Supp. 2d 57, 67 (D.D.C. 2005) ("We do not view the plaintiff's burden…as a heavy one. We would deem it sufficient on this issue for the plaintiff to present evidence as to her or his individual capabilities and suggestions for some reasonable assistance or job modification by the employer.") Dr. Norden is a proud and courageous mother and women, a scientist, and a Fullbright Scholar who has published over 50 research papers in her field. All Dr. Norden ever wanted was to work full time and do the same job that she loves and has been successfully doing from 1985 through 2000 before she contacted dengue. All Dr. Norden ever needed to be able to work full time at her job was a few reasonable accommodations for her naphthalene trigger such as an air filter / respirator as well as sufficiently reasonable flex-time to deal with the incapacitation from the uncontrollable triggers for her migraines and to deal with the close medical monitoring that is necessary whenever she is sick or injured. [Granite Aff., par. 11] [Norden Aff., par. 15] Before contacting dengue, the Smithsonian allowed Dr. Norden throughout her career to work evenings, weekends, and from home, and the continuation of this flexible schedule would have definitely allowed Dr. Norden to work full time hours in her present dengue situation. [Norden Aff., par.16 & 32]

Defendant does not argue that Dr. Norden could not do the job that she had been doing from 1985 through 2000 with reasonable accommodations. Defendant also does not argue that Dr. Norden could not work full time with reasonable accommodations. Defendant says that Dr. Norden does not meet the disability definition because she turned down "reasonable"

18

accommodations.  See <u>Pantazes v. Jackson</u>, 366 F.Supp. 2d 57, 67 (D.D.C. 2005) for this same

argument:

> "Rather, HUD's argument hinges on the notion that plaintiff is not 'qualified' because he
> purportedly rejected various accommodations that had been offered…The difficulty with
> defendant's position is that, in light of factual disputes, it cannot be concluded as a matter
> of law that the accommodations HUD provided to plaintiff were reasonable."

<u>First,</u> like Mr. Pantazes, Dr. Norden will be arguing <u>infra</u>, the claim of failure to timely

provide reasonable accommodations because there are sufficient facts to infer that the

Smithsonian's accommodations were not "reasonable."

<u>Second</u>, also like Mr. Pantazes, Dr. Norden will be arguing, <u>infra</u>, the claim of  ("whether

the agency engaged in good faith in the 'interactive process' for identifying [and implementing]

reasonable accommodations.") <u>Id</u>. at 70.

<u>Third,</u> Dr. Norden will be arguing that defendant's unreasonable accommodations were

discriminatory/retaliatory acts and that her October 2004 termination which was based on these

acts was also therefore discriminatory/retaliatory.

## IV.  <u>The Smithsonian's October 2004 termination was a discriminatory/retaliatory adverse employment action.</u>

Defendant rests its defense on its "legitimate non-discriminatory/retaliatory" reasons.

Defendant identifies its reasons in its October 8, 2004, termination letter.  Defendant states that

Dr, Norden is being terminated because it cannot accommodate her and therefore she cannot do

the essential functions of her job.  As to the basis of its reason, defendant relies solely on the

following two events: 1) Dr. Norden not accepting either version of defendant's 2004 RTWP, and

19

2) Dr. Norden not agreeing to submit her application to the position identified by the Smithsonian

at the Washington Zoo registering zoo and wildlife animals. Defendant's two reasons will be

address separately, infra, as both unreasonable accommodations and as discriminatory/retaliatory

acts.

However, defendant's statement in its October 8, 2004, letter that it could not

accommodate Dr. Norden will be addressed now.   Helping an employee find a vacant position for

reassignment that the employee is qualified for is part of the good faith interactive process and is

also a reasonable accommodation.  See Taylor v. Phoenixville School District, 184 F. 3d 296, 317

(3rd Cir.. 1999) ( "…the Postal Service engaged in good faith in the interactive process when it

exchanged a number of letters with an employee in an effort to identify a vacant position for

reassignment and sent the employee multiple job descriptions of vacant positions.") ("…the

employee does not have the burden of identifying open positions without the employer's

assistance.") Id at 316.  This standard is heightened for a federal agency specifically charged with

affirmative action under the Rehabilitation Act.  Defendant put Dr. Norden on disability in 2002

and demonstrated an ability to keep her on disability for two years.  In October of 2004,

Defendant could have maintained Dr. Norden's disability status, engaged her in good faith in the

interactive process regarding vacancies, and implemented the reasonable accommodation of either

providing a reasonable vacancy or waiting until a reasonable vacancy surfaced.  Furthermore, any

argument as to the defendant's rules that the vacancy must be presently available (defendant says

that it told Dr. Norden to apply to the only job available) or rules as to how long the defendant

will look or wait for a reasonable vacancy is not controlling. ("The employer must be willing to

consider making changes in its ordinary work rules, facilities, terms, and conditions in order to

enable a disabled individual to work.") Pantazes at 69.   The Smithsonian's termination relied on

the technicality of no other job being presently available, and this is bad faith.  See: Bultmeyer v.

Fort Wayne Cmty. Sch.,  100 F. 3d 1281, 1287, (7th Cir. 1996)( An employer acted in bad faith

during interactive process where it relied on a technicality to justify failing to accommodate a

disabled employee.)  The Smithsonian is a large employer, and is associated with other employers

such as the USDA.  Dr. Norden is a highly qualified Ph.D., reasonable vacancies would have

opened up, and indeed, Dr. Norden has identified other entomologist jobs that became available in

2004, but the Smithsonian never offered or told Dr. Norden. [Norden, aff., par.70], and the

Smithsonian PMQ testified that she was qualified for 2 of the 3 jobs. [Ex: 19, Schultz, depo.,

p.306-307]  From the evidence above, the jury can infer that the defendant's October 2004,

statement in its termination letter that it could not reasonably accommodate Dr. Norden was

pretextual and/or not made in good faith as part of the interactive process.  This includes

considering other accommodations, such as the possibility of future available positions that Dr.

