Alex T. Sliheet, D.C. Bar No. 438977
Vickie Inge Fang, *pro hac vice*
Attorneys for Plaintiff Beth Norden
8702 Nightingale Drive
Lanham, MD 20706
alexsliheet@yahoo.com
fvickie@comcast.net
(301) 552-4908

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Beth M. Norden, ) | Case No. 051232 (RMC) |
| ) | |
| ) | PLAINTIFF'S AFFIDAVIT IN |
| Plaintiff ) | OPPOSITION TO DEFENDANT'S |
| ) | MOTION FOR SUMMARY JUDGMENT OR |
| v. ) | IN THE ALTERNATIVE |
| ) | SUMMARY ADJUDICATION |
| Lawrence M. Small, ) | (IN SUPPORT OF PLAINTIFF'S REPLY |
| ) | BRIEF) |
| Defendant ) | |

AFFIDAVIT OF BETH NORDEN

I, Beth M. Norden, declare:

1.   My name is Beth Norden. I am over the age of eighteen and competent to testify. My address is 112 Greenhill Road, Greenbelt, Maryland. I am a former Smithsonian employee who holds a Ph.D. in entomology.

1

2. The Smithsonian never told me that it was not approving my need for naphthalene accommodations at any point in time in the 2002 through 2004 period.

3. I was fitted for a respirator in May of 2002, my evaluation states that the naphthalene accommodations were forthcoming on July 22, 2002, and Dr. Schultz told me in the same month that I was removed from my light duty status in November of 2002, that the respirator and the air filter were on the way.

4. On November 29, 2002, I sent an email to numerous people including Dr. Schultz, Dr. Miller, Dr. Mathis, Carol Gover (of the Smithsonian Office of Equal Employment and Minority Affairs OEEMA), Smithsonian consultant Dr. Lawford, asking among other things: "How do I know when it might be safe to return if it is the naphthalene which is activating my current blood problems?" And "Will anything dealing with my exposure be different upon return, or is my return based upon no longer being sensitive to naphthalene?" Although a few people did respond by email, no one answered either question.

5. From my receipt of the November 18, 2002, letter through November 29, 2002, I engaged in the interactive process regarding my naphthalene accommodations, and I initiated contact: 1) with three of my supervisors, 2) with the Smithsonian Ombudsman Chandra Heilman, 3) with Dr. Lawford of the Office of Safety and Environmental Management, 4) with Carol Gover, Smithsonian Program Manager of the Office of Equal Employment and Minority Affairs – OEEMA. When I initiated contact with all of these

2

individuals as described above, I spoke of my lack of receiving accommodations for my naphthalene sensitivity and my lack of knowledge as to when or if such accommodations would be forth coming in the future. None of my 3 supervisors responded to my questions.

6. Also, prior to the November 18, 2002, removal letter, on October 8, 2002, I met with Chandra Heilman, Smithsonian Onmsbudsman to discuss my need for accommodation for my naphthalene exposure. Ms. Heilman called Carol Gover, Smithsonian Program Manager of the Office of Equal Employment and Minority Affairs from Ms. Heilman's office, and I also personally spoke with Ms. Gover about my needs for naphthalene accommodations.

7. I had no actual notice of the EEO posters which I have never seen.

8. I had never previously used the EEO complaint procedures prior to April 7, 2003, and this includes when I complained solely to my supervisor of sexual harassment and took no further action.

9. There were no posters at the public entrances or exits and those were the only entrances and exits that I used in my section of the building. I did not use the staff entrances and exits, and I brought my lunch and did not use the cafeteria.

10. I did not see any posters that are alleged to have been put in the cafeteria or anywhere else. The Smithsonian is a huge series of buildings, with many sections, and I would remain in my section.

12. My stress level is exacerbated on the following day when I am unable to sleep at night.

13. I experience nightmares on almost a nightly basis. These nightmares and disruption in my sleep pattern, also cause me to feel stress the next day. I have had to wear a night guard in my mouth each night to prevent me from grinding my teeth when I sleep, and I have actually bitten through one night guard and broken another.

