# EXHIBIT 1

- Emergency and safety personnel may be informed, when appropriate, if the disability might require emergency treatment; and

- Government officials investigating compliance with laws, regulations, and instructions relevant to equal employment opportunity and affirmative action for individuals with disabilities shall be provided information upon request.

Whenever medical information is disclosed, the recipients must be informed of the confidentiality requirements.

## XIII. Granting an Accommodation Request

As soon as the Responsible Smithsonian Official determines that a reasonable accommodation will be provided, s/he should contact the Disability Program Manager to discuss implementation of the decision. The final decision should be immediately communicated to the individual in writing with a copy to the Disability Program Manager. If the accommodation cannot be provided immediately, the Responsible Smithsonian Official must inform the individual of the projected time frame for providing the accommodation. For additional guidance, see "Extenuating Circumstances" in section XV.D.

## XIV. Denial of Accommodation Request

When a determination has been made that a request for accommodation will be denied, the Responsible Smithsonian Official must fill out the "Denial of Request" form and give it to the individual who requested the accommodation. The explanation for the denial should be written in plain language, clearly stating the specific reasons for the denial. As appropriate, the denial should state the following:

- The reasons the accommodation would not be effective.

- The reason that providing the accommodation would result in undue hardship. [Before making a decision that an accommodation request will be denied, the Responsible Smithsonian Official must consult with the OEEMA and explore whether other effective accommodations exist that would not impose undue hardship.]

- Medical documentation is inadequate to establish that the individual has a disability under the Rehabilitation Act and/or needs a reasonable accommodation.

- The accommodation would require the removal of an essential function.

- The requested accommodation would require the lowering of a performance or production standard.

# EXHIBIT 2

While the written confirmation is not a requirement, it should be made as soon as possible following the request. The Smithsonian will begin processing the request as soon as it is made, whether or not the confirmation has been provided.

A written confirmation is not required when an individual needs a particular accommodation on a repeated basis for the same disability (e.g., the assistance of sign language interpreters or readers). The written form should only be completed for the first request. Notice to the appropriate individual, usually the supervisor, must be given by the employee each time the accommodation is needed.

## VII. Responsible Smithsonian Officials Who Handle Requests for Accommodation

**Requests for accommodation from employees will be decided by the requesting employee's immediate supervisor (unless management identifies another official in writing) unless the request is one which should be handled by one of the individuals or units below. Responsible officials should coordinate all requests for accommodations with OEEMA, LER, and/or OGC. Supervisors should also coordinate discussions with their unit's Equal Opportunity Liaison.**

- The Disabilities Program Manager will oversee requests for adaptive equipment, including information technology and communications equipment. Requests for adaptive equipment will be processed according to the guidelines of the Department of Defense's Computer/Electronic Accommodations Program.

- The unit sponsoring a meeting, training, or program is responsible for providing and funding accommodations related to the unit's events.

- The Parking Office handles requests for accessible parking for employees. Procedures for requesting accessible parking are detailed in Smithsonian Directive (SD) 411, "Smithsonian Institution Parking Program."

- Human Resources Specialists assist in responding to requests for reassignments from employees by providing information on available vacant positions for which they may be qualified. They also handle requests for accommodation from applicants with assistance from the Disabilities Program Manager and/or the selecting official.

- The Accessibility Coordinator, in coordination with the Office of Facilities Engineering and Operations and its components, will handle requests for the removal of architectural barrier(s) on Smithsonian grounds.

## VIII. The Interactive Process – Selecting a Reasonable Accommodation

The individual requesting the accommodation and the Responsible Smithsonian Official

5

# EXHIBIT 3

**COMPLAINT OF DISCRIMINATION**
**BECAUSE OF RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN**
**SEXUAL HARASSMENT, AGE, OR CONDITION OF HANDICAP**
*(Please type or print)*

OFFICE REPORT BY THE
SMITHSONIAN INSTITUTION
OFFICE OF EQUAL OPPORTUNITY

Full name of person complaining:

Beth Mary Norden

Street address (RD or PO Box Number):

112 Greenhill Rd.

City    State    Zip Code

Greenbelt, Md. 20770

What is the title and grade of your job? GS-11
Museum Specialist 1016 series

Name of the office where you work:
NMNH— Systematic Biology (Entomology Unit)

Street address of office:
10th & Constitution Ave.

City    State    Zip Code
Wash., D.C.    20560

5.  Date on which most recent discrimination took place:

Month    Day    Year

ongoing

---

*(FOR OEO USE ONLY. Do not write in this space)*

JUL-AUG 26  PH 2: 30

2.  Case Number: 03-20-082603
Date Filled:

Smithsonian office(s) to be credited with this complaint:

RECEIVED BY THE
SMITHSONIAN INSTITUTION
OFFICE OF EQUAL OPPORTUNITY
2003 AUG 26 AM 2:30

4.  Area code and home phone:
301-345-1697

Area code and work phone:
202-357-1829

6.  Check below why you believe you were discriminated against:

( )  Race (Your race) _____
( )  Color (Your Color) _____
( )  Religion (Your religion) _____
(X)  Sex (Your sex) _____ female
( )  National origin (Your national origin) _____
     Sexual Harassment _____
( )  Age (Your age) _____
(X)  Condition of handicap (Your handicap) _____ effects of dengue / naphthalene sensitivity

---

7.  Explain how you believe you were discriminated against *(Treated differently from other employees or applicants)* because of your race, color, religion, sex, national origin, sexual harassment, age, or condition of handicap. *(You may continue your answer on another sheet of paper if you need more space.)*

See attached

8.  What corrective action are you seeking? *(Be specific, please)*

See attached

---

9a.  Have you discussed complaint with an EO counselor?

