Alex T. Sliheet, D.C. Bar No. 438977
Vickie Inge Fang, *pro hac vice*
Attorneys for Plaintiff Beth Norden
8702 Nightingale Drive
Lanham, MD 20706
alexsliheet@yahoo.com
fvickie@comcast.net
(301) 552-4908

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Beth M. Norden, ) | Case No. 051232 (RMC) |
| ) | |
| Plaintiff ) | |
| v. ) | |
| ) | |
| Lawrence M. Small, ) | |
| ) | |
| Defendant ) | |

PLAINTIFF'S RESPONSE TO DEFENDANT'S
STATEMENT OF MATERIAL FACTS NOT AT ISSUE

*Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h),*

*Plaintiff hereby files this response to defendant's statement of material facts not at issue:*

1. Dr. Norden admits that she was a GS-11 Museum Specialist during the relevant time periods, but she disputes that her position is set forth in either the position description 39725 cover sheet or the position description which follows the cover sheet in Defendant's Exhibit 1. [Norden aff., par.74] The first page of Defendant's Exhibit 1 is a cover sheet

1

for a position description which was allegedly written in 1997 while Dr. Norden was performing research in Sri Lanka with her then supervisor Dr. Karl Krombein. During the period of Dr. Norden's active employment with the Smithsonian, it was never shown to her. [Norden aff., par.74] The cover sheet states at the bottom of the page in box 32 that it pertains to position descriptions for a GS-5, GS-7, GS-9 career ladder. Dr. Norden began working at the Smithsonian as a GS-9 and was never a GS-5 or GS-7. [Norden aff., par.74] In the same box 32, there is also the statement that this position description is for "OPM PDs for Museum Specialist/Technician." Dr. Norden never served as a technician. [Norden aff., par.74] Throughout her career, Dr. Norden always held the more highly ranked position of Museum Specialist. [Norden aff., par.74] The same box 32 also references position descriptions 39726, 39727, and 39729. Dr. Norden never held these position description numbers. [Norden aff., par.74] Dr. Norden's position description was 032204. [Norden aff., par.74] In box number 3 of Exhibit 1 at the top of the page, a number close to Dr. Norden's PD number -- 32204-- is given as the number of the position description which is being replaced; however, Exhibit 1 shows that this number was obviously written on top of some other number. Furthermore, this number appears to contradict the statement at the bottom of the page that references position description numbers 39726, 39727, and 39726. The only spot on the entire document which actually identifies Dr. Norden is box 9, "Incumbent." In this box, the names "Norden, House" are written, even though Dr. Norden's previous position descriptions never before included another person's name. [Norden aff., par.74] Dr. Norden did have a coworker named

2

Gloria House who worked in the collections department. [Norden aff., par.74] There is just enough room in box 9 of Exhibit 1 to have removed Gloria House's first name and to have written Norden and a comma, in place of Gloria. Because this cover sheet was never shown or mentioned to Dr. Norden, because it references a museum specialist/technician rather than Dr. Norden's title of museum specialist, because it references a career ladder that was not Dr. Norden's, because it references position description numbers that were not Dr. Norden's, and because the position number that it replaces on the top of the page has obviously been changed, the most logical inference is that this cover sheet was originally written for Gloria House and that Dr. Norden's name was added at some later date.

    The first time that Dr. Norden ever saw this alleged position description was in the spring of 2004 when Ms. Slomba faxed it to Dr. Norden's counsel with the statement that the return to work offer would be consistent with this position description. [Norden aff., par.74] The position description cover sheet with the name Norden written beside the name House does not actually describe any position other than "Museum Specialist/Technician." Ms. Slomba accompanied the position description cover sheet with a position description for a Museum Specialist in the Collections Management that does not have any identifying name or number on the document so that there is no way to know whether this Museum Specialist Collections Management position description was ever in any way connected with the cover sheet. [Defendant's MSJ, Ex:1] However, the position description is labeled "Museum Specialist GS-1016-11" so that it appears to be

