# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BETH M. NORDEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05-1232 (RMC) |
| | ) | |
| LAWRENCE  M. SMALL, SECRETARY | ) | |
| SMITHSONIAN INSTITUTION, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————————— | ) | |

## DEFENDANT'S REPLY IN SUPPORT OF SUMMARY JUDGMENT

Plaintiff's opposition to defendant's motion for summary judgment fails to evidence a genuine dispute of material fact supported by competent, admissible evidence.  In fact, rather than offer supported opposition to defendant's motion, plaintiff instead offers statements and arguments that contradict her prior sworn testimony, builds-up her own strawman arguments and inferences supported only by speculation and unfounded conspiracy theories, and then attempts to knock down those self-made strawman arguments.  In sum, as set forth herein, as well as set forth in defendant's motion, summary judgment in defendant's favor is appropriate on each and every one of plaintiff's claims.

## ARGUMENT

## I.    LEGAL STANDARD

A party may defeat a properly-supported summary judgment motion only by providing a "response, by affidavits or as otherwise provided in this Rule, [setting] forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  Rule 56(e) directs that summary judgment "*shall* be entered against the adverse party" if that party fails to raise a genuine issue for trial (emphasis added).  See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)

("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party"); Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 2553 (1986) ("a party who fails to make a showing sufficient to establish the existence of an element essential to establish that party's case, and on which that party will bear the burden at trial" cannot withstand a motion for summary judgment).  If the non-movant's evidence is "merely colorable, or is not significantly probative, summary judgment may be granted."  Liberty Lobby, 477 U.S. 249-50 (internal citations omitted).  Nor may the non-movant manufacture genuine issues of material fact on the basis of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), or with "conclusory allegations" or "unsubstantiated assertions."  Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994).  See also Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999) (accepting plaintiff's "conclusory allegations . . . would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial."); Harding v. Gray, 9 F.3d 150, 154 (D.C. Cir. 1993).

While it is true that summary judgment must be approached with special caution in discrimination cases, "this does not eliminate the use of summary judgment in discrimination cases." Marshall v. James, 276 F. Supp. 2d 41, 47 (D.D.C. 2003) (citing cases).  Instead, a discrimination plaintiff "is not relieved of her obligation to support her allegations by affidavits or other *competent* evidence showing that there is a genuine issue for trial."  Calhoun v. Johnson, 1998 WL 164780, at * 3 (D.D.C. March 31, 1998) (internal citation omitted), aff'd, 1999 WL 825425, at * 1 (D.C. Cir. Sept. 27, 2000) (emphasis added).  "Summary judgment is not a 'disfavored procedural shortcut,'

but is an integral procedural tool which promotes the speedy and inexpensive resolution of every case." <u>Marshall</u>, 276 F. Supp. 2d at 47 (quoting <u>Celotex Corp.</u>, 477 U.S. at 327).

II.     **PLAINTIFF'S CLAIMS RELATING TO THE SMITHSONIAN'S 2002 EFFORTS TO ACCOMMODATE HER NAPHTHALENE SENSITIVITY ARE TIME BARRED**

        A.     **Smithsonian's November 2002 Memorandum Put Plaintiff on Notice that the Requested Accommodations Would No Longer be Provided**

        In its motion for summary judgment, the Smithsonian established that plaintiff failed to exhaust her administrative remedies with respect to her complaints regarding her return to work in 2002 because she did not contact an EEO counselor within 45 days of the November 30, 2002, termination of her light duty assignment.  Defendant's Statement of Material Facts ¶ 14 ("Def's SOMF").  Notably, plaintiff does ***not*** dispute this chronology.   Pltf's Resp. To Def's SOMF ¶ 14. In her opposition, however, plaintiff argues that she did not fail to timely contact a counselor because the Smithsonian never actually rejected her naphthalene accommodation requests.  Absent a written or oral notice of denial, plaintiff's argument goes, the failure to accommodate was an ongoing violation, which lasted from 2002-2004, when she was terminated.  Thus, she claims, her April 2003 administrative complaint was timely.  Plaintiff asserts that she is not suing over the termination of her light duty, but only for the refusal of her naphthalene accommodations as if there were two types of requests, distinct and independent from one another.

        The record, however, establishes that plaintiff's requests for naphthalene accommodations were a subset of numerous requests to permit plaintiff to return to work.  In addition to avoiding naphthalene, plaintiff requested substantially reduced work hours (half time) and a three day a week schedule.  Pltf's Depo 75:120-76:10.  The Smithsonian made efforts to respond to ***all*** of these requests over the course of plaintiff's second return to work, until it decided to terminate her light

3

duty assignment in November 2002.[1]  In fact, plaintiff herself acknowledges that she received a light

duty schedule.  And, plaintiff's own email to Ms. Youmans shows that the reason plaintiff did not

receive a respirator was because plaintiff informed Ms. Youmans to ***not*** order the respirator until

plaintiff provided Ms. Youmans with additional information from plaintiff , and plaintiff ***never***

provided this additional information.[2]  Youmans Decl. Ex. 3 (attached to Def's SJ Motion).  From

November 2002 forward (until plaintiff informed the Smithsonian she could return to work full time

in response to the November 2003 proposal to remove), there were no further efforts by the

Smithsonian to accommodate any of plaintiff's sensitivities.  During this period plaintiff was no

longer working and did not ask her doctors whether she could work full time. Pltf's Depo. 110:6-

111:6.

         In contrast to the cases cited by plaintiff, Sutton v. Potter, 2004 U.S. Dist LEXIS 4656,

(N.D. Ill. Mar. 19, 2004) and Pantazes v. Jackson, 366 F. Supp 2d 57, 70 (D.D.C. 2005), in which

the defendants continued to engage in the interactive process over the course of years, in this case,

there was a "definitive temporal marker" distinguishing for plaintiff the point at which the

Smithsonian's effort to accommodate her ended: the November 18, 2002 memorandum. Plaintiff

herself identified this date as a turning point when she belatedly filed her request for informal

---

[1]  Whether plaintiff was a qualified person with a disability, whether there were reasonable accommodations that would have allowed plaintiff to perform her essential job functions full time, whether the Smithsonian denied plaintiff reasonable accommodations for naphthalene exposure, and whether plaintiff declined to take advantage of accommodations are all disputed issues of fact which would require a trial if plaintiff is allowed to proceed with her claim.

[2]  Plaintiff's own words, in her July 5, 2002 email to Ms. Youmans, stated, "Because of additional medial problems I have experienced, Carol [Youmans] is waiting to hear back before ordering the respirator."

counseling.  Def's SOMF 14 & Def's SJ Ex. 5.  That initial filing carefully founded her claim on the

Smithsonian's discontinuation of her light duty status, an act she characterized (contrary to her

current argument) to be ***the direct response to***, and denial of, her requested naphthalene

accommodations:

> In October 2002, the Office of Safety and Environmental Management requested that the
> Department develop a plan to control Dr. Norden's exposure to naphthalene, to
> accommodate her disability.  **The Department failed and refused to do so.  Rather the
> Department terminated Dr. Norden's part-time work schedule effective November 30,
> 2002.**

Def. SJ Ex. 5 (Apr. 7, 2003 Application for Informal Counseling) (emphasis added).  Additionally, to

the question "On what date(s) did the alleged discrimination take place," plaintiff  replied

"November 30, 2002."  Id.  In her briefs now, plaintiff attempts to distance herself from the informal

complaint form, yet her complaint in this action characterized the termination of light duty in the

same way:  "Instead of providing Dr. Norden with the reasonable accommodations, the Smithsonian

chose to force Dr. Norden to go on disability in November 2002 . . ."  Am. Compl.¶ 157.  Having

staked her claim on the termination of her light duty status in her amended complaint, plaintiff may

not reshape her claim or amend her complaint in her opposition to summary judgment.  See

Velikonja v. Mueller, 362 F. Supp. 2d 1, 3 n.2 (D.D.C. 2004).

