## Affidavit of Beth Mary Norden, Ph.D.

1. I am over the age of eighteen years, and I am competent to testify.

2. My address is 112 Greenhill Road, Greenbelt, MD 20770.

3. My first return to work occurred in the spring of 2001 on a twelve hour per week basis per my neurologist's orders. This period of light duty hours was terminated for health reasons by my doctors. My second return to work began in the spring of 2002 on a twenty hour per week basis. These light duty hours were terminated by my department without my doctors' or my input.

4. As I testified in my previous affidavit in this case, during the period November 2002 through January 2003, I contacted my supervisor, Dr. Schultz, Smithsonian ombudsman Chandra Heilman, counselors at the Smithsonian Employee Assistance Program, Debbie Burney and Rebecka Mevorah, Carolyn Lohr and Michael Johnson in the Office of Human Resources, EEO Disability Specialist Carol Gover, and Smithsonian physician Dr. Lawford, as well as Kathy Makos, Industrial Hygienist and Rudy Anderson, Safety and Occupational Health Manager.

5. Although Carol Gover is a disability specialist with the Smithsonian EEO, she did not inform me of the 45 day rule, nor did she otherwise advise me of my right to make a complaint with the Smithsonian EEO.

6. Instead of advising me as to my rights as a Smithsonian employee, Ms. Gover assured me that "The goal is for you to successfully return to your job full-time."

7. The attached email is an accurate photocopy of the email assurance Ms. Gover gave me in regard to my returning to work.

B

8. None of the other people I contacted in any way explained to me the option of filing a complaint, the procedures for doing so, or the 45 day rule.

9. I have never, under any circumstances, filed any sort of EEO complaint against anyone, nor did I know how to do so at the time my light duty hours were terminated.

10. I complained within my department when I was sexually assaulted on Smithsonian grounds by USDA employee James Dogger in 1988. The Smithsonian Exhibit 12 is a memo from me to one of my then current co-supervisors and department chair in which I state, "This memo was intended for your use only."

11. Dr. Krombein, who was my other co-supervisor during this period, urged me to seek legal advice about filing a lawsuit against the Smithsonian for the sexual attack I endured on Smithsonian property. I declined to do so out of loyalty to the Institution and never received any sort of legal or other advice about making a complaint although Smithsonian attorney James Douglas did help me write a letter to Dogger directing him to stop talking about the incident.

12. I worked for Dr. Krombein during the majority of my tenure at the Smithsonian. Even after he retired, he stayed on at the Smithsonian as an emeritus scientific volunteer and still functioned as my unofficial supervisor for much of my work. During the late 1990s, when Dr. Krombein himself was in his mid to late eighties, it became apparent to me that he was suffering from increasing physical fragility as well as the beginning stages of dementia.

13. On one occasion I was called to Dr. Krombein's office to help him by a USDA technician who found him on the floor. His head was bleeding profusely and he

had lost consciousness. I staunched the wound, rode with him in the ambulance, provided medical information since he was incoherent, and waited with him in the hospital hours past the time I would normally leave from work until Dr. Krombein's daughter was able to come for him.

14. As a consequence of this incident, I was publicly criticized for touching Dr. Krombein's blood without wearing protective gloves.

15. I became increasingly concerned about Dr. Krombein's physical well being as well as my own ability to perform the necessary elder care.

16. I approached the Smithsonian ombudsman and my supervisor about Dr. Krombein's ability to continue working, and I requested a first aid course for myself.

17. These "complaints" were initiated in response to my concern for Dr. Krombein's health, especially in view of the field travel we conducted. Our last field study was for three weeks in April of 2000 to the Archbold Biological Station in Central Florida.

18. During the period when I was recovering from dengue hemorrhagic fever, Dr. Krombein ceased being able to work at the Smithsonian and entered a nursing home as an Alzheimer's patient. His daughter was unable to keep him at home due to his night roaming. That nursing home is Sunrise of Gunston, at 7665 Lorton Road, Lorton, Virginia.

19. In 1996 I was granted a Senior Fulbright Research Award. When one of my supervisors, Jonathon Coddington, failed to sign the necessary travel papers so that I could travel to Sri Lanka and India, I went to his supervisor who immediately took the necessary steps to allow me to go to my teaching and research position.

20. The three incidents outlined above, complaining within my chain of command about a sexual predator, expressing concerns about Dr. Krombein's failing health and the hazards involved in his working at the Smithsonian, and going to a second supervisor to get my travel papers signed, are a complete list of my "complaints" involving the Smithsonian. None of these incidents involved the Smithsonian EEO.

21. My office is on the 5th floor, East Court Building within the Natural History Building.

22. As stated in Nor Dahlen's affidavit supplied by the Smithsonian as Exhibit 11, there is no EEO poster on the 5th floor of my building.

23. My daily route to work consisted of entering the Museum of Natural History from Constitution Avenue on the ground floor, walking through the main lobby which is part of the public museum, taking a left turn towards the East Wing, taking a right turn into the East Court hallway past the childcare center, and riding the elevators up to the fifth floor. There were no posters or other EEO information in any of these areas that comprised my daily route, nor are there any time clocks in the Museum.

24. The third floor was used primarily for meetings. I have visited the Kirby meeting room on the third floor twice in the past six years. In either 1998 or 1999 I attended a going away party in the Kirby room. In 1999 I attended a seminar on blood born pathogens in the Kirby room. I have rarely visited the third floor since these two events, and I have never seen any EEO posters on the third floor.

25. I have only rarely visited the Sixth Floor West Wing. On one of these few visits I stopped to look at a bulletin board in the hallway. I recall that it was covered with many layers of papers including the frequent job announcements and advertisements placed by

32. During my second return to work, my work hours were twenty hours per week, and I did sometimes eat a snack at work. During this period, I continued to avoid the Smithsonian cafeteria because a) by this point I had a ten year habit of eating lunch in the office, b) my time was very limited, and it was quicker to eat at my desk, c) my health was still fragile, and it was safer to eat food that I had brought from home and knew would not make me sick.

33. I had a small refrigerator in my office and either ate at my desk or in the SEM lab with Susann Braden. I did not go to the staff cafeteria.

34. I very rarely went to the other areas of the building because I was under a great deal of time pressure during my light duty hours and because the employee areas of the Smithsonian are not designed for easy access. They are a series of "add-ons" frequently under renovation, and they house many fragile specimens which are rather closely guarded by the people who work on them. Space is limited within the nonpublic areas, thus there are often post docs working at desks in the hallways where many collection cabinets are kept.

35. I am still on the rolls as a Smithsonian employee and am still seeking a return to work, not through a settlement of a case, but through a reasonable accommodation of my handicapping condition.

36. In November of 2003, the Smithsonian requested that I provide new recommendations by my doctors so that the Smithsonian could evaluate my ability to work full time and its ability to accommodate my handicapping condition.

37. Attached is a copy of the December, 2003 recommendations made by Smithsonian Doctor Lawford for my return to work at the Smithsonian.

38. The Smithsonian has not, as yet, offered any position which my doctors or I believe satisfies Dr. Lawford's return to work recommendations.

39. My attorney has suggested to Smithsonian attorney Marilyn Slomba that I be offered one of the many Smithsonian positions that does not require working with naphthalene, and Ms. Slomba has agreed to research the possibility of such an opening. My understanding is that this is being done not in settlement of any complaint, but as part of the Smithsonian's ongoing responsibility to accommodate an employee with a handicapping condition. The attached email, dated July 7, 2004, is a record of this communication.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 27th day of July, 2004.

*Beth Mary Norden*
*27 July 2004*
Beth Mary Norden