Alex T. Sliheet, D.C. Bar No. 438977
Vickie Inge Fang, *pro hac vice*
Attorneys for Plaintiff Beth Norden
8702 Nightingale Drive
Lanham, MD  20706
alexsliheet@yahoo.com
fvickie@comcast.net
(301) 552-4908

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Beth M. Norden,** ) | |
| ) | **Case No. 05cv1232 (RMC)** |
| **Plaintiff** ) | |
| ) | |
| **v.** ) | **PLAINTIFF'S OPPOSITION MEMORANDUM** |
| ) | **AND CROSS MOTION FOR SUMMARY** |
| **Cristian Samper, Acting** ) | **JUDGMENT, OR IN THE ALTERNATIVE** |
| **Secretary Smithsonian** ) | **SUMMARY ADJUDICATION ON THE 45** |
| **Institution,** ) | **DAY ISSUE AND THE ISSUE OF THE** |
| ) | **SMITHSONIAN'S FAILURE TO** |
| ) | **ACCOMMODATE IN THE 2002 PERIOD.** |
| **Defendant** ) | |
| ) | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES**

**Table of Contents**                                                    **Page**

**I.      STANDARD OF REVIEW**……………………………………….……..…..5


**II.     THE 45 DAY RULE AS TO 2002 ACCOMMODATIONS**

   **A.    USDA Transfer Accommodation:  Dr. Norden filed a timely informal
          complaint on February 10, 2003, regarding failure by the Smithsonian to
          accommodate her with a transfer to the USDA. ……………………….................7**

   **B.     Other Accommodations:  Because the USDA transfer accommodation
           was part and parcel of the discussed 2002 accommodations, the timely filing on
           February 10, 2003, covers not only the USDA transfer but all other
           accommodations requested in the 2002 period that were not given……………………11**

   **C.    Alternatively as to the Other Accommodations: The 45 day requirement
          must be extended because the 45 day requirement is independent of common
          law equitable tolling, is liberally construed, and is mandated under any of the
          4 criteria of 29 CFR §1614.105(a)(2)..………………………………….……………………14**


**III.    THE SMITHSONIAN FAILED TO ACCOMMODATE DR. NORDEN'S
          KNOWN DISABILITY DURING THE 2002 PERIOD……………………………..…32**

   **A.    Plaintiff had a disability during the 2002 period……………………………………….33**

   **B.    Plaintiff was a qualified individual who could perform the essential
          functions of her job with reasonable accommodations during the 2002
          period…………………………………………………………………………...35**

   **C.    Plaintiff requested reasonable accommodations but was denied reasonable
          accommodations for her known disability during the 2002 period……………………36**


**IV.     CONCLUSION……………………………………………………….……..44**
.

**Table of Authorities**                                                    **Page**

**Cases:**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242, 247 (1986)…………………………………………….…5

*Barth v. Gelb*,
  303 U.S. App. D.C. 21, 2F.3d 1180, 1183 (D.C. Cir. 1993)……………………32

*Celotex Corp. v. Catrett*,
  477 U.S. 317, 322 (1986)………………………………………………..…5

*Diamond v. Atwood*,
  43 F.3d 1538, 1540 (D.C. Cir. 1995)………………………………….……5

*Greene v. Dalton*,
  164 F.3d 671, 675 (D.C. Cir. 1999)……………………………………6

*Harding v. Gray*,
  9 F.3d 150, 154 (D.C. Cir. 1993)………………………………….……6

*Harris v. Gonzales*,
  488 F.3d 442, 444-445 (9th Cir 2007)…………………………………...14

*Johnson v. Runyon*,
  47 F.3d 911 (7th Cir. 1995)………………………………….……14

*Pantzes v. Jackson*,
  366 F. Supp. 2d 57, 67 (D.D.C. 2005)………………………………….…35

*Thompson v. Rice*,
  422 F. Supp 2d 158 (D.D.C. 2006)……………………………...9, 32

*Woodman v. Runyon*,
  132 F. 3d 1330, 1343 (10th Cir. 1997)…………………………...…33

**Codes:**

29 U.S.C. § 791……………………………………………...……..32

29 C.F.R. § 1614.105(a)(2)………………………………………...…et. al.

Fed. R. Civ. P. 56(c)………………………………………………5

## Brief Introduction

**ISSUE 1:**  Plaintiff asks the court to rule that Dr. Norden is entitled to summary judgment on the issue of whether she was within  the 45 day requirement under 29 CFR §1614.105(a)(2) to bring to the EEO an informal complaint regarding the Smithsonian's failure to accommodate Dr. Norden's known disability during the 2002 period.

- ***Transfer accommodation denied***

As to her transfer accommodation to the USDA in the 2002 period, on February 10, 2003, Dr. Norden did file an informal complaint with the Smithsonian Office of Equal Employment and Minority Affairs ("OEEMA") within 45 days of even first becoming aware of the USDA funding.  Dr. Norden first received an email from Dr. Webb of the USDA on December 30, 2002, that stated the following:  "I understand that Jeff Aldrich has emailed Wayne Mathis concerning transfer to our unit, but has received no reply.  Is Wayne around?  I believe things are finally set on our end, but only Jeff and Wayne can really speak to this."  Dr. Norden was never told by the Smithsonian that it was denying her 2002 USDA transfer accommodation after the USDA received funding.

- ***All other accommodations denied***

1) Because the 2002 USDA transfer accommodation was part of the 2002 accommodations, its timely filing on February 10, 2003 makes the entire claim timely;  namely,  that  the  Smithsonian  failed  to  provide  reasonable accommodations  during  the  2002  period  and  this  includes  all  other accommodations requested in the 2002 period that were not given.

2) If necessary, as to accommodations of flextime and other naphthalene accommodations  in  the  2002  period,  Dr.  Norden  meets  each  of  the  four

independent criteria for extension of the 45 day rule under 29 CFR §1614.105(a)(2). These four criteria are <u>not</u> governed by common law equitable tolling standards, are liberally construed, and are mandatory.

**ISSUE 2**: Plaintiff also asks the court to rule that Dr. Norden is entitled to summary judgment that the Smithsonian failed to accommodate Dr. Norden in the 2002 period because the Smithsonian failed to provide her with reasonable accommodations in terms of flex time to make up hours due to doctor appointments and failed to provide her with reasonable accommodations to minimize her exposure to naphthalene. After the Smithsonian agreed to return Dr. Norden to work in 2002 on light duty hours, it simply pretended to consider and eventually ignored any further consideration of the reasonable accommodations that Dr. Norden needed to perform the essential functions of her job. When the 2002 return to work ended in November of 2002, Dr. Norden had received none of the reasonable accommodations that she needed to perform the essential functions of her job.

## I.  STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). Summary judgment is properly granted against a party that "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence

of an element essential to that party's case, and on which that party will bear the burden of

N proof at trial." *Celotex*, 477 U.S. at 322. To determine which facts are "material," a court

must look to the substantive law on which each claim rests. *Anderson*, 477 U.S. at 248. A

"genuine issue" is one whose resolution could establish an element of a claim or defense

and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322.

In ruling on a motion for summary judgment, the court must draw all justifiable

inferences in the nonmoving party's favor and accept the nonmoving party's evidence as

true.  *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than

"the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. To

prevail on a motion for summary judgment, the moving party must show that the

nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof

at trial." *Celotex*, 477 U.S. at 322. The nonmoving party may not rely solely on allegations

or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding

v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993). Rather, the nonmoving party must present

specific facts that would enable a reasonable jury to find in its favor. *Greene*, 164 F.3d at

675. If the evidence "is merely colorable, or is not significantly probative, summary

judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## ANALYSIS

In this motion, Dr. Norden asserts that she is entitled to summary judgment on the

claim that the Smithsonian violated the Rehabilitation Act by failing to provide reasonable

accommodations to allow her to do the essential functions of her job during the 2002

period.  This summary judgment issue will be address, *infra* in section III.

6

However, a preliminary issue is whether Dr. Norden made an informal complaint meeting the 45 day requirement and/or whether the 45 day requirement is extended under 29 CFR §1614.105(a)(2).  Dr. Norden asserts that she is entitled to summary judgment on the 45 day issue, because: 1) she did file an informal complaint on February 10, 2003, within 45 days of learning on December 30, 2002, from the USDA that Wayne Mathis had not returned Dr. Alridge's phone call about her transfer, 2) that because the transfer accommodation was part of all of the 2002 requested accommodations, this makes the February 10, 2003, informal complaint a timely filing as to Dr. Norden's claim which is that the Smithsonian denied Dr. Norden reasonable accommodations during the 2002 period, and this includes all of the other accommodations which were not given; 3) Dr. Norden had no actual or constructive knowledge of the 45 day requirement, and 4) after being put back on disability for the 2nd time, Dr. Norden was immediately and deliberately misled and stonewalled with vague and confusing language as to the reasons why the Smithsonian repeated its 2001 conduct and placed her back on disability at the end of 2002. Dr. Norden was also never told by the Smithsonian that it was denying her 2002 USDA transfer accommodation after the USDA received funding.

## II.    THE 45 DAY RULE AS TO 2002 ACCOMMODATIONS

### A.    <u>USDA Transfer Accommodation</u>: Dr. Norden filed a timely informal complaint on February 10, 2003, regarding failure by the Smithsonian to accommodate her transfer to the USDA.

