Alex T. Sliheet, D.C. Bar No. 438977
Vickie Inge Fang, *pro hac vice*
Attorneys for Plaintiff Beth Norden
8702 Nightingale Drive
Lanham, MD  20706
alexsliheet@yahoo.com
fvickie@comcast.net
(301) 552-4908

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| **Beth M. Norden,** ) | **Case No. 05cv1232 (RMC)** |
| ) | |
| **Plaintiff** ) | |
| ) | |
| ) | **PLAINTIFF'S RESPONSE TO DEFENDANT'S** |
| ) | **SUPPLEMENTAL STATEMENT OF** |
| **v.** ) | **MATERIAL FACTS NOT IS DISPUTE AND** |
| ) | **PLAINTIFF'S STATEMENT OF MATERIAL** |
| ) | **FACTS NOT IN DISPUTE** |
| **Cristian Samper, Acting** ) | |
| **Secretary Smithsonian** ) | |
| **Institution,** ) | |
| ) | |
| ) | |
| **Defendant** ) | |

_____ )

## PLAINTIFF'S RESPONSE TO DEFENDANT'S SUPPLEMENTAL STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1. This statement is not in dispute because Dr. Norden has never seen the alleged EEO posters.

2.   This statement is not in dispute because Dr. Norden has never seen the alleged EEO posters.

3.   This statement is not in dispute because Dr. Norden did not visit the areas alleged in the affidavits.

4.   <u>This statement is partially in dispute</u>.  Dr. Norden disputes that she was required to pass by an EEO poster in order to visit Ms.  Youmans' office.    [Plt.Ex.38, floor plan of 6th floor west wing]   In order to save time, Dr. Norden always took a small, public elevator next to the guard's station office on the West Wing side of the main building. This elevator goes to two public floors and one staff floor, and is faster than the notoriously slow elevators devoted exclusively to the staff.  [Norden aff., par.17, 18-23] Once off the public elevator, Dr. Norden would quickly make her way to the stairs which led to the 6th floor of the West Wing.  [Plt.Ex.38, floor plan] From the stairwell, she would visit with George Venable [Norden aff., par.22] [Plt.Ex.38, floor plan] and do work with the Gazetteers at the Entomology Library. [Norden aff., par. 23] [Plt.Ex.38, floor plan] Then she would walk straight down the far hallway, turn right at the end, and walk down the next hallway until she reached Ms. Youmans' office. [Plt.Ex.38, floor plan] Dr. Norden did not pass Ms. Blair's office at all which is where the Smithsonian says the poster was near.  Therefore Dr. Norden did not come within sight of the EEO poster which the Smithsonian alleges was between Ms. Youmans' office and Ms. Blair's office which was farther down the hall. [Norden aff., par.17, 18-23]  [Plt.Ex.38, floor plan]  Ms. Blair's office was past Ms. Youmans' office of the hallway that Dr. Norden would walk down in order to reach Ms. Youmans' office. [Norden, aff., par. 17, 18-23]   Dr. Norden returned to her own office by retracing her

steps, again not passing any EEO poster.  [Norden aff., par.17, 18-23]   Dr. Norden never came within eyesight of an EEO poster on the 6th floor.  [Norden aff., par.17, 18-23]   This is the path that Dr. Norden always took when she worked in the main building, from 1990-2000, before the Entomology Department moved to the East Court building in 2000. [Norden aff., par.17]

Also, if the Defendant's Statement of Material Facts is alleging that an EEO poster was near the Kirby room as entered from the stairs, Dr. Norden also disputes that allegation.  Ms. Youmans' affidavit alleges that a poster was on "the 3rd floor (East Court) outside of the elevators, next to the stairway entrance that leads to the Kirby room."  The stairs on the 3rd floor of the East Court are at the opposite end of the hallway from the elevators.  [Norden aff., par. 16]  The elevators are not visible upon exiting the stairwell. [Norden aff., par. 16]   *The Smithsonian cannot have it both ways. The poster was either near the elevator or near the stairwell but one poster could not be described as being in both places.*   While a poster may have been "outside of the elevators," there was no poster close to, or visible from, the stairs.  [Norden aff., par. 16]  [Meltzer aff., par.15-16] The Kerby room was a big meeting room taking up most of the space on the 3rd floor of the East Court Building.  The floors of the East Court Building are rectangular shaped.  The Kerby room, on the 3rd floor of the East Court Building fills almost the entire floor, within halls running its perimeter on each side.  There is a front door and back door entrance to the Kerby room and both doors were open when Dr. Norden went to the Kerby room prior to 2002.  The 3rd floor elevators face the front door entrance of the Kerby room.  The 3rd floor stairwell faces the back of the Kerby room. [Norden aff., par. 16]   Dr. Norden never saw any posters in or near

