Alex T. Sliheet, D.C. Bar No. 438977
Vickie Inge Fang, *pro hac vice*
Attorneys for Plaintiff Beth Norden
8702 Nightingale Drive
Lanham, MD  20706
alexsliheet@yahoo.com
fvickie@comcast.net
(301) 552-4908

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Beth M. Norden, ) | Case No. 05cv1232 (RMC) |
| Plaintiff ) | |
| ) | |
| v. ) | PLAINTIFF'S AFFIDAVIT IN |
| ) | SUPPORT OF MOTION FOR SUMMARY |
| Cristian Samper, Acting ) | JUDGMENT, OR IN THE ALTERNATIVE |
| Secretary Smithsonian ) | SUMMARY ADJUDICATION ON THE 45 |
| Institution, ) | DAY ISSUE AND THE ISSUE OF THE |
| ) | SMITHSONIAN'S FAILURE TO |
| ) | ACCOMMODATE IN THE 2002 PERIOD. |
| Defendant ) | |
| ) | |

### AFFIDAVIT OF BETH NORDEN

1.  My name is Beth Norden.  I am over the age of eighteen and competent to testify.

    My address is Greenhill Road, Greenbelt, Maryland.  I am a former Smithsonian

    employee who holds a Ph.D. in entomology.  I worked at the Smithsonian for

    approximately 15 years, and consistently received the highest possible

performance evaluation – "outstanding."  I was mailed a copy of the February 10, 2003, letter from Bruce Goodman my former attorney in February of 2003.  I was not aware that the February 10, 2003, letter could be viewed as first contact with an EEO counselor.

2.    In mid 2002, I talked to Dr. Ralph Webb at the USDA about creating a new position for me to do research.  Dr. Webb's supervisor and lab chief Dr. Aldrich, had me spend a day in the USDA lab to ascertain that I would have no negative reactions, and I completed the day successfully.  In July of 2002, I spoke to Dr. Mathis who was Dr. Schultz' supervisor at the Smithsonian, and I asked for permission to pursue this new position.

3.    Dr. Mathis discouraged and intimidated me by suggesting that at my age I was probably menopausal and that my menopause was making me overly emotional on the subject of naphthalene   Nevertheless, I remained resolute in my request, and Dr. Mathis told me to proceed subject to Dr. Lawford's approval.  In 2002, Dr. Lawford subsequently gave me enthusiastic approval.   My light duty status was terminated on Nov. 29, 2002, prior to me knowing whether the USDA would receive funding for my USDA position.

4.    Dr. Mathis never showed or discussed the December 6, 2002, Aldrich memo with me.  I knew nothing about it at all.

5.    Although I received an email from Dr. Webb on December 30 of 2002, informing me that "things were finally set on our end," I did not know that my part time position had been almost fully funded for a period of three years until Dr. Aldrich himself gave me a copy of the memo in the fall of 2006.

6.  Subsequent to the December 30, 2002, email, the following occurred between the USDA and I:  On January 9, 2003, Dr. Aldrich informed me to call Ms. Mary Donoghue at the USDA regarding my official paperwork to transfer to the USDA. I spoke  with Ms. Mary Donoghue at USDA on January 10, 2003, and on January 13, 2003, Ms. Donoghue called me to tell me that as a Smithsonian employee, I needed to be on a "reimbursable detail to USDA, Beltsville," and Ms. Donoghue would do the paperwork.   On January 21, 2003, I attended an afternoon lab meeting (of the entire group) with Dr. Ralph Webb and Dr. Jeff Aldrich of the USDA and was introduced as new employee on loan from the Smithsonian.  On January 24, 2003, I had a meeting with Dr. Webb and Dr. Aldrich of USDA to outline my work plan for the coming year.

7.  The Smithsonian never informed me that my USDA transfer request received funding, and the Smithsonian certainly never informed me in December 2002 or in January of 2003, that the Smithsonian would not approve my accommodation that I had initiated in 2002 and that would have restored my career while benefiting two federal agencies.  I was never told by the Smithsonian that it was not approving the USDA transfer. The Smithsonian after giving its initial green light to me on the USDA transfer in 2002, never revealed to me that it was not going to allow my USDA transfer once funding had been received by the USDA or its reasons why or its "undue burden" defense. Indeed even subsequent to January 24, 2003, the Smithsonian never informed me that it was not approving my USDA transfer or any of its reasons.

8.      One of the reasons that I did not immediately pursue an informal EEO action for failure to accommodate me in the 2002 period is because from December 2002 through February of 2003, I believed that the 2002 requested and Smithsonian approved USDA transfer accommodation had finally received funding and was being implemented.

9.      Between my receipt of the December 30, 2002, email regarding the funding, and the last meeting with the USDA on January 24, 2003, the Smithsonian remained silent as to its current position regarding its previously approval of the USDA transfer.

10.      I did not have actual notice and was not notified of the time limits and was not otherwise aware of the 45 day requirement regarding filing a first contact EEO informal complaint. I have no actual notice of the 45 day requirement, and I was not aware of the requirement until it became an issue raised by the Smithsonian in response to my official complaint in late 2003.

