Plt.    EXHIBIT 21

Alex T. Sliheet, D.C. Bar No. 438977
Vickie Inge Fang, *pro hac vice*
Attorneys for Plaintiff Beth Norden
8702 Nightingale Drive
Lanham, MD  20706
alexsliheet@yahoo.com
fvickie@comcast.net
(301) 552-4908

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Beth M. Norden, ) | Case No. 051232 (RMC) |
| ) | |
| ) | **AFFIDAVIT OF DR. DAVID S. GRANITE** |
| **Plaintiff** ) | |
| ) | |
| v. ) | |
| ) | |
| Lawrence M. Small, ) | |
| ) | |
| **Defendant** ) | |
| | |

## AFFIDAVIT OF DR. DAVID S. GRANITE

I, Dr. David S. Granite, declare:

1. My name is David S. Granite;  I am over the age of eighteen and competent to

1

testify.  My address is 115 Centerway, Greenbelt, Maryland.

2.  I am a physician, and I have been Dr. Beth Norden's treating physician since 1987

both before she contracted dengue and continue to remain her physician through

the present.  I have seen Dr. Norden each month subsequent to her contracting

dengue.  Each month we talk about the effects of her dengue and her dengue

induced migraines for the past month, as well as other medical issues that may

arise.

3.  In the summer of 2000, Dr. Norden acquired Dengue Hemorrhagic Fever (DHF).

The DHF has globally affected Dr. Norden in terms of suffering neurological

damage, including brain vasculitis, an impaired immune system, and a damaged

hematological system (capillary fragility) resulting in a dramatically increased

tendency towards capillary bleeds and increased keloid formation.

4.  Dr. Norden has the dengue antibodies that weaken her capillary system for the

rest of her life.  The presence of these antibodies is permanent, and their effect on

her capillary system has been ongoing since her exposure to dengue fever.  These

antibodies make the capillaries vulnerable to leaking, and it is the leaking

capillaries that cause severe migraine headaches, severe loss of energy, bruising,

and cognitive impairment.  Dr. Norden also has difficulty thermo regulating, due

to the dengue antibodies, and the dengue antibodies cause her immune system to

be compromised and function in an abnormal manner so that any infection can

cause severe and alarming results.  In September 2006, she experienced a cat bite

2

that caused a severe hand infection. This infection was followed by neuroma and keloid formation due to the Dengue antibody induced vasculitis.

5.  Finally, being chronically ill with DHF makes Dr. Norden much more susceptible to depression.  The medications used to manage the effects of dengue, particularly migraines, cause severe disruption in her sleep pattern. DHF causes capillary fragility. Therefore, Dr. Norden cannot take antidepressant medications that also compromise capillary integrity.  In addition, Dr. Norden cannot take triptan medications for her migraines and is limited to taking narcotics for that severe pain.  Therefore, from December of 2005 through the spring of 2006, Dr. Norden agreed to try painful experimental steroid injections into her fifth cranial nerve in an attempt to control the migraines.  The injections themselves caused severe migraines, incapacitating her for days at a time.  The treatment ultimately reduced the intensity of the migraines but did not stop them. The beneficial effects of the treatment have not lasted.  Dr. Norden will begin the treatments again in January of 2007.

6.  Dr. Norden will carry the dengue antibodies for the rest of her life. The past and current effects that the dengue antibodies have on Dr. Norden's health in terms of capillary fragility are of a long-term nature and their effects on her health will in all probability be permanent.

7.  Dr. Norden is prone to easy bleeding and recurrent severe migraines caused by a variety of triggers including heat, stress, certain chemicals, medical procedures,

Case 1:05-cv-01232-RMC    Document 35-4    Filed 12/26/2006    Page 3 of 5

and barometric pressure.

8. Dr. Norden's migraines since contracting DHF are atypical in their extreme severity. The migraines she experiences are totally incapacitating. She experiences severe vomiting, loses vision, has excruciating pain, disorientation, and cannot stand or do any other task over a period of one to several days.

Case 1:05-cv-01232-RMC    Document 35-4    Filed 12/26/2006    Page 4 of 5

9. Dr. Norden's easy bleeding is exacerbated by naphthalene exposure. During the period when Dr. Norden was exposed to naphthalene in 2002, Dr. Norden had increased blood in her urine, nosebleeds and easy bruising.

10. I see Dr. Norden each month and we talk about the effect of her dengue and her migraines for the previous month. The frequency with which Dr. Norden suffers from dengue-produced migraines varies depending on the presence of triggers. These triggers include the aforementioned heat, stress, certain chemicals, medical procedures and barometric pressure. Dr. Norden has never had a month free of dengue-induced migraines. Dr. Norden cannot control the frequency or duration of the triggers. The migraines follow accordingly. For the period from 2003 through 2005, she has had many episodes of total incapacitation from the migraines that lasted from 3 to 6 days in a particular month.

11. I believe that Dr. Norden is capable of working in an environment that is adjusted to her situation. Such adjustments would include but are not limited to the absence of toxins that may aggravate her vascular sensitivity. Thus, Dr. Norden requires control procedures to limit her exposure to naphthalene. She also requires

4

flexible work schedule to deal with the unpredictability of the DHF induced severe migraines. Her capillary fragility impedes her healing when other medical conditions occur. Consequently, she requires close medical monitoring whenever she is experiencing any other disease entity or injury.

Case 1:05-cv-01232-RMC    Document 35-4    Filed 12/26/2006    Page 5 of 5

12. Increasing Dr. Norden's direct naphthalene exposure by increasing her contact with specimens is directly contrary to the advice I gave in 2003 for Dr. Norden's return to work. Eight hours of "flex time" every two weeks is very unlikely to be adequate for Dr. Norden's medical needs.

13. Any work plan that might create a sense of devaluation is not medically advisable. The neurological trauma Dr. Norden suffered because of the DHF predisposes her to depression.

14. Dr. Norden suffers sleep disturbance consequent to the narcotic medications she must frequently take for her severe migraines. As noted previously, she cannot tolerate the usual medications for migraine since they aggravate her capillary fragility. Therefore, she must rely on narcotics, which in turn disrupt her sleep. I believe she will be forced to take narcotics for pain relief indefinitely.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 12/20/06                    _David S. Granite MD_
                                   David S. Granite, M.D.

