# Plt. EXHIBIT 31

BY MS. FANG:

Q Do you know of any written instructions to Beth to the effect of you will not be getting a respirator or portable air filter because we have identified the fourth floor ventilated room as the best accommodation for you?

A No.

Q Do you recall any oral instructions to that effect?

A No.

Q Okay. Do you know of any documentation directing Beth to move her things to the fourth floor?

A No.

Q Do you recall any oral instructions to that effect?

A No.

Q Okay. Did you continue to tell Beth in October and November of 2002 that you would help her to get a respirator or an air filter, that either of these accommodations were still in process?

**Plt. EXHIBIT 32**

Case 1:05-cv-01232-RMC Document 35-5 Filed 12/26/2006 Page 32 of 59

Q. And as you understand the circumstances during the fall of 2002, that would be an incorrect statement. It would be incorrect to say, we identified the fourth floor room as the superior accommodation, and therefore Dr. Norden won't receive the other accommodations?

MR. HENAULT: Object to the form of the question.

THE WITNESS: I'm sorry, you're confusing me with double negatives, so I'm not -- simply it's not clear to me what you're saying.

BY MS. FANG:

Q. You're absolutely right to get me to clarify it until we're all on the same page. I appreciate that. But this is actually an important question to me.

Your understanding back in November of 2002 is what I'm asking about. Was it your understanding by the time you signed that termination of light duty memo, that the fourth floor had been identified as the superior

accommodation and that because the fourth floor was available, Dr. Norden wouldn't receive the other accommodations?

A That was not my understanding.

Q. If Dr. Schultz or someone else had told you, Well, we're not giving Dr. Norden a respirator or an air filter because the fourth floor has been identified as a superior accommodation, would you have terminated her light duty hours?

MR. HENAULT: Object to the form of the question. You may answer, sir.

THE WITNESS: I don't understand the question.

BY MS. FANG:

Q. If Dr. Schultz or Dr. Mathis or Dr. Furth had come to you and said, We think Dr. Norden should use the fourth floor ventilated room and because that is available as an accommodation, we don't need to provide her request for a respirator or a negative air filter or change in her tasks to minimize the

exposure to napthalene -- if you had been told that, would you have still decided to terminate her light duty hours?

MR. HENAULT: Object to the form of the question. You may answer, sir.

THE WITNESS: If I had been told that, I would have corrected that understanding, and it might or might not have affected the memo terminating the light duty hours.

BY MS. FANG:

Q. And what do you mean when you say corrected that understanding?

A. Well, as I have said, it was my understanding at that time that we had offered a respirator and it had been refused. It was my understanding that we had offered a portable air filter, and I'm not sure why the entity had never been identified, and that we had offered the fourth floor room.

And the three different items, three different accommodations were parallel, if you will, and not dependent upon one another.

Q. Sure. And if your understanding had been different, if your understanding had been that Dr. Norden wanted the respirator, wanted the air filter, OSCM was still advising the air filter and the respirator, and Dr. Schultz had made the decision that because the fourth floor room was available, the other two accommodations needn't be provided, would you have taken different action?

MR. HENAULT: Object to the form of the question. You may answer, sir.

THE WITNESS: I don't really see the relationship between the two.

BY MS. FANG:

Q. But?

A. I had -- had there been a problem -- had I been aware of a problem on the accommodation front, I would have addressed that problem, and that problem may or may not have affected the termination of light duty status.

Q. Of course.

A. So it isn't just a yes or no question.

**Plt.     EXHIBIT 33**

Q So for Beth to do that, you would have had to have changed your plan for your research, is that correct?

A Yes.

Q Okay. Now leaving for a moment the issue of naphthalene ants and alcoholic ants, note number one here requires her to bar code and database the returned specimens. [Is that something that she could have done on the fourth floor?

A With the exception of returning specimens to the collection, which is, you know, a significant portion of the task, yes.

Q But if she bar coded and databased the returned specimens on the fourth floor, she needed to have the computer that ran the program on the fourth floor.

A Right.

