**Plt.    EXHIBIT 11**

*119*

| | |
|---|---|
| **From:** | Thomas Lawford |
| **To:** | Anderson, Rudy; Gover, Carol; Makos, Kathryn; Norden, Beth; Schultz, Ted |
| **Date:** | 12/3/02 8:22AM |
| **Subject:** | Re: Norden/Naphthalene |

Good Morning Beth, I trust that you can read this from home. I have just conferred with Kathy Makos by phone, so my answers are from both Kathy and myself:

1. Kathy and I jointly constructed the memo of Oct 17 recommending possible maneuvers to reduce naphthalene exposure to you. Insofar as she and I know, there were no resulting replies to us or meetings that followed that memo.

2. Re when might it be safe to return to (some) naphthalene. That is an issue where I am in standby waiting for your docs to take a lead in advising. You have some pretty high powered experts taking care of you at GTU who have my respect. I wouldn't presume to step out in front of them with an advisory cooked up solely by me. However, when and if your docs issue future advisories on this, I would then be most interested in concurring with them to establish a meeting of the minds. Once that occurs, I would forward their new advisory on to your management.

3. Will anything re exposure be different upon return. This is 100% a management question as to what they can offer you. so sorry, I can't speculate on this one.

Dr Lawford

>>> Beth Norden 11/29/02 01:40PM >>>
In order to keep my records updated, as well as to best work towards the future, I ask for the following information:
1. What meetings (dates), people present, decisions, etc. resulted from the 17 Oct. 2002 memo pertaining to my sensitivity to naphthalene?
2. After today, I am removed from light duty in my dept. How do I know when it might be safe to return if it is the naphthalene which is activating the current blood problems?
3. Will anything dealing with my exposure be different upon return, or is my return based upon no longer being sensitive to naphthalene?
Please excuse my confusion, but major changes have occurred in a short two weeks and I am unclear what I need to do and why I am not part of the decision process. Thank you for your help in providing me with these facts. Beth

CC:    Bailey, Walter C.; Burney, Debbie; Gregory, Rachel L.; Heilman, Chandra

30134S1697    OCT 02, 2006 21:04

**Plt.    EXHIBIT 12**

I said it was my belief that the museum's reason for returning you to full-time workers comp at this time was a staffing issue. I am not certain what role the naphtalene plays in your doctors' decisions to limit your schedule to 20 hours each week. I did not participate in NMNH's decision to return you to workers comp on a full-time basis after Nov. 30.

I'm glad you followed-up with EAP. They are there to support Smithsonian employees during stressful situations. Please take advantage of them if they can help you.

Finally, I have not heard anyone mention discharging you from the Smithsonian. You have been returned to full-time workers compensation (the same status that you were on before your part-time schedule in April). The goal if for you to successfully return to your job full-time.
Carol

Carol Gover
AA/Diversity/Disability Program Manager
Office of Equal Employment & Minority Affairs
Smithsonian Institution
(202) 275-0150

>>> Beth Norden 12/03/02 12:53PM >>>
Carol,
   Thanks for speaking with me this morning. I appreciate your concern for my furstration and wish that it was not. My attempts to understand my current situation and work towards returning to a "normal" life are my way of not letting things become defeating. I appreciated your offer to look into the money concerns for Dec. (please let me know when you learn something). I also appreciated your letting me know that Ted did not indicate that my work was inferior in any way. You also seemed to feel with some certainty that naphthalene was not part of the decision to have me go out of the museum again. You also had the impression that it was my doctors which indicated that 40 hrs/wk was not possible yet. I assume that this has been a recent decision. Please correct me if I misunderstood anything that you told me. I know that it is too late to undue the memo to go out, but I am trying to understand what needs to occur now to pick up. I did contact the EAP office and will follow-up with them. When I started at the S.I. in 1984 as a pre-doc. I never envisioned going out in this fashion. I do appreciate your help and honesty during these difficult times for us all. Beth

>>> Carol Gover 12/02/02 17:14 PM >>>
Beth,
I'm not familiar with the Oct. 17 memo. Let's discuss your questions on Tuesday.
Carol

Carol Gover
AA/Diversity/Disability Program Manager
Office of Equal Employment & Minority Affairs
Smithsonian Institution
(202) 275-0150

>>> Beth Norden 11/29/02 01:40PM >>>
In order to keep my records updated, as well as to best work towards the future, I ask for the following information:
1. What meetings (dates), people present, decisions, etc. resulted from the 17 Oct. 2002 memo pertaining to my sensitivity to naphthalene?
2. After today, I am removed from light duty in my dept. How do I know when it might be safe to return if it is the naphthalene which is activating the current blood problems?
3. Will anything dealing with my exposure be different upon return, or is my return based upon no longer being sensitive to naphthalene?
Please excuse my confusion, but major changes have occurred in a short two weeks and I am unclear what I need to do and why I am not part of the decision process. Thank you for your help in providing me with these facts. Beth

Plt.    EXHIBIT 13

# E.N.T. NEWS

## SYSTEMATIC BIOLOGY – ENTOMOLOGY NEWSLETTER

Smithsonian
National Museum of Natural History

VOL. 7 NO. 2
FEBRUARY 2008

**ANNOUNCEMENTS:**

The 1071st Regular Meeting of the **Entomological Society of Washington** will convene on February 06 at 7:00 pm at the Cathy Kerby Seminar Room in the National Museum of Natural History. Robert Raguso, University of South Carolina, will present the topic "Moths as Pollinators: the Good, the Bad and the Lazy."

**GENERAL NEWS:**

**Nancy Adams** recently finished the following project: "I have finally gotten data taken and entered for the Anoplura Collection at the USNM. The data are in FileMaker Pro. I was hoping to have a searchable database on the web but we have no one in-house to get things web ready right now. In 1995 the collection was organized using Durden & Mussers 1994 Catalog, "The Sucking Lice of the World: A Taxonomic Checklist with Records of Mammalian Hosts and Geographical Distributions." In 1996 most of the data was gathered but then I got completely absorbed in preparing for and moving the Entomological Collections from one side of the building to the other, a 3-4 year process. Then I was involved with a couple of large collection improvement grants. But then finally last

summer and this summer another staff member & I were able to complete the data entry of the Anoplura. This morning I checked a few more localities and added data from a few more slides that were discovered in the Diptera collections so it is finally complete and available. I will be happy to e-mail the inventory which includes: Family, Genus, species, subspecies, Author, Year, Country of the World, States of North America, total number of slides and Hosts verbatim from the slides to anyone interested and thinks they can get at the data. I can also export it into an Excel format. There are 377 records. Enjoy! Also, please let me know if you are interested in studying any of this material or are willing to help out with identifications of undetermined material."

In the last issue of **Ent. News**, it was reported that **Beth Norden** has left the Entomology Section due to health reasons. However, Beth remains as an employee (non-pay status), and may return at a later date.

A new temporary exhibit, **"Nature's Jewels,"** A Living Exhibit of Orchids and Butterflies, opened on January 18 at the Arts and Industries

Plt.     **EXHIBIT 14**

OCT 02, 2006 20:24                                3013451697                                    Page 4

GroupWise WebAccess Message Item

Page 1 of 2

## Mail Message

Novell.

Close    Next    Forward        Reply to Sender        Reply All    Move    Delete        Read Later        Properties

**From:**     Beth Norden
**To:**       Debbie Feher, Beth Norden
**CC:**       "furth.david@nmnh.si.edu".i.SIWP01
**Date:**     Wednesday - December 18, 2002 1:22 PM
**Subject:**  Re: Accession Paperwork

Debbie & Dave, I appreciate your concern. Yet, I am worried about this return because they are holotypes. Please let me know if I can assist in any fashion with the return. Also, please know that none of my doctors or myself were consulted prior to my departure memo. I had not known before how compassionate our dept. could be. Happy holidays to you both, hold the fort! :) Beth

>>> Debbie Feher 12/17/02 16:12 PM >>>      — Co-worker
Beth—                                        — Collection's Manager

I just talked to Dave Furth-- asked if he knew what was going on with you.
He said as of November 30th you have been given a year off to try and recuperate fully. I don't know what sort of conditions you have been given, but if you have any sort of remuneration, just count yourself lucky. Of course, contracting this disease is probably one of the most unfortunate occurrences in your life... but please take this opportunity to regain your health.

DO NOT think or concern yourself about any aspect the job, least of all transactions. Above all dispense with any obsessing about modus operandi or relationships obtaining/pertaining here. Relax, read good books, listen to fine music, watch heartening films, enjoy your food, get fresh air, let your family do for you whatever they can. Now might be a good time to develop meditation techniques...join a group.

I'll remove your name from the TM Users group, so that you won't get any e-mails. However, if you'd like, I'll e-mail from time-to-time to see how you're doing.

I've had my knee surgery, and I seem to be gradually regaining flexibility... it's been four weeks now. I've dispensed with the cane, and can drive my clutch. Tomorrow I have my first session of physical therapy... I'm getting there. I hope you do too.

Take care,
Debbie

>>> Beth Norden 12/17/02 02:21PM >>>
Hey Debbie. Hope you are doing well! I had a borrow return in process (awaiting Dave's signatures) when I was abruptly told to vacate. Don't know what has happened to it, but suppose someone can complete the job. Sorry for the problem...but it really was none of my doing. Have a good holiday, Beth

>>> Debbie Feher 12/16/02 18:44 PM >>>
Hello, TM Users--

I've only just found out from O.R. that for the past two years, they have not needed the second 'Registrar's copy', and have been tossing them for re-cycling.

So, if you are not already aware of this, please take note:

It is only necessary to print 'one' accession memo document, which includes the Accession Memorandum (please remember to use archival paper), and one 'Registrar's copy'. If you would like a copy for your own records, have the cursor on the first page, and print 'Current page only'-- or make a photocopy.

Thank you

Plt.    EXHIBIT 15

OCT 02, 2006 20:24                          3013451697                            Page 4

GroupWise WebAccess Message Item

Page 1 of 2

## Mail Message

Novell.

Close    Next    Forward    Reply to Sender    Reply All    Move    Delete    Read Later    Properties

**From:** Beth Norden
**To:** Debbie Feher, Beth Norden
**CC:** "furth.david@nmnh.si.edu".I.SIWP01
**Date:** Wednesday - December 18, 2002 1:22 PM
**Subject:** Re: Accession Paperwork

Debbie & Dave, I appreciate your concern. Yet, I am worried about this return because they are holotypes. Please let me know if I can assist in any fashion with the return. Also, please know that none of my doctors or myself were consulted prior to my departure memo. I had not known before how compassionate our dept. could be. Happy holidays to you both, hold the fort! :) Beth

>>> Debbie Feher 12/17/02 16:12 PM >>>

*co-worker*
*collection's Manager*

Beth—

I just talked to Dave Furth— asked if he knew what was going on with you.
He said as of November 30th you have been given a year off to try and recuperate fully. I don't know what sort of conditions you have been given, but if you have any sort of remuneration, just count yourself lucky. Of course, contracting this disease is probably one of the most unfortunate occurrences in your life... but please take this opportunity to regain your health.

DO NOT think or concern yourself about any aspect the job, least of all transactions. Above all dispense with any obsessing about modus operandi or relationships obtaining/pertaining here. Relax, read good books, listen to fine music, watch heartening films, enjoy your food, get fresh air, let your family do for you whatever they can. Now might be a good time to develop meditation techniques...join a group.

I'll remove your name from the TM Users group, so that you won't get any e-mails. However, if you'd like, I'll e-mail from time-to-time to see how you're doing.

I've had my knee surgery, and I seem to be gradually regaining flexibility... it's been four weeks now. I've dispensed with the cane, and can drive my clutch. Tomorrow I have my first session of physical therapy... I'm getting there. I hope you do too.

Take care,
Debbie

>>> Beth Norden 12/17/02 02:21PM >>>
Hey Debbie. Hope you are doing well! I had a borrow return in process (awaiting Dave's signatures) when I was abruptly told to vacate. Don't know what has happened to it, but suppose someone can complete the job. Sorry for the problem...but it really was none of my doing. Have a good holiday, Beth

>>> Debbie Feher 12/16/02 18:44 PM >>>
Hello, TM Users—

I've only just found out from O.R. that for the past two years, they have not needed the second 'Registrar's copy', and have been tossing them for re-cycling.

So, if you are not already aware of this, please take note:

It is only necessary to print 'one' accession memo document, which includes the Accession Memorandum (please remember to use archival paper), and one 'Registrar's copy'. If you would like a copy for your own records, have the cursor on the first page, and print 'Current page only'— or make a photocopy.

