UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BETH M. NORDEN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 05-1232 (RMC) |
| ) | |
| CRISTIAN SAMPER, ACTING SECRETARY ) | |
|   SMITHSONIAN INSTITUTION, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

**DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO
DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT
AND MEMORANDUM IN OPPOSITION TO PLAINTIFF'S
CROSS- MOTION FOR SUMMARY JUDGMENT**

In response to Defendant's Renewed Motion for Summary Judgment ("Plaintiff's Opposition"), Plaintiff continues to argue that she was not aware of her rights and responsibilities under Title VII of the Civil Rights Act, including the requirement that she report any unlawful activity with 45 days of the alleged discriminatory event, and then admits that she had an attorney representing her at the time in which she could have timely sought EEO counseling. As an alternative, Plaintiff attempts to save her complaint by resurrecting her continuing violation claim, which this Court rejected in the initial Summary Judgment phase.

Finally, Plaintiff cross-moves for summary judgment, alleging that the undisputed facts require judgment as a matter of law in her favor. However, the only undisputed facts demonstrate that Defendant had reasonably posted adequate and proper notice of the employees' EEO rights and responsibilities throughout Plaintiff's workplace, and that Plaintiff was on "constructive notice" of her time limitations. Accordingly, judgment should be entered in favor of the Defendant and the remaining claim of discrimination in Plaintiff's Complaint should be

dismissed.

I. **PLAINTIFF FAILED TO EXHAUST HER ADMINISTRATIVE REMEDIES**

    A. **Plaintiff Was on "Constructive Notice" of Her Rights and Obligations Under Title VII.**

In her Opposition to Defendant's Renewed Motion for Summary Judgment ("Plaintiff's Opposition"), Plaintiff confuses "actual" notice with "constructive" notice when she denies that she actually saw any of the enlarged EEO rights notices that were posted at all heavy traffic areas throughout her work building. Indeed, Plaintiff alleges that she took a long and circuitous route through the halls of the Smithsonian just to enter Carol Youman's office from the side opposite the large EEO rights poster on the wall next to Ms. Youman's office door. Plaintiff also alleges that, despite her claims of physical limitations and ailments, she always took the stairs to her office and avoided the elevators or other areas, where additional large EEO rights posters were located. However, "constructive notice" does not require that Plaintiff actually see the poster, only that the notices were reasonably posted in the building so as to inform employees of their rights and responsibilities. Clark v. Runyon, 116 F.3d 275, 277 n. 3 (7th Cir. 1997) ("testimony to the effect that [a plaintiff] 'did not see' the EEO notices is not by itself sufficient to establish that the notices were not, in fact, posted"). Thus, Plaintiff, at a minimum, was on "constructive notice" of her rights and responsibilities, and the Court should dismiss the discrimination claim of her complaint as untimely.

As an alternative argument against dismissal, Plaintiff attaches an unsent, draft letter from her prior legal counsel in order to create the mis-impression that she timely sought EEO counseling. However, far from demonstrating that the letter was actually sent to the agency or

that Plaintiff actually filed a timely EEO claim, the draft letter only demonstrates that Plaintiff had contacted and retained the services of an attorney long before she sought EEO counseling, and was therefore well-aware of her rights and responsibilities under the EEO administrative regulations.[1]  Plaintiff fails to make any showing that the draft letter was ever sent, let alone received by the appropriate EEO officials at the Smithsonian Institution – which it was not. Declaration of Angela Roybal ("Roybal Decl.") at ¶4.  In any event, even if it was sent, it was still untimely as this Court has long rejected Plaintiff's "continuing violation" claim and has held that the operative date upon which her cause of action arose was upon the termination of her light duty on November 30, 2002.  Memorandum Opinion at 18-19.[2]

    **B.**    **Plaintiff Has Failed to Demonstrate the Factors Supporting Equitable Tolling.**

Nor has Plaintiff demonstrated facts sufficient to equitably toll the time limitations. Equitable tolling of time deadlines that operate like a statute of limitations is permissible only in narrowly tailored circumstances.  Irwin v. Department of Veteran's Affairs, 498 U.S. 89, 95-96 (1990) ("federal courts have typically extended equitable relief only sparingly.... We have

