Date: Wed, 18 Sep 2002 14:15:46 -0400
From: "Ted Schultz" <Schultz.Ted@NMNH.SI.EDU>
To: <schultz@onyx.si.edu>
Subject: Evaluation of Exposure Control Options for Beth Norden-Delegated

*KATHRYN MAKOS*
*NAPTHALENE EXPOSURE*
*18 SEPT 2002*

>>> MAKOSK 09/18/02 14:16 >>>

Dear Tom,

Based on our conversation of yesterday regarding this case, and to provide you with information for your meeting tomorrow with Beth's supervisor, Dr. Schultz, below is a summary of work practice & engineering control options avaliable to Dr. Norden and NMNH in managing her potential exposure to naphthalene in the course of her work. Rudy Anderson was also involved with these discussions, which are being emailed in the interest of time & your meeting tomorrow.

As background, it is important to note that past ambient monitoring on her floor (CE5) indicates ambient concentrations of 0.039-0.100 ppm in the room next to Dr. Norden's and in the hallway outside her office. This is 100 times less than the ACGIH TLV of 10.0 ppm, but odor thresholds for naphthalene are reported as less than 0.100 ppm and so its pungent odor can certainly be detected by more sensitive individuals.

Based on her description of her typical tasks, the first exposure point would be opening treated cases to retrieve specimen drawers. We have trained and fit-tested Dr. Norden for a full-face respirator for this task, but it has proven to be unwieldy and the department agrees that this "pulling" task could easily be done by technicians.

Although naphthalene may have been added to the perimeter of the drawer, the boxes of specimens within each drawer are typically not treated, and (according to the Collections Manager David Furth) could be removed to a new drawer which has never been in contact with naphthalene. Again this task could be done by technicians.

Further, this drawer could then be placed in the 4th floor processing room, whose table-height wall return slot grilles were designed specifically for the purpose of venting residual vapors from treated collections while they are being examined. Her microscope stand could be moved to this room for this purpose. As an alternative, the drawer could at least be left here overnight to "purge", so that she could take individual specimen boxes to her lab/office for examination, with the expectation that most if not all residual vapors would have been "off-gased" over this time period. She did not successfully fit a half-mask respirator, which would have been impractical to use with a microscope anyway, and a full-face would be even more difficult to manage.

The final option would be to purchase a table-top ductless fume hood for her office under which treated specimens &/or drawers could be left while she works in her office. These cost in the range of $2500-3500 for a unit with appropriate alarms and breakthrough monitoring ports. I have researched 4 vendors, several of which have units of the dimensions which could fit into her office.

However, given the fact that this unit would still not vent her office of the aforementioned low-levels of naphthalene, it seems best for her to attempt to do the majority of her work in the 4th floor processing room,



which does not contain treated cabinets. according to Dr. Furth.

It is prudent for me to turn this into a more formal memo to all concerned to transmit a concensus best practice in this case, but I would rather wait for you two to discuss these options and indicate which are feasible and reasonable to try. I have spoken with Beth on several occasions as these ideas have evolved and I believe she would be amenable to trying them. I will be available in my office (275-0705) tomorrow if you wish to have me come down to the clinic at some point.

.....Kathy

Kathryn A. Makos, MPH, CIH
Industrial Hygienist
Office of Safety and Environmental Management
Smithsonian Institution
PO Box 37012
Victor Building, Room 9100, MRC 932
Washington, DC 20013-7012
(202) 275-0705
(202) 275-0746-fax

SI-1740