COPY

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF COLUMBIA

3

4    BETH M. NORDEN,                    )

5    Plaintiff,                         )

6        vs.                            )    Civil Action

7    LAWRENCE M. SMALL,                 )    No.

8    Defendant.                         )    05-1232 (RMC)

9

10

11

12            —      —       —      —       —

13        The deposition of **SCOTT MILLER** was

14    taken on Monday, November 13, 2006, commencing

15    at 9:10 a.m., at the offices of the Department

16    of Justice, United States Attorney's Office, 501

17    3rd Street, N.W., Washington, D.C., before Debra

18    L. Maheux, Notary Public.

19            —      —       —      —       —

20

21

22

```
 1                 A P P E A R A N C E S

 2

 3   ON BEHALF OF THE PLAINTIFF:

 4          VICKIE INGE FANG, ESQ.

 5          8792 Nightingale Drive

 6          Lanham, Maryland  20706

 7          301-552-4908

 8          Email:  Fvickie@comcast.net

 9

10   ON BEHALF OF DEFENDANT:

11          JOHN F. HENAULT, JR., ESQ.

12          Assistant U.S. Attorney

13          District of Columbia

14          555 4th Street, N.W.

15          Washington, D.C.  20530

16          202-307-1249  Fax:  202-514-8780

17          Email:  John.Henault@usdoj.gov

18          and

19

20

21

22
```

MILLER

1    were.  I don't recall what they were at this
2    point.  That was four years ago.
3              BY MS. FANG:
4      · Q.   But as you recall it, and me please
5    correct me if I'm not stating this correctly --
6    as you recall, there was a plan laid out to give
7    Dr. Norden limits duties, and this plan
8    accommodated her sensitivities; is that what
9    you're telling me?
10       A.   There had been a plan created for her
11   duties which accommodated her needs as well as
12   we understood them at the time and as well as we
13   could within the limits of the work that needed
14   to be done.
15       Q.   Well, is that just a way of saying that
16   she only worked half time so there was a plan in
17   which she would do half the work, or are you
18   saying that the nature of her work was altered
19   to suit her, to suit her disability?
20       A.   I recall the nature of her work was
21   altered so she -- the work was less demanding
22   than it would have been otherwise.

40

MILLER

1    Dr. Norden's disability?

2            MR. HENAULT:  Object to the form of the
3    question.  You may answer, sir.

4            THE WITNESS:  My understanding was as
5    was outlined to us by Dr. Lawford at the time
6    based on his conversations with her physicians.

7            BY MS. FANG:

8        Q.    Which was what?  What was her
9    disability?

10           MR. HENAULT:  Object to the form of the
11   question.  You may answer, sir.

12           THE WITNESS:  She had hemorrhagic dingy
13   fever, and it had a series of implications to
14   her health and ability to perform job duties.

15           BY MS. FANG:

16       Q.    What were these implications?

17       A.    I don't recall the details of them at
18   the time, but I know there were memos at the
19   time, at about the approximate time of this that
20   laid them out.

21       Q.    Do you recall whether there were any
22   implications beyond her not working full time?

MILLER

1    A.    I believe that she had -- again I'm not
2    sure.  To some degree the issues changed over
3    the two-year period, but she had issues
4    contending with heat.  She had issues contending
5    with multiple simultaneous tasks.  She had
6    issues in working extended hours in front of a
7    computer.  She had issues with naphthalene.
8        Q.    Did you understand her issues with
9    napthalene to be serious?
10       A.    Yes.
11       Q.    Was anything done to accommodate her
12   issues with napthalene?
13            MR. HENAULT:  Object to the form of the
14   question.  You may answer, sir.
15            THE WITNESS:  We brought in the
16   occupational health and safety people like Kathy
17   Makos who deal with such issues.  They did
18   testing in various places around the entomology
19   area office and collections to look at
20   napthalene levels.
21            They addressed possibilities of the use
22   of a respirator, addressed the possibilities of

49

MILLER

1    Norden had rejected any accommodations?

2         A.    I don't recall.

3         Q.    When limiting Dr. Norden's duties,

4    would it have seemed logical to you to limit her

5    exposure to napthalene, a task that required the

6    heaviest exposure to napthalene?

7         MR. HENAULT:  Object to the form.  You

8    may answer, sir.

9         THE WITNESS:  Yes, it would seem

10   reasonable, but let me just say that the

11   situation in the Natural History Museum was that

12   a certain amount of napthalene exposure was

13   unavoidable because of the history of the use of

14   napthalene in the building.

