```
                                                                    1
           IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA

   BETH M. NORDEN,              )
                                )
            Plaintiff,          )
                                )
        vs.                     )
                                )  Civil Action No.
   LAWRENCE M. SMALL, SECRETARY )  05-1232 (RMC)
   OF THE SMITHSONIAN INSTITUTION, )
                                )
            Defendant.          )
```

The 30(b)(6) deposition of THEODORE ROBERT SCHULTZ was taken on Wednesday, August 23, 2006, commencing at 10:25 a.m., at the Department of Justice, 501 Third Street, N.W., Fourth Floor, Washington, D. C., before Karen Hinnenkamp, Registered Merit Reporter and Notary Public.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

                                                                    2

 1                    A P P E A R A N C E S
 2
 3   ON BEHALF OF THE PLAINTIFF:
 4        VICKIE FANG, ESQ.
 5        Attorney At Law
 6        8702 Nightingale Drive
 7        Lanham, Maryland   20706
 8        (301) 552-4908
 9        fvickie@comcast.net
10
11   ON BEHALF OF THE DEFENDANT:
12        JOHN F. HENAULT, JR., ESQ.
13        U.S. Department of Justice
14        United States Attorney's Office
15        Assistant U.S. Attorney, D.C.
16        555 Fourth Street, N.W.
17        Washington, D. C.   20530
18        (202) 307-1249
19        John.Henault@usdoj.gov
20
21
22

Schultz

10

1       BY MS. FANG:
2       Q    I appreciate the care with which you are
3  answering these questions and you are giving me the
4  answers, the information that I'm seeking.
5            Now I've seen in the interrogatory
6  answers that an accommodation was made by moving
7  her office in 2003. Does that mean that the
8  Smithsonian was still expecting her to come back or
9  thinking there was a possibility she would return
10 at that time?
11      A    In 2003.
12      Q    Hm-mm.
13      A    When we moved her office to the fourth
14 floor?
15      Q    Hm-mm.
16      A    Yes.
17      Q    Okay, good. Also in 2003 I believe, and
18 correct me if I'm wrong, that the Smithsonian hired
19 someone to remove a substantial amount of
20 naphthalene in the Entomology Department. Is that
21 correct?
22      A    Yes. I can't remember if it was in

Schultz

11

1    2003, but someone named Andrew Apgar removed lots
2    of naphthalene from our collections.
3        Q    Was it anybody's thinking that it was
4    done at least in part to accommodate Beth?
5             MR. HENAULT: Object to the form of the
6    question. You can answer, sir.
7             THE WITNESS: No, I can't speak for all
8    the people involved on what their motivations were.
9    I think it was, it might be fair to say it was part
10   of a larger ongoing process that we had been
11   involved in for I think at least a decade, maybe
12   more, of trying to rid the collection of
13   naphthalene.
14            BY MS. FANG:
15       Q    All right. I've noticed that in some of
16   your memos you pointed out that Beth contracted the
17   hemorrhagic fever while working for the
18   Smithsonian. Was it any part of your thinking
19   personally or anyone else's that you know of at the
20   Smithsonian that the Smithsonian should make any
21   sort of extra effort to accommodate her because she
22   had been injured on the job and was on workers'

1  comp?

2           MR. HENAULT: Object to the form of the
3  question. You can answer, sir.

4           THE WITNESS: I did note repeatedly,
5  including in communications with the Department of
6  Labor, that Beth contracted her illness while on
7  the job.

8           BY MS. FANG:

9      Q    Hm-mm.

10     A    I think what we did in all the attempts
11 we did to return her to work was at the level that
12 we would do for anyone who was trying to come back
13 to work.

14     Q    Okay. I'm going to show you what is
15 marked on the bottom as Smithsonian 1745.

16          MS. FANG: You can mark it Plaintiff's 2
17 if you don't mind.

18                  (The document referred to was
19                  marked Plaintiff's Exhibit
20                  No. 2 for identification.)

