Alex T. Sliheet, D.C. Bar No. 438977
Vickie Inge Fang, *pro hac vice*
Attorneys for Plaintiff Beth Norden
8702 Nightingale Drive
Lanham, MD  20706
alexsliheet@yahoo.com
fvickie@comcast.net
(301) 552-4908

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **Beth M. Norden,** | ) | |
| | ) | **Case No. 05cv1232 (RMC)** |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **PLAINTIFF'S REPLY** |
| | ) | |
| | ) | |
| **Cristian Samper, Acting** | ) | |
| **Secretary Smithsonian** | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

**PLAINTIFF'S REPLY**

**Table of contents**                                                                                        **page**

I.      There is Substantial and Un-Refuted Evidence that Dr. Norden Made the
        Complaint of Discrimination on February 10, 2003.......................................1

II.     Bruce Goodman, Esq. Mailed the February 10, 2003, letter...........................2

III.    Defendant Responded to the February 10, 2003, letter.................................3

IV.     The Four Statutory Extensions under C.F.R. 1614.105(a)(2) Apply
        to Dr. Norden..................................................................................4

V.      Defendant's Claim that Dr. Norden was not Disabled in 2002 is contrary to the
        established record and the court's previous findings in its 8/3/07, Order............11

VI.     Defendant has Offered no Legitimate Non-discriminatory Reason as to Why it
        did not Implement the 4th Floor Relocation as a Reasonable Accommodation.......17

VII.    Defendant has Offered no Legitimate Non-discriminatory Reason as to
        why it did not Implement the Respirator and/or the Air Filter as a Reasonable
        Accommodation .................................................................................19

VIII.   Defendant has Offered no Legitimate Non-discriminatory Reason as to why it
        did not Implement the USDA Reimbursable Loan/detail as a Reasonable
        Accommodation.................................................................................21

IX.     Conclusion.....................................................................................24

**Table of authority**                                                     page

<u>Cases</u>:

*Harris v. Gonzales,*
    488 F.3d 442, 444-445 (9th Cir 2007)……………………………………..……….4,5

*Johnson v. Runyon,*
    47 F.3d 911 (7th Cir. 1995)……………………………………………………....4,5

*Langon v. HHS,*
    959 F.2d 1053, 1058 (D.C. 1992)………………………………………………....21

*Norden v. Samper,*
    503 F. Supp.2d 130, 145-146. (D.D.C. 2007, Collyer)…………………………...…et. al.


<u>Codes:</u>

Fed. Rules Evid. R 301, 803(1)……………………………………………………………….1

29 C.F.R. § 1614.105(a)(2)………………………………………………………..……4,5

I.    **There is Substantial and Un-Refuted Evidence that Dr. Norden Made the Complaint of Discrimination on February 10, 2003**

Defendant has attempted to refute the evidence of Dr. Norden's February 10, 2003, complaint to the Smithsonian OEEMA by asserting for the first time that Ms. Roybal does not recall Mr. Goodman's February 10, 2003, letter and has not found it in her files. Under Federal Rules of Evidence Rule 301, however, Ms. Roybal's simple disclaimer cannot defeat Dr. Norden's evidence of having made the complaint on February 10, 2003. Accord, *Lepre v. DOL. Emple. Compensation Appeals Bd.*, 275 F.rd 59, 69 (D.C. Cir. 2001) "An issue of fact thus arises when the person to whom mail is addressed denies receipt."

Moreover, Ms. Roybal does not even attempt to lay an adequate foundation to support her affidavit under Fed. Rules Evid. R. 301. Without such a foundation, Ms. Roybal's affidavit is not sufficient to rebut the presumption of mailing under Fed. Rules Evid. R. 301. For example, Ms. Roybal does not explain how her files are maintained, how long they are maintained, whether **initial complaint letters are retained in her files or are forwarded to the counselor who actually investigates the complaint (in Dr. Norden's case, the investigating counselor was Shadella Davis who did not submit an affidavit on this point),** or whether her office has a history of reliable record keeping. By contrast, Dr. Norden has provided the February 10, 2003, letter itself in the November 18, 2007 MSJ, and an affidavit from her previous attorney who explained his relevant mailing procedures and stated under oath that he mailed the February 10, 2003, letter, and evidence that the Smithsonian actually responded to the February 10, 2003, letter by sending a Smithsonian EEO complaint form to Mr. Goodman.

II.     **Bruce Goodman, Esq. Mailed the February 10, 2003, letter.**

Plaintiff's former counsel, Bruce Edward Goodman, Esq., complained of discrimination on Dr. Norden's behalf in a letter dated February 10, 2003, to Ms. Angela Roybal of the Smithsonian.   See [Goodman Affidavit, ¶ c-d]:

> "Some time ago, I represented the Plaintiff in this matter regarding the filing of a complaint with the Smithsonian Institution under the Americans with Disabilities Act.  As I recall, the issue dealt with a disease she contracted while on an assignment for the Smithsonian in a foreign country. …I sent a letter on February 10, 2003, to the Smithsonian Institution, by first class United States mail, postage pre-paid, setting forth the particulars of her complaint and a copy of the letter to Dr. Norden.  It is the practice of my office that I send copies of all letters to the addressee as well as my client.  I do not recall receiving the letter back from the Smithsonian as having been undeliverable." [Goodman Affidavit] (emphasis added)

Dr. Norden received her copy of the February 10, 2003, letter from Mr. Goodman [Norden aff., Plt. Ex.1] in an envelope post-marked on February 11, 2003. [Norden aff., Plt. Ex. 2]

