**EXHIBIT 7**

Case 1:05-cv-01232-RMC    Document 60-11    Filed 02/13/2008    Page 1 of 8

Law Office of Vickie Fang
8702 Nightingale Drive
Lanham, MD 20706
(301) 552-4908
fvickie@comcast.net

October 13, 2003

Era L. Marshall, Director
Office of Equal Employment and Minority Affairs
P.O. Box 37012
Victor Building
Suite 8100
MRC 921
Washington, D.C. 20013-7012
By mail to the P.O. Box and by courier to Suite 8100 at the Victor Building

Re. Dr. Norden; case no. 03-20-082603

Dear Era Marshall:

      This letter is in reply to your letter dated September 30, 2003 in which you requested additional information in regard to Dr. Norden's requests for accommodations and the responses she received, as well as information in regard to the menopause comments made to her. Dr. Norden received your letter on Saturday, October 4, 2003, and she left the state the morning of Wednesday, October 8, 2003, to fulfill a previously incurred obligation. The list given below is as complete and accurate as she could make it in such a limited period of time. When Dr. Norden returns to Maryland on October 19, she will continue to research this request and will correct or supplement this list if she finds that she needs to do so.
      The menopause comments occurred on or about July 22, 2002, and are listed chronologically below.


Request: 2000, Upon her return from the hospital in December, Dr. Norden asked Dr. Schultz if she would be able to do some work from home.

Response: 2000, Dr. Schultz denied Dr. Norden's request to do any work from home.

Request: 2001, Dr. Norden asked Dr. Schultz if she could do some work from home.

Response: 2001, Dr. Schultz denied Dr. Norden's request to do any work from home.

Request: 2002, at some point at or before her return to work, Dr. Norden asked Dr. Schultz if she could do some of her work from home.

1

Response: 2002, Dr. Schultz denied Dr. Norden's request to do any work from home.

Request: prior to the April 3, 2002 return to work, Dr. Norden asked that her work hours accommodate her need for multiple appointments with her treating physicians. The Smithsonian physician, Dr. Lawford, then suggested that Dr. Norden's "return to work" document incorporate flex time to accommodate her ongoing medical needs. Dr. Norden's neurologist also sent a letter stating that flex time would be better for Dr. Norden.

Response: prior to April 3, The return to work document incorporated no flex time and no other accommodations for Dr. Norden's medical needs. Instead, it was extremely restrictive and did not allow Dr. Norden to make up time she missed as a result of medical appointments. The document was drafted by Marilyn Slomba, Esq. apparently with input from Dr. Schultz, who was Dr. Norden's immediate superior and Smithsonian Deputy Counsel James Douglas.

April 3, 2002 – Dr. Norden was allowed to return to work

Requests: The following two weeks, Dr. Norden spoke several times with Dr. Schultz about her sensitivity to naphthalene and her resulting need for accommodations, and she provided Dr. Schultz with a respirator request form

Request: Sunday, April 21, 2002, Dr. Norden emailed Dr. Schultz and Dr. Epstine, with whom she was scheduled to work the following week, that she needed to move her work day from Monday to Tuesday because a large protest demonstration in Washington was planned for Monday. Dr. Norden also tried to leave a phone message with Dr. Schultz, but his voice mail was full. The police were advising people to avoid coming into Washington if possible during the demonstration, and Dr. Norden was very fearful that she would be jostled by the crowd or hit in the head. Since Dr. Norden has a bleeding disorder, she believed that coming to work on a day when she would not be subjected to any physical roughness or injury would be a reasonable accommodation. As neither of her supervisors responded on Sunday, Dr. Norden did not come to work Monday.

Response: Dr. Schultz sent Dr. Norden multiple emails berating her for having changed her schedule without prior approval, stating that doing so "violates the rather clear terms we all agreed to under the guidance of OHR's Marilyn Slomba."

Response: April 26, 2002, Dr. Schultz signed the respirator request form

Request: May 14, 2002, Dr. Lawford recommended to Dr. Schultz that Dr. Norden have a respirator and an air filter

Request: May 14, Dr. Lawford sent an email stating that he had speeded the request process because of Dr. Norden's increasing sensitivity

Request: May 15, 2002, Dr. Norden completed the breathing test, fitting procedure, and obtained all required documents for the respirator

Request: May 20, 2002, Rachel Gregory sent a memo to Dr. Schultz providing test and ordering information for the respirator

Request: May 31, 2002, Dr. Norden emailed Dr. Schultz asking if the respirator order had been placed and if Dr. Norden needed to do anything else in order to obtain one

Request: June 7, 2002, Dr. Norden met with Webb and Aldrich at the USDA to discuss working temporarily at the USDA on loan from the Smithsonian because Dr. Norden would not be exposed to naphthalene fumes at the USDA. Dr. Norden's purpose in seeking the temporary reassignment was to "buy time" for accommodations to be made at the Smithsonian.

