Alex T. Sliheet, D.C. Bar No. 438977
Vickie Inge Fang, *pro hac vice*
Attorneys for Plaintiff Beth Norden
8702 Nightingale Drive
Lanham, MD  20706
alexsliheet@yahoo.com
fvickie@comcast.net
(301) 552-4908

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| **Beth M. Norden,** ) | **Case No. 05cv1232 (RMC)** |
| ) | |
| **Plaintiff** ) | |
| ) | |
| **v.** ) | **DR. NORDEN'S REPLY MEMORANDUM** |
| ) | **AND MEMORANDUM TO DEFENDANT'S** |
| ) | **ECONOMIC DAMAGE MEMORANDUM** |
| ) | |
| **Cristian Samper, Acting** ) | |
| **Secretary Smithsonian** ) | |
| **Institution,** ) | |
| ) | |
| **Defendant** ) | |
| _____ ) | |

## DR. NORDEN'S REPLY MEMORANDUM & MEMORANDUM
## REGARDING ECONOMIC DAMAGES

**Table of Contents**                                                                                      **Page**

I.   INTRODUCTION……………………………………….…………………………..…..7

**ARGUMENT**

II.  STANDARDS FOR EQUITABLE RELIEF – THIS COURT HAS WIDE
     DISCRETION & DEFENDANT HAS THE BURDEN………….……………………….….8

III. TWO IMPROPER ARGUMENTS TO AS TO OWCP PAYMENTS…………..…....................9

IV.  ALREADY PAID OWCP PAYMENTS SHOULD NOT BE SET-OFF AGAINST
     BACK OR FRONT PAY. ……….…………………………………………………………11

V.   INDEPENDENT OF ANY OTHER RATIONALE, THE SMITHSONIAN'S
     "UNCLEAN HANDS" PROHIBIT ANY SET-OFF………………………………………….26

VI.  UNCERTAIN AND NON-EXISTING FUTURE OWCP PAYMENTS SHOULD
     NOT BE USED AS A SET-OFF AGAINST BACK OR FRONT PAY…………………….......33

VII. UNCERTAIN AND NON-EXISTING FUTURE OWCP PAYMENTS SHOULD NOT
     BE USED AS A SET-OFF AGAINST DR. NORDEN'S RETIREMENT PENSION…….…..….36

VIII. UNDER THE COLLATERAL SOURCE RULE, A "DISABILITY RETIREMENT
     PENSION" SHOULD NOT BE USED AS A SET-OFF AGAINST A BACK OR
     FRONT PAY AWARD……………………………………………………………...............38

IX.  DAMAGES ARE GROSS WAGES  -  NOT NET WAGES AFTER TAXES…………..……....41

X.   THE EQUITABLE REMEDY OF ORDERING A TEMPORARY REINSTATEMENT
     SO THAT PLAINTIFF CAN APPLY FOR AN OPM DISABILITY RETIREMENT
     PENSION IS ONE OF THE MAKE WHOLE REMEDIES AVAILABLE TO DR.
     NORDEN IN THIS CASE AND IS NOT DEPENDANT ON DEFENDANT'S CONSENT…..43

XI.  CONCLUSION……………………………………………………………………...............44

Plaintiff's  Reply Memorandum  / Memorandum

**Table of authority**                                                                    **Page**

*Cases:*

*Albemarle Paper Co. v. Moody*,
  422 U.S. 405, 417, 95 S. Ct. 2362, 2371, 45 L. Ed. 2d 280 (1975)……………….…..20

*Arneson v. Callahan, Acting Commissioner of the Social Security Administration*,
  128 F.3d 1243, 1448 (8th Cir. 1997)…………………………………………………25, 39

*Berger v. Iron Workers Reinforced Rodmen, Local 201*,
  170 F.3d 1111, 1134 (D.C. Cir. 1999)…………………………………….…...9, 33

*Blim v. Western Elec. Co.*, 731 F.2d 1473, 1479 (10th Cir.)
  *cert. denied*, 469 U.S. 874, 83 L. Ed. 2d 161, 105 S. Ct. 233 (1984)…………………....41

*Bonura v. Chase Manhattan Bank, N.A.*
  795 F.2d 276, 277 (2nd Cir. 1986)………………………………………………….19

*Carr v. Reno*,
  23 F.3d 525, 529 (D.C. Cir. 1994)…………………………………………………22

*Commission of Internal Revenue v. Schieier*,
  1995 WL 352847 (1995)……………………………………………..………41, 42

*District of Columbia v. Jackson*,
  451 A.2d 867, 872 (D.C. 1982)…………………………….…………...……..11, 15, 39

*Fogg v. Gonzales*,
  492 F.3d 447, 456 (D.C. Cir. 2007)…………………………………………...…26

*Franks v. Bowman Transp. Co.*,
  424 U.S. 747, 763-64, 47 L. Ed. 2d 444, 96 S. Ct. 1251 (1976)………………….……..44

*Gurwara v. LyphoMed, Inc.*,
  937 F.2d 380, 283  (7th Cir. 1991)…………………………….……………....…14

*Hamlin v. Charter Township of Flint*,
  165 F.3d 426, 435-436 (6th Cir.1999)………………………………………………10

*Haughton v. Blackships, Inc.*,
  462 F.2d 788, 790 (5th Cir. 1972)…………………………………..……………12

Plaintiff's  Reply Memorandum  / Memorandum

05cv1232 (RMC)

*Johnson v. United States*,
    76 Fed. Appx. 873, 877 (10th Cir. 2003)……………………………………..…………43

*Knafel v. Pepsi-Cola Bottlers of Akron, Inc.*
    899 F.2d 1473 (6th Cir. 1990)……………………………….……………..…9, 10, 18, et. al.

*Lockheed Aircraft Corp.* v. *United States,*
    460 U.S. 190, 194, 74 L. Ed. 2d 911, 103 S. Ct. 1033 (1983)……………….…………15

*Macey v. World Airways, Inc.*,
    14 Fair Empl. Prac. Cas. (BNA) 1426 (N.D. Cal. 1977)…………..……….……...…10

*Merhengood Corp.(Del) v. Helvering,*
    89 F.2d 972, 974 (D.C. Cir. 1937)………………………….………………...……14

*Moysis v. DTG Datanet,*
    278 F. 3d 819, 828 (8th Cir. 2002)……………………………….…………….9, 11, 16

*Neal v. Director, District of Columbia,*
    1995 U.S. Dist. LEXIS 11515, *25-26 (D.D.C. 1995) ………………….9, 12, 41 et. al.

*Nichols v. Frank*,
    42 F.3d 503, 515 (9th Cir. 1994)………………..…………………….…….…15, 37

*Peyton v. DiMario,*
    287 F. 3d 1121, 1126 (D.C. Cir. 2002)………………….…………………….……8

*Phuong v. National Academy of Sciences,*
    927 F. Supp. 487 (D.D.C. 1996)……………………………………….…...…..12

*Rasimas v. Michigan Dep't of Mental Health*,
    714 F.2d 614, 627 (6th Cir.1983), *cert. denied,*
    466 U.S. 950, 80 L. Ed. 2d 537, 104 S. Ct. 2151 U.S. (1984)…………………….…...41

*Raymond v. U.S.A. Healthcare,*
    2007 U.S. Dist. LEXIS 32512 *6, (D.C. Iowa 2007)………………….……………...16

*Robinson v. Southeastern Pennsylvania Transportation Authority*,
    982 F. 2d 892, 898 (3rd Cir. 1993)………………………………….……….…..41

*Russo v. Matson Navigation Co.,*
    486 F.2d 1018, 1020 (9th Cir 1973)………………………………………….40

4

*Shager v. Upjohn Co.*
    913 F. 2d 398, 405 (7th Cir. 1990)…………………………………………………………19

*Snowden v. D. C. Transit System, Inc.,*
    454 F. 2d 1047, fn. #5,  (D.C. Cir. 1971)…………………………………………………9

*Southeastern Community College v. Davis,*
    442 U.S. 397, 410-411, 60 L. Ed. 2d 980, 99 S. Ct. 2361 (1979)………………………22

*Stemmons  v. Missouri Department of Corrections,*
    82F.3d 817 (8th Cir. 1996)……………………………………………………….……19

*Tanaka v. Department of Navy,*
    788 F.2d 1552, 1553 (Fed. Cir. 1986)………………………………………………………41

*Thurman v. Yellow Freight Sys., Inc.,*
    90 F.3d 1160, 1171 (6th Cir. 1996)………………………………………………...……11

*United States v. Burke,*
    504 U.S. 229, 119 L. Ed. 2d 34, 112 S. Ct. 1867, 1874 (1992)…………………………41

*Weldon v. Kraft, Inc.,*
    896 F.2d 793, 799 (3d Cir. 1990)………………………………………………….……19

*Whatley v. Skaggs Cos.*
    707 F.2d 1129, 1138-39 (10th Cir. 1983)………………………………….…...9, 40

## ___Codes:___

42 U.S.C. § 2000e-5(g)…………………………………………………….…...9

Restatement of Torts 920(e)…………………………………………….……..……9

Restatement 2d of Torts section 920A……………………………………….…....11, 16, 36

5 USC § 8101(5)………………………………………………………….…...………15

5 USC § 8116……………………………………………………………………37

5 USC § 8147(b)………………………………………………………...……...…21

Plaintiff's  Reply Memorandum  / Memorandum

5 USC § 8104…………………………………………..………………………………….7, 33, 34

5 USC § 8106…………………………………………..………………………………….7, 33, 34

5 USC § 8123…………………………………………..………………………………..7, 33, 34

5 USC § 8128…………………………………………..………………………………..7, 33, 34

29 USC § 791(b)…………………………………………………………………......22, 27

***Others:***

IRS Rev. Rul. 78-336, 1978-2 C.B. 255…………………………………………………41

99 C.J.S. Workmen's Compensation § 9 at 54 (1958)…………………………………...14

19 Wright, Miller & Cooper, Federal Practice and Procedure § 4512 (1982). …………....…11

I.    **INTRODUCTION**

Although defendant bears the legal burden of proof as to any claim for offsets, it assumes, without any legal or evidentiary authority, that Dr. Norden will receive OWCP workers' compensation payments until the day that Dr. Norden dies.