Norden was qualified for:

> "…an employer who acts in bad faith in the interactive process will be liable if the jury
> can reasonably conclude that the employee would have been able to perform the job with
> accommodations.  In making that determination, the jury is entitled to bear in mind that
> had the employer participated in good faith, there may have been other, unmentioned
> possible accommodations."  Taylor v. Phoenixville School District, 184 F3d 296, 317-318
> (3rd Cir. 1999).

**V.**  **The Smithsonian's informing Dr. Norden to apply for the Washington Zoo**
**Job registering zoo and wildlife animals.**

After Dr. Norden had engaged the informal EEO process and informed the Smithsonian

that its April 2004 return to work plan was unreasonable and retaliatory, Dr. Norden's counsel

asked the Smithsonian the following question:

> "Dr. Norden further informs me that there are many positions at the Smithsonian for which
> she is well qualified and which do not require exposure to naphthalene.  Have any such
> positions opened since the past fall, and do you anticipate that that any such positions will
> open in the near future?" [Defendant's MSJ, Ex;:20]

For the first and only time from 2002 through 2004, the Smithsonian responded to Dr.

Norden's request for reassignment by telling Dr. Norden to apply to a job at the Washington

Federal Zoo registering zoo and wildlife animals. [Defendant's MSJ, 1st Ex:24, page 5 of 7]  The

Washington Zoo job has an explicit <u>mandatory</u> qualification requirement listed as follows:

> "Knowledge of concepts, principles and practices of professional museum registration
> methods and collection management standards **used in a zoo or similar wildlife setting.**"
> [8] (emphasis added) [Defendant's MSJ, 1[st] Ex:24, page 7 of 7]

**A)**  **The Smithsonian's invitation to apply to the Washington Zoo job was an**
**unreasonable accommodation.**

This job was outside of Dr. Norden's education and experience as an entomologist

[Norden, aff, par.18], and Dr. Norden did not have the mandatory qualification for the

Washington Zoo job that is explicitly identified in the advertisement and that the Smithsonian told

---

[8]  Nor did Dr. Norden have the Quality Ranking Factors listed for this job such as knowledge
of Federal, state and local laws and regulations covering wild animals and knowledge of
collections registration processes as to wild animals. [Norden aff., par.18]

her would be required for her to get the job, and she immediately and in good faith, informed the Smithsonian of this fact and that she was not even qualified to apply for the job. [Norden aff., par. 18]  This attempt at "accommodation" by the Smithsonian was unreasonable because Dr. Norden could not even meet the mandatory application requirements to apply for this particular job which was also outside of education and experience in Entomology.  Compare with <u>Taylor v. Phoenixville School District,</u> 184 F. 3d 296, 317 (3rd Cir.. 1999) ( "…the Postal Service engaged in good faith in the interactive process when it exchanged a number of letters with an employee in an effort to identify a vacant position for reassignment and sent the employee multiple job descriptions of vacant positions.") ("…the employee does not have the burden of identifying open positions without the employer's assistance.") <u>Id.</u> at 316.

**B)  Use of Dr. Norden's failure to apply to the Washington Zoo Job as a basis for the October 2004 termination was discrimination/retaliation**

The Smithsonian used Dr. Norden's failure to apply for the Washington Zoo job as one of its legitimate reasons for terminating her in October of 2004.  The Smithsonian knew of the advertisement's mandatory qualifications regarding the registration of zoo and wildlife animals, and the Smithsonian told Dr. Norden that in order to get the job she would have to demonstrate that she possessed the hose qualifications.  [Norden aff., par. 18] The Smithsonian knew that Dr. Norden's did not have the qualifications to even apply to the Washington Zoo job.  Dr. Norden is a long time employee, the Smithsonian had access to her supervisors, and Dr. Norden had provided her resume. [Norden aff., par. 71]  Nevertheless, <u>Dr. Norden subsequently informed the</u>

<u>Smithsonian in good faith as part of the interactive process that she did not meet the mandatory</u>

<u>qualifications and could not apply.</u>  The Smithsonian's next step, was to use Dr. Norden's lack of

application as a basis to terminate her in October of 2004.

Use of Dr. Norden's failure to apply for a job when the Smithsonian knew she lacked the

mandatory qualifications and as a basis to terminate her is bootstrapping on the part of the

Smithsonian from which a jury can draw the inference of pretext. [Akin to when the employer ties

the employee's shoes, causes the employee to trip, and then points to the fall as justification for an

adverse employment action, such as termination.] See, <u>Stemmons v. Missouri Department of</u>

<u>Corrections,</u> 82F.3d 817 (8th Cir. 1996) (plaintiff was able to show pretext where she was

criticized for the way she dressed for an interview, but was not allowed by the defendant to leave

early to change clothes); <u>Shager v. Upjohn Co</u>. 913 F. 2d 398, 405 (7th Cir. 1990) (reversing

summary judgment in ADEA case, in part based on evidence that employer had deliberately

assigned plaintiff, a sales representative, unpromising territory) <u>Weldon v. Kraft, Inc.,</u> 896 F.2d

793, 799 (3d Cir. 1990) (race discrimination action could survive summary judgment where

plaintiff alleged that he was purposely assigned first to unusually tough supervisor, and then to

supervisor who lacked experience as trainer, thereby raising inference that defendant never

expected plaintiff to succeed); <u>Bonura v. Chase Manhattan Bank, N.A</u>. 795 F.2d 276, 277 (2nd

Cir. 1986) (affirming jury verdict for ADEA plaintiffs based in part on evidence that supervisor

had established unrealistic performance goals in order to justify replacing plaintiffs with younger

employees)