14. The Smithsonian placed me on disability leave after removing my light duty hours in November of 2002, and assisted me with the process of receiving disability pay from the Department of Labor.

15. All I ever needed to be able to work full time at my job were a few reasonable accommodations for my naphthalene trigger such as an air filter / respirator as well as sufficiently reasonable flex-time to deal with the incapacitation from the uncontrollable triggers for my migraines and to deal with the close medical monitoring that is necessary whenever I am sick or injured.

16. Before I contracted dengue, the Smithsonian allowed me throughout my career to work evenings, weekends, and sometimes from home, and the continuation of this flexible schedule would have allowed me to work full time hours in my present dengue situation.

17. The Smithsonian never gave me a Denial of Request form.

18. This Washington National Zoo job was outside of my education and

4

experience as an entomologist. I did not have the mandatory qualification for the Washington Zoo job that is explicitly identified in the advertisement and the Smithsonian told my attorney that I would be required to demonstrate such qualifications in order to be given the job. I do not have any knowledge of wildlife or zoo registration procedures or the federal state and local laws or collections registration process as to wild animals or zoo animals. I immediately and in good faith, informed the Smithsonian of this fact, and that I was not even qualified to apply for the job.

19.  I was still out on defendant's forced disability leave when I additionally filed an informal EEO complaint based on Dr. Schultz's letter threatening to remove me from the Rolls.

22.  I was originally hired to be a research assistant by the Smithsonian.

23.  I was hired to be a research assistant and that was my primary responsibility from 1985 through 2004. I also performed some of the collection tasks.

24.  A percentage breakdown of my research support work 70%, versus collection support 30%, is a good representation of the percentage breakdown over my entire career at the Smithsonian.

25.  My research with Dr. Krombein led to the publication of papers, and my research with Dr. Schultz also led to the publication of papers as well. I published at least 3 papers with Dr. Schultz.

26.     The collection support that I performed never exceed 30%, except on special occasions and for brief periods of time when it rose to 50%, for example, the relocation of the Entomology Department in 1997.   During most of 1997, however, I was in Sri Lanka doing full time research as a result of my Fulbright Research Scholarship.

27.     From 1985 through 2000, I, was a research support scientist, and I was only exposed to ambient naphthalene in the air and only directly exposed to naphthalene when I was doing work involved with my research support projects, some 20% -30% of the time.

28.     The 2004 return to work plan limited my tasks to 100% collections work which is not based on specific research projects, and thus dramatically increased my exposure to naphthalene.  The collection tasks in the 2004 return to work plan involved a dramatic increase of direct exposure to naphthalene by requiring me to do repetitive daily tasks involving repeatedly opening the air-tight cabinets (that have a built up concentration of the naphthalene) and by repeatedly working with the naphthalene filled specimens in a non research capacity.

29.     From 1985 through 2002, I was a research support scientist and performed research support scientist tasks.  I had time deadlines on a project basis and not on my daily tasks.

30.     I objected to the time constraint in the 2004 return to work plan as stress provoking and unmanageable.

31. The Smithsonian's 2004 return to work plan replaced my research support tasks with 100% collections work, and I felt a severe sense of devaluation and depression at this prospect.

32. Throughout my entire career in my previous job of research support, I enjoyed flex hours including working from home, coming in early or staying late, and working on the weekends. I could have met my full-time hours had the return to work plan provided for the continuation of this long standing flex hours provision.

33. In the period of May 2002 through November 2002, I made more than a dozen additional requests for accommodations for naphthalene, including requests for air filter and for a respirator.

34. Although I was: a) tested and fitted for a respirator in May of 2002, b) the funds were approved for it, c) the Smithsonian physician consultant and the Smithsonian's industrial hygienist both urged management to adopt numerous accommodations for me including the respirator, the Smithsonian never purchased or gave me the respirator.

35. I never received the respirator or any other accommodation for my naphthalene sensitivity.

36. On July 5, 2002, I was in Ms. Carol Youmans section of the building and had another nose bleed, and I was in the ladies bathroom. Ms Youmans is the Smithsonian secretary who would actually place the order for the respirator.