(X) Yes    Shadella Davis
                   Name of Counselor

( ) No

9b.  If you have a representative?
Attorney:

Name: Vickie Fang / Alex Slihcet

Address: 8702 Nightingale Dr.
Lanham, MD 20706

Telephone number (301) 552-9908

FVICKIE @ COMCAST.NET

---

Signature and Date    Beth B. Norden    20 Aug. '03

SEE REVERSE SIDE OF FORM FOR INSTRUCTIONS

Attachment to Beth Norden's Complaint of Discrimination

Question 7.  S.I. management discriminated against me by refusing to make reasonable accommodations for the handicapping conditions I suffered as a result of the dengue hemorrhagic fever.  At one point, when I pressed for a meaningful reduction of the naphthalene fumes in my environment, I was told that, as a 50 year old woman, I was probably going through menopause and was therefore being overly emotional.  When others at the Smithsonian pressed for accommodations on my behalf, management retaliated by forcing me to go out on disability.


Question 8.  I want to be made whole for the physical and emotional pain, suffering, and harm I experienced as a result of S.I.'s failure to accommodate my handicapping condition and for the severe depression and other emotional damage I experience as a result of having being forced out of my position and onto disability status.  I want to be made whole for all the economic damages I have suffered as a result of being forced to go on disability.  In addition, I would like my former position back under the following conditions:

    a.   adequate accommodations for the handicapping conditions I suffer as a result of the dengue hemorrhagic fever;

    b.   as protection from additional retaliation, a written employment contract with a just cause termination provision and a good faith covenant regarding all aspects of employment.

**EXHIBIT 4**

undue hardship.

## III. Definition of Key Terms

Essential Functions:  The job duties that are so fundamental to the position that the individual holds or desires that s/he cannot do the job without performing them or the function is cited as part of a critical element in the individual's Performance Plan. A function can be "essential" if, among other things: the position exists specifically to perform that function; there are a limited number of other employees who could perform the function; or the function is specialized and the individual is hired based on his/her ability to perform it.  Determination of the essential functions of a position must be done on a case-by-case basis so that they reflect the job as actually performed, and not simply the components of a generic position description.

Individual with a Disability: A person is considered to have a disability if s/he: (1) has a physical or mental impairment that substantially limits a major life activity; (2) has a record of a substantially limiting impairment; or (3) is regarded as having a substantially limiting impairment.

Qualified Individual with a Disability: An individual with a disability is qualified if (1) s/he satisfies the requisite skill, experience, education, and other job-related requirements of the position, and (2) s/he can perform the essential functions of the position, with or without reasonable accommodation.

Reasonable Accommodation: Any change in the work environment or in the way things are customarily done that enables a qualified individual with a disability to enjoy equal employment opportunities.  Examples include, but are not limited to, making existing facilities used by employees readily accessible to and usable by individuals with disabilities, the acquisition or modification of equipment or devices, job restructuring, the provision of qualified readers or interpreters, reassignment, and other similar accommodations for individuals with disabilities.

Undue Hardship: The Smithsonian does not have to provide a particular accommodation if the specific accommodation causes significant difficulty or expense to the Institution.  The determination of undue hardship is always made on a case-by-case basis, considering factors that include the nature and cost of the reasonable accommodation needed and the impact of the reasonable accommodation on the operations of the unit or program.  See Section VIII for additional information.

## IV. Responsible Offices and Staff

The Office of Equal Employment and Minority Affairs (OEEMA) monitors the Smithsonian's efforts to ensure equal opportunity in hiring, advancement, and other personnel actions among employees and applicants with disabilities and oversees the implementation of these procedures. To this end, the Disabilities Program Manager in OEEMA provides assistance to employees and

supervisors in identifying and implementing reasonable accommodations. In addition, OEEMA staff report on the Institution's provision of reasonable accommodations and work with all parties to process and attempt to resolve complaints of discrimination on the basis of disability.

The Office of Human Resources (OHR) provides assistance to supervisors, employees, and applicants through the following branches and staff:

- Labor and Employee Relations (LER) assists supervisors in requesting medical documentation and dealing with performance- and conduct-based issues.

- Human Resources Specialists assist applicants in requesting accommodations and assist supervisors in considering existing alternative assignments when other accommodations are ineffective.

- Employee Assistance Program (EAP) may provide information relevant to an employee's request for accommodation to OGC, OEEMA, and OHS. EAP does not make legal determinations, including whether an employee or applicant is a qualified individual with a disability under the Rehabilitation Act and therefore entitled to reasonable accommodation. EAP does not maintain medical information received from the employee's health care providers in response to a request for medical documentation.

Office of General Counsel (OGC) provides legal advice, when requested by OEEMA, LER/ OHR, unit personnel manager, supervisor, or other appropriate Smithsonian official, regarding (1) whether an employee or an applicant is a "a qualified individual with a disability" under the Rehabilitation Act, and (2) if the employee or applicant is "a qualified individual with a disability," whether the accommodation requested would impose an "undue hardship" and therefore cannot be granted.

Occupational Health Services (OHS) receives and maintains medical information provided by the employee's designated health care providers relevant to the request for accommodation. When the medical information submitted to OHS is inadequate or ambiguous, OHS communicates directly with the health care providers to obtain additional information after a written authorization for release of medical information is received from the employee. OHS reviews an employee's medical information to identify the nature, severity and duration of the individual's impairment, the activities that the impairment limits, the extent to which the impairment limits the individual's ability to perform the activities, and/or how the reasonable accommodation may assist the individual. When requested by OEEMA and/or OGC, OHS discloses medical information and documentation (including diagnosis and prognosis) to OEEMA/OGC in order to facilitate the review of the request. If the employee has not signed a written authorization for release of medical information, OEEMA and/or OGC sends a written request for the medical information to the OHS' Associate Director. OHS does not make legal determinations, including whether an employee is a qualified individual with a disability under the Rehabilitation Act and therefore entitled to reasonable accommodation.