3

inconsistent with the cover sheet which describes a Museum Specialist /Technician in box 32 and a career ladder that begins with GS-5 work. The position description is also headed with the words "Department of Entomology Collections Management," and it describes both collections work and research support. The majority of Dr. Norden's work had always been in research support, rather than collections, and her actual work plans from 1997, 1998, 1999, and 2000 all reflect this fact. [Plaintiff's Opposition, Ex:10 of 1997 work plan and 2000 work plan] The defendant's suspect position description cover sheet is not controlling because the PMQ testified that you have to look at the position description and the work plans to find out what an employee's work consisted of and that "[T]he performance plans…define the tasks, the job on a year-to-years basis." [Plaintiff's Opposition, Ex:18, Schultz, depo., p.299-300]

    2. The statement contained in paragraph 2 is not in dispute.

    3. Plaintiff's was forced to go on workers' compensation as the result of her DHF, but the payments were funded by the Department of Labor, not the Smithsonian. [Norden aff., par.75]

    4. The statement contained in paragraph 4 is not in dispute.

    5. The statement contained in paragraph 5 is not in dispute.

    6. The statement contained in paragraph 6 is not in dispute.

    7. The statement contained in paragraph 7 is not in dispute.

    8. The statement contained in paragraph 8 is not in dispute.

    9. The statement contained in paragraph 9 is not in dispute.

10. Dr. Norden's limited duty hours were suspended because Dr. Norden was not given any accommodations for her naphthalene sensitivity by the Smithsonian in order to have a chance to demonstrate that she could work full time hours with such accommodations by the end of 2002 [Norden, aff., par.76] Dr. Norden had not rejected any naphthalene accommodations. [Norden aff., par.76] Dr. Miller, who at the time chaired the Department of Systematic Biology, believed that adequate accommodations had been offered to Dr. Norden unsuccessfully. [Plaintiff's Opposition, Ex: 13, Miller depo., pp. 62-66] Dr. Miller testified that had he known that Dr. Norden had not denied and/or had not received the respirator and air filter accommodations, he would have "corrected" the situation and then followed Dr. Lawford's advice. [Plaintiff's opposition, Ex: 13, Miller Depo., pp.62-66] Nevertheless, despite not receiving naphthalene accommodations, Dr. Norden met her limited duty hours of 20 hours per week for the final nine weeks prior to the removal of her light duty hours in November of 2002. [Norden aff., par.76]

11. The statement contained in paragraph 11 is not in dispute.

12. Dr. Norden mentioned the problems she was having to a friend at church who was an attorney, and he referred her to an attorney. [ Norden, aff., par.73]

13. Dr. Norden did not work in the areas described in the defendant's affidavits. [Norden aff., par.77] The "PRISM" system on her computer through which the Intranet was accessed was never made functional, and, as far as Dr. Norden knows, she had no way to access the in-house Smithsonian information regarding employee Equal

Opportunity Rights. [See Norden aff., par.77] Dr. Norden has no actual notice of the EEO posters which she has never seen. [Norden afff., par.7] Dr. Norden has never previously used the EEO complaint procedures prior to April 7, 2003, and this includes when Dr. Norden complained solely to a supervisor of sexual harassment and took no further action. [Norden Aff., par.8] There were no posters at the public entrances or exits and those were the entrances and exits that Dr. Norden used. Dr. Norden did not use the staff entrances and exits. Dr. Norden brought her lunch and did not use the cafeteria. [Norden aff., par.9] Therefore, Dr. Norden would not see any posters that are alleged to have been put in the cafeteria or elsewhere. The Smithsonian is a huge series of buildings, with many sections, and Dr. Norden would remain in her section. [Norden aff., par.10]

14. The statement in paragraph 14 is not in dispute. However, Dr. Norden did seek informal counseling for naphthalene accommodations with Carol Gover, Program Manager for the Office of Equal Employment and Minority Affairs [OEEMA] both before and immediately after her light duty hours were terminated.
[Norden aff., par. 5,6 ] [Plaintiff's Opposition, Ex: 5, item q]

15. The statement in paragraph 15 is not in dispute.

16. The description in the November 5, 2003, letter is not in dispute. There were, however, significant gaps in Dr. Norden's receipt of workers' compensation payments, and these payments were not for the full amount of Dr. Norden's salary. [Norden aff., par.78]