   As plaintiff states in her opposition brief, "it is undisputed that Dr. Norden needs

accommodations for naphthalene whenever she works at her job in the Entomology Department."

Pltf. Opp. at 3.  It is equally undisputed that, following November 30, 2002, plaintiff was ***not***

working at her job in the Entomology Department and thus ***not*** receiving accommodations for

naphthalene (or any other sensitivity). The Smithsonian terminated plaintiff's light duty arrangement

in November 2002; all subsequent Smithsonian "conduct" was the passive result of this single

decision, not an on-going violation, as plaintiff would now like to describe it for the sole purpose of trying to perfect her untimely filing.

**B.    Plaintiff's Contact with Carol Gover and Others did not Serve to Initiate the Complaint Process**

In her reply brief, plaintiff argues that her contacts in early December 2002 with Carol Gover, the Disability Program Manager within the Smithsonian's Office of Equal Employment and Opportunity, Chandra Heilman, the Ombudsman, and Thomas Lawford, the Smithsonian physician, satisfy the obligation in 29 C.F.R. § 1619.105 to contact an EEO counselor within 45 days of the alleged wrongdoing. This argument is flawed for several reasons. First, plaintiff does not allege that any of these individuals was an EEO counselor or that she believed them to be EEO counselors. In fact, Ms. Gover, the only one who works within the Office of Equal Employment and Minority Affairs is ***not*** a counselor. See Gover Decl. (attached hereto). Rather, plaintiff described her contact with them as an initiation of the interactive process required by the Rehabilitation Act. See Dec. 25, 2006, Norden Aff ¶ 5 (attached to Plft's Opp.). Engaging in an interactive process, however, is not the equivalent to initiating the complaint process required by 29 C.F.R. 1619.105. Courts repeatedly have confirmed that to initiate the complaint process, one ***must*** communicate with an ***EEO counselor***. In Carter v. Greenspan, 304 F. Supp. 2d 13, 23-24 (D.D.C. 2004), for example, the court held that, although plaintiff engaged in an internal dispute resolution procedure with supervisors and a human resources representative, he did not make the required initial contact with an EEO counselor. Similarly, in Washington v. Washington Metro. Area Transit Auth., 160 F.3d 750, 752-53 (D.C. Cir. 1998), the court declined to toll the deadline though plaintiff claimed that the employer had touted its internal dispute resolution procedures as the appropriate complaint forum and lulled him into presuming he had met the necessary requirements.

Second, in the cases cited by plaintiff that have made exceptions to the rule that contact must be initiated with a counselor, the courts all found that the plaintiffs put the defendants on actual notice of alleged discrimination. In <u>Johnson v. Glickman</u>, 155 F. Supp. 2d 1240 (D. Kan. 2001), the court fully described the basis of the exception:

> In determining whether an employee has sufficiently initiated EEO contact within 45 days, the Court defers to rulings by the Equal Employment Opportunity Commission ("EEOC") unless they are plainly erroneous or inconsistent with the regulation. . . . The EEOC has held that in order to sufficiently initiate contact, the employee must (1) contact an agency official logically connected with the EEO process, even if the official is not an EEO counselor; (2) demonstrate an intent to begin the EEO process; and (3) allege that an incident in question is based on discrimination.

<u>Id</u>. at 1247 (citations omitted); <u>see</u> <u>Lloyd v. Chao</u>, 240 F. Supp 2d 1, 7-8 (D.D.C. 2002) (Plaintiff brought allegations of sexual harassment and hostile work environment to her supervisors.); <u>Briggs v. Henderson</u>, 34 F. Supp. 2d 785, 787 (D. Conn. 1999) (The purpose of the regulatory time limit has been met "if the agency has been put on notice, within 45 days of the last alleged discriminatory event, of an employee's discrimination claims.").

When one looks at the ***actual*** communications between plaintiff and Gover – in contrast to plaintiff's descriptions of the communications – it is obvious that the communications do ***not*** meet this standard; they do ***not*** relay an allegation of discrimination; they do ***not*** express plaintiff's intent to file a complaint. Plaintiff's e-mails with Gover mention her naphthalene sensitivity and ask what role it played in the termination of her light duty.  The e-mails also discuss in large measure plaintiff's concerns about timely receipt of workers compensation benefits.  <u>See</u> Ex. 1 hereto.  In light of plaintiff's actual communications, this Court's holding in <u>Schmidt v. Chao</u>, No. 04-0892(RMC), 2006 WL 1663389, *7 (D.D.C. June 13, 2006) is applicable in this action.  In <u>Schmidt</u>, this Court held, "[n]ot every complaint garners its author protection under Title VII. . . . While no

'magic words' are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition." Id. (citing Broderick v. Donaldson, 437 F.3d 1226, 1232 (D.C. Cir. 2006). Plaintiff's emails do no such thing. Thus, plaintiff's communication cannot and does not act as a substitute for contacting an EEO counselor and allegation of discrimination.

Finally, plaintiff has alleged that the same contacts with Gover, Heilman and Lawford were "false assurances" by the Smithsonian that plaintiff would be accommodated, which "lulled her into inaction" because she could not have known the Smithsonian would not accommodate her as of November 2002. Pltf's SJ Mot. at 22. It is impossible to conceive how plaintiff's December 2002 contacts with Gover and others both initiated the complaint process as required by 20 C.F.R. § 1619.105 and lulled plaintiff into inaction against filing at the same time. In reality they did neither. Plaintiff asked Gover a series of questions about how the decision to terminate light duty had been made and how she could be compensated and Gover answered them.

**C.    It is Undisputed that Plaintiff Had Access to Information Regarding the EEO Process**

In her reply brief and December 25, 2006, affidavit, plaintiff attempts to show that her daily routine would not have put in her contact with any of the EEO posters identified by the Smithsonian. Notably, plaintiff does not state that she ***never*** visited the areas in which the posters hung. Nor does she deny the existence of the posters. Pltf's Depo. 121:8-16; 123:11-13. Plaintiff admitted in her deposition that she visited the department chairman's office on the 6th floor and the cafeteria. Pltf's Depo. 121:18-122:6. In pleadings before the EEOC, Plaintiff also stated that she attended meetings in the conference room, though she denied seeing the posters. Ex. 2 hereto (July 27, 2004 Norden Aff.) Plaintiff also states in her brief and December 25, 2006 affidavit and that she did not have access to the Smithsonian intranet, Prism, on which the notice also was posted. This assertion

conflicts with plaintiff's deposition testimony, in which she said she in fact had access to Prism on her computer.  Pltf's Depo. 123:22-124:9.  In short, the most recent affidavit does not dispute the presence of the posters in plaintiff's building generally, and her department specifically, and it contradicts her own prior statements about her access to areas and computer services in which the EEO information was made available.

Credibility issues aside, the plaintiff's subjective knowledge of the EEO deadlines is irrelevant.  See Harris v. Attorney General of the United States, 400 F. Supp. 2d 24, 28 (D.D.C. 2005) (granting summary judgment for defendant where posters were available in a file room and break room, although plaintiff claimed not to have known of deadlines).  "If the information is available to the employee, he will not be heard to claim unawareness as an excuse for missing the deadline." O'Neal v. Johnson, 2003 U.S. Dist. LEXIS 13348, *4 (D.D.C. July 27, 2003).