On February 10, 2003, Dr. Norden's former attorney sent a letter to the Ms. Angela Roybal, Smithsonian Office of Equal Employment and Minority Affairs **("OEEMA").** [Plt. Ex. 1] The former attorney also subsequently filed an "EEO informal complaint form" on April 7, 2003. [Plt.Ex.2]

The February 10, 2003, letter was <u>not</u> limited to the USDA transfer accommodation and stated: *"The Department has failed and refused to accommodate Dr. Norden...please consider this letter to be an informal or a formal complaint under the ADA."* [Plt.Ex.1]  Dr. Norden was mailed a copy of this very letter by her attorney in February of 2003.  [Norden Aff., par.1]  The Smithsonian's EEO Posters submitted in evidence state that the person discriminated against needs to contact "the Office of Equal Employment and Minority Affairs **within forty-five (45) calendar days** of the alleged discrimination . . ." (emphasis in the original).  The February 10, 2003, letter is addressed to OEEMA and specifies that it is an "informal complaint."

This February 10, 2003, letter was not produced in discovery by the Smithsonian either at the EEOC stage of this litigation or at any time during the federal litigation. Plaintiff's present counsel were unaware of this February 10, 2003, letter and had they been aware, would have certainly used it to make arguments during the EEOC stage of this litigation and last year in their motions for summary judgment to this Court.  Plaintiff's counsel took over the case from Dr. Norden's former attorney, and they were only aware of correspondence from the Smithsonian EEO that indicated that the first contact had occurred on April 7, 2003. [Plt.Ex.2]  Dr. Norden was also not aware that the February 10, 2003, letter constituted the first contact with an EEO counselor. [Norden, aff., par. 1]

**The 2002 USDA Transfer Accommodation**

As will be shown, *infra,* it was not until December 30, 2002, that Dr. Norden even knew that grant funding had finally been obtained by the USDA regarding her requested and Smithsonian approved 2002 transfer to the USDA. [Plt.Ex.4]

While the Smithsonian in 2002 could not succeed even in ordering a respirator or an air filter for Dr. Norden, Dr. Norden found a solution that would have allowed her to work productively part-time in a naphthalene-free environment while saving the Smithsonian over $22,000 per year.  In mid 2002, Dr. Norden talked to Dr. Ralph Webb at the USDA about creating a new position for Dr. Norden to do research.  [Norden aff., par. 2]  Dr. Webb's supervisor, Dr. Aldrich, had Dr. Norden spend a day in the USDA lab to ascertain that she would have no negative reactions, and she completed the day successfully. [Norden aff., par.2]  In July of 2002, Dr. Norden spoke to Dr. Mathis who was Dr. Schultz' supervisor at the Smithsonian, and Dr. Norden asked for permission to pursue this new position.  Dr. Mathis discouraged and intimidated Dr. Norden by suggesting that at her age she was probably menopausal and that her menopause was making her overly emotional on the subject of naphthalene.  [Norden aff., par.3]  Nevertheless, Dr. Norden remained resolute in her request, and Dr. Mathis told Dr. Norden to proceed subject to Dr. Lawford's approval. [Norden aff., par.3] "The Act …protects requests made at the time…" *Thompson v. Rice*, 422 F. Supp 2d 158 (D.D.C. 2006)  In 2002, Dr. Lawford subsequently gave enthusiastic approval.  [Norden aff., par.3]  Dr. Norden's light duty status was terminated on Nov. 29, 2002, prior to anyone knowing whether the USDA would receive funding for Dr. Norden's USDA position.  [Norden aff., par.3] [Plt. Ex.3]

However, the USDA did receive funding shortly afterwards, and on December 6, 2002, Dr. Aldrich sent a memo to Dr. Mathis stating that he obtained funding at the rate of $22,500 per year for a period of three years and which would be reimbursable to the Smithsonian for loaning Dr. Norden to the USDA. [Plt.Ex:3]  **Dr. Mathis hid the December 6, 2002, Aldrich memo from Dr. Norden**.  [Norden aff., par. 4]  Although Dr.

Norden received an email from Dr. Webb on December 30 of 2002 [Plt. Ex.4]  informing her that "things were finally set on our end," she did not know that her part time position had been almost fully funded for a period of three years until Dr. Aldrich himself gave her a copy of the memo in the fall of 2006.  [Norden aff., par.5]   Subsequent to the December 30, 2002, email, the following occurred between Dr. Norden and the USDA:

- On January 9, 2003, Dr. Aldrich instructed Dr. Norden to call Ms. Mary Donoghue at the USDA regarding Dr. Norden's official paperwork to transfer to the USDA [Plt.Ex.5]; Dr. Norden spoke with Ms. Mary Donoghue at USDA on January 10, 2003, and on January 13, 2003, Ms. Donoghue called Dr. Norden to tell her that as a Smithsonian employee, Dr. Norden needed to be on a "reimbursable detail to USDA, Beltsville," and Ms. Donoghue would do the paperwork.  [Norden aff., par.6]

- On January 21, 2003, Dr. Norden attended an afternoon lab meeting (of the entire group) with Dr. Ralph Webb and Dr. Jeff Aldrich of the USDA and was introduced as a new employee on loan from the Smithsonian. [Norden aff., par.6]

- On January 24, 2003, Dr. Norden met with Dr. Webb and Dr. Aldrich of USDA to outline Dr. Norden's work plan for the coming year.  [Norden aff., par.6]

The Smithsonian never informed Dr. Norden that her USDA transfer request received funding.  It also never informed Dr. Norden that the Smithsonian would not approve the accommodation that Dr. Norden had initiated in 2002 and that would have restored her career while benefiting two federal agencies.  [Norden aff., par.7]

The Smithsonian continued its campaign of deception about the USDA position even after this lawsuit was filed, failing to produce Dr. Aldrich's December 6, 2002 memo

in discovery and failing to acknowledge its existence. [Plt.Ex.6, Defendant's interrogatory answers No.3]

The Smithsonian now maintains that Dr. Norden cannot be compensated for the injuries she suffered at the Smithsonian in 2002 because she should have been aware of all the acts of discrimination perpetuated against her by November 30, 2002.  The earliest date that Dr. Norden discovered that the USDA had obtained the grant money was December 30, 2002 when she received Dr. Webb's email.  [Plt.Ex.4]  Yet the USDA's conduct in January 2003, *supra*, demonstrates that even the USDA was unaware that the Smithsonian would ultimately deny the transfer subsequent to the grant money being received.

Through her former attorney, Bruce Goodman, Dr. Norden filed an informal complaint on February 10, 2003, within the 45 day requirement from the earliest date of the December 30, 2002, email from Dr. Webb, and well within the last meeting with the USDA on January 24, 2003, when Dr. Norden met with Dr. Webb and Dr. Aldrich of the USDA to outline her work plan for the coming year.  Since Dr. Norden herself created an accommodation which would have benefited the Smithsonian, and since she filed an informal complaint on February 10, 2003, within the legal time period for doing so, she is entitled to summary judgment on the 45 day rule as applied to the USDA transfer accommodation.

**B.  <u>Other Accommodations:</u>  Because the USDA transfer accommodation was part and parcel of the discussed 2002 accommodations, the timely filing on February 10, 2003 covers not only the USDA transfer but all other accommodations requested in the 2002 period that were not given.**

The February 10, 2003, informal complaint is a timely filing as to Dr. Norden's claim which is that <u>the Smithsonian denied Dr. Norden her reasonable accommodations during the 2002 period</u>.  After initially approving the transfer in 2002, the Smithsonian

never revealed to Dr. Norden that it was not going to allow her USDA transfer once funding had been received by the USDA. [Norden, aff. Par.7]

Relying and incorporating the analysis in section A, *supra,* the timely filing on February 10, 2003, covers not only the USDA transfer accommodation but all other accommodations requested in the 2002 period that were not given.    It was eminently reasonable for Dr. Norden not to pursue an informal EEO action for failure to accommodate her in the 2002 period, e.g., not providing a respirator, air filter, or flex-time, if Dr. Norden believed that the 2002 requested and Smithsonian approved USDA transfer accommodation had finally received funding and was being implemented. [Norden, aff., par. 8]

There can be no dispute that the USDA transfer was a Smithsonian approved accommodation that was part of the 2002 accommodations.  See section A, *supra*.   As of the termination of Dr. Norden's light duty hours on November 29, 2002, the funding for the transfer was still unknown.  See section A, *supra*.   The USDA transfer accommodation was still a viable and in-play 2002 accommodation.   Even if we assume that the 45 day clock started ticking on November 30, 2002, with the removal of Dr. Norden's light duty hours, the 45 day clock on the failure to accommodate Dr. Norden for the 2002 period *stopped and went to zero* when Dr. Norden became aware on December 30, 2002, through Dr. Webb's email that funding was now available for the transfer and that the USDA was actively pursing the Smithsonian approved transfer.  The termination of the light duty hours does not undermine the 2002 Smithsonian approved USDA transfer and the Smithsonian's steadfast approval and green light.   The behavior of Dr. Aldrich and Dr. Webb of the USDA during the months of December 2002 and January 2003 demonstrates this fact

vividly.  The 45 day clock stayed at zero during the time that the USDA and Dr. Norden held meetings through January 24, 2003, to organize her work plan at the USDA as discussed in section A, *supra*.[1]

Between Dr. Norden's receipt of the December 30, 2002, email regarding the funding, and the last meeting with the USDA on January 24, 2003, the Smithsonian remained silent as to its current position regarding its previously approved  USDA transfer. [Norden, aff., par.9]   Thus, the 45 day clock was not running during this period of time. Indeed even subsequent to January 24, 2003, the Smithsonian never informed Dr. Norden that it was not approving her USDA transfer.  [Norden aff., par.7]

Thus, because the transfer accommodation was part of all of the 2002 requested accommodations, the 45 day clock stopped and went to zero from December 30, 2002 through some reasonable amount of time after the last meeting between Dr. Norden and the USDA on January 24, 2003.  This makes the February 10, 2003, informal complaint a timely filing as to Dr. Norden's claim which is that the Smithsonian denied Dr. Norden her reasonable accommodations during the 2002 period.