the 3rd Floor Kerby room because the Smithsonian says the poster was located by the elevators at the front of the Kerby room, and Dr. Norden used the stairs to enter the Kerby room from the back. [Norden aff., par. 16] To get to the Kerby room, Dr. Norden would take the stairs which were immediately and directly adjacent to her 5th floor office [Plt.Ex.37, floor plan] and quickly walk down two flights of stairs to the 3rd floor stairwell exit and then immediately enter the Kerby room from its back door which was always open when she was there. [Norden aff., par. 16]. This was the shortest route, because using the elevators required walking a further distance from her office on the 5th floor [Plt.Ex.37, floor plan], and because the Smithsonian elevators were notoriously slow when crowded. [Norden aff., par.16] [Braden, aff., par. 8] There were no posters in the stairwell, near the exit of the stairwell on the 3rd floor, or near the back entrance of the Kerby room or in the Kerby room itself. [Norden aff., par.16] Ms. Meltzer corroborates and declares: "There is a stairway near Dr. Norden's former office on the 5th floor of the Court East Building. This stairway leads to a door very close to the Kerby Room on the 3rd floor of the Court East Building. There is no EEO information posted near this stairway entrance on the 3rd floor. There is no EEO information posted on the stairway either." [Meltzer aff., par.15-16] These Kerby elevators were on the other side of the perimeter of the Kerby room, were not visible from the back of the Kerby room and also were not visible from inside the Kerby room. [Norden aff., par. 16]

5. Ms. Cones did not state what department bulletin boards existed, where they were located, or whether the SEM Lab. bulletin board was considered a department bulletin board. If the SEM Lab. bulletin board was a department bulletin board, then this statement is disputed through the affidavit of Ms. Braden, who worked in the SEM Lab. Dr. Norden would sometimes eat lunch with her colleague Susann Braden who was also a museum specialist and worked at the SEM lab which was located on the main floor near the East Court Building. There were no posters at or near the SEM lab. [Norden, aff., par.12] [Braden, aff., par. 13 ]

6. This statement is not in dispute.

7. This statement is disputed because Dr. Norden testified that she had "partial access" to PRISM. Counsel for Defendant chose not to depose her as to what "partial access" meant. By "partial access," Dr. Norden meant that she was aware that a PRISM system existed and that she believed that she could have asked a coworker to allow her to use his or her computer to access although she had never done so. [Norden aff., par.25] The PRISM was a new system being implemented in 2003, [Braden, aff. Par. 14] [Meltzer, aff., par. 5-10] and that had not been installed on Dr. Norden's computer in 2002. [Norden aff, par. 26] Dr. Norden received any instruction on the PRISM system. Dr. Norden used "groupwise" in 2002 to access emails at the Smithsonian. [Norden aff., par. 24] Ms. Meltzer, a current Smithsonian employee, corroborates Dr. Norden and states that "Prior to 2003, however, I accessed email at the Smithsonian through "groupwise" and not through PRISM, that "PRISM was still being developed in 2003, and I did not begin to use it on a regular basis until the end of 2003," that "Prior to 2003, only some computers at the Smithsonian could even access PRISM," that "I was

never trained in the use of PRISM or given any orientation in PRISM, and that "I was never made aware that EEO information could be accessed through PRISM." [Meltzer aff., par. 7-10]   Also, Susann Braden, who retired from the Smithsonian in 2003, corroborates this information on the lack of PRISM on the computers before and during the 2002 period. In fact, Ms. Braden was not even aware that a program known as PRISM existed at the Smithsonian.  [Braden, aff, par.14]

8.  This statement is not in dispute because Dr. Norden has never used PRISM.

9.  This statement is not in dispute because Dr. Norden has never used PRISM.

## PLAINTIFF'S SEPARATE STATEMENT OF
## MATERIAL FACTS NOT IN DISPUTE

1.    On February 10, 2003, Dr. Norden's former attorney Bruce Goodman sent a letter to the Ms. Angela Roybal, Smithsonian Office of Equal Employment and Minority Affairs ("OEEMA").  [Plt. Ex. 1]

2.    The former attorney Bruce Goodman also subsequently filed a "EEO informal complaint form" on April 7, 2003. [Plt.Ex.2]

3.    The February 10, 2003, letter was not limited to the USDA transfer accommodation and stated:  *"The Department has failed and refused to accommodate Dr. Norden...please consider this letter to be an informal or a formal complaint under the ADA."*  [Plt.Ex.1]

4.   Dr. Norden was mailed a copy of this very letter by her attorney in February of 2003.  [Norden Aff., par.1]

5.   Dr. Norden was also not aware that the February 10, 2003, letter constituted the first contact with an EEO counselor. [Norden, aff., par. 1]

6.   In July of 2002, Dr. Norden spoke to Dr. Mathis who was Dr. Schultz' supervisor at the Smithsonian, and Dr. Norden asked for permission to pursue a USDA transfer. Dr. Mathis told Dr. Norden to proceed subject to Dr. Lawford's approval. In 2002, Dr. Lawford subsequently gave enthusiastic approval.  [Norden aff., par.3]