11.      The Smithsonian National Museum of Natural History is a massive series of buildings comprised of the Main National Museum of Natural History Smithsonian Building; there is a West Court Building and a West Wing Building on one side; there is an East Court Building and an East Wing Building on the other side.

12.      In 2000, 2001 and 2002, the Entomology Department moved its location to the new East Court Building which was still under some construction in 2002.  The East Court Building is a building between the main building and the East Wing Building.  The East Court Building had its own elevators, floors, and even

windows for light like any other separate building.   During the 2002 period, I worked only six months and only part time and remained almost without exception, in my office on the 5th floor of the East Court Building during my working day.  I would sometimes eat lunch with my colleague Susann Braden who was also a museum specialist and worked at the SEM lab which was located on the main floor near the East Court Building.  There were no posters at or near the SEM lab.

13.   My path to and from work each day in 2002 was the same.  I would:

    1) enter through the main entrance of the National Museum of Natural History ("NMNH"), constitution avenue doors,

    2) walk to the left through the main lobby of the NMNH,

    3) walk to the hallway leading into the East Wing,

    4) walk to the bank of elevators leading to the Court East Building,

    5) take the elevator for the Court East Building offices,

    6) get off on my 5th floor in the Court East Building and go to my office.

There were no posters of EEO information in any of these areas that I routinely used in 2002. Ms. Meltzer, a current Smithsonian employee, signed me into the NMNH as a visitor in October of 2007, and we walked through the six areas of the Smithsonian listed above.  We both noted that there still were/are no posters visible.

14.   I brought my lunch and did not use the cafeteria not only during the 2002 period, but also before the 2002 period.    I did not see posters that were alleged to have been put in the cafeteria or near the cafeteria.

15. I never went to the 3rd Floor "Kerby room" located in the East Court Building in 2002. The 9/10/2002 "Federal Hazard Communication Training" 2002 seminar that was scheduled to be in the Kerby room in 2002 was cancelled. Prior to 2002, I recall that I went to the Kerby room for Stan Shelter's retirement party and for a Blood Borne Pathogen seminar. I never walked by the posters near the elevators on the 3rd floor Kerby room.

16. The Kerby room was a big meeting room taking up most of the space in the center of the 3rd floor of the East Court Building. The floors of the East Court Building are rectangular shaped. The Kerby room, on the 3rd floor of the East Court Building fills almost the entire floor, within halls running its perimeter on each side. There is a front door and back door entrance to the Kerby room and both doors were open when I went to the Kerby room prior to 2002. The 3rd floor elevators face the front door entrance of the Kerby room. The 3rd floor stairwell faces the back of the Kerby room. I never saw any posters in or near the 3rd Floor Kerby room because the Smithsonian says the poster was located by the elevators at the front of the Kerby room, and I used the stairs to enter the Kerby room from the back  To get to the Kerby room, I would take the stairs which were immediately and directly adjacent to my 5th floor office and quickly walk down two flights of stairs to the 3rd floor stairwell exit and then immediately enter the Kerby room from its back door which was open when I was there. This was the shortest route, because using the elevators required walking a further distance from my office on the 5th floor, and because the Smithsonian elevators were notoriously slow when crowded. There were no

posters in the stairwell, near the exit of the stairwell on the 3rd floor, or near the back entrance of the Kerby room or in the Kerby room itself.

17. I went to the West Wing no more than four times in the 2002 period.    The West Wing is far away from my office.  The travel time from my East Court Building to the West Wing Building is considerable, some ten minutes. Much of the reason for the lengthy travel time was the Smithsonian's slow elevators.  I always took a small, public elevator next to the guard's station office on the West Wing side of the main building.  This elevator goes to two public floors and one staff floor, and is faster than the notoriously slow elevators devoted exclusively to the staff.  Once off the public elevator, I would quickly make my way to the stairs which led to the 6th floor of the West Wing.  From the stairwell, I would walk straight down the far hallway, turn right at the end, and walk down the next hallway until I reached Ms. Youmans' office.  I did not pass Ms. Blair's office at all and therefore did not come within sight of the EEO poster which the Smithsonian alleges was between Ms. Youmans' office and Ms. Blair's office. Ms. Blair's office was past Ms. Youmans' office in the hallway that I would walk down in order to reach Ms. Youmans' office.  I returned to my own office by retracing my steps, again not passing any EEO poster.  I never came within eyesight of an EEO poster on the 6th floor.  This is the path that I always took when I worked in the main building, from 1990-2000, before the Entomology Department moved to the East Court building in 2000.

18.    In 2002, I went to the 6th floor West Wing (entomology main office)
approximately 3-4 times.  We had an entomology office, Juanita Hall secretary,
on the 4th floor East Court (my building, one floor below mine), so there was
seldom need to go the long way to the 6th floor West Wing.  Two times that I
went to 6th floor West Wing were to speak with Dr. Scott Miller regarding Dr.
Karl Krombein.  Dr. Miller's dept. chair office was off of Carol Youmans' main
office.  I had to enter Carol's office from the hallway & then go into the smaller
room (Dr. Miller's office).  The 3rd & possibly 4th time I went to Carol's office
was to check on or pick up a box of camera equipment for Ted.Schultz.