5

**Plt.    EXHIBIT 22**

Alex T. Sliheet, D.C. Bar No. 438977
Vickie Inge Fang, *pro hac vice*
Attorneys for Plaintiff Beth Norden
8702 Nightingale Drive
Lanham, MD 20706
alexsliheet@yahoo.com
fvickie@comcast.net
(301) 552-4908

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Beth M. Norden, ) | Case No. 051232 (RMC) |
| ) | |
| ) | **PLAINTIFF'S AFFIDAVIT IN** |
| **Plaintiff** ) | **OPPOSITION TO DEFENDANT'S** |
| ) | **MOTION FOR SUMMARY JUDGMENT OR** |
| v. ) | **IN THE ALTERNATIVE** |
| ) | **SUMMARY ADJUDICATION** |
| Lawrence M. Small, ) | **(IN SUPPORT OF PLAINTIFF'S REPLY** |
| ) | **BRIEF)** |
| **Defendant** ) | |

### AFFIDAVIT OF BETH NORDEN

I, Beth M. Norden, declare:

1.  My name is Beth Norden. I am over the age of eighteen and competent to

testify. My address is 112 Greenhill Road, Greenbelt, Maryland. I am a former

Smithsonian employee who holds a Ph.D. in entomology.

1

2.      The Smithsonian never told me that it was not approving my need for

naphthalene accommodations at any point in time in the 2002 through 2004 period.

3.      I was fitted for a respirator in May of 2002, my evaluation states that the

naphthalene accommodations were forthcoming on July 22, 2002, and Dr. Schultz told me

in the same month that I was removed from my light duty status in November of 2002,

that the respirator and the air filter were on the way.

4.      On November 29, 2002, I sent an email to numerous people including Dr.

Schultz, Dr. Miller, Dr. Mathis, Carol Gover (of the Smithsonian Office of Equal

Employment and Minority Affairs OEEMA), Smithsonian consultant Dr. Lawford, asking

among other things: "How do I know when it might be safe to return if it is the

naphthalene which is activating my current blood problems?"  And "Will anything dealing

with my exposure be different upon return, or is my return based upon no longer being

sensitive to naphthalene?"   Although a few people did respond by email, no one answered

either question.

5.      From my receipt of the November 18, 2002, letter through November 29,

2002, I engaged in the interactive process regarding my naphthalene accommodations, and

I initiated contact: 1) with three of my supervisors, 2) with the Smithsonian Ombudsman

Chandra Heilman, 3) with Dr. Lawford of the Office of Safety and Environmental

Management, 4) with Carol Gover, Smithsonian Program Manager of the Office of Equal

Employment and Minority Affairs – OEEMA.  When I initiated contact with all of these

2

individuals as described above, I spoke of my lack of receiving accommodations for my

naphthalene sensitivity and my lack of knowledge as to when or if such accommodations

would be forth coming in the future.   None of my 3 supervisors responded to my

questions.

Case 1:05-cv-01232-RMC   Document 35-3   Filed 12/26/2006   Page 3 of 18

6.      Also, prior to the November 18, 2002, removal letter, on October 8, 2002,

I met with Chandra Heilman, Smithsonian Onmsbudsman to discuss my need for

accommodation for my naphthalene exposure.  Ms. Heilman called Carol Gover,

Smithsonian Program Manager of the Office of Equal Employment and Minority Affairs

from Ms. Heilman's office, and I also personally spoke with Ms. Gover about my needs

for naphthalene accommodations.

7.      I had no actual notice of the EEO posters which I have never seen.

8.      I had never previously used the EEO complaint procedures prior to April 7,

2003, and this includes when I complained solely to my supervisor of sexual harassment

and took no further action.

9.      There were no posters at the public entrances or exits and those were the

only entrances and exits that I used in my section of the building.  I did not use the staff

entrances and exits, and I brought my lunch and did not use the cafeteria.

10.     I did not see any posters that are alleged to have been put in the cafeteria

or anywhere else.  The Smithsonian is a huge series of buildings, with many sections, and I

would remain in my section.

3

12.     My stress level is exacerbated on the following day when I am unable to sleep at night.

13.     I experience nightmares on almost a nightly basis.  These nightmares and disruption in my sleep pattern, also cause me to feel stress the next day.  I have had to

Case 1:05-cv-01232-RMC     Document 35-3     Filed 12/26/2006     Page 4 of 18

wear a night guard in my mouth each night to prevent me from grinding my teeth when I sleep, and I have actually bitten through one night guard and broken another.

14.     The Smithsonian placed me on disability leave after removing my light duty hours in November of 2002, and assisted me with the process of receiving disability pay from the Department of Labor.

15.     All I ever needed to be able to work full time at my job were a few reasonable accommodations for my naphthalene trigger such as an air filter / respirator as well as sufficiently reasonable flex-time to deal with the incapacitation from the uncontrollable triggers for my migraines and to deal with the close medical monitoring that is necessary whenever I am sick or injured.

16.     Before I contracted dengue, the Smithsonian allowed me throughout my career to work evenings, weekends, and sometimes from home, and the continuation of this flexible schedule would have allowed me to work full time hours in my present dengue situation.

17.     The Smithsonian never gave me a Denial of Request form.

18.     This Washington National Zoo job was outside of my education and

experience as an entomologist.  I did not have the mandatory qualification for the

Washington Zoo job that is explicitly identified in the advertisement and the Smithsonian

told my attorney that I would be required to demonstrate such qualifications in order to be

given the job.  I do not have any knowledge of wildlife or zoo registration procedures or

Case 1:05-cv-01232-RMC     Document 35-3     Filed 12/26/2006     Page 5 of 18

the federal state and local laws  or collections registration process as to wild animals or

zoo animals.  I immediately and in good faith, informed the Smithsonian of this fact, and

that I was not even qualified to apply for the job.

19.     I was still out on defendant's forced disability leave when I additionally

filed an informal EEO complaint based on Dr. Schultz's letter threatening to remove me

from the Rolls.

22.     I was originally hired to be a research assistant by the Smithsonian.

23.     I was hired to be a research assistant and that was my primary

responsibility from 1985 through 2004.  I also performed some of the collection tasks.

24.     A percentage breakdown of my research support work 70%, versus

collection support 30%, is a good representation of the percentage breakdown over my

entire career at the Smithsonian.

25.     My research with Dr. Krombein led to the publication of papers, and my

research with Dr. Schultz also led to the publication of papers as well.  I published at least

3 papers with Dr. Schultz.

5

26.     The collection support that I performed never exceed 30%, except on

special occasions and for brief periods of time when it rose to 50%, for example, the

relocation of the Entomology Department in 1997.     During most of 1997, however, I

was in Sri Lanka doing full time research as a result of my Fulbright Research Scholarship.