Q And as far as you know, she did not have the computer on the fourth floor, did she.

A No. As far as I know -- well, I know for sure she did not have a computer with Filemaker Pro running on it on the fourth floor.]

Q So she really couldn't bar code and latabase on the fourth floor, could she.

A She couldn't database.

Q Okay. Going to part two of this set of instructions, is the ant type collection project something that involves the holotypes?

A Yes.

Q So very precious, fragile specimens that are very heavily impregnated with naphthalene?

A Precious. In some cases fragile. I'm not sure that they are heavily impregnated with naphthalene.

Q And she couldn't database them on the fourth floor, could she.

A Well, under the circumstances that we talked about in your previous question. Without Filemaker Pro.

Q Right. Yeah. I'm sorry these questions are tedious, but your attorney will explain that's how depositions are.

A I mean it would have been possible, but it would have required Filemaker Pro.



**Plt. EXHIBIT 34**

A. I believe either Wayne and/or I spoke with the USDA lab about it and encouraged them, and we basically never heard back from them.

Q. Did Dr. Mathis tell you he never heard back from the USDA?

A. Yes, during the time period -- I forget exactly when this discussion was going on, but -- and when I would have last asked him about it, but it's the sort of thing that had they responded positively, I would have been told about it.

Q. If they had responded in December or January, December of 2002, January of 2003 saying that at least some funds had been approved and were ready for her here, how would you have reacted?

MR. HENAULT: Object to the form of the question. You may answer, sir.

THE WITNESS: I think we would have responded positively.

BY MS. FANG:

Q. Meaning you would have -- meaning what?

A. We certainly would have explored with the USDA the situation and with her and with our human resource people.

MS. FANG: Five minute break, please.

MR. HENAULT: Five minutes. We've also got to call the court.

**(Whereupon, a brief recess was taken from 11:23 until 11:51 p.m.)**

BY MS. FANG:

Q. Dr. Miller, was it your understanding that Dr. Norden would be able to do most of her work on the fourth floor ventilating room if that was the floor she chooses?

MR. HENAULT: Could you repeat that question?

BY MS. FANG:

Q. Was it your understanding that Dr. Norden would be able to do most of her work in the fourth floor ventilating room, if she choose?

MR. HENAULT: Object to the form. You may answer, sir.

**Plt. EXHIBIT 35**

**ADMISSION REQUEST NO. 15**

Admit or deny that the majority of the work Dr. Norden performed in the period 1997 through 2000 was consisted of research support.

**RESPONSE:** Plaintiff's performance plans referred variously to "research assistance" and "research support." As indicated in Plaintiff's performance appraisal, from June 1996 -May 31, 1997, Plaintiff worked for Karl Krombein, a research scientist emeritus, and Ted Schultz, a research scientist, with David Furth, Collections Manager, as the rating official of record. (Tab 1, pages 211-218) From June 1997 -May 31, 1998, Plaintiff worked for Krombein and Schultz. (Tab 1, 196-210) From June 1, 1998-May 31, 1999, Plaintiff worked for Krombein, Schultz, and spent 4-8 hours per week on "curatorial" work. (Tab 1, pages 185-195) From June 1, 200-May 31, 2000, Worked 20% for Krombein, 50% for Schultz, and 30% for Mark Epstein, a collection manager. (Tab 1, pages 174-184). As indicated in the June 1, 2000-May 31, 2001 narrative appraisal, from June 2000 through Sept. 2000, Plaintiff worked 50% for Schultz, 20% for Krombein, and 30% for Epstein; after September she was assigned 50% to Schultz and 50% to

Epstein. (Tab 7, pages 1529)

**ADMISSION REQUEST NO. 16**

Admit or deny that USDA EMPLOYEES attempted to contact Smithsonian EMPLOYEES through email or other means about a temporary position for Dr. Norden to work at the USDA after the NOVEMBER 2002 MEMO, and that Smithsonian EMPLOYEES did not alter Dr. Norden's disability status or otherwise make arrangements to allow her to take the position.