Thank you

## Plt.    EXHIBIT 16

Schultz

13

1    Duty." I'm gathering from your earlier statements

2    that even when this memo was issued, there was

3    still -- you, meaning the department, were still in

4    the process of continuing to make some adjustments

5    for her and hoping to help her come back to work.

6    Is that correct?

7        A    Yes.

8        Q    Okay, good.  So I've got that as

9    Plaintiff's 2.  Thank you.

10           So this is why she was kept on the rolls

11   and not terminated, because you were still

12   expecting that she might come back?

13       A    Yes.  Yes.

14       Q    And you still, you being the

15   Smithsonian, you were still assuming this

16   responsibility to accommodate her if you could.

17       A    Yes.

18       Q    Okay.  And it was reasonable for Beth to

19   assume likewise.

20           MR. HENAULT:  Object to the form of the

21   question.

22           BY MS. FANG:

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Schultz

14

```
 1      Q      As far as you know.  Should she have --
 2    I will strike that because you're right, that's not
 3    a good question.  As far as the Smithsonian knows,
 4    would it be reasonable for Beth to expect that when
 5    she received this memo in 2002 she should expect
 6    that the Smithsonian was still working to
 7    accommodate her and that she would be brought back
 8    if she were capable of coming back?
 9      A      Yes.
10      Q      Okay, good.  All right.  Now I know that
11    this stretches out over a long period of time and
12    there were a lot of efforts made so in organizing
13    my questions I broke a lot of them down into
14    specific time periods or specific accommodation
15    efforts.  At any point if you don't understand the
16    question, you're not sure which accommodation or
17    which time period I'm referring to, please ask me.
18      A      Okay.
19      Q      But I'm also kind of giving you titles
20    to groups of questions so that we can be clear.
21             I'm going to ask some questions
22    referring to the February 2002 through November
```

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**Plt.     EXHIBIT 17**

3013451697

OCT 02,2006 17:36

## Memorandum

To:    Wayne Mathis
       Chair, Department of Entomology

From:  Ted Schultz
       Department of Entomology

Date:  17 December 2003

Subject: My resignation as Norden's supervisor

CC:    Scott Miller

I want to make it perfectly clear that in the event that Beth Norden returns to duty in the Department of Entomology, I will not serve as her supervisor.

This reiterates a request I made almost two years ago in a memo dated 22 March 2002 (copy attached), which was ignored at the time.

In her letter of 13 November 2003, transmitted via her attorney Vickie Fang, Beth requests a "protocol" to protect her from the "retaliation" and "continued hostility" that she expects to encounter when she returns. Given this fear, and given the events that have transpired during the three years since Beth contracted dengue fever, I think a "fresh start" is in the best interests of both Beth and myself. In my opinion, Beth should be assigned to another supervisor and another unit, ideally outside of Entomology.

Whatever your decision, however, I refuse to continue as her supervisor. I am willing to continue to serve in this role in the present context of interacting with OHR regarding whether or not Beth will be separated from her position or whether she will return to work. If it becomes clear that she will return, however, then I'm afraid that you will need to assign her to a new supervisor.

I apologize for any inconvenience that this decision may cause for you and the Department.

SI-1237

**Plt.    EXHIBIT 18**

- Emergency and safety personnel may be informed, when appropriate, if the disability might require emergency treatment; and

- Government officials investigating compliance with laws, regulations, and instructions relevant to equal employment opportunity and affirmative action for individuals with disabilities shall be provided information upon request.

Whenever medical information is disclosed, the recipients must be informed of the confidentiality requirements.

## XIII. Granting an Accommodation Request

As soon as the Responsible Smithsonian Official determines that a reasonable accommodation will be provided, s/he should contact the Disability Program Manager to discuss implementation of the decision. The final decision should be immediately communicated to the individual in writing with a copy to the Disability Program Manager. If the accommodation cannot be provided immediately, the Responsible Smithsonian Official must inform the individual of the projected time frame for providing the accommodation. For additional guidance, see "Extenuating Circumstances" in section XV.D.

## XIV. Denial of Accommodation Request

When a determination has been made that a request for accommodation will be denied, the Responsible Smithsonian Official must fill out the "Denial of Request" form and give it to the individual who requested the accommodation. The explanation for the denial should be written in plain language, clearly stating the specific reasons for the denial. As appropriate, the denial should state the following:

- The reasons the accommodation would not be effective.

- The reason that providing the accommodation would result in undue hardship. [**Before making a decision that an accommodation request will be denied, the Responsible Smithsonian Official must consult with the OEEMA and explore whether other effective accommodations exist that would not impose undue hardship.**]

- Medical documentation is inadequate to establish that the individual has a disability under the Rehabilitation Act and/or needs a reasonable accommodation.

- The accommodation would require the removal of an essential function.

- The requested accommodation would require the lowering of a performance or production standard.

9

**Plt.    EXHIBIT 19**

While the written confirmation is not a requirement, it should be made as soon as possible following the request. The Smithsonian will begin processing the request as soon as it is made, whether or not the confirmation has been provided.

A written confirmation is not required when an individual needs a particular accommodation on a repeated basis for the same disability (e.g., the assistance of sign language interpreters or readers). The written form should only be completed for the first request. Notice to the appropriate individual, usually the supervisor, must be given by the employee each time the accommodation is needed.

## VII. Responsible Smithsonian Officials Who Handle Requests for Accommodation

**Requests for accommodation from employees will be decided by the requesting employee's immediate supervisor (unless management identifies another official in writing) unless the request is one which should be handled by one of the individuals or units below. Responsible officials should coordinate all requests for accommodations with OEEMA, LER, and/or OGC. Supervisors should also coordinate discussions with their unit's Equal Opportunity Liaison.**

- The Disabilities Program Manager will oversee requests for adaptive equipment, including information technology and communications equipment. Requests for adaptive equipment will be processed according to the guidelines of the Department of Defense's Computer/Electronic Accommodations Program.

- The unit sponsoring a meeting, training, or program is responsible for providing and funding accommodations related to the unit's events.

- The Parking Office handles requests for accessible parking for employees. Procedures for requesting accessible parking are detailed in Smithsonian Directive (SD) 411, "Smithsonian Institution Parking Program."

- Human Resources Specialists assist in responding to requests for reassignments from employees by providing information on available vacant positions for which they may be qualified. They also handle requests for accommodation from applicants with assistance from the Disabilities Program Manager and/or the selecting official.

- The Accessibility Coordinator, in coordination with the Office of Facilities Engineering and Operations and its components, will handle requests for the removal of architectural barrier(s) on Smithsonian grounds.

## VIII. The Interactive Process - Selecting a Reasonable Accommodation

The individual requesting the accommodation and the Responsible Smithsonian Official

5

**Plt.    EXHIBIT 20**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BETH M. NORDEN, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 05-1232 (RMC) |
| CRISTIAN SAMPER[1] Acting Secretary, Smithsonian Institution, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

This is that rare case in which a plaintiff wins on summary judgment. Plaintiff Beth M. Norden contracted Dengue Hemorraghic Fever ("DHF") in 2000 while traveling in Brazil on the business of her employer, the Smithsonian Institution. The disease nearly killed her and has left her with the permanent presence of dengue antibodies that cause her to suffer from continuing physical and mental ailments. After years of recovery and unsuccessful efforts to return to work part time, in late 2003 Dr. Norden's doctors assured the Smithsonian that she could work a full 40-hour week if she received proper accommodations. In response, the Smithsonian conditioned Dr. Norden's return to work on retaliatory and illegal terms and, when she asked for better accommodations for her genuine disability, it fired her. The Smithsonian does not defend its conduct by arguing that Dr. Norden could not fulfill the essential functions of her job; rather, it asserts that she was not disabled at all. This defense being patently contrary to the undisputed facts, partial summary judgment will be granted to Dr. Norden. Specifically, the Court finds that the Smithsonian violated the

---

[1] Dr. Norden brought this suit against Lawrence Small in his official capacity as Secretary of the Smithsonian. Cristian Samper, the current acting Secretary, is substituted for Mr. Small pursuant to Fed. R. Civ. P. 25(d)(1).

Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.*, when it failed and refused to return Dr. Norden to work in 2004 and discharged her.  The factual record is insufficient, however, to rule on whether the Smithsonian also violated Dr. Norden's rights when it put her on unpaid leave in November 2002.

## I.  FACTUAL BACKGROUND

Dr. Norden holds a Ph.D in entomology.[2]  Pl.'s Statement of Material Facts Not at Issue ("Pl.'s Facts") ¶ 1.  She worked at the Smithsonian's Department of Entomology at the Museum of Natural History for approximately 15 years.  *Id.*  Before contracting DHF, Dr. Norden consistently received positive performance evaluations.  *Id.*; *see also* Def.'s Statement of Material Facts Not at Issue ("Def.'s Facts") Ex. 26.  She was awarded a Fulbright Fellowship to perform research in Sri Lanka and she has published over 50 professional papers in her field.  Pl.'s Facts ¶ 2.  The vast majority of Dr. Norden's work at the Smithsonian required little supervision, and she worked very long hours, often alone, on weekends and evenings.  *Id.* ¶ 3.

In the summer of 2000, Dr. Norden contracted DHF while in Brazil in support of a Smithsonian research project conducted by Dr. Ted Schultz.  *Id.* ¶ 4; Reply Aff. of Beth Norden ¶ 86.  The DHF caused a near-fatal level of hemorrhage that required approximately three weeks of hospitalization.  Pl.'s Facts ¶ 5.  The infection affected all of Dr. Norden's organ systems in different ways: she suffered neurological damage, including brain trauma; an impaired immune system; and a damaged circulatory system in the form of an increased tendency for her capillaries to bleed.  *Id.*

After leaving the hospital, Dr. Norden spent months in intense pain and encephalitic

---

[2]  The facts are not in dispute unless otherwise indicated.

confusion, unable even to read a newspaper competently.[3]  *Id.* ¶ 6.  Although her condition improved

during the next year, her neuropsychologist documented cognitive impairment in the areas of

attention and information processing speed, learning and memory, and performance on timed

measures of mental flexibility.  *Id.*  In April and May 2001, Dr. Norden took a series of neurological

tests at Georgetown University.  *Id.*  She tested at the 16th percentile for auditory attention span; at

the 5th percentile for a test that measured auditory, working memory, and processing speed; and at

the 14th percentile for verbal learning.  *Id.*  By January 2003, however, the same tests revealed that

Dr. Norden's intellectual capacity had returned to a "high level of cognitive function."  *Id.* ¶ 7; Pl.'s

Ex. 2.

   Dr. Norden spent almost the entire period from September 2000 to April 2002 on

complete disability.  Pl.'s Facts ¶ 8.  She attempted a return to work in 2001 at 12 hours per week,

but after four months her doctors determined that even this limited schedule was too physically

stressful for her to continue.  *Id.*  Records of her illness and impaired functioning were sent to the

Smithsonian's physician, Dr. Thomas Lawford, and there appears to be no dispute that Dr. Norden

was too ill to work at that time.  *Id.* ¶ 9.

---

  [3]  The Smithsonian objects that these and other statements of her condition presented by Dr.
Norden "are not proper for consideration on summary judgment, as Ms. [sic] Norden is not a medical
doctor and has no foundation to discuss the specific medical diagnoses of her condition and the
medical effect of that condition."  Def.'s Response to Pl.'s Statement of Material Facts Not At Issue
("Def.'s Fact Response") ¶ 6.  Dr. Norden's statements are not medical diagnoses; they are
statements made from personal knowledge regarding the symptoms she endured.  In fact, the
Smithsonian concedes that, "[t]o the extent a response to paragraph 6 is required, the statements
contained in paragraph 6 are not in dispute, with the caveat that the effects of [DHF] on plaintiff
were not permanent."  *Id.*  Defendant has offered no evidence to support this conclusion, however,
while Dr. Norden has submitted the affidavit of her treating physician, Dr. David Granite, who stated
that the presence of dengue antibodies in Dr. Norden's system is permanent.  Granite Aff. ¶ 4.

-3-

In early 2002 Dr. Norden informed the Smithsonian that she was ready to return to work on a part-time basis. *Id.* ¶ 12. Her physicians and neuropsychologist supported her return to work with accommodations, and Dr. Lawford was provided access to her medical records in order to make his own assessment. *Id.* ¶¶ 13-14. At that time, Dr. Norden had demonstrated substantial cognitive improvement and no longer suffered from acute dengue infection; she did, however, continue to suffer from intense fatigue and other symptoms, such as debilitating migraines. *Id.* ¶¶ 15-16. Dr. Norden's doctors made clear that the light-duty hours were temporary and that her hours could be reevaluated at the end of 2002. *Id.* ¶ 16. Both her neurologist and Dr. Lawford advised the Smithsonian that Dr. Norden needed "flex time" as an accommodation so that she could go to her many doctors' appointments and take time off when she suffered a migraine or other symptoms of her illness. *Id.* ¶ 19.