---

[1] Throughout her prior pleading, Plaintiff repeatedly asserted and admitted that she first contacted an EEO counselor in April 2003.  Plaintiff's Motion for Summary Judgment (Dkt. No. 17) at 17 ("Dr. Norden filed her first informal complaint in April of 2003"); Plaintiff's Statement of Material Facts Not at Issue (Dkt. NO. 18) at ¶ 59 ("In April of 2003, Dr. Norden filed an informal complaint for failure to accommodate and retaliation"); Affidavit of Beth Norden (attached to Plaintiff's initial Motion for Summary Judgment at ¶ 34 ("In April of 2003, I filed an informal complaint for failure to accommodate and retaliation").  Here, any evidence that the February 2003 letter was *actually sent* is conspicuously absent.

[2] Defendant has already demonstrated that Plaintiff's claim that passivity on the part of Defendant after her termination of light duty on November 30, 2002, is not a discrete act giving rise to a new cause of action.  Defendant's Reply in Support of (Initial) Motion for Summary Judgment at 4-5.

generally been much less forgiving in receiving late filings where the claimant failed to exercise due diligence in preserving his legal rights"). Plaintiff bears the burden of pleading and proving equitable reasons for failure to comply with this requirement. Bayer v. U.S. Department of Treasury, 956 F.2d 330, 333 (D.C. Cir. 1992); Smith v. Dalton, 971 F. Supp. 1, 3 (D.D.C. 1997). The power to equitably toll a statute of limitation, however, is "exercised only in extraordinary and carefully circumscribed instances." Smith-Haynie v. District of Columbia, 155 F.3d 575, 580 (D.C. Cir. 1998) (internal quotations and citation omitted).

      The controlling case law within the D.C. Circuit that sets forth the factors or standards for determining if equitably tolling is to be applied in circumstances involving the failure to timely file a civil complaint are set forth by the Supreme Court in Baldwin County Welcome Center v. Brown, 466 U.S. 147 (1984) (*per curiam* ). In that case, the Court stated that equitable tolling would be proper in "a case in which a claimant has received inadequate notice, ... or where a motion for appointment of counsel is pending and equity would justify tolling the statutory period until the motion is acted upon, ... or where the court has led the plaintiff to believe that she ha[s] done everything required of her ... [or] where affirmative misconduct on the part of a defendant lulled the plaintiff into inaction." Id. at 151. See Bowden v. U.S., 106 F.3d 433, 438 (D.C. Cir. 1997) ("courts have excused parties, particularly those acting *pro se,* who make diligent but technically defective efforts to act within a limitations period, . . . . who were misled about the running of a limitations period, whether by an adversary's actions, . . . by a government official's advice upon which they reasonably relied, . . . or by inaccurate or ineffective notice from a government agency required to provide notice of the limitations period") (citations omitted); see also Glenn v. Williams, 2006 WL 401816, slip op. at 10 (D.D.C. Feb 21, 2006)

4

("The four circumstances this Circuit has recognized in which a court may properly allow for equitable tolling in Title VII cases are where a claimant has received inadequate notice, where a motion for appointment of counsel is pending and equity would justify tolling the statutory period until the motion is acted upon, where the court has led the plaintiff to believe that she had done everything required of her, or where affirmative misconduct on the part of a defendant lulled the plaintiff into inaction.") (*citing* Mondy v. Secretary of the Army, 845 F.2d 1051, 1057 (D.C. Cir.1988)). None of these circumstances are applicable to Plaintiff's situation.

Here, Plaintiff makes no allegation that any party acted in a manner so as to mislead her as to her rights and duties. Plaintiff further admits that she was represented by legal counsel during the early stages of the administrative proceedings, including the time period when she could have timely filed. Moreover, when it has been established that a plaintiff received "constructive notice" of the time limitations, equitable tolling is not available as a defense, as a matter of law. See Foster v. Gonzales, 516 F.Supp.2d 17, 27 (D.D.C. 2007). See also Harris v. Gonzales, 448 F.3d 442, 444 (D.C. Cir. 2007) ("it cannot be that an employee claiming to have been unaware of the 45-day time limit would be automatically entitled to an extension even though the agency, through posters, employee handbooks, orientation sessions, etc., made conscientious efforts to advise its employees of the time limit.")

Accordingly, because Plaintiff cannot establish facts sufficient to require the tolling of the 45-day time limitation, judgment should be awarded in favor of Defendant.