15        BY MS. FANG:

16        Q.    There would always be ambient fumes; is

17   that correct?

18        MR. HENAULT:  You have to answer yes or

19   no rather than shake your head.

20        THE WITNESS:  Yes.

21        MS. FANG:  Thank you.  I was just

22   nodding along, and I missed that.

MILLER

1          MR. HENAULT:  Object to the form of the

2     question.  You may answer, sir.

3          THE WITNESS:  I believe that we had

4     offered those accommodations.

5          BY MS. FANG:

6     Q.    I'm sure you did, sir.  I believe that

7     when I first saw the memo, but what I'm asking

8     now is if you had believed otherwise, if you had

9     believed that Dr. Norden had been repeatedly

10    promised these accommodations and not given

11    them, Dr. Schultz simply didn't purchase them,

12    would you have terminated her light duty hours?

13          MR. HENAULT:  Object to the form of the

14    question.  You may answer, sir.

15          THE WITNESS:  At least in the case of

16    the respirator, I had evidence that I believed

17    she had not -- that she had been offered and

18    gone through the process and not accepted the

19    respirator.

20          BY MS. FANG:

21    Q.    I think we've established certainly to

22    my satisfaction, I think to any reasonable

64

MILLER

1    persons, that you believed these offers had been

2    made.

3         A.    Yes.

4         Q.    And that she had rejected them or for

5    some reason they just weren't possible.

6         A.    And that's the answer to your question.

7         Q.    No.  My question is:  If you didn't

8    believe that, if you believed that Dr. Norden

9    may have said, I want a negative air filter

10   instead of a respirator, was told she could have

11   both, happily accepted the offer of both, Dr.

12   Schultz simply didn't provide them, would you

13   have still terminated her light duty hours?

14        MR. HENAULT:  Object to the form of the

15   question.  You may answer, sir.

16        THE WITNESS:  I believed as did to my

17   knowledge the rest of the people copied on this

18   Email that we had made a good faith effort to

19   offer those accommodations.

20        BY MS. FANG:

21        Q.    If you believed otherwise, if you

22   believed that one of your subordinates had not

MILLER

1      A.   It was Ted's interpretation of a
2 management meeting about a sensitive situation.

3      Q.   What was your understanding as to why
4 Dr. Norden shouldn't know about this meeting?

5      A.   It was a management meeting where those
6 of us in the museum management were conferring
7 with folks in other offices in the Smithsonian
8 about how to deal with an ongoing management
9 situation.

10      Q.   What was that ongoing management
11 situation?

12      A.   That we had been trying for almost two
13 years at that point to help an employee return
14 to full time work and that was not working, and
15 we had to figure out how to deal with that
16 situation.

17      Q.   And in what sense was it not working?

18      A.   Even the light duty accommodations that
19 we had worked out did not seem to be working.
20 She was having trouble meeting the number of
21 hours, even the sort of light duty hours, and in
22 the meantime, the work that needed to be done on

71

MILLER

1    Ted Schultz's research program as well as in the

2    collections were not getting done, so Dr.

3    Schultz was falling behind in various issues.

4            And it came to a point where we had

5    made a good faith effort to accommodate it for a

6    considerable length of time hoping that that

7    would allow her to return to work full time.

8            BY MS. FANG:

9        Q.   And do you think that Dr. Norden could

10   have given any useful input in this meeting

11   concerning her own health and need for

12   accommodations?

13       A.   The issue in this particular meeting

14   was understanding the Smithsonian and federal

15   government practices and from my standpoint, it

16   was to seek the advice of the medical

17   professionals and the human resources

18   professional about how they felt we should

19   proceed.

20       Q.   I'm going to give you an Email from Dr.

21   Lawford that's a summary of a meeting he held

22   with Smithsonian management about Dr. Norden.

1     DISTRICT OF COLUMBIA, to wit:

2

3         I, Debra L. Maheux, the officer before whom the foregoing deposition was taken, do hereby certify that the within-named witness

4  personally appeared before me at the time and place herein set out, and after having been duly

5  sworn by me, according to law, was examined by counsel.

6

7         I further certify that the examination was recorded stenographically by me and this transcript is a true record of the proceedings.

8

9         I further certify that I am not of counsel to any of the parties, nor an employee of counsel, nor related to any of the parties,

10 nor in any way interested in the outcome of this action.

11

12         As witness my hand and notarial seal this 14th day of November, 2006.

13

14

15

16               _Debra L Maheux_
              Debra L. Maheux

17               Notary Public

18

19 MY COMMISSION EXPIRES:

20                 3/14/08

21

22