21          BY MS. FANG:

22     Q    The subject line is "Temporary Limited

1  was at least discussed that they could move her to
2  the fourth floor, to a better ventilated room.
3     A   That's what I thought you meant by the
4  air filter.
5     Q   Oh. No. There was a charcoal air
6  filter. It's a portable unit. It's not mentioned
7  in the memo but it is mentioned in some of her
8  other accommodation requests.
9     A   Right. Yes. I remember that was
10 mentioned in a memo from Dr. Lawford. It may have
11 even been one of the earliest points at which we
12 learned about naphthalene.
13    Q   So as far as you knew, that
14 accommodation was still in process. You were still
15 looking into or still in the process of buying the
16 portable air filter?
17    MR. HENAULT: When?
18    MS. FANG: 2002 September.
19    THE WITNESS: The way I would like to
20 answer that would be to say that the moment, my
21 recollection is the moment I learned of things we
22 might need, like a respirator, and I believe it was

1  the air filter, I notified Scott Miller of this.
2  Scott Miller approved the purchase of these things.
3  And I told Beth to set in motion whatever it took,
4  the fitting and the purchase through our funds
5  manager of these items.
6          BY MS. FANG:
7   Q     Okay. Thank you. As far as I know,
8  those are all the questions I'm going to ask about
9  that particular meeting. I appreciate your
10 patience with me on our three cons.
11         But let me just clarify back to the
12 meeting. In September 2002 as far as you knew, as
13 far as you understood, was there an ongoing process
14 to move her to that fourth floor room that was
15 considered more desirable in terms of naphthalene
16 exposure?
17  A     As far as I'm concerned from some point
18 fairly early on we were advised by the safety
19 nurse, I believe her name is Kathy Makos, Rudy
20 Anderson, the safety officer in our building, and
21 possibly others, that Beth should be allowed to
22 work full or part time in that fourth floor

1    ventilated room. This was communicated to Beth by
2    me, possibly others in the department, and possibly
3    by these same individuals, and so that -- and that
4    fourth floor ventilated room is not permanently
5    occupied by other people so it at that point became
6    available to her to move down there, move her
7    operation down there completely or partly.
8    Q    Okay. I'm going to have more questions
9    to ask about that but I think I will just stay with
10   my sequence because I have my documents in order.
11   Thank you.
12        Now I'm on to a different issue in the
13   good faith interactive process. It has nothing to
14   do with this meeting and nothing to do with you
15   personally, Dr. Schultz, but I'm asking you of
16   course in your capacity as the person most
17   qualified.
18        When Beth asked Dr. Mathis to be loaned
19   out to the USDA to accommodate her sensitivity, he
20   suggested among other things that at her age she
21   was probably going through menopause and was
22   therefore more sensitive, more emotional on the

Schultz

106

1    Q    Right. She could use the microscope,
2 but she couldn't use the microscope with the
3 respirator.
4    A    Right. But she could use the microscope
5 and be accommodated for the naphthalene.
6    Q    Right. What would be the best way to
7 accommodate her while she was using the microscope?
8    A    Doing that work in the fourth floor
9 ventilated room.
10   Q    Okay. Would a portable air filter unit
11 be a good accommodation for when she couldn't wear
12 the respirator?
13        MR. HENAULT: Object to the form of the
14 question. You can answer, sir.
15        BY MS. FANG:
16   Q    Your understanding at the time.
17   A    You know, I'm not an expert on air
18 purifiers, but based on the advice I got from
19 various people who are, actually the fourth floor
20 ventilated room was a superior solution.
21   Q    Would it have been reasonable to give
22 her an air purifying unit to use in the fourth

Schultz

114

1  telling where something was collected, when it was
2  collected, who collected it.
3     Q    Was there bar coding involved?
4     A    Yes.
5     Q    Tell me how that works.
6     A    Most or maybe even all objects entered
7  into the database are assigned a bar code label,
8  which is a unique eight-digit identifier, and that
9  label is affixed to the object, whether it's put on
10 a pin or stuck into a vile.
11    Q    Oh, I see. Could you have done that
12 from the fourth floor?
13    A    Yes.
14    Q    You're not sure which room though.
15    A    No, she could have done it from the
16 fourth floor ventilated room.
17    Q    Oh, there was a computer in there.
18    A    There are computer connections in the
19 fourth floor ventilated room. It may have required
20 setting up a computer. There may have already been
21 a computer in there. I don't remember.
22    Q    Okay. Is it fair to say that in order

Schultz

115

1   to use the fourth floor room she needed to have a
2   computer that ran your program there so she could
3   use it in conjunction with her microscope?
4        A    Only for the databasing part of her job.
5        Q    But as I understand, this is very
6   precise work with very precious specimens. Would
7   you have wanted her going from floor to floor, sort
8   of carrying the bar code, the labels, back and
9   forth, or jotting down information and going to
10  another floor and typing it in?
11       A    The specimens would have been
12  transported in drawers so they would be in trays
13  within drawers and it's a simple matter to
14  transport the drawers from one floor to another.
15  They have to be pulled from the cabinets and
16  transported to wherever you're going to work on
17  them.
18       Q    Was anything ever set up so that Beth
19  would have a computer to use in the fourth floor
20  room?
21            MR. HENAULT: Ever?
22            MS. FANG: Ever.