As stated in the moving papers, the February 10, 2003, letter was not produced in discovery by the Smithsonian either at the EEOC stage of this litigation or at any time during the federal litigation.  Plaintiff's present counsel were unaware of this February 10, 2003, letter and had they been aware, would have certainly used it to make arguments during the EEOC stage of this litigation and last year in their motions for summary judgment to this Court.  Plaintiff's counsel took over the case from Dr. Norden's former attorney, and the only document they were aware of was correspondence from the Smithsonian EEO that indicated that the first contact had occurred on April 7, 2003. *[November 18, 2007, MSJ, Plt.Ex.2]* Dr. Norden was also not aware that the February 10, 2003, letter could be viewed as a first complaint with an EEO counselor. *[November 18, 2007, MSJ, Norden, aff., ¶ 1]*  She believed that a complaint had to be filled out on a complaint form. [Norden, aff., ¶ 2]

III.    **Defendant Responded to the February 10, 2003, letter**

Ms. Roybal's affidavit ¶ 6 states that "It is my practice to provide employees or their counsel with the OEEMA complaint form and brochures in response [to] letters like Plaintiff's Exhibit 1 [the Goodman February 10, 2003, letter]" This is exactly what Ms. Roybal did in response to the February 10 letter. On March 12, 2003, Bruce Goodman called Dr. Norden: See Norden, aff., ¶ 2:

> "I am a creature of habit, and I habitually note events on my calendar contemporaneously with their occurrence. Specifically on March 12, 2003, Bruce Goodman called me and he **specifically said that he had received some paperwork** from the Smithsonian and that he could fill most of it out, but needed to know my direct supervisor's name and my department name. I gave him the information, and then I **immediately calendared** the March 12, 2003, phone call after speaking with Bruce Goodman, and wrote: **"Spoke w/lawyer B. Goodman EEO Form completed-Supervisor names depts…"** I was always operating under the belief that this "EEO Form" that I helped Mr. Goodman fill out on March 12, 2003, was the EEO Form that he sent to the Smithsonian on April 7, 2003, and that constituted my complaint. I believed that a complaint had to be filled out on a complaint form." (emphasis added)

Thus, on March 12, 2003, Dr. Norden calendared the March 12, 2003, phone call immediately after speaking with Bruce Goodman, and wrote: "Spoke w/lawyer B. Goodman EEO Form completed-Supervisor names depts…" [Norden aff., ¶ 2] [Plt. Ex.3, Dr. Norden's March 2003, Calendar.] Any hearsay objection that Dr. Norden only knew that Bruce Goodman needed the information to fill out a Smithsonian "EEO form" that he had received from the Smithsonian is unavailing. Habitually, Dr. Norden calendared the statement immediately after the phone call on March 12, 2003 [Norden aff., ¶ 2], and therefore her notes and her memory based upon them are a "present sense impression" exception to the hearsay rule under Fed Rules Evid. R. 803(1).

**IV.    The Four Statutory Extensions under C.F.R. 1614.105(a)(2) Apply to Dr. Norden**

The issue of receipt of the February 10, 2003, letter is independent of the issue of the liberal application of any of the four statutory extensions under 29 C.F.R. § 1614.105(a)(2) as to either the February 10, 2003, complaint letter or as to the April 7, 2003, EEO Form complaint.    Despite Defendant's claim to the contrary, Dr. Norden is not attempting to resurrect the equitable tolling argument.    Instead, Dr. Norden is simply seeking a favorable ruling as to the application of the four statutory extensions under 29 C.F.R. § 1614.105(a)(2) and *Johnson v. Runyon*, 47 F.3d 911 (7th Cir. 1995) and *Harris v. Gonzales*, 488 F.3d 442, 444-445 (9th Cir 2007).

The court in *Harris,* p.  444-445, held that the common law equitable tolling standard is inapplicable:

> "… the common law equitable tolling standard is inapplicable: "Given subsection (a)(2)'s mandatory language—'the agency . . . shall extend the 45-day time limit'--we agree with Harris that the agency must grant an extension if the employee shows that she 'was not notified' or 'otherwise aware' of the time limit. 29 C.F.R. § 1614.105(a)(2) (emphasis added). *An employee who makes such a showing need not separately satisfy the common law standard for equitable tolling." Id.* (emphasis added)

Furthermore, the *Johnson* court, *supra*, held that 1614.105(a)(2) must be interpreted liberally:

> "Our analysis must be governed by the principle that the Rehabilitation Act is remedial legislation that must be construed liberally to effectuate its purposes… 'the [45] day statute of limitations is not reasonable if agencies and courts do not liberally construe the [(a)(2)] exceptions.'…"

Defendant's opposition simply ignores any of the four criteria of 29 CFR 1614.105(a)(2) and Plaintiff's arguments as to each of the four criteria, and argues that constructive notice is established simply because it had some posters up.  This of course is not the law. See, *Harris,* p. 445-446:

4

"…every circuit to have done so has followed the lead of the Seventh Circuit in *Johnson*, which declined to adopt a 'strict theory of constructive notice' and instead set out a two-step inquiry: (1) whether 'notification of the time requirements was provided,' and (2) whether the notification was 'reasonably geared to inform the complainant of the time limits…[t]he presence or absence of posted notices does not, standing alone, determine whether the limitations period should be tolled."

Finally, under the two step *Harris* test, the Defendant must submit evidence as to the number of employees who came into contact with the posters and the frequency of the contact demonstrating the probability that the alleged posters was "reasonably geared to inform the complainant of the time limits." See *Harris*, p. 446:

"But the mere fact that these rooms were available to contractors-absent information such as the placement of the posters and the number of contractors who entered these rooms, as well as the frequency with which they did so-tells us nothing about the likelihood that Harris herself was ever in these rooms or, if so, whether she should have seen the posters."

## Constructive Notice

<u>First,</u> Defendant opposition does not provide any opposition as to Plaintiff's arguments regarding each of the four criteria of 29 CFR 1614.105(a)(2).