Request: June 29, 2002 Dr. Norden contacted Kathy Makos about borrowing a respirator and otherwise avoiding naphthalene fumes

Response: June 29, 2002, Kathy Makos emailed Dr. Norden about the respirator, asking, "Have they still not ordered you that respirator??!!"

Request and Response, July 22, 2002, Dr. Norden spoke with Dr. Mathis in his office and asked him about the possibility of a temporary assignment to the USDA to "buy time" in avoiding naphthalene. Dr. Mathis said that it might be possible and that Dr. Norden should seek Dr. Lawford's medical opinion of the temporary transfer.
    Dr. Mathis first suggested that Dr. Norden's actual concern should be her thyroid problem, but she assured him that her thyroid was under control. Dr. Mathis next suggested that people with disabilities should change careers, and that Dr. Norden could do many other things. Dr. Norden insisted that she wanted to continue to work as an entomologist.
    Dr. Mathis then posited that at Dr. Norden's age she was probably going through menopause and that, as a result, she was probably more emotional on the subject of naphthalene than she would otherwise be. Dr. Mathis then discussed his wife's menopause and told Dr. Norden that his wife had gone through a prolonged period of extreme emotional sensitivity as a result of her changing hormones. Dr. Norden was not going through menopause, but saw no reason to discuss her continued menstruation with Dr. Mathis when she had a well documented need to reduce her exposure to naphthalene. She left the meeting feeling embarrassed and concerned that requests for accommodations could jeopardize her career.

Request: July 22, 2002, Dr. Norden requested Dr. Lawford's medical opinion of her proposed temporary reassignment to USDA

Response: July 23, 2002, Dr. Lawford responded that a temporary reassignment to USDA would be a positive change for her.

Response: July 23, 2002, performance evaluation written by Dr. Schultz in which he states that a respirator and air filter are "in progress"

Request and Response: July 31, 2002, Dr. Norden met with David Furth, the Collection Manager. Dr. Norden noted that the smell of naphthalene was unusually strong. David Furth explained Maureen Mello had recharged the collection cabinets with naphthalene, contrary to policy. (Mello had earlier apologized to Dr. Norden for her action and said that she had done so under the belief that she was required to.) Dr. Norden also explained that she had extreme sensitivity to naphthalene as a result of her hemorrhagic fever. David Furth responded by saying that he had only known three people with naphthalene sensitivity and that she didn't "look like any of them." There was no further response throughout the remainder of Dr. Norden's employment in regard to storing the collection differently, or establishing a protocol for bringing the collection to Dr. Norden so that she didn't have to open the cabinet, etc. On her own, while Dr. Schultz was in Guyana, Ms. Mello did pull several drawers for Dr. Norden.

Request: September 2, 2002, Dr. Lawrence emailed Dr. Schultz with Dr. Norden's medical updates and suggested that the issue of whether Dr. Norden could work full time be revisited in December.

Request: September 16, 2002, Dr. Norden met with Kathy Makos and Rudy Anderson to get an air filter purchased and on site

Request: Mid September, Dr. Norden believes that Dr. Lawford met with Dr. Schultz to discuss naphthalene problems and control options for Dr. Norden.

Request: September 18, 2002, Kathy Makos sent emails stating that Dr. Norden agreed with Smithsonian suggestions for accommodations.

Response: September 30, 2002, Dr. Schultz left Dr. Norden a memo listing the tasks she should perform while Dr. Schultz was in Guyana from October 1 through October 24. These tasks primarily consisted of bar coding, labeling, and databasing the "Ant Type Collection" and other specimens. Dr. Schultz stated, "If you have problems with naphthalene, I strongly encourage you to work with specimens in the ventilated room on the fourth floor.
 Dr. Norden was dismayed by this memo for the following reasons: 1) the cabinets she was required to work on had very high concentrations of naphthalene, so that she would still be required to breath heavy fumes every time she took or replaced a tray, 2) although she had been advised to work on the fourth floor, she could not do so because the computer with the necessary program, which had been designed by Dr. Schultz, was located on the fifth floor and could not be moved, 3) she had believed that she would have a portable air purifying unit, but none had been provided, and 4) Dr. Schultz's phrase, "**If** you have problems with naphthalene. . ." reinforced her belief that her medical needs still were not being taken seriously.

4

Request: October 4, 2002, Dr. Norden notified Dr. Lawford and Kathy Makos of her concerns and said that she would fax them both a copy of Dr. Schultz's memo. She further stated, "I will try to avoid as many fumes as I can, yet I feel set up for failure. My health is important, but so is getting work done without making anybody any more irritated. It might be best to do nothing further about this present situation. I need to focus on finding another job that does not require accommodations. I was not serious about doing that until now. Working with misunderstanding or bad feelings is not a good way to live."