[*"Dr. Norden was not offered a disability retirement: she remains unemployed and dependant on workers' compensation." Collyer, 8/3/7, Order, p.12]*

Defendant's entire brief depends on this assumption of lifetime OWCP workers' compensation payments until the age of 82.  *[Dr. Norden's life expectancy is approximately 82 years of age, Plt. Ex. 1, Gaskin's report]*  However, OWCP workers' compensation payments are not a retirement plan, and are reviewed on a yearly basis for reduction, removal, vocation rehabilitation and other work alternatives. *[See infra, Section VI: 5 USC §8123; 5 USC §8128; 5 USC §8104; 5 USC §8106]*

Combining its above unfounded assumption with its incorrect legal argument that yearly OWCP workers' compensation benefits are allowed as a set-off for back pay, front pay, and retirement pension, the defendant arrives at the conclusion that it owes Dr. Norden no economic damages.  Defendant wants to shift the risk of the uncertainty of future OWCP payment to Dr. Norden; to aggregate those OWCP payments *[those already paid and those that the defendant assumes will be paid through Dr. Norden's* death]; and then to conclude that those aggregated OWCP payments will exceed any damage award.  Needless to say the defendant offers nothing in the way of any court making such a ruling and/or shifting the risk of uncertain and non-existent future OWCP payments to the victim of the discrimination.

**Through this memorandum, Plaintiff is not waiving her right to seek a jury trial as to the amount of her damages. Plaintiff seeks a ruling on the following seven (7) separate legal issues critical to economic damages and to future settlement discussions.**

1) Already paid OWCP payments should not be set-off against back pay or front pay.

2) Independent of any other rationale, the Smithsonian's "Unclean Hands" prohibit any set-off.

3) Uncertain and non-existing future OWCP payments should not be used as a set-off against back or front pay.

4) Uncertain and non-existing future OWCP payments should not be used as a set-off against Dr. Norden's retirement pension.

5) Under the collateral source rule, a "Disability Retirement Pension" should not be used as a set-off against back or front pay.

6) Damages are gross wages – not net wages after taxes.

7) The equitable remedy of ordering a temporary reinstatement so that Plaintiff can apply for an OPM disability retirement pension is one of the make whole remedies available to Dr. Norden in this case and is not dependent on the defendant's consent.

## ARGUMENT

**II.     STANDARDS FOR EQUITABLE RELIEF – THIS COURT HAS WIDE DISCRETION & DEFENDANT BEARS THE BURDEN**

First, back pay and front pay are equitable relief that carry a standard of review of abuse of discretion. In the District of Columbia Circuit, the issue of workers' compensation benefits being used as a set-off against equitable relief has not been decided by the D.C. Circuit Court of Appeals. The resolution and determination of this issue remains within the discretion of the district court. The standard of review is stated in *Peyton v. DiMario*, 287 F. 3d 1121, 1126 (D.C. Cir. 2002):

Plaintiff's Reply Memorandum / Memorandum

05cv1232 (RMC)

"The D.C. Circuit Court of Appeals 'reviews equitable relief, the standard for calculating back pay and front pay, under an abuse of discretion standard. *See Barbour*, 48 F.3d at 1277-78. A 'district court has wide discretion to award equitable relief." 48 F.3d at 1278. 'The district court should fashion this relief so as to provide a victim of employment discrimination the most complete make-whole relief possible.' *Id*. In reviewing for an abuse of discretion, the Court considers "whether the decision maker failed to consider a relevant factor, whether [the decision maker] relied on an improper factor, and whether the reasons given reasonably support the conclusion.' *Id.*"

Second, the defendant bears the burden in establishing any set-offs. "The burden of establishing facts in mitigation of…pay liability is … upon the violator." *Berger v. Iron Workers Reinforced Rodmen, Local 201,* 170 F.3d 1111, 1134 (D.C. Cir. 1999).

## III.    **TWO IMPROPER ARGUMENTS AS TO OWCP PAYMENTS**

### A) **It is improper to label workers' compensation benefits as "interim earnings" subject to mandatory set-off under 42 U.S.C. § 2000e-5(g).**

OWCP payments are not "interim earnings" because no work was performed for the income, i.e., nothing has been "earned" from employment; therefore, there is no mandatory requirement for a deduction under 42 U.S.C. § 2000e-5(g) from a back pay award. See: *Snowden v. D. C. Transit System, Inc.,* 454 F.2d 1047, fn.#5, (D.C. Cir. 1971) quoting the *Restatement of Torts 920(e)* that makes this very point:

"Where a person has been disabled and hence cannot work but derives an income during the period of disability from a contract of insurance or from a contract of employment which requires payment during such a period, his income is not the result of earnings but of previous contractual arrangements made for his own benefit, not the tortfeasor's."  (emphasis added)

The following discrimination cases all analyzed workers' compensation under the collateral source rule and not under 42 U.S.C. § 2000e-5(g) as an "interim earning." See: *Moysis v. DTG Datanet,* 278 F. 3d 819, 828 (8th Cir. 2002); *Knafel v. Pepsi-Cola Bottlers of Akron, Inc.* 899 F.2d 1473 (6th Cir. 1990); *Whatley v. Skaggs Cos.* 707 F.2d 1129, 1138-39 (10th Cir. 1983).  See *Neal v. Director, District of Columbia*, 1995 U.S. Dist. LEXIS 11515,

9

fn.7, (D.D.C. 1995) (authorizing the consideration of workers' compensation under the collateral source rule, but not having to reach the issue).

In the "interim" since her termination, Dr. Norden has been working in a church to "earn" the income of $50.00 per week. She has also performed yearly judging duties for the Intel Science Competition. *[Norden aff., ¶ 6]* This is the only income that Dr. Norden has "earned" through employment and the only income subject to 42 U.S.C. § 2000e-5(g). See: *Macey v. World Airways, Inc.*, 14 Fair Empl. Prac. Cas. (BNA) 1426 (N.D. Cal. 1977): ("This [42 U.S.C. § 2000e-5(g)] is a mitigation of damages provision, permitting deduction of amounts earned by a plaintiff from other employment.")  (emphasis added)

### B) It is improper to argue that OWCP payments should be set-off because such payments are mutually exclusive with the ability to work.

The appellate court in *Hamlin v. Charter Township of Flint*, 165 F.3d 426, 435-436 (6th Cir.1999) reversed the district court's desire for such a rule. The district court held that: *"any benefits that a plaintiff would not have earned had he or she continued working should be offset [under the collateral source rule]."*  The *Hamlin* court stated that: "As a general proposition, the district court's purported…rule would swallow up the entire logic of the collateral source rule long adhered to by this and other circuits."

The appellate court in *Knafel v. Pepsi-Cola Bottlers, Inc*., 899 F.2d 1473, 1480-1481 (6th Cir. 1990) also refused to allow a defendant to make this argument and to benefit from its own wrongdoing in an effort to set-off workers' compensation. In *Knafel:*

> "Pepsi argues that there is an important distinction: unemployment benefits are paid when the employee is able to work, while workers' compensation payments are made only when the employee cannot work."

The Knafel 6th Circuit ruled:

> "We are not persuaded by Pepsi's arguments. **The district court refused to toll a back pay award for the time during which Knafel was unable to work because her inability to work was caused by Pepsi**. Trial courts have discretion to fashion remedies to make Title VII victims whole. Given the overwhelming evidence indicating that Pepsi exacerbated Knafel's back condition by assigning burdensome work designed to injure her, the district court's award was appropriate. <u>Furthermore, the court correctly applied the law in finding that workers' compensation, like unemployment benefits, are subject to the collateral source rule. Restatement (Second) of Torts § 920A(2).</u>" (emphasis added)

### IV.    ALREADY PAID OWCP WORKERS' COMPENSATION BENEFITS SHOULD NOT BE SET-OFF AGAINST BACK OR FRONT PAY.

The following discrimination cases all held that workers' compensation benefits are a collateral benefit not to be set-off from a discrimination award:

*Moysis v. DTG Datanet,* 278 F.3d 819, 828 (8th Cir. 2002) (defining workers' compensation benefits as a collateral source in an ADA suit and holding that:

> "An employer can not set up in mitigation of damages in a tort action by an injured employee indemnity from a collateral source, such as insurance or compensation or benefits under a Workmen's Compensation Act, even where **the defendant has contributed to the fund**."  (emphasis added));

*Thurman v. Yellow Freight Sys., Inc.,* 90 F.3d 1160, 1171 (6th Cir. 1996) (stating in a race discrimination case that workers' compensation benefits are a collateral source that should not be deducted from back pay awards);

*Knafel v. Pepsi-Cola Bottlers of Akron, Inc.*, 899 F.2d 1473 (6th Cir. 1990) (stating in a sex discrimination case that workers' compensation benefits are a collateral source and citing to the *Restatement 2nd of Torts §920A(2)* which holds that collateral benefits are "…benefits arising by statute, as in worker's compensation acts…");

The collateral source rule is a rule of substantive law. See: *19 Wright, Miller & Cooper, Federal Practice and Procedure § 4512 (1982).*  In *District of Columbia v. Jackson,*

Plaintiff's  Reply Memorandum  / Memorandum

451 A.2d 867, 871-872 (D.C. 1982), the court stated the collateral source rule as applied in the District of Columbia:

> "A source of benefits also will be deemed collateral, however -- and the victim will be entitled to both the benefit and the judgment -- even when the tortfeasor has provided or contributed to those benefits, so long as the victim has contracted for the benefits…The rationale here "is that the plaintiff deserves any additional compensation he may receive because he has 'contracted' for it, because it is in the nature of insurance." (emphasis added)

Accordingly, in the District of Columbia, the proper analysis of workers' compensation benefits is to focus on the character of the benefit regardless of the fact that the defendant is the source of the benefit. Other circuits have also correctly focused their analysis of the collateral source rule on the character of the benefit and not on who pays for the benefit. See, e.g., *Haughton v. Blackships, Inc*., 462 F.2d 788, 790 (5th Cir. 1972):

> "However, it is also true that the source of the funds may be determined to be collateral or independent, even though the employer-tortfeasor supplies such funds, *United States v. Price*, 288 F.2d 448 (4th Cir. 1961). *See* also Annot., 75 A.L.R.2d 886 (1961). Application of the collateral source rule depends less upon the source of funds than upon the ***character of the benefits received***, *Gypsum Carrier, Inc. v. Handelsman,* 307 F.2d 525, 534-535 (9th Cir. 1962). The mere fact that the employer-tortfeasor has contributed money (by payment of premiums, contributions, etc.) to the fund from which the benefits derive does not establish that such fund may not be a collateral source, *Hall v. Minnesota Transfer Ry. Co.*, 322 F. Supp. 92, 95 (D.Minn.1971), and cases cited therein." (emphasis added)

Under the collateral source rule, the "character of the benefit" analysis was discussed in detail by Judge Lambreth in the discrimination case of *Neal v. Director, District of Columbia,* 1995 U.S. Dist. LEXIS 11515, *19-23 (D.D.C. 1995) as to unemployment benefits and workers' compensation benefits. In *Phuong v. National Academy of Sciences,* 927 F. Supp. 487 (D.D.C. 1996), Judge Friedman adopted the *Neal* analysis.