24

**VI.**    <u>The Smithsonian's 2004 return to work plan ("RTWP").</u>

**A)  The RTWP was a discriminatory/retaliatory act.**

Contrary to the arguments in the defendant's brief, the RTWP that removed Dr. Norden

from her position of primary responsibility as a research assistant in the Entomology Department

was a retaliatory/discriminatory act by Dr. Schultz who <u>implemented</u> his retaliatory/

discriminatory statements made in his November 2003 memo ("MEMO"). [Plaintiff's MSJ,

Ex:30]  The MEMO was written after Dr. Norden filed a formal EEO complaint in August of

2003, and after Dr. Schultz sent her a certified letter in November of 2003 stating that he

proposed to remove Dr. Norden from the Smithsonian Rolls.  [Plaintiff's MSJ, Exhibit 28] On

November 13, 2003, Dr. Norden responded to Dr. Schultz that she was ready to return to work

full time with accommodations for naphthalene sensitivity, "flex time" to accommodate her many

doctor appointments and migraine headaches, and an absence of retaliation and hostility to her

need for accommodations.  The November 13, 2003, letter makes clear that all of these requests

by Dr. Norden were for accommodations based on the medical necessity of reducing her triggers

for atypical DHF migraines, including Dr. Norden's retaliation concern and its effects on her

stress trigger. [Plaintiff's MSJ, Exhibit 29, middle of page 2]  [Granite aff, par.7]  [Oberg aff.,

par.10]  Dr. Norden, who was still out on defendant's forced disability leave, additionally filed an

informal EEO complaint based on Dr. Schultz's letter threatening to remove her from the Rolls.

[Norden aff. 19]  Dr. Schultz then wrote his MEMO [produced by the defendant in discovery for

the first time] to his superiors with the subject line: "My resignation as Norden's supervisor."  In

25

the MEMO, Dr. Schultz states that he refuses to continue as her supervisor and suggests that she

be assigned another supervisor and another unit "ideally outside of Entomology." Dr. Schultz

gives as his reasons Dr. Norden's request for protection from "hostility and retaliation" and "the

events that have transpired during the three years since Beth contracted dengue fever" as his

reasons. [Plaintiff's MSJ, Exhibit 30]  The November Schultz' MEMO tied Dr. Schultz's

statements and actions to Dr. Norden's protected activity of asking not to be retaliated against,

and to the events, including disability accommodation requests, that have transpired over the past

3 years.  Dr. Schultz was the person designed to be responsible for accommodations for Dr.

Norden. [Ex:2, part VII]  His MEMO indicates that he did not want to be Dr. Norden's

supervisor, he was tired of the events of the past 3 years which includes bothering with Dr.

Norden's disability accommodation needs (which he never implemented), and that Dr. Schultz

wanted Dr. Norden out of "his" Entomology Department.  A jury can infer a retaliatory state of

mind from his MEMO.  When Dr. Schultz removed himself as Dr. Norden's supervisor under the

RTWP, he eliminated Dr. Norden's ability to serve as his research assistant.  As indicated in his

MEMO, Dr. Schultz wanted Dr. Norden out of the Department and therefore did not want Dr.

Norden serving as a research assistant to any other Entomologist in the Entomology Department.

Dr. Schultz was able to make this happen through the RTWP because he was Chairman of the

Department.  Dr. Schultz then approached Collections Manager Nancy Adams and asked her to

be Dr. Norden's supervisor.  Dr. Schultz stated the reason as "no research entomologist was

willing to take on the supervision of Beth." [Defendant's MSJ, Adams, aff., p.2, bottom 1/3 of

page].  Dr. Schultz oversaw then read and approved of the implementation of the RTWP [Ex: 7, Schultz depo., p.265].  Dr. Schultz implemented his MEMO's retaliatory statements and actions and removed Dr. Norden from being a research assistant to himself or anyone, and to being in collection support.

First, in its brief, Defendant did not advance as a reason for the RTWP that Dr. Norden was rejected to be a research assistant by the other entomologists or that her work was substandard (which it could not do because of Dr. Norden's outstanding work record as a research assistant).  The defendant merely suggested but did not state in its brief that after Dr. Krombine left there was no other research assistant work for Dr. Norden to perform. ["KROMBEIN reason"]  This implied but unstated reason is nonetheless pretextual.  A jury can infer that Dr. Schultz's discriminatory/ retaliatory state of mind exhibited by his MEMO was subsequently implemented and that this is the real reason for removing Dr. Norden's research assistant duties from the RTWP.   As further evidence of pretext to defendant's KROMBEIN reason, Ms. Nancy Adams, noted in her declaration submitted by the defendant, that the Entomology Department was actually short staffed for research support. [Defendant's MSJ, Adams, aff., p.2, middle of page]  As further evidence of pretext to the defendant's KROMBEIN reason for the RTWP, from 1996 through 2002, when Dr. Schultz was Dr. Norden's supervisor, Dr. Norden never spent less than 50% of her time as Dr. Schultz' s research assistant demonstrating the falsity of the KROMBEIN reason. [Norden aff., par.20]  Furthermore, Dr. Schultz testified that his NSF grant has run substantially past its deadline [Ex: 8 Schultz depo, p

27

201] It is reasonable to infer that Dr. Schultz would have benefited substantially from the continued assistance of a talented Fulbright Research Scholar such as Dr. Norden. As further evidence of pretext to defendant's KROMBEIN reason for the removal of Dr. Norden's research assistant duties in the RTWP, Dr. Norden had spoken with entomologist Dr. Don Davis after she first contacted dengue. Dr. Davis her that he would like to have Dr. Norden's assistance on the monograph he was working on. Dr. Davis stated that he had lost his former assistant and needed help with both research and SEM photography. Dr. Norden was quite willing to have all or part of her time assigned to Dr. Davis, and told him so. Dr. Davis responded that he would speak to Dr. Mathis about the possibility of reassigning some of Dr. Norden's time to him, but neither Dr. Mathis nor anyone else brought the subject up again to Dr. Norden. Years later, Dr. Norden met up with Dr. Davis socially in the fall of 2005. At that time Dr. Davis again told her that he still would need help on the monograph. Dr. Norden was qualified to assist him in his work. [Norden aff., par. 87] As further evidence of pretext to defendant's KROMBEIN reason is the Smithsonian's 1st RTWP agreement that required Dr. Norden to waive her rights. The Smithsonian argues that this was merely its attempt at a settlement with Dr. Norden. However, the Smithsonian demanded not just to "settle" Dr. Norden's current claims, but also a waiver of any future claims that might specifically arise out of the RTWP. [Plaintiff's MSJ, Ex:5, par. 19 and 20] The Smithsonian also demanded that Dr. Norden agree to be terminated if she violated any provision of the RTWP. [Plaintiff's MSJ, Ex:5, par. 15 and 16] These are retaliatory conditions that are intentionally tied to the RTWP and have nothing to do with "settling" present