37. Ms. Youmans came into the bathroom, and I told Ms. Youmans that I

7

could not use the respirator while looking into the microscope, and that perhaps an air filter would be better.

38. Ms. Youmans never informed me at any time that she was waiting for more information from me. I sent her a July 5, 2002, memo asking if I could have an air filter instead of the respirator because I could not use the respirator when I used the microscope.

39. I did not receive any accommodation for naphthalene in the period of 2002 through 2004.

40. As of late July, three weeks after my July 5, 2002, memo, the department was still claiming that it was attempting to purchase a respirator, and I was still being advised that I would receive one. Dr. Schultz signed my performance evaluation in late July stating that a respirator and an air filter would be provided for me.

41. Dr. Schultz continued to assure me orally that I would receive both a respirator and an air filter almost until the day that the Smithsonian forced me to go back onto 100% disability.

42. Not only did the "ventilated room" on the fourth floor lack both the computer and the specimens I needed, it was also kept locked, and I was denied a key by Collections Manager Dr. David Furth when I asked him for one.

43. Other than the statement by Dr. Schultz to me that if I had a problem with naphthalene I could use the 4th floor for the period of time that he would be going out of

8

town, I never heard anything from the Smithsonian about the 4th floor being considered as a possible accommodation, and I never refused to relocate to the fourth floor.

44. My doctor had advised me that he would reconsider my ability to work without the light duty accommodation at the end of 2002. I continued to believe that I would eventually receive naphthalene accommodations and that once I had them, I would be able to work full time.

45. In November of 2002, I advised Dr. Schultz that my doctors would be evaluating me at the end of the year and that I believed that I could work full time with the accommodations for naphthalene, and he again promised that I would receive accommodations.

46. On November 18, 2002, I was given a memo instructing me that my light duty accommodation was terminated as of the end of the month. I asked three supervisors to explain the memo to me and none of the three would do so.

47. I then sent a memo to Dr. Lawford asking him what he knew about the decision to terminate my light duty. On November 23, 2002, Dr. Lawford replied that he, Dr. Schultz, Marilyn Slomba, and possibly the industrial hygienist held a meeting prompted by his October memo explaining that my doctors would revisit my need for light duty at the end of 2002. According to Dr. Lawford, Dr. Schultz said, "Well if her doctors can revisit it on Dec. 31, we can revisit it too." Dr. Schultz then asked Ms. Slomba if "we have to offer light duty" and was told "not if it is insufficiently productive toward the

9

departments goals."

48. I did not know what else to do regarding ascertaining whether naphthalene accommodations would be given to me by the Smithsonian in the future.

49. I believe that with the naphthalene accommodations and flex time accommodations that I requested in 2002, I could have gotten a favorable recommendation by my doctors and worked full time hours by the end of the 2002 year.

50. In mid 2002, I talked to Dr. Ralph Webb at the USDA regarding creating a new position for me so that I could be "loaned" to USDA to do research.

51. Dr. Webb's supervisor Dr. Aldrich had me come spend a day in the USDA lab to ascertain that I would not have any negative reactions, and I completed the day successfully.

52. In July of 2002, I spoke to Dr. Mathis, Dr. Schultz' supervisor, at the Smithsonian to ask for permission to pursue this new position. Dr. Mathis ridiculed and intimidated me by suggesting that at my age I was probably menopausal and that my menopause was making my overly emotional on the subject of naphthalene.

53. Dr. Mathis told me to go ahead subject to Dr. Lawford's approval. Dr. Lawford subsequently gave enthusiastic approval.

54. Although the Smithsonian did not follow through on the USDA "loan" job, in the spring of 2003, I began doing substantial volunteer work with Dr. Aldrich's lab at the USDA performing research, and this work lead to the publication of several papers.

55. The effect of the lack of response by the Smithsonian regarding the USDA position was to discourage me from submitting additional requests for a transfer for other jobs.

56. Chandra Heilman suggested, encouraged and helped me pursue a position at the Museum's Insect Zoo that had just become available and had not been advertised. I am thoroughly familiar with the Insect Zoo, and I have done work for the Insect Zoo throughout much of my career.