3

# EXHIBIT 5

p. July 31, 2002, I met with Dr. Furth to discuss my naphthalene sensitivity and any possible accommodations to it in terms of specimen use.

q. October 8, 2002, I met with Chandra Heilman to discuss my need for accommodations for naphthalene exposure. Ms. Heilman called Carol Grover from her office. Over the next week Ms. Heilman and I emailed each other about the possibility of my working in the Insect Zoo.

r. November, 2002, Days before receiving the memo which terminated my light duty hours, I asked Dr. Schultz if I would receive my respirator and air filter. He assured me that these accommodations were in progress.

s. November 29, 2002, Attempted interactive process through email as described in the answer to Interrogatory Answer 12(d).

t. In December of 2002 and the beginning of 2003, Dr. Aldrich from the USDA tried to inform my department that funding for my "loan" to USDA had been approved and asked that I be transferred there. This loan was a part of the accommodation process I had initiated.

u. On November 13, 2003, I sent a letter to Dr. Mathis and Dr. Schultz requesting to be returned to my position with accommodations in the fall of 2003, and my doctors also sent letters advising accommodations.

v. My attorney, Vickie Fang, requested accommodations from Marilyn Slomba and asked that I be reassigned to a different position if my naphthalene exposure could not be accommodated in my previous position.

w. The informal and formal complaints I filed asked to be returned to work with appropriate accommodations.

# EXHIBIT 6

1    incapacitated?

2        A    Yes.

3        Q    Okay.  From November 2003 through current times, how

4    often do you get migraines?

5        A    It varies.  It's based on triggers.  Right now if

6    you gave me a plate with naphthalene in it, I would probably

7    go into a migraine.  I avoid all the triggers that I can

8    avoid.  Unfortunately there are some life changes and

9    barometric pressure I can't avoid, and working with the

10   neurologist I had a series of nerve blocks starting last

11   December going through March that have been effective in

12   reducing the number so now approximately two to three a month.

13       Q    Okay.  From November -- and is that a reduction from

14   what you were getting in the November 2003 time frame?

15       A    Yes, it is.

16       Q    Okay.  Let's talk about from roughly November 2003

17   until the time you had this treatment, I think you said

18   December of last year.

19       A    It started December.  My neurologist, Dr. Blake, had

20   suggested it because she knew that obviously I would like to

21   be migraine free.

22       Q    Uh-huh.

23       A    And I felt that would be very beneficial for any

24   kind of functioning.

25       Q    So from November 2003 until this, this treatment

1   successfully reduced your migraines, how many would you get a

2   month, average, rough, roughly?

3        A    Prior to that I was getting maybe five or six.

4        Q    Okay.  And that would mean you were, with those five

5   or six migraines, if you do the math, that incapacitated you

6   for two to three days a piece, you were incapacitated for 15

7   to 20 days a month?

8        A    Possibly.  Again, if a migraine begins, and there is

9   a precursor, there is the visual distortion, I know when I'm

10  going into a migraine.  If I'm able to early on take

11  medication I am usually successful in blocking it.

12       Q    Okay.

13       A    If I don't stop it, then it's just like a snowball

14  rolling downhill.  Then it becomes full blown and then it's

15  out of control.

16       Q    Okay.  So from roughly the November 2003 time frame

17  until this treatment that helped you out with the problem, how

18  many migraines a month would you get that incapacitated you?

19       A    Again, it's hard to answer your question because I

20  would get migraines and I know what to do so in terms of days

21  that I was totally incapacitated, maybe three.

22       Q    Maybe three days or three migraine episodes?

23       A    Maybe three days.

24       Q    Okay.  The rest of --

25       A    We're talking totally incapacitated.

1      Q     Right, right.  The rest of the time you feel you are

2  successfully able through medication to, to control the

3  migraine such that you were not incapacitated?

4      A     Yes.

5      Q     Okay.  When you are able to control your migraines

6  such that you're not totally incapacitated, are you of a

7  condition that you believe you are capable of working?

8      A     I would not have requested to return to work if I

9  didn't believe that I would be able to handle it, so to answer

10  your question, yes, I believe I could return to work.  Yes, I

11  believe with appropriate precautions I can work full time.

12      Q     Okay.  And the precautions that, that you believe

13  you needed were the three set forth in the November 13, 2003

14  letter?

15      A     Yes.

16      Q     Okay.

17      A     Yes.  Again, nobody knows for sure --

18      Q     Hang on a second.  Let him mark this.

19            MR. HENAULT:  This is 17, correct, sir?

20            COURT REPORTER:  17, right.

21            (Norden Deposition Exhibit Number 17 marked for

22  identification.)

23            BY MR. HENAULT:

24      Q     Ms. Norden, please take a look at what has been

25  marked as Exhibit 17.

# EXHIBIT 7

Schultz

265

1                MS. FANG:  Third, excuse me.

2                Madam court reporter, I will ask you to

3        number that sequentially.

4                        (The document referred to was

5                        marked Plaintiff's Exhibit

6                        No. 18 for identification.)

7        (Brief pause.)

8        THE WITNESS:  Okay.

9        BY MS. FANG:

10       Q        Do you recognize this as the work plan

11       that went with the proposed third return to work?

12       A        Yes.

13       Q        Did you have any part in creating it?

14       A        Only in that I -- yes, I did.

15       Q        Okay.  What was your participation with

16       it?

17       A        I mainly approved it.

18       Q        So you read and approved this plan.

19       A        Yes.

20       Q        Who drew it up?

21       A        It was primarily designed by Nancy

22       Adams.

# EXHIBIT 8

1   were?

2       A       Were photographed?

3       Q       Were mounted and micrographs taken.

4       A       I don't think so.

5       Q       Okay.  Is that just because it wasn't

6   necessary for the project?

7       A       The project may yet come when we will

8   need to make images of some of these ants, but as

9   far as I can remember, we haven't had a project

10  like that yet.

11      Q       Okay.  Is the NSF grant completed?

12      A       It's currently on a one year no cost

13  extension.

14      Q       Okay.

15              MS. FANG:  I'm going to ask for about a

16  two-minute break.

17              (Brief recess.)