17. The statement in paragraph 17 is not in dispute.

18. Defendant states that Dr. Norden testified that she only has "approximately"

6

three days of incapacitation per month. This is inaccurate. Defendant asked her to give him an **"average, rough, roughly"** as to the number of migraines per month over an entire two year period from November 2003 through November 2005. This is such a broad question over such a broad time period, and Dr. Norden told the defendant that it was difficult to answer. Dr. Norden's answers were based on this fact, and she told the defendant that **"It varies. Its's based on triggers."** Dr. Norden also told the defendant that **"again, it's hard to answer your question…"** (emphasis added) [Plaintiff's opposition, Ex: 6. Norden, depo. 143-145] Nevertheless, Dr. Norden gave the defendant his "rough" answer which he now puts before the court with words such as "approximately." However, Dr. Granite, having seen Dr. Norden each month from 2000 forward, is also aware of the specifics regarding her migraines. Dr. Granite states that: "Dr. Norden has never had a month free of dengue-induced migraines. Dr. Norden cannot control the frequency or duration of the triggers. The migraines follow accordingly. For the period from 2003 through 2005, she has had many episodes of total incapacitation from the migraines that lasted from 3 to 6 days in a particular month." [Granite Aff., par. 10] As to the **mitigating measures** available to Dr. Norden and their limitations and their side effects Dr. Granite states as follows:

> "Finally, being chronically ill with DHF makes Dr. Norden much more susceptible to depression. The medications used to manage the effects of dengue, particularly migraines, cause severe disruption in her sleep pattern. DHF causes capillary fragility. Therefore, Dr. Norden cannot take antidepressant medications that also compromise capillary integrity. In addition, Dr. Norden cannot take triptan medications for her migraines and is limited to taking narcotics for that severe pain. Therefore, from December of 2005 through the spring of 2006, Dr. Norden

7

agreed to try painful experimental steroid injections into her fifth cranial nerve in an attempt to control the migraines. The injections themselves caused severe migraines, incapacitating her for days at a time. The treatment ultimately reduced the intensity of the migraines but did not stop them. The beneficial effects of the treatment have not lasted. Dr. Norden will begin the treatments again in January of 2007." [Granite Aff., par.5]

19. The statement contained in paragraph 19 is not in dispute.

20. The statement contained in paragraph 20 is not in dispute.

21. Dr. Lawford's medical advisory also included Dr. Oberg's advice as to protecting Dr. Norden from hostility and retaliation as to her requests and needs for accommodations. [Defendnt's MSJ, Ex: 10 p.1, bottom] The November 13, 2003, letter requests accommodations for naphthalene sensitivity, accommodations for Dr. Norden's medically based need for a flexible schedule, and a medical concern for the absence of retaliation or hostility to her needs for accommodations. [Plaintiff's MSJ, Ex: 29, middle of page 2]

22. Dr. Schultz's contradicts his own deposition testimony that after receiving Dr. Norden's November 13, 2003 letter and receiving information from Dr. Lawford, he no longer believed that Dr. Norden had a disability. Dr. Schultz executed an affidavit on April 19, 2005 submitted in Plaintiff's MSJ, Ex: 4, page 3. On page 3 of the affidavit, Dr. Schultz is specifically responding to a question at the top of the page that is asking him to discuss the time period of April 8, 2004 through October 15, 2004. In speaking as to the time period of April 8, 2004 through October 15, 2004, Dr. Schultz states in the last paragraph on page 3 that: *"Dr. Norden presented satisfactory evidence of disability, and*

8

*this disability was never in question. The evidence consisted of medical evaluations that were communicated directly to Dr. Lawford...*" [Plaintiff's MSJ, Ex: 4, Schultz Aff., signed April 19, 2005, page 3, bottom paragraph.] Additionally, No.22 is disputed because Dr. Schultz deposition testimony is not credible based on either Dr. Norden's November 13, 2003, letter or based on information from Dr. Lawford. Both of these sources of information specifically requested accommodations in the area of naphthalene sensitivity, flex time for migraines and medical appointments and monitoring, and not to be retaliated/discriminated against for the request for accommodations. [Plaintiff's MSJ, Ex: 29, November 13, 2003, letter middle of page 2] Based upon all of the above, Dr. Schultz may credibly maintain that he believed that with such accommodations, Dr. Norden could have returned to work on a full time basis, but not that Dr. Norden suddenly no longer had a disability that needed accommodations.