The D.C. Circuit has held that the court should equitably toll only in extraordinary **carefully circumscribed** instances. Mondy v. Secretary of Army, 845 F.2d 1051, 1057 (D.C. Cir. 1988); Washington v. Washington Metro. Area Transit Auth., 160 F.3d 750, 753 (D.C. Cir. 1998); Smith-Haynie v. Dist. of Columbia, 155 F.3d 575, 579-580 (D.C. Cir. 1998).  In other words, equitable doctrines should be "applied sparingly." AMTRAK v. Morgan, 536 U.S. 101 (2002).  Here, information regarding the applicable time limits was available and was reasonably geared to inform Smithsonian employees of those limits.  The Smithsonian has presented uncontradicted evidence of posters displayed presenting the EEO complaint process and time frames within plaintiff's department, in particular, and in other public spaces within the building where she worked.  In light of the D.C. Circuit's directives in Mondy, Washington, Smith-Haynie and the Supreme Court's instruction in Morgan, the plaintiff has **not** met her burden of presenting facts to support equitable

tolling.  <u>Aceto v. England</u>, 328 F. Supp. 2d 1, 5-7 (D.D.C. 2004) (granting summary judgment

where plaintiff had access to posters and training although he claimed to be unaware of the

deadlines). Accordingly, the court should grant summary judgment to the Smithsonian on all claims

relating to the 2002 second return to work.

## III.    PLAINTIFF WAS NOT DISABLED AS OF HER NOVEMBER 2003 REQUEST TO RETURN TO WORK[3]

To establish a prima facie claim of failure to accommodate, plaintiff must show that the

Smithsonian was on notice of her disability.  <u>Edwards v. U.S. E.P.A.</u>, – F. Supp. 2d —, 2006

Westlaw 2965507, * 20 (D.D.C. Oct. 18, 2006); <u>Thompson v. Rice</u>, 442 F. Supp. 2d 158, 176

(D.D.C. 2006).  In Defendant's Motion for Summary Judgment, the Smithsonian showed that the

evidence available to it as of December 2003 was that plaintiff had recovered and was able to return

to work.  Def's SJ Mot. at 20.  The Smithsonian also demonstrated that plaintiff's own deposition

testimony was consistent with the Smithsonian's understanding that she did not suffer from an

impairment that substantially limited a major life activity.  In her opposition, for the first time,

plaintiff clarifies that her claim is not founded on an inability to perform the major life activity of

work.  Pltf's Opp. at 12.  Rather, it appears that plaintiff's claim is that she is regularly and

frequently incapacitated by severe migraines that render her unable to perform ***any*** task while the

migraines last (and that this condition is likely to be permanent).  Pltf's Opp. at 8-10.  Plaintiff

---

[3] Plaintiff asserts that the Smithsonian has conceded that she was disabled under the Rehabilitation Act between April 2002 and October 2003.  ***This is false***.  <u>See</u>, as examples, Defendant's Response to Plaintiff's Material Facts not in Issue, ¶ 6 (disputing permanency of Plaintiff's condition), ¶ 10 (disputing that Smithsonian's Office of General Counsel determined Plaintiff was disabled), ¶ 17 (disputing Plaintiff's level of debilitation); Defendant's Statement of Material Facts at 9 (Defendant believed Plaintiff's light duty status was temporary).  <u>See</u> <u>also</u> Defendant's Answer ¶ 146 (denying Plaintiff is disabled).

attempts to distance herself from her own deposition testimony, in which she was able to provide

estimates of the duration and frequency of her incapacitation, by providing an affidavit from Dr.

Granite to underscore the intensity of her migraines.[4]  Interestingly, Dr. Granite's affidavit does ***not***

provide any additional specificity on the number of days overall that plaintiff suffers incapacitating

migraines.  Dr. Granite states both that plaintiff  "has never had a month free of dengue-induced

migraines" and that "for the period from 2003 through 2005, she has had many episodes of total

incapacitation from migraines that lasted from 3 to 6 days in a particular month."  Granite Dec.¶ 10.

Yet, like plaintiff's deposition testimony, Dr. Granite's statement does not provide any detail as to

how many 3-6 day migraines plaintiff has suffered.  Even if it did offer such specificity, it would be

inadmissable to show that the Smithsonian was aware of plaintiff's total incapacitation by migraines

(of any duration or frequency) at the time of the alleged wrong-doing.  "A person alleging a

disability protected by the ADA has a burden of establishing with medical evidence the existence of

the alleged disability, and presenting the documentation during the term of employment, not

following termination." Kalekiristos v. CTS Hotel Mgmt. Corp., 958 F. Supp. 641, 657-658 (D.D.C.

1997); see Weigert v. Georgetown Univ., 120 F. Supp. 2d 1, 8 (D.D.C. 2000).

---

[4]  Moreover, although plaintiff portrays her deposition responses as answers to questions
for "average, rough, roughly" numbers, the actual record evidences something entirely different.
In deposition, plaintiff was asked, "Okay.  So from roughly the November 2003 time frame until
this treatment that helped you out with the problem, how many migraines a month would you get
that incapacitated you?"  Pltf's Depo. 143:13-143:15.  Plaintiff responded, "Again, it's hard to
answer your question because I would get migraines and I know what to do so in terms of days
that I was totally incapacitated, maybe three."  Pltf's Depo. 143:16-143:18.  Plaintiff was then
asked, "Maybe three days or three migraine episodes?"  Pltf's Depo. 143:19.  Plaintiff responded
"Maybe three days," Pltf's Depo. 143:20, then confirmed that the rest of the time she was able to
control her migraines with medication, Pltf's Depo. 143:23-144:1.  Plaintiff's unequivocal
deposition testimony did not offer a "rough" or "average" number of migraines.  Rather, she
unequivocally testified under oath that she was incapacitated for only three days per month.

Plaintiff points to the medical evidence that she provided in support of her claim for workers compensation payments in 2002 as evidence that the Smithsonian knew of her alleged Rehabilitation Act disability. To state the obvious, the purpose of a workers compensation claim is to show that an employee is not able to work due to a work-related injury. In November 2003, however, plaintiff claimed to be capable of returning to work and, in her opposition brief, has clarified that she does not base her Rehabilitation Act disability on an inability to perform the major life activity of work. Between 2002 and 2003, therefore, plaintiff's condition had changed. Plaintiff cannot point to any document that informed the Smithsonian of her disability as now defined by her, i.e., the inability to perform any task during a severe migraine. To the contrary, contemporaneous record evidence **submitted by plaintiff** in support of her motion for summary judgment shows that, based on the information provided to him by the plaintiff and her physicians, the Smithsonian's physician Dr. Lawford believed that plaintiff's migraines had improved. For example, in April 2003, when plaintiff began to see her therapist Dr. Oberg, plaintiff asked Dr. Lawford to write Dr. Oberg a summary of plaintiff's history, which he did:

> As of right now, her thinking machinery is 100% back. Vision is fine. **The headaches are much less and manageable.** She can sweat and thermoregulate again, so we hope that 97F days this summer won't fatigue her as much as last summer. The skin purpura are much less frequent. Nosebleeds seem to have stopped but recurred once she smelled naphthalene several week ago.

Pltf's Oct. 2, 2006 Aff. ¶ 34 & Pltf's SJ Ex. 26 (emphasis added).

In November 2003, when plaintiff informed the Smithsonian that she desired to return to work, the Smithsonian asked her to update her medical information and she did so in December 2003, also signing a waiver that allowed Dr. Lawford to speak with her physicians. Pltf's SOMF ¶¶ 66 & 67. Based on these documents and discussions with plaintiff's physicians, Dr. Lawford's

impression was that plaintiff's migraines had improved.  In December 2003, Lawford wrote that,

following the onset of her illness in 2000, the migraines' "frequency and intensity gradually

lessened over the next several years."  Def's SJ Ex. 10.  Dr. Lawford addressed migraine frequency

as follows:

> Beth is, at this stage in her recovery down to having typically two, sometimes three
> migraines in a month's time.  Her providers agree with this figure. The question I know
> management wants me to ask is 'What will the frequency once she re-enters the naphthalene
> ambient atmosphere of her department?" I have asked both providers and even asked Beth.
> No one knows.  *Her overall disease process and it symptoms have lessened since she last
> worked 20 hours per week*, so I would hold that she should experience less migraine
> frequency in the workplace than she did a year ago.

Def's SJ Ex. 10 (emphasis added).