---

[1]  Subsequent to the December 30, 2002, memo, the following occurred between Dr. Norden and the USDA: On January 9, 2003, Dr. Aldrich informed Dr. Norden to call Ms. Mary Donoghue at the USDA regarding Dr. Norden's official paperwork to transfer to the USDA [Plt.Ex.5];  Dr. Norden spoke with Ms. Mary Donoghue at USDA on January 10, 2003, and on January 13, 2003, Ms. Donoghue called Dr. Norden to tell her that as a Smithsonian employee, Dr. Norden needed to be on a "reimbursable detail to USDA, Beltsville," and Ms. Donoghue would do the paperwork.  [Norden aff., par.6]  On January 21, 2003, Dr. Norden attended an afternoon lab meeting (of the entire group) with Dr. Jeff Webb and Dr. Ralph Aldrich of the USDA and was introduced as new employee on loan from Smithsonian. [Norden aff., par.6]   On January 24, 2003, Dr. Norden had a meeting with Dr. Webb and Dr. Aldrich of USDA to outline Dr. Norden's work plan for the coming year.  [Norden aff., par.6]

**C.** <u>**Other accommodations**</u>**: The 45 day requirement must be extended because the 45 day requirement is independent of common law equitable tolling, is liberally construed, and is mandated under any of the 4 criteria of 29 CFR §1614.105(a)(2)**

Alternatively, Dr. Norden is also entitled to summary judgment regarding extending the 45 day requirement for the Smithsonian's other failures to accommodate her in 2002. It is true that an individual who believes that he or she has an employment discrimination claim must initiate contact with an employment counselor within 45 days of the alleged discriminatory action. <u>29 C.F.R. § 1614.105(a)(2)</u>, *Johnson v. Runyon*, 47 F.3d 911 (7th Cir. 1995) which was recently adopted by the court in *Harris v. Gonzales*, 488 F.3d 442, 444-445 (9th Cir 2007), held that 1614.105(a)(2) mandates four independent criteria for extension of the 45 day requirement:

> *"[1] that he or she was not notified of the time limits and was not otherwise aware of them,*
>
> *[2] that he or she did not know and reasonably should not have . . .known that the discriminatory matter or personnel action occurred,*
>
> *[3] that despite due diligence he or she was prevented by circumstances beyond his or her control from contacting the counselor within the time limits, or*
>
> *[4] for other reasons considered sufficient by the agency or the [EEOC]."*

The court in *Harris v. Gonzales*, 488 F.3d 442, 444-445 (9th Cir 2007) held that the common law equitable tolling standard is <u>inapplicable</u>. The *Harris* court held that the standard to extending the 45 days under the four criteria is to be taken from the language of the statute itself which mandates their application: "Given <u>subsection (a)(2)</u>'s mandatory language—'the agency . . . *shall* extend the 45-day time limit'--we agree with *Harris* that the agency must grant an extension if the employee shows that she 'was not notified' or 'otherwise aware' of the time limit. <u>29 C.F.R. § 1614.105(a)(2)</u> (emphasis added). *An*

*employee who makes such a showing need not separately satisfy the common law standard for equitable tolling." Id.* (emphasis added)

Moreover, the *Johnson* court, *supra,* held that 1614.105(a)(2) must be interpreted liberally: "Our analysis must be governed by the principle that the Rehabilitation Act is remedial legislation that must be construed liberally to effectuate its purposes…'the [45] day statute of limitations is not reasonable if agencies and courts do not liberally construe the [(a)(2)] exceptions.'…"

### The 1614.105(a)(2) Mandatory/Liberal standard of the Four Criteria as Applied to Dr. Norden.

### <u>Criteria 1:</u>  *Adequacy of Posters/PRISM/constructive notice.*

Dr. Norden did not have actual notice and was not notified of the time limits and was not otherwise aware of the 45 day requirement.  [Norden, aff., par. 10]   Dr. Norden has no actual notice of the 45 day requirement, and she was not aware of the requirement until it became an issue raised by the Smithsonian in response to her official complaint in late 2003.  [Norden Aff., par.10]

In terms of constructive notice, the *Harris* court also held that: "Although we have yet to address this issue, every circuit to have done so has followed the lead of the Seventh Circuit in *Johnson*, which declined to adopt a "strict theory of constructive notice" and instead set out a two-step inquiry: (1) whether "notification of the time requirements was provided," and (2) whether the notification was "reasonably geared to inform the complainant of the time limits."  The Smithsonian's submitted evidence of Posters/PRISM fails to meet the *Harris* standard.

### 1) POSTERS

First and foremost, to the extent that the Smithsonian's evidence of poster does not establish that the posters were in place during the 2002 period at issue, they are insufficient to support their summary judgment motion. See, *Harris*, holding: "Harris's potential exposure to posters at a different EOUSA office in a separate contract assignment seven months prior to her firing is insufficient to eliminate a genuine issue of material fact regarding her notice of the 45-day requirement." *Harris,* p.446.

### **Dr. Norden's movements in the Smithsonian during 2002**

The Smithsonian National Museum of Natural History is a massive series of buildings comprised of the Main National Museum of Natural History Smithsonian Building; there is a West Court Building and a West Wing Building on one side; there is an East Court Building and an East Wing Building on the other side. [Norden Aff., par.11]

In 2000, 2001 and 2002, the Entomology Department moved its location to the new East Court Building which was still under some construction in 2002. [Norden Aff., par.12] The East Court Building is a building between the main building and the East Wing Building. The East Court Building had its own elevators, floors, and windows for light like any other separate building. [Norden aff., par.12] [Braden, aff., par .7] During the 2002 period, Dr. Norden worked only six months and only part time and remained almost without exception, in her office on the 5th floor of the East Court Building during

her working day.[2] [Norden aff., par.12]

**Dr. Norden's path to and from work each day in 2002 was the same.  Dr. Norden would:**

> 1) enter through the main entrance of the National Museum of Natural History ("NMNH"), Constitution Avenue doors,
>
> 2) walk to the left through the main lobby of the NMNH,
>
> 3) walk to the hallway leading into the East Wing,
>
> 4) walk to the bank of elevators leading to the Court East Building,
>
> 5) take the elevator for the Court East Building offices,
>
> 6) get off on her 5th floor in the Court East Building and go to her office.
>
> [Norden, aff., par. 13]

There were no posters of EEO information in any of these areas that Dr. Norden routinely used in 2002. [Norden aff., par. 13] **Most importantly, the Smithsonian 's evidence of posters does not refute this fact and does not state that were posters in any of these six areas in 2002.** Ms. Meltzer, a current Smithsonian employee, signed Dr. Norden into the NMNH as a visitor in October of 2007, and the two women walked through the six areas of the Smithsonian listed above.  Both women noted that there still were/are no posters visible. [Meltzer, aff., par. 11-16] [Norden aff., par.13]

The Smithsonian's alleged use of posters was thus not reasonably calculated to inform Dr. Norden of the 45 day requirement <u>as she went routinely to and from work each day</u>.  Nevertheless, the Smithsonian still presents general information on posters

---

[2]  Dr. Norden would sometimes eat lunch with her colleague Susann Braden who was also a museum specialist and worked at the SEM lab which was located on the main floor near the East Court Building.  There were no posters at or near the SEM lab. [Norden, aff., par.12] [Braden, aff., par. 11-13 ]

located elsewhere.  However, the *Harris* court citing *Johnson* has made clear that "[t]he presence or absence of posted notices does not, standing alone, determine whether the limitations period should be tolled." *Johnson*, 47 F.3d at 918…"  Thus, as will be shown, *infra*, the Smithsonian's general information on posters located elsewhere was not reasonably calculated to inform Dr. Norden of the 45 day requirement.

### (a) cafeteria

Dr. Norden brought her lunch and did not use the cafeteria, not only during the 2002 period, but also before the 2002 period. [Meltzer aff., par. 19] [Norden aff., par.14][Braden, aff., par. 9-12].  Also, Ms. Meltzer, who is still a current employee of the Smithsonian and has worked at the Smithsonian since 1986, states that the cafeteria poster has not been consistently posted [Meltzer, aff., par. 14]  Therefore, Dr. Norden would not have seen the poster that was alleged to have been put in the cafeteria or near the cafeteria.  As the *Harris* court made clear, the probability and frequency of contact is important to assessing the "reasonable calculated" standard:

> But the mere fact that these rooms were available to contractors-absent information such as the placement of the posters and the number of contractors who entered these rooms, as well as the frequency with which they did so-tells us nothing about the likelihood that Harris herself was ever in these rooms or, if so, whether she should have seen the posters.  *Harris* at p. 446.