7.   Dr. Norden's light duty status was terminated on Nov. 29, 2002, prior to anyone knowing whether the USDA would receive funding for Dr. Norden's USDA position.  [Norden aff., par.3] [Plt. Ex.3]

8.   The USDA did receive funding shortly afterwards, and on December 6, 2002, Dr. Aldrich sent a memo to Dr. Mathis stating that he obtained funding at the rate of $22,500 per year for a period of three years and which would be reimbursable to the Smithsonian for loaning Dr. Norden to the USDA. [Plt.Ex:3]

9.   Dr. Mathis did not tell Dr. Norden about the December 6, 2002, Aldrich memo. [Norden aff., par. 4]

10.   Although Dr. Norden received an email from Dr. Webb on December 30 of 2002 [Plt. Ex.4] informing her that "things were finally set on our end," she did not know that her part time position had been almost fully funded for a period of three years until Dr. Aldrich himself gave her a copy of the memo in the fall of 2006.  [Norden aff., par.5]

11.  Subsequent to the December 30, 2002, memo, the following occurred between Dr.
     Norden and the USDA: On January 9, 2003, Dr. Aldrich instructed Dr. Norden to
     call Ms. Mary Donoghue at the USDA regarding Dr. Norden's official paperwork
     to transfer to the USDA [Plt.Ex.5]; Dr. Norden spoke with Ms. Mary Donoghue at
     USDA on January 10, 2003, and on January 13, 2003, Ms. Donoghue called Dr.
     Norden to tell her that as a Smithsonian employee, Dr. Norden needed to be on a
     "reimbursable detail to USDA, Beltsville," and Ms. Donoghue would do the
     paperwork.  [Norden aff., par.6]   On January 21, 2003, Dr. Norden attended an
     afternoon lab meeting (of the entire group) with Dr. Jeff Webb and Dr. Ralph
     Aldrich of the USDA and was introduced as a new employee on loan from
     Smithsonian. [Norden aff., par.6]   On January 24, 2003, Dr. Norden met with Dr.
     Webb and Dr. Aldrich of USDA to outline Dr. Norden's work plan for the coming
     year.  [Norden aff., par.6]

12.  The Smithsonian never informed Dr. Norden never informed Dr. Norden that the
     Smithsonian would not approve the USDA transfer accommodation. [Norden aff.,
     par.7]

13.  The Smithsonian failed to produce Dr. Aldrich's December 6, 2002 memo in
     discovery and failing to acknowledge its existence. [Plt.Ex.6, Defendant's
     interrogatory answers No.3]

14.  The earliest date that Dr. Norden discovered that the USDA had obtained the grant
     money was December 30, 2002 when she received Dr. Webb's email.  [Plt.Ex.4]

15.  Through her former attorney, Bruce Goodman, Dr. Norden filed an informal
     complaint on February 10, 2003, within the 45 day requirement from the date of the

December 30, 2002 email from Dr. Webb, and well within the last meeting with the

USDA on January 24, 2003, when Dr. Norden met with Dr. Webb and Dr. Aldrich

of the USDA to outline her work plan for the coming year. Norden aff.,

par.1][Plt.Ex.1]

16. After initially approving the transfer in 2002, the Smithsonian never revealed to Dr.

Norden that it was not going to allow her USDA transfer once funding had been

received by the USDA. [Norden, aff. Par.7]

17. From December 2002 through February of 2003, Dr. Norden believed that the 2002

requested and Smithsonian approved USDA transfer accommodation had finally

received funding and was being implemented. [Norden, aff., par. 8]

18. As of the termination of Dr. Norden's light duty hours on November 29, 2002, the

funding for the transfer was still unknown. [Plt.Ex.3]

19. Indeed even subsequent to January 24, 2003, the Smithsonian never informed Dr.

Norden that it was not approving her USDA transfer.  [Norden aff., par.7]

20. Dr. Norden did not have actual notice and was not notified of the time limits and

was not otherwise aware of the 45 day requirement until it became an issue raised

by the Smithsonian in response to her official complaint in late 2003.  [Norden Aff.,

par.10]

21. The Smithsonian National Museum of Natural History is a massive series of

buildings comprised of the Main National Museum of Natural History Smithsonian

Building; there is a West Court Building and a West Wing Building on one side;

there is an East Court Building and an East Wing Building on the other side.