19.    My path was not to use the 6th floor West Wing elevators so I would not walk
down the hall where the EEO poster was alleged to have been placed near Ms.
Blair's office.  I always entered the 6th floor West Wing from the opposite end
of the hall, and where the stairwells are located.

20.    My path was to leave my office on the 5th floor East Court and take the East
Court elevators to the ground floor of the East Court.  Then I walked from the
East Court elevator lobby into the main lobby of the main building.  That lobby
is the public area of the Constitution Ave. entrance to the Main Natural History
Building. At the opposite side of that main lobby (west wing side) is a small
public elevator next to the guard's station office.  That small elevator is run by a
guard since it goes to 2 public floors and one staff floor.  (It was usually faster
than the staff elevators).  I would either take it to the 2nd floor public area and
walk through the Mummy Hall & through Hall 27 to the back stairwell of the
main building (staff only) [I previously had an office on Hall 27, from 1990 –

2000, and this is the way I used to take so I knew the way well.]  Or, I would take the little elevator to the 3rd floor Main Building (actually 6th floor numbering since staff areas equal two public areas).

21.     Either way, I would come up the back stairwell or cut through the Mammal area on the 6th floor and take a tiny, twisting hallway from the main building into the west wing.  (Years ago, when I first worked at the museum, I was located on the 6th floor main building, so I was very familiar with this passageway).  I liked walking familiar pathways with good memories. The passageway came out (through a door) onto the rectangular hallway of the 6th floor west wing.  It came out on the opposite side of the rectangle from the entomology main office hallway.

22.     On reason I took this route was to see George Venable.  He was a Scientific Illustrator for the Smithsonian. His office was on the route that I would take through my route of the west wing, 6th floor. Dr. Krombein and I worked with George for years as he did the illustrations for all of our papers. Even after Karl was gone from the museum, I worked with George to finish up some of our papers (a good example is the Florida Perdita..."swimming bees").  I always stopped by to see George when I went to the 6th floor west wing. He had become a good friend.

23.     Also, I would go to the Entomology Library on this route after seeing George Venable.  I had a running list of insect lable data that I was trying to find longitude & latitude for.  Karl's old specimen lables just had a location, date, and collector name.  I would stop in the Entomology Library which had two

large Gazetteers.  I would spend about 30 min.  I remember doing just that in 2002 when I was up on the 6th floor.  Farther down that hallway was Carol Youmans' office.  I stopped in at Carol's after being in the library.  But I would not pass Ms. Blair's office since it was father down the hall from Carol Youmens' office.  I always took this route for 10 years.  My return path was to retrace my steps.

24.  I have never used the PRISM system and was never aware that EEO information was on the PRISM system.  The PRISM system was not on my computer in 2002, and I never received any instruction on the PRISM system.  I used "groupwise" in 2002 to access emails at the Smithsonian.

25.  In deposition, I testified that PRISM had not been installed on my computer, and when asked whether I had any access to PRISM, testified that I had "partial access."  By "partial access," I meant that I was aware that a PRISM system existed and that I believed that I could have asked a coworker to allow me to use his or her computer to access although I had never done so.  I was not, however, aware that PRISM contained any EEO information, nor did I have any direct access to it.

26.  The PRISM was a new system, and was not on my computer in 2002.

27.  Previously, in 2001, I returned to light duty status after attempting a comeback.  I viewed the 2002 return as a repeat of this conduct.

28.  My direct supervisors Dr. Mathis and Dr. Miller did not answer my questions regarding the reason for the termination of the light duty hours.  Dr. Schultz did

not answer my questions either.  Although a few people did respond by email, no one directly answered either question regarding my 2002 disability status.

29.    When I wrote both the coworker and my supervisor back praising our department's compassion, no one corrected my belief or the original statement that I was being given time off to recuperate.  This is what had happened in 2001.

30.    An Entomologist is not a fungible worker in the workplace who can easily obtain employment, and the Smithsonian is a prized and prestigious workplace for an Entomologist. The Entomology Department is a very highly specialized and tight knit group of scientist at the Smithsonian.  I was a Smithsonian employee/scientist who wanted to work and absolutely had to maintain a good working relationship with the Smithsonian and especially with my supervisor, Dr. Schultz.  I felt like I was in an untenable position at the end of November 2002.

31.    I never received such a "Denial of Request" form at anytime during the period 2002 or 2003.

32.    I worked as a museum specialist at the Smithsonian for nearly fifteen years and had consistently received the highest possible evaluation – "Outstanding."

33.    My performance evaluations for both my first 2001 and second 2002 return to work stated that I had performed my work well, and this work was performed well even though I had not received my accommodations for naphthalene sensitivity.

34.     Besides the light duty hours, I also needed additional accommodations for naphthalene sensitivity and a flexible work hour schedule that would allow for my medical appointments.

35.     In the period of May, 2002 through November 2002, I made more than a dozen additional requests for accommodations for naphthalene, including requests for air filter, respirator, transfer to a vacant position in the Smithsonian's "Insect Zoo" which did not use naphthalene, and a "loan" to a sister research facility at the USDA which also did not use naphthalene.