27.     From 1985 through 2000, I, was a research support scientist, and I was

only exposed to ambient naphthalene in the air and only directly exposed to naphthalene

when I was doing work involved with my research support projects, some 20% -30% of

the time.

28.     The 2004 return to work plan limited my tasks to 100% collections work

which is not based on specific research projects, and thus dramatically increased my

exposure to naphthalene.  The collection tasks in the 2004 return to work plan involved a

dramatic increase of direct exposure to naphthalene by requiring me to do repetitive daily

tasks involving repeatedly opening the air-tight cabinets (that have a built up concentration

of the naphthalene) and by repeatedly working with the naphthalene filled specimens in a

non research capacity.

29.     From 1985 through 2002, I was a research support scientist and performed

research support scientist tasks.  I had time deadlines on a project basis and not on my

daily tasks.

30.     I objected to the time constraint in the 2004 return to work plan as stress

provoking and unmanageable.

6

31.     The Smithsonian's 2004 return to work plan replaced my research support tasks with 100% collections work, and I felt a severe sense of devaluation and depression at this prospect.

32.     Throughout my entire career in my previous job of research support, I

enjoyed flex hours including working from home, coming in early or staying late, and working on the weekends.  I could have met my full-time hours had the return to work plan provided for the continuation of this long standing flex hours provision.

33.     In the period of May 2002 through November 2002, I made more than a dozen additional requests for accommodations for naphthalene, including requests for air filter and for a respirator.

34.     Although I was: a) tested and fitted for a respirator in May of 2002, b) the funds were approved for it, c) the Smithsonian physician consultant and the Smithsonian's industrial hygienist both urged management to adopt numerous accommodations for me including the respirator, the Smithsonian never purchased or gave me the respirator.

35.     I never received the respirator or any other accommodation for my naphthalene sensitivity.

36.     On July 5, 2002, I was in Ms. Carol Youmans section of the building and had another nose bleed, and I was in the ladies bathroom.  Ms Youmans is the Smithsonian secretary who would actually place the order for the respirator.

37.     Ms. Youmans came into the bathroom, and I told Ms. Youmans that I

7

could not use the respirator while looking into the microscope, and that perhaps an air filter would be better.

38.    Ms. Youmans never informed me at any time that she was waiting for more information from me. I sent her a July 5, 2002, memo asking if I could have an air filter

instead of the respirator because I could not use the respirator when I used the microscope.

39.    I did not receive any accommodation for naphthalene in the period of 2002 through 2004.

40.    As of late July, three weeks after my July 5, 2002, memo, the department was still claiming that it was attempting to purchase a respirator, and I was still being advised that I would receive one. Dr. Schultz signed my performance evaluation in late July stating that a respirator and an air filter would be provided for me.

41.    Dr. Schultz continued to assure me orally that I would receive both a respirator and an air filter almost until the day that the Smithsonian forced me to go back onto 100% disability.

42.    Not only did the "ventilated room" on the fourth floor lack both the computer and the specimens I needed, it was also kept locked, and I was denied a key by Collections Manager Dr. David Furth when I asked him for one.

43.    Other than the statement by Dr. Schultz to me that if I had a problem with naphthalene I could use the 4th floor for the period of time that he would be going out of

8

town, I never heard anything from the Smithsonian about the 4th floor being considered as a possible accommodation, and I never refused to relocate to the fourth floor.

44.     My doctor had advised me that he would reconsider my ability to work without the light duty accommodation at the end of 2002. I continued to believe that I

would eventually receive naphthalene accommodations and that once I had them, I would be able to work full time.

45.     In November of 2002, I advised Dr. Schultz that my doctors would be evaluating me at the end of the year and that I believed that I could work full time with the accommodations for naphthalene, and he again promised that I would receive accommodations.

46.     On November 18, 2002, I was given a memo instructing me that my light duty accommodation was terminated as of the end of the month. I asked three supervisors to explain the memo to me and none of the three would do so.

47.     I then sent a memo to Dr. Lawford asking him what he knew about the decision to terminate my light duty. On November 23, 2002, Dr. Lawford replied that he, Dr. Schultz, Marilyn Slomba, and possibly the industrial hygienist held a meeting prompted by his October memo explaining that my doctors would revisit my need for light duty at the end of 2002. According to Dr. Lawford, Dr. Schultz said, "Well if her doctors can revisit it on Dec. 31, we can revisit it too." Dr. Schultz then asked Ms. Slomba if "we have to offer light duty" and was told "not if it is insufficiently productive toward the

departments goals."

48.    I did not know what else to do regarding ascertaining whether naphthalene accommodations would be given to me by the Smithsonian in the future.

49.    I believe that with the naphthalene accommodations and flex time

accommodations that I requested in 2002, I could have gotten a favorable recommendation by my doctors and worked full time hours by the end of the 2002 year.

50.    In mid 2002, I talked to Dr. Ralph Webb at the USDA regarding creating a new position for me so that I could be "loaned" to USDA to do research.

51.    Dr. Webb's supervisor Dr. Aldrich had me come spend a day in the USDA lab to ascertain that I would not have any negative reactions, and I completed the day successfully.

52.    In July of 2002, I spoke to Dr. Mathis, Dr. Schultz' supervisor, at the Smithsonian to ask for permission to pursue this new position. Dr. Mathis ridiculed and intimidated me by suggesting that at my age I was probably menopausal and that my menopause was making my overly emotional on the subject of naphthalene.

53.    Dr. Mathis told me to go ahead subject to Dr. Lawford's approval. Dr. Lawford subsequently gave enthusiastic approval.

54.    Although the Smithsonian did not follow through on the USDA "loan" job, in the spring of 2003, I began doing substantial volunteer work with Dr. Aldrich's lab at the USDA performing research, and this work lead to the publication of several papers.

55.     The effect of the lack of response by the Smithsonian regarding the USDA

position was to discourage me from submitting additional requests for a transfer for other

jobs.

56.     Chandra Heilman suggested, encouraged and helped me pursue a position

at the Museum's Insect Zoo that had just become available and had not been advertised.  I

am thoroughly familiar with the Insect Zoo, and I have done work for the Insect Zoo

throughout much of my career.

57.     I have published over 10 papers, 2 children's books, and I have contributed

with others in writing over 100 articles as well for the Insect Zoo.  My performance

evaluations cite this work as one of the reasons that I received the rating of

"Outstanding."

58.     The Insect Zoo has a picture of  me on its wall performing research.

59.     I agreed to seek the Insect Zoo job and got approval from my supervisor

Dr. Schultz.