**RESPONSE:** Deny.

**Plt.    EXHIBIT 36**

Q. I'm referring to the third paragraph, the area that I've marked with a star, was it your understanding that purchase of a breath mask, respirator, negative air filter were still in process for Dr. Norden?

A. I believe that's the fourth paragraph, but I -- as I have said before, I believe that we were undertaking the purchase of that equipment.

Q. When you signed the 2002 November memo, you believe that Dr. Norden hadn't received those accommodations, either because she had rejected them or they had simply been shown to be ineffective; is that correct?

A. Yes.

Q. Would you have signed this memo and taken this action if you believed instead that Dr. Schultz simply never provided a respirator and never provided a negative air filter?

MR. HENAULT: What memo are you referring to him signing?

MS. FANG: The November one.

MR. HENAULT: Object to the form of the question. You may answer, sir.

THE WITNESS: I believe that we had offered those accommodations.

BY MS. FANG:

Q. I'm sure you did, sir. I believe that when I first saw the memo, but what I'm asking now is if you had believed otherwise, if you had believed that Dr. Norden had been repeatedly promised these accommodations and not given them, Dr. Schultz simply didn't purchase them, would you have terminated her light duty hours?

MR. HENAULT: Object to the form of the question. You may answer, sir.

THE WITNESS: At least in the case of the respirator, I had evidence that I believed she had not -- that she had been offered and gone through the process and not accepted the respirator.

BY MS. FANG:

Q. I think we've established certainly to my satisfaction, I think to any reasonable

persons, that you believed these offers had been made.

A. Yes.

Q. And that she had rejected them or for some reason they just weren't possible.

A. And that's the answer to your question.

Q. No. My question is: If you didn't believe that, if you believed that Dr. Norden may have said, I want a negative air filter instead of a respirator, was told she could have both, happily accepted the offer of both, Dr. Schultz simply didn't provide them, would you have still terminated her light duty hours?

MR. HENAULT: Object to the form of the question. You may answer, sir.

THE WITNESS: I believed as did to my knowledge the rest of the people copied on this Email that we had made a good faith effort to offer those accommodations.

BY MS. FANG:

Q. If you believed otherwise, if you believed that one of your subordinates had not

offered the accommodations, possibly not even been honest with you about the whole procedure, would you have still terminated her light duty hours?

MR. HENAULT: Object to the form of the question. You may answer, sir.

THE WITNESS: I would have corrected that situation.

BY MS. FANG:

Q. Of course you would have. Of course. And your correction of it would have been to get the accommodations, wouldn't it?

A. Yes.

Q. And then after you had gotten the accommodations for her, would you then have given it some time and seen whether she was able to work full time hours after she had some recovery period with the accommodations?

MR. HENAULT: Object to the form of the question. You may answer, sir.

THE WITNESS: That would have depended on the advice of Dr. Lawford. Again, it was not

my job to judge the effectiveness of the accommodations versus the health condition.

BY MS. FANG:

Q. I understand. If Dr. Lawford had advised that her health was improving now that she had accommodations, would it have been your decision to allow her to continue on light duty hours for at least some period?

MR. HENAULT: Object to the form of the question. You may answer, sir.

THE WITNESS: If I had Lawford's recommendation of that, I would have followed it.

BY MS. FANG:

Q. Thank you.

**(Miller Deposition Exhibit Number 5 was marked for identification.)**

THE WITNESS: I've read it.

BY MS. FANG:

Q. Do you remember seeing it in 2002?

A. Yes.

Q. Looking at the bottom of the second

**Plt. EXHIBIT 37**

FIFTH FLOOR COURT EAST, NMNH
COLOR KEY: Orange shows primary evacuation Exit CE-S
Yellow shows secondary evacuation Exit CE-N
Green shows Evacuation Warden's area of responsibility
CE525
CE502
CE503
CE528
CE529
CE523
CE522
CE521
CE520
CE519
CE532
CE534
CE530
CE531
CE507
CE508
CE509
CE512
CE518
CE517
CE516
CE515
CE514
my office
Schultz
Stairway
My Office
My floor
5th floor
EAST
COURT