After Dr. Norden returned to work in April 2002 she began to have difficulties because the museum contained high concentrations of naphthalene, a chemical used to protect insect specimens from being eaten by live insects. *Id.* ¶ 21. Specifically, Dr. Norden suffered persistent and severe nosebleeds that would abate only when she left her work area on the second floor and remained outside the presence of naphthalene for an extended period of time. Norden Aff. ¶ 22. The naphthalene also caused Dr. Norden to suffer frequent and severe migraine headaches and diminished her ability to concentrate. *Id.* Dr. Norden made several requests for some accommodation to reduce or eliminate her exposure to naphthalene. Pl.'s Facts ¶ 26. The parties dispute whether the Smithsonian failed to provide appropriate protection for Dr. Norden to assist her in avoiding naphthalene fumes or whether Dr. Norden refused to accept the protection offered. *Id.* ¶¶ 27-40; Def.'s Fact Response ¶ 27. The Court does not need to resolve this dispute. Suffice it to

-4-

say that by October 2002, Dr. Lawford sent a memo to Smithsonian management that noted that Dr. Norden

> has progressively exhibited symptoms, including nosebleeds, intense headaches, and nausea.  Both hemorrhagic fever, and naphthalene, can cause these symptoms, as well as hematological dysfunction. . . .  In Dr. Norden's case, the two conditions appear to be acting in concert to aggravate her symptoms considerably. . . . We ask that you notify us as soon as possible to the course of actions to be taken to minimize naphthalene exposure to Dr. Norden in the course of her work.

Pl.'s Ex. 15.

Dr. Lawford then met with Dr. Schultz and Marilyn Slomba, of the Smithsonian's Labor and Employee Relations office, to discuss Dr. Norden's exposure to naphthalene.  Pl.'s Ex. 16.  Dr. Schultz asked Ms. Slomba if "we have to offer light duty" and was told "not if it is insufficiently productive toward the departments [sic] goals." *Id.*  Thus freed from an obligation he did not like, Dr. Schultz promptly issued a November 18, 2002, memo to Dr. Norden informing her that her light duty accommodation would be terminated at the end of the month.  Def.'s Ex. 3.  No explanation was provided.  *See id.*  Dr. Norden was returned to 100% disability status on worker's compensation.  *See* Pl's Facts ¶ 36.

After receiving the memo, Dr. Norden sent an email to numerous people asking, "How do I know when it might be safe to return if it is the naphthalene which is activating my current blood problems?" and "Will anything dealing with my exposure be different on return, or is my return based upon no longer being sensitive to naphthalene?"  Pl.'s Ex. 18.  Dr. Lawford responded, "Re when might it be safe to return to (some) naphthalene.  That is an issue where I am in standby waiting for your docs to take the lead in advising. . . ."  Pl.'s Ex. 19.  Smithsonian Program Manager of Cultural Diversity/Affirmative Action Carol Glover sent Dr. Norden an email

telling her that "[t]he goal is for you to successfully return to your job full time." Pl.'s Ex. 20.  A

coworker sent Dr. Norden an email to tell her that Dr. David Furth, Dr. Norden's co-supervisor, had

said that "as of November 30[th] you have been given a year off to try and recuperate fully." Pl.'s Ex.

21.[4]  Dr. Norden replied to both the coworker and Dr. Furth, stating, "I had not known before how

compassionate our dept. could be.  Happy holidays to you both, hold the fort!"  *Id.*

   But Dr. Norden was not happy to be out of work, and in April 2003 she filed an

informal EEO complaint alleging that the Smithsonian had failed to accommodate her disability.

Pl.'s Facts ¶ 59.  She also began receiving therapy from Dr. Donald Oberg, who diagnosed her as

suffering from Major Depressive Disorder, Recurrent Severe without psychotic features, and Post-

Traumatic Stress Disorder.  *Id.* ¶¶ 59-60.  These psychological conditions have caused Dr. Norden

to experience problems socializing, sleeping, and eating.  *Id.*  In addition, she has experienced poor

self-image and an inability to take pleasure in life.  *Id.* ¶ 60.

   On November 5, 2003, approximately one year after Dr. Norden's part-time

assignment was terminated, Dr. Schultz sent Dr. Norden a letter saying that the Smithsonian was

permanently terminating her employment.  Def.'s Facts ¶ 16; Def.'s Ex. 6.  Dr. Schultz described

the history of Dr. Norden's attempts to return to work after contracting DHF and concluded that,

based on her "medical limitations," she could not "perform the essential functions of [her] position."

Def.'s Ex. 6.  Dr. Norden responded on November 13, 2003, that she was ready to return to work full

time with accommodations for naphthalene sensitivity, "flex time" to accommodate her many doctor

---

  [4] The Smithsonian protests that this is double hearsay and not appropriate for consideration
for summary judgment.  Def.'s Fact Response ¶ 51.  However, Dr. Norden does not proffer this
exchange for the truth of the matter asserted but for evidence of her state of mind, which is an
exception to the hearsay rule.  *See* Fed. R. Evid. 803(3).

appointments and migraine headaches, and an absence of retaliation and hostility from the

Smithsonian. Def.'s Ex. 7. One month later, Dr. Schultz sent a memo to his superiors with the

subject line, "My resignation as Norden's supervisor," which stated in part:

> I want to make it perfectly clear that in the event that Beth Norden
> returns to duty in the Department of Entomology, **I will not** serve as her
> supervisor. . . .
>
> In her letter of 13 November 2003, transmitted via her attorney
> Vickie Fang, Beth requests a "protocol" to protect her from the "retaliation"
> and "continued hostility" that she expects to encounter when she returns.
> Given this fear, and given the events that have transpired during the three
> years since Beth contracted dengue fever, I think a "fresh start" is in the best
> interests of both Beth and myself. In my opinion, Beth should be assigned
> to another supervisor and another unit, ideally outside of Entomology.

Pl.'s Ex. 30 (boldface in original).

Dr. Schultz's ultimatum notwithstanding, the Smithsonian asked Dr. Norden to

submit updated medical records. Pl.'s Facts ¶ 66. Dr. Norden provided letters from her doctors,

which were reviewed by Dr. Lawford. *Id.* ¶ 67; Def.'s Exs. 8-10. Dr. Lawford also spoke with Dr.

Norden's doctors and with her, Def.'s Facts ¶ 21, and, based on his review, he drafted a report

advising Ms. Slomba as follows:

> Her illness and outage are an accepted [Office of Workers'
> Compensation Programs] case, caused by her contracting a near fatal
> mosquito-borne disease while on the job in Brazil in August of 2000. This
> was/is a multisystem disease which affected her physically, mentally and
> neurologically. Her last return to work in her department, Entomology, was
> from April to November in 2002 at 20 hours per week. Her department felt
> that they could not continue with this accommodation.
>
> Overall Recovery: Both providers advise me that she has, albeit
> slowly, made great progress in recovery from her cluster of symptoms.
> While her disease is still present in vastly diminished form, it is
> considerably improved from the period she attempted work at 20 hours per

Case 1:05-cv-01232-RMC    Document 38    Filed 08/03/2007    Page 8 of 47

week. They both feel that she is now capable of performing her full duties for 40 hours per week. . . .

Dr. Oberg has (successfully) been treating her for a mental state of dysfunctionality caused by "a state of devaluation" and her perception of punishment by the combination of her disease and her management's unacceptance. He advises that for her to remain mentally healthy and fully functional, she should be given work that is as mentally demanding as the "work she performed prior to contracting" her disease. He says that "this is particularly important in that doing less intellectually demanding work in all likelihood will . . . deprive her of the intellectual stimulation essential to neurological recovery" and possibly resurrect her former mentally dysfunctional status.

. . . .

Migraines - naphthalene Beth has a history of migraine headaches. They occurred sporadically before her disease process began in August of 2000. After her disease began in August of 2000 the migraines were almost nonstop, requiring narcotics. Their frequency and intensity gradually lessened over the next several years. Beth discovered upon her attempts to return to work that naphthalene . . . would trigger a migraine. . . . Both of her providers are certain, as am I, that the naphthalene trigger is a feature generated by her August 2000 disease.

Dr. Oberg writes that for her return to be successful she "would require protection from exposure to naphthalene – this would include both atmospheric exposure and direct contact due to specimen handling. Dr. Norden's sensitivity to naphthalene is a direct consequence of the (diagnosis August 2000) [sic]."

Dr. Granite writes that "I believe that she is a strong candidate for . . . [c]ontrol procedures to limit her exposure to naphthalene." He earlier said in his letter that the August 2000 disease causes her to have capillary fragility and easy bleeding which is triggered by naphthalene. This easy bleeding in turn triggers migraines. I concur in this.

Both providers advised that management should be prepared for her need for "flex time." . . . They are strictly speaking of any time lost to leaving work from a migraine, which she might want to make up another day. Of even more consequence, however, is the fact that Beth has numerous medical appointments each month. Some she can schedule outside of work hours, others she cannot. . . .

-8-

> <u>Migraine Frequency</u> Beth is, at this stage in recovery down to having
> typically two, sometimes three migraines in a month's time.  Her providers
> agree with this figure.  The question I know management wants to ask me
> is "What will be the frequency once she re-enters the naphthalene ambient
> atmosphere [in] her department?"  I have asked both providers, and even
> asked Beth.  No one knows.  Her overall disease process and its symptoms
> have lessened since she last worked 20 hours per week, so I would hold that
> she should experience less migraine frequency in the workplace than she
> had one year ago.

Def.'s Ex. 10.  Dr. Lawford ended his memo recommending that Dr. Norden return to work.  *Id.*

Several months later, in April 2004, Dr. Norden received a return-to-work proposal, from the Smithsonian ("the RTWP"), which was comprised of two separate documents: a Work Plan that specified, among other things, the type of work that Dr. Norden would be assigned when she returned to work; and a "Settlement Agreement," which imposed further terms and conditions on Dr. Norden's continued employment at the Smithsonian.  Pl.'s Facts ¶ 69; Def.'s Exs. 11-12.  Under the Work Plan, Dr. Norden would perform collections work almost exclusively; she would not perform any research or writing projects similar to the work she did before contracting DHF.  Def.'s Ex. 12.  Because the collection work involved dealing with preserved insect specimens, it would require prolonged daily exposure to high concentrations of naphthalene.  Pl.'s Facts ¶ 72.  The Work Plan also detailed specific tasks and the length of time allowed to complete them.  *See* Def.'s Ex. 12.  For instance, in "Month 3," Dr. Norden was to "crea[te] and affix all drawer labels needed in the Odonate envelope collection (3 days); take data, create & affix labels to the Mallophaga collection drawers (3 days); and upgrade and inventory the Tiphiid collection (13 days)."  *Id.*  From the outset, the Smithsonian made clear that it was unwilling to negotiate the "work assignments" and "standards" that were described in the Work Plan.  Pl.'s Ex. 5 at p. 1.

The other component of the RTWP, the so-called "Settlement Agreement," purported to provide the accommodations that Dr. Norden requested and imposed other conditions on Dr. Norden's return to work. *See* Def.'s Ex. 11. That document indicated that Dr. Norden would receive an office on the fourth floor, away from the insect collections, and a respirator but not a portable air filter, as she had requested, because "the Smithsonian Office of Environmental Safety had determined [it] would be ineffective." *Id.*; Pl.'s Facts ¶ 71. It also included an Alternative Work Schedule, requiring Dr. Norden to work from 8:00 a.m. to 5:30 p.m., Monday through Friday, with the second Friday of the pay period off, during which she could work as needed to make up any missed hours. Def.'s Ex. 11. Dr Norden would not be permitted to "perform work outside of these hours." *Id.* The Settlement Agreement also included the following paragraphs:

- Dr. Norden agrees to meet her performance standards by accomplishing the tasks outlined in her work plan in an accurate and timely manner, and to demonstrate satisfactory and punctual attendance . . . .

- Dr. Norden's supervisors will review her performance and her attendance every 320 hours (8 weeks) and on an as-needed basis, to assess and provide feedback on her success in meeting the standards established in the performance plan as specified in her work plan.

- The Smithsonian agrees to hold Dr. Norden's separation in abeyance while she demonstrates satisfactory performance and attendance as shown by compliance with this agreement, as judged at the end of each 320-hour (8-week) review cycle. Absences will not be acceptable reasons for not meeting the work plan and performance requirements.