## II. PLAINTIFF HAS FAILED TO DEMONSTRATE THAT SHE WAS DISABLED IN 2002

As evidence of her disability in 2002, Plaintiff relies on the court's memorandum

opinion. The court's previous opinion did not address Plaintiff's condition, as known to the Smithsonian in 2002. Whether or not Plaintiff was disabled within the meaning of the Rehabilitation Act is a disputed issue of material fact. Specifically, the Smithsonian disputes that Plaintiff's condition was considered permanent in the 2002 period when she claims she was entitled to accommodations.

An impairment must have a permanent or long-term impact to qualify as a disability under the Act. Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 198 (2002). "The relevant time for assessing a claim of disability is when an accommodation is requested." Lytes v. D.C. Water & Sewer Auth., 2007 U.S. Dist. LEXIS 91154 (D.D.C. 2007). "To receive ADA protection, a disability must be demonstrated at the time plaintiff requested and was refused a reasonable accommodation." Heasley v. D.C. Gen. Hosp., 180 F. Supp. 2d 158, 167 (D.D.C. 2002).

At the point Plaintiff returned to work in 2002, the Smithsonian repeatedly had been informed that Plaintiff was recovering from the affects of dengue, which included increased bruising, fatigue, and headaches.[3] "Doctors' evaluations, which indicate that an individual's impairment is improving, are persuasive evidence that the impairment is expected to be only temporary." Pollard v. High's of Balt., Inc., 281 F.3d 462, 469 (4th Cir. 2002) (employee absent for nine months following surgery, but predicted to recover was not disabled). Though her path to

---

[3] There is no evidence to suggest that the Smithsonian was informed of Plaintiff's sexual disfunction, post-traumatic stress syndrome, or immune system impairments. An inference that the Smithsonian knew of these conditions because Dr. Lawford was granted permission to speak with Plaintiff's physicians is both impermissible, Anderson v. liberty Lobby, inc., 477 U.S. 242, 255 (1986), and contrary to the records maintained in the Plaintiff's Smithsonian health record. See, e.g., Def. Ex. 3B; Def. Ex. 4B; and Def. Ex. 5B, none of which mention sexual disfunction, post traumatic stress, or immune system impairments.

recovery appeared to be rocky, the Smithsonian was led to believe that Plaintiff was in fact recovering.

In October 2001, Plaintiff's neurologist reported, "It is my impression, based on my knowledge of Ms. Norden and the reports generated by Dr. Quig, that Ms. Norden is disabled and has been disabled from employment from August 2001. <u>I hope that these problems will improve over time and that she will no longer be disabled as on (sic) November</u>." Def. Ex. 3B (emphasis added). On November 26, 2001, Plaintiff's hematologist wrote, "I was gratified by her improvement <u>when I saw her in September, as her symptoms were dissipating quite rapidly</u>. However, a cold virus in November apparently reactivated the effects of the dengue, causing the symptoms to recur (multiple viruses can do that at times.) We are currently watching the situation." Def. Ex. 4B (emphasis added)  In December 2001, Plaintiff's dermatologist reported "It appears overall, that the severity of the ecchymoses and petechiae <u>appear to be resolving over the last 15 months.  I am hopeful, that over the next year or two, the majority of these symptoms will entirely resolve</u>, although it has been a difficult and protracted course of dengue fever up to this point." Def. Ex. 5B (emphasis added).  A neurologic report provided to the Smithsonian in February 2002 stated, "Dr. Norden's level of performance on multiple measures of visual scanning speed, simple attention, and sustained attention moved from the impaired range on 5.2.01 to within normal limits." Report of neuropsychologigal evaluation (Def. Ex. 9B).  On February 8, 2002, Dr. Blake wrote, while Ms. Norden is greatly improved medically, she is not yet completely back to her baseline, <u>although we do anticipate that she will return to her usual level of function</u>." February 8, 2002 Blake letter (Def. Ex. 10B).  Thus, at the time she made her requests for accommodations, Plaintiff suffered from a serious but, apparently, temporary condition and

was not disabled within the meaning of the Rehabilitation Act.  See Adams v. Rice, 484 F. Supp. 2d 15, 20 (D.D.C. 2007) ("While plaintiff's cancer resulted in her being limited while recovering from surgery, the cancer itself was not a long-term physical impairment, and thus not a disability.")  Plaintiff's attempts to rely on Dr. Granite's affidavit as proof of her disability also must fail.  Notably, Dr. Granite does not assert that he informed the Smithsonian of Plaintiff's impairments.