Schultz

116

1  MR. HENAULT: Okay.

2  THE WITNESS: I would say the answer to
3  that is yes. If you include the office that we set
4  up for Beth on the fourth floor.

5  BY MS. FANG:

6  Q  In 2003?

7  A  Yes.

8  Q  During the period of 2002 was there
9  anything set up for her to use the computer on the
10 fourth floor?

11 A  Okay, first of all, I don't know if
12 there was a computer there. If there was a
13 computer there, she could have used it. We never
14 installed Filemaker Pro on any computer in the
15 ventilated room.

16 Q  Okay. So at the time she was working
17 there in 2002, assuming that the ant holotypes
18 could survive the very strong air flow, she would
19 not have had the computer there to database the
20 information, is that correct?

21 A  I'm having trouble with the would part.

22 Q  She didn't have a computer.

Schultz

117

1  A    We could have fairly easily set that up.
2  Q    Okay. Why didn't you?
3  A    For a long time prior to that, ever
4  since the naphthalene issue came up, the safety
5  people encouraged Beth as one of the high priority
6  solutions to the naphthalene exposure to use the
7  fourth floor ventilated room. To my knowledge Beth
8  never used the fourth floor ventilated room.
9  Q    Did you ever speak to her about that?
10 A    Yes.
11 Q    What did you say?
12 A    I strongly encouraged her to use the
13 fourth floor ventilated room.
14 Q    And how did she respond?
15 A    I don't remember, except that she never
16 used it.
17 Q    Okay. When did you discover she was not
18 using it?
19 A    I think I was aware of it all along.
20 Q    Did you ever counsel her about her
21 failure to take appropriate steps to accommodate
22 her disability?

Schultz

117

1  A  We could have fairly easily set that up.
2  Q  Okay. Why didn't you?
3  A  For a long time prior to that, ever
4  since the naphthalene issue came up, the safety
5  people encouraged Beth as one of the high priority
6  solutions to the naphthalene exposure to use the
7  fourth floor ventilated room. To my knowledge Beth
8  never used the fourth floor ventilated room.
9  Q  Did you ever speak to her about that?
10  A  Yes.
11  Q  What did you say?
12  A  I strongly encouraged her to use the
13  fourth floor ventilated room.
14  Q  And how did she respond?
15  A  I don't remember, except that she never
16  used it.
17  Q  Okay. When did you discover she was not
18  using it?
19  A  I think I was aware of it all along.
20  Q  Did you ever counsel her about her
21  failure to take appropriate steps to accommodate
22  her disability?

Schultz

134

1  Q   Okay. There is a suggestion here that
2  Beth's microscope stand could be moved to the
3  fourth floor processing room. Was that ever done?
4  A   No.
5  Q   Why not?
6  A   It would have been up to Beth to do it.
7  Q   That's something she could have just
8  picked up and carried downstairs.
9  A   Yes.
10 Q   The next paragraph suggests buying a
11 tabletop ductless fume hood for her office under
12 which treated specimens and/or drawers could be
13 left while she works in her office. It goes on to
14 state that several units could fit the dimensions
15 of her office. Is this the portable air filter
16 that's referred to?
17 A   I don't believe so.
18 Q   This is a different accommodation.
19 A   Yes.
20 Q   Okay. Did it surprise you that this
21 memo from Kathy Makos says that Beth is agreeable
22 to all these different proposals, including working

311

```
 1              CERTIFICATE OF NOTARY PUBLIC
 2      I, Karen Hinnenkamp, the officer before whom
 3  the foregoing deposition was taken, do hereby
 4  certify that the witness whose testimony appears in
 5  the foregoing deposition was duly sworn by me; that
 6  the testimony of said witness was taken in
 7  shorthand and thereafter reduced to typewriting by
 8  me or under my direction; that said deposition is a
 9  true record of the testimony given by said witness;
10  that I am neither counsel for, related to, nor
11  employed by any of the parties to the action in
12  which this deposition was taken; and further that I
13  am not a relative or employee of any attorney or
14  counsel employed by the parties thereto, nor
15  financially or otherwise interested in the outcome
16  of the action.
17
18                    _____
19                    Notary Public in and for
20                    the District of Columbia
21  My commission expires:
22  September 14, 2008
```