<u>Second,</u> Defendant's opposition does not create an issue of material fact regarding Dr. Norden coming within eyesight of any poster.

<u>Third,</u> every path that Dr. Norden took was a reasonable and available path through the massive Smithsonian and included using Smithsonian stairs, Smithsonian elevators and Smithsonian doors, all of which were open and available and intended for use.   Dr. Norden was not sneaking around.

<u>Fourth,</u> Defendant's opposition does not create an issue of material fact that its posters were placed in locations "reasonably calculated" under *Harris* to inform <u>part-time Entomology employees such as Dr. Norden in 2002</u>.  As will be shown, *infra,* Defendant has

failed to provide any evidence or analysis as to any alleged poster of the numbers and the frequency of contact demonstrating the probability that complainant, who was a part-time employee in 2002, should have seen any alleged poster as is required under the *Harris* 2nd prong, *supra.*

### 1. Posters

*Cafeteria*

There is a question of fact as to whether the posters were always up at the cafeteria. *[November 18m 2007, MSJ, Meltzer affidavit, ¶ 14]* As discussed in the moving papers, the Smithsonian is a very large series of Buildings with a very large number of employees. The main floor cafeteria is not even visible from the East Court Building and is a good five minute walk through the crowded public entrance and main hall, and the cafeteria sits close to the West Wing Building. [Norden aff., ¶ 3] As made clear in the moving papers, Dr. Norden did not eat at the cafeteria, and it is not reasonable for the Smithsonian to assume that all or a majority of its employees or its Entomology employees, especially part-time employees, would eat at the Smithsonian's cafeteria during the 2002 period.

The Smithsonian is, of course, located in a popular tourist area of a major city and is therefore surrounded by a number of restaurants which employees may find preferable to the company cafeteria. In addition, some employees may be on special diets or bring their lunches. In Dr. Norden's case, she was in the habit of eating with Dr. Krombien in his office during the past, and she simply followed this habit in 2002. *See November 18, 2007, MSJ, Bradon aff., ¶ 10-12, Meltzer aff., ¶ 19]* . Furthermore, Dr. Norden was limiting unnecessary activities and movements at the Smithsonian in order to conserve energy due to the lingering effects of DHF fatigue. [Norden, Aff. ¶.3] Finally, avoiding unnecessary contract with

people was a concern for Dr. Norden because the common cold virus was suspected of causing the dengue virus to activate and cause more bleeding. [Norden affidavit, ¶ 4] [Norden aff., Plt.Ex.4, Dr. Kessler November 26, 2001 letter]. Thus, under *Harris, supra,* the Defendant has not met its burden of showing numbers and the frequency of contact demonstrating the probability that the alleged cafeteria poster was "reasonably geared to inform the complainant of the time limits."

### *Kerby Room*

As stated in Plaintiff's MSJ, the East Court Building was a new building that was still under construction in 2002. The Kerby room which sits on the 3rd floor of the East Court Building was therefore also a new room as of 2002. It is not reasonable for the Smithsonian to assume that all or a majority of its Entomology employees or part-time employees, would be in the Kerby room during the 2002 period. In her moving papers, Dr. Norden testified that she was never required to go to the Kerby room during the 2002 period and that prior to 2002, she would not see the poster near the elevator because when she had gone to the Kerby room in the past she took the back stairs.

Moreover, the Kerby room does not have fixed seating. Museum-wide meetings or lectures were usually held in the Baird auditorium, for example, when the Entomology Department held a memorial service for Margaret Collins and when Dr. Norden got the Smithsonian unsung hero award. Also, lectures of visiting entomologists and entomology department socials were usually held in the smaller and more intimate Waldo Schmidt room. [Norden, aff. ¶ 5]

Thus, under *Harris, supra*, the Defendant has not met its burden of showing the amount and the frequency of contact demonstrating the probability that the alleged Kerby poster was "reasonably geared to inform the complainant of the time limits."

### Between Carol Youman's and Ms. Blair's office on the 6th Floor West Wing

Dr. Norden testified that: "…We had an entomology office, Juanita Hall secretary, on the 4th floor East Court (my building, one floor below mine), so there was seldom need to go the long way to the 6th floor West Wing." *[November 18, 2007, MSJ, section II (C) (1) subsection (c)]*

Furthermore, at the Entomology Department/East Court/4th floor, Dr. Norden's time keeper, Cindy Murphy, was the East Court person who usually signed Dr. Norden's time sheets. The Entomology Department/East Court/ 4th floor office had all the needed office supplies and is where Dr. Norden sent faxes and made photocopies, and Dr. Norden's mail was sent from and received at the East Court Building. [Norden, Aff., ¶ 6]

The Entomology department went through a relocation beginning in 1999, and as of 2002, the main Entomology department had been temporarily located in the West Wing 6th floor with about half of the other entomology staff offices, including Dr. Norden's, being located in the new East Court building on the other side of the Natural History Building. [Norden aff., ¶ 7] Dr. Norden describes this in her own words:

> "Entomology is a very large dept. due to all our many insect collections (95% of life on earth is insect). Our dept. was already spread out on several floors & wings of the NMNH. It took years to pack our collections & move our offices to new quarters in the new building in the East Court. At the end of 1999 & beginning of 2000 I and Hymenoptera, including USDA Hymenopterists, were moved to the East Court. But, probably half of Entomology was still left in the main building or the West Wing. At about the time I was moving, Carol Youmans, Marie Blair and Dept. Chair Scott Miller were moved to the 6th floor West Wing. It was intended to be temporary until the entomology floors 6-7 of the East Court were completed. Because of the time & effort needed to get

8

from the East Court to the West Wing, it was decided to set up a 2nd Entomology office on the 4th floor East Court for the half of us who were now in the new East Court." [Norden aff., ¶ 7]

It is not reasonable for the Smithsonian to assume that all or a majority of its Entomology Department/East Court employees, or its part-time employees, would take the ten minute trip and take a specific route past Ms. Blair's office on the way to Carol Youman's Entomology office located on the west wing during the 2002 period. Dr. Norden testified that she went to Ms. Youman's office three to four times in 2002, never seeing the posters because the 6th floor west wing doors that she used specifically to see George Venable and to use the Entomology Library did not take her near or past Ms. Blair's office. *[November 18, 2007, MSJ, section II (C) (1) subsection (c)]*

Thus, under *Harris, supra*, the Defendant has not met its burden of showing numbers and the frequency of contact demonstrating the probability that the alleged 6th Floor West Wing poster was "reasonably geared to inform the complainant of the time limits."