Response: October 4, 2002, Kathy Makos responded that she and Dr. Lawford had met with Dr. Schultz and informed him of Dr. Norden's needs.

Request: on or about October, 4, 2002, Dr. Norden asked Kathy Makos if she could borrow a respirator and was told that she could not.

Request: October 9 -15, Dr. Norden made several requests to be transferred to the Smithsonian's Insect Zoo or any other Smithsonian location where there would be no naphthalene fumes.

Response: Her requests to transfer to the Zoo were denied by Ross Simons.

Response: October 11, 2002, Kathy Makos advised Dr. Norden to refuse to perform tasks that injure her health.

Response: October 15, 2002, Ross Simons approves the reimbursable "loan" of Dr. Norden to the USDA (where there would be no naphthalene fumes).

Response: October – November, there were a few attempts by fellow employees to accommodate Dr. Norden by taking specimens out of the cabinets for her or preventing her from opening cabinets.

Request: October 17, Dr. Lawford and Kathy Makos sent a memo regarding Dr. Norden's naphthalene sensitivity and urging accommodations.

Response: Late October Dr. Schultz and Marilyn Slomba, Esq. met with others to discuss accommodations for Dr. Norden's naphthalene sensitivity. They discussed an office with air vents in it, a personal air purifier, a mask, and a respirator. In an apparent reference to the statement that the doctors wanted to "revisit" Dr. Norden's need for light duty in December, Dr. Schultz said, "Well, if her docters can revisit it on December 31, we can revisit it too." Dr. Schultz then asked Ms. Slomba if he was required to continue to offer light duty, and Ms. Slomba replied "not if it is insufficiently productive toward the department goals."

Response: November 13, 2002, Dr. Schultz told Dr. Norden that he would approve an air filtration unit. Dr. Norden now believes that Dr. Schultz knew at the time that, instead of being provided with an air filtration unit, Dr. Norden would be put on disability.

5

Response: November 18, 2002, Dr. Miller and Dr. Mathis handed Dr. Norden a memo informing her that she would be terminated from light duty as of November 30, 2002.

Request: November 27 or 28, 2002, Dr. Norden met with Debbie Burney and Rebecca Mevorah, counselors at the Smithsonian Employee Assistance Program. Dr. Norden asked them if they could explain what had happened to her, but both women said they had never seen anything like this.

Response: December 30, Webb from USDA emailed Dr. Norden wanting to know why Dr. Mathis wasn't responding to USDA. Funding was available, and the USDA wanted to "borrow" Dr. Norden.

Request: November 29, 2002, Dr. Norden sent a memo asking, among other things, "How do I know when it might be safe to return if it is the naphthalene which is activating my current blood problems?" and "Will anything dealing with my exposure be different upon return, or is my return based upon no longer being sensitive to naphthalene?"

Response: December 3, 2002, Dr. Lawford responded that he expected her doctors to take the lead in advising as to the extent of her naphthalene sensitivity. He further wrote, "Will anything re exposure be different upon return. This is a 100% management question as to what they can offer you, so sorry, I can't speculate on this one."

Response: January 7, 2003, Ms. Lohr responded that Dr. Norden's return depends on her doctors. No mention was made of accommodations.

Response: January 22, 2003, D. Burney emailed Dr. Norden with the statement that "As much as you want to work, I do not believe it is in your best interest to maintain employment in an environment in which you are not wanted."

Possible Response: September, 2003 – Sidney Cameron surprised a close friend of Dr. Norden's by calling the friend's unlisted phone number and making a number of inquiries about Dr. Norden's health. Ms. Cameron is only a very distant acquaintance of Dr. Norden. It is unknown whether Ms. Cameron's inquiries as to Dr. Norden's health were prompted by the Smithsonian's obligation to respond to Dr. Norden's continuing request for accommodations.

Summary of Responses: At no point was Dr. Norden ever provided with 1) a respirator, 2) an air filter, 3) an office reassignment that would have allowed her to perform her job, 4) specimens that were not treated with naphthalene, 5) a system in which someone else would have brought her the specimen trays so that she didn't have to open the cabinets, 6) "loan" to USDA, despite the fact that the USDA received funding for her, 7) permanent or temporary reassignment to the Insect Zoo, 8) flexible working hours so that she could go to doctors' appointments and otherwise accommodate her handicapping

condition, 9) permission to work from home, or 10) any accommodation to her handicapping condition other than light duty.

As discussed above, this list of requests and responses in regard to Dr. Norden's need for accommodations was produced in a very short time period, and Dr. Norden is prepared to continue researching the issue once she returns to Maryland. Please feel free to contact me at either (301) 552-4908 or fvickie@Comcast.net if I can be of any further assistance.

Very truly yours,


Vickie Fang