In *Neal,* the Court rigorously explored the defendant's collateral source arguments and properly applied the collateral source rule, holding that:

> "…the collateral source principle, properly applied, suggests that unemployment benefits should not be subtracted."

The *Neal* court identified and listed the threefold arguments against the collateral source rule:

> "Arguments against the rule are threefold":
>
> First, it should only be applied where benefits are received from a source wholly independent of the wrongdoer. That is, if plaintiff receives collateral benefits from the defendant, not from an independent third party, courts should decline to apply the rule….
>
> Second, the doctrine condones multiple recovery and thus violates a principle objective of corrective justice: place the victim in as favorable a position as he or she would have been absent the injury -- but no more favorable….
>
> Third, by allowing benefits in excess of actual loss, the collateral source rule converts a tort-based system from a compensatory to a punitive standard."
>
> *[The Smithsonian has advanced these arguments in its brief as well]*

The *Neal* court <u>concluded</u>: "The court finds these arguments to be unconvincing," Id at *20,

and went on to explain why:

> "….unemployment benefits do not represent multiple recovery for injuries inflicted upon the plaintiffs by the Department of Corrections. Instead, these <u>benefits are remuneration under a separate contract with the government, financed by payroll taxes and payable whether or not an employer is culpable of sexual harassment or any other tort. Plaintiffs are separately entitled to back pay and to unemployment benefits.</u> *The former is compensation for the wrong they have suffered. The latter is an obligation incurred by the government under a distinct and unrelated statutory regimen.* Payment of unemployment benefits is not punitive; <u>it is mandatory, and entirely independent of defendants' transgressions….</u> Id at *21. (emphasis added)

The *Neal* court gave further explanation:

> "Unemployment benefits are **analogous** to insurance. The plaintiff **ultimately** pays for the benefits -- if not by policy premiums, then by lower wages to offset employer payroll taxes. Logically, it makes no difference whether the insurer is the defendant or an independent third party." Id at *21-22. (emphasis added)

As to workers' compensation benefits, the *Neal* court stated:

> "Plaintiffs conceivably could have raised these same arguments against subtracting workers' compensation [but they did not]." Id at *22, fn.7.

### Dr. Norden contracted for her OWCP insurance benefit

Dr. Norden raises the *Neal* arguments as to workers' compensation benefits. Workers' compensation benefits, to a much greater degree than the unemployment benefits in *Neal*, are "analogous to insurance" and the Plaintiff "ultimately pays for the benefits." Thus, it make no difference that Congress allocates funds to pay the OWCP payment on behalf of the Smithsonian because Dr. Norden gave multiple forms of consideration for her workers' compensation benefits. Dr. Norden accepted an offer of employment with the Smithsonian and thereby agreed to waive her rights to sue the Smithsonian for a potentially much larger award of damages in exchange for the insurance that her "on the job injuries" would be compensated. See: 99 C.J.S. *Workmen's Compensation* § 9 at 54 (1958) ("The conception underlying worker's compensation is one of insurance, in particular…of accident, industrial, occupational, occupational disease, or social insurance.") See *Merhengood Corp.(Del) v. Helvering,* 89 F.2d 972, 974 (D.C. Cir. 1937) ("…consideration was his entering Blair's employment at a fixed salary for an indefinite time") *Gurwara v. LyphoMed, Inc.,* 937 F.2d 380, 283 (7th Cir. 1991) ("…The mere fact that his consideration took the form of accepting employment instead of pecuniary remuneration matters not at all.")

Dr. Norden had knowledge of and relied upon the workers' compensation benefits at the time of her acceptance of employment. *[Norden, aff., ¶ 5]* Indeed, under the *Neal* analysis, not only does Dr. Norden give consideration for the workers' compensation benefit by agreeing to accept an offer of employment, but Dr. Norden also ultimately pays [and pays dearly in this case] for the workers' compensation benefit by waiving a potentially much

larger award that could have been obtained in a separate suit for the injuries that occurred on the job. See: *Neal*, *supra*. "Congress enacted FECA to give federal employees <u>smaller</u> but more certain and less costly recoveries in <u>exchange</u> for the right to sue the government in tort." *Lockheed Aircraft Corp.* v. *United States,* 460 U.S. 190, 194, 74 L. Ed. 2d 911, 103 S. Ct. 1033 (1983)." (emphasis added)

*Without the underlying contract of employment between Dr. Norden and the Smithsonian, there would be no FECA rights or OWCP benefits available to Dr. Norden as a matter of law.* Therefore, since the statutory right to the insurance protection of FECA has been contracted for by Dr. Norden's acceptance of employment and the accompanying loss of the right to bring suit, the collateral source rule allows Dr. Norden to obtain the benefit of her bargain without any set-off whatsoever. Any argument that a double recovery is being obtained is either incorrect or irrelevant. *See, Neal, supra,* dismissing this argument. See: *District of Columbia v. Jackson,* 451 A.2d 867, 873 (D.C. 1982): "[a] plaintiff may invoke the collateral source rule…when the plaintiff may be said to have contracted for the prospect of a 'double recovery.'"

### The OWCP payment is for a different "injury."

Under the *Neal* analysis, workers' compensation benefits compensate for "injuries" on the job as specifically defined by 5 USC § 8101(5). Workers' compensation is not a payment to offset liability for the Smithsonian's tort injury caused by a violation of the discrimination laws. See: *Nichols v. Frank*, 42 F.3d 503, 515 (9th Cir. 1994) ( "…harm as a result of Title VII discrimination is not an "injury" within the meaning of FECA…") Dr. Norden is entitled to full damages for her injuries from the Smithsonian's violation of the discrimination laws and independently, full workers' compensation benefits. *"The former is*

*compensation for the wrong Dr. Norden has suffered. The latter is an obligation incurred by the government under a distinct and unrelated statutory regimen."* See: *Neal, supra.* See also, *Raymond v. U.S.A. Healthcare,* 2007 U.S. Dist. LEXIS 32512 *6, (D.C. Iowa 2007), following the *Neal* line of reasoning:

> **"…**the workers' compensation was for a different injury….To put it another way, the amount or sums that Raymond has received as workers' compensation benefits for workplace injuries are simply irrelevant to the determination of any damages that U.S.A. Healthcare might be required to pay for the different tortious conduct of retaliating for filing workers' compensation claims."

See also *Moysis v. DTG Datanet*, 278 F.3d 819, 828 (8th Cir. 2002) following the *Neal* line of reasoning:

> "An employer can not set up in mitigation of damages in a tort action by an injured employee indemnity from a collateral source, such as insurance or compensation or benefits under a Workmen's Compensation Act, even where **the defendant has contributed to the fund**." (emphasis added)

See also the *Restatement 2d of Torts section 920A(a)* on this point: "If a tort defendant makes a payment toward his tort liability, it of course has the effect of reducing that liability." However, the Smithsonian has made no payment to Dr. Norden towards its tort liability for violating the discrimination laws. The OWCP payments are not a payment to discharge liability for discrimination injuries. The OWCP payments are exclusively for the DHF injuries and in all probability have saved the Smithsonian a vast amount of money by allowing the Smithsonian to inexpensively reap the reward of the agreed waiver of Dr. Norden's right to sue for the DHF injuries. Dr. Norden's DHF illness was contracted as the result of the defendant's gross negligence. Defendant's gross negligence included sending scientists on a prolonged field trip to a Brazilian jungle/rainforest with no mosquito netting, with no provisions for emergency evacuation, and with so little water that after a week the group was forced to drink directly from the local stream. *[Norden aff., ¶ 7]*

Nevertheless, unsatisfied with the huge benefit it has already reaped by limiting its tort liability to less substantial OWCP payments, the Smithsonian now attempts to persuade the Court that this huge benefit is not enough. The Smithsonian wants to make double use of this benefit by also setting it off against all of the Smithsonian's discrimination liability. This is not the intended purpose of the collateral source rule. See *Neal, supra.*

### The argument that portions of workers' compensation benefits overlap with back pay/front pay was rejected by the Neal Court.

The argument that workers' compensation benefits should cover lost wages from discrimination is an unsubstantiated argument that was rejected by the *Neal* court, *supra*:

> "…the doctrine condones multiple recovery and thus violates a principle objective of corrective justice: place the victim in as favorable a position as he or she would have been absent the injury -- but no more favorable….The court finds these arguments to be unconvincing."

First, as discussed, *infra, pp. 21-22 under the deterrence section*, Congress, and not the Smithsonian / tortfeasor, pays the OWCP "invoice" from the DOL.

Second, as discussed, *supra*, under the collateral source rule, the paid for / contracted for / insurance character of the OWCP benefit makes this argument irrelevant because workers' compensation is a collateral benefit to a charge of discrimination. See *Neal, supra.* *[Unemployment benefits which also cross-over to replace wages are not allowed as a set off.]*

Third, asking for a cross-over based on lost-wages is bootstrapping. The Smithsonian's discrimination, in this case, caused Dr. Norden to maintain the OWCP benefits since 2003-2004 *[Collyer, 8/3/7, Order]*, and caused Dr. Norden's inability to return to work at the Smithsonian. *[Dr. Oberg, aff., ¶¶ 8-11]* The Smithsonian is bootstrapping in asking for a set-off for the results of its own discriminatory conduct. See: *Knafel v. Pepsi-*

*Cola Bottlers, Inc.*, 899 F.2d 1473, 1480-1481(6th Cir. 1990) refusing to allow a defendant to

benefit from its own wrongdoing and refusing to set-off workers compensation.  In *Knafel:*

<u>Pepsi argued that</u>: "From June to September 1985, about one third of the back pay period, Knafel was still employed by Pepsi. During this period, Knafel received workers' compensation payments. Pepsi argues that this compensation must be offset against an award of back pay.