28

claims. A jury can infer a retaliatory mind set from these two conditions that is specifically tied to the RTWP by the defendant. A jury can infer that such a retaliatory mind set is evidence of pretext and is the real reason for the removal of Dr. Norden's research assistant duties from the RTWP and not defendant's stated KROMBEIN reason. Contrary to defendant's argument in its brief, Dr. Norden's facts are right on point with Carney v. American University , 151 F.3d 1090, 331 U.S.App.D.C. 416 (1998). Like Ms. Carney's claim of retaliation, Dr. Norden's retaliation claim is based on the Smithsonian conditioning to grant Dr. Norden her legal right to pursue "reasonable" accommodations only upon Dr. Norden consenting to the waiver of other rights/claims. [Incidentally, while Dr. Norden may have been confused at deposition as to which version of defendant's RTWP agreement had the termination provision, it is the first version that had the termination provision. [Plaintiff's MSJ, Ex:5, par.15 and 16]]

Second, defendant's attempt in a footnote to distinguish Burlington v. White fails because Dr. Norden's facts are even stronger than the facts were in White. The Burlington Court held that "While she also performed some of the other track laborer tasks, operating the forklift was White's primary responsibility," and that "…a jury could reasonably conclude that the reassignment of responsibilities would have been materially adverse to a reasonable employee, even though the former and present duties fell within the same job description." (emphasis added) 126 S. Ct. 2405.[9]   Our facts are even stronger because Dr. Norden was originally hired to

_____

[9]    The position description submitted by the defendant and purported to be that of Dr.

29

be a research assistant. [Norden aff., par.22] Like Ms. White, Dr. Norden's retaliation claim is

that she was hired to be a research assistant and that was her primary work plan responsibility

from 1985 through 2004, and that she also performed some of the other collection tasks, even

though these duties both fell within the same job description. [Norden aff., Par. 23]  The

defendant's suspect (see footnote #10) position description cover sheet is not controlling because

the PMQ testified that you have to look at the position description and the work plans to find out

what an employee's work consisted of and that "[T]he performance plans…define the tasks, the

job on a year-to-years basis."  [Ex:18, Schultz, depo., p.299-300]  Dr. Norden's work plans

amply and unequivocally demonstrate that her primary responsibility in her work plans was for a

research assistant.  For example, Dr. Norden's 1996 work plan states: "In January 1996 Beth

Norden began providing research support for Karl Krombein and Ted Schultz (50% time for

each)." [Ex:9]  For example her 2000 work plan states: "Norden's job is not an easy one,

because she is required to divide her time between Schultz research (50%), Krombein research

(20%), and collections support (epstein and the HHAL unit, 30%)" [Ex:10, 2000 work plan,

par.2 & 1998-1999  work plan]  This percentage breakdown of Dr. Norden's research support

work 70%, versus collection support 30%, is a good representation of the percentage breakdown

over her entire career at the Smithsonian. [Norden aff. par.24]  Although all research starts with

---

Norden, is not Dr. Norden's.  See Plaintiff's dispute to Defendant's SMF no.1.

work collecting and preparing the specimens, the research work involves additional multiple steps

and intellectual tasks above and beyond the collection work and it is the research work that leads

to the advancement of the science, the intellectual challenge, and the publication of papers.

[Norden aff., par.69]    Dr. Norden's research with Dr. Krombein led to the publication of papers,

and contrary to the claims of the defendant, the research with Dr. Schultz also led to the

publication of papers as well.  Dr. Norden published at least 3 papers with Dr. Schultz. [Norden

aff., par.25] The collection support that Dr. Norden performed never exceed 30%, except on

special occasions for brief periods of time when it rose to 50%, for example, the relocation of the

Entomology Department in 1997.  [Norden aff., par.26]

Third, defendant states that Dr. Norden would be allowed to do research work on her own

outside of work.  But the defendant never made this offer in the interactive process and only

makes the offer in litigation.  Nevertheless, the RTWP eliminated Dr. Norden's research assistant

duties, and the defendant's litigation statement that it would have allowed Dr. Norden to pursue

such activities as a "hobby" is not relevant to the inquiry of discrimination/retaliation.

Thus, based on all of the above, Dr. Norden's termination was bootstrapping because it

was based on this discriminatory/retaliatory RTWP that removed her from the position of research

assistant.  See, Stemmons, Shager, Weldon, Bonura, supra, in section V.

**B)  The RTWP was an unreasonable accommodation**

**1.  RTWP changed the essential functions of Dr. Norden's job.**

Based upon Dr. Schultz's actions as discussed above, the RTWP changed the long

standing essential functions of Dr. Norden's job, and these changes made the RTWP unreasonable based upon the medical needs of Dr. Norden's disability as will be discussed, infra.  Moreover, the Smithsonian did not argue in its moving papers *undue hardship* in maintaining the long standing essential functions of Dr. Norden's research assistant position as a reasonable accommodation.