57. I have published over 10 papers, 2 children's books, and I have contributed with others in writing over 100 articles as well for the Insect Zoo. My performance evaluations cite this work as one of the reasons that I received the rating of "Outstanding."

58. The Insect Zoo has a picture of me on its wall performing research.

59. I agreed to seek the Insect Zoo job and got approval from my supervisor Dr. Schultz.

60. Because the job was not yet advertised, Mr. Ross Simmons, Associate Director of the Museum of National History had to approve my taking the position. Ms. Heilman talked with Mr. Simmons, and told me that Mr. Simmons had declined to give the position to me.

61. Ms. Heilman told me that is was political, and I never got any other answer

11

as to why I was not allowed to take the Insect Zoo position in 2002.

62.  In 2004, the Insect Zoo position was open again. I asked Mr. Nate Erwin, Director of the Insect Zoo, if the advertised GS-9 position could be upgraded to GS-11, and he answered yes.

63.  I then asked Director Erwin if I could apply even if Ross Simmons had previously said no.

64.  Director Erwin answered that if Ross Simmons had previously refused my request, then I should not waste my time, and I therefore did not apply for the position.

65.  I believe that I was more than qualified for the Insect Zoo position and that it was an excellent accommodation to reduce, if not eliminate, my naphthalene induced migraines, as well as to greatly reduced the stress trigger for my migraines.

66.  There is almost no naphthalene associated with the Insect Zoo position.

67.  The Insect Zoo job was amenable to both research and writing as I had demonstrated throughout my career by publishing many books and articles on my own and in association with others for the Insect Zoo.

68.  The fact that the Insect Zoo is open 7 days a week would have allowed the flex time availability that I needed as an accommodation in terms of being able to work weekends if I so needed due to my disability.

69.  Although all research starts with work collecting and preparing the specimens, the research work involves additional multiple steps and intellectual tasks

12

above and beyond the collection work and it is the research work that leads to the advancement of science, the intellectual challenge and the publication of papers.

70.     I identified other jobs that became available and that called for an entomologist in 2004, but the Smithsonian never offered or brought these jobs to my attention.

71.     I provided my resume to the Smithsonian in 2004 upon their request and before the Smithsonian sent me the Washington National Zoo job offer.

72.     I was not told at anytime that two individuals would be performing the tasks in the return to work plan that was presented to me in 2004.

73.     I mentioned the problems I was having to a friend at church who was an attorney, and he referred me to an attorney.

74.     I admit that I was a GS-11 Museum Specialist during the relevant time periods, but I dispute that my position is set forth in either the position description 39725 cover sheet or the position description which follows the cover sheet in Defendant's Exhibit 1. In 1997, I was in Sri Lanka with my unofficial supervisor Dr. Karl Krombein. I was never shown Exhibit 1 at anytime during my employment with the Smithsonian. I began working at the Smithsonian as a GS-9 and was never a GS-5 or GS-7. I never served as a technician. Throughout my career, I always held the more highly ranked position of Museum Specialist. I never held position descriptions numbered 39726, 39727, and 39729. My position description was number 032204. My previous position

descriptions had only my name on them, and they were only issued when I was first hired, and then when I was promoted. I did have a coworker named Gloria House who worked in the Collections Management Unit at the Smithsonian. The first time that I ever saw this alleged position description was in the spring of 2004 when Ms. Slomba faxed it to my counsel with the statement that the return to work offer would be consistent with this position description.

75. I was forced to go on workers' compensation, but the payments were funded by the Department of Labor, not the Smithsonian.

76. My limited duty hours were suspended because I was not given any accommodations for my naphthalene sensitivity by the Smithsonian in order to have a chance to demonstrate that I could work full-time hours with such accommodations by the end of 2002. I never rejected any naphthalene accommodations. I met my limited duty hours of 20 hours per week for the final nine weeks prior to the removal of my light duty hours in November of 2002.