18              MS. FANG:  Back on the record.

19              BY MS. FANG:

20      Q       During this time period, the second

21  return to work, was there any consideration given

22  to having Beth do SEMs or help to complete

**EXHIBIT 9**

amended 95-96 Plan

AMENDED 1995-96 PERFORMANCE PLAN
for Beth B. Norden, 12 April 1996

David Furth, Supervisor of Record

In January 1996 Beth Norden began providing research support for Karl Krombein and Ted Schultz (50% time for each). Work was to be conducted at NHB and MSC as appropriate for the tasks involved. A meeting of Furth, Krombein, Schultz, and Norden was held on 23 Jan. 1996 to discuss working arrangements and how existing tasks would be modified. Several later meetings between Schultz and Norden determined specific tasks for Schultz to be added to the 95-96 plan. The following outlines how performance elements 1 and 2 are to be amended:

Element #1:
This element will be eliminated with the exception of the following specific goals--
a. Scoliidae curation project will be completed.
d. Outstanding K. Krombein loans will continue to be cleaned-up. (Four loans per week will be handled until no loans remain in question).
e. MSC logistics coordination will be provided as requested by D. Furth.

note: Research related loans will continue to be processed by Norden, but non- research related material will be handled as determined by Furth.

Element #2:
This element will now also include research support related to biosystematic studies of ants. The following specific goals are being added--
c. An ant rearing room will be designed and set up at MSC; ant colonies will be appropriately maintained.
d. Label orders will be compiled and processed for the 1992 Brasil/Nicaragua collections.
e. Material in temporary storage from Brasil/Nicaragua will be transferred to labeled shell vials.
f. SEM wing mounts will be prepared for Mycocepurus, Myrmicocrypta, and Apterostigma.
g. An effective SEM preparation technique using critical point drying will be developed for preparing early instar ant larvae.
h. SEM mounts (at least 3 per instar) will be prepared for all Mycocepurus smithi instars.
i. SEM photographs of M. smithi will be taken (all appropriate angles and magnifications) for each of the four instars.

# EXHIBIT 10

**Summary Performance Appraisal**

Norden B. Norden, SSN 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

Department of Entomology, NMNH

June 1, 1999-May 31, 2000

Prepared by: Ted Schultz (17 July 2000)

*last evaluation*
*pre-dengue*
*(contracted dengue Aug. 2000)*

GENERAL COMMENTS

Beth Norden has exceeded the requirements of her job during the 1999-2000 period

The thing I have come to appreciate most about Norden is that she is highly self-motivated and genuinely interested in her work. She is here at SI because she wants to make a contribution, and she works best when she is given a complex task and a reasonable degree of autonomy. She is happiest when the results of her work produce some obvious benefit -- however modest -- to the department, to the collections, or to the advancement of science in general. This is not to say that Norden shirks mindless, routine work, however; in fact, a large part of her time is occupied with such tasks, and she takes them seriously and carries them out in an exemplary fashion. Whatever the task, Norden always does a good job.

Norden's job is not an easy one, because she is required to divide her time between Schultz research (50%), Krombein research (20%), and collections support (Epstein and the HHAL unit, 30%). All three taskmasters ask more of Norden than she can provide during these weekly time percentages, and Norden is thus required to continually prioritize, schedule, and shift between tasks, all the while keeping each of her three "supervisors" informed of how and why particular tasks must be parceled out and performed over a period of time. Krombein in particular has had trouble modifying his needs to accomodate this arrangement, placing extra pressure on Norden. Because Norden is task-oriented and derives job satisfaction from seeing tasks through to completion, she often copes with this difficult situation by working in excess of the time percentages listed above. This is a problem that both Epstein and I have tried to address during the past year, because this is entirely unfair to Norden.

Overall, I'd say that Norden has made a significant contribution to the Department this year, and, as in the past, I rate Norden's overall performance as outstanding.

SMITHSONIAN INSTITUTION
Performance Plan
[* indicates a critical element]
Beth B. Norden, SSN: 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
June 1, 1998 - May 31, 1999

## PERFORMANCE ELEMENT No. 1 -- RESEARCH ASSISTANCE - HYMENOPTERA.*

These duties are in support of aculeate Hymenoptera research and will occupy a variable amount of time depending on contracts to be negotiated. Included are such tasks as manuscript preparation, proofreading, and review; suggestions for future research and possible approaches; scientific writing of field data and laboratory analysis; literature searches and library research; correspondence with authorities on specific research topics; microdissection of specimens for microscopic analysis and special mounts; SEM preparation of specimens including unique uncoated material; preparation of photos and tables for illustrative plates; coordination with illustrators, SEM technicians, botanists, and outside agencies for supporting services contributing to biosystematic studies of Ceylonese wasps and other Hymenoptera research contributions. Field work includes such tasks as collection and behavioral studies conducted at domestic and foreign sites in support of research projects and to obtain specimens for the National Collection.

PERFORMANCE STANDARDS for Element 1.
(Quality, quantity, timeliness or other measures)

STANDARDS NOT MET: Does not support research on aculeate Hymenoptera well, including aspects of manuscript preparation and review, literature and library work, correspondence, field work, etc. (as detailed above).

STANDARDS MET: Various duties are conducted in a timely fashion with minimal supervision. There are no serious errors, and publication results. Field work yields quantifiable results in terms of numbers or value of specimens and/or data obtained.

STANDARDS EXCEEDED: Difficult tasks or situations are handled well (receiving positive feedback from colleagues) or when a new approach/technique is created and achieves positive results.

ACTUAL PERFORMANCE for Element 1.
Performance of this element . . .

☐ EXCEEDED    ☐ MET    ☐ DID NOT MEET

standards in the following ways and for the following reasons:

Performance Plan
Beth B. Norden, SSN: 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
June 1, 1998 - May 31, 1999

PERFORMANCE ELEMENT No. 2 -- **RESEARCH ASSISTANCE - FORMICIDAE.***

These duties are in support of research on Formicidae, and will occupy 45% of Norden's time. Included are such museum tasks as specimen preparation, sorting, labeling; maintenance of ~75 live ant colonies; storage and preparation of specimens and some lab procedures for DNA sequencing; databasing of specimens and of bibliographic references; manuscript preparation, proofreading, and review; scientific writing of field data and laboratory analysis; literature searches and library research; correspondence with authorities on specific research topics; micro-dissection of specimens for microscopic analysis and special mounts; SEM preparation of specimens including unique uncoated material; preparation of photos and tables for illustrative plates; coordination with illustrators, SEM technicians, other specialists, and outside agencies for supporting services contributing to research on ants. Field work may be required at domestic and foreign sites in support of research projects and to obtain specimens for the National Collection.