23. There were no negotiations between Dr. Norden or her counsel and the Smithsonian. In her November 13, 2003, letter, Dr. Norden requested to come back to work and complied with the Smithsonian's request to timely submit letters from her doctors in 2003. [Norden aff., par. 79] The Smithsonian remained silent until some 5 months later when Dr. Norden received the Smithsonian's proposed "Settlement Agreement" in April of 2004. [Norden aff. par. 79] There was no discussion of her needs for accommodations or her doctor's concerns for her health regarding retaliation or hostility as to her requests for accommodations, which were all stated in her November 13, 2003, letter. [Norden aff., par.79] [Plaintiff's, MJS, Ex: 29, Nov. 13, 2003, letter,

9

middle of page 2]

24. Dr. Norden does not dispute the statements in paragraph 24 except to state that the proposed work plan was originally not included in the agreement that was sent and designated as non-negotiable. [Norden aff., par.80] Only on the prompting of Dr. Norden's counsel did the Smithsonian send the work plan part of the agreement. [Norden, aff., par.80] Dr. Schultz approached Collections Manager Nancy Adams and asked her to be Dr. Norden's supervisor. Dr. Schultz stated the reason as "no research entomologist was willing to take on the supervision of Beth." [Defendant's MSJ, Adams, aff., p.2, bottom 1/3 of page]. Dr. Schultz oversaw then read and approved of the implementation of the return to work plan. Ex: 7, Schultz depo., p.265]. Nancy Adams had previously warned Dr. Norden that Ms. Slomba did not intend to send the work plan unless it was specifically requested. [Norden aff., par.80]

25. The statements in paragraph 25 are not in dispute except to clarify that Dr. Norden objected to the performance plan as well as the proposed settlement agreement. [Norden aff., par.81]

26. The statements in paragraph 26 are not in dispute.

27. Dr. Norden had great respect and considerable fondness for Nancy Adams as a person. She also believed that Ms. Adams took her job as a museum specialist very seriously. Dr. Norden did not consider Ms. Adams a scientist, however. [Norden aff., par.82] The statement that the Smithsonian provided a complete job description is contradicted by Dr. Schultz's testimony that the work plan and deadlines that were

10

proposed to Dr. Norden were actually work intended for two people rather than Dr. Norden alone. [Plaintiff's Opposition, Ex: 17, Schultz's depo, p. 275] If Dr. Schultz's testimony is accurate, then the work plan was seriously misrepresented to Dr. Norden because no one told her that two people were to do the tasks in the work plan that was given to her. [Norden aff., par. 82].

28. The statements in paragraph 28 are not in dispute.

29. The statements in paragraph 29 are not in dispute.

30. While the collections work described in the Proposed Return to Work Plan might or might not have been consistent with some museum specialist's duties, they were not consistent with the primary responsibility and duties that Dr. Norden had performed in her more than fifteen year tenure with the Smithsonian. [Norden, aff., par.83] Prior to contracting DHF, Dr. Norden's museum specialist duties had consisted primarily of research support with collections work done as needed. The defendant's suspect (see No. 1, above) position description cover sheet is not controlling because the PMQ testified that you have to look at the position description and the work plans to find out what an employee's work consisted of and that "[T]he performance plans…define the tasks, the job on a year-to-years basis." [Plaintiff's Opposition, Ex:18, Schultz, depo., p.299-300] Dr. Norden's work plans amply and unequivocally demonstrate that her primary responsibility in her work plans was as a research assistant. For example, Dr. Norden's 1996 work plan states: "In January 1996 Beth Norden began providing research support for Karl Krombein and Ted Schultz (50% time for each)." [Plaintiff's Opposition, Ex:9]