Because plaintiff has offered no evidence to establish the Smithsonian was aware of her

inability to perform any task during her episodes of migraines, she has failed to meet her burden of

proof and summary judgment is appropriate in defendant's favor.

## IV.    PLAINTIFF WAS NOT A QUALIFIED PERSON WITH A DISABILITY

In its April 2004 settlement offer, the Smithsonian offered plaintiff reasonable

accommodations to permit her to return to work and *she rejected them*.  Therefore, she cannot be

considered a qualified person with a disability.  Plaintiff disputes that the accommodations offered to

her were reasonable and made in good faith by submitting affidavits from Doctors Oberg and

Granite that state that the return to work plan was inconsistent with their recommendations.  Pltf's

Opp. at 19, 32-34.  At the time the agreement was presented to her, however, plaintiff did *not* offer

these criticisms to the Smithsonian or suggest a different accommodation because plaintiff did not

even discuss the options proposed by the Smithsonian with her doctors.  Pltf's Depo. 171:22-172:9.

If an employer is unable to obtain an adequate understanding of what action it should take because

the employee fails to provide it information, it cannot be held liable for failure to make "reasonable accommodations." Beck v. University of Wisconsin Bd. of Regents, 75 F.3d 1130, 1136 (7th Cir. 1996). "An employer is only responsible for employment decisions based on information available to it when it decides." Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 725 (2d Cir. 1994).

The Smithsonian proposed accommodations were reasonable because they responded to the advice of the Plaintiff's physicians, and were approved as reasonable by Dr. Lawford. Because Plaintiff rejected them, she is not a qualified employee with a disability.[5] Hankins v. The Gap, 84 F. 3d 797, 801 (6th Cir. 1996).

## V.    PLAINTIFF'S RETALIATION CLAIMS FAIL

### A.    Plaintiff has Offered No Evidence of Retaliation with Respect to the Return to Work Agreement

In its summary judgment motion, the Smithsonian established the return to work plan could not be retaliatory because (1) it was written by Nancy Adams, who was **not** aware of plaintiff's protected activity and (2) the terms of the plan do not constitute a materially adverse action against plaintiff. Plaintiff **does not dispute** that Adams drafted the plan and offers **no** evidence to suggest Adams was aware of plaintiff's protected activity. Rather, she offers a remarkable patchwork of unsupported allegations and strawman arguments ranging from the suggestion that the Smithsonian forged her position description, Pltf's Opp. n.10 & Pltf's Resp. to Def's SOMF No. 1, to a refutation of "the KROMBEIN argument," which the Smithsonian has not even made (plaintiff describes it as

---

[5] Plaintiff notes in her reply brief that the Smithsonian "has not argued that she could not work full time with reasonable accommodations." Plf's Opp. at 18. Such an argument by the Smithsonian would be speculative. In light of the fact that the Smithsonian offered her reasonable accommodations, which she declined to use, it may well be that Plaintiff cannot work full time at the Smithsonian with accommodations.

"implied but not stated" in the Smithsonian's motion). Pltf's Opp. at 27. Though it is somewhat difficult to discern, the gist of plaintiff's brief appears to be that assigning plaintiff to Adams's supervision rather than assigning her to a research scientist was a materially adverse action implemented by Ted Schultz, who had knowledge of plaintiff's EEO activity and allegedly harbored retaliatory motivations.[6] As evidence of Schultz's bad motives, plaintiff points to a memo Dr. Shultz wrote in November 2003, asking to be removed from supervising her.

### 1.    Assigning Adams to Supervise Plaintiff was Not a Materially Adverse Action

To show that the return to work plan materially affected her work conditions, plaintiff insists that she was hired as a "research assistant." This simply is not true[7] and contrary to plaintiff's admission that her title was "museum specialist." Pltf's Resp to Def. SOMF ¶ 1. Plaintiff also admits that she spent between 30% and 50% of her time on collections management support rather than research support. Further, plaintiff does not dispute that the return to work plan provided for plaintiff to work on the ***same*** collections she had worked on prior to her departure, including Krombien's wasps and Schultz's ants. Def's SJ Ex. 12, Work Plan; Furth Declaration ¶ 17.

---

[6] Plaintiff's opposition seeks to confuse the issues by referring to her job as a Museum Specialist, then as a Research Assistant, and then as a Research Support Scientist. This Court should not be confused by plaintiff's efforts; plaintiff herself admits in response to Defendant's Statement of Facts that she was a GS-11 Museum Specialist during the entire relevant time period. See Pltf's Resp. to Def SOMF ¶ 1.

[7] Layering inference on top of inference Plaintiff attempts to show that the position description in her official personnel file is a forgery. Pltf's Resp to Def. SOMF ¶ 1. The fact that plaintiff does not understand all of the notations on her position description cover sheet is not credible evidence that it is not hers. The evidence is undisputed that position description 39725, Def's SJ Ex. 2, was assigned to plaintiff in 1997 as part of a reorganization, Furth Decl. ¶ 9, and is the position description from plaintiff's Official Personnel File. Slomba Decl. of Jan. 8, 2007 ¶ 3.

Plaintiff, who is obviously quite proud of her academic accomplishments, "did not consider Ms. Adams a scientist" and noted in her deposition that Ms. Adam's "got her bachelors degree at a bible college." Dec. 25, 2006 Norden Aff ¶ 82; Pltf's Depo. 166;13-15. But working for someone with fewer degrees is simply ***not*** a materially adverse change in duties, particularly when that supervisor is higher in grade and in a supervisory position.[8] The "standard for judging harm must be objective." <u>Burlington Northern & Santa Fe Ry. v. White</u>, 126 S. Ct. 2405, 2415 (U.S. 2006). "Because we rely upon objective factors, rather than subjective impressions, we must look underneath an assertion of 'prestige' to determine whether there is anything concrete to substantiate it." <u>Freeman v. Potter</u>, 2006 U.S. App. LEXIS 25072 (6th Cir. 2006). Quite simply, there is nothing to substantiate plaintiff's claims.

### 2.     The Schultz Memo Does Not Show Retaliatory Motive

Plaintiff argues that the decision to place her under the supervision of Nancy Adams was made by Ted Schultz, who as "Chairman of the Department" was able to prevent plaintiff from working for him or any other research entomologist in "his" department. Pltf's Opp. at 26. Plaintiff points to Schultz's November 2003 memo as direct evidence of this alleged plot. Pltf's Ex. 30. In order to draw inferences of a discriminatory plan from this memo, however, one must ignore its actual words. First, the memo is written from Shultz to **Wayne Mathis, Department Chair**, so the

---

[8] It bears noting that employers have discretion to decide who supervises employees. Using the reasonable accommodation process to get the supervisor of one's choice is not appropriate. <u>See, e.g.</u>, <u>Kennedy v. Dresser Rand Co.</u>, 193 F.3d 120, 122-23(2d Cir. 1999) (a request for a different supervisor is presumed unreasonable); <u>Weiler v. Househol Fin. Corp.</u>, 101 F.3d 519, 526 (7th Cir. 1996) (request to return to work under a different supervisor was not reasonable accommodation; employer, not courts, has discretion to decide who would supervise employees); <u>Wernick v. Fed. Reserve Bank of New York</u>, 91 F.3d 379, 384 (2d Cir. 1996) (request to work for a different supervisor was not reasonable accommodation). <u>Mills v. BMC Software, Inc.</u>, 2002 U.S. Dist. LEXIS 14890, *82-83 (D. Tex. April 23, 2002).

memo does not support plaintiff's assertion that Schultz, as department chair, was in a position to implement his "plan." Second, the memo makes no reference to plaintiff's requests for accommodations as plaintiff suggests. See Pltf's Opp. at 26 ("His MEMO indicates that he did not want to be Dr. Norden's supervisor, he was tired of the events of the past 3 years which includes bothering with Dr. Norden's disability accommodation."). Rather, the memo cites as a reason for not being her supervisor the fact that plaintiff's counsel had expressed concerns that she would be subjected to "continued hostility" upon her return. Pltfs. Ex 30.