As the *Johnson* court held: "We have serious doubts as to whether posting a notice near a door in a location that an applicant visits on just one occasion could ever be "reasonably geared" to give that applicant constructive notice of the time limits." *Johnson,* p.919.

Accordingly, since the frequency of visits of Dr. Norden to the cafeteria before and during the 2002 period at issue was zero, Smithsonian evidence of posters near the

cafeteria does not create an issue of material fact to prevent summary judgment being issued for Dr. Norden on the constructive notice issue of the 45 day requirement.

### (b) 3rd Floor Kerby room

Dr. Norden NEVER went to the 3rd Floor "Kerby room" located in the East Court Building in 2002. [Norden aff., par. 15]  The 9/10/2002 "Federal Hazard Communication Training" 2002 seminar that was scheduled to be in the Kerby room in 2002 was cancelled.  [Plt.Ex.9] [Norden aff., par. 15]  Prior to 2002, Dr. Norden's recalls that she went to the Kerby room for Stan Shelter's retirement party and for a Blood Borne Pathogen seminar.  [Norden aff., par. 15]  Dr. Norden never walked by the posters near the elevators on the 3rd floor Kerby room. [Norden aff., par. 15]

The Kerby room was a big meeting room taking up most of the space in the center of the 3rd floor of the East Court Building.  The floors of the East Court Building are rectangular shaped.  The Kerby room, on the 3rd floor of the East Court Building fills almost the entire floor, within halls running its perimeter on each side.  There is a front door and back door entrance to the Kerby room and both doors were open when Dr. Norden went to the Kerby room prior to 2002.  The 3rd floor elevators face the front door entrance of the Kerby room.  The 3rd floor stairwell faces the back of the Kerby room. [Norden aff., par. 16]

Dr. Norden never saw any posters in or near the 3rd  Floor Kerby room because the Smithsonian says the poster was located by the elevators of the Kerby room, and Dr. Norden used the stairs to enter the Kerby room from the back.  [Norden aff., par. 16] *These elevators were on the other side of the perimeter of the Kerby room, were not visible from the back of the Kerby room and also were not visible from inside the Kerby*

*room.* [Norden aff., par. 16] To get to the Kerby room, Dr. Norden would take the stairs which were immediately and directly adjacent to her 5th floor office [Plt.Ex.37, floor plan] and quickly walk down two flights of stairs to the 3rd floor stairwell exit and then immediately enter the Kerby room from its back door which was always open when she was there. [Norden aff., par. 16]. This was the shortest route, because using the elevators required walking a further distance from her office on the 5th floor [Plt.Ex.37, floor plan], and because the Smithsonian elevators were notoriously slow when crowded [Norden aff., par.16] [Braden, aff., par. 8]

There were no posters in the stairwell, near the exit of the stairwell on the 3rd floor, or near the back entrance of the Kerby room or in the Kerby room itself. [Norden aff., par.16]  Ms. Meltzer corroborates and declares**:** **"**There is a stairway near Dr. Norden's former office on the 5th floor of the Court East Building.  This stairway leads to a door very close to the Kerby Room on the 3rd floor of the Court East Building.  There is no EEO information posted near this stairway entrance on the 3rd floor.  There is no EEO information posted on the stairway either." [Meltzer aff., par.15-16]

The Smithsonian does not dispute these facts.  The Smithsonian claims that it placed the poster on the 3rd floor near the elevators of the Kerby room.  This placement by the Smithsonian was not reasonably calculated to inform Dr. Norden:

1) because the path that Dr. Norden took to the Kerby room was prudent and available, and the back door of the Kerby room was left open by the Smithsonian and provided an entrance,

2) because Dr. Norden never went to the Kerby room in 2002, and only went to the Kerby room a few times prior to 2002,

3) because it would have been easy for the Smithsonian to effectuate the 45 day notice by placing posters directly in the East Court elevator that Dr. Norden used everyday, and/or placing posters in the Kerby room, and/or placing posters on the 5th floor where Dr. Norden worked each day.

As the *Harris* court stated the probability and frequency of contact is important to assessing the "reasonable calculated" standard. *Harris*, p.446. As the *Johnson* court held: "We have serious doubts as to whether posting a notice near a door in a location that an applicant visits on just one occasion could ever be "reasonably geared" to give that applicant constructive notice of the time limits." *Johnson*, p. 919. Here, the Kerby room was never visited by Dr. Norden in 2002, and only a few times prior to 2002 and on those times the posting near the elevators was never visited by Dr. Norden because the Smithsonian provided an open back door which was used by Dr. Norden prudently and acceptably through the stairwell. As a result, Dr. Norden's contact with the alleged EEO poster was zero.

Accordingly, the poster near the Kerby room does not create an issue of material fact to prevent summary judgment being issued for Dr. Norden on the constructive notice issue of the 45 day requirement.

### (c) West Wing 6th Floor

Dr. Norden went to the West Wing no more than four times in the 2002 period. [Norden, aff., par.17] The West Wing is far away from Dr. Norden. The travel time from Dr. Norden's East Court Building to the West Wing Building is considerable, some ten minutes. [Norden aff., par.17] Ms. Meltzer declared: **"**My work requires me to go between the various buildings that comprise the NMNH. I estimate that it takes me ten

minutes to go from the ground floor of the West Wing to the third floor of the Court East Building." [Meltzer, aff., par.18]  Much of the reason for the lengthy travel time was the Smithsonian's slow elevators.  [Braden aff., par. 8] [Norden, aff., par.17]  In order to save time, Dr. Norden always took a small, public elevator next to the guard's station office on the West Wing side of the main building.  This elevator goes to two public floors and one staff floor, and is faster than the notoriously slow elevators devoted exclusively to the staff.  [Norden aff., par.17]    Once off the public elevator, Dr. Norden would quickly make her way to the stairs which led to the 6th floor of the West Wing.  [Plt.Ex.38, floor plan] From the stairwell, she would walk straight down the far hallway, turn right at the end, and walk down the next hallway until she reached Ms. Youmans' office. [Plt.Ex.38, floor plan] Dr. Norden did not pass Ms. Blair's office at all and therefore did not come within sight of the EEO poster which the Smithsonian alleges was between Ms. Youmans' office and Ms. Blair's office which was farther down the hall. [Norden aff., par.17]  [Plt.Ex.38, floor plan]  Ms. Blair's office was past Ms. Youmans' office of the hallway that Dr. Norden would walk down in order to reach Ms. Youmans' office. [Norden, aff., par. 17]    Dr. Norden returned to her own office by retracing her steps, again not passing any EEO poster.  [Norden aff., par.17]  As a result, Dr. Norden never came within eyesight of an EEO poster on the 6th floor.  [Norden aff., par.17]  This is the path that Dr. Norden always took when she worked in the main building, from 1990-2000, before the Entomology Department moved to the East Court building in 2000. [Norden aff., par.17]  Dr. Norden explains in her own words the route she took and <u>why she took this particular, 10 year familiar route; namely to see George Venable and to go to the Entomology Library:</u>

In 2002, I went to the 6th floor West Wing (entomology main office) approximately 3-4 times. We had an entomology office, Juanita Hall secretary, on the 4th floor East Court (my building, one floor below mine), so there was seldom need to go the long way to the 6th floor West Wing. Two times that I went to 6th floor West Wing were to speak with Dr. Scott Miller regarding Dr. Karl Krombein. Dr. Miller's dept. chair office was off of Carol Youmans' main office. I had to enter Carol's office from the hallway & then go into the smaller room (Dr. Miller's office). The 3rd & possibly 4th time I went to Carol's office was to check on or pick up a box of camera equipment for Ted.Schultz.

My path was not to use the 6th floor West Wing elevators so I would not walk down the hall where the EEO poster was alleged to have been placed near Ms. Blair's office. I always entered the 6th floor West Wing from the opposite end of the hall, and where the stairwells are located.

My path was to leave my office on the 5th floor East Court and take the East Court elevators to the ground floor of the East Court. Then I walked from the East Court elevator lobby into the main lobby of the main building. That lobby is the public area of the Constitution Ave. entrance to the Main Natural History Building. At the opposite side of that main lobby (west wing side) is a small public elevator next to the guard's station office. That small elevator is run by a guard since it goes to 2 public floors and one staff floor. (It was usually faster than the staff elevators). I would either take it to the 2nd floor public area and walk through the Mummy Hall & through Hall 27 to the back stairwell of the main building (staff only) [I previously had an office on Hall 27, from 1990 – 2000, and this is the way I used to take so I knew the way well.] Or, I would take the little elevator to the 3rd floor Main Building (actually 6th floor numbering since staff areas equal two public areas).

Either way, I would come up the back stairwell or cut through the Mammal area on the 6th floor and take a tiny, twisting hallway from the main building into the west wing. (Years ago, when I first worked at the museum, I was located on the 6th floor main building, so I was very familiar with this passageway). I liked walking familiar pathways with good memories. The passageway came out (through a door) onto the rectangular hallway of the 6th floor west wing. It came out on the opposite side of the rectangle from the entomology main office hallway.

On reason I took this route was to see George Venable. He was a Scientific Illustrator for the Smithsonian. His office was on the route that I would take through my route of the west wing, 6th floor. Dr. Krombein and I worked with George for years as he did the illustrations for all of our papers. Even after Karl was gone from the museum, I worked with George to finish up some of our papers (a good example is the Florida

Perdita..."swimming bees").  I always stopped by to see George when I went to the 6th floor west wing. He had become a good friend.