[Norden Aff., par.11]

22.  In 2000, 2001 and 2002, the Entomology Department moved its location to the new East Court Building which was still being built in 2002.  [Norden Aff., par.12]  The East Court Building was a Building within the East Wing Building.  The East Court Building had its own elevators, floors, and sections like any other separate building. [Norden aff., par.12]  [Braden, aff., par .7]

23.  During the 2002 period, Dr. Norden worked only six months and only part time and remained almost without exception, in her office on the 5th floor of the East Court Building during her working day. [Norden aff., par.12]

24.  Dr. Norden would sometimes eat lunch with her colleague Susann Braden who was also a museum specialist and worked at the SEM lab which was located on the main floor near the East Court Building.  There were no posters at or near the SEM lab. [Norden, aff., par.12] [Braden, aff., par. 13 ]

25.  Dr. Norden's path to and from work each day in 2002 was the same.  Dr. Norden would: 1) enter through the main entrance of the National Museum of Natural History ("NMNH"),  2) walk through the main lobby of the NMNH, 3) walk to the hallway leading into the East Wing, 4) walk to the bank of elevators leading to the Court East Building, 5) take the elevator leading to the Court East Building offices, 6) get off on her 5th floor in the Court East Building and go to her office.  [Norden, aff., par. 13]

26.  There were no posters of EEO information in any of these areas that Dr. Norden routinely used in 2002. [Norden aff., par. 13]  Ms. Meltzer, a current Smithsonian employee, signed Dr. Norden into the NMNH as a visitor in October of 2007, and the two women walked through the six areas of the Smithsonian listed above.  Both

women noted that there still were/are no posters visible. [Meltzer, aff., par. 11-16] [Norden aff., par.13]

27.   Dr. Norden brought her lunch and did not use the cafeteria, not only during the 2002 period, but also before the 2002 period. [Norden aff., par.14][Braden, aff., par. 9-12].

28.   Also, Ms. Meltzer who is still a current employee of the Smithsonian and has worked at the Smithsonian since 1986, states that the cafeteria poster has not been consistently posted [Meltzer, aff., par. 14]

29.   Dr. Norden never went to the 3rd Floor "Kerby room" located in the East Court Building in 2002. [Norden aff., par. 15]  The 9/10/2002 "Federal Hazard Communication Training" 2002 seminar that was scheduled to be in the Kerby room in 2002 was cancelled. [Plt.Ex.9] [Norden aff., par. 15]

30.   Prior to 2002, Dr. Norden's recalls that she went to the Kerby room for Stan Shelter's retirement party and for a Blood Borne Pathogen seminar. [Norden aff., par. 15]  Dr. Norden never walked by the posters near the elevators on the 3rd floor Kerby room. [Norden aff., par. 15]

31.   The Kerby room was a big meeting room taking up most of the space on the 3rd floor of the East Court Building.  The floors of the East Court Building are rectangular shaped.  The Kerby room, on the 3rd floor of the East Court Building fills almost the entire floor, within halls running its perimeter on each side.  There is a front door and back door entrance to the Kerby room and both doors were open when Dr. Norden went to the Kerby room prior to 2002.  The 3rd floor elevators

face the front door entrance of the Kerby room. The 3rd floor stairwell faces the back of the Kerby room. [Norden aff., par. 16]

32.  Dr. Norden never saw any posters in or near the 3rd Floor Kerby room because the Smithsonian says the poster was located by the elevators at the front of the Kerby room, and Dr. Norden used the stairs to enter the Kerby room from the back. [Norden aff., par. 16] To get to the Kerby room, Dr. Norden would take the stairs which were immediately and directly adjacent to her 5th floor office [Plt.Ex.37, floor plan] and quickly walk down two flights of stairs to the 3rd floor stairwell exit and then immediately enter the Kerby room from its back door which was always open when she was there. [Norden aff., par. 16]. This was the shortest route, because using the elevators required walking a further distance from her office on the 5th floor [Plt.Ex.37, floor plan], and because the Smithsonian elevators were notoriously slow when crowded.  [Norden aff., par.16] [Braden, aff., par. 8]

33.  There were no posters in the stairwell, near the exit of the stairwell on the 3rd floor, or near the back entrance of the Kerby room or in the Kerby room itself.  [Norden aff., par.16]  Ms. Meltzer corroborates and declares**: "**There is a stairway near Dr. Norden's former office on the 5th floor of the Court East Building.  This stairway leads to a door very close to the Kerby Room on the 3rd floor of the Court East Building.  There is no EEO information posted near this stairway entrance on the 3rd floor.  There is no EEO information posted on the stairway either." [Meltzer aff., par.15-16]

34.    These Kerby elevators were on the other side of the perimeter of the Kerby room,

were not visible from the back of the Kerby room and also were not visible from

inside the Kerby room.  [Norden aff., par. 16]

35.    Dr. Norden went to the West Wing no more than four times in the 2002 period.

[Norden, aff., par.17]  The West Wing is far away from Dr. Norden.  The travel

time from Dr. Norden's East Court Building to the West Wing Building is

considerable, some ten minutes. [Norden aff., par.17]   Ms. Meltzer declared: **"My**

**work requires me to go between the various buildings that comprise the NMNH.  I**

**estimate that it takes me ten minutes to go from the ground floor of the West Wing**

**to the third floor of the Court East Building."** [Meltzer, aff., par.18]  Much of the

reason for the lengthy travel time was the Smithsonian's slow elevators.  [Braden

aff., par. 8] [Norden, aff., par.17]