36.     I received no reasonable accommodations at all other than light duty hours. Even after the October 17, 2002 memo by Dr. Lawford and the industrial hygienist from OSEM, I still was not accommodated in any way for naphthalene.

37.     Before I contracted dengue, the Smithsonian allowed me throughout my career to work evenings, weekends, and sometimes from home. The continuation of this flexibility was not allowed by the Smithsonian in 2002.

38.     Under the schedule, I was not allowed to deviate from the "prearranged" schedule for each pay period. This was highly inflexible. For example, on one occasion, I attempted to alter a Monday to a Tuesday on my schedule to avoid riding the metro because of demonstrations in Washington, DC. I could not get a hold of Dr. Schultz whose voicemail was full. [Norden aff., par. 38] Dr. Schultz rebuked me later and accused me of violating the "flexible" schedule. This rebuking prevented me from ever attempting to alter the schedule again. Furthermore, contrary to what the schedule stated the schedule was not

reviewed per pay period ever in order to determine if it needed to be changed or adjusted for the upcoming pay period. The schedule did not allow for emergencies or for my unpredictable migraine triggers such as stress and heat.

39. Dr. Schultz signed a performance evaluation in late July stating that a respirator and an air filter would be provided for me. As of late July, three weeks after the putative refusal, I was still being advised that I would receive one. Dr. Schultz continued to assure me that I would receive both accommodations almost until the day that the Smithsonian forced me to go back onto 100% disability. I welcomed the possibility of receiving both accommodations. I could benefit from the portable air filter while using a microscope, and I could use the respirator when I had to open a specimen cabinet or do other tasks that would cause me to have particularly strong exposure to naphthalene.

40. Dr. Schultz continued to assure me that I would receive both accommodations almost until the day that the Smithsonian forced me to go back onto 100% disability.

41. I have never refused to work on the fourth floor, and I was never instructed to move to the 4th floor.

42. I believe that with the naphthalene accommodations and flex time accommodations that I requested in 2002, I could have gotten a favorable recommendation by my doctors and worked full time hours by the end of the 2002 year.