60.     Because the job was not yet advertised, Mr. Ross Simmons, Associate

Director of the Museum of National History had to approve my taking the position.  Ms.

Heilman talked with Mr. Simmons, and told me that Mr. Simmons had declined to give the

position to me.

61.     Ms. Heilman told me that is was political, and I never got any other answer

11

as to why I was not allowed to take the Insect Zoo position in 2002.

62.    In 2004, the Insect Zoo position was open again.  I asked Mr. Nate Erwin, Director of the Insect Zoo, if the advertised GS-9 position could be upgraded to GS-11, and he answered yes.

Case 1:05-cv-01232-RMC    Document 35-3    Filed 12/26/2006    Page 12 of 18

63.    I then asked Director Erwin if I could apply even if Ross Simmons had previously said no.

64.    Director Erwin answered that if Ross Simmons had previously refused my request, then I should not waste my time, and I therefore did not apply for the position.

65.    I believe that I was more than qualified for the Insect Zoo position and that it was an excellent accommodation to reduce, if not eliminate, my naphthalene induced migraines, as well as to greatly reduced the stress trigger for my migraines.

66.    There is almost no naphthalene associated with the Insect Zoo position.

67.    The Insect Zoo job was amenable to both research and writing as I had demonstrated throughout my career by publishing many books and articles on my own and in association with others for the Insect Zoo.

68.    The fact that the Insect Zoo is open 7 days a week would have allowed the flex time availability that I needed as an accommodation in terms of being able to work weekends if I so needed due to my disability.

69.    Although all research starts with work collecting and preparing the specimens, the research work involves additional multiple steps and intellectual tasks

12

above and beyond the collection work and it is the research work that leads to the

advancement of science, the intellectual challenge and the publication of papers.

70.     I identified other jobs that became available and that called for an

entomologist in 2004, but the Smithsonian never offered or brought these jobs to my

attention.

71.     I provided my resume to the Smithsonian in 2004 upon their request and

before the Smithsonian sent me the Washington National Zoo job offer.

72.     I was not told at anytime that two individuals would be performing the

tasks in the return to work plan that was presented to me in 2004.

73.     I mentioned the problems I was having to a friend at church who was an

attorney, and he referred me to an attorney.

74.     I admit that I was a GS-11 Museum Specialist during the relevant time

periods, but I dispute that my position is set forth in either the position description 39725

cover sheet or the position description which follows the cover sheet in Defendant's

Exhibit 1.  In 1997, I was in Sri Lanka with my unofficial supervisor Dr. Karl Krombein.  I

was never shown Exhibit 1 at  anytime during my employment with the Smithsonian.  I

began working at the Smithsonian as a GS-9 and was never a GS-5 or GS-7.   I never

served as a technician.  Throughout my career, I always held the more highly ranked

position of Museum Specialist.  I never held position descriptions numbered 39726,

39727, and 39729.  My position description was number 032204.  My previous position

13

descriptions had only my name on them, and they were only issued when I was first hired, and then when I was promoted. I did have a coworker named Gloria House who worked in the Collections Management Unit at the Smithsonian. The first time that I ever saw this alleged position description was in the spring of 2004 when Ms. Slomba faxed it to my

counsel with the statement that the return to work offer would be consistent with this position description.

75.    I was forced to go on workers' compensation, but the payments were funded by the Department of Labor, not the Smithsonian.

76.    My limited duty hours were suspended because I was not given any accommodations for my naphthalene sensitivity by the Smithsonian in order to have a chance to demonstrate that I could work full-time hours with such accommodations by the end of 2002. I never rejected any naphthalene accommodations. I met my limited duty hours of 20 hours per week for the final nine weeks prior to the removal of my light duty hours in November of 2002.

77.    I did not work in the areas described in the defendant's affidavits. The "PRISM" system on my computer through which the Intranet was accessed was never made functional, and, as far as I know, I had no way to access the in-house Smithsonian information regarding employee Equal Opportunity Rights. I have no actual notice of the EEO posters which I had never seen. I have never previously used the EEO complaint procedures prior to April 7, 2003, and this includes when I complained solely to a

14

supervisor of sexual harassment and took no further action.  There were no posters at the

public entrances or exits and those were the entrances and exits that I used.  I did not use

the staff entrances or exits, and I brought my lunch and did not use the cafeteria.

Therefore, I would not see any posters that are alleged to have been put in the cafeteria or

elsewhere.  The Smithsonian is a huge series of buildings, with many sections, and I would

remain in my section.

78.     There were very significant gaps in my receipt of workers' compensation

payments, and these payments were not for the full amount of my Smithsonian salary.

79.     After my November 13, 2003, letter, when I requested to come back to

work with accommodations, I complied with the Smithsonian's request to timely submit

letters from my doctors in 2003.   The Smithsonian remained silent until some 5 months

later when I received the Smithsonian's proposed "Settlement Agreement" in April of

2004. There was no discussion of my needs for accommodations or my doctor's concerns

for my health regarding retaliation or hostility as to my requests for accommodations,

which were all stated in my November 13, 2003, letter.

80.     The proposed work plan was originally not included in the agreement that

was sent and designated as non-negotiable.  Only on the prompting of my counsel did the

Smithsonian send the work plan part of the agreement.  Ms. Nancy Adams had told me

that Ms. Slomba did not intend to send the work plan unless it was specifically requested.

81.     I objected to the performance work plan as well as the proposed

15

settlement agreement.

82.     I had great respect and considerable fondness for Nancy Adams as a

person.  I also believed that Ms. Adams took her job as a museum specialist very

seriously.  I did not consider Ms. Adams a scientist, however.  No one told me that two

people were to do the tasks in the work plan that was given to me.

83.     While the collections work described in the Proposed Return to Work Plan

might or might not have been consistent with some museum specialist's duties, they were

not consistent with the primary responsibility and duties that I had performed in my more

than fifteen year tenure with the Smithsonian.

84.     Ms. Nancy Adams stated to me that she was afraid that both of us were

"being set up" by the return to work plan proposal.

85.     I admit that my previous work involved exposure to both direct and

ambient naphthalene, for which I was never given any accommodations.  The 2004

proposed work plan would greatly increase the more harmful direct naphthalene exposure.

86.     I admit that I could no longer work with Dr. Krombein since he was no

longer at the museum, but I strongly deny that there was no opportunity for me to do

research support at the Smithsonian. The Brazil trip on which I contracted DHF was the

start of a major Hymenoptera research project funded by the National Science Foundation

and led by Dr. Schultz .  I functioned as Dr. Schultz's research assistant on the project.