**Plt. EXHIBIT 38**



2002 FLOOR PLAN
SIXTH FLOOR WEST WING,NHB
COLOR KEY: Orange shows primary evacuation Exit WN
Yellow shows secondary evacuation Exit WW
Green shows Evacuation Warden's area of responsibility
SIXTH FLOOR WEST WING
MITCHELL
CAROL YOUMANS
BLAIR'S
ENTOMOLOGY LIBRARY
6th FLOOR MAIN BLDG
WARDEN'S PATH
GEORGE VENABLE

**Plt. EXHIBIT 39**

# Smithsonian Institution

# Memo

Office of Safety and Environmental Management
Environmental Management Division

Date May 20, 2002

Ted was told to get me a respirator

To Ted Schultz, Curator
Entomology, NMNH

cc Angela D. Ward, OHSD
Beth Norden
Rudy Anderson

From Rachel L. Gregory, Assistant Director

Subject **Respirator Training and Fit-Testing**

**Action Required: For information only - no response required.**

On May 15, 2002, respirator training and fit testing was conducted for Beth B. Norden, of your staff, as required by the Occupational Safety and Health Administration's Respiratory Protection Standard, 29 CFR 1910.134. The training and fit testing was conducted by Kathryn Makos, staff industrial hygienist. This memorandum and its attachments serve as your record of this important safety training. **We request your review of the following actions and responsibilities:**

1. It is your responsibility to provide the required respirators and parts as soon as possible after receipt of this memorandum. In the interim, employees are not to work in any chemical or particulate overexposure situation for which respiratory protection is required. Attachment 1 is a table of the respirator fit-test results, including the specific type and size of the respirator to be worn, specific cartridges and filters to be used in specific operations, part numbers, and the date on which the employee's medical certification to wear the respirator expires. **Please note the authorization expiration date.** Attachment 2 contains suggested sources from which the respirator can be purchased. We recommend purchasing extra replacement parts such as inhalation and exhalation port diaphragms, and headband straps.

2. The determination of respirator and filtering element type that would afford the best protection was based on the industrial hygienist's evaluation of your current workplace exposure risks. Should new chemicals be introduced or work conditions change, I ask that you contact us to determine if new respirator cartridges or filters are required.

750 9th Street NW Suite 9100
Washington DC 20560-0932
202.275.1167 Telephone
202.275.0746 Fax

**Plt. EXHIBIT 40**



Smithsonian
National Museum of Natural History

Department of Entomology
PO Box 37012, NHB CE 619, MRC 169
Smithsonian Institution
Washington, D.C. 20013-7012

October 8, 2004

Dr. Beth Norden
112 Green Hill Road
Greenbelt, MD 20770

Dear Dr. Norden:

It was my decision on the November 5, 2003 proposal to separate you from your position of Museum Specialist (Zoology), GS-1016-11, and from the rolls of the Smithsonian. The basis for the proposal was your inability to perform the duties required for your position.

I received the response that you sent on November 13, 2003, addressed to both the proposing official and myself. You wrote that you very much wanted to come back to work for the Smithsonian and that you believed you would be able to work full time if given appropriate accommodations. You stated your willingness to have your doctors provide information regarding your ability to work full time to the Smithsonian Occupational Health Physician, Dr. Thomas Lawford. In that letter you designated your attorney, Vickie Fang, Esq. as your representative in this matter.

On December 23, 2003, Dr. Lawford reported that he had recently received two medical reports from your treating physicians, Donald Oberg, Ph.D. and David Granite, M.D. and that he had received clarification and additional information from his discussions with them. They advised him that you were capable of performing your full duties for 40 hours per week, although Dr. Oberg proposed a review of your job description and of who would be providing your supervision. Both your doctors believed that you would require protection from exposure to naphthalene to avoid triggering migraines. No one could predict what the frequency of migraines might be once you re-entered the naphthalene ambient atmosphere in our department. Your doctors advised a flexible work schedule because you have numerous medical appointments each month and would need to take leave for some of those as well as for the migraines.