- The parties understand that it is critical that Dr. Norden adhere to each of the provisions of this agreement and that any failure to adhere to those provisions, as evaluated at the end of each 8-week review cycle, will result in her separation from the rolls of the Smithsonian as proposed in the November 5, 2003 letter, during the duration of this agreement.

- Dr. Norden waives her right to grievance/arbitration procedures, to appeal to the Merit Systems Protection Board and any right to file suit in Federal or state court for

any adverse actions based on performance or conduct taken against her during the life
of this agreement or on any separation effected as a result of her failing to meet the
terms of this agreement.

*Id.* ¶¶ 12-13, 15-16, 19.

Before becoming ill with DHF, research and writing were 70% of Dr. Norden's

workload, while specimen collection and support accounted for only 30%. Pl's Reply Ex. 10.

Consequently, Dr. Norden was distressed that, for the first time in her career, she was being assigned

a workload that did not involve researching and writing papers. Pl.'s Facts ¶ 79. The RTWP caused

Dr. Norden emotional and physical distress in the form of serious and increased nightmares,

migraine headaches, and a painful sense of devaluation and punishment. Pl.'s Facts ¶ 79. Dr. Oberg

believes that the Smithsonian's proposal caused a setback in Dr. Norden's treatment.[5] *Id.* ¶ 80. On

April 19, 2004, Dr. Norden, through her counsel, informed the Smithsonian that she could not return

to work under the conditions contained in the RTWP. Def.'s Facts ¶ 25. And, based on the RTWP,

she filed a new EEO complaint alleging retaliation due to her prior EEO charge. Pl.'s Facts Ex. 31.

In response to Dr. Norden's rejection of the RTWP, the Smithsonian sent a letter to

Dr. Norden's counsel attaching a revised return-to-work agreement that did not require Dr. Norden

to relinquish any legal rights as a condition of her return to work. Def.'s Ex. 17. The other

provisions of the proposal, however, remained the same. *See id.* There being little material

difference between the "revised" return-to-work proposal and the original RTWP, Dr. Norden

refused to accept it. Def.'s Facts ¶ 31; Def.'s Exs. 18, 20. The Smithsonian was unwilling to

---

[5] The Smithsonian does not contest these facts, Def.'s Fact Response ¶ 80, although it
disputes that Dr. Norden's emotional and physical pain were caused by its conduct. *Id.* Whether the
Smithsonian caused Dr. Norden's symptoms to worsen, however, is not relevant to Defendant's
liability on her Rehabilitation Act claims.

address Dr. Norden's concerns and indicated that her refusal to accept the RTWP would result in her termination. Def.'s Ex. 19.

After reaching an impasse on a plan to return Dr. Norden to her former position, Dr. Norden's counsel asked the Smithsonian if there were any other positions for which Dr. Norden might be considered that did not involve exposure to naphthalene. Def.'s Ex. 20. In response, the Smithsonian conducted a single 30-day search and located one vacant position in a nonscientific job registering live animals at the Smithsonian Institution's National Zoo. *See* Def.'s Facts ¶ 41; Def.'s Ex. 22. Defendant did not offer to reassign Dr. Norden to the National Zoo position; rather, it invited her to demonstrate that she met the vacancy's selection factors and advised her that "it would be essential for [her] to provide a statement of her knowledge of professional museum registration methods and collection management standards used in a zoo or similar wildlife setting." *Id.*; Pl.'s Ex. 32. Dr. Norden had no such training or experience and declined to apply. Pl.'s Facts ¶ 86.

Dr. Norden was terminated on October 8, 2004, on the basis that she refused to accept the April 2004 RTWP and refused to apply for the Zoo position. Pl.'s Ex. 33. Dr. Norden was not offered a disability retirement: she remains unemployed and dependent on workers' compensation. Norden Aff. ¶ 53.

## II. LEGAL STANDARDS

Under Federal Rule of Civil Procedure 56, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v.*

Case 1:05-cv-01232-RMC    Document 38    Filed 08/03/2007    Page 13 of 47

*Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). Summary judgment is properly granted against a party that "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson*, 477 U.S. at 248. A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. The nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Greene*, 164 F.3d at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

### III. ANALYSIS

In her First Amended Complaint, Dr. Norden asserts two causes of action: failure to accommodate her disability under Section 501 of the Rehabilitation Act; and retaliation based on

protected EEO activity. Am. Compl. ¶¶ 142-163. Dr. Norden moves for summary judgment as to both claims, and Defendant has filed an opposition and cross-motion for summary judgment.

### A.　　Failure to Accommodate.

The Rehabilitation Act of 1973 "governs employee claims of handicap discrimination against the Federal Government. Its basic tenet is that the Government must take reasonable affirmative steps to accommodate the handicapped, except where undue hardship would result." *Barth v. Gelb*, 2 F.3d 1180, 1183 (D.C. Cir. 1993). It specifically requires federal executive agencies and the Smithsonian to develop affirmative action plans for the hiring and integration of disabled persons into their work forces. 29 U.S.C. § 791. Because of the affirmative action obligations placed on federal agencies and the Smithsonian, "[i]t is well established both by the statutory language and Supreme Court decisions interpreting the [Rehabilitation] Act that federal employers have greater duties to accommodate disabled workers under [29 U.S.C. § 791] than the duties owed by federal grantees under [29 U.S.C. § 794] or those owed by employers under the ADA." *Woodman v. Runyon*, 132 F.3d 1330, 1343 (10th Cir. 1997).

The standards used to determine whether a federal agency has violated the Rehabilitation Act are now the same standards that are applied under the Americans with Disabilities Act, 42 U.S.C. §§ 12111 *et seq* ("ADA"). *See* 29 U.S.C. § 791(g). To establish a prima facie case for failure to accommodate under these standards, a plaintiff must demonstrate that she is a qualified person with a disability; that she can perform the essential functions of her job with or without reasonable accommodation; and either that her employer failed to reasonably accommodate her disability or that she was terminated due to her disability. *Barth*, 2 F.3d at 1186; *Carr v. Reno*, 23 F.3d 525, 529 (D.C. Cir. 1994).

-14-

A "qualified individual" is one "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *Breen v. Dep't of Transp.*, 282 F.3d 839, 841 (D.C. Cir. 2002). "Essential functions" are the fundamental duties of a position. 29 C.F.R. § 1630.2(n)(1). Some of the factors that courts evaluate in determining whether a job function is "essential" include the amount of time that is required to perform the function; the consequences of not requiring that such function be performed; and whether current and former employees holding the same position performed the function. *See Baker v. Potter*, 294 F. Supp. 2d 33, 43 (D.D.C. 2003); 29 C.F.R. § 1630.2(n)(3). Courts frequently defer to the employer's judgment as to what functions of a job are essential. *Kalekiristos v. CTF Hotel Mgmt. Corp.*, 958 F. Supp. 641, 660 (D.D.C. 1997). An individual who cannot perform the essential duties of her job, even with an accommodation, is not "qualified" under the statute. *Chinchillo v. Powell*, 236 F. Supp. 2d 18, 24 (D.D.C. 2003).

An individual is "disabled" for purposes of the Rehabilitation Act if she (1) suffers from "a physical or mental impairment that substantially limits one or more of [her] major life activities"; (2) has "a record of such an impairment"; or (3) is "regarded as having such an impairment." 42 U.S.C. § 12102(2). This definition does not include "impairments that interfere in only a minor way with the performance of manual tasks"; to qualify under the Act, an impairment must "prevent[] or severely restrict[] the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long term." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197-98 (2002).

A federal employer must reasonably accommodate the known limitations of an employee who is a qualified individual with a disability unless it can demonstrate that the

-15-

accommodation would impose an undue hardship on its operations. *Carr*, 23 F.3d at 528-29. In other words, accommodations are reasonable if they allow the employee to perform the essential functions of the job without imposing undue hardship on the employer. *Chinchillo*, 236 F. Supp. 2d at 23. It is the employee's burden to identify reasonable accommodations that would allow her to perform the essential functions of the job, and the agency has the burden of showing undue hardship. *Id.* at 23-24. In determining whether an accommodation would impose an undue burden, factors to be considered include, but are not limited to, the nature and cost of the accommodation. 29 C.F.R. § 1613.704(c)(3).

The duty to accommodate is a continuing duty that is not exhausted by one effort. *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1138 (9th Cir. 2001). Reasonable accommodation may include job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, and reassignment to another position. 42 U.S.C. § 12111(9)(B); 29 C.F.R. § 1630.2(*o*); *Carr*, 23 F.3d at 529. The duty to accommodate does not require an employer to relieve the employee of any essential functions of the job or modify the actual duties. *Robertson v. Neuromedical Ctr.*, 161 F.3d 292, 295 (5th Cir. 1998); *Chinchillo*, 236 F. Supp. 2d at 24.

If accommodation cannot be made in the employee's current position, the federal employer must consider the feasibility of reassigning the disabled employee to a vacant position. *Carr*, 23 F.3d at 530; *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1301 (D.C. Cir. 1998); *see* 42 U.S.C. § 12111(8) (defining a qualified individual with a disability as one who, with or without reasonable accommodation, "can perform the essential functions of the employment position that such individual holds *or desires*.") (emphasis added). The parties have a duty to proceed in a "reasonably interactive manner" to determine whether the employee would be qualified, with or

-16-

without reasonable accommodations, for another job assignment, and, if so, to identify an appropriate reassignment opportunity. *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1173 (10th Cir. 1999); *see also Aka*, 156 F.3d at 1304 n.27 (employee had an obligation to demonstrate that there was a vacant position to which he could have been assigned and employer had a corresponding duty to help identify appropriate job vacancies).

Dr. Norden's Rehabilitation Act claim is based on two separate but related incidents in which the Smithsonian allegedly failed to accommodate her disability. The first occurred in 2002, when Dr. Norden returned to work on a light-duty schedule. The second occurred in 2003-2004, when Dr. Norden attempted to return to work full time after the Smithsonian placed her on one-year unpaid medical leave. Because each incident raises distinct legal and factual issues, the Court will analyze them as two separate claims under the Rehabilitation Act.

       *1.    Claim based on Dr. Norden's 2002 return to work.*

Dr. Norden argues that Defendant violated the Rehabilitation Act in 2002 when the Smithsonian could find no solution to her sensitivity to naphthalene. *See* Pl.'s Mem. of P. & A. In Support of Mot. for Summ. J. ("Pl.'s Mem.") at 14-16. Defendant raises several arguments in opposition, but his primary position is that Dr. Norden is precluded from bringing this claim because she did not contact an EEO Counselor within 45 days of the November 30, 2002, termination of her light-duty assignment as required by 29 C.F.R. § 1619.105. *See* Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J. and in Support of Def.'s Cross-Mot. for Summ. J. ("Def.'s Mem.") at 10-12. Dr. Norden concedes, as she must, that she failed to consult an EEO counselor until April 2003, more than 45 days after she was placed on unpaid leave. Pl.'s Mem. at 17. She nonetheless advances four arguments in an effort to avoid the 45-day requirement.

-17-

First, she contends that her EEO complaint in April 2003 was timely because Defendant's failure to accommodate her disability was ongoing. *See* Pl.'s Mem. at 19-21. Under the so-called "continuing violations" doctrine, an employee may file a timely Rehabilitation Act claim based on incidents that occurred outside the limitations period if those incidents were part of a discriminatory practice that was "continuing in nature." *Gary v. Washington Metro. Area Transit Auth.*, 886 F. Supp. 78, 89 (D.D.C. 1995). "[A] continuing violation is one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period . . . ." *Taylor v. F.D.I.C.*, 132 F.3d 753, 765 (D.C. Cir. 1997) (internal quotation marks and citation omitted). However, "discrete claims of retaliation that are time-barred do not become timely by alleging one timely retaliatory act related to earlier, untimely, retaliatory acts." *Coleman v. Potomac Elec. Power Co.*, 310 F. Supp. 2d 154, 159-60 (D.D.C. 2004) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)). Dr. Norden argues that the Smithsonian's refusal to accommodate her disability was ongoing from 2002 through 2004, and thus her failure to file an EEO claim within 45 days of being placed on unpaid leave in November 2002 is not a bar to her Rehabilitation Act claims based on events that led to that employment action. Pl.'s Mem. at 19-21.

The Court disagrees. Defendant's failure to accommodate Dr. Norden's sensitivity to naphthalene, and the decision to terminate her light-duty assignment and place her on one-year unpaid leave, were discrete acts. They were obviously related to later acts of alleged discrimination, but that alone is insufficient to render them part of a "continuing violation." *See Coleman*, 310 F. Supp. 2d at 159-60. Moreover, the nature of those acts was clear at the time; a reasonable employee would have immediately known that it was necessary to file a claim. *See Taylor*, 132 F.3d at 765.