Further, the fact that the Smithsonian returned Plaintiff to the full time workers' compensation periodic rolls pending her full recovery does not establish that she was perceived as being disabled.  Anderson v. Foster Group, 2007 U.S. Dist. LEXIS 77179, *74-75; 19 Am. Disabilities Cas. (BNA) 1578  (D. Ill. 2007).  This is especially so, where, as here, Plaintiff's physician made repeated statements that Plaintiff's condition would improve, and that any impairment to her ability to perform her job would go away over time.

### III. PLAINTIFF WAS NOT QUALIFIED TO PERFORM THE ESSENTIAL FUNCTIONS OF HER POSITION

A "qualified individual with handicaps" is "an individual with handicaps who, with or without reasonable accommodation, can perform the essential functions of the position in question...." 29 C.F.R. § 1614.203(a)(6).  While there is no dispute that Plaintiff had the education and training necessary to perform her job, there is a dispute of fact whether Plaintiff could perform the essential duties of her job with or without accommodations.  The whole emphasis of Plaintiff's pleadings is that she could have worked but for her naphthalene sensitivity, but this is false. Indeed, naphthalene was only one of the issues that made it difficult for Plaintiff to return to work.  "To some degree the issues changed over the two year period, but she had

issues contending with heat. She had issues contending with multiple simultaneous tasks. She had issues working extended hours in front of a computer. She had issues with naphthalene." Miller Depo. 40:21:41:7.

     First, Plaintiff herself states that, <u>in addition to</u> naphthalene accommodations, she required a light duty schedule. Plf's Aff.11/18/07, ¶ 34. Light duty was necessary due to <u>intense fatigue</u>. Pltf's Aff. 10/2/06, ¶ 14, (attached to Plaintiff's 1st MSJ). Plaintiff's doctors recommended working three days a week (rather than five half days) to limit commuting. Plaintiff's Depo. 75:19-76:12. In addition to the half time schedule her doctor requested that she be allowed additional time to perform tasks and that she complete tasks in a linear fashion with multiple breaks. Quig Report of Neuropsychological Evaluation (Def. 9B). At the time of Plaintiff's return to work in 2002, the Smithsonian had been informed that high temperature, pollution, stress, and cold viruses could exacerbate her condition. September 2, 2001, letter from Pamela Blake (Def. Ex. 11B); Def. Ex. 4B. According to her own affidavits, Plaintiff's headaches could be triggered by causes other than naphthalene, including heat, stress, changes in barometric pressure, illness, and medication. Pl. Aff. 10/2/06 at ¶15 (attached to Plaintiff's initial Motion for Summary Judgment). Heat and stress, in addition to exposure to chemicals, could cause capillary bleeds. Pl. Aff. 10/2/06 at ¶ 16 (attached to Plaintiff's initial Motion for Summary Judgment). Commuting in crowded situations was problematic. Pl. Aff. 11/18/07at ¶ 38.

     In other words, assuming a successful accommodation existed for Plaintiff's naphthalene sensitivity (which is a disputed material fact), Plaintiff's condition in 2002 was such that she was anticipated to work only half time with less than 50% productivity while she continued to recover. Def. Ex. 2B. In fact, Plaintiff worked less than the half time schedule arranged for her. In the 17

pay periods in which she was allowed to work a reduced 50% schedule, she fulfilled the required (reduced) hours in only 7 pay periods (three of which included federal holidays on her scheduled work day.) Murphy Declaration and Exhibit. Plaintiff was on full leave for four weeks from August 22, 2002 to September 21, 2002. Murphy Declaration and Exhibit. Her doctor recommended this break to avoid the stress of summer heat. Def. Ex. 6B.