### *Bulletin Boards*

Relying on the affidavit of Tracey Cones, the Smithsonian says that there were posters on all "Department" bulletin boards but does not say where the alleged Bulletin Boards were placed so that the *Harris* two pronged test cannot be applied to the alleged Bulletin Boards. As to the location of the Entomology Department bulletin board, Ms. Cones refers to the "6th floor west wing…" and to the poster between Carol Youman's office and Ms. Blair's office on the Entomology Department/West Wing/6th floor. See in depth discussion of this poster not being reasonably calculated as discussed, *supra*, and as discussed in November 18, 2007 *MSJ, section II (C) (1) subsection (c)]*

First, The blanket assertion by Ms. Cones that posters were always placed on **all** "Department Bulletin Boards," is contradicted by Ms. Meltzer, who is a current Smithsonian employee, and who has already stated that there was no EEO poster on the Herpetology "Department bulletin board." [See  November 18, 200*7, MSJ Meltzer aff.* ¶ 13]

Second, during 2002, Dr. Norden saw no bulletin boards and no EEO posters in her Entomology Department/East Court Building.  [Norden aff., ¶ 8]  [*See also, November 18, 2007, Braden, aff., ¶ 13 as to no "bulletin board" near the Scanning Electronic Microscope (SEM) Laboratory East Court Building.]*

Third, on October 21, 2007, Dr. Norden and Ms. Meltzer walked through the National Museum of Natural History and the Entomology Department/East Court.  There was still no EEO information at 1) the main entrance to the National Museum of Natural History ("NMNH"), 2) in the main lobby of the NMNH, 3) in the hallway leading into the East Wing, either before or after the bank of elevators leading to the East Court Building, 4) in either elevator leading to the East Court Building offices, 5) anywhere in the hallway of the 5th floor in the East Court Building. [Norden aff, ¶ 9]  *[November 18, 2007, MSJ, Meltzer aff., ¶ 12-13]*

## 2. Prism

The Smithsonian offers no argument that a system that: 1) was not on Dr. Norden's computer in 2002, 2) that was still in implementation in 2003, and 3) for which employees were not trained and orientated in 2002,  was "reasonably calculated" as of 2002 to inform Entomology employees, or part-time entomology employees such as Dr. Norden. *[See Braden affidavit, ¶ 14, and Meltzer affidavit, ¶ 7-10, in support of these facts submitted with November 18, 2007, MSJ.]*   Dr. Norden has previously explained what she meant in her

deposition by "limited access" in terms of literally being able to ask a fellow employee to allow Dr. Norden the use of his or her computer. *[November 18, 2007, MSJ Norden, Affidavit, ¶ 25]*

Thus, under *Harris, supra,* Defendant has not met its burden of showing numbers and the frequency of contact demonstrating the probability that the alleged PRISM was "reasonably geared to inform the complainant of the time limits.

## V.    Defendant's Claim that Dr. Norden was not Disabled in 2002 is contrary to the established record and the court's previous findings in its 8/2/07, Order.

### A)    Substantially impaired.

The evidence relied upon by the court in ruling that Dr. Norden was disabled in *Norden v. Samper*, 503 F.Supp. 2d 130 (D.D.C. 2007, Collyer) was not limited to the 2003-2004 period. *See section III (A) of Plaintiff's November 18, 2007, MSJ* and citations to the Court's August 2, 2007 Order in footnotes 5 and 6.

For example, Dr. Granite's affidavit covered the 2002 period November 18, 2007 *MSJ, Plt. Ex. 21, Granite affidavit],* and as the Court has already noted, stated:

> "Dr. Norden will carry the dengue antibodies <u>for the rest of her life</u>. The past and current effects that the dengue antibodies have on Dr. Norden's health in terms of capillary fragility are of a <u>long-term nature and their effects on her health will in all probability be permanent</u>." (emphasis added)

Also, Dr. Norden's affidavit covered the 2002 period *[November 18, 2007 MSJ, Plt. Ex. 22, Norden, affidavit],* regarding the effects of the DHF. Furthermore, the Smithsonian was aware of Dr. Norden's medical records from 2000 forward and made decisions on that medical record, including during the 2002 period at issue. See *Norden, supra at* 138: as to this Court's findings of facts regarding the 2002 period; as to Dr. Lawford being provided

access to Dr. Norden's medical files; and as to Dr. Norden still suffering from debilitating

migraines:

> "Dr. Norden spent almost the entire period from September 2000 to April 2002 on
> complete disability. Pl.'s Facts P 8. She attempted a return to work in 2001 at 12
> hours per week, but after four months her doctors determined that even this
> limited schedule was too physically stressful for her to continue. *Id.* Records of
> her illness and impaired functioning were sent to the Smithsonian's physician, Dr.
> Thomas Lawford, and there appears to be no dispute that Dr. Norden was too ill
> to work at that time. *Id.* P 9."