<u>The trial court held</u>: "The district court rejected that argument, finding no distinction between workers' compensation and, for example, unemployment benefits; both are collateral sources, not properly offset against an award of back pay."

<u>Pepsi appealed with</u>:"Pepsi argues that there is an important distinction: unemployment benefits are paid when the employee is able to work, while <u>workers' compensation payments are made only when the employee cannot work</u>."  (emphasis added)

<u>The 6th Circuit ruled</u>: "We are not persuaded by Pepsi's arguments. The district court refused to toll a back pay award for the time during which Knafel was unable to work because her inability to work **was caused by Pepsi**. Trial courts have discretion to fashion remedies to make Title VII victims whole. Given the overwhelming evidence indicating that **Pepsi exacerbated Knafel's back condition by assigning burdensome work designed to injure her,** the district court's award was appropriate. Furthermore, the court correctly applied the law in finding that <u>workers' compensation, like unemployment benefits, are subject to the collateral source rule.</u> Restatement (Second) of Torts § 920A(2)." (emphasis added)

    Courts simply do not allow the tortfeasor to benefit from his own wrongdoing, akin to

when an employer deliberately retaliates and handicaps an employee's ability to perform,

only to then cite that lack of performance as the legitimate grounds for the employer's

adverse employment action.[1]

The same reasoning and rationale is applied to requests for set-offs by the tortfeasor when the tortfeasor's discrimination forces a Plaintiff, <u>who can work with reasonable accommodations</u>, to go on and maintain OWCP benefits, and also when the tortfeasor's discrimination destroys the ability of the Plaintiff to work post-judgment for the tortfeasor, <u>thus raising the issue of the necessity of uncertain OWCP payments into the future</u>. *[Oberg, aff. , ¶¶ 8-11]*    In our case, the bootstrapping argument and the discriminatory causation factor is even stronger because the Smithsonian, through Dr. Lawford and Ms. Marylyn Slomba, were warned about the damaging effects of the Smithsonian's discrimination upon Dr. Norden's mental health, ie.e., PTSD and Major Depressive Disorder. *[Oberg, aff. , ¶¶ 3-6 and  discussion in section V, under "The Doctrine of Unclean Hands," infra.]*

---

[1]

- *Stemmons v. Missouri Department of Corrections*, 82F.3d 817 (8th Cir. 1996) (plaintiff was able to show pretext where she was criticized for the way she dressed for an interview, but was not allowed by the defendant to leave early to change clothes).
- *Shager v. UpjohnCo*. 913 F. 2d 398, 405 (7th Cir. 1990) (reversing summary judgment in ADEA case, in part based on evidence that employer had deliberately assigned plaintiff, a sales representative, unpromising territory);
- *Weldon v. Kraft, Inc.,* 896 F.2d 793, 799 (3d Cir. 1990) (race discrimination action could survive summary judgment where plaintiff alleged that he was purposely assigned first to unusually tough supervisor, and then to supervisor who lacked experience as trainer, thereby raising inference that defendant never expected plaintiff to succeed);
- *Bonura v. Chase Manhattan Bank, N.A.* 795 F.2d 276, 277 (2nd Cir. 1986) (affirming jury verdict for ADEA plaintiffs based in part on evidence that supervisor had established unrealistic performance goals in order to justify replacing plaintiffs with younger employees).

19

***Allowing the OCWP payment as a set off, especially in this case, will allow the
Smithsonian to escape the primary purpose of the discrimination laws.***

On February 14, 2002, Ms. Marilyn Slomba told Dr. Norden that even though Dr.
Norden was not working, Dr. Norden was also suffering no harm because Dr. Norden was
receiving OWCP payments. *[Norden, aff., ¶ 8]* Defendant's brief maintains this position.

Ms. Slomba, "Labor Relations" of the Smithsonian Institution was a key architect of
both the return to work plan of 2002 and the discriminatory return to work plan of 2004.
*[Collyer, 8/3/7, Order]*    Ms. Slomba is also the person who advised Dr. Schultz that he
could terminate Dr. Norden's light duty hours in 2002; Ms. Slomba is the person to whom
Dr. Lawford wrote a December 23, 2003, memo *[Plt. Ex. 5]* as to the accommodations Dr.
Norden's physicians stated Dr. Norden needed for her return to work; Ms. Slomba is the
person who negotiated the attempt to find another position for Dr. Norden after the
discriminatory return to work plan of 2004 was rejected. *[Fang, aff. ¶¶ 4-7]* Ms. Slomba,
therefore, held significant decision making authority in the ongoing decision to discriminate
against Dr. Norden and may be said to have represented the defendant's policy towards
accommodating its disabled employees. *[Fang, aff. ¶¶ 4-7]* As Ms. Slomba's February 14,
2002, statement to Dr. Norden demonstrates, defendant's position is that regardless of the
reason that a disabled employee is currently not working, once the disabled employee accepts
OWCP payments, that disabled employee is suffering no harm from being out of work.

However, allowing a tortfeasor to subtract contracted for statutory insurance benefits
as an offset to its discrimination liability undermines the "primary purpose" of the
discrimination laws, i.e., to deter discriminatory conduct by the tortfeasor in the future. In
*Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417, 95 S. Ct. 2362, 2371, 45 L. Ed. 2d 280

(1975) (footnote omitted), the Supreme Court emphasized that Title VII's "primary objective (is) a prophylactic one." The Court stated:

> "It is the reasonably certain prospect of a back pay award that "provide(s) the spur or catalyst which causes employers and unions to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history." Id. at 417-18, 95 S. Ct. at 2371-72."

The financial deterrent of the discrimination laws is that the tortfeasor's discriminatory conduct will <u>financially hurt the tortfeasor</u> because the tortfeasor will face the employees' <u>full back pay award for its discrimination</u>. (without of course the corresponding benefit of the employee's services during that time period). The assumption is that the prospect of this reality will financially motivate the tortfeasor to end the unproductive discriminatory conduct.

However, this common sense financial deterrent cannot be brought to bear on the Smithsonian because the Smithsonian does not pay for the OWCP benefits. The defendant Smithsonian's receives a "statement" from the DOL for the OWCP payments made to Dr. Norden by the DOL from the Employee Compensation Fund. 5 USC § 8147(b).[2] Under 5 USC §8147(b), the Smithsonian submits a budget for an allocation of funds from Congress to pay the OWCP statement in full. Congress has allocated funds to fully pay the full workers' compensation DOL statement of the Smithsonian. *[Plt Ex. 2, 2003-2009, Smithsonian*

---

[2] **5 USC section 8147(b):** "Before August 15 of each year, the Secretary shall furnish to each agency and instrumentality of the United States…a statement showing the total cost of benefits and other payments made from the Employees' Compensation Fund during the preceding July 1 through June 30 expense period on account of the injury…Each agency and instrumentality shall include in its annual budget estimates for the fiscal year beginning in the next calendar year a request for an appropriation in an amount equal to the costs. Sums appropriated pursuant to the request shall be deposited in the Treasury to the credit of the Fund within 30 days after they are available."

*Budget Excerpt, showing full OWCP allocations from Congress]*  Thus, not only does Congress allocate and pay the money on behalf of the Smithsonian, but under 5 USC §8147(b), the Smithsonian is actually able to make money on the OWCP allocation by floating the allocation for 30 days before it is deposited in the Treasury: "…shall be deposited in the Treasury to the credit of the Fund within 30 days after they are available."

Notwithstanding the above arrangement, the fact of the matter is that: Neither Congress nor "The United States Treasury" discriminated against Dr. Norden.  Neither Congress nor "The United States Treasury" is the decision-maker-tortfeasor in this case.  The Smithsonian is the only entity, the only discriminatory decision-maker, and the only tortfeasor in this case.   The discrimination laws cannot financially deter the decision-maker Smithsonian to alter its discriminatory conduct when the Smithsonian merely functions as an agent regarding the money and its principal Congress actually pays the DOL statement.  In this case, allowing the Smithsonian to subtract contracted-for statutory benefits as an offset to its discrimination liability vitiates the "primary purpose" of the discrimination laws. Moreover, deterrence is not the only goal of the discrimination laws as applied to the Smithsonian.  The Smithsonian is mandated to be a role model for affirmative action that private employers are to emulate under 29 U.S.C. § 791 (b).[3]  Instead, the Smithsonian's behavior has been a role model for the exact type of blatant indifferent behavior that the discrimination laws abhor. *[Collyer, 8/3/07, Order]*

---

[3] "Section 501 of the Act applies specifically to federal employers; it requires them to take *affirmative action* on behalf of the disabled, an obligation that goes beyond the non-discrimination requirement in § 504. 29 U.S.C. § 791 (b)." *Carr v. Reno*, 306 U.S. App. D.C. 217, 23 F.3d 525, 529 (D.C. Cir. 1994).  See also *Southeastern Community College v. Davis*, 442 U.S. 397, 410-411, 60 L. Ed. 2d 980, 99 S. Ct. 2361 (1979)

If such a set-off is allowed, then the Smithsonian, as the real decision-maker and tortfeasor in this case, will merely incur an actual financial damage and "deterrent" *of approximately ¼ of Dr. Norden's back wages.* Thus, the Smithsonian gets away with not paying any salary to Dr. Norden because of its discrimination, gets away with not paying the OWCP/DOL statement because of Congress, and now seeks a full set-off of the OWCP payment against its discriminatory tort liability.  Allowing a set-off in such a situation will result in: 1) a savings by the Smithsonian of ¾'s of the back pay of Dr. Norden's salary for each year starting in 2003, and 2) a loss of the deterrent purpose of the discrimination laws as applied to the decisionmaker-Smithsonian-tortfeasor.  See: *Albemarle, supra.*

The 8th Circuit was absolutely correct in *Moysis v. DTG Datanet,* 278 F.3d 819, 828 (8th Cir. 2002) in terms of disallowing the set off for workers' compensation because it would reduce the deterrence effect of Title VII:

> "an employer can not set up in mitigation of damages in a tort action by an injured employee indemnity from a collateral source, such as insurance or compensation or benefits under **a Workmen's Compensation Act, even where the defendant has contributed to the fund.**"…this is so because back pay awards not only serve to make a victim whole, **they also "deter future discrimination."…**it would be "less costly for the employer to wrongfully terminate a protected employee." (emphasis added)

Allowing a set-off for OWCP benefits must not be allowed in this case because the primary purpose of the discrimination laws, i.e., to financially pressure and deter the conduct of the discriminatory decision-maker-tortfeasor must be made a practical reality.