### 2. RTWP increased exposure to naphthalene.

From 1985 through 2000, Dr. Norden, as a research support scientist, was only exposed to ambient naphthalene in the air and only directly exposed to naphthalene when she was doing work involved with her research support projects, some 20% -30% of the time. [Norden aff., par. 27]  The RTWP limited Dr. Norden to pure collections work which is not based on specific research projects, and thus dramatically increased Dr. Norden's exposure to naphthalene.  The collection tasks in the RTWP involved a dramatic increase of direct exposure to naphthalene by requiring Dr. Norden to do repetitive daily tasks involving repeatedly opening the air-tight cabinets (that have a built up storage of the naphthalene) and by repeatedly working with the naphthalene filled specimens in a non research capacity.  [Norden aff., par.28]  Dr. Granite has stated that "Increasing Dr. Norden's direct naphthalene exposure by increasing her contact with specimens is directly contrary to the advice I gave in 2003 for Dr. Norden's return to work." [Granite aff par.12]  Dr. Oberg has also stated that the 2004 work plan is not advisable medically for this very reason because the migraines, the stress and the depression/PTSD are interrelated. [Oberg, aff., par. 10]

3.  **RTWP provisions for time deadlines for every task.**

From 1985 through 2000, Dr. Norden as a research support scientist, had time deadlines on a project basis and not on her daily tasks. [Norden, aff. par.29]   Dr. Oberg testified that the "The time constraints imposed by the 2004 work plan on its various tasks are stress provoking and are not stress reducing.  In my professional opinion, the stress that Dr. Norden experiences, her mental conditions, and her dengue migraines, are all interrelated." [Oberg Aff., par.10] Dr. Granite testified that stress is a trigger for migraines. [Granite aff., par. 7]  Dr. Norden objected to the time constraint as stress provoking and unmanageable. [Norden, aff.30]  Dr. Schultz has subsequently acknowledged the impossibility of the time deadlines for one person and has stated in deposition for the first time that two individuals would be performing the tasks in the RTWP. [Ex: 17, Schultz, depo. p.275]  But this fact was not told to Dr. Norden when the RTWP was presented to her in 2004 as a "reasonable" accommodation.  [Norden aff., par. 72]

4.  **RTWP removed the intellectual stimulation/professional development of research support.**

The Smithsonian's RTWP replaced Dr. Norden's research support tasks with 100% collections work, and Dr. Norden felt a sense of devaluation and depression at this prospect. [Norden aff., par. 31]  Dr Granite testified that: "Any work plan that might create a sense of devaluation is not medically advisable.  The neurological trauma Dr. Norden suffered because of the DHF predisposes her to depression." [Granite aff par.13]  Dr. Oberg testified that "…the stress that Dr. Norden experiences, her mental conditions, and her dengue migraines, are all interrelated." [Oberg aff., par.10]  On this point of the 2004 RTW plan, Dr. Oberg testified:

Both proposals ignored my recommendations in the November 24, 2003, letter to Smithsonian consultant Dr. Lawford as to the type of work that would accommodate Dr. Norden's clinical needs. In that November 24, 2003 letter, I specifically state that assigning work that is less intellectually demanding than the work she performed prior to Dr. Norden contracting DHF would be harmful. The reasons are based on the following: 1) such an assignment would result in greater naphthalene exposure, 2) such an assignment would deprive Dr. Norden of the intellectual stimulation essential to her neurological recovery, and 3) such an assignment would foster a sense of devaluation and punishment in Dr. Norden and increase her stress level. I am aware that stress is also a trigger for her dengue migraines, as is the naphthalene. [Oberg aff par.10]

### 5. RTWP lacked adequate provisions for flex time hours.

The defendant's RTWP provided for 8 hours of flex time every two weeks.

Dr. Granite has testified that "Eight hours of 'flex time' every two weeks is very unlikely to be adequate for Dr. Norden's medical needs." [Granite aff par.12] This is based upon the uncontrollable nature of her triggers, and her need for close medical supervision if injured or when she is sick. [Granite aff., par.11] Throughout her career, in her previous job of research support, Dr. Norden enjoyed flex hours including working from home, coming in early or staying late, and working on the weekends. Dr. Norden could have met full time hours had the RTWP provided for the continuation of this long standing flex hours provision. [Norden , aff. par.32]. However, the April 22, 2004, RTWP expressly prohibited this, and it gave specific set hours, and it specifically stated: "Dr. Norden will not perform work outside of these hours." [Plaintiff's MSJ, Ex 5: par.16] Thus based on all of the above, the RTWP was an unreasonable accommodation, and Dr. Norden's termination was bootstrapping based on this unreasonable RTWP.

34

**VII.    The Smithsonian: 1) failed to provide timely reasonable accommodations, and/or 2) failed to act in good faith in the interactive process from 2002 through 2004.**

An employer that engages in bad faith in the interactive process is not entitled to an award of summary judgment in its favor.  See: <u>Pantazes v. Jackson</u>, 366 F. Supp 2d 57, 70 (D.D.C. 2005) ("Thus, if a jury could conclude that HUD failed to engage in good faith in the interactive process, and that failure led to defendant not according reasonable accommodations to Pantazes in a timely manner, summary judgment cannot be granted.")  As discussed in <u>Pantazes</u>, the law regarding bad faith in the interactive process is that: "A party that obstructs or delays the interactive process is not acting in good faith.  A party that fails to communicate, by way of initiation or response, may also be acting in bad faith.  In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility." <u>Beck v. University of Wisconsin</u>, 75 F. 3d 1130, 1135 (7th Cir. 1996). "…[W]e believe that jurors should be able to distinguish between stonewalling and assisting an employee in finding accommodations." <u>Taylor v. Phoenixville School District</u>, 184 F. 3d 296, 318 (3rd Cir. 1999).  "…[T]he process must be interactive because each party holds information the other does not have or cannot easily obtain…the employee does not have the burden of identifying open positions without the employer's assistance. ) <u>Taylor v. Phoenixville School District</u>, 184 F. 3d 296, 316 (3rd Cir. 1999). "…**[A] material factual dispute concerning responsibility for a one-year delay in communicating about the need for medical documentation about plaintiff's disability precluded summary judgment in favor of defendant agency.**") (emphasis added)  <u>Breen v.</u>

35

DOT, 350 U.S. App. D.C. 212, 282 F. 3d 839, 844 n.7 (D.C. Cir. 2002), cited by Pantazes v.