77. I did not work in the areas described in the defendant's affidavits. The "PRISM" system on my computer through which the Intranet was accessed was never made functional, and, as far as I know, I had no way to access the in-house Smithsonian information regarding employee Equal Opportunity Rights. I have no actual notice of the EEO posters which I had never seen. I have never previously used the EEO complaint procedures prior to April 7, 2003, and this includes when I complained solely to a

supervisor of sexual harassment and took no further action. There were no posters at the public entrances or exits and those were the entrances and exits that I used. I did not use the staff entrances or exits, and I brought my lunch and did not use the cafeteria. Therefore, I would not see any posters that are alleged to have been put in the cafeteria or elsewhere. The Smithsonian is a huge series of buildings, with many sections, and I would remain in my section.

78.     There were very significant gaps in my receipt of workers' compensation payments, and these payments were not for the full amount of my Smithsonian salary.

79.     After my November 13, 2003, letter, when I requested to come back to work with accommodations, I complied with the Smithsonian's request to timely submit letters from my doctors in 2003. The Smithsonian remained silent until some 5 months later when I received the Smithsonian's proposed "Settlement Agreement" in April of 2004. There was no discussion of my needs for accommodations or my doctor's concerns for my health regarding retaliation or hostility as to my requests for accommodations, which were all stated in my November 13, 2003, letter.

80.     The proposed work plan was originally not included in the agreement that was sent and designated as non-negotiable. Only on the prompting of my counsel did the Smithsonian send the work plan part of the agreement. Ms. Nancy Adams had told me that Ms. Slomba did not intend to send the work plan unless it was specifically requested.

81.     I objected to the performance work plan as well as the proposed

15

settlement agreement.

82. I had great respect and considerable fondness for Nancy Adams as a person. I also believed that Ms. Adams took her job as a museum specialist very seriously. I did not consider Ms. Adams a scientist, however. No one told me that two people were to do the tasks in the work plan that was given to me.

83. While the collections work described in the Proposed Return to Work Plan might or might not have been consistent with some museum specialist's duties, they were not consistent with the primary responsibility and duties that I had performed in my more than fifteen year tenure with the Smithsonian.

84. Ms. Nancy Adams stated to me that she was afraid that both of us were "being set up" by the return to work plan proposal.

85. I admit that my previous work involved exposure to both direct and ambient naphthalene, for which I was never given any accommodations. The 2004 proposed work plan would greatly increase the more harmful direct naphthalene exposure.

86. I admit that I could no longer work with Dr. Krombein since he was no longer at the museum, but I strongly deny that there was no opportunity for me to do research support at the Smithsonian. The Brazil trip on which I contracted DHF was the start of a major Hymenoptera research project funded by the National Science Foundation and led by Dr. Schultz. I functioned as Dr. Schultz's research assistant on the project.

87. After I contracted DHF, Dr. Davis told me that he would like to have my

16

assistance on the monograph he was working on. He had lost his former assistant and needed help with both research and SEM photography. I was quite willing to have all or part of my time assigned to Dr. Davis, and I told him so. Dr. Davis responded that he would speak to Dr. Mathis about the possibility of reassigning some of my time to him, but neither Dr. Mathis nor anyone else brought the subject up again. Years later, I met up with Dr. Davis socially in the fall of 2005. At that time Dr. Davis again told me that he still would need help on the monograph. I was qualified to assist him in his work.

88. The proposed work plan did not include my previous primary responsibilities for research or research support tasks and activities. The proposed work plan also did not include any association with other scientists or research projects.

89. Ms. Slomba did not investigate my objections that I submitted to the work plan by contacting me or my doctors. After November of 2002, no one at the Smithsonian ever spoke to me or my counsel about how best to accommodate my disability.

90. I admit that I did not have the mandatory or even the recommended qualifications required for the proposed Washington National Zoo job vacancy, that the Smithsonian was aware of these facts from my resume which was previously submitted, from my work history at the Smithsonian, and/or from my supervisors, and that I would have violated the good faith requirements of the interactive process if I had claimed that I did have these mandatory and recommended qualifications.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 25 Dec. 2006

Respectfully submitted,

*Beth M. Norden*
Dr. Beth M. Norden

18