---

PERFORMANCE STANDARDS for Element 2.
(Quality, quantity, timeliness or other measures)

STANDARDS NOT MET: Does not support research on ants well, including aspects of manuscript preparation and review, literature and library work, correspondence, field work, etc. (as detailed above).

STANDARDS MET: Various duties are conducted in a timely fashion with minimal supervision. There are no serious errors, and publication results. Field work yields quantifiable results in terms of numbers or value of specimens and/or data obtained.

STANDARDS EXCEEDED: Difficult tasks or situations are handled well (receiving positive feedback from colleagues), when a new approach/technique is created and achieves positive results.

---

ACTUAL PERFORMANCE for Element 2.
Performance of this element . . .

☐ EXCEEDED      ☐ MET      ☐ DID NOT MEET

standards in the following ways and for the following reasons:

Performance Plan
Beth B. Norden, SSN:  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
June 1, 1998 - May 31, 1999

PERFORMANCE ELEMENT No. 3 -- ADMINISTRATIVE/CLERICAL.

Tasks in this element provide administrative and clerical support for the Research Scientists including letter/memo/report writing; photocopying; S.I. Press and other couriering; library retrievals and returns; reprint mailing, and reprint and Hymenoptera Catalog requests; reprint folder typing and filing; FAX sending and receiving; routine phone/correspondence inquiries; SEM lab sign-up coordination; current price lists and supply ordering; updating of computer files for mailing lists, etc.; and maintaining stock of necessary office/research supplies in appropriate rooms.  These duties will occupy a variable amount of time depending on contracts to be negotiated.

Department-wide duties include: Outreach with permission of supervisor; reads SI e-mail daily.

PERFORMANCE STANDARDS for Element 3.
(Quality, quantity, timeliness or other measures)

STANDARDS NOT MET: Administrative and clerical duties are not performed in an efficient and timely fashion so that unacceptable delays and confusion occur.

STANDARDS MET:  Duties are accomplished in a timely fashion, are error free, and require no supervision.

STANDARDS EXCEEDED: Diplomatic problem solving is noted by supervisor, a special project is undertaken that benefits the Department,  more efficient methodology is invented, or a large amount of productivity is accomplished.

ACTUAL PERFORMANCE for Element 3.
Performance of this element . . .

☐ EXCEEDED        ☐ MET        ☐ DID NOT MEET

standards in the following ways and for the following reasons:

Performance Plan
Beth B. Norden, SSN: 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
June 1, 1998 - May 31, 1999

PERFORMANCE ELEMENT No. 4 -- **CURATORIAL.**

**These duties are in support of the Hymenoptera Collections Management Unit, this will occupy a variable amount of time depending on contracts to be negotiated and consist of CRIS loan transactions of aculeate taxa under the responsibility of Schultz.**

PERFORMANCE STANDARDS for Element 4.
(Quality, quantity, timeliness or other measures)

STANDARDS NOT MET: Collections duties are not performed in an efficient and timely fashion so that unacceptable delays and confusion occur

STANDARDS MET:  Collections duties are accomplished in a timely fashion, are error free, and require no supervision.

STANDARDS EXCEEDED: Diplomatic or innovative problem solving is noted by supervisor, a special project is undertaken that benefits the Department, more efficient methodology is invented, or a large amount of productivity is accomplished.

ACTUAL PERFORMANCE for Element 4.
Performance of this element . . .

☐ EXCEEDED    ☐ MET    ☐ DID NOT MEET

standards in the following ways and for the following reasons:

# EXHIBIT 11

06/21/02  FRI 09:03 FAX 202 357 2078      Entomology                                    ☑ 001

*Hold off on order*
*Per Beth —*



**FAX** *not allowed*
*to wear*

Department of Entomology
National Museum of Natural History
Smithsonian Institution
Mail Stop 105
10th & Constitution Ave., NW
Washington, DC 20560
Fax: (202) 786-2894
Confirm: (202) 357-2078

*respirator*
*Due to*
*fainting spells*

Date: ___21 June 2002___

Number of Pages: _____
(Including cover sheet)

To: ___Carol Youmans___

Phone: _____        Fax: ___786-3141___

From: _____

Phone: _____

Instructions or Comments (if any):                    **SI-1680**

___Ordering info. from Kathy Makos. Thanks —___
___Please let me know if there is any problem___
___with ordering.___

# EXHIBIT 12

MILLER

1      Q.   And as you understand the circumstances

2  during the fall of 2002, that would be an

3  incorrect statement.  It would be incorrect to

4  say, we identified the fourth floor room as the

5  superior accommodation, and therefore Dr. Norden

6  won't receive the other accommodations?

7           MR. HENAULT:  Object to the form of the

8  question.

9           THE WITNESS:  I'm sorry, you're

10  confusing me with double negatives, so I'm

11  not -- simply it's not clear to me what you're

12  saying.

13           BY MS. FANG:

14      Q.   You're absolutely right to get me to

15  clarify it until we're all on the same page.  I

16  appreciate that.  But this is actually an

17  important question to me.

18           Your understanding back in November of

19  2002 is what I'm asking about.  Was it your

20  understanding by the time you signed that

21  termination of light duty memo, that the fourth

22  floor had been identified as the superior

MILLER

1    accommodation and that because the fourth floor

2    was available, Dr. Norden wouldn't receive the

3    other accommodations?

4         A.    That was not my understanding.

5         Q.    If Dr. Schultz or someone else had told

6    you, Well, we're not giving Dr. Norden a

7    respirator or an air filter because the fourth

8    floor has been identified as a superior

9    accommodation, would you have terminated her

10   light duty hours?

11        MR. HENAULT:    Object to the form of the

12   question.  You may answer, sir.

13        THE WITNESS:    I don't understand the

14   question.

15        BY MS. FANG:

16        Q.    If Dr. Schultz or Dr. Mathis or Dr.

17   Furth had come to you and said, We think Dr.

18   Norden should use the fourth floor ventilated

19   room and because that is available as an

20   accommodation, we don't need to provide her

21   request for a respirator or a negative air

22   filter or change in her tasks to minimize the

MILLER

1    exposure to napthalene -- if you had been told

2    that, would you have still decided to terminate

3    her light duty hours?