11

For example her 2000 work plan states: "Norden's job is not an easy one, because she is required to divide her time between Schultz research (50%), Krombein research (20%), and collections support (epstein and the HHAL unit, 30%)" [Plaintiff's Opposition, Ex:10, par.2] This percentage breakdown of Dr. Norden's research support work 70%, versus collection support 30%, is a good representation of the percentage breakdown over her entire career at the Smithsonian. [Norden aff. par.24] Although all research starts with work collecting and preparing the specimens, the research work involves additional multiple steps and intellectual tasks above and beyond the collection work and it is the research work that leads to the advancement of the science, the intellectual challenge, and the publication of papers. [Norden aff., par.69]   Dr. Norden's research with Dr. Krombein led to the publication of papers, and contrary to the claims of the defendant, the research with Dr. Schultz also led to the publication of papers as well. Dr. Norden published at least 3 papers with Dr. Schultz. [Norden aff., par.25] The collection support that Dr. Norden performed never exceed 30%, except on special occasions for brief periods of time when it rose to 50%, for example, the relocation of the Entomology Department in 1997. [Norden aff., par.26]

    31. The April 30, 2004, letter speaks for itself. The April 30, 2004, letter from counsel does not state that the proposed agreement "did not limit her exposure to naphthalene." The letter <u>specifically states</u> that the proposed "work plan requires a career change from research to collection work so that she would face direct, not simply ambient, contact with naphthalene." [See also, Norden aff., par. 28] The April 30, 2004, also

<u>specifically states</u> that the proposed career change and the tight supervisory review schedule, among other things, in the proposed agreement were themselves acts of retaliation.

32. The statement made in Dr. Norden's April 30, 2004, letter that the work did not comply with the requirements of the doctors is supported by affidavits from both of Dr. Norden's primary doctors. [Granite aff] [Oberg, aff] Dr. Granite stated: "Increasing Dr. Norden's direct naphthalene exposure by increasing her contact with specimens is directly contrary to the advice I gave in 2003 for Dr. Norden's return to work. [Granite aff., par. 12] Eight hours of "flex time" every two weeks is very unlikely to be adequate for Dr. Norden's medical needs." [Granite aff., par. 12] Also, Dr. Oberg testified that

> Both proposals ignored my recommendations in the November 24, 2003, letter to Smithsonian consultant Dr. Lawford as to the type of work that would accommodate Dr. Norden's clinical needs. In that November 24, 2003 letter, I specifically state that assigning work that is less intellectually demanding than the work she performed prior to Dr. Norden contracting DHF would be harmful. The reasons are based on the following: 1) such an assignment would result in greater naphthalene exposure, 2) such an assignment would deprive Dr. Norden of the intellectual stimulation essential to her neurological recovery, and 3) such an assignment would foster a sense of devaluation and punishment in Dr. Norden and increase her stress level. I am aware that stress is also a trigger for her dengue migraines, as is the naphthalene. [Oberg aff par.10]

See also, Norden aff., par. 28: "The collection tasks in the 2004 return to work plan involved a dramatic increase of direct exposure to naphthalene by requiring me to do repetitive daily tasks involving repeatedly opening the air-tight cabinets (that have a built up storage of the naphthalene) and by repeatedly working with the naphthalene filled specimens in a non research capacity." See: Dr. Oberg also testified that: " I strongly

13

supported Dr. Norden's decision not to accept either version of the 2004 return to work proposal." [Oberg aff., par. 10] Dr. Oberg also stated that stated that he was aware that stress is a trigger for Dr. Norden's migraines and that "In my professional opinion, the stress that Dr. Norden experiences, her mental conditions, and the migraines that Dr. Norden experiences as all interrelated." [Oberg Aff., par. 10] [Norden aff., par. 13]