More important, in his November 30, 2003 memo, Schultz writes that he is reiterating a request made in a memo dated 22 March 2002, which he attached to the November 30, 2003 memo. Plaintiff's Exhibit 30, however, conveniently neglects to include the March 22, 2002 attachment. In other words, to cast Schultz's November 2003 memo as retaliatory, plaintiff ignores the fact that it expressly repeated and incorporated an earlier request made *before* plaintiff had returned to work and *before* she had made requests to Schultz to accommodate her naphthalene sensitivity. Among other things, the 22 March 2002 memo shows that Schultz believed that plaintiff was dissatisfied working with him because the arrangement did not offer the "unrestricted schedule, a fair amount of research travel, and a strong component of collaborative research" that she had enjoyed working with Karl Krombein. It also shows that Schultz believed that plaintiff herself had suggested that he should not continue as her supervisor. Significantly, it also shows that these issues were not new, but existed prior to plaintiff's illness: "During the years I've managed Beth, I've been overwhelmed by the responsibility of dealing with these daily issues." Ex. 3 hereto.

### 3.    The Return to Work Agreement Was an Offer of Reasonable Accommodations

Plaintiff also appears to argue that the return to work plan was materially adverse because it increased her exposure to naphthalene, provided for unreasonable deadlines, removed intellectual stimulation, and did not adequately address her need for flextime.  Again, the only support for these arguments are the *new* affidavits of Doctors Oberg and Granite.  As discussed above, plaintiff cannot now use her doctors' criticisms of the plan to show that it was unreasonable when she refused to provide that information contemporaneously.  Beck v. University of Wisconsin Bd. of Regents, 75 F.3d 1130, 1136 (7th Cir. 1996); Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 725 (2d Cir. 1994). "The issue is not whether the 'the correctness or desirability of [the] reasons offered ... [but] whether the employer honestly believes in the reasons it offers.'" Fischbach v. District of Columbia Dep't of Corrections, 318 U.S. App. D.C. 186 (D.C. Cir. 1996) (quoting McCoy v. WGN Continental Broadcasting Co., 957 F.2d 368, 373 (7th Cir. 1992)).

### B.    Plaintiff Has Offered No Evidence of Pretext for Her Termination

The Smithsonian's reasons for terminating plaintiff are straight forward: Plaintiff was terminated for inability to perform her job.  From the onset of her illness in August 2000, plaintiff had not worked full time.  Def's SOMF ¶¶ 2-9 (not disputed by plaintiff).  On November 5, 2003, the Smithsonian proposed to terminate plaintiff effective on the date at which she would have been on leave without pay and receiving workers compensation benefits for more than one year.  Def's SOMF ¶ 16 (not disputed by plaintiff).  In response to the November 2003 proposal to remove, plaintiff informed the Smithsonian she could work full time with accommodations.  Def's SOMF ¶ 17 (not disputed by plaintiff).  The Smithsonian offered her reasonable accommodations that it believed, based upon the advice of Dr. Lawford, would have permitted plaintiff to perform her job.

18

Def's SOMF ¶¶ 26 & 28, and Ex. 11 and 15 (not disputed by Plaintiff). Plaintiff declined them.
Def's SJ Ex. 18 (April 30, 2004 letter from V. Fang to M. Slomba); Deft's Ex. 20, (July 7, 2004
Email from V. Fang to M. Slomba) (contents of exhibits not disputed by plaintiff). Thereafter, the
Smithsonian searched for vacancies to which it could reassign plaintiff and found only one that
might have been suitable for plaintiff. Def's SOMF ¶¶ 41 and 42 (not disputed by plaintiff).
Plaintiff, however, determined that she was not qualified for the position. Def's SOMF ¶. 43 (not
disputed but elaborated upon by plaintiff). In summary, because plaintiff was unable or unwilling to
perform her job over the course of four years with or without accommodations, she was terminated.
Pltf's SJ Ex. 33; Deft's SJ Ex. 25.

Even assuming that plaintiff was disabled within the meaning of the Rehabilitation Act
(which the Smithsonian disputes), the Smithsonian met its obligations to attempt to accommodate
her (1) by offering her changes to her workspace and schedule that the Smithsonian believed, based
upon the advice of Dr. Lawford, were consistent with her doctors' recommendations and (2) by
searching for vacancies to which she could be reassigned when efforts to accommodate her in her
museum specialist position were exhausted.

Significantly, Plaintiff does not dispute the Smithsonian's chronology of events. Instead, she
overlooks them and attempts to show pretext in the Smithsonian's explanation by arguing that the
Smithsonian's efforts to accommodate her were not made in good faith.[9] Plaintiff argues that the
Smithsonian acted in bad faith by not identifying vacancies for her during the time period in which it

---

[9] Plaintiff's argument that the return to work agreement was made in bad faith is one and
the same as her argument that the return to work agreement was retaliatory. Pltfs. Opp. at 25-34.
Those arguments have been addressed by the Smithsonian in Section V. A. above.

was attempting to negotiate her return to work in the Entomology Department.[10]  Under the

Rehabilitation Act, however, an employer's obligation to reassign an employee arises **only** after

attempts to accommodate her in her current position fail.  Reassignment is an accommodation of ***last***

***resort***.  Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1301 (D.C. Cir. 1998) ("Congress saw

reassignment, as the EEOC does, as an option to be considered only after other efforts at

accommodation have failed."); Kalekiristos v. CTS Hotel Mgmt. Corp., 958 F. Supp. 641, 663

(D.D.C. 1997) ("under the ADA, reassignment is appropriate when no accommodation would

enable the plaintiff to remain in his current position, he is qualified (with or without reasonable

accommodation) for another position, and that position is vacant within a reasonable time.").  Thus,

the Smithsonian's failure to identify vacancies for plaintiff when it had ***no duty to do so*** is not

evidence of bad faith.[11]

Plaintiff argues that the Smithsonian acted in bad faith both by failing to consider "the

possibility of future available positions" and by inquiring as to whether she was qualified for the zoo

vacancy.  Plaintiff's logic is more than a little confusing – the Smithsonian should have kept the

vacancy search open indefinitely, but was wrong for discussing an actual opening with her.  Plaintiff

suggests that, rather than terminating plaintiff when it did (four years after she first became unable to

work and two years after she had been on full time leave without pay), the Smithsonian should have

---

[10]  In yet another example of logical inconsistency in plaintiff's brief, the argument that
the Smithsonian acted in bad faith by not exploring reassignment outside of the Entomology
Department is contrary to her argument that Schultz's November 2003 memo suggesting that she
work outside of the Entomology Department was retaliatory.

[11]  Plaintiff does not allege that she requested to work at the insect zoo in 2004 when a
vacancy actually existed, though she apparently was aware of opening. Norden Dec. 25, 2006
Aff.¶ 62.

"waited until a reasonable vacancy surfaced." Pltf's Opp. at 20. This is tantamount to a request for indefinite leave, which is not is reasonable accommodation. Scarborough v. Natsios, 190 F. Supp. 2d 5, 26 (D.D.C. 2002) ("Requests for indefinite medical leave are also unreasonable as a matter of law."); Sampson v. Citibank, F.S.B., 53 F. Supp. 2d 13, 18 (D.D.C. 1999) (upholding a termination after 78 days leave); Nowak v. St. Rita High Sch., 142 F.3d 999, 1004 (7th Cir. 1998) ("The ADA does not require an employer to accommodate an employee who suffers a prolonged illness by allowing him an indefinite leave of absence.").