Also, I would go to the Entomology Library on this route after seeing George Venable.  I had a running list of insect lable data that I was trying to find longitude & latitude for.  Karl's old specimen lables just had a location, date, and collector name.  I would stop in the Entomology Library which had two large Gazetteers.  I would spend about 30 min.  I remember doing just that in 2002 when I was up on the 6th floor.  Farther down that hallway was Carol Youmans' office.  I stopped in at Carol's after being in the library.  But I would not pass Ms. Blair's office since it was father down the hall from Carol Youmens' office.  I always took this route for 10 years.  My return path was to retrace my steps.  [Norden aff., par. 18-23]

The placement by the Smithsonian of a poster near Ms. Blair's office was not reasonably calculated to inform Dr. Norden:

1)  because the path that Dr. Norden took to Carol Youmans' office was prudent and available, and of a long standing nature,

2)  because Dr. Norden went to Carol Youmans' office only 4 times in 2002, and

3)  because it would have been easy for the Smithsonian to effectuate the 45 day notice by placing posters directly in  the East Court elevator that Dr. Norden used everyday, and/or placing posters directly inside Carol Youmans' office, and/or placing posters on the 5th floor where Dr. Norden worked each day.

**2) PRISM**

Dr. Norden has never used the PRISM system and was never aware that EEO information was on the PRISM system.  The PRISM system was not on Dr. Norden's computer in 2002, and Dr. Norden never received any instruction on the PRISM system.  Dr. Norden used "groupwise" in 2002 to access emails at the Smithsonian. [Norden aff., par. 24]

Ms. Meltzer, a current Smithsonian employee, corroborates Dr. Norden and states that "Prior to 2003, however, I accessed email at the Smithsonian through "groupwise" and not through PRISM, that "PRISM was still being developed in 2003, and I did not begin to use it on a regular basis until the end of 2003," that "Prior to 2003, only some computers at the Smithsonian could even access PRISM," that "I was never trained in the use of PRISM or given any orientation in PRISM, and that "I was never made aware that EEO information could be accessed through PRISM." [Meltzer aff., par. 7-10]

Also, Susann Braden, who retired from the Smithsonian in 2003, corroborates this information on the lack of PRISM on the computers before and during the 2002 period. In fact, Ms. Braden was not even aware that a program known as PRISM existed at the Smithsonian.  [Braden, aff, par.14]

Thus, the Smithsonian's evidence of EEO information on PRISM fails both prongs of the *Harris* test on constructive notice.   Under the first prong of the *Harris* test, notification of the time requirements was not provided to Dr. Norden through the PRISM system because it was not on Dr. Norden's computer, and Dr. Norden was never informed that EEO information was available to anyone on the PRISM system.  In deposition, Dr. Norden testified that PRISM had not been installed on her computer, and when asked whether she had any access to PRISM, testified that she had "partial access."  By "partial access," Dr. Norden meant that she was aware that a PRISM system existed and that she believed that she could have asked a coworker to allow her to use his or her computer to access although she had never done so.  [Norden aff., par.25]  Dr. Norden was not, however, aware that PRISM contained any EEO information, nor did she have any direct access to it.  Under the second prong of the *Harris* test, the Smithsonian's PRISM system

in general in 2002 could not have been "reasonably calculated" to inform Dr. Norden since the PRISM was a new system being implemented in 2003, [Braden, aff. Par. 14] [Meltzer, aff., par. 8] and that had not been installed on Dr. Norden's computer in 2002. [Norden aff, par. 26]

### Conclusion as to Criteria 1: constructive notice

Although the Smithsonian has made allegations as to where some EEO posters were hanging, it has not succeeded in showing that Dr. Norden even once came within eyesight of an EEO poster. The burden of proving constructive knowledge falls on the Smithsonian. The Smithsonian has not met its burden since it has not established a single instance in which Dr. Norden was even indirectly informed of the 45 day requirements.

Thus, all of the Smithsonian's evidence of the 45 day requirement is insufficient to demonstrate constructive knowledge under the *Harris* test. Thus, under criteria 1 of 1614.105(a)(2), summary judgment should be issued for Dr. Norden as she has demonstrated "*that…she was not notified of the time limits and was not otherwise aware of them…*"

### Criteria 2: *Dr. Norden's Discovery of her Discrimination Claim*

The controlling regulation provides for a mandatory extension of the 45 day limit "when the individual shows that . . . he or she did not know and reasonably should not have known that the discriminatory matter or personnel action occurred . . . ." 29 C.F.R. § 1614.105(a)(2). The time limit is extended until "'facts that would support a charge of discrimination . . . were apparent or should have been apparent to a person with a reasonably prudent regard for his rights similarly situated to the plaintiff.'" …" *Johnson, supra.*

See *Johnson, supra*: "While Johnson concedes that her claim *accrued* at the time she received her rejection letter on November 2, 1992, *see Delaware State College v. Ricks,* 444 U.S. 1070, 100 S. Ct. 1012, 62 L. Ed. 2d 751 (1980), she maintains that the limitations period was tolled even after that date, because she needed additional time until the medical "'facts that would support a charge of discrimination . . . were apparent.'" *Wolfolk,* 729 F.2d at 1117 (quoting *Reeb,* 516 F.2d at 931)."   In our case, the limitations period was tolled even after the November 2002 date because Dr. Norden needed additional time until the Smithsonian informed her of the reasons for its 2002 decision to place her back on disability status.  This is understandable because the previous conduct of the parties is that they had attempted light duty hours in the 2001 period and then returned Dr. Norden to disability status. [Norden aff., par.27]   The 2002 period was a repeat of this conduct. Indeed this is what she was told: The manager of Smithsonian EEO Cultural Diversity/Affirmative Action reassured her by stating that "You have been returned to full-time workers compensation **(the same status that you were on before your part-time schedule in April).** The goal is for you to successfully return to your job full time." (emphasis added) [Plt.Ex.12]

While Dr. Norden did ask for accommodations in the 2002 period which were not provided, Dr. Norden acted reasonably after being returned to disability status in November of 2002 by asking the Smithsonian to clarify whether its action was a repeat of the 2001 conduct. As soon as Dr. Norden received the memo on November 18, 2002, she asked her two supervisors Dr. Mathis and Dr. Miller who presented her with the memo, why the light duty status was ending and what she needed to do to return to the Smithsonian.   The two supervisors did not answer.  [Norden aff., par.28]  On November 29, 2002, Dr. Norden then

sent an email to various other individuals including her direct supervisor Dr. Schultz asking among other things: "How do I know when it might be safe to return if it is the naphthalene which is activating my current blood problems?" And "Will anything dealing with my exposure be different upon return, or is my return based upon no longer being sensitive to naphthalene?" [Plt.Ex.10] Dr. Schultz did not answer. [Norden aff., par.28] Thus, none of the three supervisors explained whether the 2002 decision was a repeat of the 2001 decision or whether Dr. Norden's requests for accommodations were being denied. Although a few people did respond by email, no one directly answered either question. [Norden aff., par.28] Defendant's physician and its Office of Human Resources both told her that her return would be addressed by her doctors. [Plt.Ex.11] The possibility of her return was published in an internationally circulated newsletter approximately three months after she received the memo terminating her light duty hours.[Plt.Ex.13] A coworker wrote that one of Dr. Norden's co-supervisors had said she was being given a year off to recover. ." [Plt.Ex.14] When Dr. Norden wrote both the coworker and the supervisor back praising her department's compassion, no one corrected her belief or the original statement. [Plt.Ex.15] [Norden aff., par.29] As discussed, *supra*, the Smithsonian also hid the fact that the USDA did receive funding shortly afterwards for the transfer accommodation. [Plt.Ex:3] [Norden aff., par.4] The Smithsonian also remained silent regarding its true intentions regarding the USDA transfer. [Norden, aff. Par.7]

Nevertheless, during the deposition of Dr. Schultz, the PMQ, in 2006, Defendant maintained the position that it had been attempting to accommodate Dr. Norden's disabilities during the period in which she filed her first informal complaint, despite the fact

that it now also claims that Dr. Norden was on notice that she would not be accommodated. [Plt.Ex.16]

There is an additional reality to consider. An Entomologist is not a fungible worker in the workplace who can easily obtain employment, and the Smithsonian is a prized and prestigious workplace for an Entomologist. [Norden aff., par.30]   Moreover, the Entomology Department is a very highly specialized and tight knit group of scientist at the Smithsonian [Norden aff., par.30]  Dr. Norden was a Smithsonian employee/scientist who wanted to work and absolutely had to maintain a good working relationship with the Smithsonian and especially with her supervisor, Dr. Schultz.  [Norden, aff., par.30]  To ask Dr. Norden to jeopardize her return to work by filing an informal EEO complaint against Dr. Schultz and the Smithsonian without the Smithsonian's providing Dr. Norden with its reason for repeating a 2001 conduct and putting her back on disability status puts Dr. Norden in an untenable position. [Norden, aff., par.30]   Indeed, when Dr. Norden did question Dr. Schultz's decision to remove her from the rolls in late 2003, Dr. Schultz's reaction was to refuse to supervisor her further and ask that she be placed outside of his Entomology department. [Plt.Ex.17]   See *Johnson, supra.*[3]   Why should Dr. Norden's immediate Smithsonian supervisors be allowed to remain silent while other Smithsonian employees offer reassuring reasons to Dr. Norden's inquiries as to why she was being placed on disability status for the 2nd time?  See *Johnson, supra:* "…employers who violate anti-discrimination statutes would be able to immunize themselves from suit by providing

---

[3] See: *Johnson, supra*: "Johnson argues that the district court's ruling puts plaintiffs in the untenable position of either having to file discrimination charges before they can obtain the information necessary to decide whether the injury is due to the defendant's wrongdoing, or making them wait to obtain such information until they no longer can file a timely charge."

their victims with only the type of calculatingly vague information that the Postal Service gave Johnson, and then stonewalling them until the limitations period has passed. We refuse to condone such stonewalling on the part of an agency …"

Thus, Dr. Norden asks the court to rule as a matter of law that the 45 days is extended under 1614.105(a)(2) because she needed additional time to determine that the Smithsonian's 2002 actions were not a repeat of what occurred in 2001.