36.    In order to save time, Dr. Norden always took a small, public elevator next to the

guard's station office on the West Wing side of the main building.  This elevator

goes to two public floors and one staff floor, and is faster than the notoriously slow

elevators devoted exclusively to the staff.  [Norden aff., par.17, 18-23]   Once off

the public elevator, Dr. Norden would quickly make her way to the stairs which led

to the 6th floor of the West Wing.  [Plt.Ex.38, floor plan] From the stairwell, she

would visit with George Venable [Norden aff., par.22] and work at the Entomology

Library. [Norden aff., par. 23]  Then she would walk straight down the far hallway,

turn right at the end, and walk down the next hallway until she reached Ms.

Youmans' office. [Plt.Ex.38, floor plan] Dr. Norden did not pass Ms. Blair's office

at all and therefore did not come within sight of the EEO poster which the

Smithsonian alleges was between Ms. Youmans' office and Ms. Blair's office which was farther down the hall. [Norden aff., par.17, 18-23]  [Plt.Ex.38, floor plan]  Ms. Blair's office was past Ms. Youmans' office of the hallway that Dr. Norden would walk down in order to reach Ms. Youmans' office.  [Norden, aff., par. 17, 18-23]  Dr. Norden returned to her own office by retracing her steps, again not passing any EEO poster.  [Norden aff., par.17, 18-23]

37.  Dr. Norden never came within eyesight of an EEO poster on the 6th floor.  [Norden aff., par.17, 18-23]  This is the path that Dr. Norden always took when she worked in the main building, from 1990-2000, before the Entomology Department moved to the East Court building in 2000. [Norden aff., par.29]

38.  Dr. Norden has never used the PRISM system and was never aware that EEO information was on the PRISM system.  The PRISM system was not on Dr. Norden's computer in 2002, and Dr. Norden never received any instruction on the PRISM system.  Dr. Norden used "groupwise" in 2002 to access emails at the Smithsonian. [Norden aff., par. 24]

39.  Ms. Meltzer, a current Smithsonian employee, corroborates Dr. Norden and states that "Prior to 2003, however, I accessed email at the Smithsonian through "groupwise" and not through PRISM, that "PRISM was still being developed in 2003, and I did not begin to use it on a regular basis until the end of 2003," that "Prior to 2003, only some computers at the Smithsonian could even access PRISM," that "I was never trained in the use of PRISM or given any orientation in PRISM, and that "I was never made aware that EEO information could be accessed through PRISM." [Meltzer aff., par. 5-10]

40.  Also, Susann Braden, who retired from the Smithsonian in 2003, corroborates this
     information on the lack of PRISM on the computers before and during the 2002
     period. In fact, Ms. Braden was not even aware that a program known as PRISM
     existed at the Smithsonian.  [Braden, aff, par.14]  Thus, the Smithsonian's evidence
     of EEO information on PRISM fails both prongs of the *Harris* test on constructive
     notice.

41.  In deposition, Dr. Norden testified that PRISM had not been installed on her
     computer, and when asked whether she had any access to PRISM, testified that she
     had "partial access."  By "partial access," Dr. Norden meant that she was aware that
     a PRISM system existed and that she believed that she could have asked a coworker
     to allow her to use his or her computer to access although she had never done so.
     [Norden aff., par.25]

42.  The PRISM was a new system being implemented in 2003, [Braden, aff. Par. 14]
     [Meltzer, aff., par. 8] and that had not been installed on Dr. Norden's computer in
     2002. [Norden aff, par. 26]

43.  As soon as Dr. Norden received the memo on November 18, 2002, she asked her
     two supervisors Dr. Mathis and Dr. Miller who presented her with the memo, why
     the light duty status was ending and what she needed to do to return to the
     Smithsonian.   The two supervisors did not answer.  [Norden aff., par.28]

44.  On November 29, 2002, Dr. Norden then sent an email to various other individuals
     including her direct supervisor Dr. Schultz asking among other things: "How do I
     know when it might be safe to return if it is the naphthalene which is activating my
     current blood problems?"  And "Will anything dealing with my exposure be

different upon return, or is my return based upon no longer being sensitive to naphthalene?" [Plt.Ex.10] Dr. Schultz did not answer.  [Norden aff., par.28]

45.  Although a few people did respond by email, no one directly answered either question.  [Norden aff., par.28]

46.  Defendant's physician and its Office of Human Resources both told her that her return would be addressed by her doctors. [Plt.Ex.11]

47.  The manager of Smithsonian EEO Cultural Diversity/Affirmative Action reassured her by stating that "You have been returned to full-time workers compensation (the same status that you were on before your part-time schedule in April). The goal is for you to successfully return to your job full time." [Plt.Ex.12]