43. Exhibit 1 is a true and correct copy of February 10, 2003, letter.

44. Exhibit 2 is a true and correct copy of April 7, 2003, OEEMA letter

45.    Exhibit 3 is a true and correct copy of December 6, 2002, letter & Aldrich Aff.

46.    Exhibit 4 is a true and correct copy of December 30, 2002, email

47.    Exhibit 5 is a true and correct copy of January 9, 2003, email

48.    Exhibit 6 is a true and correct copy of Defendants' interr. Answers, no.3

49.    Exhibit 7 is a true and correct copy of Mathis Decl.

50.    Exhibit 8 is a true and correct copy of Hossain Decl.

51.    Exhibit 9 is a true and correct copy of September 10, 2002, email

52.    Exhibit 10 is a true and correct copy of November 29, 2002, email

53.    Exhibit 11 is a true and correct copy of December 3, 2002, email

54.    Exhibit 12 is a true and correct copy of Gover, December 3, 2002, email

55.    Exhibit 13 is a true and correct copy of February 2003 newsletter

56.    Exhibit 14 is a true and correct copy of December 18, 2002, email

57.    Exhibit 15 is a true and correct copy of my email thanking co-workers

58.    Exhibit 16 is a true and correct copy of Schultz depo. 14.

59.    Exhibit 17 is a true and correct copy of December 17, 2003, memo

60.    Exhibit 18 is a true and correct copy of Smithsonian EEO disability procedure

61.    Exhibit 19 is a true and correct copy of Smithsonian EEO disability procedure

62.    Exhibit 20 is a true and correct copy of Court's 8/3/07, order

63.    Exhibit 21 is a true and correct copy of Granite affidavit 12/20/06

64.    Exhibit 22 is a true and correct copy of Norden Affidavit, 12/25/06

65.    Exhibit 23 is a true and correct copy of October 17, 2002, letter

66.    Exhibit 24 is a true and correct copy of Schultz depo., p.143.

67.    Exhibit 25 is a true and correct copy of Lawford email to Dr. Oberg.

68.    Exhibit 26 is a true and correct copy of 2002 work schedule.

69.    Exhibit 27 is a true and correct copy of September 15, 2003, EEO report

70.    Exhibit 28 is a true and correct copy of Schultz depo., p.262.

71.    Exhibit 29 is a true and correct copy of Norden email

72.    Exhibit 30 is a true and correct copy of July 23, 2002, Schultz performance eval.

73.    Exhibit 31 is a true and correct copy of Schultz depo. P.8

74.    Exhibit 32 is a true and correct copy of Miller depo., 80-83.

75.    Exhibit 33 is a true and correct copy of Schultz depo., p.141-142.

76.    Exhibit 34 is a true and correct copy of Miller depo. p. 99-100.

77.    Exhibit 35 is a true and correct copy of Smithsonian admission response No. 16.

78.    Exhibit 36 is a true and correct copy of Miller depo., p.62-66.

79.    Exhibit 37 is a true and correct copy of floor plans for 5th floor court east.

80.    Exhibit 38 is a true and correct copy of floor plans for 6th floor west wing.

81.    Exhibit 39 is a true and correct copy of May 20, 2002, letter to Schultz

82.    Exhibit 40 is a true and correct copy of termination letter October 8, 2004

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 11/18/07

Respectfully submitted,

*Beth M. Norden, Ph.D.*
Dr. Beth M. Norden

15

68.     Exhibit 26 is a true and correct copy of 2002 work schedule.

69.     Exhibit 27 is a true and correct copy of September 15, 2003, EEO report

70.     Exhibit 28 is a true and correct copy of Schultz depo., p.262.

71.     Exhibit 29 is a true and correct copy of Norden email

72.     Exhibit 30 is a true and correct copy of July 23, 2002, Schultz performance eval.

73.     Exhibit 31 is a true and correct copy of Schultz depo. P.8

74.     Exhibit 32 is a true and correct copy of Miller depo., 80-83.

75.     Exhibit 33 is a true and correct copy of Schultz depo., p.141-142.

76.     Exhibit 34 is a true and correct copy of Miller depo, p. 99-100.

77.     Exhibit 35 is a true and correct copy of Smithsonian admission response No. 16.

78.     Exhibit 36 is a true and correct copy of Miller depo., p.62-66.

79.     Exhibit 37 is a true and correct copy of floor plans for 5th floor court east.

80.     Exhibit 38 is a true and correct copy of floor plans for 6th floor west wing.

81.     Exhibit 39 is a true and correct copy of May 20, 2002, letter to Schultz

82.     Exhibit 40 is  a true and correct copy of termination letter October 8, 2004

I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct.


Dated: _____                    Respectfully submitted,



                                          _____
                                          Dr. Beth M. Norden

Plt.  EXHIBIT 1

*FYI - Suzanne*

# BRUCE E. GOODMAN
## ATTORNEY AT LAW
### 7676 NEW HAMPSHIRE AVENUE - SUITE 114
### TAKOMA PARK, MARYLAND 20912
#### TELEPHONE: (301) 408-2445    FACSIMILE: (301) 439-7090

February 10, 2003

ATTN: MS. ANGELA ROYBAL
SMITHSONIAN INSTITUTION
OFFICE OF EQUAL EMPLOYMENT
 AND MINORITY AFFAIRS
P.O. BOX 37012  MRC 921
WASHINGTON, DC  20013-7012

Re: ADA Complaint
Dr. Beth Norden

Dear Ms. Roybal:

Please be advised that I have been retained by Dr. Beth Norden to represent in her with respect to charges against the Smithsonian Institution for violations of the Americans With Disabilities Act (ADA). Please direct all inquires and/or correspondence to my attention at the above-noted address and/or telephone number.

In August 2000, Dr. Norden contracted hemorrhagic fever during the course of performing fieldwork for the Smithsonian Institution. As a result, Dr. Norden has developed an acute sensitization to naphthalene, a chemical being used throughout her department, the Department of Systemic Biology in the National Museum of Natural History. In October 2002, the Office of Safety and Environmental Management requested that Dr. Norden's department develop a plan to control her exposure to naphthalene, i.e., to accommodate her disability. The Department has failed and refused to accommodate Dr. Norden's disability and terminated her part-time work schedule effective November 30, 2002. In light of the foregoing, please consider this letter to be an informal or a formal complaint under the ADA.

Please contact the undersigned to schedule a meeting with Dr. Norden to obtain any further details of this matter, including an affidavit, if necessary and/or required.

Sincerely,

Bruce E. Goodman

**Plt.**    **EXHIBIT 2**

Page 12 of 105

*MEMORANDUM*

**DATE:**       September 15, 2003

**TO:**         Director, Office of Equal Employment and Minority Affairs

**FROM:**       EEO Counselor – Shadella Davis

**SUBJECT:**    EEO Counseling Report – Beth Norden

1. Name, Series, Grade, Job Title, and Office Number of Person Counseled:
Beth Norden, Museum Specialist, GS-1016-11

2. Organization Designation and Location:
National Museum of Natural History
10th and Constitution Avenue, SW
Washington, D.C. 20013

3. Date of First Contact: April 7, 2003

4. Date of Initial Interview: May 14, 2003

5. Bases of Alleged Discrimination: Disability (Hemorrhagic Fever)

6. Date of Alleged Discrimination: Ongoing

7. Claim:
Whether Ms. Norden was discriminated against on the bases of her disability when she was
denied a reasonable accommodation.

8. Corrective Action Requested by Person Counseled:
Ms. Norden requests (1) an accommodation for her disability and (2) to be made whole for all
losses sustained as a result of management's failure and refusal to accommodate her disability.

9. Name and Job Title of Officials Involved:
Scott Miller, Chair, Department of Systematic Biology

10. Summary of Interviews:
Ms. Norden stated that she contracted Hemorrhagic Fever while performing fieldwork, as a
result, she developed an acute sensitization to Naphthalene. She stated that, in October 2002, the
Office of Safety and Environmental Management requested that her department develop a plan to
control her exposure to Naphthalene to accommodate her disability. Ms. Norden stated that her
department failed to develop a plan, and terminated her part-time schedule.