87.     After I contracted DHF, Dr. Davis told me that he would like to have my

16

assistance on the monograph he was working on.  He had lost his former assistant and

needed help with both research and SEM photography.   I  was quite willing to have all or

part of my time assigned to Dr. Davis, and I told him so.   Dr. Davis responded that he

would speak to Dr. Mathis about the possibility of reassigning some of my time to him,

but neither Dr. Mathis nor anyone else brought the subject up again.  Years later, I met up

with Dr. Davis socially in the fall of 2005.    At that time Dr. Davis again told me that he

still would need help on the monograph.  I was  qualified to assist him in his work.

88.  The proposed work plan did not include my previous primary responsibilities

for research or research support tasks and activities.  The proposed work plan also did not

include any association with other scientists or research projects.

89.  Ms. Slomba did not investigate my objections that I submitted to the work

plan by contacting me or my doctors.   After November of 2002, no one at the

Smithsonian ever spoke to me or my counsel about how best to accommodate my

disability.

90.     I admit that I did not have the mandatory or even the recommended

qualifications required for the proposed Washington National Zoo job vacancy, that the

Smithsonian was aware of these facts from my resume which was previously submitted,

from my work history at the Smithsonian, and/or from my supervisors, and that I would

have violated the good faith requirements of the interactive process if I had claimed that I

did have these mandatory and recommended qualifications.

I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Case 1:05-cv-01232-RMC    Document 35-3    Filed 12/26/2006    Page 18 of 18