An agreement was written to outline the arrangements by which you would return to work under conditions that would meet the needs your doctors were recommending. The agreement was reviewed by Dr. Lawford and by the Smithsonian Office of Equal Employment and Minority Affairs' Disability Program Manager. The agreement was received by Ms. Fang on April 8, 2004. At her request, the performance plan and the work plan that had been written to more fully define the agreement terms were sent the same day. The agreement projected your return to work on April 18, 2004.

Ms. Fang responded on April 16, 2004, that you would not be able to report to work on April 18, and advised that a further response would be forthcoming. In an April 21 e-mail message, Ms. Fang reiterated that you objected to the agreement and indicated that she would respond promptly to any new proposal we wished to make.

It is apparent to me that management did make a good faith effort to alter your assignments and work schedule in the draft agreement and accompanying plans you received on April 8. The intent was to achieve a clear understanding of expectations as a basis for an agreement on the adjustments made to enable you to return to your GS-11 Museum Specialist position. Since Ms. Fang made it clear that you did not wish to sign the agreement, a restatement of the plan for your return to work within the limitations recommended by your doctors was sent to Ms. Fang on April 22, 2004,

without agreement provisions. She was asked to provide any proposed alterations within the following week so that you could return to work on May 3, 2004.

In an April 30, 2004 letter, Ms. Fang strongly objected to the return to the plan that was sent on April 22. She claimed that the necessary limiting of naphthalene exposure could be accomplished by returning you to your former research support position, and that the proposed work plan required a career change from research to collections work involving direct rather than ambient contact with naphthalene. Ms. Fang objected to the species of insect and to the education level of the supervisor with which you would be assigned to work. She also claimed that the proposed work schedule and periodic performance reviews were retaliatory. Ms. Fang stated that she was advising you not to return to work until a more acceptable effort was made to safeguard you from environmental hazards and what she viewed as retaliation.

Management's response to the April 30, 2004 letter was sent to Ms. Fang by Marilyn Slomba, the Smithsonian Human Resources Specialist representing management, on June 9, 2004; it noted that the only alternative Ms. Fang had proposed was to simply return you to your former research position. The June 9 message clearly stated that the plan for your return to work, which was sent again with the June 9 message, was consistent with your position description and with the duties you performed prior to your illness. It cited an October 17, 2002 report resulting from a study conducted by the Smithsonian Office of Safety and Environment Management, which noted that your work prior to your illness involved constant exposure to low level of naphthalene.

The June 9, 2004 message reiterated that the 2004 work plan was designed to minimize naphthalene exposure as much as possible within the requirements of your position. It pointed out that your office would be moved to the fourth floor of the East Court of the Natural History Building, where there are no permanent collections and the ambient naphthalene levels are lower, and that the office was located almost directly across from the ventilated room where OSEM recommended that you conduct all your work. It explained that the performance review schedule was intended to provide you with feedback on your performance, and that the proposed alternative work schedule was designed to facilitate scheduling of medical appointments and to assist you in making up unscheduled leave. The message concluded by advising you that failure to return to duty by July 12, 2004, under the provision of that attached plan, would be considered as a basis to separate you for inability to perform the duties of your position, as was proposed on November 5, 2003. On June 19, 2004, Ms. Fang confirmed that she had conveyed to you the message that was faxed to her on June 9, and that you were aware of the July 19 deadline.

Ms. Fang responded by e-mail on July 7, 2004, informing us that you were declining the return to work plan, which you saw as being at variance with your doctors' recommendations. In that message she conveyed your belief that there were other positions at the Smithsonian for which you would be qualified that do not require exposure to naphthalene. She inquired if there were any such positions that had opened since the past fall or were anticipated to open in the near future. Ms. Slomba's response on the same day was that current Smithsonian federal vacancies at or below Dr. Norden's grade level would be reviewed before any further action was taken on the proposal to remove. Ms. Fang was asked to provide an updated copy of your resume by July 14, 2004, to ensure that Smithsonian's Office of Human Resources has the most recent information on your qualifications. Ms. Fang sent your resume by fax on July 16, 2004, and Ms. Slomba provided it to Audrey J. Davis, the HR Specialist assigned to search for vacant positions for which you might be qualified.