-18-

The Court finds that the Smithsonian's termination of Dr. Norden's light duty in 2002 consisted of a discrete act and, as a result, was subject to the 45-day filing requirement of 29 C.F.R. § 1619.105.

Next, Dr. Norden argues that the 45-day requirement should be equitably tolled because Smithsonian officials lulled her into inaction by falsely assuring her that her disability would be accommodated. Pl.'s Mem. at 21-22 (citing emails in which Smithsonian employees indicated that they were endeavoring to return Dr. Norden to work). The facts simply do not support this argument. Equitable tolling is applied sparingly and should be invoked "only in extraordinary and carefully circumscribed circumstances." *Norman v. United States*, 467 F.3d 773, 776 (D.C. Cir. 2006) (internal quotation marks omitted). There is nothing in the record indicating that anyone at the Smithsonian misled Dr. Norden about her work status in November 2002 or that anyone tricked her into believing that she would be immediately returned to work with the accommodations she was seeking. *See* Pl.'s Exs. 18-21. In fact, the Smithsonian's November 18, 2002, memo to Dr. Norden was quite clear that the Smithsonian was giving up on the plan to have her work part time. *See* Def.'s Ex. 3. Simply put, the facts in the record do not amount to the type of extraordinary circumstances that justify equitable tolling.

Third, Dr. Norden contends that she complied with the 45-day requirement because she sent emails to various Smithsonian employees that amounted to informal EEO complaints. Pl.'s Opp'n/Reply Mem. at 5-6. Specifically, she cites a November 29, 2002, email that she sent to numerous Smithsonian employees, including Carol Gover of the Smithsonian's Office of Equal Employment and Minority Affairs, in which she asked whether the Smithsonian would make different accommodations or whether her return to work was dependent upon her no longer being sensitive to naphthalene. Pl.'s Ex. 19. She also points out that she met with the Smithsonian

-19-

Ombudsman "to discuss [her] need for accommodation for her naphthalene exposure." Pl.'s Opp'n/Reply Mem. at 6 n.3.

This argument is also unavailing. In order to satisfy the exhaustion requirement, an employee must contact an EEO Counselor. *See* 29 C.F.R. § 1614.105(a). There is no dispute that none of the individuals who Dr. Norden contacted before April 2003, including Ms. Gover, was designated as an EEO Counselor. Informal efforts to resolve employment disputes outside the EEO process do not satisfy the requirements of § 1615.105(a). *See Carter v. Greenspan*, 304 F. Supp. 2d 13, 23-24 (D.D.C. 2004); *see also Washington v. Washington Metro. Area Transit Auth.*, 160 F.3d 750, 752-53 (D.C. Cir. 1998). Moreover, the substance of the contacts in question was insufficient to put the Smithsonian on notice that Dr. Norden was raising an EEO claim; the evidence shows only that Dr. Norden and the Smithsonian employees were engaged in the interactive process required by the Rehabilitation Act to determine what, if any, reasonable accommodations would allow Dr. Norden to return to work.

Finally, Dr. Norden argues that she should have received an extension to file her administrative claim because she did not know of the 45-day requirement. Pl.'s Opp'n/Reply Mem. at 7. Dr. Norden is correct that, under the express language of the regulations, the 45-day deadline must be extended when the employee "shows that he or she was not notified of the time limits and was not otherwise aware of them." 29 C.F.R. § 1614.105(a)(2). Dr. Norden submitted an affidavit in which she indicates that she was unaware that she was required to contact an EEO Counselor within 45 days of an adverse employment action. *See* Norden Reply Aff. ¶¶ 7-10.

Defendant argues that Dr. Norden was at least on constructive notice of the requirement because she conceded in her deposition that she had access to EEO posters and to the

-20-

Smithsonian's "PRISM" computer system, both of which allegedly contained information regarding the filing deadline. *See* Def.'s Reply Mem. at 8-9; Def.'s Reply Ex. 2 (Norden Dep) at 121-123. Defendant relies on *Harris v. Attorney Gen. of U.S.*, 400 F. Supp. 2d 24, 28 (D.D.C. 2005), in which the district court refused to suspend the 45-day requirement where the defendant had shown that the plaintiff had access to rooms containing EEO posters that displayed that requirement. *See* Def.'s Rely Mem. at 9. Since Defendant filed his brief, however, the D.C. Circuit reversed the *Harris* decision, holding that the record did not conclusively establish that the plaintiff had constructive notice of the 45-day deadline. *See Harris v. Gonzales*, 448 F.3d 442, 445 (D.C. Cir. 2007). The Circuit followed the Seventh Circuit's lead in *Johnson v. Runyon*, 47 F.3d 911, 918 (7th Cir. 1995), in which it declined to adopt a "'strict theory of constructive notice' and instead set out a two-step inquiry: (1) whether 'notification of the time requirements was provided,' and (2) whether the notification was 'reasonably geared to inform the complainant of the time limits.'" *Harris*, 448 F.3d at 445 (citations omitted). Applying that standard, the D.C. Circuit noted that the posters that the plaintiff allegedly saw were not part of the record and, as a result, it was impossible to determine whether the posters' language and manner of display were "reasonably geared" towards informing the plaintiff of the 45-day deadline. *Id.*

Here, as in *Harris*, the record does not contain a copy of the posters that allegedly put Dr. Norden on notice of the Rehabilitation Act's time limits. Carol Youmans and Tracey Cones submitted affidavits in which they indicate where some of the posters were located, but they do not provide any information regarding the manner in which they were displayed. *See* Youmans Aff. ¶¶ 6-8; Cones Aff. ¶¶ 6-8. Dr. Norden, for her part, contends that she never saw the posters. Def.'s Reply Ex. 2 (Norden Dep) at 121-123. The only evidence regarding the posters' content is Ms.

Youmans's affidavit, in which she says that the posters "contain information about how to file a claim." Youmans Aff. ¶ 5. Similarly, an affiant indicates that the Smithsonian's PRISM computer system contained "a notice regarding employees' Equal Employment Opportunity rights, responsibilities, and time frames for filing complaints," Karen Margensey Aff. ¶ 2, but the actual language of that notice is not provided. This evidence is insufficient to establish that the posters and PRISM notice were "reasonably geared" towards informing employees of the 45-day requirement. *See Harris*, 448 F.3d at 445. The Court "cannot say that no reasonable jury, viewing the evidence in the light most favorable to [Dr. Norden] and drawing all inferences in her favor, could conclude that she lacked constructive notice of the 45-day requirement." *Id.* Because there is a material issue of disputed fact as to Dr. Norden's knowledge of the 45-day requirement, the Court must deny without prejudice both parties' motions with respect to Dr. Norden's Rehabilitation Act claim arising from her return to work in 2002.

> 2.    *Claim based on Dr. Norden's attempt to return to work in 2003-2004.*

There is no question that Dr. Norden's Rehabilitation Act claim arising from her attempt to return to work in 2003-2004 was timely. Thus, the question is whether there is sufficient evidence to support the claim or whether, as Defendant contends, Dr. Norden cannot make a prima facie showing of a failure to accommodate a disability in violation of the Rehabilitation Act.

> a.    <u>Was Dr. Norden disabled?</u>

The first element of Dr. Norden's prima facie case is a showing that she was disabled at the time in question. *See Barth*, 2 F.3d at 1186. Dr. Norden claims that she suffered from both a physical and mental impairment in 2003-2004. Pl.'s Mem. at 7-9. With respect to her physical disability, Dr. Norden submits her own affidavit as well as a letter and affidavit from her treating

-22-

physician, Dr. David Granite.  In her affidavit, Dr. Norden explains the horrific symptoms she endured after she contracted dengue fever in August 2000.  Norden Aff. ¶¶ 5-7.  She also explains that one year after surviving the acute DHF infection she still suffered from significant cognitive impairment, particularly in the areas of information processing and memory.  *Id.* ¶ 7.  By January 2003, however, her "intellectual functioning was documented as having returned to the 'oftentimes superior level,'" *id.* ¶ 8, and she "demonstrated substantial, though not full, cognitive improvement[] and no longer suffered from the acute dengue infection," *id.* ¶ 12.  Although Dr. Norden continued to suffer from intense fatigue, her doctors approved a limited return to work with accommodations.  *Id.* ¶ 14.

Dr. Norden's affidavit also makes several assertions about her current medical condition.  She states that "[t]he presence of [the dengue] antibodies is permanent, and their effect on [her] capillary system is also ongoing."  *Id.* ¶ 15.  As a result, she is susceptible to "migraine headaches, severe loss of energy, bruising, and cognitive impairment severe enough to render [her] unable to work, learn, or care for herself [sic] in many of [her] daily functions."  *Id.*  Dr. Norden further states that "[t]he permanent presence of the dengue antibodies also causes [her] immune system to be compromised so that any infection can cause severe and alarming results."  *Id.* ¶ 16.  As an example, Dr. Norden states that in July 2006 her daughter's cat bit her on the hand, which resulted in an eight-day hospital stay, surgery, and nearly required the hand to be amputated.  *Id.*  Dr. Norden still suffers ongoing pain and dramatic swelling, and further surgery may be necessary.  *Id.*  Dr. Norden also states that "[h]eat, stress, and exposure to certain chemicals can trigger" significant capillary bleeding.  *Id.*  In addition, Dr. Norden is unable to have sexual intercourse "because the physical pressure involved causes [her] to bleed heavily."  *Id.*

-23-

In his letter dated November 26, 2003, just a few months before Dr. Norden was presented with the RTWP, Dr. Granite explained Dr. Norden's then-current medical condition. *See* Def.'s Ex. 9. He stated that, while she had improved since contracting DHF in 2000, Dr. Norden "has continued to have problems with both easy bleeding and severe recurrent migraines. Her easy bleeding is caused by membrane fragility from the dengue fever and has been severely aggravated by naphthalene exposure. This in turn has caused her to have frequent severe incapacitating migraines." *Id.* Dr. Granite also submitted an affidavit in this case in which he confirms that the presence of dengue "antibodies is permanent, and their effect on [Dr. Norden's] capillary system has been ongoing since her exposure to dengue fever." Granite Aff. ¶ 4. Dr. Granite further states that the dengue antibodies "cause [Dr. Norden's] immune system to be compromised and function in an abnormal manner so that any infection can cause severe and alarming results." *Id.* Dr. Granite describes Dr. Norden as being "chronically ill from DHF," *id.* ¶ 5, and clarifies that her migraines are prompted by triggers (such as naphthalene and other chemicals), which makes their frequency and severity difficult to predict, *id.* ¶ 10.

With respect to her mental disability, Dr. Norden submitted a letter and an affidavit from her psychologist, Dr. Oberg. *See* Def's Ex. 8. According to Dr. Oberg, as of November 2003 Dr. Norden was suffering from Post-traumatic Stress Disorder and Major Depressive Disorder. *Id.* These conditions resulted from Dr. Norden's experience with DHF and were "exacerbated by her problems at her work in terms of obtaining accommodations and by the loss of the intellectual stimulation of her job in terms of doing research . . . for the purpose of publishing and advancing the science of Entomology." Oberg Aff. ¶ 6. "These mental conditions make Dr. Norden much more vulnerable to stress" and also cause her to suffer from frequent nightmares. *Id.* ¶ 7. Dr. Oberg noted

that these ailments are difficult to treat due to Dr. Norden's inability to take certain medication, such as antidepressants, because of the lingering effects of DHF. *Id.* ¶ 8.

Defendant's staff physician, Dr. Lawford, summarized the diagnoses provided by Dr. Norden's doctors in his own 2003 report on Dr. Norden's condition. *See* Def.'s Ex. 10. Dr. Lawford acknowledged that her condition was "an accepted case, caused by her contracting" DHF in August 2000 and that her condition "was/is a multisystem disease which affected her physically, mentally and neurologically." *Id.* Dr. Lawford concurred in the conclusion that Dr. Norden's naphthalene sensitivity "is a feature generated by" the DHF and was the cause of her migraine headaches in 2000. *Id.* He also agreed that the lingering effects of DHF caused Dr. Norden to experience capillary fragility and easy bleeding. *Id.* Dr. Lawford further indicated that neither he, nor Dr. Norden's doctors, could predict how renewed exposure to naphthalene would impact Dr. Norden's health. *Id.*

According to Dr. Norden, this evidence demonstrates that she is substantially impaired in the major life functions of "learning, concentrating, self care, and sexual activity." Pl.'s Mem. at 8. Specifically, Dr. Norden points to her frequent migraines, which can be triggered by heat, stress, changes in barometric pressure, and certain chemicals; her frequent bleeding; her "inability to thermo regulate"; and her inability to engage in sexual relations. *Id.* Defendant argues that this evidence is insufficient to show that Dr. Norden suffered a disability that impaired a major life function. Def.'s Mem. at 18 ("Plaintiff's condition was not a 'disability' requiring accommodation when she requested to return to work in November 2003"). Defendant points out that by 2003 Dr. Norden's capacity to learn had returned to normal, *id.* at 20, and that Dr. Norden's migraines could be controlled by medication and were not sufficiently severe or persistent to

interfere with her major life activities, *id.* at 20-22; Def.'s Reply at 10 ("as of December 2003 . . . plaintiff had recovered and was able to return to work").