For a variety of reasons, Plaintiff was unable to report to work for a half time schedule and therefore not qualified to perform the essential functions of her full-time job. "One of the most fundamental requirements of any position is reporting for work." Rosell v. Kelliher, 468 F. Supp. 2d 39, 45-46 (D.D.C. 2006), aff'd, 2006 U.S. App. LEXIS 26314 (D.C. Cir. Oct. 20, 2006). "An essential function of any government job is an ability to appear for work . . . and to complete assigned tasks within a reasonable period of time." Carr v. Reno, 23 F.3d 525, 530 (D.C. Cir. 1994) (finding that plaintiff's was not entitled to flexible arrival time and elimination of time sensitive duties because her record of "prolonged, frequent and unpredictable absences render her unqualified for any government job"); see Sampson v. Citibank, 53 F. Supp. 2d 13, 18 (D.D.C. 1999) aff'd, 221 F.3d 196 (D.C. Cir. 2000) (holding that an employee who cannot meet the attendance requirements of the job is not a "qualified individual" under the Americans with Disabilities Act); Walders v. Garrett, 765 F. Supp. 303, 312 (E.D. Va. 1991), aff'd, 956 F.2d 1163 (4th Cir. 1992) (Plaintiff's doctor's "belief" that she could work 40 hours a week based on plaintiff's self-assessment did not prove her qualified in light of her record of absenteeism.)

Plaintiff's duties required a forty hour week, and the light duty assignment was always envisioned as a temporary schedule while Plaintiff recovered. See Def. Ex. 2B. In addition to reducing her hours, the assignments given to her were less demanding. Miller Depo 38:20-22.

10

The Smithsonian's expectation was that she initially would accomplish less than the 50% work load during her 20 hours a week. Def. Ex. 2B. Her half-time schedule did not allow her to complete the work necessary for her supervisor and the collection. Miller Depo. At 70:18-71:7. Employers are not required under the Rehabilitation Act to create permanent light duty positions. Jones v. Univ. of the Dist. of Columbia, 505 F. Supp. 2d 78, 90 (D.D.C. 2007); Dorchy v. Washington Metro. Area Transit Auth., 45 F. Supp. 2d 5, 13 (D.D.C. 1999). Plaintiff was unable to work a full-time, full duty schedule for reasons unrelated to her naphthalene sensitivity and thus was not qualified to perform her essential job functions.

## IV. PLAINTIFF WAS NOT DENIED REASONABLE ACCOMMODATIONS

Plaintiff's argument that she was denied reasonable accommodations for her naphthalene sensitivity is based on the false premise that her exposure to naphthalene could be avoided in the Entomology Department. Notably, how (and whether) her exposure to naphthalene could actually be reduced sufficiently to allow her to perform her museum specialist duties is a disputed material fact. In addition, the record establishes that the Smithsonian took affirmative steps to try to limit Plaintiff's exposure to naphthalene, and that some of those steps were rejected by Plaintiff herself. Though Plaintiff asserts in her pleadings that she never refused an accommodation, contemporaneous records suggest that her self-serving affidavits are less than credible.

In order to prove discrimination based on a "failure to accommodate," Plaintiff must demonstrate that "'an accommodation was needed' in order to carry out *the essential function of the position*." Bissell v. Reno, 74 F.Supp. 2d 521, 528 (D. Md. 1999) (emphasis added). Under this test, the question of *how* Plaintiff's medical or physical condition was accommodated by Defendant is irrelevant, so long as the accommodation which was offered addressed her

"disability" and was "reasonable." "[A]n employer does not have to chose the best accommodation available or the accommodation that the employee prefers." Salmon v. Dade County School Board, 4 F.Supp.2d 1157, 1160-1161 (D.Fla. 1998). And if Plaintiff here was offered a reasonable accommodation, then the question as to whether her rights were violated is at an end, regardless of how the Defendant fulfilled its obligation to her.

    In the present matter, because of the history and use of naphthalene in the Natural History building, exposure to a certain amount of it is unavoidable. Miller Depo. 49:9-20. Despite the fact that there are certain levels of ambient fumes in the building, throughout 2002, the Smithsonian was attempting to identify an accommodation that would have reduced Plaintiff's exposure to naphthalene in the Entomology Department. The Smithsonian tested Plaintiff's work space to determine the level of naphthalene present. Pl. Ex. 23. The Collections Manager of the Entomology Department transferred trays of specimens stored in Plaintiff's office to naphthalene-free drawers. Furth Decl. ¶ 6; Pl. Depo78:25-79:3. Plaintiff's supervisor approved the funds necessary for equipment and relied on Plaintiff to follow through with purchasing the equipment. Schultz Depo. 71:19-72:5. Plaintiff, however, determined that she could not look into a microscope while wearing a respirator. Pl. Aff. 11/18/07 at ¶ 23; Pl. Aff. 12/25/06 at ¶ 37 (filed with Plaintiff's Opposition to Defendant's (Initial) Motion for Summary Judgment). Though there is no question that Plaintiff did not receive a respirator, it was due to her decision that working with one would not be feasible, not because the Smithsonian denied her any equipment.