> "In early 2002 Dr. Norden informed the Smithsonian that she was ready to return
> to work on a part-time basis. *Id.* P 12. Her physicians and neuropsychlogist
> supported her return to work with accommodations, **and Dr. Lawford was
> provided access to her medical records in order to make his own assessment.**
> *Id.* PP 13-14. At that time, Dr. Norden had demonstrated substantial cognitive
> improvement and no longer suffered from acute dengue infection; she did,
> however, **continue to suffer from intense fatigue and other symptoms, such as
> debilitating migraines.** *Id.* PP 15-16. Dr. Norden's doctors made clear that the
> light-duty hours were temporary and that her hours could be reevaluated at the
> end of 2002. *Id.* P 16. **Both her neurologist and Dr. Lawford advised the
> Smithsonian that Dr. Norden needed "flex time"** as an accommodation so that
> she could go to her many doctors' appointments and take time off when she
> suffered a migraine or other symptoms of her illness. *Id.* P 19." (emphasis added)

Thus, Dr. Norden's impairment was "permanent" or of a "long term nature" before and

during the 2002 period. Furthermore, Dr. Lawford was aware of Dr. Norden's record of such

impairment before and during the 2002 period, and Dr. Lawford relied and made decisions

based on that record of impairment in the 2002 period. The court has already ruled that Dr.

Norden has established that she is disabled based on having a record of an impairment. Such

a ruling was not limited to the 2003-2004 period and is applicable to the 2002 period.

**B)     Qualified to do the Essential functions of the job in 2002.**

The Smithsonian provided light duty hours for the period of 2002 to be reviewed at

the end of the year because Dr. Norden still suffered from fatigue from the DHF as of 2002.

Thus, for the year 2002, Dr. Norden did not need to meet a full time hours requirement.

However, it became very clear that Dr. Norden needed additional reasonable accommodations in order to meet the 2002 light duty hours. The Smithsonian failed to provide any further reasonable accommodations for the 2002 period, and this is the basis for Dr. Norden's claim of failure to accommodate for the 2002 period.

Now the Smithsonian is claiming that Dr. Norden could not meet the light duty hours and therefore was not qualified during the 2002 period. The Smithsonian is bootstrapping. It is because the Smithsonian failed to act under the law and provide reasonable accommodations that Dr. Norden could not fully meet the light duty hours during the 2002 period. Indeed, Dr. Norden's migraines greatly increased during the 2002 return to work because of the Smithsonian's failure to address the naphthalene sensitivity accommodation requests. [Norden, aff., ¶ 10] There is plenty of evidence in the record, which is not contradicted by the Smithsonian, that Dr. Norden could do the essential functions of the light duty hours during the 2002 period had she been given reasonable accommodations regarding her naphthalene sensitivity. See *Norden*, *supra* regarding Dr. Norden's ability in 2002:

> "In addition to showing that she was disabled, Dr. Norden has presented sufficient evidence to demonstrate that she was otherwise qualified for an entomology position at the Smithsonian. There is no dispute that, before contracting dengue fever, Dr. Norden received outstanding performance evaluations and was well-regarded within her department. *See, e.g.*, Pl.'s Reply Ex. 10; *see also* Norden Aff. ¶ 4. When Dr. Norden returned to part-time duty in 2002 and experienced an intense adverse reaction to naphthalene, Dr. Schultz concluded that she performed "better than might be expected" under the circumstances. Def.'s Ex. 26. Thus, there is evidence in the record demonstrating that Dr. Norden could have performed the essential duties of her job with the accommodations recommended by her physicians. In fact, Dr. Schultz stated that he believed that Dr. Norden could perform the essential duties of her job as long as she received accommodations. *See* Schultz Decl. ¶ 5."

See Dr. Granite's affidavit regarding Dr. Norden's ability in 2002:

> "I believe that Dr. Norden is capable of working in an environment that is adjusted to her situation. Such adjustments would include but are not limited to the absence of toxins that may aggravate her vascular sensitivity. Thus, Dr. Norden requires control procedures to limit her exposure to naphthalene. She also requires flexible work schedule to deal with the unpredictability of the DHF induced severe migraines. Her capillary fragility impedes her healing when other medical conditions occur. Consequently, she requires close medical monitoring when ever she is experiencing any other disease entity or injury." [November 18, 2007, MSJ, Plt. Ex. 21, ¶ 11]

See Dr. Norden's affidavit regarding her ability in 2002:

> "I believe that with the naphthalene accommodations and flex time accommodations that I requested in 2002, I could have gotten a favorable recommendation by my doctors and worked full time hours by the end of the 2002 years."[November 18, 2007, MSJ, Plaintiff's affidavit, ¶ 42]

### *The Smithsonian's further Bootstrapping as to the other DHF triggers*

The Smithsonian offers no evidence whatsoever to contradict the fact that Dr. Norden would have been able to do the essential functions of her light duty hours in 2002 with reasonable accommodations. The fact that there are other triggers for the migraine headaches such as extreme heat and stress does not minimize the Smithsonian's duty to provide reasonable accommodations nor does it relieve the Smithsonian of having to provide reasonable accommodations to accommodate such triggers, including for example, the requested flex-time and being allowed to work nights and weekends to make up lost hours due to triggers or due to doctors appointments. [Norden affidavit, ¶ 11]

Throughout her career, Dr. Norden always enjoyed the flex hours of working nights and weekends until she contacted DHF, and then, in 2002, the Smithsonian slammed the door shut on working nights and weekends. [Norden affidavit, ¶ 12] Nevertheless, even without any accommodations, Dr. Norden met 223/294 or 76% of the hours. *[November 18, 2007,*

*MSJ, Plt. Ex. 30]* Had the Smithsonian accommodated the naphthalene sensitivity and provided the flex hours to make up the lost time due to doctor appointments and migraine triggers, Dr. Norden believes that she could have met the full 294 hours simply by working nights and weekends as necessary and as she had done in the past.  [Norden affidavit, ¶ 13]

Due to the "10-day strings" of extreme 95 plus heat of late August of 2002, Dr. Granite and Dr. Lawford agreed that Dr. Norden should take off the month of September 2002. See Norden, aff., Plt. Ex. 5, Dr. Lawford's September 2, 2002, email, stating that

> "...the past month of August with its 10-day strings of 95-98F days.  Dr. Granite recommends /approves of/endorses the plan for her to take off for one month.  He is quite positive that this does not represent a reversal in her improvement trend.  Rather it is a tactical maneuver to even the score with the heat stress she has experienced."