### *Defendant's cited cases*

The decisions in the Smithsonian's cited cases in its brief were made at the discretion of the individual judges.  The appellate courts held that the trial courts had discretion to make their decisions.  As the defendant's brief highlights, the cases taken as a group, simply and

myopically focus on the fact that the defendant paid the benefit [*See Pollard, McLean & Giles, infra]* without any of the above *Neal* analysis as to the "character of the benefit."

Also, almost all of the cases concern "disability retirement benefits," and they do not concern "workers' compensation benefits" that are medically evaluated on a yearly basis for reduction, removal, vocation rehabilitation and other work alternatives. *[See infra, section VI: 5 USC §8123; 5 USC §8128; 5 USC §8104; 5 USC §8106]*  <u>*No case cited by the defendant shifts the risk to the Plaintiff and assumes that Plaintiff will be receiving uncertain and non-existent future workers' compensation payments that can be used as a set-off.*</u>  For example, the cases that the defendant cites to support its "lifetime workers' compensation" set-off argument have the following results:

*Davis v. Odeco*, 18 F.3d 1237, 1245, fn. 31 (5th Cir. 1994).  This case dealt with a disability benefit and not with yearly uncertain workers' compensation payments.  The court did do a *Neal* character of the benefit analysis, and found that the disability plan was a collateral benefit.  The court held:

> "We share the district court's concern that requiring Murphy Co. to pay both Plan premiums and Davis' past and future medical expenses (as part of Davis' damage award) appears to be making Murphy Co. pay twice for the same injury in contravention of a fundamental policy underlying the collateral source rule…As noted above, however, when the benefit at issue was established and funded by the employer as additional compensation (i.e., as a fringe benefit), refusing to deduct benefit payments from the plaintiff-employee's damage award does not make the employer pay twice---any more than refusing to set off the employee's salary would make the employer pay twice."

*Pollard v. Dupont De Nemours, Inc.*, 338 F. Supp.2d 865, 874, 884 (W.D. Tenn. 2003).  This case dealt with a disability retirement pension and not with workers' compensation; unlike Dr. Norden, Ms. Pollard testified that she could no longer work anywhere.  Ms. Pollard testified:  "she would not be able to return to work at DuPont…[and]

does not believe she is able to work somewhere else." Ms. Pollard's psychologist testified that: "Dr. Farmer believes Plaintiff would become suicidal if she were forced to return to work at DuPont or elsewhere." Id. 874. The court did not do a *Neal* character of the benefit analysis, and simply held that: "The incapability supplement has been funded solely by DuPont." The Court also made the <u>error</u>, discussed *supra in Section III(B),* by stating: "Plaintiff would not receive this benefit if she had continued to work and receive a salary from DuPont through age 65." Id. 884. *[See Knafel & Hamlin, supra, section III(B)]*

*McLean v. Runyon*, 222 F.3d 1150,1156 (9th Cir. 2000). This court did not do a *Neal* character of the benefit analysis. It simply and incorrectly adopted the myopic view that: "the collateral source rule does not apply when the benefit is derived from the defendant himself." The court acknowledged in footnote 9 that its ruling, applied to other cases, may have the potential to frustrate Title VII's deterrent purpose. *[See Plaintiff's deterrence argument, supra.]*

*Giles v. GE*, 245 F.3d 474 (5th Cir. 2001). This case dealt with a fixed disability retirement pension and not with yearly uncertain workers' compensation payments. The court did not do a *Neal* character of the benefit analysis and focused on GE as the source of the benefit. Compare *Giles* to *Arneson v. Callahan*, *Acting Commissioner of the Social Security Administration*, 128 F.3d 1243, 1448 (8th Cir. 1997) [Section VIII., *infra*], which also dealt with a fixed disability retirement pension (for a federal employee) and did do a character of the benefit analysis: *"...Arneson has unquestionably contributed to his CSRS disability retirement fund...the payments to Arneson from the CSRS disability fund were made to carry out a social policy wholly independent of back pay."*

*Conclusion as to workers' compensation payments*

Thus, for all of the above reasons, the collateral source rule applies to Dr. Norden's OWCP payments and excludes any set-off from front or back pay:

1) Because Dr. Norden contracted for and gave consideration for the insurance protection of her right to OWCP payments.

2) Because the OWCP payments are exclusively for the DHF injury and represent a Smithsonian benefit of capped exposure to DHF liability; and because the OWCP payments are not paid to relieve the Smithsonian of the "injury" caused by the Smithsonian's violation of the discrimination laws.

3) Because the Smithsonian's discrimination caused the necessity of the OWCP benefits and the inability of Dr. Norden to return to work at the Smithsonian, and therefore, the Smithsonian is bootstrapping in asking for a set-off for the results of its own discriminatory conduct.

4) Because the primary purpose of deterrence of the discrimination laws would be severely undermined by allowing the Smithsonian to use OWCP benefits that are fully paid by Congress under 5 USC section 8147(b) to offset the Smithsonian's discrimination.

## V.  INDEPENDENT OF ANY OTHER RATIONALE, THE SMITHSONIAN'S "UNCLEAN HANDS" PROHIBIT ANY SET-OFF.

Independent of any other rationale, this court has total discretion to disallow any equitable set-off for OWCP payments under Equity and/or The Doctrine of Unclean Hands. See: *Fogg v. Gonzales*, 492 F.3d 447, 456 (D.C. Cir. 2007), citing the Supreme Court:

> "*See Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814, 65 S. Ct. 993, 89 L. Ed. 1381, 1945 Dec. Comm'r Pat. 582 (1945) (doctrine of unclean hands "closes the doors of a court of equity to one tainted

26

with *__inequitableness or bad faith relative to the matter in which he seeks relief"__*).… the latter ground for decision was well within the district court's equitable discretion, *see id.* at 815 (unclean hands doctrine "necessarily gives wide range to…court's use of discretion in refusing to aid" litigant so tainted)" *(emphasis added)*

### *The Smithsonian's inequitableness or bad faith conduct*
### *forced the necessity of the OWCP payments and front pay.*

<u>First,</u> the defendant's 2003-2004 illegal failure to accommodate and illegal termination *[Collyer, Order 8/3/07]* literally forced Dr. Norden to remain on workers' compensation in order to survive. Dr. Norden's receipt of OWCP benefits and the Smithsonian's payment of those benefits was an active choice that the Smithsonian made instead of complying with their affirmative duty under 29 U.S.C. § 791 (b) and accommodating Dr. Norden. The defendant, and not Dr. Norden, made a choice between OWCP benefits and complying with the discrimination laws by providing reasonable accommodations to an <u>employee willing, able and desiring to work</u>. The defendant should be made to accept the consequences of its choice, and it should not be allowed a set-off for OWCP payments that it, and it alone, purposefully caused by illegally refusing to accommodate, and by illegally terminating Dr. Norden in 2004 in violation of the discrimination laws. *[Collyer, 8/3/07, Order]*

<u>Second</u>, the defendant's illegal discrimination also actually caused and/or severely exacerbated Dr. Norden's "Major Depressive Disorder" and "PTSD" rendering Dr. Norden unable to return to work at the Smithsonian. *[See Oberg, aff., ¶¶ 3-6, regarding Dr. Oberg's conclusion][See Plt. Ex. 6, Oberg Therapy Notes for 4/14/04 and 4/16/04 during the time the Smithsonian issued its discriminatory Return to Work Plan].* The Smithsonian's discrimination *[Collyer, 8/3/07, Order]* put Dr. Norden in such a position.

Third, as early as May 2003, Dr. Lawford and the Smithsonian knew and admitted that entomology is a very rare occupation and that Dr. Norden would have great trouble finding a new position.  See: Dr. Lawford's May 2003, memo to Dr. Oberg *[Plt. Ex. 3]:*

> "And what is to come of her career.  When the DOL decides it is time to send her to voc rehab, will she become a Delta Airlines gate agent for the rest of her life?  Being an entomologist is a very rare occupation.  If she were an HVAC tech the whole thing would be easier."  (emphasis added)

As Dr. Lawford states, not only did the defendant know that Dr. Norden would have great trouble finding a new position, but also defendant's own extraordinary behavior destroyed Dr. Norden's best chance of obtaining employment elsewhere.  It is uncontested that: 1) Dr. Norden sought to make her own accommodation by working at the USDA, 2) defendant approved the "loan," 3) the USDA received a grant to pay the majority of Dr. Norden's part time salary, 4) defendant failed to release Dr. Norden to the USDA once she was funded to work there.  The people who knew Dr. Norden well at the USDA have since retired.  The USDA management that went to the trouble of creating a job for her and acquiring funding for that job has shown no inclination to repeat its efforts.