Jackson, 366 F.Supp 2d 57 (D.D.C. 2005).  An employer acted in bad faith during interactive

process where it relied on a technicality to justify failing to accommodate a disabled employee.

Bultmeyer v. Fort Wayne Cmty. Sch., 100 F. 3d 1281, 1287, (7th Cir. 1996)  "If the note [from

the psychiatrist requesting accommodation] was too ambiguous and [the employer] did not know

what Bultemeyer wanted, **[the employer easily could have called [the psychiatrist] for a**

**clarification.**"(emphasis added)  Taylor v. Phoenixville School District, 184 F. 3d 296, 311 (3rd

Cir. 1999) quoting Bultemeyer v. Fort Wayne Community Schools, 100 F.3d 1281, 1285 (7th cir.

1996).   "The employer must be willing to consider making changes in its ordinary work rules,

facilities, terms, and conditions in order to enable a disabled individual to work."  Pantazes v.

Jackson, 366 F. Supp. 2d 57, 69 (D.D.C. 2005)

### Defendant's lack of good faith in the interactive process as to reasonable accommodations for naphthalene sensitivity

#### 1)  A respirator and/or an air filter.

In February 2002, Dr. Lawford on his own raised the concern with Dr. Norden of the

possibility that naphthalene may be a problem on her 2nd return to work.  [Norden depo., p.123]

Contrary to defendant's slanting of this fact in its brief, Dr. Norden did not know at that time

whether naphthalene would be a problem.  [Norden depo., p. 123]  However, it did become a

problem and in the spring of 2002, Dr. Norden spoke to Dr. Schultz several times about her

sensitivity to naphthalene and her resulting need for accommodations. [Complaint par.59,

admitted by defendant in answer.]   Dr. Schultz was the person whom the Smithsonian designated

as being responsible for ensuring reasonable accommodations for Dr. Norden.  [Ex: 2]  In the

period of May 2002 through November 2002, Dr. Norden made more than a dozen additional

requests for accommodations for naphthalene, including requests for air filter and for a respirator.

[Norden, Aff, par.33]  Although Dr. Norden was: a) tested and fitted for a respirator in May of

2002, b) the funds was approved for it, c) the Smithsonian physician consultant and the

Smithsonian's industrial hygienist both urged management to adopt numerous accommodations

for Dr. Norden including the respirator, the Smithsonian never purchased the respirator. [Norden,

Aff, par. 34]  Dr. Norden never received the respirator or any other accommodation for her

naphthalene sensitivity.  [Norden aff., par. 35]  During this 2002 period, Dr. Norden's supervisor,

Dr. Schultz, understood that the exposure to naphthalene was exacerbating her illness.  [Plaintiff's

SMF No.30 not in dispute]

On July 5, 2002, Dr. Norden was in Ms. Carol Youmans section of the building and had

another nose bleed and was in the ladies bathroom.  Ms Youmans is the Smithsonian secretary

who would actually place the order for the respirator. [Norden aff. par.36]  Ms. Youmans came

into the bathroom, and Dr. Norden told Ms. Youmans that she could not use the respirator while

looking into the microscope, and that perhaps an air filter would be better. [Norden aff. Par.37]

At some point in time, Ms. Youmans wrote down on the order slip to hold off on the purchase of

the respirator because it causes Dr. Norden to faint. [Ex:11]  This of course was not true.

Furthermore, Ms. Youmans never informed Dr. Norden that she was waiting for more

information from Dr. Norden as defendant argues in its brief. [Norden aff. Par.38] Nevertheless, on the very same day, July 5, 2002, Dr. Norden sent a follow up email to Ms. Youmans and to Dr. Schultz, as well as Dr. Lawford, and the industrial hygienist of OSEM that she was unable to use a microscope while using the full face mask required by the respirator and asked if she could have a portable air filter instead. [Plaintiff's MSJ, Exhibit 10] On October 17, 2002, Dr. Lawford and the industrial hygienist from OSEM sent a lengthy memo to upper management. The memo discussed a variety of accommodations and concluded with "We ask that you notify us as soon as possible to the course of actions to be taken to minimize naphthalene exposure to Dr. Norden in the course of her work. [Plaintiff's MSJ, Exhibit 15] Dr. Norden did not receive any accommodation for naphthalene. [Norden aff., par.39] After Dr. Norden filed a complaint, Smithsonian management misrepresented to the EEO counselor that Dr. Norden did not receive accommodations because she refused to wear a respirator [Plaintiff's MSJ, Exhibit 8, top of page 2], and in its interrogatory answers, defendant falsely claimed that:

> "Dr. Norden failed to participate in good faith in the interactive process. While on light duty, Plaintiff was fitted for a respirator, but informed the funds manager in her department not to buy one. Plaintiff did not inform the Office of Safety and Environmental Management that she had rejected the respirator, leading them to believe the department was not following its advice." [Plaintiff's MSJ, Exhibit 9]

However, PMQ Dr. Schultz, backed off of the Smithsonian's previous position and testified that a more accurate statement would be that the Smithsonian "made department resources available for a respirator, had Beth fitted by safety for a respirator, and in the end had it turn out that Beth didn't find it possible to work with wearing a respirator." [Plaintiff's MSJ, Exhibit 11, Schultz

38

testimony, p. 262] Moreover, as of late July, three weeks after Dr. Norden's July 5 memo, the

department was still claiming that it was attempting to purchase a respirator, and Dr. Norden was

still being advised that she would receive one. Dr. Schultz signed a performance evaluation in late