4         MR. HENAULT:  Object to the form of the

5    question.  You may answer, sir.

6         THE WITNESS:  If I had been told that,

7    I would have corrected that understanding, and

8    it might or might not have affected the memo

9    terminating the light duty hours.

10        BY MS. FANG:

11        Q.   And what do you mean when you say

12   corrected that understanding?

13        A.   Well, as I have said, it was my

14   understanding at that time that we had offered a

15   respirator and it had been refused.  It was my

16   understanding that we had offered a portable air

17   filter, and I'm not sure why the entity had

18   never been identified, and that we had offered

19   the fourth floor room.

20        And the three different items, three

21   different accommodations were parallel, if you

22   will, and not dependent upon one another.

MILLER

1        Q.    Sure.  And if your understanding had

2   been different, if your understanding had been

3   that Dr. Norden wanted the respirator, wanted

4   the air filter, OSCM was still advising the air

5   filter and the respirator, and Dr. Schultz had

6   made the decision that because the fourth floor

7   room was available, the other two accommodations

8   needn't be provided, would you have taken

9   different action?

10       MR. HENAULT:  Object to the form of the

11  question.  You may answer, sir.

12       THE WITNESS:  I don't really see the

13  relationship between the two.

14       BY MS. FANG:

15       Q.    But?

16       A.    I had -- had there been a problem --

17  had I been aware of a problem on the

18  accommodation front, I would have addressed that

19  problem, and that problem may or may not have

20  affected the termination of light duty status.

21       Q.    Of course.

22       A.    So it isn't just a yes or no question.

**EXHIBIT 13**

MILLER

1    Q.    I'm referring to the third paragraph,

2    the area that I've marked with a star, was it

3    your understanding that purchase of a breath

4    mask, respirator, negative air filter were still

5    in process for Dr. Norden?

6    A.    I believe that's the fourth paragraph,

7    but I -- as I have said before, I believe that

8    we were undertaking the purchase of that

9    equipment.

10    Q.    When you signed the 2002 November memo,

11    you believe that Dr. Norden hadn't received

12    those accommodations, either because she had

13    rejected them or they had simply been shown to

14    be ineffective; is that correct?

15    A.    Yes.

16    Q.    Would you have signed this memo and

17    taken this action if you believed instead that

18    Dr. Schultz simply never provided a respirator

19    and never provided a negative air filter?

20        MR. HENAULT:   What memo are you

21    referring to him signing?

22        MS. FANG:   The November one.

MILLER

1        MR. HENAULT:  Object to the form of the

2    question.  You may answer, sir.

3        THE WITNESS:  I believe that we had

4    offered those accommodations.

5        BY MS. FANG:

6    Q.   I'm sure you did, sir.  I believe that

7    when I first saw the memo, but what I'm asking

8    now is if you had believed otherwise, if you had

9    believed that Dr. Norden had been repeatedly

10   promised these accommodations and not given

11   them, Dr. Schultz simply didn't purchase them,

12   would you have terminated her light duty hours?

13       MR. HENAULT:  Object to the form of the

14   question.  You may answer, sir.

15       THE WITNESS:  At least in the case of

16   the respirator, I had evidence that I believed

17   she had not -- that she had been offered and

18   gone through the process and not accepted the

19   respirator.

20       BY MS. FANG:

21   Q.   I think we've established certainly to

22   my satisfaction, I think to any reasonable

MILLER

1    persons, that you believed these offers had been

2    made.

3        A.    Yes.

4        Q.    And that she had rejected them or for

5    some reason they just weren't possible.

6        A.    And that's the answer to your question.

7        Q.    No.  My question is:  If you didn't

8    believe that, if you believed that Dr. Norden

9    may have said, I want a negative air filter

10   instead of a respirator, was told she could have

11   both, happily accepted the offer of both, Dr.

12   Schultz simply didn't provide them, would you

13   have still terminated her light duty hours?

14       MR. HENAULT:  Object to the form of the

15   question.  You may answer, sir.

16       THE WITNESS:  I believed as did to my

17   knowledge the rest of the people copied on this

18   Email that we had made a good faith effort to

19   offer those accommodations.

20       BY MS. FANG:

21       Q.    If you believed otherwise, if you

22   believed that one of your subordinates had not

MILLER

1    offered the accommodations, possibly not even

2    been honest with you about the whole procedure,

3    would you have still terminated her light duty

4    hours?

5            MR. HENAULT:  Object to the form of the

6    question.  You may answer, sir.

7            THE WITNESS:  I would have corrected

8    that situation.

9            BY MS. FANG:

10       Q.   Of course you would have.  Of course.

11   And your correction of it would have been to get

12   the accommodations, wouldn't it?

13       A.   Yes.

14       Q.   And then after you had gotten the

15   accommodations for her, would you then have

16   given it some time and seen whether she was able

17   to work full time hours after she had some

18   recovery period with the accommodations?

19            MR. HENAULT:  Object to the form of the

20   question.  You may answer, sir.

21            THE WITNESS:  That would have depended

22   on the advice of Dr. Lawford.  Again, it was not

MILLER

1    my job to judge the effectiveness of the

2    accommodations versus the health condition.

3              BY MS. FANG:

4       Q.   I understand.  If Dr. Lawford had

5    advised that her health was improving now that

6    she had accommodations, would it have been your

7    decision to allow her to continue on light duty

8    hours for at least some period?

9              MR. HENAULT:  Object to the form of the

10   question.  You may answer, sir.

11             THE WITNESS:  If I had Lawford's

12   recommendation of that, I would have followed

13   it.

14             BY MS. FANG:

15      Q.   Thank you.

16             **(Miller Deposition Exhibit Number 5 was**

17   **marked for identification.)**

18             THE WITNESS:  I've read it.

19             BY MS. FANG:

20      Q.   Do you remember seeing it in 2002?

21      A.   Yes.

22      Q.   Looking at the bottom of the second

# EXHIBIT 14

MILLER

1    A.    I believe either Wayne and/or I spoke

2    with the USDA lab about it and encouraged them,

3    and we basically never heard back from them.