33. The proposed work agreement did include an inadequate Alternative Work Schedule (AWS) and that during her deposition, which took place two and a half years after the agreement had been proposed, Dr. Norden acknowledged that it included more flexibility than she recalled. However, Dr. Granite testified that the work plan's 8 hours of flexibility per two week period was inadequate for Dr. Norden's disability. [Granite aff., par.12] Dr. Norden suffers from at least three days of total incapacitation from migraines every month and many months between 3-6 days. [Granite aff., par.10] The frequency is unpredictable depending on the presence, intensity and duration of the triggers during the months such as heat, barometric pressure, stress. [Granite aff., par.10]  As explained in Dr. Granite's affidavit, Dr. Norden also requires close medical monitoring when she is sick or injured because of the dengue damage to her immune and other systems. [Granite aff., par.11] Also, the work plan did not include and actually prohibited Dr. Norden, from working any hours that were not specifically specified,  working on the weekends, and working at home. [Plaintif's MSJ, Ex:5, par.16] All of this flexibility had been previously allowed throughout Dr. Norden's career. [Norden aff., par.32] Throughout her career at the Smithsonian, Dr. Norden worked an average of 10 hours each week after hours, at

home, and/or on weekends. [Norden aff., par.32] No individual at the Smithsonian ever objected to these hours until Dr. Norden required flexible time as an accommodation. [Norden aff., par.32]

34. The statement in paragraph 34 is not in dispute, and Dr. Norden further admits that she believes the proposed supervisor Nancy Adams had a substantial basis for the fears she expressed to Dr. Norden which were that Ms. Adams was afraid that both women were "being set up" by the work proposal. [Norden aff., par.84]

35. Dr. Norden admits that her previous work involved exposure to both direct and ambient naphthalene, for which she was never given any accommodations. She further claims that the 2004 proposed work plan would greatly increase the more harmful direct naphthalene exposure. [Norden aff., par.85] Dr. Norden admits that she could no longer work with Dr. Krombein since he was no longer at the museum, but strongly denies that there was no opportunity for her to do research support at the Smithsonian. [Norden aff., par.86] Dr. Norden spent 50% of her time doing research support for Dr. Schultz. For example, Dr. Norden's 1996 work plan states: "In January 1996 Beth Norden began providing research support for Karl Krombein and Ted Schultz (50% time for each)." [Plaintiff's Opposition, Ex:9] For example her 2000 work plan states: "Norden's job is not an easy one, because she is required to divide her time between Schultz research (50%), Krombein research (20%), and collections support (epstein and the HHAL unit, 30%)" [Plaintiff's Opposition, Ex:10, par.2] Throughout her career as a museum specialist at the Smithsonian Dr. Norden performed research support and co-authored

15

papers with several other Smithsonian entomologists, including 3 papers with Dr. Schultz. [Norden , aff., par. 25] The Brazil trip on which Dr. Norden contracted DHF was the start of a major Hymenoptera research project funded by the National Science Foundation and led by Dr. Schultz and Dr. Norden functioned as his research assistant on the project. [Norden aff., apr. 86] As of August, 2006, the project was seriously over deadline, and it may be inferred that the assistance of a talented, Fulbright research scholar and Hymenopterist such as Dr. Norden, who had taken part in the original field work, could have been of great benefit to the Smithsonian. Also, Ms. Nancy Adams testified that the Entomology Department was short staffed in terms of research support. [Defendant's MSJ, Adams aff., p.2, middle of page] It is also highly likely that other Smithsonian entomologists could have benefited from Dr. Norden's support. In addition, at least one other Smithsonian entomologist, Dr. Davis, could have benefited from Dr. Norden's research assistance. After Dr. Norden contracted DHF, Dr. Davis told her that he would like to have her assistance on the monograph he was working on. [Norden, aff, par.87] He had lost his former assistant and needed help with both research and SEM photography. [Norden aff., par. 87] Dr. Norden, who is talented in both areas, was quite willing to have all or part of her time assigned to Dr. Davis, and she told him so. [Norden aff., par. 87] Dr. Davis responded that he would speak to Dr. Mathis about the possibility of reassigning some of Dr. Norden's time to him, but neither Dr. Mathis nor anyone else brought the subject up again with Dr. Norden until years later when Dr. Norden met Dr. Davis socially in the fall of 2005. [Norden aff., par. 87]    At that time Dr. Davis again told