Plaintiff's counsel requested that the Smithsonian search for vacancies on July 7, 2004. Def's SOMF ¶ 9. The Smithsonian searched for vacancies for over a month after that. Def's SJ Exs. 22 & 23. In doing so, the Smithsonian acted in good faith consistent with the requirements of the Rehabilitation Act. Moreover, to the extent that plaintiff alleges the Smithsonian had a duty to search positions that were not open, which is a peculiar and unsupported claim, that claim fails as a matter of law: "A position is vacant for purposes of reassignment if the position is available at the time the employee requests the accommodation or the employer knows that it will become available within a reasonable amount of time." Lucarelli v. CONRAIL, 2002 U.S. Dist. LEXIS 12201 n.8 (E.D. Pa. Mar. 26, 2002); Cravens v. Blue Cross & Blue Shield, 214 F.3d 1011, 1019 n.5 (8th Cir. 2000); Monette v. Elec. Data Sys. Corp., 90 F.3d 1173, 1187 (6th Cir. 1996) (holding that an employer did not violate the ADA by keeping an employee on unpaid leave for thirty-seven days before terminating him when no new position opened); Kalskett v. Larson Mfg. Co., 146 F. Supp. 2d 961, 976-78 (N.D. Iowa 2001) (employer not required to reassign employee to position that became available two months after request for reasonable accommodation).

VI.    **THE SMITHSONIAN PARTICIPATED IN GOOD FAITH IN THE INTERACTIVE PROCESS**

Finally, plaintiff seeks to defeat the Smithsonian's Summary Judgment Motion by arguing that it failed to participate in good faith in the interactive process.  Plaintiff's Opp. at 35-43.  The bulk of this argument is founded upon the Smithsonian's actions in 2002, including alleged action by the Smithsonian which chilled her from pursuing work at the USDA.  As shown in Section I above, plaintiff failed to file a timely administrative complaint regarding these allegations.  A large part of this argument, however, is that the Smithsonian thwarted plaintiff's efforts to find a detail at the USDA – an Executive Branch Agency separate and distinct from the Smithsonian.  Plaintiff offers *no authority* – because there is none – for the proposition that the Rehabilitation Act requires an employer to detail an employee to another agency.  Further, plaintiff's argument that the Smithsonian stood in the way of a USDA detail includes the remarkable, unsupported allegation that Dr. Mathis hid a USDA memo from Dr. Miller and the Smithsonian has lied about its contacts with the USDA.  First the memo that Dr. Mathis allegedly hid did not come from the Smithsonian. It was provided to defense counsel via e-mail as a stand alone Word attachment *after* the discovery period had closed without any authentication or foundation.  It should *not* be considered by this court for that reason.  Second, the offer reflected in the memo to reimburse the Smithsonian $22,500 for plaintiff's time is entirely *consistent* with Dr. Mathis's recollection that the USDA did not offer enough money to allow the Smithsonian to hire someone to perform plaintiff's Smithsonian duties.  Mathis Decl. ¶ 5.

In sum, plaintiff has offered no actual evidence to dispute the chronology of the Smithsonian's efforts to allow her to work in the Entomology Department over a four year period, but has resorted to asserting her unsupported "beliefs" and "speculation," and offering information

from her physicians, which she has not previously produced to the Smithsonian and was not known by the Smithsonian at the time the decisions were made.

## **CONCLUSION**

For the foregoing reasons, as well as those contained in defendant's motion for summary judgment, judgment in defendant's favor on each and every one of plaintiff's claims is appropriate.

January 9, 2007                           Respectfully submitted,


                                          ___/s/_____
                                          JEFFREY A. TAYLOR, D.C. BAR # 498610
                                          United States Attorney


                                          ___/s/_____
                                          RUDOLPH CONTRERAS, D.C. BAR # 434122
                                          Assistant United States Attorney


                                          ___/s/_____
                                          JOHN HENAULT, D.C. BAR # 472590
                                          Assistant United States Attorney
                                          555 4th Street, N.W.
                                          Washington, D.C. 20530
                                          (202) 307-1249

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BETH M. NORDEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05-1232 (RMC) |
| | ) | |
| LAWRENCE  M. SMALL, SECRETARY | ) | |
| SMITHSONIAN INSTITUTION, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

### DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE
### TO DEFENDANT'S STATEMENT OF MATERIAL FACTS

Defendant Lawrence M. Small, Secretary of the Smithsonian Institution, respectfully

submits this reply to Plaintiff's Response to Defendant's Statement of Material Facts Not at Issue.

### INTRODUCTION

Plaintiff's response fails to establish that there are any genuine issues of material fact for

trial.  To the contrary, plaintiff either admits the vast majority of defendant's material facts, or fails

to rebut them by offering admissible evidence.  Plaintiff may not defeat summary judgment by

offering inadmissible evidence.  Similarly, she may not rely on unsupported allegations or

speculation, or by ignoring her own binding testimony and representations given under oath during

deposition.  Accordingly, summary judgment is appropriate in defendant's favor.

### SPECIFIC RESPONSES

1.  Plaintiff admits that during all relevant periods, she was a GS-11 Museum Specialist.

This admission stands in stark contrast to plaintiff's statements in her declaration that she was hired

by the Smithsonian as a "research assistant," Pltf's Dec. 25, 2006 Decl. ¶¶ 22 & 23, and was a

"research support scientist, Pltf.'s Dec. 25, 2006 Decl. ¶ 27.  Plaintiff may not create a dispute of

fact by offering contradictory testimony and statements regarding her position. As she admits in response to defendant's statement of material facts, plaintiff was a GS-11 Museum Specialist. Notwithstanding plaintiff's admission that she is a Museum Specialist, plaintiff attempts to dispute that the position description included with defendant's motion for summary judgment was her position description. Plaintiff's attempt to dispute this fact by offering her unsupported conspiracy theory that defendant manufactured the position description for purposes of this litigation fails. In fact, notwithstanding plaintiff's speculation that the position description was manufactured for this litigation, in deposition, plaintiff contradicted this assertion when she stated, "I have no way of knowing if it's manufactured or false. I just know I have never seen it before." Pltf's Depo. 42:2-42:5. Plaintiff may not contradict her sworn deposition testimony to create a dispute of fact relating to the position description. Moreover, attached to this filing is the declaration of Marilyn Slomba. See Declaration of Marilyn Slomba ¶¶ 1-5 (attached hereto). As set forth in that declaration, the position description attached as Exhibit 2 to defendant's motion is a true and correct copy of the position description contained in Smithsonian business records, namely plaintiff's Official Personnel File. Thus, not only is plaintiff's speculation regarding the position description insufficient to create a dispute of material fact, particularly in light of plaintiff's prior sworn testimony, her speculation is not sufficient to overcome the sworn testimony of Ms. Slomba that Exhibit 2 to defendant's motion is a true and accurate copy of the position description maintained by the Smithsonian in its official records.

2. Plaintiff admits this statement.

3. Plaintiff disputes the statement that the Smithsonian funds her disability payments, but offers no evidence other than her conclusory statement. Pltf's Decl. ¶ 75. Plaintiff does not provide

any evidence that she has a foundation to make such a claim.  In contrast to plaintiff's conclusory statement, attached to this filing is the Declaration of Farhana Hossain, who offers admissible evidence that the Smithsonian Institution pays the Department of Labor for disability payments made by the Office of Worker's Compensation Programs to current and former Smithsonian employees.  Declaration of Farhana Hossain ¶¶ 1-3 (attached hereto).  Thus, the Smithsonian funds plaintiff's disability benefits.  In light of the foregoing, plaintiff has not created a genuine dispute of material fact as to paragraph 3 of defendant's statement.