### **Criteria 3:** *Impediments to Johnson's Contact of the EEO Counselor*

As the court in Johnson held: ("For reasons similar to those set forth above, we hold that Johnson falls within this exception of <u>29 C.F.R. § 1614.105(a)(2)</u>. As in *Wolfolk,* the plaintiff's "lack of knowledge of facts which would support a discrimination claim clearly constituted 'circumstances beyond [her] control' " which prevented her from filing her charge with an EEO counselor within 45 days…")

In our case, the Smithsonian's failure to disclose the nature and reasons for the decision to once again place Norden on 2002 disability status were particularly beyond her control because the reasons for this decision was "'peculiarly within the knowledge of the employer.'" Thus, Dr. Norden asks the court to rule as a matter of law that the 45 days is extended under 1614.105(a)(2) because the Smithsonian held the answers and remained silent as to the Smithsonian's reasons for its 2002 decision, whether the Smithsonian's 2002 actions were a repeat of what occurred in 2001, and its true intentions as to the USDA transfer.

### **Criteria 4:** *The "Catch-All" Tolling Provision*

Finally, Dr. Norden argues that the 45 day period tolls "for other reasons considered sufficient by the agency or the [EEOC]." *29 C.F.R. § 1614.105(a)(2).* She

contends that the combination of factors that support tolling in this case also make this criterion applicable, even if none of the other criteria alone compels tolling.

Dr. Norden asserts:

1)  that the fact she had no actual notice of the deadlines,

2)  that she diligently attempted to find out what the reasons were for the 2002 disability status,

3)  that she was intentionally given cryptic and false reasons by the Smithsonian designed to assure her that the 2002 disability status was no different than the 2001 disability status,

4)  the Smithsonian violated its owns rules for denying accommodations; namely, "…the Responsible Smithsonian Official must fill out the **'Denial of Request'** form and give it to the individual…" (emphasis added) [Plt.Ex.18, Smithsonian Procedures for Accommodations.]  The "Responsible Smithsonian Official" assigned to address the reasonable accommodations and/or provide the "Denial of Request" form was Dr. Schultz, the "requesting employee's immediate supervisor."  [Plt.Ex.19, Smithsonian's Procedures for Accommodations]  Dr. Norden never received such a "Denial of Request" form at anytime during the period 2002 or 2003.  [Norden Aff., par.31], and

5)  that the Smithsonian did not show that it was prejudiced by the approximately 73 day delay in filing, especially since the Smithsonian in 2003 and 2004, was dealing with the same issues (flex-time and naphthalene sensitivity) in terms of providing reasonable accommodations

These are all sufficient reasons for application of this provision.[4]

Accordingly, based on all of the above analysis, Dr. Norden asks the court to rule that there is no issue of material fact for a jury, and that Dr. Norden is entitled to a ruling that the 45 days is extended as a matter of law.

## III.    THE SMITHSONIAN FAILED TO ACCOMMODATE DR. NORDEN'S KNOWN DISABILITY DURING THE 2002 PERIOD

In order to establish a prima facie case for failure to accommodate under the Rehabilitation Act, a plaintiff must show (1) that he has a disability within the meaning of the statute, (2) that the employer had notice of the disability, (3) that a reasonable accommodation would allow him to perform the essential functions of his position, and (4) that the request for accommodation was denied. *E.g.*, *Thompson v. Rice*, 422 F. Supp. 2d 158, 165-66 (D.D.C. 2006).

The Rehabilitation Act of 1973 "governs employee claims of handicap discrimination against the Federal Government. Its basic tenet is that the Government must take reasonable affirmative steps to accommodate the handicapped, except where undue hardship would result." *Barth v. Gelb*, 303 U.S. App. D.C. 211, 2 F.3d 1180, 1183 (D.C. Cir. 1993).   It specifically requires federal executive agencies and the Smithsonian to

---

[4] See: *Johnson, supra*: "[the Poster Service] contends that the lack of prejudice resulting from Johnson's failure to comply with the time limit is, at most, incidental to the court's determination on tolling… In light of our determination that Johnson is clearly entitled to tolling of the limitations period under three of the exceptions listed in 29 C.F.R. § 1614.105(a)(2), it is unnecessary for us to discuss this issue at length except to note that the Postal Service's arguments as to why some or all of these factors, taken together, would not compel extension of the 45 day limit, are not persuasive for all the reasons discussed above.")

develop affirmative action plans for the hiring and integration of disabled persons into their work forces. 29 U.S.C. § 791. Because of the affirmative action obligations placed on federal agencies and the Smithsonian, "[i]t is well established both by the statutory language and Supreme Court decisions interpreting the [Rehabilitation] Act that federal employers have greater duties to accommodate disabled workers under [29 U.S.C. § 791] than the duties owed by federal grantees under [29 U.S.C. § 794] or those owed by employers under the ADA." *Woodman v. Runyon*, 132 F.3d 1330, 1343 (10th Cir. 1997).

A.     **Dr. Norden had a disability within the meaning of the statute during the 2002 period.**

The court has already ruled that Dr. Norden had a disability which was known by the Smithsonian.[5]

The court has also already ruled that Dr. Norden had a record of disability which was known by the Smithsonian.[6]

---

[5]  Previously, the court held in its 8/3/07 order: "Tellingly, Defendant makes no attempt to address Dr. Norden's …fatigue, susceptibility to bruising, compromised immune and capillary systems, or her inability to have sexual intercourse — all of which are long-term and caused by the dengue infection….First, it is undisputed that Dr. Norden is unable to have sexual relations due to her propensity to bleed easily, which is caused by the dengue antibodies that are permanently present in her system. Norden Aff. ¶ 16. This Court has previously held, as have other courts, that the ability to engage in sexual relations is a major life activity….This alone is sufficient to render Dr. Norden disabled under the Act…. Dr. Lawford had full information about Dr. Norden….Dr. Norden's major life activities were also impaired during the relevant time period by other effects of her illness, including… (2) frequent and debilitating migraine headaches; (3) a severely compromised capillary system that bleeds when she is exposed to heat or chemicals, causing extensive and persistent bruising; and (4) an immune system that is so impaired that a scratch could cause life-threatening infection. These ailments caused Dr. Norden to be in an extremely fragile mental and physical state….Her migraine headaches were unpredictable and, when they occurred, totally debilitating. And her immune deficiency placed her at peril from everyday activities — a person who risks losing her hand due to a cat bite is obviously restricted from engaging in all sorts of physical activities that most people take for granted. These impairments were severe, they affected Dr. Norden's mental and physical well being, they were long-term or — in the case of her compromised capillary and immune systems — permanent….In combination, they rendered Dr. Norden unable to function as a normal person and to live free from constant pain and fear." [Plt.Ex.20, pp.26-28]

Most importantly, the evidence relied upon by the court in ruling that Dr. Norden was disabled in footnote 6 and 7, *supra,* was not limited to the 2003-2004 period. Dr. Granite's affidavit on Dr. Norden's medical condition, Dr. Norden's affidavit on her medical condition, and the Smithsonian's knowledge of Dr. Norden's medical condition, was not limited to the 2003-2004 period. Dr. Granite's affidavit covered the 2002 period [Plt.Ex.21, Granite affidavit], Dr. Norden's affidavit covered the 2002 period [Plt.Ex.22, Norden, affidavit], and the Smithsonian was aware of Dr. Norden's medical records from 2000 forward and made decisions on that medical record, including during the 2002 period at issue. [footnote 7, *supra.*]    Thus, Plaintiff asks the court to once again hold that the record allows no genuine dispute that in 2002 Dr. Norden suffered from a disability that restricted her from engaging in activities that are of central importance to most people's daily lives, and/or that in 2002 Dr. Norden had a record of disability of which the Smithsonian was aware and relied upon.