48.  The possibility of her return was published in an internationally circulated newsletter approximately three months after she received the memo terminating her light duty hours.[Plt.Ex.13]

49.  A coworker wrote that one of Dr. Norden's co-supervisors had said she was being given a year off to recover. ." [Plt.Ex.14]  When Dr. Norden wrote both the coworker and the supervisor back praising her department's compassion, no one corrected her belief or the original statement. [Plt.Ex.15] [Norden aff., par.29]

50.  During the deposition of Dr. Schultz, the PMQ, in 2006, Defendant maintained the position that it had been attempting to accommodate Dr. Norden's disabilities during the period in which she filed her first informal complaint in 2003. [Plt.Ex.16]

51.  An Entomologist is not a fungible worker in the workplace who can easily obtain employment, and the Smithsonian is a prized and prestigious workplace for an

Entomologist. [Norden aff., par.30]  Moreover, the Entomology Department is a very highly specialized and tight knit group of scientist at the Smithsonian [Norden aff., par.30]  Dr. Norden was a Smithsonian employee/scientist who wanted to work and absolutely had to maintain a good working relationship with the Smithsonian and especially with her supervisor, Dr. Schultz.  [Norden, aff., par.30]

52.  When Dr. Norden did question Dr. Schultz's decision to remove her from the rolls in late 2003, Dr. Schultz's reaction was to refuse to supervisor her further and ask that she be placed outside of his Entomology department. [Plt.Ex.17]

53.  The Smithsonian violated its owns rules for denying accommodations; namely, "…the Responsible Smithsonian Official must fill out the **'Denial of Request'** form and give it to the individual…" (emphasis added) [Plt.Ex.18, Smithsonian Procedures for Accommodations.]

54.   The "Responsible Smithsonian Official" assigned to address the reasonable accommodations and/or provide the "Denial of Request" form was Dr. Schultz, the "requesting employee's immediate supervisor."  [Plt.Ex.19, Smithsonian's Procedures for Accommodations]

55.  Dr. Norden never received such a "Denial of Request" form at anytime during the period 2002 or 2003.  [Norden Aff., par.31],

56.   The court has already ruled that Dr. Norden had a disability which was known by the Smithsonian [Plt.Ex.20, 8/3/07 Court order, pp.26-28]]

57.  The court has also already ruled that Dr. Norden had a record of disability which was known by the Smithsonian. [Plt.Ex.20, 8/3/07 Court order, pp.28-30]

58. The evidence relied upon by the court in its 8/3/07 ruling that Dr. Norden was disabled was not limited to the 2003-2004 period. Dr. Granite's affidavit on Dr. Norden's medical condition, Dr. Norden's affidavit on her medical condition, and the Smithsonian's knowledge of Dr. Norden's medical condition, was not limited to the 2003-2004 period. Dr. Granite's affidavit covered the 2002 period [Plt.Ex.21, Granite affidavit], Dr. Norden's affidavit covered the 2002 period [Plt.Ex.22, Norden, affidavit], and the court in its 8/3/07 order has held that Smithsonian was aware of Dr. Norden's medical records from 2000 forward and made decisions on that medical record, including during the 2002 period at issue. [Plt.Ex.20, 8/3/07 Court order, pp. 29-30]

59. Dr. Norden had worked as a museum specialist at the Smithsonian for nearly fifteen years and had consistently received the highest possible evaluation – "Outstanding." [Norden aff., par.32]

60. Her performance evaluations for both her first 2001 and second 2002 return to work stated that she performed her work well, *and this work was performed even when she did not have accommodations for her naphthalene sensitivity*. [Norden aff., par.33] [Plt.Ex.30]

61. The court previously ruled that Dr. Norden was qualified [ Plt.Ex.20,  pp.29-30]

62. Beyond light duty schedule, Dr. Norden also needed additional accommodations for naphthalene sensitivity and a flexible work hour schedule that would allow for medical appointments. [Norden aff., par.34] [Plt.Ex.23]

63. In the period of 2002, Dr. Norden made more than a dozen requests for accommodations for flex-time and naphthalene sensitivity.  [*See paragraph 26 of*

*the Material Facts for Plaintiff's 10/2/06 MSJ* ] [Norden, Aff, par. 35]  In addition, her doctors, and Smithsonian medical and industrial hygiene personnel, made the same requests for accommodations.  On October 17, 2002, Dr. Lawford and the industrial hygienist from OSEM sent a lengthy memo to upper management, Dr. Miller, chair and Dr. Schultz.  [Plt.Ex.23]  The "ACTION REQUIRED" memo discussed a variety of accommodations and concluded with "We ask that you notify us as soon as possible to the course of actions to be taken to minimize naphthalene exposure to Dr. Norden in the course of her work. [Plt.Ex.23]  These requests centered on her need for flexible hours to accommodate her many doctors' visits and her migraine headaches, as well as her need to reduce her exposure to naphthalene.