**Plt.    EXHIBIT 3**



**United States Department of Agriculture**

Research, Education, and Economics
Agricultural Research Service

December 6, 2002

SUBJECT:   Employment of Beth Norden in CAIBL

Case 1:05-cv-01232-RMC    Document 35-5    Filed 12/26/2006    Page 48 of 59

TO:   Wayne Mathis
      Research Entomologist / Smithsonian Department of Systematic Biology

FROM:   Jeffrey R. Aldrich
        Research Leader / Chemicals Affecting Insect Behavior Laboratory

A Cooperative Research and Development Agreement has finally been agreed upon and approved by the National Program Staff between our laboratory and Sterling International, Inc., for "Development of a trap and lure for the Asian tiger mosquito, *Aedes albopictus*." Under this agreement we will receive $22,500 per year (after overhead charges) for 3 years. Part of the understanding between Mr. Rod Schneidmiller, President of Sterling International, and myself was that we have an opportunity to enlist the services of Dr. Beth Norden who, for personal reasons, is highly motivated to and desirous of performing the type of research targeted under the CRADA.

As a result of this agreement, CAIBL is now in a position to reimburse the Department of Systematic Biology for the full amount stated above to help defray the salary cost of Dr. Norden. We hope that this funding, plus additional accommodations provided due to the health issues involving Dr. Norden, will be sufficient to enable her to be assigned to our laboratory for an initial period of 1 year beginning as early in 2003 as possible. Toward the end of this first year, the success of Dr. Norden in the project will be evaluated by CAIBL and Sterling International staff for her possible extension for a second year. A similar process will be followed for possible extension of Dr. Norden for a third year.

cc
Ralph Webb
Rod Schneidmiller
Ron Rosenberg
Wanda Collins
Harry Danforth



Chemicals Affecting Insect Behavior Laboratory
10300 Baltimore Avenue X BARC-West, Bldg 007, Room 301 X Beltsville, MD 20705-2350

An Equal Opportunity Employer

Alex T. Sliheet, D.C. Bar No. 438977
Vickie Inge Fang, *pro hac vice*
Attorneys for Plaintiff Beth Norden
8792 Nightingale Drive
Lanham, MD 20706
alexsliheet@yahoo.com
fvickie@comcast.net
(301) 552-4908

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Beth M. Norden, ) | Case No. 051232 (RMC) |
| ) | |
| ) | AFFIDAVIT OF JEFF R. ALDRICH, Ph.D. |
| Plaintiff ) | |
| ) | |
| v. ) | |
| ) | |
| Lawrence M. Small, ) | |
| ) | |
| Defendant ) | |

## AFFIDAVIT OF JEFF R. ALDRICH, Ph.D.

I, Dr. Jeff R. Aldrich, declare:

1. My name is Jeff R. Aldrich. I am over the age of eighteen and competent to

   testify.

1

2. My address is the U.S. Department of Agriculture, BARC-West , Building 007,

   Beltsville, MD 20705.

3. The attached memo which is dated December 6, 2002, is a true and correct copy

   of the memo that I sent to Dr. Wayne Mathis at the Smithsonian regarding

   employment of Dr. Beth Norden in the Chemicals Affecting Insect Behavior

   Laboratory at the USDA based on the USDA having received a grant for 3 years

   to cover Dr. Norden's salary.

I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct.

Dated: 12/15/06

Jeff R. Aldrich, Ph.D

2

December 6, 2002

SUBJECT:     Employment of Beth Norden in CAIBL

TO:     Wayne Mathis
       Research Entomologist / Smithsonian Department of Systematic Biology

FROM:  Jeffrey R. Aldrich
       Research Leader / Chemicals Affecting Insect Behavior Laboratory

Case 1:05-cv-01232-RMC   Document 35-5   Filed 12/26/2006   Page 51 of 59

A Cooperative Research and Development Agreement has finally been agreed upon and approved by the National Program Staff between our laboratory and Sterling International, Inc., for "Development of a trap and lure for the Asian tiger mosquito, *Aedes albopictus*." Under this agreement we will receive $22,500 per year (after overhead charges) for 3 years. Part of the understanding between Mr. Rod Schneidmiller, President of Sterling International, and myself was that we have an opportunity to enlist the services of Dr. Beth Norden who, for personal reasons, is highly motivated to and desirous of performing the type of research targeted under the CRADA.