Dated: 25 Dec. 2006

Respectfully submitted,

_Beth M. Norden_

Dr. Beth M. Norden

<u>Plt.</u>   <u>**EXHIBIT 23**</u>

3013451697

OCT 02, 2006 17:36

## Smithsonian Institution                                      Memo

~~~ meeting~~~

Office of Safety and Environmental Management
Environmental Management Division

Date   October 17, 2002

To     Scott Miller, Chair
       Department of Systematic Biology, NMNH

cc     Ross Simons
       Wayne Mathis
       Ted Schultz
       Rudy Anderson
       ~~Beth Norden~~

Through  Rachel L. Gregory, Assistant Director  *Rachel L. Gregory*   *Walter G. Bailey*
         Walter G. Bailey, Assistant Director for Occupational Health Services

From    Thomas Lawford, M.D.  *TL by kam*
        Kathryn Makos, Industrial Hygienist  *Kathryn Makos*

Subject  **Naphthalene Exposure Control Options for Beth Norden**

ACTION REQUIRED: Respond, as soon as feasible, with plan of action based on recommendations.

This memorandum outlines recommendations for managing potential occupational exposure to naphthalene for Dr. Beth Norden, of your staff. With the concurrence of Dr. Norden's personal physician, Dr. David Granite, we recommend that she be relocated to a work area free of naphthalene supplies and, to the greatest extent feasible, be allowed to work with collections without residual naphthalene vapor associated with past storage and treatment practices.

Background

Dr. Norden appears to have developed an acute sensitization to naphthalene as a side effect of hemorrhagic fever contracted in the course of fieldwork for the Smithsonian Institution in August 2000. Since returning to work in the Court East, 5th floor, she has progressively exhibited symptoms, including nosebleeds, intense headaches, and nausea. Both hemorrhagic fever, and naphthalene, can cause these symptoms, as well as hematological dysfunction. In addition, naphthalene exposure can inflame nasal passages and vessels. In Dr. Norden's case, the two conditions appear to be acting in concert to aggravate her symptoms considerably.

Ambient air monitoring conducted on Dr. Norden's floor revealed naphthalene concentrations of 0.039-0.100 parts per million (ppm) in the adjacent office and in the hallway outside her office. These concentrations are significantly less than the Permissible Exposure Limit of 10.0 ppm for naphthalene, established by the Occupational Safety and Health Administration (OSHA). However, the exposure standards established by OSHA

PO Box 37012
Victor Building , Suite 9100, MRC-932
Washington DC 20013-7012
202.275.1167 Telephone
202.275.0746 Fax

3013451697

OCT 02,2006 17:36

are based on a relatively healthy worker population, not a community with wide variance in age and health histories, and are not meant to accommodate highly susceptible individuals.

Over the past six months, this office has consulted with her immediate supervisor, Dr. Ted Schultz, her personal physician, and had conducted inspections of her work areas with Mr. Rudy Anderson, NMNH Safety Manager. Exposure control options were discussed with Drs. Schultz and Norden, but it is unclear as to how fully these have been attempted. It would be of value, at this point, to systematically re-evaluate the feasibility of these options, in the new context of relocation to a naphthalene-free environment.

### Discussion of Control Options

Based on Dr. Norden's description of her typical tasks, an acute exposure to naphthalene might be initiated upon opening treated cases to retrieve specimen drawers. Dr. Norden has been medically certified, trained, and fit-tested to wear a full-face air-purifying respirator for this task. However, Dr. Norton reported that a respirator, loaned to her from this office to assess its effectiveness, was unwieldy and impractical. Dr. Schultz, and Dr. David Furth, collections manager, agreed that technicians, in most cases, could accomplish the "pulling" task. Although naphthalene may have been added to the perimeter of a specimen drawer, the boxes of specimens within each drawer are typically not treated. Dr. Furth suggested that these boxes could be removed to a new, untreated drawer, by technicians, prior to any examinations by Dr. Norden. If Dr. Norden is required to open treated collection cases for any reason, or work with drawers containing naphthalene, she must wear the appropriate respirator, which the department is responsible for providing.

Another option discussed would be to purchase a table-top ductless fume hood for Dr. Norden's office, under which treated specimens and/or drawers could be left while she works. These cost in the range of $2500-3500 for a unit with appropriate alarms and breakthrough monitoring ports. We have researched four major vendors, several of which have units of the dimensions which could fit into her office. However, given the fact that this unit would still not vent the ambient office and collections area, it seems best for her to attempt to do the majority of her work in a relatively naphthalene-free environment.

The selection of suitable alternative work sites is within your purview, as we are not aware of all the possibilities. However, consideration might be given to the laboratories at the Museum Support Center, or a Court East office on a floor not associated with a naphthalene storage collection. A lesser option would be to move Dr. Norden's microscope and examining station, and data entry equipment, to the Court East, 4th floor processing room. This room does not contain treated cabinets, according to Dr. Furth, and contains table-height wall return slot grilles which were designed specifically for the purpose of venting residual vapors from treated collections while they are being examined or catalogued.

We ask that you notify us as soon as possible as to the course of actions to be taken to minimize naphthalene exposure to Dr. Norden in the course of her work. We are continuing to provide medical and industrial hygiene oversight in the management of this case, and remain available to consult with you as to these recommendations. Should you wish to discuss this case further, please contact us at either 202-275-9286 (Dr. Lawford) or 202-275-0705 (Ms. Makos).

**Plt.     EXHIBIT 24**

Schultz

143

Q    Right.  There is an initial clause in
the next sentence that says "if you have problems
with naphthalene."  Was there any question in your
mind at this point on September 30, 2002, as to
whether Beth had problems with naphthalene?

A    Well, I don't think I meant it in that
way.

Q    Yeah.  I'm just giving you the chance to
explain how you meant it.

A    Okay.  There was no doubt in my mind
that naphthalene was exacerbating her condition, so
that's not what I meant.

Q    Yeah.  Okay.  Going back for just a
moment to Smithsonian 1927, the July 5th e-mail.

MR. HENAULT:  For the record, that's
Plaintiff's Exhibit 11.

BY MS. FANG:

Q    This is just a minor point, I think.
There has been an interrogatory answer that says
when Beth refused the respirator, she told Carol
not to order it, she didn't tell the occupational
safety people.  Seeing that this e-mail is copied

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Plt.    EXHIBIT 25**

### Beth Norden – Dengue Hemorrhagic Fever – summary to date

**To: Dr. Don Oberg  email**                        **301-220-0707**

Medical Aspects: Beth acquired (read 'caught') Dengue Hemorrhagic Fever (DHF) in August 2000 on a Smithsonian sponsored entomologic trip deep into Brazilian jungle. It is a viral disease transmitted by mosquitoes, and is thought to have 4 serotypes. The old fashioned name for Dengue is Breakbone Fever due to the intense skeletal pain that is experienced. The Hemorrhagic variety is much much worse, and is thought to be set in motion by first catching one serotype, and later in life catching a different serotype. This sets up an autoimmune phenomenon directed against the intracellular seals of capillary wall cells, making the capillaries leaky. There is no platelet dysfunction.

Beth became extremely ill (had a very good chance of dying) upon return from Brazil in August of 2000. Her illness consisted of intense migraine-like headaches all day every day, total body wide purpura seen on patches of skin over her entire body which would form where ever she rested an arm or leg against anything for a few minutes. An encephalitic dementia was a prominent part of the picture, with a fugue state and confusion. In addition she had visual difficulties. She learned in the next summer that she could no longer sweat and her thermoregulation was poor.

For a brief time she was turned away by hospital ER's and the rest of the medical establishment because "If you say its workmens comp your insurance won't pay us, and until you get Dept of Labor (DOL) approval, they may never pay us either." I suspect the DOL had never been faced with a claim like this, and it didn't fit the cookie cutter pattern of strained backs and knees. I and my nurse visited the DOL on N. Capitol Street and made a plea for acceptance. The DOL accepted her and she was admitted to GTU.