Ms. Davis sent you a message by e-mail on September 8, 2004, regarding a vacant position at the Smithsonian's National Zoological Park (NZP) for which she thought you might be qualified. Among the vacancies announced from the date you provided your resume through the following 30 days, that was the only one for which Ms. Davis found you might qualify. In her September 8 message, Ms. Davis asked you to respond to the selective factor listed on the vacancy announcement by September 23. Ms. Slomba confirmed that information in an e-mail message to Ms. Fang on the same date. On September 13, you sent an e-mail message to Ms. Davis acknowledging receipt. On September 23, Ms. Fang sent a response to Ms. Slomba, in which she stated that the specialized knowledge required for the zoological registration specialist position is entirely different from your specialized knowledge based on your education and subsequent years of experience in research and research support in the highly specialized field of entomology. Ms. Fang informed us that you would not pursue the NZP position although you continued to look

forward to the opportunity to resume a full time position in entomological research. No such vacant positions were identified by Ms. Davis during her search.

After my review of the information on which the proposal was based and the efforts made in identifying and considering potential accommodations as described above, it is clear to me that we are not able to accommodate your doctors' recommendations, in manner that you find acceptable, that would allow you to do the work of your position of Museum Specialist. I also find that when you clearly declined further consideration of returning to that position and provided a current resume, a search was made to identify another vacant Smithsonian position for which you would be qualified, but that effort was unsuccessful.

Since we are unable to plan for your return to duty, I believe that your separation from Smithsonian rolls is warranted, based on your inability to perform the essential duties of your position. The effective date will be October 15, 2004.

Your separation from Smithsonian rolls will not, in any way, interfere with decisions of the Department of Labor's Office of Workers' Compensation regarding the compensation you are receiving. If you have questions regarding OWCP or any other benefits to which you may be entitled, please contact the Benefits Branch of the Smithsonian Office of Human Resources at 202-275-1102.

If you believe this action is not warranted, you may appeal to the Merit Systems Protection Board (MSPB) or you may file a grievance under the negotiated agreement between the Smithsonian Institution and the American Federation of Government Employees, Local 2463. You may not file both a written grievance and an appeal. An appeal must be filed within 30 calendar of the effective date of this action; a grievance must be filed within 20 calendar days of the effective date of this action. An appeal to the MSPB should be filed on the attached Appeal Form 185. It must be filed by mail, by facsimile or by personal delivery during normal business hours to the Regional Director, Merit Systems Protection Board, Washington Regional Office, 1800 Diagonal Road, Suite 205, Alexandria, Virginia 22314. If you file an appeal to the MSPB after the time limit, the appeal must be accompanied by a motion for wavier of the time limit containing evidence and argument showing good cause for the untimely filing. A copy of 5 CFR, Part 1201, "MSPB practices and Procedures," is attached for your information.

If you believe this action is being taken wholly or in part because of discrimination based on race, color, religion, sex (including sexual harassment), national origin, disability, or age, you may include the allegation in any grievance or MSPB appeal you choose to file on this action. Alternatively, you may file a discrimination complaint with the Smithsonian Office of Equal Employment and Minority Affairs (OEEMA), 750 Ninth Street, N.W. Suite 8100, Washington, DC 20560, within 45 days of the effective date of this action. For information about filing a discrimination complaint, please see the Smithsonian Staff Handbook for Equal Opportunity, SSH 1300, Chapters 10-13, or call 202-275-0145. If you file a discrimination complaint, the complaint must be instead of (not in addition to) a written grievance or appeal.

If you would like advice about your rights or about the procedures to follow, please contact our Human Resources Specialist, Audrey Davis, 750 Ninth Street, NW, Suite 6100, 202-275-1005.

Sincerely,

Wayne N. Mathis

Wayne N. Mathis

Enclosures: MSPB Practices and Procedures
MSPB OF 185

cc: Vickie Fang, Esq.