    The Court agrees with Defendant that the evidence does not support Dr. Norden's claim that her ability to learn was substantially impaired in 2003-2004; by her own admission, at that time her "intellectual functioning . . . [had] returned to the 'oftentimes superior level.'" Norden Aff. ¶ 8. Defendant is flat wrong, however, when he argues that Dr. Norden was not disabled because she was cleared to return to work. *See* Def.'s Reply at 10. If an employee's ability to return to work, with accommodations, constituted proof that the employee was not disabled, the Rehabilitation Act would be a dead letter. Tellingly, Defendant makes no attempt to address Dr. Norden's Post-Traumatic Stress Disorder and severe depression, her fatigue, susceptibility to bruising, compromised immune and capillary systems, or her inability to have sexual intercourse — all of which are long-term and caused by the dengue infection. This unchallenged evidence is sufficient to establish that in 2003-2004 Dr. Norden was disabled within the meaning of the Rehabilitation Act.

    First, it is undisputed that Dr. Norden is unable to have sexual relations due to her propensity to bleed easily, which is caused by the dengue antibodies that are permanently present in her system. Norden Aff. ¶ 16. This Court has previously held, as have other courts, that the ability to engage in sexual relations is a major life activity. *Doe v. District of Columbia*, 796 F. Supp. 559, 568 (D.D.C. 1992); *see also McAlindin v. County of San Diego*, 192 F.3d 1226, 1234 (9th Cir. 1999) ("We conclude that engaging in sexual relations, just like procreation, is a major life activity.") (citing *Bragdon v. Abbott*, 524 U.S. 624, 638 (1998)); *Powell v. City of Pittsfield*, 221 F. Supp. 2d 119, 146 (D. Mass. 2002) ("[C]ourts have had little trouble finding that 'sexual relations' is also a major life activity."). This alone is sufficient to render Dr. Norden disabled under the Act.

Dr. Norden's major life activities were also impaired during the relevant time period by other effects of her illness, including: (1) Post-Traumatic Stress Disorder and Major Depressive Disorder; (2) frequent and debilitating migraine headaches; (3) a severely compromised capillary system that bleeds when she is exposed to heat or chemicals, causing extensive and persistent bruising; and (4) an immune system that is so impaired that a scratch could cause life-threatening infection. These ailments caused Dr. Norden to be in an extremely fragile mental and physical state. Her post-traumatic stress disorder and depression caused her to suffer fatigue and nightmares, impaired her ability to socialize, and deprived her of the ability to take pleasure in life. Her migraine headaches were unpredictable and, when they occurred, totally debilitating. And her immune deficiency placed her at peril from everyday activities — a person who risks losing her hand due to a cat bite is obviously restricted from engaging in all sorts of physical activities that most people take for granted. These impairments were severe, they affected Dr. Norden's mental and physical well being, they were long-term or — in the case of her compromised capillary and immune systems — permanent. *See* 29 C.F.R. § 1630.2(j)(2) (listing factors that should be considered in determining whether an individual is substantially limited in a major life activity). In combination, they rendered Dr. Norden unable to function as a normal person and to live free from constant pain and fear. Accordingly, the record allows no genuine dispute that in 2003-2004 Dr. Norden suffered from a disability that restricted her from engaging in activities that are of central importance to most people's daily lives.[6]

_____

[6] The Smithsonian makes a faint argument that it had insufficient knowledge of Dr. Norden's condition in 2003, Def.'s Reply at 13-14, but this is yet another argument unsupported by the clear facts. Dr. Lawford had full information about Dr. Norden. *See, e.g.*, Def.'s Ex. 10.

Even if Dr. Norden could not establish that, in 2003-2004, she had an impairment that substantially restricted one or more major life activities, she may still establish that she was disabled under the Rehabilitation Act by demonstrating that she had a "record of such an impairment." 42 U.S.C. § 12102(2); 29 U.S.C. § 705(20)(B)(ii); 29 C.F.R. § 1630.2(k). An employee is disabled under this definition if she "'has a history of . . . a mental or physical impairment that substantially limits one or more major life activities.'" *Thompson v. Rice*, 422 F. Supp. 2d 158, 174 (D.D.C. 2006) (quoting 29 C.F.R. 1630.2(k). The record of impairment must be one "relied on by [the] employer." *Thompson*, 422 F. Supp. 2d at 174 (internal quotation marks omitted).

Here, the evidence establishes that Dr. Norden had a record of a substantial impairment at the time she attempted to return to work in 2003-2004. It is undisputed that the Smithsonian knew that Dr. Norden contracted DHF in 2000, nearly died from the acute infection, and was on full medical disability for over a year. *See* Def.'s Ex. 6; Pl.'s Ex. 15. During that time she suffered from severe confusion and her cognitive abilities were markedly impaired. Pl.'s Facts ¶ 6; Pl.'s Ex. 1. She attempted to return to work in 2001, but it proved too difficult for her and she returned to disability status. Def.'s Ex. 6; Pl.'s Facts ¶ 8. She attempted another return to work in 2002, but once more the lingering effects of DHF caused her considerable pain and the Smithsonian again placed her on a year-long medical leave of absence. Def.'s Ex. 6. And when the Smithsonian proposed to terminate her employment in November 2003, it cited her "medical limitations" as the exclusive reason. *Id.* Thus, it is beyond dispute that when Dr. Norden attempted to return to work a third time in 2003 she had a well-documented history of a major disability that substantially restricted her in the major life activities of learning and working, and that the Smithsonian had relied on her record of impairment in making several employment decisions. This is sufficient to render

-28-

her disabled under the Rehabilitation Act.  *See, e.g.*, *Gaskins v. Runyon*, 921 F. Supp. 779, 782 (D.D.C. 1994) (concluding after bench trial that postal employee who, over the course of four years, had spent significant time on disability leave for back pain had a "record of a substantial physical impairment" under the Rehabilitation Act); *cf. Shaver v. Indep. Stave Co.*, 350 F.3d 716, 720 (8th Cir. 2003) (holding that employee had a record of substantial impairment under the ADA because he once had severe epilepsy that was corrected by brain surgery); *Granzow v. Eagle Food Ctrs., Inc.*, 27 F. Supp. 2d 1105, 1108-09 (N.D. Ill. 1998) (holding, on cross-motions for summary judgment, that employee who told her employer that she had epilepsy and at one point took four months off due to her illness had demonstrated a record of substantial impairment under the ADA).

        b.      <u>Was Dr. Norden otherwise qualified?</u>

        In addition to showing that she was disabled, Dr. Norden has presented sufficient evidence to demonstrate that she was otherwise qualified for an entomology position at the Smithsonian.  There is no dispute that, before contracting dengue fever, Dr. Norden received outstanding performance evaluations and was well-regarded within her department.  *See, e.g.*, Pl.'s Reply Ex. 10; *see also* Norden Aff. ¶ 4.  When Dr. Norden returned to part-time duty in 2002 and experienced an intense adverse reaction to naphthalene, Dr. Schultz concluded that she performed "better than might be expected" under the circumstances.  Def.'s Ex. 26.  And, in November 2003, Dr. Norden's doctors informed the Smithsonian that she could return to full-time work with accommodations for her sensitivity to naphthalene, flexible scheduling to accommodate her propensity to suffer debilitating migraines and other symptoms, and protection from retaliation and hostility — particularly the assignment of work that was less intellectually demanding than the work she performed before contracting DHF.  *See* Def.'s Exs. 8-9.  Thus, there is evidence in the record

demonstrating that Dr. Norden could have performed the essential duties of her job with the accommodations recommended by her physicians. There is nothing contrary in the record because the Smithsonian never tested her ability to return to work.

Defendant makes no attempt to argue that Dr. Norden would have been incapable of performing the essential duties of her position if she had received the accommodations she requested. In fact, Dr. Schultz stated that he believed that Dr. Norden could perform the essential duties of her job as long as she received accommodations. *See* Schultz Decl. ¶ 5. Rather, Defendant argues that there is no dispute that Dr. Norden could not have performed the essential functions of her job without accommodations, the Smithsonian offered her reasonable accommodations, and, because Dr. Norden rejected those accommodations, she could not have performed the essential functions of her job; therefore, Dr. Norden was not "otherwise qualified." *See* Def.'s Mem. at 23-34. While that syllogism makes sense, it contains a factual assumption that is not established by the record — namely, that the accommodations that Dr. Norden rejected were reasonable. As discussed in greater detail below, the accommodations in the RTWP were patently unreasonable and Dr. Norden was well within her rights to reject them. Because the Smithsonian offers no other argument as to why Dr. Norden was not "otherwise qualified" for an entomology position, the Court finds that Dr. Norden has made a prima facie showing on this element of her Rehabilitation Act claim.

c.    <u>Did Defendant fail to accommodate Dr. Norden's disability?</u>

Finally, Dr. Norden must show that she requested reasonable accommodations and that Defendant failed to provide them. Dr. Norden requested three basic accommodations: (1) a reduction of her exposure to naphthalene; (2) a flexible work schedule to account for her physical limitations, especially her propensity to experience severe migraines; and (3) the assignment of

-30-

intellectually demanding work that was similar to the work she performed before contracting DHF. Def.'s Exs. 8-9. These were categorically reasonable requests. *See* 42 U.S.C. § 12111(9)(B) (listing as reasonable accommodations "job restructuring, part-time or modified work schedules, . . . [and] acquisition or modification of equipment or devices."); 29 C.F.R. § 1630.2(o) (same). In response to these requests, Defendant prepared the RTWP, which proposed the following accommodations: Dr. Norden would receive (1) a ventilated office and a respirator similar to the one she received in 2002; (2) an Alternative Work Schedule ("AWS") that allowed her to take one Friday off in every two-week pay period, provided she worked at least 80 hours over the course of the pay period; and (3) a work plan under which Dr. Norden would sort, organize, catalogue, and label insect specimens. Def.'s Ex. 11. Dr. Norden argues that the Smithsonian's proposal failed to provide the reasonable accommodations she was seeking. Defendant argues that the RTWP contained the precise accommodations that Dr. Norden's doctors recommended and, because Dr. Norden rejected it, she cannot prove a claim under the Rehabilitation Act. Def.'s Mem. at 23-24.

Contrary to its argument, the Smithsonian did not provide the accommodations that Dr. Norden requested. The RTWP would not have reduced Dr. Norden's exposure to naphthalene as she requested and her doctors recommended; it merely provided that she could wear a respirator while constantly handling insect specimens soaked in naphthalene. Granite Aff. ¶ 12 ("Increasing Dr. Norden's direct naphthalene exposure by increasing her contact with specimens is directly contrary to the advice I gave in 2003 for Dr. Norden's return to work."). Defendant states only that Dr. Norden's exposure would have been accommodated by the respirator, *see* Def.'s Resp. to Pl.'s

Facts ¶ 72;[7] Defendant makes no attempt to explain why the Smithsonian could not have assigned Dr. Norden to a position that would have involved less than constant exposure to naphthalene.

Nor did the RTWP provide a flexible work schedule to accommodate Dr. Norden's limitations; it merely provided her with every other Friday off — but only if she worked a full 80 hours during the two-week span.  Moreover, the RTWP specifically stated that absences would "not be acceptable reasons for not meeting the work plan and performance requirements," that any failure to adhere to the deadlines would be grounds for termination, and that Dr. Norden would have to waive her right to challenge any adverse employment action based on her performance under the Work Plan.  Def.'s Ex. 11 at ¶¶ 15-16, 19.  Thus, if Dr. Norden had to take medical leave due to her disability, she would not have been able to extend the preordained deadlines set out in the Work Plan, she could have been fired for not meeting those deadlines, and she would have had no right to challenge her termination.   Moreover, she was not allowed to work after 5:30 p.m. or on weekends, which meant that even with the AWS day she would have had very limited time to make up any lost hours.  The proposal bore little resemblance to the "flexible" work schedule that Dr. Norden and her doctors requested, and the Smithsonian provides no rationale or excuse for the proposal's heavy-handed features.  *See* Granite Aff. ¶ 12.