    Indeed, whether any piece of equipment could sufficiently reduce Plaintiff's naphthalene exposure was uncertain. The Smithsonian's physician, Dr. Lawford, and industrial hygienist, Kathy Makos, considered the option of installing a fume hood, but rejected it because it would not

vent ambient office and collections areas in which Plaintiff worked. Pl. Ex. 23. In September 2002, the hygienist wrote to Lawford and Schultz "it seems best for her to attempt to do the majority of her work in the 4th floor processing room." See 9/18/02 Makos e-mail (Def. Ex. 8B). Ultimately, Makos and Lawford formally recommended that Plaintiff's office be moved to a naphthalene-free environment or the fourth floor processing room. Pl. Ex. 23.

Plaintiff's assertion that "I never heard anything form the Smithsonian about the 4th floor being considered as a possible accommodation," Pl. Aff.11/18/07 ¶ 43, is contradicted by the October memo, which was addressed to her. It is also contradicted by her own deposition testimony, in which she stated that Schultz discussed the fourth floor idea with her. Pl. Depo. 79:15-80:3; see also Schultz Depo. 72:17-73:7; 117:9-13. The affidavit is also inconsistent with Makos's earlier e-mail on the subject of the fourth floor, which states " I have spoken with Beth on several occasions as these ideas have evolved and I believe she would be amendable to trying them. Def. Ex. 8B.

Dr. Schultz believed Plaintiff could have performed much of her work in the fourth floor room, including work with her microscope, which she could have carried there herself. Schultz Depo. 106:6-9; 116:11-117:1; 134:7-8. Dr. Furth also has stated that Plaintiff could do much of her work in the fourth floor room. Furth Decl. ¶¶ 4-5. Plaintiff, apparently, did not agree, "It became very clear to me that delicate specimens could not be worked on because the air draft is so great." Pl. Depo. 79:25-80:3.

Plaintiff's statement that she "continued to believe that she would eventually receive naphthalene accommodations and that once I had them, I would be able to work full time" is similarly belied by statements she made at the time the Smithsonian was investigating whether her

13

naphthalene sensitivity could be accommodated. In October 2002, for example, she wrote to Dr. Lawford and Kathy Makos (among others) "there is no real way to avoid off gasing from our collection, even when all reservoirs of naphthalene are removed. I had hoped that a transfer from dead to live bugs night be a solution.... I do not think working with naphthalene is a choice." 10/9/02 e-mail (Def. Ex. 12B).

Thus, Plaintiff's allegations are contradicted by the documentary evidence, and are sufficiently in dispute so as to deny summary judgment in her favor.

### V. THE REQUEST TO "TRANSFER" TO THE USDA WAS NOT A REQUEST FOR A REASONABLE ACCOMMODATION

As stated above, what is a "reasonable accommodation" is not necessarily what the employee wants. Salmon, 4 F.Supp.2d at 1160-1161. Additionally, although Federal employers must consider the feasibility of reassigning a disabled employee to a vacant position, the Rehabilitation Act does not require that an employer accommodate its employees by creating new positions or finding them jobs with another employer. See Aka v. Washington Hospital Center, 156 F.3d 1284, 1305 (D.C. Cir. 1998).

Here, Plaintiff has not identified a vacant position at the Smithsonian that she was denied, but argues that the Smithsonian denied her a "transfer" to the USDA.[4] Because the case law does not recognize a transfer to another employer as a "reasonable accommodation" under the Rehabilitation Act, her claim must fail.