Nevertheless, had Dr. Norden been given the reasonable accommodation of flex-time in terms of working nights/weekends, then during the hot month of August 2002, *Dr. Norden would have traveled on the metro during the cooler evening hours and/or her husband would have driven her to the Smithsonian if she had been allowed to work nights or weekends.* [Norden, affidavit, ¶ 14] [Affidavit of Arnold Norden, Dr. Norden's husband, ¶ 2]   Dr. Norden never got this chance because the Smithsonian refused this reasonable accommodation.

Dr. Miller, supervisor to Dr. Schultz and Dr. Mathis, testified that had he known that the accommodations were not given to Dr. Norden, Dr. Miller would have given Dr. Norden the accommodations, and he would not have removed Dr. Norden from her light duty hours. *November 18, 2007, MSJ, Ex. 36 Miller depo]* Those accommodations include the flex-time that was refused by the Smithsonian.  Dr. Miller testified that all of the accommodations were supposed to be given together. *[November 18, 2007, MSJ, Ex 32 Miller depo]*

15

The bottom line is that the Smithsonian never gave Dr. Norden a chance to demonstrate that she could meet the light duty hours with reasonable accommodations because the Smithsonian never implemented any of the requested accommodations other than the light duty hours. This Smithsonian conduct, especially for a federal agency charged with an affirmative duty, was illegal because Dr. Norden needed additional reasonable accommodations which the Smithsonian simply and uniformly denied. Now the Smithsonian argues to the Court, that Dr. Norden failed to meet its light duty hours.

Not only is the Smithsonian bootstrapping, but it is doing so:

1) Despite Dr. Schultz's statements, *supra*, that Dr. Norden could do the essential functions of her job with the reasonable accommodations;

2) Despite Dr. Miller's statements, *supra*, that the light duty hours would not have been terminated had Dr. Miller known that Dr. Norden did not receive the accommodations;

3) Despite the knowledge that each and every day that Dr. Norden did not receive accommodations during 2002 devastated Dr. Norden's health and undermined her ability to meet the light duty hours without flex-time. See for example November *18, 2007, MSJ, Plt. Ex. 23, Dr. Lawford October 17, 2002, letter to management:*

"Since returning to work in the Court East, 5th floor, she has progressively exhibited symptoms, including nosebleeds, intense headaches, and nausea. Both hemorrhagic fever, and naphthalene, can cause these symptoms, as well as hematological dysfunction. In addition, naphthalene exposure can inflame nasal passages and vessels. In Dr. Norden's case, the two conditions appear to be acting in concert to aggravate her symptoms considerably."

4) Despite the knowledge that Dr. Norden needed flex-time. See *Norden, supra* at 138: as to this Court's findings of facts regarding the 2002 period;

"Both her neurologist and Dr. Lawford advised the Smithsonian that Dr. Norden needed "flex time" as an accommodation so that she could go to her many doctors' appointments and take time off when she suffered a migraine or other symptoms of her illness. *Id.* P 19." (emphasis added)

See also, February 8, 2002, letter from Dr. Blake: "Even when Ms. Norden is at her full-time schedule, she may still require intermittent leave for any temporary recurrence of symptoms or for medical visits." [Norden aff., Plt. Ex. 6]

Thus, with reasonable accommodations Dr. Norden was qualified to do the essential functions of her job during the 2002 period.

## VI.    Defendant has Offered no Legitimate Non-discriminatory Reason as to Why it did not Implement the 4th Floor Relocation as a Reasonable Accommodation.

Defendant has no legitimate non-discriminatory reason as to why it did not <u>implement</u> the reasonable accommodation of moving and setting up Dr. Norden on the 4th floor. Defendant claims that many of its personnel considered the 4th floor as a positive accommodation; however, the accommodation was never implemented.  Instead of offering an explanation, defendant proceeds to do the only thing available which is to shift the blame to the Plaintiff.  Thus, Defendant incorrectly cites to and then takes out of context, Plaintiff's affidavit submitted in her original SMJ motion filed on October 2, 2006, ¶ 43.  The correct citation and entire quote is as follows:

"Other than the statement by Dr. Schultz to me that if I had a problem with naphthalene I could use the 4th floor for the period of time that he would be going out of town, I never heard anything from the Smithsonian about the 4th floor being considered as a possible accommodation, and I never refused to relocate to the fourth floor."

The purpose of ¶ 43 from Dr. Norden's October 2, 2006, affidavit was simply to clarify that the one and only communication from Dr. Schultz to Dr. Norden regarding the 4th floor was that Dr. Norden should use the 4th floor in Dr. Schultz's absence when he was

17

going out of town <u>on that one occasion</u>.  ¶ 43 became necessary because back in 2006, the Smithsonian tried to argue that Dr. Schultz had offered the 4th floor as an accommodation to Dr. Norden.   This Smithsonian position that the 4th floor had been offered as an accommodation was later withdrawn by Dr. Schultz in his PMQ deposition.  Dr. Schultz testified that Dr. Norden was never instructed orally or in writing to move her office to the fourth floor. *[November 18, 2007, MSJ, Plt. Ex. 13, Schultz depo., p. 8]*  Dr. Schultz testified that Dr. Norden was unable to do a substantial part of her work in the area to which she should have relocated on the fourth floor as an accommodation because the necessary computer was not in that room.  *[November 18, 2007, MSJ, Plt. Ex. 13, Schultz depo., p. 141-142]*