### *The defendant  was also warned and had knowledge of the effects of its discriminatory conduct on the mental health of Dr. Norden*

Also, the Smithsonian had knowledge of what was happening to Dr. Norden based on the Smithsonian's discriminatory conduct prior to the Smithsonian implementing its "coup de gras" towards Dr. Norden with its Discriminatory/Retaliatory Return to Work Plan in April of 2004, and its Discriminatory/Retaliatory termination in October of 2004.  *[Collyer, 8/3/07 Order]*

In <u>April of 2003</u>, after Dr. Norden realized that the USDA transfer was not going to become a reality, Dr. Norden started seeing Dr. Oberg, her psychologist.  Dr. Norden was immediately diagnosed with "Major Depressive Disorder, Recurrent Severe without psychotic features," and "PTSD."  *[Oberg, aff., ¶¶ 1-2]*

In <u>May of 2003</u>, Dr. Lawford, MD "Occupational Medicine for the Smithsonian Institution, sent Dr. Oberg a memorandum summarizing Dr. Lawford's and therefore, the defendant's, knowledge of Dr. Norden's case to date.  In his memorandum, Dr. Lawford keenly observes and writes:

> "In Dec of 2002 her department notified her that they could no longer accommodate her working 20 hours a week, and that she should return home on workmens comp.  <u>While for some I have met, this would be a lifelong dream come true, it was the opposite for Beth.</u>  She has an active mind, publishes papers and is a scholar.  <u>Sitting at home is a real punishment for her</u>.  Comes the realization that even when she regains full stamina and could do 40 hours a week, the naphthalene will always be present and she can probably never go back to her career there.  This now casts a dark shadow over what he career will be, if it is to be at all.  <u>Its as major a life stressor as a divorce or a death in the family.</u>
>
> <u>There is a certain real negative aspect of being rejected by The Smithsonian Institution and being pushed out in the street</u>. …*Smithsonian professional feel a real pride in being a part of this noble institution and sharing academic camaraderie with their coworkers.  When they go to professional meetings, they make themselves an extra large badge that says in all caps 'Smithsonian.'* Being rejected and pushed away by those whom you had felt for years you were family with is –traumatic.  I have told Beth that it is analogous to Kubler-Ross' 'stages of death and dying.'  Disbelief, lets make a deal, anger, resignation, and finally acceptance.  I feel that Beth is still in the anger stage, <u>with a dollop of depression thrown in.</u>" *[Plt. Ex. 3]*

Thus, as early as <u>May of 2003</u>, the Smithsonian knew that Dr. Norden was seeing a psychologist, that Dr. Norden did not want to be on OWCP benefits, and that the Smithsonian's refusal to accommodate was causing Dr. Norden to suffer depression, rejection and severe stress.  Dr. Lawford, as the Smithsonian's physician, was fully kept

aware of Dr. Norden's DHF medical condition since 2000, *[Collyer, 8/3/7, Order]* and he knew that stress is a trigger for DHF and that DHF makes the patient more susceptible to the effects of depression.

In <u>November of 2003</u>, the Smithsonian threatened to remove Dr. Norden from the rolls. Dr. Norden again insisted that she could do the essential functions of her job with reasonable accommodations. The Smithsonian asked for updated medical information which was provided to Dr. Lawford from Dr. Oberg and from Dr. Granite.

**November 24, 2003, Oberg's response to Lawford**
In his <u>November 24, 2003</u>, letter to Smithsonian Dr. Lawford, Dr. Oberg wrote:

> "Dr. Norden has been under my care since April 30, 2003 to the present. We have met at least weekly for 90 minutes sessions. On intake I diagnosed Dr. Norden as having <u>Posttraumtic Stress Disorder in addition to also having the diagnosis of Major Depressive Disorder, Recurrent Severe-Without Psychotic Features</u>. ***These diagnoses are still active.***"

> "Dr. Norden has made great progress in treatment and I believe that returning to work would be highly therapeutic—under the right circumstances…Protection against agency/supervisor retaliation and hostility in the form of being assigned work less intellectually demanding than the work she performed prior to contracting DHF…This is particularly important <u>in that doing less intellectually demanding work in all likelihood will…deprive Dr. Norden of the intellectual stimulation essential to neurological recover, and…foster a sense of devaluation and punishment.</u>

> "Finally, given that the DHF made Dr. Norden vulnerable to a <u>depression which **was exacerbated by the workplace's failure to meet her needs during her last period of work."**</u> (emphasis added)
> *[Plt. Ex. 4]*

**December 23, 2003, Lawford's recommendation memo to Slomba**
In his <u>December 23, 2003,</u> Smithsonian Dr. Lawford wrote a memorandum to Smithsonian

Marilyn Slomba, "Labor Relations" and stated:

> "Dr. Oberg has (successfully) been treating her for a mental state of dysfunctionality caused by 'a state of devaluation' and her perception of

punishment by the combination of her disease and <u>her management's</u> <u>unacceptance.</u> He advised that for her to remain mentally health and fully functional, she should be given work that is as mentally demanding as the 'work she performed prior to contracting' her disease. He says that <u>'this is particularly important in that doing less intellectually</u> <u>demanding work in all likelihood will…deprive her of the intellectual</u> <u>stimulation essential to neurological recovery'</u> **and possibly resurrect** **her former mentally dysfunctional status.** Dr Oberg goes on to add that a successful return to work <u>will require absence of</u> <u>agency/supervisor retaliation and hostility.</u> (emphasis added)
*[Plt. Ex. 5]*

**8/3/07 Court's ruling on Smithsonian's discriminatory conduct**

The Court ruled on 8/3/07 as to the Smithsonian's blatant discriminatory/retaliatory response

to Dr. Norden despite the Smithsonian's possession of information from Dr. Lawford, Dr.

Oberg and Dr. Granite[4]:

- "the Smithsonian provides no rationale or excuse for the proposal's heavy handed features." p.32.
- "In short, the Smithsonian offered Dr. Norden an ersatz version of the accommodations suggested by her physicians." p. 34.
- "the requirement that Dr. Norden waive her right to challenge future adverse employment actions was oppressive and illegal." p 38.
- "Relegating her to the full-time cataloguing of insect specimens was demeaning and transparently punitive." p. 38.
- "One of the accommodations that Dr. Norden requested was met with a sham proposal (a 'flexible' schedule that was actually inflexible), and the other two request were simply ignored…" p. 34.

### *Conclusion as to Unclean Hands*

As the Court's 8/3/7 Order states, the Smithsonian's return to work plan of 2004

decreased the flexibility of her hours, decreased the intellectual stimulation necessary to

neurological recovery, increased her exposure to naphthalene, and dramatically increased her

sense of devaluation and punishment. In other words, fully aware that Dr. Norden was a

---

[4] *[Plt. Ex. 7, Dr. Granite's November 26, 2003, recommendation was for Dr. Norden to return to work with flex-time and limitations to naphthalene exposure.]*

Plaintiff's Reply Memorandum / Memorandum

vulnerable person who had already suffered greatly in the line of duty, defendant appears to have used her doctors' recommendations as a blue print for further methods of harming her, both physically and psychologically. Equity demands that the defendant not receive a set-off for such discriminatory conduct and its foreseeable consequences. Allowing the defendant's discrimination to actively cause the necessity of maintaining OWCP benefits, and the necessity of front pay, while allowing the defendant a set-off for the OWCP benefits, in effect rewards the defendant's discriminatory conduct. See *Knafel, supra*, refusing to condone such behavior.

Allowing such a result provides an avenue for the defendant to intentionally make the decision that it does not want "disabled employees" in its workforce, and that it is willing to accept the consequences of refusing to accommodate and of terminating its disabled workers, since: 1) Congress / The United States Treasury, not the Smithsonian, pays for the OWCP benefits, and 2) the Judicial System will guarantee that the OWCP benefits received by the disabled worker, <u>regardless of the circumstances or the defendant's discriminatory conduct</u>, will be fully set-off from the defendant's liability for back pay or front pay. This conclusion is evident from the defendant's Marylyn Slomba, Labor Relations, who told Dr. Norden that Dr. Norden was not harmed by being out of work because Dr. Norden was receiving OWCP benefits. *[Norden aff., ¶ 8]* This is not the attitude that the discrimination laws want the decision-maker-tortfeasor to maintain towards the victim. See: *Albemarle Paper Co., infra.*

Thus, based on Equity and/or the Doctrine of Unclean Hands, Dr. Norden respectfully asks this Court to rule <u>that in this case</u>, Dr. Norden's OWCP workers' compensation payments are not to be set-off against any liability of the Smithsonian for economic damages.

## VI.    UNCERTAIN AND NON-EXISTING FUTURE OWCP PAYMENTS SHOULD NOT BE USED AS A SET-OFF AGAINST BACK OR FRONT PAY.

Although defendant bears the legal burden of proof as to any claim for offsets, it assumes, without any legal or evidentiary authority, that Dr. Norden will be receiving OWCP payments until the day that she dies.    Defendant's entire brief depends on this unsubstantiated assumption.  *[Dr. Norden's life expectancy is approximately 82 years of age, Plt. Ex. 1, Gaskin's report]*    Needless to say the defendant offers nothing in the way of any court making such a ruling and/or shifting such risk to the victim of the discrimination.  None of the defendant's' cited cases (which almost exclusively deal with disability retirement benefits) shift the risk to the Plaintiff that uncertain and non-existing yearly future workers' compensation payment should be used as a set-off .  *[See discussion in section IV, infra, as to the Smithsonian cases as to front pay.]*

Moreover, "[t]he burden of establishing facts in mitigation of…pay liability is … upon the violator."  *Berger v. Iron Workers Reinforced Rodmen, Local 201,* 170 F.3d 1111, 1134 (D.C. Cir. 1999)   Nobody knows when the DOL will begin to move Dr. Norden off of OWCP benefits.  Nobody knows whether Dr. Norden will remain on or be thrown off of OWCP workers' compensation next year, let alone whether Dr. Norden will be allowed to remain on OWCP workers' compensation until the day that Dr. Norden dies as the defendant assumes.  OWCP payments are not a retirement plan.  *[See, infra: 5 USC §8123; 5 USC §8128; 5 USC §8104; 5 USC §8106]*

The Smithsonian's own doctor, Dr. Lawford, acknowledges the DOL's power to throw Dr. Norden off workers' compensation or to force Dr. Norden into "vocation rehabilitation" as Dr. Lawford fearfully acknowledges in his May 2003 letter to Dr. Norden's psychologist, Dr. Oberg:

"And what is to come of her career. <u>When the DOL decides it is time to send her to voc rehab, will she become a Delta Airlines gate agent for the rest of her life?</u> Being an entomologist is a very rare occupation. If she were an HVAC tech the whole thing would be easier." (emphasis added) *[Plt. Ex. 3]*

Dr. Norden applies for OWCP benefits each year, and each year the DOL judges her as meriting OWCP benefits in full, in part, or not at all. *[5 USC §8123; 5 USC §8128].* The OWCP benefits can be easily eliminated or reduced. As, Dr. Lawford states, 5 USC Section 8104 authorizes vocational rehabilitation for individuals suffering from "permanent disability."

Moreover, 5 U.S.C. Section 8106 authorizes alternative work for individuals suffering from "partial disability." Indeed, section 8106 paragraph (c)(2) states that:

"A partially disabled employee who refuses or, neglects to work after suitable work is offered to, procured by, or secured for him, is not entitled to compensation."