July stating that a respirator and an air filter would be provided for Dr. Norden. [Plaintiff's MSJ,

Norden affidavit, par. 40, Exhibit 12, Performance evaluation, page 1, par. 3] Dr. Schultz

continued to assure Dr. Norden that she would receive both accommodations almost until the day

that the Smithsonian forced Dr. Norden to go back onto 100% disability. [Norden, Aff., par.41]

However, Dr. Schultz contradicted these statement to Dr. Norden when he testified that because

the Smithsonian considered the fourth floor room to be the superior accommodation, Dr. Norden

was not told that the other accommodations were not going to be given. [Plaintiff's MSJ, Exhibit

13, Schultz depo., p. 8] This new position by the Smithsonian is an attempt to try and explain

why the respirator/air filter accommodations were not provided for the months of July, August,

September, October and November of 2002. However, Dr. Schultz' testimony that the 4th floor

was a superior accommodation was contradicted by Dr. Miller who was Dr. Schultz's and Dr.

Mathis's supervisor. Dr. Miller testified that no accommodation was considered superior to any

other and that all accommodations were considered parallel and were supposed to be together.

[Ex: 12, Miller depo., pages 80-83] Thus, Dr. Schultz never told his supervisor Dr. Miller that

Dr. Norden had not received any accommodations for naphthalene during the 2002 time period.

Finally, Dr. Miller testified that had he known that the accommodations were not given, he would

not have removed Dr. Norden's light duty status. [Ex:13, Miller depo. Pages 62-66]

### 2) The fourth floor as an accommodation to naphthalene sensitivity

During 2002, Dr. Schultz was going out of town for a short period, and told Dr. Norden in a memo that if she had a problem with naphthalene, she could work from the 4th floor. [Defendant's MSJ, Ex:29, bottom of page]    Not only did the "ventilated room" on the fourth floor lack both the computer and the specimens Dr. Norden needed, it was also kept locked, and Dr. Norden was denied a key by Dr. David Furth.  [Norden Aff., par.42]  Other than the statement by Dr. Schultz to Dr. Norden that if she had a problem with naphthalene she could use the 4th floor for the period of time that he would be going out of town, Dr. Norden never heard anything from the Smithsonian about the 4th floor being considered as a possible accommodation, and she never refused to relocate to the fourth floor. [Norden, aff., par.43]

After Dr. Norden filed a complaint, Smithsonian management misrepresented to the EEO counselor that Dr. Norden did not receive the 4th floor as an accommodation because she refused to have her office relocated [Plaintiff's MSJ, Exhibit 8, top of page 2]  Dr. Schultz, speaking as the PMQ, retracted this position.  Dr. Schultz admitted that Dr. Norden was never instructed orally or in writing to move her office to the fourth floor.  [Plaintiff's MSJ, Exhibit 13, Schultz depo., p. 8]  Dr. Schultz testified that Dr. Norden was unable to do a substantial part of her work in the area to which she should have relocated on the fourth floor as an accommodation because the necessary computer was not in that room and that Dr. Norden never refused to move to the fourth floor. [Plaintiff's MSJ, Exhibit 7, Schultz depo, p. 141]  Dr. Norden's doctor had advised that he would reconsider her ability to work without the light duty accommodation at the end of

40

2002.  Dr. Norden continued to believe that she would eventually receive naphthalene

accommodations and that once she had them, she would be able to work full time.  [Norden, aff.

par. 44]  Dr. Norden advised Dr. Schultz of this in November of 2002, and he again promised that

she would receive accommodations.  [Norden aff., par. 45]  On November 18, 2002, Dr. Norden

was given a memo instructing her that her light duty accommodation was terminated as of the end

of the month.  Dr. Norden asked three supervisors to explain the memo to her and none of the

three would do so.     [Norden aff., par.46]  On November 23, 2002, Dr. Lawford replied to Dr.

Norden's inquires and stated that he, Dr. Schultz, Marilyn Slomba, and possibly the industrial

hygienist held a [secret] meeting prompted by his memo explaining that Dr. Norden's doctors

would revisit her need for light duty at the end of 2002.  According to Dr. Lawford, Dr. Schultz

said, "Well if her doctors can revisit it on Dec. 31, we can revisit it too."  Dr. Schultz then asked

Ms. Slomba if "we have to offer light duty" and was told "not if it is insufficiently productive

toward the departments goals."  [Plaintiff's MSJ, Exhibit 16, Norden aff., par. 47]

        Dr. Norden did not know what to do regarding ascertaining whether the naphthalene

accommodations would be given.  [Norden aff. par.48]  Had the defendant acted in good faith in

the interactive process, then Dr. Norden's return to full time work would have been expedited by

her doctors who were concerned about the damage to her health from naphthalene exposure and

her need for accommodations before agreeing to have Dr. Norden attempt full-time work in the

Entomology Department. [Granite Aff., par. 11] [Oberg Aff., par. 10[sic], page 4-5] Dr. Norden

believes that with the naphthalene accommodations and flex time accommodations that she

41

requested in 2002, she could have gotten a favorable recommendation by her doctors and worked

full time hours by the end of the 2002 year. [Norden aff., par.49]

### Defendant's lack of good faith in the interactive process as to the USDA position as a reasonable accommodation

In mid 2002, Dr. Norden talked to Dr. Ralph Webb at the USDA regarding creating a new

position for Dr. Norden to do research at the USDA. [Norden aff., par.50] Dr. Webb's

supervisor Dr. Aldrich had Dr. Norden come spend a day in the USDA lab to ascertain that she

would have any negative reactions, and she completed the day successfully. [Norden aff., par.51]

In July of 2002, Dr. Norden spoke to Dr. Mathis, Dr. Schultz' supervisor, at the Smithsonian to

ask for permission to pursue this new position. Dr. Mathis ridiculed and intimidated Dr. Norden

by suggesting that at her age she was probably menopausal and that her menopause was making

her overly emotional on the subject of naphthalene. [Norden aff., par.52] Dr. Mathis told Dr.