4    Q.    Did Dr. Mathis tell you he never heard

5    back from the USDA?

6    A.    Yes, during the time period -- I forget

7    exactly when this discussion was going on, but

8    -- and when I would have last asked him about

9    it, but it's the sort of thing that had they

10    responded positively, I would have been told

11    about it.

12    Q.    If they had responded in December or

13    January, December of 2002, January of 2003

14    saying that at least some funds had been

15    approved and were ready for her here, how would

16    you have reacted?

17    MR. HENAULT:  Object to the form of the

18    question.  You may answer, sir.

19    THE WITNESS:  I think we would have

20    responded positively.

21    BY MS. FANG:

22    Q.    Meaning you would have -- meaning what?

MILLER

1      A.   We certainly would have explored with

2   the USDA the situation and with her and with our

3   human resource people.

4           MS. FANG:  Five minute break, please.

5           MR. HENAULT:  Five minutes.  We've also

6   got to call the court.

7           **(Whereupon, a brief recess was taken**

8   **from 11:23 until 11:51 p.m.)**

9           BY MS. FANG:

10     Q.   Dr. Miller, was it your understanding

11   that Dr. Norden would be able to do most of her

12   work on the fourth floor ventilating room if

13   that was the floor she chooses?

14          MR. HENAULT:  Could you repeat that

15   question?

16          BY MS. FANG:

17     Q.   Was it your understanding that Dr.

18   Norden would be able to do most of her work in

19   the fourth floor ventilating room, if she

20   choose?

21          MR. HENAULT:  Object to the form.  You

22   may answer, sir.

# EXHIBIT 15

## ADMISSION REQUEST NO. 15

Admit or deny that the majority of the work Dr. Norden performed in the period 1997 through 2000 was consisted of research support.

**RESPONSE:** Plaintiff's performance plans referred variously to "research assistance" and "research support." As indicated in Plaintiff's performance appraisal, from June 1996 -May 31, 1997, Plaintiff worked for Karl Krombein, a research scientist emeritus, and Ted Schultz, a research scientist, with David Furth, Collections Manager, as the rating official of record. (Tab 1, pages 211-218) From June 1997 -May 31, 1998, Plaintiff worked for Krombein and Schultz. (Tab 1, 196-210) From June 1, 1998-May 31, 1999, Plaintiff worked for Krombein, Schultz, and spent 4-8 hours per week on "curatorial" work. (Tab 1, pages 185-195) From June 1, 200-May 31, 2000, Worked 20% for Krombein, 50% for Schultz, and 30% for Mark Epstein, a collection manager. (Tab 1, pages 174-184). As indicated in the June 1, 2000-May 31, 2001 narrative appraisal, from June 2000 through Sept. 2000, Plaintiff worked 50% for Schultz, 20% for Krombein, and 30% for Epstein; after September she was assigned 50% to Schultz and 50% to Epstein. (Tab 7, pages 1529)

## ADMISSION REQUEST NO. 16

Admit or deny that USDA EMPLOYEES attempted to contact Smithsonian EMPLOYEES through email or other means about a temporary position for Dr. Norden to work at the USDA after the NOVEMBER 2002 MEMO, and that Smithsonian EMPLOYEES did not alter Dr. Norden's disability status or otherwise make arrangements to allow her to take the position.

**RESPONSE:** Deny.

# EXHIBIT 16



**United States Department of Agriculture**

Research, Education, and Economics
Agricultural Research Service

December 6, 2002

SUBJECT:     Employment of Beth Norden in CAIBL

TO:     Wayne Mathis
Research Entomologist / Smithsonian Department of Systematic Biology

FROM:     Jeffrey R. Aldrich
Research Leader / Chemicals Affecting Insect Behavior Laboratory

A Cooperative Research and Development Agreement has finally been agreed upon and approved by the National Program Staff between our laboratory and Sterling International, Inc., for "Development of a trap and lure for the Asian tiger mosquito, *Aedes albopictus*." Under this agreement we will receive $22,500 per year (after overhead charges) for 3 years. Part of the understanding between Mr. Rod Schneidmiller, President of Sterling International, and myself was that we have an opportunity to enlist the services of Dr. Beth Norden who, for personal reasons, is highly motivated to and desirous of performing the type of research targeted under the CRADA.

As a result of this agreement, CAIBL is now in a position to reimburse the Department of Systematic Biology for the full amount stated above to help defray the salary cost of Dr. Norden. We hope that this funding, plus additional accommodations provided due to the health issues involving Dr. Norden, will be sufficient to enable her to be assigned to our laboratory for an initial period of 1 year beginning as early in 2003 as possible. Toward the end of this first year, the success of Dr. Norden in the project will be evaluated by CAIBL and Sterling International staff for her possible extension for a second year. A similar process will be followed for possible extension of Dr. Norden for a third year.

cc
Ralph Webb
Rod Schneidmiller
Ron Rosenberg
Wanda Collins
Harry Danforth



Alex T. Sliheet, D.C. Bar No. 438977
Vickie Inge Fang, *pro hac vice*
Attorneys for Plaintiff Beth Norden
8792 Nightingale Drive
Lanham, MD  20706
alexsliheet@yahoo.com
fvickie@comcast.net
(301) 552-4908

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Beth M. Norden, ) | Case No. 051232 (RMC) |
| ) | |
| ) | **AFFIDAVIT OF JEFF R. ALDRICH, Ph.D.** |
| Plaintiff ) | |
| ) | |
| v. ) | |
| ) | |
| Lawrence M. Small, ) | |
| ) | |
| Defendant ) | |
| ) | |

## AFFIDAVIT OF JEFF R. ALDRICH, Ph.D.

I, Dr. Jeff R. Aldrich, declare:

1. My name is Jeff R. Aldrich.  I am over the age of eighteen and competent to

   testify.