Dr. Norden that he wished he had Dr. Norden's help on the monograph. Dr. Norden was qualified for this position. [Norden, aff., par.87]

36. The proposed work plan did not implement the recommendations of Dr. Norden's doctors. (See response, supra, to No. 32-33 incorporated herein, regarding increased direct naphthalene exposure, insufficient flex time, etc. Granite aff.] [Oberg aff.] ) The proposed work plan gave Dr. Norden detailed, set and limited working hours at the museum [Plaintiff's MSJ, Ex: 5, par. 16] and did not include Dr. Norden's previous primary responsibilities for research or research support tasks and activities. [Norden, aff., par.88] The proposed work plan also did not include any association with other scientists or research projects. [Norden aff., par.88] Any suggestion made solely during litigation that Dr. Norden could have used museum resources to support an after-hours research "hobby" on her own is not material to a claim that her new work plan eliminated her long standing primary responsibility and position as a research assistant as demonstrated in her previous work plans and the work history of her career at the Smithsonian. [See, Plaintiff's Opposition, Ex: 9 and 10]

37. Ms. Slomba did not "investigate" Dr. Norden's claim that the new work plan was inconsistent with Dr. Norden's medical doctors recommendations, and with Dr. Norden's previous work plans for the Smithsonian. An investigation would have involved investigating the objections that were submitted by Dr. Norden as to the new work plan, investigating her prior work plans, and communicating with Dr. Norden and/or her counsel and/or Dr. Norden's doctors as to the basis for Dr. Norden's objections. This was

17

not done [Norden aff., par.89]   Instead, Ms. Slomba asked the manager who had refused to provide accommodations and who had been accused of discriminating/retaliating against Dr. Norden as to whether his new plan involved discrimination/retaliation, and Ms. Slomba then accepted his denial at face value.

38.  The statement in paragraph 38 is not in dispute.

39.  Counsel's July 7, 2004, email regarding Dr. Norden did not limit her request only as to currently open positions.  Counsel's letter to Ms. Slomba stated the following:

> "Dr. Norden further informs me that there are many positions at the Smithsonian for which she is well qualified and which do not require exposure to naphthalene. Have any such positions opened since the past fall, and do you anticipate that that any such positions will open in the near future?" [Defendant's MSJ, Ex: 20]

40.  As described above, counsel did not ask and limit her inquiry as to whether there were any currently vacant positions.  Counsel's question extended to both future positions and positions that had been vacant in the recent past.  The Smithsonian's conduct in attempting to rely on a "technical" limited reading of the July 7, 2004, email is bad faith in the interactive process as argued in the Opposition/reply brief.

41.  The statement in paragraph 41 is not in dispute.

42.  The statement in paragraph 42 is not in dispute.

43.  Dr. Norden admits that she did not have the mandatory or even the recommended qualifications required for the proposed vacancy, that the Smithsonian was aware of these facts from her resume which was previously submitted, from her work history at the Smithsonian, and/or from her supervisors, and that Dr. Norden would have

violated the good faith requirements of the interactive process if she had claimed that she did have these mandatory and recommended qualifications. [Norden aff., par. 90]

44. Plaintiff was terminated from the Smithsonian due to the Smithsonian's bootstrapping its own failure to accommodate, bootstrapping its own failure to engage in the interactive process in good faith, and bootstrapping its own discrimination/retaliation as to: 1) its unreasonable accommodation, i.e., the 2004 work plan, and 2) its unreasonable accommodation, i.e., the Washington Zoo job. Dr. Norden incorporates by reference, her statements in dispute and their supporting evidence as to SMF No.'s 1-43, supra, as evidence to support the statements made in dispute for this SMF, No. 44. Dr. Norden also incorporates by reference her entire Opposition Memorandum which also cites to evidence to support the statements made to dispute SMF, No. 44.

DATED: __12/26/06____                    Respectfully submitted,

                                         _____/s/_____
                                         Alex T. Sliheet, D.C. Bar No. 438977
                                         Vickie Inge Fang, *pro hac vice*
                                         8702 Nightingale Drive
                                         Lanham, MD  20706
                                         alexsliheet@yahoo.com
                                         (301) 552-4908