4.  Plaintiff admits this statement.

5. Plaintiff admits this statement.

6.  Plaintiff admits this statement.

7.  Plaintiff admits this statement.

8.  Plaintiff admits this statement.

9.  Plaintiff admits this statement.

10.  In an attempt to create a genuine dispute of material fact regarding the reasons for the termination of plaintiff's light duty hours, plaintiff offers her conclusory reason.  This reason, however, is not supported by competent evidence and, in fact, is not supported by any evidence other than plaintiff's simple conclusion.  All competent evidence supports defendant's statement: "On November 30, 2002, plaintiff's light duty status was in fact terminated and she returned to a full time leave without pay status, during which she would receive worker's compensation payments." Exhibit 4 to defendant's motion for summary judgment.  Moreover, plaintiff herself confirmed by email with Ms. Youmans on July 5, 2002 that Ms. Youmans was waiting to hear back from plaintiff *prior* to ordering a respirator because plaintiff has received varying medical opinions.  Youmans

Decl. ¶ 12 (filed as an exhibit to defendant's motion for summary judgment). Following this email, plaintiff **never** provided Ms. Youmans with additional information. Youmans Decl. ¶ 13. Finally, although plaintiff asserts that she met her part time hours for the final nine weeks prior to the termination of her light duty status, she conveniently ignores the fact that for the seventeen pay periods she worked in 2002, she only met her light duty hours for five of the seventeen pay periods. See Murphy Decl. Attachment 1 (filed as an exhibit to defendant's motion for summary judgment). Moreover, to the extent that plaintiff cites and  mischaracterizes the testimony of Dr. Miller to support her cause, that testimony was strictly hypothetical, and not related to plaintiff's situation. Thus, it creates no dispute of material fact.

11.  Plaintiff admits this statement.

12.  Plaintiff admits this statement, although she attempts to portray the consultation with an attorney as a simple conversation with a church member. In deposition, plaintiff was asked about her retainer of an attorney to investigate potential discrimination, she responded, "That weekend I spoke with an attorney that's a member of my church. He has an office in Greenbelt." Pltf's Depo. 118:25-119:1. Plaintiff further explained that she "contacted my friend who is an attorney, asked him how serious this was . . . ." Pltf's Depo. 119:22-119:23, and that "there were follow up conversations. There were follow up emails. He is the person who connected me with Bruce Goodman," Pltf's Depo. 120:8-10. Regardless of how it is characterized, plaintiff sought legal counsel immediately after she received the letter terminating her light duty status, but failed to file an informal complaint of discrimination until almost five months later.

13.  Although plaintiff disputes that she ever saw the EEO posters hanging in and around the Smithsonian, she does **not** dispute the fact that they were there. To the extent that plaintiff now

4

asserts that she did not have access to PRISM, the Smithsonian's intranet, plaintiff is contradicting her own sworn deposition testimony – in deposition, when asked if she had access to PRISM, plaintiff stated, "I had limited access, yes." Pltf's Depo. 123:22-124:3. Thus, plaintiff's attempt to create a dispute of fact by Contradicting her deposition testimony does not create a dispute. In sum, there is no dispute of fact that there were several places around plaintiff's workplace at which EEO posters advising employees of their EEO rights were posted. See Def's SOMF ¶ 13.

14. Plaintiff admits this statement. To the extent that plaintiff asserts that she sought counseling with Ms. Gover immediately after the termination of her light duty status, Ms. Gover is not an EEO counselor. See Declaration of Carol Gover. Therefore, plaintiff could not have sought informal counseling from Ms. Gover. Moreover, the plain language of the communications between plaintiff and Ms. Gover belie the claim that she sought informal counseling for alleged discrimination. See Exhibit 1 hereto (Email exchange of Beth Norden and Carol Gover).

15. Plaintiff admits this statement.

16. Plaintiff admits this statement regarding the letter terminating her light duty status. While plaintiff attempts to claim that there were gaps in her worker's compensation payments, she does not dispute that as of the date upon which plaintiff would be removed from the Smithsonian as an employee, plaintiff would have been on leave without pay and receiving full worker's compensation payments for more than one year. Plaintiff admitted this fact in her deposition. See Pltf's Depo. 126:16-126:24.

17. Plaintiff admits this statement.

18. Plaintiff tries to create a dispute of material fact by seeking to contradict her own sworn testimony. In deposition, plaintiff was asked, "Okay. So from roughly the November 2003 time

5

frame until this treatment that helped you out with the problem, how many migraines a month would you get that incapacitated you?"  Pltf's Depo. 143:13-143:15.  Plaintiff responded, "Again, it's hard to answer your question because I would get migraines and I know what to do so in terms of days that I was totally incapacitated, maybe three."  Pltf's Depo. 143:16-143:18.  Plaintiff was then asked, "Maybe three days or three migraine episodes?"  Pltf's Depo. 143:19.  Plaintiff responded "Maybe three days," Pltf's Depo. 143:20, then confirmed that the rest of the time she was able to control her migraines with medication, Pltf's Depo. 143:23-144:1.  Plaintiff's unequivocal deposition testimony did not offer a "rough" or "average" number of migraines.  Rather, she unequivocally testified under oath that she was incapacitated for only three days per month.  To the extent that plaintiff now offers the testimony of Dr. Granite to support her claims and create a dispute of fact, Dr. Granite's affidavit does no such thing.  Dr. Granite's affidavit does ***not*** provide any additional information on the number of days overall that plaintiff suffers incapacitating migraines.  Dr. Granite states both that plaintiff "has never had a month free of dengue-induced migraines" and that "for the period from 2003 through 2005, she has had many episodes of total incapacitation from migraines that lasted from 3 to 6 days in a particular month."  Granite Dec.¶ 10.  Yet like plaintiff's deposition testimony, Dr. Granite's statement does not provide any detail as to how many 3-6 day migraines plaintiff has suffered.  Moreover, the information from Dr. Granite was never provided to the Smithsonian at the time plaintiff's claims accrued and is actually contradictory to the information that plaintiff and her physicians did provide to the Smithsonian:  In December 2003, Lawford wrote that, following the onset of her illness in 2000, the migraines' "frequency and intensity gradually lessened over the next several years."  Def's SJ Ex. 10.  Dr. Lawford addressed migraine frequency as follows:

> Beth is, at this stage in her recovery down to having typically two, sometimes three migraines in a month's time.  Her providers agree with this figure. The question I know

management wants me to ask is 'What will the frequency once she re-enters the naphthalene ambient atmosphere of her department?" I have asked both providers and even asked Beth. No one knows. ***Her overall disease process and it symptoms have lessened since she last worked 20 hours per week***, so I would hold that she should experience less migraine frequency in the workplace than she did a year ago.

Def's SJ Ex. 10 (emphasis added).  Thus, because plaintiff's sworn testimony contradicts her response to defendant's statement of material facts, her contradictory statements cannot create a genuine dispute of material fact.

19.  Plaintiff admits this statement.

20.  Plaintiff admits this statement.

21.  Plaintiff admits this statement, but adds that Dr. Lawford's recommendation included Dr. Oberg's request that plaintiff be free from hostility or retaliation.  Defendant admits that the recommendation from Dr. Lawford repeated Dr. Oberg's request, but disputes (1) that plaintiff had been subject to hostility and retaliation, and (2) that this request is a proper accommodation for medical issues.

22.  In his administrative declaration, Dr. Shultz did in fact state that plaintiff has presented sufficient evidence of a disability.  However, he clarified this statement with dates and further information in his declaration attached to defendant's motion for summary judgment; he clarified that his belief that plaintiff suffered from a disability related to her first return to work and that, when plaintiff requested to return to work, he believed, based upon the information he received from Dr. Lawford, that plaintiff was not disabled.  Moreover, to the extent that Dr. Shultz did consider plaintiff disabled, Dr. Shultz was not qualified to give a legal conclusion that plaintiff was disabled under the Rehabilitation Act; he is ***not*** an attorney.  And, simply believing plaintiff is disabled does

not mean that she is "otherwise qualified" under the Rehabilitation Act.  Thus, plaintiff has not created a genuine dispute of material fact regarding defendant's statement 22.

23.  Plaintiff does not dispute that the Smithsonian presented a proposed settlement agreement, or that pursuant to the terms of proposed settlement agreement, the Smithsonian would agree to withdraw the notice of the proposed termination and permit plaintiff to return to work under specified conditions provided the plaintiff withdrew her EEO complaint.  While plaintiff asserts that there was no discussion of plaintiff being free from hostility or retaliation, plaintiff was not subject to hostility or retaliation in the first place, and the Work Plan presented to plaintiff's counsel the same day as the proposed settlement agreement provided that plaintiff would report to Nancy Adams, a person against whom plaintiff does not, nor has ever, alleged discrimination or retaliation. Thus, there is no dispute of material fact regarding defendant's statement 23.

24.  Plaintiff does not dispute statement 24, but suggests that the Work Plan was not included with the proposed settlement agreement.  There is no dispute of fact regarding this; defendant's statement asserts, "On the same day the Smithsonian transmitted the Proposed Settlement Agreement to plaintiff's counsel, it sent a Work Plan that outlined her duties and responsibilities upon her proposed return to work.  Pltf's Depo. 163:1-163:9; Exhibit 12 (Work Plan).  This work plan was developed and drafted by Nancy Adams, a GS-12 Museum Specialist. Pltf's Depo. 164:16-164:21."  Thus, there is no dispute of fact regarding defendant's statement 24.

25.  Plaintiff admits this statement.

26.  Plaintiff admits this statement.  Notably, plaintiff is admitting that Dr. Lawford advised the Smithsonian that, based upon his discussions with plaintiff's treating physicians, the medically-related terms of the return to work plan were appropriate for plaintiff.

8

27.    Plaintiff does not dispute that Nancy Adams was a GS-12 Supervisory Museum Specialist against whom plaintiff had never alleged retaliation or discrimination and for whom plaintiff had respect as a person.  Moreover, although plaintiff now asserts that she did not consider Ms. Adams to be a scientist, plaintiff admitted in deposition that she respected Ms. Adams as a Museum Specialist.  Pltf's Depo., 167:1-167:2 (Q: Did you have respect for her as a museum specialist?  A: Of course.).  Regardless, plaintiff does not dispute that she herself was a GS-11 Museum Specialist and that Ms. Adams was a GS-12 Supervisory Museum Specialist.  Moreover, plaintiff mischaracterizes the testimony of Dr. Shultz in attempting to create a dispute of fact.  Dr. Shultz testified that Ms. Adams would also be performing some of the tasks with plaintiff, thus, there were no misrepresentations to plaintiff regarding the proposed return to work plan.  Moreover, the text of the Work Plan itself states that certain tasks would be accomplished "with assistance from supervisor."  Def's SJ Ex. 12.  Thus, plaintiff's assertions are demonstrably false and contradicted by the plain language of the Work Plan itself.

28.  Plaintiff admits this statement.

29.  Plaintiff admits this statement.

30.  In an attempt to create a dispute of fact regarding defendant's statement 30, plaintiff asserts that "the collections work described in the proposed return to work plan might or might not have been consistent with some museum specialist's duties."  Plaintiff herself admits that she was a Museum Specialist and admits that she previously performed collections work.  Plaintiff also admits that "all research starts with work collecting and preparing specimens."  Thus, plaintiff fails to create a genuine dispute of fact regarding defendant's statement 30.  Moreover, to the extent that plaintiff claims she did different work for Dr. Krombein, plaintiff herself admits that Dr. Krombein had

9

passed away and was no longer at the Smithsonian for her to work with at this time.  Pltf's Depo. 216:19-218:15.

31.  There is no dispute of fact regarding defendant's statement 31, which is supported by the words of plaintiff and her counsel.  Moreover, simply because plaintiff's counsel states in her letter that the plan is retaliatory does not make it so; all competent, admissible evidence is to the contrary.

32.  Although plaintiff now seeks to provide evidence from her physicians that the proposed return to work plan was contradictory to their recommendations, the documentation provided to the Smithsonian by plaintiff and her physicians at the time the plan was drafted indicated that the plan was entirely consistent with the recommendations of plaintiff's doctors at that time.  See Def's SJ Exhibits 8 & 9.  Moreover, plaintiff does not dispute that Dr. Lawford advised the Smithsonian that the medically related terms of the proposed return to work agreement complied with the recommendations of plaintiff's physicians.  And, plaintiff herself testified that she does not believe that Dr. Lawford either provided wrong advice or discriminated against her.  Pltf's Depo. 149:8-150:24.

33.  In an attempt to create a dispute as to defendant's statement 33, plaintiff now seeks to back away from her sworn deposition testimony.  In deposition, plaintiff admitted that, at the time she received the proposed return to work agreement, she misunderstood it and that it in fact provided her the flex time she would have needed.  Pltf's Depo. 172:19-173:19.  Moreover, plaintiff does not dispute that Dr. Lawford advised the Smithsonian that the "floating Friday" complied with the recommendations of plaintiff's doctors.  To the extent that plaintiff now seeks to provide statements not before the agency at the time the decision was made, those statements are insufficient to create a

genuine dispute of material fact because it is beyond dispute that plaintiff did not inform the Smithsonian of these facts at the time the decision was made.

34. Plaintiff does not dispute defendant's statement 34, but offers hearsay statements that neither contradict or explain defendant's statement 34. Thus, there is no dispute of fact regarding defendant's statement 34.

35. Plaintiff's response to defendant's statement 35 neither directly addresses the statement, nor contradicts it. Instead, plaintiff offers hearsay statements that are insufficient to create a genuine dispute of material fact. In sum, because plaintiff's response does not directly respond to defendant's statement 35, that statement is admitted.

36. All competent, admissible evidence supports defendant's statement that the proposed return to work plan complied completely with the recommendations the Smithsonian received from plaintiff's doctors. <u>Compare</u> Def's SJ Exs. 12 & 15 (Work Plan and Proposed Return to Work Agreement) <u>with</u> Exs. 8 & 9 (letters provided to the Smithsonian from plaintiff's doctors during the relevant time period). Moreover, to the extent that plaintiff asserts that the Court should disregard the statement that plaintiff could continue to utilize Smithsonian assets for her personal research, such an assertion is without merit. This was a benefit afforded all museum specialists, including plaintiff, at all times providing they completed their assigned work, and was a benefit that plaintiff herself utilized. Pltf's Depo. 179:14-179:21; Shultz Decl. ¶ 6. Thus, there is no basis for the Court to disregard this statement.

37. Plaintiff disputes that Ms. Slomba investigated plaintiff's claims, but does so with no foundation to make such a statement. Accordingly, plaintiff's speculation is insufficient to create a dispute of fact. In fact, plaintiff's response to defendant's statement 37 is entirely unsupported with

competent, admissible evidence and, therefore, not sufficient to create a genuine dispute of material fact.

38.  Plaintiff admits this statement.

39.  Plaintiff's response to defendant's statement 39 is nonsensical, she asserts that the Smithsonian should have somehow inquired regarding positions that were not open.  This assertion makes no sense, if a position is not open, it is impossible to fill that position.  In sum, plaintiff's response to statement 39 is not sufficient to create a genuine dispute of material fact.

40.  As with plaintiff's response to statement 39, plaintiff's response to statement 40 is insufficient to create a genuine dispute of fact.  As a matter of law, defendant is not required to maintain plaintiff in an indefinite leave status permanently.  And, at the time the Smithsonian conducted a job search, it could only search for open positions; if a position is not open, it cannot be filled.

41.  Plaintiff admits this statement.

42.  Plaintiff admits this statement.

43.  Plaintiff admits this statement.

44.  Plaintiff offers her own legal conclusions in response to defendant's statement 44. However, such legal conclusions, unsupported by the factual record are not sufficient to create a genuine dispute of material fact regarding the reasons for plaintiff's termination.  As explained in the letter advising plaintiff of her termination, she was terminated for her inability to perform the functions of her job, and not due to some alleged "bootstrapping."  In sum, plaintiff's legal conclusions are insufficient to create a dispute of fact and, therefore, defendant's statement 44 is admitted.

12

January 9, 2007                          Respectfully submitted,


  /s/
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


  /s/
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


  /s/
JOHN HENAULT, D.C. BAR # 472590
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
(202) 307-1249

13