---

[6]  Previously, the court held in its 8/3/07 order "… It is undisputed that the Smithsonian knew that Dr. Norden contracted DHF in 2000, nearly died from the acute infection, and was on full medical disability for over a year. *See* Def.'s Ex. 6; Pl.'s Ex. 15. During that time she suffered from severe confusion and her cognitive abilities were markedly impaired. Pl.'s Facts ¶ 6; Pl.'s Ex. 1. She attempted to return to work in 2001, but it proved too difficult for her and she returned to disability status. Def.'s Ex. 6; Pl.'s Facts ¶ 8. She attempted another return to work in 2002, but once more the lingering effects of DHF caused her considerable pain and the Smithsonian again placed her on a year-long medical leave of absence. Def.'s Ex. 6. And when the Smithsonian proposed to terminate her employment in November 2003, it cited her "medical limitations" as the exclusive reason. *Id.* Thus, it is beyond dispute that …she had a well-documented history of a major disability that substantially restricted her in the major life activities of learning and working, and that the Smithsonian had relied on her record of impairment in making several employment decisions. This is sufficient to render her disabled under the Rehabilitation Act."    [Plt.Ex.20, pp.28-29]

**B.      Plaintiff was a qualified individual who could perform the essential functions of her job with reasonable accommodations during the 2002 period.**

Dr. Norden had worked as a museum specialist at the Smithsonian for nearly fifteen years and had consistently received the highest possible evaluation – "Outstanding." [Norden aff., par.32]  Her performance evaluations for both her first 2001 and second 2002 return to work stated that she performed her work well, *and this work was performed even when she did not have accommodations for her naphthalene sensitivity.*  [Norden aff., par.33]  On this issue the court previously ruled:

> "In addition to showing that she was disabled, Dr. Norden has presented sufficient evidence to demonstrate that she was otherwise qualified for an entomology position at the Smithsonian. There is no dispute that, before contracting dengue fever, Dr. Norden received outstanding performance evaluations and was well-regarded within her department. *See, e.g.*, Pl.'s Reply Ex. 10; *see also* Norden Aff. ¶ 4. When Dr. Norden returned to part-time duty in 2002 and experienced an intense adverse reaction to naphthalene, Dr. Schultz concluded that she performed "better than might be expected" under the circumstances. Def.'s Ex. 26. Thus, there is evidence in the record demonstrating that Dr. Norden could have performed the essential duties of her job with the accommodations recommended by her physicians.  In fact, Dr. Schultz stated that he believed that Dr. Norden could perform the essential duties of her job as long as she received accommodations. *See* Schultz Decl. ¶ 5." [Plt.Ex 20, 8/3/07 Order, pp.29-30]

Thus, Plaintiff once again asks the court to rule that she was otherwise qualified to do the essential functions of her job in 2002 with reasonable accommodations. See *Pantzes v. Jackson,* 366 F. Supp. 2d 57, 67 (D.D.C. 2005) ("We do not view the plaintiff's burden…as a heavy one.  We would deem it sufficient on this issue for the plaintiff to present evidence as to her or his individual capabilities and suggestions for some reasonable assistance or job modification by the employer.")

**C.    Plaintiff requested reasonable accommodations but was denied reasonable accommodations for her known disability during the 2002 period.**

Finally, to be granted summary judgment on her failure to accommodate claim for the 2002 period, Dr. Norden must show that she requested reasonable accommodations and that Defendant failed to provide them.

Although the Smithsonian provided the accommodation of light duty hours at the beginning of the 2002 period, this accommodation alone was not reasonable because Dr. Norden also needed additional accommodations for naphthalene sensitivity and a flexible work hour schedule that would allow for medical appointments. [Norden aff., par.34]

**Requests for accommodations**

In the period of 2002, Dr. Norden made more than a dozen requests for accommodations for flex-time and naphthalene sensitivity.    [*See paragraph 26 of the Material Facts for Plaintiff's  10/2/06 MSJ* ] [Norden, Aff, par. 35]  In addition, her doctors and Smithsonian medical and industrial hygiene personnel, made the same requests for accommodations.   On October 17, 2002, Dr. Lawford and the industrial hygienist from OSEM sent a lengthy memo to upper management, Dr. Miller, chair and Dr. Schultz. [Plt.Ex.23]  The "ACTION REQUIRED" memo discussed a variety of accommodations and concluded with "We ask that you notify us as soon as possible to the course of actions to be taken to minimize naphthalene exposure to Dr. Norden in the course of her work. [Plt.Ex.23]  These requests centered on her need for flexible hours to accommodate her many doctors' visits and her migraine headaches, as well as her need to reduce her exposure to naphthalene.   Since these requests were summarized and advanced by Defendant's own safety experts (Dr. Lawford and the industrial hygienist), and promised by Defendant, it is impossible for Defendant to argue that it was not aware or even that it

did not understand the needed accommodations or that the accommodations were not reasonable. During this 2002 period, Dr. Schultz who was Dr. Norden's supervisor, understood that the exposure to naphthalene was exacerbating her illness. [Plt.Ex.24, Plaintiff's MSJ, exhibit 7, p.143] Dr. Schultz was the person whom the Smithsonian designated as being responsible for ensuring reasonable accommodations for Dr. Norden. [Plt.Ex.19] [Plt.Ex.39]

### Results of requests

Dr. Norden received no reasonable accommodations at all other than light duty hours. [Norden aff., par.36 and see paragraph 42 of the Material Facts, Plaintiff's MSJ, 10/2/06] [Plt.Ex.23] The Defendant did not provide for any accommodations other than light duty hours which was not reasonable because Dr. Norden needed additional accommodations in order to do the essential functions of her job. The Defendant's sole justification for not providing accommodations has been the claim that, after begging for the accommodations, Dr. Norden refused to wear a respirator and refused to use the ventilated fourth floor office. The Defendant has no excuse as to why the air filter was not provided. The Defendant's position is that "flextime" was provided. The Defendant's position is that the USDA transfer was an undue financial burden.

### *Flextime accommodations*

The Smithsonian's position on flextime is that it was provided. This position is undermined by the Smithsonian's own consultant Dr. Lawford who described how intransigent the Smithsonian was to allowing Dr. Norden to meet the 20 hours on a flex schedule:

> "In November of 2001 Beth decided she was ready to attempt to return to work at 20 hours per week…This time her department swung to the opposite of a casual return to work.  It took 4 months of emails, conferences and meetings with confirmatory phone calls to her docs.   When we hammered out the details with her management that the days would not be contiguous, I recall another two weeks of emails to decide how to handle it if there was a Monday holiday and 4 work days. " [Plt.Ex.25, p.2]

As to flextime hours, before Dr. Norden contracted dengue, the Smithsonian allowed her throughout her career to work evenings, weekends, and sometimes from home. [Norden aff., par.37, admitted by Defendant in its answer]   The continuation of this flexibility was not allowed by the Smithsonian.   [Norden aff., par.37]    Moreover, Dr. Norden was provided with a fixed schedule that was anything but "flexible." [Plt.Ex.26]

> "Your hourly and daily schedule will be prearranged with me on a per-pay-period basis, as recommended by Dr. Lawford and Marilyn Slomba.  Work will take place between the hours of 8 AM and 3:30 PM on normal work days (i.e., Monday through Friday except for federal holidays).  Your initial schedule will be Monday (7 hours), Wednesday (7hours), Friday (6 hours)." [Plt.Ex.26]

Under the schedule, Dr. Norden was not allowed to deviate from the "prearranged" schedule for each pay period.  This was highly inflexible.   For example, on one occasion, Dr. Norden attempted to alter a Monday to a Tuesday on her schedule to avoid riding the metro because of demonstrations in Washington, DC. Dr. Norden could not get a hold of Dr. Schultz whose voicemail was full. Dr. Norden sent him an email. [Norden aff., par. 38] Dr. Schultz rebuked Dr. Norden and accused her of violating the "flexible" schedule.  This rebuking prevented Dr. Norden from ever attempting to alter the schedule again. [Norden aff., par.38]    Furthermore, contrary to what the schedule stated [Plt.Ex.26] the schedule was not reviewed per pay period ever in order to determine if it needed to be changed or adjusted for the upcoming pay period.  The schedule did not allow for emergencies where

notice could not be given well in advance such as for unpredictable migraine triggers such as stress and heat. [Norden, aff., par.38] [Plt.Ex.21, Granite Aff.]

### *Ventilation accommodations*

After Dr. Norden filed a complaint, Smithsonian management misrepresented to the EEO counselor that Dr. Norden did not receive accommodations because she refused to wear a respirator [Plt.Ex.27, p.2, Plaintiff's MSJ, Exhibit 8], and in its interrogatory answers, defendant falsely claimed that:

> "Dr. Norden failed to participate in good faith in the interactive process. While on light duty, Plaintiff was fitted for a respirator, but informed the funds manager in her department not to buy one. Plaintiff did not inform the Office of Safety and Environmental Management that she had rejected the respirator, leading them to believe the department was not following its advice." [Plt.Ex.6] [Plaintiff's 10/2/06, MSJ, Exhibit 9]

However, at deposition, the PMQ on reasonable accommodations, Dr. Schultz, **admitted that Dr. Norden had not refused a respirator.** [Plt.Ex.28] Dr. Norden had merely sent a memo suggesting that she could perform her job better with a portable air filter. On, July 5, 2002, Dr. Norden sent an email to Ms. Youmans and to Dr. Schultz, as well as Dr. Lawford, and the industrial hygienist of Office of Safety and Environmental Management that she was unable to use a microscope while using the full face mask required by the respirator and asked if she could have a portable air filter instead. [Plt. Ex.29] [Plaintiff's MSJ, Exhibit 10]

Thus, PMQ Dr. Schultz, reversed the Smithsonian's litigation position and testified that a more accurate statement would be that the Smithsonian "made department resources available for a respirator, had Beth fitted by safety for a respirator, and in the end it turn out that Beth didn't find it possible to work with wearing a respirator." [Plt.Ex.28] [Plaintiff's MSJ, exhibit 11, Schultz testimony, p. 262] Moreover, as of late July, three weeks after

Dr. Norden's July 5 memo, the department was still claiming that it was attempting to purchase a respirator, and Dr. Norden was still being advised that she would receive one. Dr. Schultz signed a performance evaluation in late July stating that a respirator and an air filter would be provided for Dr. Norden. [Plt.Ex.30, performance evaluation] [Norden aff., par 39] Indeed, Dr. Norden's performance evaluation, dated nearly three weeks after Dr. Norden's memo, states that a respirator and portable air filter are being procured for her. [Plt.Ex.30]  As of July 22, 2002, a respirator and air filter were still considered reasonable accommodations by the Defendant, and Dr. Norden's preference for an air filter over a respirator had not been viewed as a "refusal to wear a respirator."  She was still being promised both accommodations, and she still hoped to receive both accommodations.  [See paragraphs 34 – 36 of the Material Facts, Plaintiff's MSJ 10/2/06] [Norden aff., par. 39]

Dr. Schultz continued to assure Dr. Norden that she would receive both accommodations almost until the day that the Smithsonian forced Dr. Norden to go back onto 100% disability.  [Norden, Aff., par.40]  However, Dr. Schultz contradicted these statements to Dr. Norden when he testified that because the Smithsonian considered the fourth floor room to be the superior accommodation, no other accommodations were to be given. [Plt.Ex.31, Schultz depo., p.8]  This new position by the Smithsonian is an attempt to explain why the respirator/air filter accommodations were not provided for the months of July, August, September, October and November of 2002.  However, Dr. Schultz' testimony that the 4th floor was a superior accommodation was contradicted by his supervisor, Dr. Miller.  Dr. Miller testified that no accommodation was considered superior to any other and that all accommodations were considered equal and supposed to be pursued equally. [Plt.Ex.32, Miller depo, p.123]  Thus, Dr. Schultz never told his

supervisor Dr. Miller that Dr. Norden had not received any accommodations for naphthalene during the 2002 time period.  Finally, Dr. Miller testified that had he known that the accommodations were not given, he would not have removed Dr. Norden's light duty status. [Plt.Ex.36, Miller depo., p.62-66]

As to moving Dr. Norden to the fourth floor, Dr. Norden has never refused to work on the fourth floor. [Norden, aff., par. 41]  Dr. Schultz, the PMQ, also admitted that Dr. Norden had never been instructed to move her office to the fourth floor and that she could not perform a significant part of her work on the fourth floor.   [Plt. Ex.33, Schultz depo.,p.141-142]  Moreover, Dr. Schultz again contradicted this testimony regarding the 4th floor being a superior accommodation, when he  testified that Dr. Norden was unable to do a substantial part of her work in the area to which she should have relocated on the fourth floor as an accommodation because the necessary computer was not in that room.   The "ventilated room" on the fourth floor lacked both the computer and the specimens Dr. Norden needed. [Plt. Ex.33, Schultz depo.,p.141-142]

Wishing that an employee would change offices without instructing the employee to do so and without making it possible for the employee to do a significant amount of her work in the new office is hardly a legal defense to the employer's obligation to provide reasonable accommodations. The sole defense for not providing reasonable accommodations is a pretext that has been effectively withdrawn through deposition testimony of PMQ, Dr. Schultz.  The bottom line is that in 2002: 1) Dr. Norden did not get an air filter and the Smithsonian has no explanation as to why, and 2) Dr. Norden did not get a respirator and the Smithsonian "refused" reason is undermined by the contradicting testimony between Youmans, Miller, Schultz, and Schultz's evaluations.

### *Transfers Accommodations*

As discussed in section II, *supra*, during the 2002 period, Dr. Norden requested transfer to the USDA in 2002 and received approval from Dr. Mathis to pursue this avenue. [Norden aff., par.3]  "The Act …protects requests made at the time…" *Thompson v. Rice*, 422 F. Supp 2d 158 (D.D.C. 2006)

Also as discussed *supra*, and incorporated herein from section II, the USDA did receive funding shortly afterwards, and on December 6, 2002, Dr. Aldrich of the USDA sent a memo to Dr. Mathis stating that he obtained funding at the rate of $22,500 per year for a period of three years and which would be reimbursable to the Smithsonian for loaning Dr. Norden to the USDA. [Plt.Ex:3]   **Dr. Mathis hid the December 6, 2002, Aldrich memo from Dr. Norden**.  [Norden aff., par.4]

Dr. Mathis also hid the December 6, 2002, memo from his supervisor, Dr. Miller. Dr. Miller testified that he and Dr. Mathis never heard back from the USDA and that "it's the sort of thing that had they responded positively, I would have been told about it." [Plt.Ex.34] [Miller depo, p.99-100]   Dr. Mathis' bad faith in hiding the $22,500 funding obtained by the USDA led to the Dr. Norden not getting this position because Dr. Miller also testified that if the USDA had responded in December of 2002 or January of 2003 and had it obtained <u>even some</u> of the funding for Dr. Norden's position, he would have responded positively and would have explored the situation with the USDA and with Dr. Norden. [Plt.Ex.34] [Miller depo, p.99-100]   The Smithsonian also lied about the existence of the  December 6, 2002, memo in its denial of Plaintiff's Admission Request No.16. [Plt.Ex.35]

Furthermore, the Smithsonian claimed in its own MSJ that approving Dr. Norden's "loan" to the USDA would have been an undue financial burden because it was "…insufficient to allow us to hire someone to perform Norden's duties while she was on detail." [Plt.Ex.7, Mathis decl.].    This "undue burden" argument from is not only undermined by Dr. Mathis's October 8, 2004, letter stating that he wanted to separate Dr. Norden from the Smithsonian Rolls as early as November 5, 2003, [Plt.Ex.40], it also begs the question because by allowing the USDA transfer the Smithsonian would have saved the $22,500 on its workman's compensation payments that it was making to Dr. Norden.  The Smithsonian so stated in Decl of Farhana Hossain, Reply to Plaintiff's Response to Defendant's Statement of Material Facts, filed January 9, 2007:

> " [T]he Smithsonian pays the Department of Labor for the payments made by the Office of Workers' Compensation Programs to current and former Smithsonian employees…the chargeback includes Beth Norden's workers compensation payments." [Plt.Ex.8]

Thus, since Dr. Norden's disability payments would have been reduced by the salary paid to her through the USDA, the Smithsonian would have actually benefited financially in terms of the $22,500 funding that the USDA would have repaid the Smithsonian from the grant.    Instead of accepting a loan arrangement which would have accommodated Dr. Norden's disability and saved the Smithsonian money, the Smithsonian chose to remain silent as to the USDA transfer that became available in December of 2002 and January of 2003, hide the evidence of the funding, and lie about the funding for the transfer which would have saved the Smithsonian money throughout the course of this litigation.

The funding for the USDA job would have reduced the Smithsonian's disability pay obligation on Dr. Norden's behalf to the Department of Labor, and it would have also

allowed Dr. Norden to work productively. Thus, the Smithsonian would save money by alleviating part of its disability pay obligation by having Dr. Norden work at the USDA. The Smithsonian would have actually benefited financially from this arrangement. Nevertheless, the Smithsonian failed to implement this USDA transfer reasonable accommodation, and it has no legal defense as to why.

### *Bottom line as to the 2002 period.*

Dr. Norden believes that with the naphthalene accommodations and flex time accommodations that she requested in 2002, she could have gotten a favorable recommendation by her doctors and worked full time hours by the end of the 2002 year. [Norden Aff., par.42] The Smithsonian never gave her this chance because it refused to implement the reasonable accommodations necessary for Dr. Norden to do the essential functions of her job during the 2002 period. the Smithsonian cannot carry its heightened burden under 29 USC section 791 in front of a jury.

## IV.    CONCLUSION

Courts routinely, and properly, grant Summary Judgments by finding as a matter of law that a given act was not retaliatory or that no jury could reasonably find that a plaintiff met all the elements of a discrimination case. As was stated above, such judgments are not "a disfavored legal shortcut." *Celotex, supra.* When there are sufficient undisputed facts to allow the court to rule on a case as a matter of law, the court should do so. There is nothing in the law, however, that suggests that Summary Judgments are reserved for Defendants alone. Dr. Norden has shown undisputed facts as to the following:

a) the February 10, 2003, letter to the OEEMA is a timely filing of Dr. Norden's

claim that the Smithsonian failed to provide her with reasonable

accommodation in the 2002 period,

b) Extension of the 45 day period is liberal and mandatory under *Harris &*

*Johnson* and is merited in this case,

c) Dr. Norden was disabled in the 2002 period,

d) Dr. Norden could do the essential functions of her job with reasonable

accommodations which she requested in the 2002 period,

e) The Smithsonian did not provide reasonable accommodations in the 2002

period

For all of the above reasons, summary judgment should be given to Dr. Norden for

the Smithsonian's 2002 failure to accommodate, or in the alternative summary adjudication

should be given as to those issues where the material facts are not in dispute.

Dated: 11/18/07                              Respectfully submitted,

_____/s/_____
Alex T. Sliheet, D.C. Bar No. 438977
Vickie Inge Fang, *pro hac vice*
Attorneys for Plaintiff Beth Norden
8702 Nightingale Drive, Lanham, MD  20706
alexsliheet@yahoo.com; fvickie@comcast.net
(301) 552-4908