64.   During this 2002 period, Dr. Schultz who was Dr. Norden's supervisor, understood that the exposure to naphthalene was exacerbating her illness.  [Plt.Ex.24, Plaintiff's MSJ, exhibit 7, p.143]

65.   Dr. Schultz was the person whom the Smithsonian designated as being responsible for ensuring reasonable accommodations for Dr. Norden.  [Plt.Ex.19] [Plt.Ex.39]

66.   Nevertheless, Dr. Norden received no reasonable accommodations at all other than light duty hours.  [Norden aff., par.36 and see paragraph 42 of the Material Facts, Plaintiff's MSJ, 10/2/06] [Plt.Ex.23]

67.   The Smithsonian's own consultant Dr. Lawford described how intransigent the Smithsonian was to allowing Dr. Norden to meet the 20 hours on a flex schedule. During the 2002 period. [Plt.Ex.25, p.2]

68.  As to flextime hours, before Dr. Norden contracted dengue, the Smithsonian allowed her throughout her career to work evenings, weekends, and sometimes from home.  [Norden aff., par.37, admitted by Defendant in its answer]  The continuation of this flexibility was not allowed by the Smithsonian.  [Norden aff., par.37]

69.  Dr. Norden in 2002 was provided with a fixed schedule that was anything but "flexible." [Plt.Ex.26]  Under the schedule, Dr. Norden was not allowed to deviate from the "prearranged" schedule for each pay period.  This was highly inflexible. For example, on one occasion, Dr. Norden attempted to alter a Monday to a Tuesday on her schedule to avoid riding the metro because of demonstrations in Washington, DC. She could not get a hold of Dr. Schultz whose voicemail was full. [Norden aff., par. 38]  Dr. Schultz rebuked Dr. Norden and accused her of violating the "flexible" schedule.  This rebuking prevented Dr. Norden from ever attempting to alter the schedule again. [Norden aff., par.38]   Furthermore, contrary to what the schedule stated [Plt.Ex.26] the schedule was not reviewed per pay period ever in order to determine if it needed to be changed or adjusted for the upcoming pay period.  The schedule did not allow for emergencies where notice could not be given well in advance such as for unpredictable migraine triggers such as stress and heat. [Norden, aff., par.38] [Plt.Ex.21, Granite Aff.]

70.  After Dr. Norden filed a complaint, Smithsonian management misrepresented to the EEO counselor that Dr. Norden did not receive accommodations because she refused to wear a respirator [Plt.Ex.27, p.2] Plaintiff's MSJ, Exhibit 8],

71.  In its interrogatory answers, defendant falsely claimed that:" Dr. Norden failed to participate in good faith in the interactive process. "While on light duty, Plaintiff was fitted for a respirator, but informed the funds manager in her department not to buy one. Plaintiff did not inform the Office of Safety and Environmental Management that she had rejected the respirator, leading them to believe the department was not following its advice." [Plt.Ex.6] [Plaintiff's 10/2/06, MSJ, Exhibit 9]

72.  However, at deposition, the PMQ on reasonable accommodations, Dr. Schultz, admitted that Dr. Norden had not refused a respirator. [Plt.Ex.28]

73.  Dr. Norden had merely sent a memo suggesting that she could perform her job better with a portable air filter. On, July 5, 2002, Dr. Norden sent an email to Ms. Youmans and to Dr. Schultz, as well as Dr. Lawford, and the industrial hygienist of Office of Safety and Environmental Management that she was unable to use a microscope while using the full face mask required by the respirator and asked if she could have a portable air filter instead. [Plt. Ex.29] [Plaintiff's MSJ, Exhibit 10]

74.  Thus, PMQ Dr. Schultz testified that a more accurate statement would be that the Smithsonian "made department resources available for a respirator, had Beth fitted by safety for a respirator, and in the end it turn out that Beth didn't find it possible to work with wearing a respirator." [Plt.Ex.28] [Plaintiff's MSJ, exhibit 11, Schultz testimony, p. 262]

75.  Moreover, as of late July, three weeks after Dr. Norden's July 5 memo, the department was still claiming that it was attempting to purchase a respirator, and

Dr. Norden was still being advised that she would receive one.  Dr. Schultz signed a

performance evaluation in late July stating that a respirator and an air filter would

be provided for Dr. Norden. [Plt.Ex.30, performance evaluation] [Norden aff., par

39] Indeed, Dr. Norden's performance evaluation, dated nearly three weeks after

Dr. Norden's memo, states that a respirator and portable air filter are being procured

for her. [Plt.Ex.30]  As of July 22, 2002, a respirator and air filter were still

considered reasonable accommodations by the Defendant, and Dr. Norden's

preference for an air filter over a respirator had not been viewed as a "refusal to

wear a respirator."  She was still being promised both accommodations, and she still

hoped to receive both accommodations.  [See paragraphs 34 – 36 of the Material

Facts, Plaintiff's MSJ 10/2/06] [Norden aff., par. 39] [Plt.Ex.23]

76.    Dr. Schultz continued to assure Dr. Norden that she would receive both

accommodations almost until the day that the Smithsonian forced Dr. Norden to go

back onto 100% disability.  [Norden, Aff., par.40]

77.    However, Dr. Schultz contradicted these statements to Dr. Norden when he testified

that because the Smithsonian considered the fourth floor room to be the superior

accommodation, no other accommodations were to be given. [Plt.Ex.31, Schultz

depo., p.8]  However, Dr. Schultz' testimony that the 4th floor was a superior

accommodation was contradicted by his supervisor, Dr. Miller.  Dr. Miller testified

that no accommodation was considered superior to any other and that all

accommodations were considered equal and supposed to be pursued equally.

[Plt.Ex.32, Miller depo, p.123]  Finally, Dr. Miller testified that had he known that

the accommodations were not given, he would not have removed Dr. Norden's light

duty status. [Plt.Ex.36, Miller depo., p.62-66]

78.  As to moving Dr. Norden to the fourth floor, Dr. Norden has never refused to work

on the fourth floor. [Norden, aff., par. 41]

79.  Dr. Schultz, the PMQ, also admitted that Dr. Norden had never been instructed to

move her office to the fourth floor and that she could not perform a significant part

of her work on the fourth floor.  [Plt. Ex.33, Schultz depo.,p.141-142]

80.  Moreover, Dr. Schultz again contradicted this testimony regarding the 4th floor

being a superior accommodation, when he  testified that Dr. Norden was unable to

do a substantial part of her work in the area to which she should have relocated on

the fourth floor as an accommodation because the necessary computer was not in

that room.  The "ventilated room" on the fourth floor lacked both the computer and

the specimens Dr. Norden needed. [Plt. Ex.33, Schultz depo.,p.141-142]

81.  Dr. Norden requested transfer to the USDA in 2002 and received approval from Dr.

Mathis to pursue this avenue.   [Norden aff., par.3]

82.  The USDA did receive funding shortly afterwards, and on December 6, 2002, Dr.

Aldrich of the USDA sent a memo to Dr. Mathis stating that he obtained funding at

the rate of $22,500 per year for a period of three years and which would be

reimbursable to the Smithsonian for loaning Dr. Norden to the USDA. [Plt.Ex:3]

83.  Dr. Mathis did not tell Dr. Norden about the December 6, 2002, Aldrich memo.

[Norden aff., par.4]

84.  Dr. Mathis also hid the December 6, 2002, memo from his supervisor, Dr. Miller.

Dr. Miller testified that he and Dr. Mathis never heard back from the USDA and

that "it's the sort of thing that had they responded positively, I would have been told about it." [Plt.Ex.34] [Miller depo, p.99-100]

85. Dr. Miller also testified that if the USDA had responded in December of 2002 or January of 2003 and had it obtained even some of the funding for Dr. Norden's position, he would have responded positively and would have explored the situation with the USDA and with Dr. Norden. [Plt.Ex.34] [Miller depo, p.99-100]

86. The Smithsonian also lied about the December 6, 2002, memo in its denial of Plaintiff's Admission Request No.16. [Plt.Ex.35]

87. Furthermore, the Smithsonian claimed in its own MSJ that approving Dr. Norden's "loan" to the USDA would have been an undue financial because it was insufficient to allow us to hire someone to perform Norden's duties while she was on detail." [Plt.Ex.7, Mathis decl.].

88. By allowing the USDA transfer the Smithsonian would have saved the $22,500 on its workman's compensation payments that it was making to Dr. Norden.  The Smithsonian so stated in <u>Decl of Farhana Hossain, Reply to Plaintiff's Response to Defendant's Statement of Material Facts</u>, filed January 9, 2007:  " [T]he Smithsonian pays the Department of Labor for the payments made by the Office of Workers' Compensation Programs to current and former Smithsonian employees…the chargeback includes Beth Norden's workers compensation payments." [Plt.Ex.8]

89. Dr. Norden's disability payments would have been reduced by the salary paid to her through the USDA, the Smithsonian would have actually benefited financially in

terms of the $22,500 funding that the USDA would have repaid the Smithsonian

from the grant.

90.   Dr. Norden believes that with the naphthalene accommodations and flex time

accommodations that she requested in 2002, she could have gotten a favorable

recommendation by her doctors and worked full time hours by the end of the 2002

year.  [Norden Aff., par.42]


Dated:  _____                              Respectfully submitted,


                                                     _____
                                                     Alex T. Sliheet, D.C. Bar No. 438977
                                                     Vickie Inge Fang, *pro hac vice*
                                                     Attorneys for Plaintiff Beth Norden
                                                     8702 Nightingale Drive, Lanham, MD  20706
                                                     alexsliheet@yahoo.com; fvickie@comcast.net
                                                     (301) 552-4908