As a result of this agreement, CAIBL is now in a position to reimburse the Department of Systematic Biology for the full amount stated above to help defray the salary cost of Dr. Norden. We hope that this funding, plus additional accommodations provided due to the health issues involving Dr. Norden, will be sufficient to enable her to be assigned to our laboratory for an initial period of 1 year beginning as early in 2003 as possible. Toward the end of this first year, the success of Dr. Norden in the project will be evaluated by CAIBL and Sterling International staff for her possible extension for a second year. A similar process will be followed for possible extension of Dr. Norden for a third year.

cc
Ralph Webb
Rod Schneidmiller
Ron Rosenberg
Wanda Collins
Harry Danforth

<u>Plt.</u>    <u>EXHIBIT 4</u>

GroupWise WebAccess Message Item                                           Page 1 of 1

## Mail Message                                                           Novell.

Close    Previous    Next    Forward    Delete or Resend    Reply All    Reply    Delete    Read Next    Properties

**From:**    "Ralph Webb" <webbr@ba.ars.usda.gov>
**To:**      Beth Norden
**Date:**    Monday - December 30, 2002 1:38 PM
**Subject:** Happy New Year!
             Mime.822 (1716 bytes)  [View] [Save As]

Hi Beth:

Just a short note wishing you a happy new year.

I understand that Jeff Aldrich has emailed Wayne Matthis concerning your transfer to our unit, but has
received no reply. Is Wayne around? I believe things are finally set on our end, but only Jeff and Wayne
can really speak to this. I hope things are well with you.

Ralph

## Plt.    EXHIBIT 5

~ From: Jeffrey Aldrich ~

Page 1 of 1

AT&T

> Member Services

**E-MAIL**

---

**Mailbox:** abnorden on AT&T Worldnet      **Message:** **4 of 52**
**Current Folder:** **INBOX**

| Reply | Forward | Delete | E-mail Source | Printable View | | Previous | Next |

"Jeffrey Aldrich" <aldrichj@ba.ars.usda.gov>  [ Save Address ]

<abnorden@att.net>

SF-50

Thu, 09 Jan 2003 13:38:46 -0500

Dear Beth,

Please give Mary Beth Donoghue of personnel office a call (504-1333) regarding
official paperwork related to your illness change of status and November 30
termination with the Smithsonian. Its better that you provide this information
directly or give her the authority to contact Smithsonian personnel department.
OK?

Thanks, J. Aldrich

Dr. Jeffrey R. Aldrich / Research Leader
USDA-ARS Chemicals Affecting Insect Behavior Laboratory
BARC-West, B-007, rm 301,
10300 Baltimore Avenue, Beltsville, MD 20705
Office:  301-504-6085; FAX:  504-6580

| Reply | Forward | Delete | E-mail Source | Printable View | | Previous | Next |

Get E-mail  Message List  Compose  Address Book  Mailboxes  Options  Printable View  Help  Feedback  Logout
E-mail  Calendar  Instant Messaging  Webnews  Web Access by Phone  AT&T Worldnet Home

Terms and Conditions  AT&T Online Privacy Policy

http://webmail.att.net/wmc/v/wm?cmd=Show&no=49&uid=1101&sid=c0          01/10/2003

**Plt.     EXHIBIT 6**

3. Plaintiff failed to participate in good faith in the interactive process. While on light duty, Plaintiff was fitted for a respirator, but informed the funds manager in her department not to buy one. Plaintiff did not inform the Office of Safety and Environmental Management that she had rejected the respirator, leading them to believe the department was not following its advice. Following November 30, 2002, when the Smithsonian terminated Plaintiff's light duty assignment, Plaintiff did not inform the Smithsonian that she was capable of working 40 hours a week until the Smithsonian issued the November, 2003 proposal to terminate. Plaintiff requested changes in the Smithsonian's proposed job plan that were unrelated to her impairment (i.e, the inclusion of independent research and the elimination of collections management activities, the educational level of her supervisors). Plaintiff did not identify any actual vacancy at the Smithsonian that she was qualified to fill. Following the termination of her light duty assignment, Plaintiff did not inform the Smithsonian that the USDA had informed her that a detail was possible.

4. The Smithsonian had legitimate non-retaliatory reasons for terminating Plaintiff. Over the course of almost four years, the Smithsonian attempted to return Plaintiff to work in an environment that would not endanger her health and would address the concerns raised by her physicians and her attorney. Ultimately, Plaintiff refused to return to work and thus was terminated for her inability to perform her job functions.

5. Failure to state claim

6. Failure to mitigate damages: Plaintiff has not sought jobs outside of her specific area of expertise.

**Plt.**     **EXHIBIT 7**

DECLARATION OF WAYNE MATHIS

I, Wayne Mathis, do state:

1.   I am a Research Entomologist in the Smithsonian Institution's National, Museum of Natural History.

2.   In 2002, I was the chairman of the Entomology section of the Department of Systematic Biology.

3.   During the summer of 2002, Beth Norden discussed with me the idea of her working at the USDA lab in Beltsville, Maryland.   Norden had been experiencing difficulty with heat, commuting downtown and naphthalene in the department and she believed working in the Beltsville lab might alleviate these problems.

4.   I was in favor of exploring the possibility of such an arrangement.   I called Jeff Aldrich at the USDA Agricultural Research Service, to discuss the possibility of Norden working at the USDA on a detail. I informed Aldrich that the Smithsonian was amenable to detailing Norden to the USDA if the USDA could reimburse the Smithsonian for a reasonable portion of Norden's salary, which the department needed in order to hire someone to perform her work while she was at the USDA.   Aldrich agreed to call me back with the details of the financial arrangement and timing of the detail.

5.   A few months later, Aldrich called and informed me that the USDA had some funds with which it could reimburse the Smithsonian. The amount was far less than originally anticipated and insufficient to allow us to hire someone to perform Norden's duties while she was on detail.

6.   Norden never discussed with me the possibility that the gap between the amount offered by USDA and the department's expense of hiring a replacement might be paid for through Workers Compensation.

7.   Norden did not pursue the idea of the detail with me after the department ended her light duty schedule in November 2002.

Pursuant to 28 U.S.C. sec. 1746 and under penalty of perjury, I certify that the foregoing statement is true and correct.

_____                    17 NOV 2006
Wayne Mathis                                         Date

Plt.     EXHIBIT 8

## DECLARATION OF FARHANA HOSSAIN

I, Farhana Hossain do state:

1. I am a Human Resources Benefits Specialist in Office of Human Resources at the Smithsonian Institution. Within the Office of Human Resources, I am responsible for the National Museum of Natural History.

2. On an annual basis, the Smithsonian pays the Department of Labor for the payments made by the Office of Workers' Compensation Programs to current and former Smithsonian employees.

3. I have reviewed recent quarterly chargeback reports from the Department of Labor, which list all cases and costs for which the Smithsonian is charged on its yearly bill, and have confirmed that the chargeback includes Beth Norden's workers compensation payments.

Pursuant to 28 U.S.C. sec. 1746 and under penalty of perjury, I certify that the foregoing statement is true and correct.

_____          1-8-2007
                                 _____
                                 Date

1

Plt.  EXHIBIT 9

| | |
|---|---|
| From: | Ted Schultz <schultz@lms.si.edu> |
| To: | "Dahlan, Faridah" <fdahlan@onyx.si.edu>, "Mello, Maureen" <Mello.Maureen@NMNH.SI.EDU>, "Suman, Ted" <tsuman@toad.net>, "Corey Washington" <cgw@glue.umd.edu>, "Epstein, Marc" <epstein.marc@NMNH.SI.EDU>, <okonskie@NMNH.SI.EDU>, "Norden, Beth" <norden.beth@NMNH.SI.EDU>, <cm13@cornell.edu>, <schultz@onyx.si.edu> |
| Date: | 9/10/02 3:59PM |
| Subject: | Hazard Class cancelled |

I am so VERY sorry to inform you of the following cancellation:


>Date: Tue, 10 Sep 2002 14:37:41 -0400
>From: "Ted Schultz" <Schultz.Ted@NMNH.SI.EDU>
>To: <schultz@onyx.si.edu>
>Subject: Re: Federal Hazard Communication Training-Delegated
>
>
>
>>>> BLAIRM 09/10/02 14:37 >>>
>
>Please note the email below from Rudy Anderson stating that this training
>has been cancelled.
>
>>>> Rudy Anderson 09/06/02 04:25PM >>>
>Regarding the above subject, the Hazard Communication Training sessions
>scheduled for September 12th & 18th have been canceled. It has been
>determined that the basic training requirement can be provided to NMNH staff
>assigned to NHB via e-mail. Staff will be in receipt of this information by
>the end of this month.
>
>We are also currently reviewing Internet based programs that might be used
>to provide hazard communication training for NHB staff who work directly
>with chemicals.
>
>Thanks to the many staff who had confirmed their attendance at the
>previously scheduled training sessions.
>


--

---
Ted Schultz
Research Entomologist
Smithsonian Institution
PO Box 37012
NHB, CE516, MRC 188
Washington, DC 20013-7012
U.S.A.

schultz@lms.si.edu
Phone (Voice and Fax): 00-1-202-357-1311

Use above address for U.S. Post Office (including Express Mail).

Use address below for private carriers (e.g. Fed Ex, UPS, DHL).

**Plt.    EXHIBIT 10**

GroupWise WebAccess Message Item                              Page 1 of 1

Mail Message

Close  Previous Item    Delete From      Delete From All    Forward Reply to Sender Reply All  Move Delete  Read Later Properties
                        This Mailbox     Mailboxes

**From:**    Beth Norden
**To:**      Kathryn Makos, Rudy Anderson, Ted Schultz, Carol Gover, Thomas Lawford
**CC:**      Debbie Burney, Chandra Heilman
**BC:**      "jcole@mail.his.com".i.SIWP01
**Date:**    Friday - November 29, 2002 1:40 PM
**Subject:** Norden/Naphthalene

In order to keep my records updated, as well as to best work towards the future, I ask for the following information:

1. What meetings (dates), people present, decisions, etc. resulted from the 17 Oct. 2002 memo pertaining to my sensitivity to naphthalene?

2. After today, I am removed from light duty in my dept. How do I know when it might be safe to return if it is the naphthalene which is activating the current blood problems?

3. Will anything dealing with my exposure be different upon return, or is my return based upon no longer being sensitive to naphthalene?

Please excuse my confusion, but major changes have occurred in a short two weeks and I am unclear what I need to do and why I am not part of the decision process. Thank you for your help in providing me with these facts. Beth