After a period of hospitalization and stabilization, she was sent home.  Home in a state of stultification and confusion with intense pain that was to last for months, with body wide under-skin hemorrhages. I have a dental report from months later where Beth had crushed a rear molar by grinding her teeth in a state of blinding headache and encephalitic confusion.  Beth has related to me that in perhaps the first 6 months she had difficulty reading a computer screen or a newspaper. When she got to where she could read a newspaper, it left her confused and she couldn't grasp what she had just read.  For someone who is a Fullbright Scholar, PhD in Entomology – and who lives in a world of ideas, this is a truly frightening and depressing state to be in.  To be trapped at home in pain and confusion and unable to read for distraction, or to manage the torrent of DOL paper work required is a real downer.

Eventually in 2001 Beth through her physicians wanted to attempt a part time return to work. Her department was rather casual and said sure, why not. I gather from the record that several stressors combined were too much for her and she had to retreat back to home.  Summer heat worsened her considerably. Getting to and from work on bus – subway also caused an increase in migraines.  The ever present smell of naphthalene in her department cause and increase in nosebleeds and headaches. (They sprinkle naphthalene all through their collections to keep live bugs from moving in to eat the dead

bugs.)

In November of 2001 Beth decided she was ready to attempt to return to work at 20 hours per week. Psychometric testing was done before this RTW by GTU. This time her department swung to the opposite of a casual return to work. It took 4 months of emails, conferences and meetings with confirmatory phone calls to her docs. When we hammered out the details with her management that the days would not be contiguous, I recall another two weeks of emails to decide how to handle it if there was a Monday holiday and 4 work days. Beth's perception of this was one of dismay and rejection. As we had discussed, one would expect that when you recover from nearly dying doing your job, one would be greeted with hugs and flowers on the desk. Beth tells me that was far from the case. Even so, she was diligent in doing her 20 hours per week, although the omnipresent naphthalene increased her symptoms – headaches and nosebleeds.

In Dec of 2002 her department notified her that they could no longer accommodate her working 20 hours a week, and that she should return home on workmens comp. While for some I have met, this would be a lifelong dream come true, it was the opposite for Beth. She has an active mind, publishes papers and is a scholar. Sitting at home is a real punishment for her. Comes the realization that even when she regains full stamina and could do 40 hours a week, the naphthalene will always be present and she can probably never go back to her career there. This now casts a dark shadow over what her career will be, if it is to be at all. Its as major a life stressor as a divorce or a death in the family.

There is a certain real negative aspect of being rejected by The Smithsonian Institution and being pushed out in the street. I am currently dealing with another employee here who is feeling what Beth feels. Smithsonian professionals feel a real pride in being a part of this noble institution, and sharing academic camaraderie with their coworkers. When they go to professional meetings, they make themselves an extra large badge that says in all caps "Smithsonian". Being rejected and pushed away by those whom you had felt for years you were family with is – traumatic. I have told Beth that it is analogous to Kubler-Ross' "stages of death and dying". Disbelief, lets make a deal, anger, resignation, and finally acceptance. I feel that Beth is still in the anger stage, with a dollop of depression thrown in.

I have told her in jest "Beth, you have a serious character flaw. As a good little federal employee, you are supposed to swallow the bureaucratic BS without so much as even a whimper. But noooooo, you run around grabbing people by the lapels protesting loudly. (A Briggs Myers ESFP I would guess.) You're an especially difficult case – it'll take a lot to bring you 'round." I think she feels betrayed by people who she thought were academic peers and friends. And what is to come of her career. When the DOL decides it is time to send her to voc rehab, will she become a Delta Airlines gate agent for the rest of her life? Being an entomologist is a very rare occupation. If she were an HVAC tech the whole thing would be easier.

As of right now her thinking machinery is 100% back. Vision is fine. The headaches are much less and manageable. She can sweat and thermoregulate again, so we hope that 97F days this summer won't fatigue her as much as last summer. The skin purpura are much less frequent. Nosebleeds seem to have stopped (but recurred once when she smelled naphthalene several weeks ago.) I hear that GTU may repeat psychometric testing, to give them two data points. They can likely get a paper out of Beth's case.

The medical team that Beth sees at GTU as well as Dr. Granite are all top notch. I think that medically she is in excellent hands. Now the thing that needs work is the mental health aspect of having been put through this experience. I am glad that she has chosen to see you, and hope and expect that good things will come of this.  You will find Beth to be articulate, engaging and voluble, which should be a real plus for a therapeutic relationship. Please feel free to call me if you have any questions.

Respectfully,

Tom Lawford MD

Occupational Medicine for SI Tue Wed Thurs

202-275-9286 (or 2222)  (fax 202-275-1270)  home ph 703-476-5155

**Plt.    EXHIBIT 26**

*FYI*
*return to work memo (file on rtw)*

To:          Beth Norden

From:        Ted Schultz

Date:        22 March 2002

Subject:     Return to Work and Temporary Work Plan

Cc:          Scott Miller, Wayne Mathis, Marc Epstein, Marie Blair,

Marilyn Slomba, Thomas Lawford

### Summary of 21 March 2002 meeting

As we agreed in our meeting yesterday with Marilyn Slomba and Tom Lawford, you will
return to work on Wednesday, 03 April 2002 at 8 AM. This revision in your return-to-
work date (delayed from the earlier date specified in my 06 March memo) is due to: (1)
your request for such a delay, communicated in Dr. Lawford's 07 March memo, and (2)
our need to understand and accomodate Dr. Lawford's concerns about migraine
headaches and commuting stress, also communicated in his 07 March memo.

As required by your physicians, you will work no more than 20 hours per week. Your
hourly and daily schedule will be prearranged with me on a per-pay-period basis, as
recommended by Dr. Lawford and Marilyn Slomba. Work will take place between the
hours of 8 AM and 3:30 PM on normal work days (i.e., Monday through Friday except
for federal holidays). Your initial schedule will be Monday (7 hours), Wednesday (7
hours), Friday (6 hours).

We agreed that, at least for the first four weeks of your return to work, you will limit your
presence in the non-public areas of the Museum to your work hours. This requirement is
due to my strong impression that it is management's legal obligation to insure (as per your
physicians' instructions) that you are not working in excess of 20 hours per week and that,
in a legal sense, your presence in the workplace constitutes "working." We have further
agreed that this requirement may be modified depending on reliable legal advice currently
being pursued by Marilyn Slomba.

The Section of Entomology's agreement to these terms, including your half-time basis, are
predicated on the understanding that these conditions are temporary and on the
expectation and hope that you will return to a full-time schedule within a reasonable
period of time.

I do not have a copy of the neurologist's letter approving a 20-hour work week. I would
appreciate it if you would supply a copy for your personnel file prior to your return on 03
April.

### Temporary work plan

SMITHSONIAN INSTITUTION

**Plt.    EXHIBIT 27**

Page 12 of 135

*MEMORANDUM*

**DATE:**      September 15, 2003

**TO:**         Director, Office of Equal Employment and Minority Affairs

**FROM:**      EEO Counselor – Shadella Davis

**SUBJECT:**    EEO Counseling Report - Beth Norden

1.  Name, Series, Grade, Job Title, and Office Number of Person Counseled:
Beth Norden, Museum Specialist, GS-1016-11

2.  Organization Designation and Location:
National Museum of Natural History
10th and Constitution Avenue, SW
Washington, D.C. 20013

3.  Date of First Contact: April 7, 2003

4.  Date of Initial Interview: May 14, 2003

5.  Bases of Alleged Discrimination: Disability (Hemorrhagic Fever)

6.  Date of Alleged Discrimination:  Ongoing

7.  Claim:
Whether Ms. Norden was discriminated against on the bases of her disability when she was
denied a reasonable accommodation.

8.  Corrective Action Requested by Person Counseled:
Ms. Norden requests (1) an accommodation for her disability and (2) to be made whole for all
losses sustained as a result of management's failure and refusal to accommodate her disability.

9.  Name and Job Title of Officials Involved:
Scott Miller, Chair, Department of Systematic Biology

10.  Summary of Interviews:
Ms. Norden stated that she contracted Hemorrhagic Fever while performing fieldwork, as a
result, she developed an acute sensitization to Naphthalene.  She stated that, in October 2002, the
Office of Safety and Environmental Management requested that her department develop a plan to
control her exposure to Naphthalene to accommodate her disability.  Ms. Norden stated that her
department failed to develop a plan, and terminated her part-time schedule.

*Management stated that he ... ... of dengue fever)* while working in Brazil. According to Mr. Schultz, Dr. Norden was on extended leave during the period of September 2000 through March 2001; she worked a reduced schedule of 12 hours per week during the period of March 8, 2002 through July 25, 2001. He stated that Dr. Norden was absent from work during the period of July 26, 2001 through April 2, 2002; she returned to work, on April 3, 2002, and was placed on a temporary schedule of 20 hours per week. Mr. Schultz stated that, during the period of April 3, 2002 through July 12, 2002, Dr. Norton worked 223 out of 294 hours expected from her part-time schedule (71 hours were due to sick leave). Management concurred that it was expected that Dr. Norden would gradually return to a full-time schedule and perform the essential duties of her position. Mr. Schultz stated that a large portion of his duties, over the next few years, is defined by contractual obligations with the National Science Foundation, and a minimum of 50% of Dr. Norden's duties are performed in support of his research. Management stated that a number of efforts have been made to enable Dr. Norden to continue working, i.e., limited duties, part-time schedule, approved funds to purchase a respirator, and offered to relocate her office space. Mr. Miller stated that Dr. Norden told them not to purchase the respirator, and she refused to relocate.

11. Management Response to Corrective Action Requested:
Management stated that, after Dr. Norden is medically clear to perform her duties, they are willing to relocate her office space and purchase a respirator, etc.

12. Date of Notice of Right to File: May 13, 2003

13. Date of Final Interview: July 30, 2003

14. Date of Report: September 15, 2003

15. Documents Reviewed:
See #17

16. Persons Interviewed:
Scott Miller
Ted Schultz
Wayne Mathis

17. Listing of Attachments:
Notice of Final Interview, dated July 30, 2003
Letter from Dr. Norden, dated July 11, 2003
Notice of Right to File a Discrimination Complaint, dated May 13, 2003
Employees' EEO Rights and Responsibilities, dated April 8, 2003
Request for Counseling w/attachments, received April 8, 2003

_____
Signature of EEO Counselor

**Plt.     EXHIBIT 28**

Schultz

262

1          MR. HENAULT:  Object to the form.  Go

2    ahead and answer the question, sir.

3          THE WITNESS:  No, I don't.

4          BY MS. FANG:

5      Q     Okay.  Let me skip down a few sentences.

6    We have the phrase "Offered Beth a special

7    respirator which fit her and she turned it down."

8    Is that an accurate statement?

9      A     Well, it's somewhat inaccurate.

10     Q     Can you explain to me, please, what a

11   more accurate statement on the subject would be?

12     A     Made departmental resources available

13   for a respirator, had Beth fitted by safety for a

14   respirator, and in the end had it turn out that

15   Beth didn't find it possible to work with wearing a

16   respirator.

17     Q     Okay.  Do you have any idea where Tracey

18   got the idea that Beth simply turned it down?

19     A     No.  It may be Tracey's way of

20   expressing what I just said.  I don't know.

21     Q     I had the impression reading the

22   interrogatory answers that the Smithsonian was

## Plt.    EXHIBIT 29

To: "Carol Youmans" <Youmans.Carol@NMNH.SI.EDU>,
   "Thomas Lawford" <LAWFOTH@OEMS.SI.EDU>,
   "Kathryn Makos" <makoska@OEMS.SI.EDU>, <schultz@onyx.si.e
Subject: naphthalene/respirator

I am sending this e-mail as an update, and to request
further assistance. Because of an additional medical
problem I have experienced, Carol was waiting to hear back
before ordering the respirator. It may or may not be a
problem for me wearing one (I have varying medical
opinions). However, I have since realized that often times
I do things around a collection containing naphthalene that
I cannot do with a respirator on. For example, on Mon. I
was looking at some type specimens with a visitor. There
was a problem with a type that required careful use of the
microscope and detailed conversation. It was obvious to me
that a desk unit that purified the ambient air would be much
better than having to take a respirator off to use the
microscope and be able to talk effectively. Reducing rather
than eliminating naphthalene that I'm exposed to seems more
reasonable given the kinds of things that I need to be able
to do (and my inclination to do them even when it means
removing the respirator). It also seems better to be
putting money into something that others can use too. (A
size small respirator won't fit too many others in the
dept.). Therefore...can an appropriate air purifying unit
be suggested? And, can it be ordered reasonably soon?
Thank you all for your help, and I apologize for the extra
work this situation has caused. Beth

Beth B. Norden, Ph. D.
Dept. of Systematic Biology
NHB, MRC-188
Smithsonian Institution
Washington, D.C. 20560

Phone: 202-357-1821
FAX: 202-786-2894

Date: Mon, 22 Jul 2002 11:01:39 -0400
From: "Beth Norden" <Norden.Beth@NMNH.SI.EDU>
To: "Thomas Lawford" <LAWFOTH@OEMS.SI.EDU>
Cc: "Wayne Mathis" <Mathis.Wayne@NMNH.SI.EDU>, <schultz@o
Subject: Norden work at USDA, Beltsville

Dr. Lawford,
   I just had a discussion with Wayne Mathis and Ted
Schultz about the potential of my temporarily working (6-12
months) at the lab in Beltsville. I know we have previously
discussed my concerns about the naphthalene here in SI and
the metro/heat commuting problems. Wayne suggested that a
memo from you in support of my "loan" to the USDA might be a
good idea. If you would be able to provide your input as
part of the paperwork we submit, it would be much
appreciated. Thanks, Beth

**Plt.    EXHIBIT 30**

*evaluation*

Performance Evaluation, <u>Page 1</u>
Beth B. Norden, SSN: 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
June 1, 2001 - May 31, 2002

*B. Norden 26 Aug. 2002 ( I have read this evaluation and sincerely hope that the coming year will bring more health & productivity).*

**TO:**    Beth B. Norden Personnel File

**FROM:**  Ted R. Schultz, Supervisor    *Ted Schultz*

**SUBJECT:**  Norden Performance Evaluation, June 1, 2001 to May 31, 2002

**DATE:**   <u>23 July 2002</u>

**GENERAL COMMENTS:**

The unusual circumstances reported in last year's evaluation memo have continued throughout the current review year. For this reason I am once again undertaking an evaluation that does not include formal assessments of standards (i.e., "not met" / "met" / "exceeded").

In general, I think it would be most accurate to say that Norden has performed her job better than might be expected under exceedingly trying and restrictive circumstances, and given the drastically reduced number of hours worked.

As it did during the 2000 to 2001 year, Norden's illness (a hemorrhagic form of dengue fever, contracted while on the job in Manaus, Brazil, in August 2000) has continued to complicate her job performance during the 2001-2002 year. On advice of physicians, Norden worked a reduced schedule of 12 hours per week from 08 March to 25 July 2001 (evenly divided 6/6 between Schultz and Epstein). She was entirely absent from work from 26 July 2001 to 02 April 2002. She returned to work on a reduced schedule of 20 hours per week from 03 April 2002, and this schedule continued until last week (again, evenly divided 10/10 between Schultz and Epstein).

During the period since April 2002, Norden's health has not been optimal. For the period from 03 April to 12 July, Norden worked 223 out of 294 hours expected from her half-time schedule. Of the missed 71 hours, 51 were due to sick leave and 20 were due to annual leave. The illness is persistent: 5 of the 8 pay periods during this time span included sick leave. As documented by physicians (including SI physician Thomas Lawford), certain aspects of Norden's job have been shown to exacerbate her condition. These include: working around napthalene vapors, prolonged work at a computer screen, commuting, and exposure to hot summer weather. Steps are being taken to deal with the first problem, including the use of a breathing mask and a negative air-flow filter, but the latter three problems still present a challenge.

Norden's time has been evenly divided between support of my research and support of collections under the supervision of Marc Epstein. Thus, from 08 March to 25 July 2001, Norden worked 6 hours per week research support and 6 hours per week collections support, and from 03 April 2002 to present she has worked 10 hours per week for research support and 10 hours per week for collections support. Given the short total hours, this 50/50 division has proven to be, in my opinion, a very poor arrangement.

Since Norden's duties (as outlined in her Performance Plan) were formulated with a 40-hour week in mind, Norden's reduced hours have been inadequate to address the totality of her duties. She has nonetheless persevered.