It is therefore not surprising that Defendant makes no real effort to defend the work schedule contained in the RTWP.  Instead, Defendant argues that it submitted a "revised" proposal

---

[7] Defendant argues that there is a factual dispute on this issue because Dr. Lawford indicated that the terms of the RTWP "complied with all the recommendations of [Dr. Norden's] physicians." Def.'s Reply to Pl.'s Response to Def.'s Facts ¶ 32. The only evidence cited by Defendant, however, is an email in which Dr. Lawford stated that the terms in the RTWP were "reasonable and appropriate." Def.'s Ex. 16. This email does not state that the RTWP provided the accommodations that Dr. Norden's doctors requested and, therefore, it does not create a factual dispute on this issue.

that omitted the provision allowing the Smithsonian to fire Dr. Norden for failing to adhere to the deadlines. *See* Def.'s Ex. 15. It is not at all clear from the record that this "revised" return-to-work proposal officially replaced the original RTWP offered to Dr. Norden. *See id.* In any event, even the "revised" RTWP allowed Dr. Norden to take only one Friday off per pay period. This did not satisfy Dr. Norden's request for a "flexible" work schedule and the Smithsonian gives no reason for not acceding to Dr. Norden's request.

Finally, the RTWP did not provide intellectually stimulating work similar to what Dr. Norden did before becoming ill — it relegated her to, in essence, affixing labels to insect specimens. All Defendant can say in defense of this decision is that the tasks assigned to Dr. Norden were "entirely consistent with the duties of a Museum Specialist." Def.'s Mem. at 32. That excuse fails for several reasons. The research and writing duties that Dr. Norden requested were also consistent with the described duties of her position, Def.'s Ex. 2, and were the kind of work she had done previously. The Smithsonian makes no suggestion that this type of work was no longer being performed or that it would have been an undue hardship to assign Dr. Norden to such work. Moreover, the Supreme Court has repudiated the Smithsonian's argument in a similar context. *See Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2416 (2006) ("Almost every job category involves some responsibilities and duties that are less desirable than others. Common sense suggests that one good way to [discriminate against an employee] would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable."). Simply put, the Smithsonian's decision to assign Dr. Norden tasks that were merely "consistent" with her job description, but were neither the tasks she had previously performed nor

-33-

the tasks that her doctor indicated were necessary to accommodate her impairments, was not an "accommodation" in any sense of the word.

Defendant argues that Dr. Norden could not be returned to her former research assistant assignment because the person she had been assisting, Dr. Karl Krombein, had left the Smithsonian. Def.'s Mem. at 33. Defendant misses the point. Dr. Norden did not ask to be returned to the exact same assignment; she asked only that she be given a work assignment similar to the research work she had been performing before she contracted DHF. Defendant makes no attempt to explain why Dr. Norden could not work as a research assistant to someone other than Dr. Krombein, or why there was no other available work assignment more in line with her level of education and experience. Defendant also contends that Dr. Norden would have been permitted to pursue research and writing on her own time. Def.'s Mem. at 32; Schultz Aff. ¶ 6. The fact that Dr. Norden was not prohibited from conducting research on her own time hardly answers her doctor's request that she be assigned work that was intellectually stimulating. Indeed, suggesting that Dr. Norden could research on her own time is particularly perverse given the strict deadlines that the Work Plan imposed on her assigned tasks.

In short, the Smithsonian offered Dr. Norden an ersatz version of the accommodations suggested by her physicians. One of the accommodations that Dr. Norden requested was met with a sham proposal (a "flexible" schedule that was actually inflexible), and the other two requests were simply ignored (reducing or eliminating her exposure to naphthalene and assigning her intellectually stimulating work). Providing a respirator was the only arguable accommodation that the Smithsonian made, although that would have done nothing more than return Dr. Norden to the same unacceptable situation she faced when she returned on a part-time schedule in 2002 — the only

-34-

difference being that under the RTWP she would have been required to work full time under inflexible deadlines that could not be extended if she should take ill. Thus, Dr. Norden has met her burden of establishing that she requested reasonable accommodations and that Defendant refused to provide them.

For his part, Defendant does not argue that the accommodations Dr. Norden requested would have created any hardship for the Smithsonian; he argues only that the Smithsonian did, in fact, provide her with those accommodations. Even viewing the evidence in the light most favorable to Defendant, no reasonable jury could find that the Smithsonian legitimately offered Dr. Norden the accommodations that she and her doctors requested. Because Dr. Norden has made a prima facie showing sufficient to prove that Defendant failed to accommodate her disability in violation of the Rehabilitation Act, and Defendant has raised no genuine dispute of material fact in opposition to Dr. Norden's evidence, Dr. Norden is entitled to judgment as a matter of law.

B.    Retaliation.

In her Amended Complaint, Dr. Norden avers that the Smithsonian unlawfully retaliated against her for filing claims in which she alleged that the Smithsonian had failed to accommodate her disability as required by the Rehabilitation Act. *See* Am. Compl. ¶¶ 151-163. In her brief supporting the instant motion, she appears to argue this claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq. See* Pl.'s Mem. at 23. Although Defendant is silent on this issue, it is doubtful that a complaint based on alleged violations of the Rehabilitation Act can give rise to a retaliation claim under Title VII. *See Hazen Paper Co. v. Biggins*, 507 U.S. 604, 612 (1993) ("[I]t cannot be true that an employer who fires an older black worker because the worker is black thereby violates the [Age Discrimination in Employment Act]. The employee's race is an

improper reason, but it is improper under Title VII, not the ADEA."); *see also Totten v. Norton*, 421 F. Supp. 2d 115, 119 n.2 (D.D.C. 2006). In any event, the Rehabilitation Act itself provides a cause of action for retaliation that is governed by the same legal standard as a retaliation claim under Title VII. *See Totten*, 421 F. Supp. 2d at 119 n.2; *see also Duncan v. Washington Meto. Area Transit Auth.*, 214 F.R.D. 43, 49-50 (D.D.C. 2003). The Court will therefore treat Dr. Norden's retaliation claim as arising under the Rehabilitation Act.

    To establish a claim for retaliation under the Rehabilitation Act, a plaintiff must show that (1) she engaged in statutorily protected activity; (2) her employer took a materially adverse action against her; and (3) a causal connection between the two exists. *See Duncan*, 214 F.R.D. at 49-50; *see also Holbrook v. Reno*, 196 F.3d 255, 263 (D.C. Cir.1999); *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006). If the plaintiff makes a prima facie showing on those three elements, a rebuttable presumption of retaliation arises and the burden shifts to the employer to provide a legitimate, non-retaliatory reason for its actions. *See Duncan*, 214 F.R.D. at 50 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). "If the [employer] does so, the *McDonnell Douglas* framework disappears, and [the Court] must decide whether a reasonable jury could infer intentional discrimination from the plaintiff's prima facie case and any other evidence the plaintiff offers to show that the actions were discriminatory or that the non-discriminatory justification was pretextual." *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006) (quoting *Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005)).

    Dr. Norden argues that the Smithsonian took two retaliatory actions against her — the RTWP and the termination of her employment. Although those actions are related and the relevant evidence overlaps, the Court will analyze them separately.

-36-

1.    *The RTWP.*

Dr. Norden engaged in protected activity when she filed EEO complaints regarding Defendant's failure to accommodate her disability.  *Cf. Holbrook*, 196 F.3d at 263 (holding that filing an EEO complaint is protected activity for purposes of a Title VII retaliation claim).  Although Defendant does not expressly concede this point, nowhere in its briefs does it argue that Dr. Norden did not engage in protected activity.  Accordingly, the first element of Dr. Norden's prima facie case is satisfied.

Dr. Norden must next show that the RTWP constituted a materially adverse act.  To make that showing, Dr. Norden must demonstrate that the action was one that a reasonable employee would have found to be "materially adverse," which in the context of a Title VII retaliation claim "means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington*, 126 S. Ct. at 2415 (internal quotation marks omitted).  To be materially adverse, the harm to the employee must be serious and not trivial, although whether a given action is sufficiently serious "will often depend upon the particular circumstances."  *Id.*

Dr. Norden argues that many of the terms and conditions contained in the RTWP were materially adverse.  Specifically, she argues that the RTWP (1) required that she waive her right to challenge future adverse employment actions based on the RTWP, (2) imposed unreasonable, inflexible deadlines on her tasks, (3) prohibited her from using medically necessary absences as a reason to extend those deadlines; (4) effectively demoted her from working as a research assistant to cataloguing insect specimens, (5) subjected her to bimonthly performance reviews, (6) stripped her of her seniority with respect to the accrual of annual leave; and (7) deprived her of her tenure and returned her to the status of a probationary employee.  Pl.'s Mem. at 24-27.

It is easy to conclude that a reasonable employee would be dissuaded from filing an EEO complaint in the face of these actions. The requirement that Dr. Norden waive her right to challenge future adverse employment actions was oppressive and illegal.[8] *Cf. Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 673 (6th Cir. 2003) (collecting cases which hold that arbitration agreements limiting an employee's remedies under Title VII are unlawful). Further, the deadlines were unreasonably short; indeed, Dr. Schultz admitted at deposition that, at the time the work plan was drafted, it required two employees to do that much work in those short timeframes. Pl.'s Reply Ex. 17 (Schultz Dep.) at 275:10-17. Moreover, the deadlines represented a dramatic change from the way in which Dr. Norden's work was supervised before she fell ill with DHF. *See* Pl.'s Reply Ex. 10 (Performance Appraisal). In addition, the RTWP would have prohibited Dr. Norden, whose medical condition was well documented, from using medical absences as a reason to extend the deadlines. This was objectively unreasonable, especially given that the record contains no explanation why the tasks to be assigned to Dr. Norden were time sensitive. The Court notes that Dr. Norden is a Fulbright Scholar who had published several research papers in the course of her 15-year employment at the Smithsonian. Relegating her to the full-time cataloguing of insect specimens was demeaning and transparently punitive. *See Burlington*, 126 S. Ct. at 2416 ("[T]he EEOC has consistently found '[r]etaliatory work assignments' to be a classic and 'widely recognized' example

---

[8] Defendant characterizes this provision in the RTWP as requiring that Dr. Norden waive only her past EEO claims. Def.'s Mem. at 29, 31. This is a gross mischaracterization of the RTWP. By its plain terms, the RTWP required Dr. Norden to "waive[] her right to grievance/arbitration procedures, to appeal to the Merit Systems Protection Board and any right to file suit in Federal or state court for any adverse actions based on performance or conduct taken against her during the life of this agreement or on any separation effected as a result of her failing to meet the terms of this agreement." Def.'s Ex. 11 at ¶ 19. This provision clearly would have required Dr. Norden to waive her right to challenge future adverse employment actions.

of 'forbidden retaliation.'"). The frequent performance evaluations also represented a drastic change from before Dr. Norden contracted DHF and created an atmosphere of pressure and mistrust. Finally, stripping Dr. Norden of her seniority and tenure were clearly recriminatory actions for which there is no evident reason. The Court therefore concludes that the RTWP was materially adverse to Dr. Norden. *See Burlington*, 126 S. Ct. at 2415.

Defendant disputes this conclusion, arguing that the RTWP cannot form the basis for a retaliation claim because it was an offer to compromise Dr. Norden's EEO complaint and is, therefore, privileged under Federal Rule of Evidence 408. Def.'s Mem. at 26. This is a frivolous argument. The RTWP was not an offer to compromise within the meaning of Rule 408 — it was itself a retaliatory, adverse act that violated the Rehabilitation Act.[9]

Defendant also contends that the RTWP was not adverse because, after Dr. Norden objected to it, the Smithsonian made a revised proposal that removed some of the more offensive terms, such as the requirement that Dr. Norden waive her legal right to challenge future employment actions. Def.'s Mem. at 27. Thus, Defendant argues that because it "took no action against [Dr. Norden] relating to the [RTWP]," the RTWP was not a materially adverse act. *Id.* This argument is also frivolous. The factual assertion underlying the argument is patently false: the Smithsonian did take action against Dr. Norden relating to the RTWP — it fired her when she refused to accept it. *See* Def.'s Mem. at 34. It is also legally unsound because, even assuming *arguendo* that

---

[9] The ultimate irony of Defendant's Rule 408 argument is that, if it were correct, it would necessarily entitle Dr. Norden to summary judgment on her retaliation claim. If the RTWP were excluded under Rule 408, neither party could use it as evidence; it would disappear from the record. Thus, Defendant's proffered legitimate reason for terminating Dr. Norden — *i.e.*, her failure to accept the RTWP — would also disappear, leaving Defendant with no evidence to rebut Dr. Norden's conceded prima facie case of retaliation as to the termination decision.

-39-

Defendant "took no action" against Dr. Norden based on the RTWP, it is no longer legally necessary for her to demonstrate an adverse employment action to sustain her retaliation claim; she need only show that the Smithsonian acted in a way that a reasonable employee would find "materially adverse." *See Burlington*, 126 S. Ct. at 2415. Thus, when the Smithsonian presented the RTWP containing the offensive terms to Dr. Norden, the adverse act was a *fait accompli*. That the Smithsonian later changed some of the terms does not alter its initial materially adverse action in proposing the RTWP. And even if the Smithsonian could immunize its prior adverse conduct with a *post hoc* change of heart, the revised RTWP still contained several provisions that were materially adverse to Dr. Norden, such as the unreasonable and inflexible deadlines, the deprivation of her tenure and seniority, and the *de facto* demotion. Defendant comes nowhere close to demonstrating that there is a genuine dispute as to whether the RTWP was a materially adverse action for purposes of the Rehabilitation Act.

Finally, Dr. Norden must present evidence of a causal link between her protected EEO activity and the adverse personnel action. Defendant acknowledges that the RTWP was the Smithsonian's response to Dr. Norden's EEO complaint after she requested accommodations under the Rehabilitation Act. *See* Def.'s Mem. at 26 ("There is no dispute that the [RTWP] was offered to [Dr. Norden] by the Smithsonian in an attempt to resolve her EEO claims . . . ."). Thus, Defendant concedes a causal connection between the two. In addition, the RTWP contained a blatantly unlawful provision conditioning Dr. Norden's return to work on her agreement to waive her right to file a future EEO claim challenging any adverse employment action taken against her pursuant to the terms of the RTWP. This also conclusively demonstrates that the RTWP was a response to Dr. Norden's EEO activities.

Defendant argues that Dr. Norden cannot establish causation because there is no evidence in the record that the person who "drafted" the Work Plan, Nancy Adams, was "aware of [Dr. Norden's] EEO activity." Def.'s Mem. at 29. This argument is wholly without merit. It is misleading because it attempts to treat the Work Plan and the "Settlement Agreement" separately when those documents functioned together as part of a comprehensive return-to-work proposal. *See* Pl.'s Ex. 5. Defendant's artificial attempt to treat the Work Plan separately entirely ignores the context in which it was presented to Dr. Norden.

In any event, this argument is not supported by the facts. In telling the Court that Ms. Adams was the person who "developed and drafted" the Work Plan, Defendant cites paragraph 24 of his Statement of Facts, which in turn cites a portion of Dr. Norden's deposition in which she gave an affirmative answer to the following question: "You're aware that Nancy Adams *helped* develop this work plan, correct?" (Emphasis added.) This single question and answer does not establish that Ms. Adams "drafted" the Work Plan or that she was the only person involved in developing the Work Plan. In fact, it is implicit in the question that Ms. Adams was *not* the only person involved.

Although Defendant's brief does not reference it, Ms. Adams submitted an affidavit in which she states that she "drew up" the Work Plan and that she "didn't know that Dr. Norden was engaged in any formal or informal EEO activity." Adams Aff. at 2-3. But the affidavit also indicates that Ms. Adams was directed to prepare the Work Plan by Dr. Schultz, that she knew "something was going on with [Dr. Norden's] employment," and that she knew Dr. Norden "had an attorney and that she had contacted the Labor Department." *Id.* Thus, Dr. Norden's deposition testimony and Ms. Adams's affidavit fail to support Defendant's assertion that Ms. Adams singlehandedly developed

-41-

the Work Plan in complete ignorance of Dr. Norden's EEO complaints. There can be no *genuine* dispute of fact on this question.

Even if one were to accept the Smithsonian's argument that there is no evidence of causation with respect to the Work Plan, which is impossible to do, the Smithsonian says nothing about the "Settlement Agreement," which clearly contained several materially adverse provisions that were in direct response to Dr. Norden's EEO activity. *See* Def.'s Ex. 11 (requiring Dr. Norden to waive her future EEO rights, subjecting her to bimonthly performance reviews, and stripping her of her seniority and tenure). The evidence is indisputable that Dr. Norden's EEO activity caused the Smithsonian to develop the RTWP. Thus, Dr. Norden has presented sufficient evidence to support a prima facie case of retaliation under the Rehabilitation Act.

Next, the Court must determine whether Defendant has come forward with evidence from which a jury could find that it had a legitimate, non-retaliatory reason for the adverse act of proposing the RTWP. The Court concludes that Defendant is prohibited from offering any legitimate, non-retaliatory reason for the RTWP because it failed to respond to Dr. Norden's discovery requests on this subject. *See, e.g.*, *Chambers v. Nasco, Inc.*, 501 U.S. 32, 44-45 (1991) (holding that federal courts have the inherent power to impose sanctions for bad-faith conduct and other abuses of the judicial process). Dr. Norden submitted an interrogatory that specifically asked Defendant to "Explain and Describe any legitimate, nondiscriminatory reasons for the clauses in the" RTWP to which Dr. Norden objected and that this Court has found to be materially adverse. Pl.'s Ex. 34. In response, Defendant objected on the ground that the RTWP "was made during an effort to settle [Dr. Norden's] administrative claims of discrimination and, therefore, is a protected communication." *Id.* As the Court indicated above, that position is legally indefensible. Because

Defendant refused to respond to a clear, unobjectionable discovery request asking Defendant to provide a legitimate reason for the adverse provisions in the RTWP, Defendant cannot now offer such a reason in opposition to Dr. Norden's motion for summary judgment.

Even if Defendant were not precluded from offering legitimate, non-retaliatory reasons for the objectionable provisions in the RTWP, the record contains no evidence of any such reasons. Indeed, Defendant does not even attempt to defend the various punitive clauses contained in that document, as the entire argument from his brief amply demonstrates:

> In an effort to provide plaintiff with part of the remedy she requested in her EEO complaint, i.e., return her to work, and to satisfy plaintiff's desire to not be removed as an employee of the Smithsonian, the Smithsonian proposed a settlement agreement. Under the terms of this proposed settlement agreement, plaintiff would withdraw her EEO complaint, while the Smithsonian would hold the proposed removal in abeyance. Plaintiff would also return to work with her requested accommodations, and the Smithsonian would receive guarantees about plaintiff's performance. Quite simply, the Smithsonian had legitimate, non-retaliatory reasons for the proposed settlement agreement – it was giving up some of its rights, i.e, the right to terminate plaintiff after a two years of unsuccessful part time attendance and one year of full leave without pay, in exchange for plaintiff giving up some her rights, i.e., withdrawing her EEO complaint. This language is standard settlement and release language designed to protect the interests of the Smithsonian while simultaneously providing plaintiff with what she wanted. This is a perfectly proper proposal. Accordingly, defendant has legitimate, non-retaliatory reasons for the waiver provisions in the proposed settlement agreement and plaintiff cannot establish that they are pretext.

Def.'s Mem. at 28-29 (case and record citations omitted).

The RTWP amounted to what employment lawyers call a "last chance agreement." In effect, such agreements are used to reinstate an employee whose work misconduct would otherwise allow discharge. In returning under a "last chance agreement," an employee concedes that she has engaged in a dischargeable offense and promises not to grieve or sue if she fails to perform

-43-

upon return. A "last chance agreement" is offered by the grace of the employer. *See, e.g., U.S. Dep't of Air Force v. Fed. Labor Relations Auth.*, 949 F.2d 475, 478 (D.C. Cir. 1991) ("'Last chance' agreements are probationary contracts negotiated by an agency with an employee who faces removal or serious discipline for poor performance. In exchange for the employer's withholding the adverse action, the employee pledges rehabilitation or job performance improvement in specific ways.").

But that was not the situation facing the Smithsonian when Dr. Norden sought to return to work. Rather than having the right to fire her, which it could suspend as a matter of grace, the Smithsonian had a *legal obligation to return Dr. Norden to work* if she could perform the essential functions of her job with or without accommodations. Dr. Norden had engaged in no misconduct: she had contracted a near-fatal disease while on work-related travel and had fought for years to recover from its impact on her bodily systems. She had a legal right to be restored to her job unless the Smithsonian could legitimately demonstrate that the requested accommodations would cause it undue hardship. It has made no such showing. As a result, Dr. Norden has proved a retaliation claim based on the RTWP.

2.    *The Termination Decision.*

Defendant concedes that Dr. Norden has made a prima facie showing of retaliation with respect to the Smithsonian's decision to fire her. *See* Def.'s Mem. at 34 ("Regarding the October 2004 termination of plaintiff's employment with the Smithsonian, defendant does not contest plaintiff's ability to establish a prima facie case."). Defendant does contend, however, that the Smithsonian had a legitimate, non-retaliatory reason for the decision.

Defendant argues that Dr. Norden's rejection of the RTWP was sufficient grounds to justify her termination. *Id.* The Court has already found that the RTWP was not a legitimate

attempt to settle Dr. Norden's EEO claims and return her to work with reasonable accommodations. An employer cannot condition an employee's ongoing employment on her acceptance of unreasonable and unlawful working conditions and then rely on the employee's rejection of those conditions as a legitimate reason for discharge. As discussed above, the evidence conclusively demonstrates that the RTWP was a bad-faith action by the Smithsonian designed to retaliate against Dr. Norden and prompt her to refuse its conditions. Simply put, Defendant cannot legitimize the decision to fire Dr. Norden based on her rejection of a return-to-work proposal that was itself unlawful.

Defendant further argues that it legitimately fired Dr. Norden because she refused to apply for the job at the National Zoo. Def.'s Mem. at 34-35. This argument fails for similar reasons. As an initial matter, the Smithsonian's attempt to "reassign" Dr. Norden did not satisfy its obligations under the Rehabilitation Act because it merely invited her to apply for the job; it did not offer her a reassignment. *See* 29 C.F.R. § 1615.203(g) ("When a nonprobationary employee becomes unable to perform the essential functions of his or her position . . . due to a handicap, an agency *shall* offer to reassign the individual to a funded vacant position.") (emphasis added); *cf. E.E.O.C. v. Manville Sales Corp.*, 27 F.3d 1089, 1097 n.7 (5th Cir. 1994) (noting that an employer cannot toll the accrual of a backpay award "[s]ince the plaintiffs were not offered employment, but simply the opportunity to apply for an unspecified number of jobs."). In addition, an employer should consider reassignment only when the accommodations requested by the employee for her original position would pose an undue hardship on the employer. *See Aka*, 156 F.3d at 1301. Because there is no evidence that the accommodations Dr. Norden requested would have been any hardship to the Smithsonian, there was no basis for Defendant to reassign her — and, therefore, there

-45-

was no reason why Dr. Norden was obligated to accept a reassignment. The evidence also demonstrates that Dr. Norden was not qualified for the job, a fact that supports the conclusion that it was suggested in bad faith. Thus, the evidence indicates that the invitation for Dr. Norden to apply for the National Zoo job was itself retaliatory, and Dr. Norden's refusal to apply for the job — a job she did not want and for which she was not qualified — was not a legitimate reason to fire her. An employer cannot condition an employee's continued employment on her acceptance of retaliatory employment conditions and then use her rejection of those conditions as a basis for an adverse employment action. Defendant's contrary view of the law would eviscerate the Rehabilitation Act and other statutes protecting employees from discriminatory employment decisions.

Because Dr. Norden has made a prima facie showing that her termination was retaliatory in violation of the Rehabilitation Act, and because Defendant has failed to advance a legitimate, non-retaliatory reason for terminating her, Dr. Norden is entitled to summary judgment.

## IV. CONCLUSION

There is a genuine dispute of fact as to whether, in 2002, Dr. Norden knew that she was required to file an EEO complaint within 45 days of the Smithsonian's decision to place her on unpaid medical leave. Thus, her Rehabilitation Act claim arising from that incident cannot be decided on summary judgment. The manner in which the Smithsonian treated Dr. Norden when she attempted to return to work in 2003-2004, however, clearly violated the Rehabilitation Act. The Smithsonian ignored the recommendations of Dr. Norden's physicians and presented her with the dilemma of returning to work under intolerable conditions or rejecting those conditions and facing termination. The Smithsonian makes no attempt to argue that it would have been an undue hardship to provide the accommodations that Dr. Norden's doctors requested or that the other conditions it

presented to Dr. Norden were necessary.   Moreover, the Smithsonian offers no legitimate nondiscriminatory reasons for the retaliatory acts it took against Dr. Norden.   Accordingly, Dr. Norden's motion for summary judgment will be granted in part, and Defendant's motion for summary judgment will be denied.

Date:  August 3, 2007

_____
                /s/
ROSEMARY M. COLLYER
United States District Judge

-47-