Nor can Plaintiff find support for this proposition in administrative guidance. The Office

---

[4] Though she casts it now as a request related exclusively to naphthalene, at the time she requested the "transfer" Plaintiff explained that working at USDA would alleviate her problems with naphthalene and reduce her issues commuting on metro. E-mails between Lawford and Norden (Def. Ex. 13B).

of Personnel Management, for example, in discussing the obligation to reassign disabled employees in lieu of disability retirement states, "Thus, when an employee initiates an application for disability retirement, the employing agency must review all vacant positions under its jurisdiction, at the same grade or pay level and tenure in the commuting area, to determine if the employee meets the minimum qualification standards for any vacant position. NOTE: An agency is not obligated to create a position for a disabled employee." CSRS and FERS Handbook, Disability Retirement Chapter 60, page 17, available at https://www.opm.gov/retire/asd/hod/pdf/C060.pdf (Def. Ex. 14B) (emphasis added). In contrast to the mandated reassignment within the employers' jurisdiction, with respect to inter-agency details, OPM advises that "Agencies are strongly encouraged to provide assistance to employees in locating positions for which they are qualified in other Federal facilities in the commuting area," however, it does not require such. Id. at 20. Requiring the Smithsonian to detail an employee to a position outside of its jurisdiction is tantamount to requiring that it create a new position, or transfer her to another employer, which is not mandated by the Rehabilitation Act. Aka, 156 F.3d at 1305.

      Plaintiff conflates worker's compensation issues with the Rehabilitation Act, arguing that assigning her to work at the USDA would have reduced the Smithsonian's worker compensation liability so should be seen as a benefit rather than un undue hardship. The purpose of reassignment accommodations in the Rehabilitation Act is twofold: "[T]o prevent the employee from being out of work and [the] employer from losing a valuable worker." Id. at 1301 (*quoting* H.R. REP. No. 485(II), 101st Cong., 2d Sess. at 63 (1990), reprinted in 1990 U.S.C.C.A.N. 267, 345). A detail to the USDA would have achieved the first purpose – keeping Plaintiff working --

but would not have allowed the Smithsonian to benefit from her services, as the Defendant still would have needed someone to perform Plaintiff's job duties.[5]

Plaintiff could not perform her job at the Smithsonian and has not identified a vacancy within the Smithsonian for which she was qualified. What she wanted was a job with a different, distinct federal agency rather than an accommodation in the performance of one of the Smithsonian's positions. Because the Rehabilitation Act does not require employers to create new positions (or fund them for other employers), her request was not reasonable under the Act. As the Seventh Circuit Court of Appeals has explained, "[a] person is 'otherwise qualified' within the meaning of the ADA only if she can perform one of the regular jobs (with or without an accommodation). Watson v. Lithonia Lighting, 304 F.3d 749, 752 (7th Cir. 2002). Accordingly, Plaintiff has failed to demonstrate a legal or factual basis for awarding summary judgment in her favor.

## **CONCLUSION**

Because there is no dispute of fact that Plaintiff had constructive notice of the EEO filing requirements and failed to contact a counselor within the required period, Plaintiff's claim should be dismissed. With respect to the merits of her claim, too many material facts remain in dispute, including whether Plaintiff was disabled in 2002, whether she was otherwise qualified to perform her job, whether there were accommodations for naphthalene that would have permitted her to perform her job, and whether she was denied such accommodations, for this Court to find, as a

---

[5] Further, if reducing the worker's compensation payments were the only factor to consider, disabled employees receiving workers' compensation would get different accommodations than those disabled employees whose disabilities were not caused by on-the-job injuries. Plaintiff has cited no basis in the Rehabilitation Act for discriminating among disabled employees in this way.

matter of law, for the Plaintiff.

    For the foregoing reasons, Defendant respectfully requests that the Court enter summary judgment in his favor on plaintiff's remaining claims and deny Plaintiff's motion for summary judgment on the same claim.

                              Respectfully submitted,

                              _/s/ Jeffrey A. Taylor_
                              JEFFREY A. TAYLOR, D.C. BAR # 498610
                              United States Attorney

                              _/s/ Rudolph Contreras_
                              RUDOLPH CONTRERAS, D.C. BAR # 434122
                              Assistant United States Attorney

                              _/s/ Darrell C. Valdez_
                              DARRELL C. VALDEZ, D.C. BAR # 420232
                              Assistant United States Attorney
                              Judiciary Center Building
                              555 4th St., N.W., Civil Division
                              Washington, D.C.  20530
                              (202) 307-2843