Of course, the 4th floor was suggested to Dr. Schultz as a possible accommodation for Dr. Norden by Dr. Lawford and Kathy Makos of OSEM.  These individuals were working on Dr. Norden's behalf in an attempt to obtained reasonable accommodations throughout the 2002 period and even as late as October 17, 2002.  *[November 18, 2007 MSJ, Plt. Ex. 23]* Thus, in her October 2, 2006, affidavit, ¶ 43, Dr. Norden simply meant that she had only one conversation with Dr. Schultz regarding the 4th floor, and that as far as she was aware, Dr. Norden never heard from Dr. Schultz or his supervisors [Dr. Mathis, Dr. Miller] that the 4th floor was an accommodation that was being considered, was being implemented, or was something that was actively being pursued.  As Dr. Norden testified in her current MSJ November 18, 2007, affidavit, "I have never refused to work on the fourth floor, and I was never instructed to move to the 4[th] floor."  This testimony is not refuted by the Smithsonian.  The Smithsonian opposition on this point states nothing in the form of explaining its intransigent behavior regarding the 4th floor accommodation.  The bottom line is that the 4th

floor as an accommodation, like all of the other accommodations, was not implemented by the Smithsonian and the Smithsonian has again offered absolutely no legitimate non-discriminatory reason as to why.

VII.    **Defendant has Offered no Legitimate Non-discriminatory Reason as to why it did not Implement the Respirator and/or the Air Filter as a Reasonable Accommodation.**

1. **Air filter:**

The Smithsonian has no legitimate non-discriminatory reason as to why Dr. Norden was not provided an air filter.  After realizing that the respirator *"…may or may not be a problem for me wearing one…"* [point *2, infra*], Dr. Norden on July 5, 2002, continued the informal process and <u>asked</u> if an air filter might be better.  *[November 18, 2007, MSJ, Plt. Ex 29]*  From <u>July</u>, <u>August</u>, <u>September</u>, <u>October</u> and <u>November</u> of 2002, 150 days, the Smithsonian provided no air filter, and <u>it has no explanation as to why.</u>

2. **Respirator:**

Dr. Norden sent this July 5, 2002, *[November 18, 2007, MSJ, Plt. Ex 29]*  memo regarding the respirator as part of the informal process:

> "To:  Carol Youmans; Thomas Lawford; Kathryn Makos; Schultz
>   Subject: naphthalene/respirator
>
> "I am sending this e-mail as an update, and to **request further assistance**. Because of an additional medical problem I have experienced, Carol was waiting to hear back before ordering the respirator.  **It may or may not be a problem for me wearing one** (I have varying medical opinions).  However, I have since realized that often times I do thing around a collection containing naphthalene that I cannot do with a respirator on.  For example, on Mon. I was looking at some type specimens with a visitor.  There was a problem with a type that required careful use of the microscope and detailed conversation.  It was obvious to me that a desk unit that purified the ambient air would be better than having to take a respirator off to use the microscope and be able to talk effectively.  Reducing rather than eliminating naphthalene that I'm exposed to seems more reasonable given the kinds of things that I need to be able to do (and my inclination is to do them even when it means removing the respirator).  It also seems better to be

putting money into something that others can use too. (A small size respirator won't fit too many others in the dept.) Therefore…, can an appropriate air purifying unit be suggested? **And, can it be ordered reasonably soon?** Thank you all for your help, and I apologize for the extra work this situation has caused. Beth" (emphasis added)

Following this July 5, 2002, memo, the Smithsonian engaged in the following conduct:

- Dr. Schultz signed a performance evaluation in late July stating that <u>both</u> a respirator and an air filter would be provided for Dr. Norden. *[November 18, 2007, MSJ, Norden affidavit, ¶ 24, Exhibit 12, Performance evaluation]*

- Dr. Schultz continued to assure Dr. Norden that she would receive <u>both</u> accommodations almost until the day that the Smithsonian forced Dr. Norden to go back onto 100% disability. *[November 18, 2007, MSJ, Norden, Aff., ¶ 23]*

- However, Dr. Schultz contradicted these statements to Dr. Norden when he testified that the Smithsonian considered the fourth floor room to be the superior accommodation, and that is why Dr. Norden was not told that she would not be getting the other accommodations. *[November 18. 2007, MSJ, Plt. Ex. 13, Schultz depo., p. 8]*

- However, Dr. Schultz' testimony that the 4th floor was a superior accommodation, was contradicted by his supervisor, Dr. Miller. Dr. Miller testified that no accommodation was considered superior to any other and that all accommodations were considered equal and supposed to be pursued equally. *[November 18, 2007, MSJ, Ex. 32 Miller depo]*

- Dr. Miller testified that had he known that the accommodations were not given, he would not have removed Dr. Norden's light duty status. *[November 18, 2007, MSJ, Ex.36 Miller depo]*

Thus, the bottom line is that neither an air filter nor a respirator was ordered for the months of <u>July</u>, <u>August</u>, <u>September</u>, <u>October</u> and <u>November</u> of 2002. This is 150 days of failing to accommodate a person who was known to be suffering on almost a daily basis from the naphthalene exposure. The Smithsonian has no legitimate non-discriminatory reason as to why.

### VIII. <u>Defendant has Offered no Legitimate Non-discriminatory Reason as to why it did not Implement the USDA Reimbursable Loan/detail as a Reasonable Accommodation</u>

Citing no authority, the Smithsonian for the first time argues that it does not have to "transfer" employees to other employers, and therefore that the USDA accommodation is not a reasonable accommodation, and therefore the Smithsonian cannot be charged with failing to provide or pursue this accommodation. As will be shown *infra*, Dr. Norden is being whipsawed by the Smithsonian's shifting positions as to the reasonableness of loaning Dr. Norden to the USDA.[1]

<u>First,</u> there is nothing in the law that limits what accommodations can be considered between an employer and an employee in the informal give and take process. Certainly, if an employer tells an employee that he is willing to consider or implement a certain accommodation, then the employer must view the accommodation as reasonable at the time

---

[1] See: *Langon v. HHS*, 959 F.2d 1053, 1058 (D.C. 1992)

"… a few words are in order about HHS's shifting positions in this case and the confusion this has generated….In the district court, and on appeal, however, HHS has put forth an entirely different and, in some ways contradictory, rationale…a position entirely at odds with HHS's findings in 1983…One cannot escape the impression that Ms. Langon is being **whipsawed**." (emphasis added)

that the employer agrees. The only limitation on consideration of an accommodation for another job assignment is that:

> "The parties have a duty to proceed in a 'reasonably interactive manner' to determine whether the employee would be qualified, with or without reasonable accommodations, for another job assignment, and, if so, to identify an appropriate reassignment opportunity." *Norden, supra* at, 145-146.

<u>Second</u>, the loan between the Smithsonian and the USDA is technically called "detailing her on a reimbursable basis" which is in effect loaning one person from one federal agency to another federal agency. [See: Norden Aff., Plt. Ex. 7, October 15, 2002, email from Ombudsman, Chandra Heilman, stating that Mr. Ross Simons, Associate Director of the National Museum of Natural History, suggests: "…detailing her, on a reimbursable basis, to another agency or bureau was a possibility if we could identify a position elsewhere that could pay her salary."]

<u>Third</u>, the USDA and the Smithsonian are interrelated and have a long history of cooperation. The two federal agencies work closely together in many areas of entomology research and collections management. For example, the "National Insect Collection" at the Smithsonian is under the care of the USDA, but housed at the Smithsonian NMNH. [Norden affidavit, ¶ 16] Thus, there were multiple USDA personnel working with Dr. Norden's on the 5th floor. East Court [Norden affidavit, ¶ 15] Thus, there is a vast list of USDA Systemic Entomology Laboratory (SEL) individuals who work at the main Smithsonian's National History Building (NHB) [Norden aff., Plt. Ex. 8] Thus, the Smithsonian publishes a joint "SI-USDA-MSC STAFF INTERNET ADDRESSES" sheet. [Norden aff., Plt. Ex. 9] Also, see article by Pamela Henson, of Smithsonian Institution, presented on 7/15/2005 in MACK

237 as to duel authority over the "US National Entomological Collection."[2] [Norden aff., Plt. Ex.10]

Fourth, and most importantly, the Smithsonian's whipsawing argument that the "reimbursable detail" was not a reasonable accommodation is contradicted by its own supervisory personnel: 1) Dr. Mathis, 2) Dr. Lawford, and 3) Dr. Miller of the Smithsonian.

1) Dr. Wayne Mathis, approved the USDA loan/detail, subject to Dr. Lawford's approval, when Dr. Norden raised the possibility of the USDA loan/detail with Dr. Mathis in the informal give and take process. *[November 18, 2007, MSJ, Norden aff., ¶ 3]*

2) Dr. Lawford gave his subsequent enthusiastic approval. *[November 18, 2007, MSJ, Norden aff., ¶ 3]*

3) Dr. Miller, who was the supervisor of both Dr. Mathis and Dr. Schultz, testified that Dr. Miller or Wayne spoke to the USDA lab and **"encourage[d]"** them to pursue the idea: "I believe either Wayne and/or I spoke with the USDA lab about it and encourage[d] them…" *[November 18, 2007, MSJ, Plt. Ex. 34]*

Thus, after Dr. Mathis', Dr. Lawford's, and Dr. Miller's endorsing actions and statements regarding the USDA loan/detail, how can the Smithsonian now attempt to whipsaw and argue in a self serving manner that the USDA was not a reasonable accommodation? Nothing changed after the Smithsonian's enthusiastic approval and

---

[2] "After a fire at the Smithsonian in 1865, he [Joseph Henry, Secretary of Smithsonian] transferred a number of its collections to other organization, including its entomological collections to the USDA where research focused on economic issues. In 1874 the National Museum established a curator of insects to conduct basic research. In 1881, after Secretary Henry's death and Baird's appointment as the second Secretary, the collections were returned to the Smithsonian. USDA staff were given offices in the USNM where they studied economically important insects, while USNM staff focused on basic research on economically unimportant groups. This sharing arrangement continues to today, despite several subsequent attempts to return the collection to the USDA." (emphasis added)

encouragement. Dr. Norden was still an employee of the Smithsonian despite going out on disability again at the end of November 2002.   The only thing that occurred was positive, i.e., the funding for the "reimbursable detail" came in a mere 6 days after the removal of the light duty hours, *[November 18, 2007, MSJ, Plt. Ex. 3],* and this funding would have saved the Smithsonian money in the form of reduced worker's compensation payments.   *[See, November 18, 2007, MSJ, section II A]*

Thus, the Smithsonian has no legitimate non-discriminatory reason as to why the USDA detail/loan was not implemented.

IX.    **Conclusion**

For all of the above reasons, Dr. Norden's MSJ should be granted and the Defendant's MSJ should be denied.

Dated: 1/30/2008                          Respectfully submitted,

                                          __/s/ Alex Sliheet
                                          Alex T. Sliheet, D.C. Bar No. 438977
                                          Vickie Inge Fang, *pro hac vice*
                                          Attorneys for Plaintiff Beth Norden
                                          8702 Nightingale Drive
                                          Lanham, MD  20706
                                          alexsliheet@yahoo.com
                                          fvickie@comcast.net
                                          (301) 552-4908

24