This literally means that if the DOL determines that Dr. Norden is partially disabled and secures a job for Dr. Norden as a Wal-mart greeter, and pays the difference between the Smithsonian's salary and what Wal-mart pays -- and Dr. Norden refuses -- OWCP has every right to cut off Dr. Norden's OWCP payments. Thus, under FECA, a 'partially disabled' individual offered any job that the DOL believes is appropriate, must either accept or the OWCP benefits are surrendered. Dr. Norden has no control or assurance over her future OWCP benefits or amounts, and neither does the defendant.

Also, defendant's desire for a ruling that sets off uncertain and non-existing future OWCP payments would make the insidious effects of the defendant's discrimination follow Dr. Norden for the rest of her life. A woman who is desperate to remain on OWCP for the rest of her life would be well advised to live the life of an invalid and perform work (let alone

pay in order to perform such work) that would suggest to the Department of Labor that she no longer qualifies for OWCP support. Although, after five years of seeking work in her field, Dr. Norden has been unable to find another position for a highly experienced entomologist specializing in aculeate Hymenoptera, Dr. Norden is still a capable scientist who has found other ways to contribute to the scientific community through her unpaid work. Both Dr. Norden and society as a whole are best served if Dr. Norden is allowed to continue her research in various forms even without pay, and very likely at her own expense for materials and facilities. Dr. Norden pays approximately $350.00 per week to perform research at the Archbold Research Station. She works there approximately four weeks per year and, of course, must also pay for her own transportation to and from Florida. The follow-up research and writing that Dr. Norden does once she returns home is essentially "free." *[Norden, aff., ¶¶12-13]* Defendant wants Dr. Norden to choose between burying her abundant talents or facing the very real possibility of the loss of any uncertain future OWCP payments, and the resulting impoverished old age. Such a result is not the intent of the make whole remedies of the Rehabilitation Act.

Finally, the defendant must bear the full risk of the unknown regarding future OWCP payments. This is true not only because the defendant carries the burden to establish set-offs, but also because the Smithsonian's illegal discrimination actually caused and/or severely exacerbated Dr. Norden's "Major Depressive Disorder" and "PTSD" *[Oberg, aff., ¶¶ 3-6]* rendering Dr. Norden unable to return to work for the defendant.[5] *[Oberg, aff., ¶¶ 8-11]*

---

[5] Even if Dr. Norden was hypothetically able to return to work at the Smithsonian, the defendant has demonstrated that it does not want Dr. Norden to return. Although at least one research Entomologist position, for which Dr. Norden was qualified, became vacant at the Smithsonian since the August 2007 ruling in this case, defendant did not inform or offer the position to Dr. Norden. *[Plt. Ex. 8] [Norden, aff., ¶ 11]*

The risk and uncertainty and the need of future OWCP benefits was created by the Smithsonian's discriminatory conduct. *[See also the doctrine of Unclean Hands, section V, supra. See Knafel, supra.]*

## VII.  UNCERTAIN AND NON-EXISTING FUTURE OWCP BENEFITS SHOULD NOT BE USED AS A SET-OFF AGAINST DR. NORDEN'S  RETIREMENT PENSION.

A retirement pension is a term of the employment, a fringe benefit, and deferred compensation to which Dr. Norden contributed each and every year in terms of making the maximum Thrift Savings Plan contribution. *[Dr. Norden, aff., ¶ 9]*   The Smithsonian does not dispute that a retirement pension is a collateral benefit *[See Restate 2nd of Torts 920A]* or that Dr. Norden's termination has resulted in damage to Dr. Norden's retirement pension calculated to start at 65 years of age, not as 62 as defendant's brief incorrectly states. *[See Plt. Ex. 1, Gaskin's report]*

What the Smithsonian argues however is that the if the court assumes that Dr. Norden will be receiving OWCP payments until the day she dies, then when Dr. Norden turns *65 years of age [Gaskin's report, retirement is at 65 years of age, Plt. Ex. 1]* she would not be able to stay on OWCP benefits and start collecting her normal FERS retirement benefit simultaneously.  Based on this irrelevant future scenario, the defendant wants a current set-off of the lifetime OWCP benefits, i.e., the defendant wants all responsibility for Dr. Norden's retirement pension damage eviscerated.   The response to this argument is straightforward:

### *Shifting the risk with unsupported assumptions*

1) The attempt by the Smithsonian to shift the risk and the lack of any legal or evidentiary support for such an assumption of lifetime OWCP payments has already been discussed. *[See section VI, supra]*  OWCP payments are not a retirement plan.

Plaintiff's  Reply Memorandum  / Memorandum

***Based on the Smithsonian's unlawful discrimination, Dr. Norden's retirement pension
has been turned into a present value <u>discrimination injury</u> in a discrimination case.***

2) Dr. Norden will not be making an election between OWCP payments and a retirement
pension at age 65, because Dr. Norden is seeking a current lump sum award of her
retirement pension, adjusted for all of the losses and lack of contributions caused by the
unlawful termination, and then discounted to its present value and <u>paid currently as a
damage award in equity for discrimination injuries.</u> *[See Plt. Ex. 1, Gaskin's report,
making such a calculation]*   Moreover, the Smithsonian's discrimination eliminated
reinstatement as an option for medical reasons, and thus, turned the "retirement
pension" into a liquidated discrimination injury and award.   *See: Neal, supra*, on
discrimination injuries standing on their own.  *See: "Unclean Hands" argument, supra*,
and *See Knafel, supra*, on the Smithsonian bearing responsibility for the outcomes
resulting from the Smithsonian's discrimination.

***The DOL itself does not determine or hinge its
OWCP "injury" payment on discrimination injury damage awards.***

3) FECA's exclusive-liability provision, 5 USC §8116, limits Dr. Norden's right to receive
compensation, but only as to her DHF "injury." However, the defendant is trying to do
an end run around the fact that:  "…harm as a result of Title VII discrimination is not
an **"injury"** within the meaning of FECA…" See: *Nichols v. Frank*, 42 F.3d 503, 515
(9th Cir. 1994).  Thus, even FECA does not authorize the right to stop or to set-off
benefits based on a present value award of damages in equity to a victim of
discrimination for discrimination injuries.   This is what the Smithsonian is trying to do.

Plaintiff's Reply Memorandum / Memorandum

**VIII.** **UNDER THE COLLATERAL SOURCE RULE, A "DISABILITY RETIREMENT PENSION" SHOULD NOT BE USED AS A SET-OFF AGAINST A BACK OR FRONT PAY AWARD**

In its brief, the defendant has hinted to putting Dr. Norden back on the rolls so that Dr. Norden can apply for OPM disability retirement, despite the passing of the OPM one year deadline.  *[Defendant's brief, Bottom page 7-8]* Of course, the Smithsonian cannot guarantee that OPM will approve a disability retirement benefit, especially since Dr. Norden can work with reasonable accommodations.  *[Collyer, 8/3/7, Order]* Apparently, through such a tactic, the defendant can strengthen its argument to the court that Dr. Norden will be on a disability retirement pension until the day that she dies.  *[Something the defendant can not do by any stretch of the imagination for OWCP payments. See section VI, supra]*

However, Dr. Norden does not want to retire at 56 years of age.[6]  Not only does Dr. Norden want to presently resume a career as an Entomologist, but also, intellectually stimulating work is highly therapeutic to Dr. Norden. *[Norden, aff., ¶10] [Oberg, aff., ¶ 7]* See also, November 24, 2003, Dr. Oberg letter to Smithsonian: *"I believe that returning to work would be highly therapeutic—under the right circumstances" [Plt. Ex. 4]* See also May of 2003, memo of Smithsonian Dr. Lawford, MD "Occupational Medicine for the Smithsonian Institution, to Dr. Oberg:

> "In Dec of 2002 her department notified her that they could no longer accommodate her working 20 hours a week, and that she should return home

---

[6] Since the defendant forced her back onto full time workers' compensation, Dr. Norden has worked on a volunteer basis through the USDA, the Archbold Research Station in Florida, and through a professional association of biologists in the Washington Metropolitan area.  Dr. Norden's work has required her to walk for hours across sand in Florida and to carry packs weighing in excess of 100 pounds for the USDA.  She has successfully completed all of her volunteer work in entomology and has published several papers as a result.  *[Norden aff., ¶¶ 12-13]*  Dr. Norden is on workers' compensation only because defendant chose to discriminate against her.

on workmens comp.  <u>While for some I have met, this would be a lifelong dream come true, it was the opposite for Beth.</u>  She has an active mind, publishes papers and is a scholar.  <u>Sitting at home is a real punishment for her</u>.  *[Plt. Ex. 3]*

However, since the issue of a disability retirement pension is certain to arise in future settlement discussions, Plaintiff asks the court to rule that the collateral source rule prohibits a set-off for any "disability retirement pension."  The case directly on point is *Arneson v. Callahan, Acting Commissioner of the Social Security Administration*, 128 F.3d 1243, 1448 (8th Cir. 1997), which involved a federal employee and where the court held that Arneson's disability retirement pension could not be deducted from his lost wages.  The court listed its reasons for refusing the set-off.  One of the underlying reasons was similar to Dr. Norden's case, i.e., that Arneson could work with reasonable accommodations. *[Collyer, 8/3/7, Order]* Arneson only took a disability retirement pension because the government's discrimination forced him to do so.

> "We affirm the district court's refusal to deduct Arneson's disability benefits from his back pay award because these benefits were from a collateral source and should not be considered interim earnings. *Cf. Eichel v. New York Central R.R. Co.*, 375 U.S. 253, 254, 11 L. Ed. 2d 307, 84 S. Ct. 316 (1963) (stating "respondent does not dispute that it would be highly improper for the disability pension payments to be considered in mitigation of" petitioner's damages). We believe Arneson's back pay award does not include monies for disability pension contributions that the SSA would have made but for Arneson's wrongful termination. Moreover, the disability benefits do not come entirely from Arneson's employer because <u>Arneson has unquestionably contributed to his CSRS disability retirement fund. Finally, the payments to Arneson from the CSRS disability fund were made to carry out a social policy wholly independent of back pay.</u>"

See also *District of Columbia v. Jackson*, 451 A.2d 867, 872, (D.C. 1982) rejecting the argument to bifurcate the portion paid by the employer: "We disagree…that courts should bifurcate their analysis of a benefit and allow a credit against the judgment for the percentage

traceable to the tortfeasor…"  The *Jackson* court did an excellent character of the benefit

analysis:

> "<u>The payments are retirement benefits, payable because of age or disability,</u>
> <u>and from a special fund derived in large measure from the contributions of the</u>
> <u>employees.</u> Such benefits are obviously not mere gratuities to injured persons
> paid on account of their injuries. Rather, the Government in its roel [sic] of
> employer has, like many other employers today, set up a retirement plan under
> which both the employees and the employer contribute. <u>These retirement</u>
> <u>payments are entirely separate from the Government's acknowledged statutory</u>
> <u>duty as tortfeasor to pay any injured person for particular injuries…The two</u>
> <u>types of payments come from different sources, since tort payments are made</u>
> <u>from general revenues, while retirement benefits, on the other hand, are from</u>
> <u>the fund created in part by the employees themselves.</u>" (emphasis added)

See: e.g., *Whatley v. Skaggs Cos.*, 707 F.2d 1129, 1138 (10th Cir. 1983):

> "The trial court's refusal to deduct plaintiff's disability benefits from
> defendant's back pay liability is likewise not error. Such benefits are from a
> collateral source, and offset is not required."), *cert. denied*, 464 U.S. 938, 104
> S. Ct. 349, 78 L. Ed. 2d 314 (1983)."

See, e.g., *Russo v. Matson Navigation Co.,* 486 F.2d 1018, 1020 (9th Cir 1973):

> "it was improper to consider the seaman's maritime [disability retirement]
> pension in mitigation of damages. The court found that, although all money in
> the retirement fund was contributed by the employer, the fund was established
> as the result of a contract between the employer and the union and was in the
> nature of a fringe benefit or deferred compensation. <u>In other words, the</u>
> <u>pension was a term of employment rather than an attempt by the employer to</u>
> <u>indemnify itself against liability.</u>" (emphasis added)

Therefore, **Dr. Norden** asks the court to rule that an OPM  disability retirement

pension is a collateral benefit and cannot serve as a source for any set-offs for either back or

front pay.

## IX.     DAMAGES ARE GROSS WAGES - NOT NET WAGES AFTER TAXES.

In its brief, the defendant states that the OWCP benefits are tax free, but then fails to advance the argument that it made at the March 28, 2008, status conference; namely, that the tax free nature of the OWCP payments leads to "a wash" in terms of the Smithsonian's liability for back and front pay. Nevertheless, the Plaintiff will put the issue to the court to eliminate this issue from arising again between the parties.

First, the amount of back pay owed by the Smithsonian is the gross amount not the net amount after taxes. Under federal law, back pay awards are taxable as gross income and taxable in the year when the award is received. See *United States v. Burke*, 504 U.S. 229, 119 L. Ed. 2d 34, 112 S. Ct. 1867, 1874 (1992).[7] Accordingly, in *Neal v. Director, District of Columbia*, 1995 U.S. Dist. LEXIS 11515, *25-26 (D.D.C. 1995), the court awarded the gross amount of back pay and refused to deduct any taxes, income or payroll:

> "The Supreme Court's explicit holding -- that back pay awards are taxable as gross income -- commits this court to treat income taxes the same as payroll taxes. Neither will be subtracted in computing the amount of back pay to which plaintiffs are entitled. The requisite subtraction will be discharged at the appropriate time -- undoubtedly with great relish -- by the relevant taxing authorities."

See also: *Robinson v. Southeastern Pennsylvania Transportation Authority*, 982 F. 2d 892, 898 (3rd Cir. 1993) ("…we remand to the district court with directions to reinstate the amount of the award reduced for payment of income taxes.") *Rasimas v. Michigan Dep't of Mental Health*, 714 F.2d 614, 627 (6th Cir.1983), *cert. denied*, 466 U.S. 950, 80 L. Ed. 2d

---

[7]     The Supreme Court decided *United States v. Burke*, 504 U.S. 229, 119 L. Ed. 2d 34, 112 S. Ct. 1867, 1874 (1992), holding that backpay awards under Title VII are taxable. Backpay awards are taxable in the year paid, *Tanaka v. Department of Navy*, 788 F.2d 1552, 1553 (Fed. Cir. 1986); *Blim v. Western Elec. Co.*, 731 F.2d 1473, 1479 (10th Cir.), *cert. denied*, 469 U.S. 874, 83 L. Ed. 2d 161, 105 S. Ct. 233 (1984); Rev. Rul. 78-336, 1978-2 C.B. 255.

537, 104 S. Ct. 2151 U.S. (1984)." ("Backpay awards should not be reduced by the amount of income and social security taxes which would have been deducted from the wages the claimant would have received but for discrimination.") See: *Commission of Internal Revenue v. Schleier*, 132 L. Ed. 2d 294, 115 S. Ct. 2159 (For federal income tax purposes, Plaintiff must include the back-pay award in gross income). See also *Johnson v. United States*, 76 Fed. Appx. 873, 877 (10th Cir. 2003) discussed below.

Second, the above tax analysis as to back pay also applies to front pay. Taxes are not taken out from front pay. The only exception is when front pay is being paid to a Plaintiff who post-judgment, *cannot work at all due to the discrimination that caused personal injuries as defined by IRS Code 26 USC section 104(a)(2)*. See *Neal, infra, citing to Commission of Internal Revenue v. Schieier,* 1995 WL 352847 (1995):

> "Front pay, however is "excludable [net of taxes] as being 'on account of personal injuries' as long as lost wage resulted from time in which the taxpayer was out of work as a result of her injuries…" [In *Neal,* "Plaintiffs' psychiatric expert, Dr. Ellen McDaniel, posited lengthy periods of time for plaintiffs to recover from the effects of harassment and retaliation."]

Unlike the situation in *Neal*, Dr Norden's PTSD and Major Depressive Disorder injuries do not prevent Dr. Norden from working. Dr. Norden can work. Dr. Norden simply cannot work for the Smithsonian because the Smithsonian now serves as a trigger for Dr. Norden's PTSD and her Major Depressive Disorder. *[Dr. Oberg, aff., ¶¶ 8-11]* Furthermore, Dr. Norden's post-judgment inability to work for the Smithsonian was caused by the Smithsonian through its blatant violation of the discrimination laws. *[Collyer 8/3/7, Order] [Dr. Oberg, aff., ¶¶ 3-6] [See also discussion of The Doctrine of Unclean Hands, infra]*

Dr. Norden will be asking the jury to award her a front pay award because of the defendant's discrimination and not because Dr. Norden cannot work due to personal injuries as defined in IRS Code 26 USC section 104(a)(2). See, e.g., *Johnson v. United States*, 76 Fed. Appx. 873, 877 (10th Cir. 2003), where the court specifically held that the front pay was the <u>gross amount</u> of the wages for the following reason:

> "The amount of back and front pay awarded was independent of Mr. Johnson's personal physical injuries. *See <u>Schleier</u>, 515 U.S. at 330*. Thus, Mr. Johnson received the front and back pay award because of his employer's discriminatory conduct, not "on account of personal physical injury." <u>26 U.S.C. § 104(a)(2)</u>."

Accordingly, as to Dr. Norden, both the back pay and the front pay should be the gross amount not subject to any reduction for taxes of any kind.[8] Dr. Norden's expert Mr. Rick Gaskins calculated the back and front pay as the gross amount. *[Plt. Ex. 1, See Gaskin's Expert Report of Damages]*    So did defendant's expert.  *[Plt. Ex. 9, See Defendant's Contee's Expert Report of Damages]*

**X.    THE EQUITABLE REMEDY OF ORDERING A TEMPORARY REINSTATEMENT SO THAT PLAINTIFF CAN APPLY FOR AN OPM DISABILITY RETIREMENT PENSION IS ONE OF THE MAKE WHOLE REMEDIES AVAILABLE TO DR. NORDEN IN THIS CASE AND IS NOT DEPENDANT ON DEFENDANT'S CONSENT**

Dr. Norden is past the OPM one-year deadline to file for OPM disability retirement. However, but for defendant's unlawful termination, *[Collyer, 8/3/7, Order]* Plaintiff would still be employed at the Smithsonian and would still have the option to apply for OPM disability retirement. *[Oberg, aff., ¶ 7]* Therefore, Plaintiff asks the Court to rule that the

---

[8]    <u>Incidentally</u>: 1) allowing a net of taxes award in this case would save the Smithsonian money because the Smithsonian since 2002, has not been paying Dr. Norden's salary and therefore would not be paying any tax difference to anyone, and 2) allowing a net of taxes award in this case would double tax the Plaintiff who is required by the IRS to include all damages awarded as gross income for tax purpose, and would also withhold from the Plaintiff the benefit of fully accumulating the pre-judgment and post-judgment interest on the outstanding gross amounts for both back and front pay.

equitable remedy of ordering a temporary reinstatement so that Plaintiff can apply for an OPM disability retirement pension is one of the make whole remedies available to Dr. Norden in this case and is not dependent on the defendant's consent.  See: *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763-64, 47 L. Ed. 2d 444, 96 S. Ct. 1251 (1976) (As part of its equitable powers under the Rehabilitation Act, a district court has broad discretion to fashion remedies to make the plaintiff whole for injuries resulting from a violation as required in the "circumstances of a particular case.")

**XI.    CONCLUSION**

    For all of the above reasons the Court should hold that:

1) Already paid OWCP payments should not be set-off against back or front pay.

2) Independent of any other rationale, the Smithsonian's "Unclean Hands" prohibit any set-off.

3) Uncertain and non-existing future OWCP payments should not be used as a set-off against any back or front pay.

4) Uncertain and non-existing future OWCP payments should not be used as a set-off against Dr. Norden's retirement pension.

5) Under the collateral source rule, a disability retirement pension should not be set-off against a back or front pay award.

6) Damages are gross wages – not net wages after taxes.

7) The equitable remedy of ordering a temporary reinstatement so that Plaintiff can apply for an OPM disability retirement pension is one of the make whole remedies available to Dr. Norden in this case and is not dependent on the defendant's consent.

Dated:   4/28/08                              Respectfully submitted,


                                             _____/s/   Alex Sliheet_____
                                             Alex T. Sliheet, D.C. Bar No. 438977
                                             Vickie Inge Fang, *pro hac vice*
                                             **Attorneys for Dr. Norden**
                                             8702 Nightingale Drive, Lanham, MD  20706
                                             alexsliheet@yahoo.com; fvickie@comcast.net
                                             (301) 552-4908; (301) 294-6839