Norden to go ahead subject to Dr. Lawford's approval. Dr. Lawford subsequently gave

enthusiastic approval. [Norden aff., par.53]    Dr. Norden's light duty status was terminated on

Nov. 29, 2002, prior to the USDA receiving funding for her position. The USDA did receive

funding and on December 6, 2002, Dr. Aldrich sent a memo to Dr. Mathis stating that he obtained

funding at the rate of $22,500 per year for a period of three years and which would be

reimbursable to the Smithsonian for loaning Dr. Norden to the USDA. [Ex:16, Aldrich Dec. 6

memo and affidavit] Dr. Mathis hid the December 6, 2002, Aldrich memo from Dr. Miller. Dr.

Miller is Dr. Mathis' supervisor and testified that he and Dr. Mathis never heard back from the

42

USDA and that "it's the sort of thing that had they responded positively, I would have been told about it." [Ex:14, Miller depo, pages 99-100]   Dr. Mathis' bad faith led to the Dr. Norden not getting this position because Dr. Miller also testified that if the USDA had responded in December of 2002 or January of 2003 and had it obtained even some of the funding for Dr. Norden's position, he would have responded positively and would have explored the situation with the USDA and with Dr. Norden. [Ex: 14]   The Smithsonian also lied about this issue in its denial of Plaintiff's Admission Request No.16 [Ex:15]  Had Dr. Norden been informed of the funding, she believes that she could have negotiated with the Department of Labor to pay the difference in the funding versus her regular salary at the Smithsonian either for full time or for part time work at the USDA.  The funding for the USDA job would have reduced the disability pay obligation of the Department of Labor, and it would have also allowed Dr. Norden to work productively. In the spring of 2003, Dr. Norden began doing substantial volunteer work with Dr. Alrich's department at the USDA performing research, and this work lead to the publication of several papers.  [Norden Aff., par.54] The effect of this lack of response by the Smithsonian regarding the USDA position was to chill Dr. Norden from submitting additional requests for a transfer for other jobs.  [Norden Aff., par.55]

### Defendant's lack of good faith in the interactive process as to the Insect Zoo position as a reasonable accommodation

Chandra Heilman suggested, encouraged and helped Dr. Norden pursue a position at the Museum's Insect Zoo that had just become available and had not been advertised.  Dr. Norden is

thoroughly familiar with the Insect Zoo and has done volunteer work for the Insect Zoo

throughout her career.  [Norden aff., par.56]  Dr. Norden has published over 10 papers on her

own, 2 children's books on her own, and has contributing with others in writing over 100 articles

as well for the Insect Zoo all on a volunteer basis.  Her work plan evaluations cite this work, and

this work is one of the reasons that her evaluations received the grade of "Outstanding." [Norden

aff., par.57]  The Museum's Insect Zoo has a picture of Dr. Norden on its wall performing

research.  [Norden aff., par.58]

Dr. Norden agreed to seek the job and got approval from her supervisor Dr. Schultz.

[Norden, aff. par.59]   Because the job was not yet advertised, Mr. Ross Simmons, Associate

Director of the Museum of National History, had to approve Dr. Norden taking the position.  Ms.

Heilman talked with Mr. Simmons and told Dr. Norden that Mr. Simmons had declined to give

the position to Dr. Norden,.  [Norden aff., par.60]  Ms. Heilman told Dr. Norden that is was

political, and Dr. Norden never got a straight answer as to why she was not allowed to take the

Insect Zoo position.  [Norden Aff., par.61]   In 2004, the Insect Zoo position was open again.

Dr. Norden asked Mr. Nate Irwin, Director of the Insect Zoo, if the advertised GS-9 position

could be upgraded to GS-11, and he answered yes. [Norden aff. Par.62]   Dr. Norden then asked

Director Irwin if she could apply even if Ross Simmons had previously said no. [Norden aff.,

par.63]  Director Irwin answered that if Ross Simmons had previously refused, then Dr. Norden

should not waste her time, and therefore, Dr. Norden did not apply for the position.  [Norden aff.,

par.64]  The Smithsonian's previous failure to engage in the good faith interactive process

actually had the affect of the Director of the Insect Zoo discouraging Dr. Norden's from applying

for the position a the Insect Zoo,  However. Dr.  Schultz testified that there was "no reason for

her not to work at the insect zoo."  [Plaintiff's MSJ, Exhibit 14, Schultz depo., p. 229]

Dr. Norden believes that she was more than qualified for the Insect Zoo position and that

it was a reasonable and great accommodation to reduce if not eliminate her naphthalene induced

migraines, as well as to greatly reduced the stress trigger for her migraines.  [Norden aff. Par.65]

[Oberg aff. par.12] There is almost no naphthalene associated with the Insect Zoo position.

[Norden aff., par.66]  Contrary to the Smithsonian's brief, the Insect Zoo job was amenable to

both research and writing as Dr. Norden has already amply demonstrated throughout her career

by publishing many books and articles on her own and in association with others for the Insect

Zoo.  [Norden aff., par.67]  Moreover, the fact that the Insect Zoo is open 7 days a week would

have allowed the flex time availability that Dr. Norden needed as an accommodation in terms of

being able to work weekends if she so needed due to her disability. [Norden, aff., par.68] [Granite

Aff. par. 11, on the need for flex time]

**VIII.** <u>**Conclusion**</u>      For all of the above reasons, Defendant's MSJ should be denied and

Plaintiff's MSJ should be granted.                    Respectfully submitted,

DATED:__12/26/06__                    _____/s/_____

Alex T. Sliheet. D.C. Bar No. 438977
Vickie Inge Fang, *pro hac vice*
8702 Nightingale Drive
Lanham, MD  20706
alexsliheet@yahoo.com
(301) 552-4908

45