1

2.  My address is the U.S. Department of Agriculture, BARC-West , Building 007, Beltsville, MD 20705.

3.  The attached memo which is dated December 6, 2002, is a true and correct copy of the memo that I sent to Dr. Wayne Mathis at the Smithsonian regarding employment of Dr. Beth Norden in the Chemicals Affecting Insect Behavior Laboratory at the USDA based on the USDA having received a grant for 3 years to cover Dr. Norden's salary.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 12/25/06

Jeff R. Aldrich, Ph.D

2

December 6, 2002

SUBJECT:    Employment of Beth Norden in CAIBL

TO:    Wayne Mathis
       Research Entomologist / Smithsonian Department of Systematic Biology

FROM:  Jeffrey R. Aldrich
       Research Leader / Chemicals Affecting Insect Behavior Laboratory

A Cooperative Research and Development Agreement has finally been agreed upon and approved by the National Program Staff between our laboratory and Sterling International, Inc., for "Development of a trap and lure for the Asian tiger mosquito, *Aedes albopictus*." Under this agreement we will receive $22,500 per year (after overhead charges) for 3 years. Part of the understanding between Mr. Rod Schneidmiller, President of Sterling International, and myself was that we have an opportunity to enlist the services of Dr. Beth Norden who, for personal reasons, is highly motivated to and desirous of performing the type of research targeted under the CRADA.

As a result of this agreement, CAIBL is now in a position to reimburse the Department of Systematic Biology for the full amount stated above to help defray the salary cost of Dr. Norden. We hope that this funding, plus additional accommodations provided due to the health issues involving Dr. Norden, will be sufficient to enable her to be assigned to our laboratory for an initial period of 1 year beginning as early in 2003 as possible. Toward the end of this first year, the success of Dr. Norden in the project will be evaluated by CAIBL and Sterling International staff for her possible extension for a second year. A similar process will be followed for possible extension of Dr. Norden for a third year.

cc
Ralph Webb
Rod Schneidmiller
Ron Rosenberg
Wanda Collins
Harry Danforth

**EXHIBIT 17**

Schultz

275

1    one day?

2            MR. HENAULT:  Objection to the form.  Go

3    ahead, sir.

4            THE WITNESS:  Yes.

5            BY MS. FANG:

6        Q    Is that calculation based on the premise

7    that very few of the specimens would require

8    research?

9        A    No.

10        Q    What's it based on?

11        A    It's based on two things.  Number one,

12    Nancy Adams was going to participate in this

13    process so it would be two people; and number two,

14    that task is currently being carried out by two

15    people in our department and it's roughly at that

16    rate, and they don't know anything about these

17    particular groups of insects.

18        Q    If they don't know anything about these

19    groups of insects, are they going into the main

20    collection accurately?

21        A    I believe it reflects the fact that

22    Karl's collection and the main collection are using

# EXHIBIT 18

Schultz

299

1    individual PDs with only their name on it or are

2    they given sort of group PDs with several names on

3    them?

4        A    Well, speaking from my limited

5    experience, most PDs are very general.

6        Q    How do you know what a person does at

7    the museum?  Is the PD the best identifier or are

8    the performance plans and evaluations better

9    identifiers?

10        A    The PDs reflect categories of employment

11    and they define broad duties and they define career

12    ladders.  The performance plans are more fine

13    scaled.  They define the tasks, the job on a

14    year-to-year basis, agreed upon by the supervisor

15    and the supervisee.

16        Q    If you wanted to know what somebody's

17    career at the Smithsonian had consisted of, would

18    you go to the PD or would you go to the series of

19    performance plans and evaluations?

20        A    Well, career has a particular meaning

21    and so I would go to the PD.

22        Q    If you wanted to know what their work

Schultz

1    consisted of, which would you go to?

2        A    I would probably want to go to both.

3        Q    Okay.  I'm showing you what the

4    Smithsonian has marked 1906.

5                    (The document referred to was

6                    marked Plaintiff's Exhibit

7                    No. 20 for identification.)

8            BY MS. FANG:

9        Q    Are you familiar with this document?

10       A    Not offhand.

11       Q    As far as you know, is the reason that

12    is circled, number 10, "Potential for the

13    employee's rehabilitation," and number 12 which is

14    not circled but is at least marked, are these the

15    only two reasons that Beth was terminated from her

16    position?

17           MR. HENAULT:  Object to the form of the

18    question.  You may answer, sir.

19           THE WITNESS:  I would have to back up

20    from that question and say that at this point I

21    don't even know in what way this document is

22    relevant to Beth's situation.

**EXHIBIT 19**

Schultz

306

1       Q       Going to position 1137 in the Office of

2   Facilities Engineering and Operations --

3               MR. HENAULT:  Just for the record, that

4   is Plaintiff's Exhibit 23.

5               BY MS. FANG:

6       Q       -- do you know whether Beth was

7   qualified for this position?

8       A       From reading this, I would say yes, she

9   was.

10      Q       Do you know whether the person who was

11  actually hired was better qualified?

12      A       No, I don't know.

13      Q       Okay.  Looking at the Museum Technician

14  description 1081 --

15              MR. HENAULT:  That is Plaintiff's

16  Exhibit 21.

17              BY MS. FANG:

18      Q       -- do you know whether Beth is qualified

19  for this?

20      A       From my reading of this, I would say

21  yes.

22      Q       Do you know whether the person who was

Schultz

307

1    actually hired was better qualified?

2        A    No, I don't know.

3        Q    Okay.  And looking at the last one, the

4    Biological Science Laboratory Technician --

5            MR. HENAULT:  Plaintiff's Exhibit 22.

6            BY MS. FANG:

7        Q    -- was Beth qualified for this?

8        A    No.

9        Q    Why not?

10       A    It's at the LAB, with a major component

11   of heavy duty molecular benchwork.  That's not part

12   of Beth's background.

13       Q    She doesn't have DNA background?

14       A    Very little.

15       Q    Who trained her?

16       A    Me.

17       Q    Okay.  Do you know of any reason to

18   believe that Beth is not disabled?

19           MR. HENAULT:  Object to the form of the

20   question.  You may answer, sir.

21           THE WITNESS:  Could you repeat it?

22           BY MS. FANG: